UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---------------------------------------------X
UNITED STATES OF AMERICA

   -against-                                     Case No.: 1:24-cr-00265-TNM

ROBERT P. BURKE, et. al.
---------------------------------------------X

**DEFENDANT ROBERT BURKE'S MEMORANDUM IN RESPONSE TO MOTION FOR SEVERANCE**

Defendant Admiral Robert P. Burke, through his counsel, submits this Memorandum in Response to the Motion to Sever, filed by co-defendants Kim and Messenger. Defendant Burke joins in the application, but not in the reasoning.

**Preliminary Statement**

The Defendants in this case are charged with a bribery scheme, where the Government has alleged that Defendants Kim and Messenger, in their capacity as co-CEOs of Company A, bribed Admiral Burke by offering him a job in exchange for him granting Company A a contract with the Navy, along with additional counts related to Burke's representations to the Navy about his post-service employment negotiations. Notwithstanding the large volume of discovery in this matter, there is shockingly little evidence of criminality. For example, the bribery allegation relies almost entirely on the eyewitness testimony of a jilted ex-girlfriend, who is also a known and proven perjurer.

Notwithstanding the complete lack of incriminating evidence, co-defendants Kim and Messenger intend to present defenses that are so fundamentally conflicting and irreconcilable with Admiral Burke that there is a substantial danger that the jury will unjustifiably infer that this conflict alone demonstrates that all Defendants are guilty.

At issue in this case are unrecorded meetings between Admiral Burke and Defendants Kim and Messenger in which Kim and Messenger were trying to convince the Navy to contract with Company A.  The Government contends that at the July 23, 2021 meeting, there was an explicit agreement between the Defendants to link the awarding of a contract to an offer of post-service employment to Admiral Burke.  The only evidence of this alleged agreement is the deeply flawed eyewitness testimony of an individual identified as "Person 3" in the indictment, a biased ex-girlfriend[1] of the Defendant who has previously been found by a court to have committed perjury.

Although Kim floated the possibility of post-service employment at a second meeting, Admiral Burke rejected any formal discussion until after he had authorization from the Navy to begin such discussions. Admiral Burke is steadfast in his position that nothing improper was discussed at either meeting.  Contemporaneous written communications confirm that there was "zero" connection between any contract and potential post-service employment.

However, Kim and Messenger's motion indicates that these co-Defendants plan to take a starkly clashing position regarding this and other meetings, intending to claim that Admiral Burke was very open to formal employment discussions and led them to believe that such discussions were permitted and legal.  Shockingly, their moving papers fail to even address whether they intend to contest the Government's theory of a *quid pro quo*.

Oddly, Kim and Messenger go on to claim that such employment discussions were held at other meetings as well, in a seeming attempt to further inculpate Admiral Burke.

---

[1] At the time, Admiral Burke and his wife were going through the process of separating and commencing a divorce.  However, they since reconciled and never filed the divorce action.  This reconciliation led "Person 3" to become extremely bitter and vindictive. Given her history of committing perjury to try to hurt her ex-husband, it is unsurprising that she made the initial false complaint to initiate this investigation and prosecution.

2

However, these false claims are directly contradicted by the Grand Jury testimony[2] of another Government witness, who testified that no such improper discussion occurred.

Part of the issue here is that Kim and Messenger had sent messages to Company A investors after these meetings embellishing and even outright fabricating portions of the conversations to inflate their investor's confidence. This is consistent with Kim and Messenger's admitted practice of "Lying Hiding and Faking" within Company A. In an attempt to speak it into existence, they claimed they had "landed" a four-star "general" when they had not. Showing these misrepresentations to investors were bravado and not proof of bribery will be a cornerstone in the defense of Admiral Burke while impeaching the credibility of Defendants Kim and Messenger, who based on their filings, may plan to testify in their own defense in order to place all blame on Admiral Burke.

Although these messages conflict with the Government's witnesses in several material aspects, it appears that the Government may want to introduce at least a portion of these messages to support their theory. Given the dilemma that to properly contest the allegations in the indictment, Kim and Messenger may be required to admit that they misled investors, Kim and Messenger appear to have chosen to double down on their false claims.

While the moving papers are somewhat unclear, it appears that the co-Defendants intend to argue to the jury that at least a portion of the Government's allegations are accurate, but that they relied upon Admiral Burke's assurances that everything was legal, whereas Admiral Burke intends to argue that the Government's allegations are false and

---

[2] In fairness, Kim and Messenger filed their motion before the Government disclosed the Grand Jury minutes. It is possible that they did not know that the Government was not alleging any impropriety at this meeting when they fabricated this claim.

none of the Defendants committed the offenses alleged – two diametrically opposed positions.

This is a textbook example of mutually contradictory defenses, which warrants severance. Although Messenger and Kim's legal arguments also focus on the spillover prejudice, their false factual arguments are the actual basis for a severance.

## STATEMENT OF FACTS

The indictment in this matter contains numerous misstatements and apparent misunderstanding of the history of the interactions between the parties and the Navy.

### Contracting History

Admiral Burke served as the Chief of Navy Personnel (CNP) from May 2016 to June 2019. In this position, he was responsible for the Navy's overall manpower readiness. During this time, Admiral Burke became acquainted with Kim and Messenger, who were running Company A, offering leadership training and consulting.

Believing that Company A could potentially offer solutions for the Navy, Admiral Burke participated in the awarding of a contract to Company A for a pilot program.

Because Company A had no past experience in government contracting, they were not set up to bid on or receive government contracts. As is the common practice for new entrants into the market, their initial contract had to be run through an existing contractor as a sub-contractor. 13 CFR 125

Though Kim apparently believed that this pilot program could have turned into a $100 million Navy contract, this was never realistic, and the product failed to deliver results for the Navy. This was due, in part, to the fact that it relied upon a phone-based

4

app, which Navy personnel were unable to use, given restrictions on cell phone usage at sea and in classified spaces.  The pilot program was terminated by November 2019.

By the time the pilot program was cancelled, Admiral Burke had moved on to a new position as the Vice Chief of Naval Operations (VCNO).  Though this position is the second highest ranking officer in the Navy, the VCNO does not oversee any contracts and would have no involvement in any negotiations for Company A to work with the Navy.

As outlined in the indictment, Kim and Messenger attempted to contact Admiral Burke about reestablishing a business relationship with the Navy.  However, they were referred back to the contracting officer, as Admiral Burke had no involvement in his new position.  There was never any "order" prohibiting contact, but rather a referral to deal with the correct contracting official.

By early 2021, Admiral Burke had moved on to a new assignment as Commander, U.S. Naval Forces Europe and Africa ("NAVEUR-/NAVAF").  Kim and Messenger again reached out to try to reestablish a business relationship.  As Admiral Burke had moved on to a position that could engage in contracts and Admiral Burke personally believed in the promise of what Company A could provide, he began discussions, rather than refer them out, as he had as VCNO.

The parties held multiple meetings and discussions and eventually agreed to try another pilot program for $355,000 with the hope it would be a useful tool for the Navy.  Due to operational constraints, the pilot failed to produce results and Admiral Burke rejected options to extend or expand the contract, effectively cancelling it.

## Employment with Company A

As often happens between contractors and government officials, there were informal side conversations from the beginning about how long Admiral Burke had left

5

until retirement and whether he had thought about his next job after retirement. While Kim and Messenger appeared interested in hiring him, Admiral Burke deferred official discussions until May 2022, when he received authorization to have these discussions.

On May 13, 2022, Admiral Burke sent an email to Kim and Messenger informing them that "I have all my ducks in a row now with Navy to have discussions with you on employment." Bates DOJ-0000695900

Upon his retirement, Admiral Burke went to work for Company A. However, he quickly became disillusioned with the company, working there for less than four months in total.

Of particular concern to Admiral Burke was Kim's efforts to have him participate in an event where Company A intended to tour the United States Space Force Headquarters and tout their services to their personnel. Admiral Burke declined and reminded Kim that he was prohibited from engaging in any such activities during the "cooling off period," going so far as to question whether this was the intention of Company A in hiring him and expressing willingness to decline the offer if that was in fact the case. Bates DOJ-0000691645. This conversation occurred following Admiral Burke's permission from the Navy to engage in official negotiations with Company A but before his actual start date with Company A.

This email exchange on September 9, 2022 raised Admiral Burke's concerns about the lack of ethics at Company A, while simultaneously raising concerns with Messenger and Kim that Admiral Burke would not be able to produce the government contracts they were hoping for. When assured that he would not be asked to do anything prohibited and that he was valued for his leadership experience, Admiral Burke continued forward with the planned post-retirement employment with Company A.

Part of the corporate culture at Company A included an approval from the highest levels of Company A that to get ahead or stay ahead you should lie, hide and fake until you no longer have to.  Shockingly, in a publicly available video of a leadership speech that Defendants Kim and Messenger gave in 2018 to the Air Force Academy, Messenger described herself as "the best LHF (Lying, Hiding, Faker) you could find," comparing herself to the lead (criminal) character in the movie "Catch Me If You Can."[3] While Messenger then spoke about the importance of moving past this lying, hiding and faking to become more authentic, the experience at Company A and the discovery in this case demonstrate that Messenger and Kim have not yet followed their own advice.

This dysfunctional corporate climate finally began to implode, as evidenced when Messenger emailed Kim on January 16, 2023 raising concerns that Burke may discover that Company A really didn't have any business and he may "tell everyone." Bates DOJ-0000697809.  Admiral Burke, having only been with Company A for approximately 3 months began to suspect there was a severe lack of substance and he quickly came to the realization that he did not want to be associated with Company A which caused him to submit his resignation on January 17, 2023, to be effective on January 31, 2023. Admiral Burke had no further contact with Company A until investigators contacted Company A about Admiral Burke and they relayed this to the Admiral.

## Person 3

While the above outlined fact pattern certainly raises ethical questions, the reason this failed business relationship has been elevated to a federal criminal case are the efforts of Person 3.

---

[3] youtube.com/watch?v=VE5q-ACxZ30  "Charlie Kim & Meghan Messenger Talk Leadership and Employee Development at NCLS 2018"

7

From review of the initial half million pages of discovery turned over thus far, it appears the investigation that eventually led to the indictment in this case stemmed from a Department of Defense (DoD) Inspector General (IG) complaint by Person 3 following Admiral Burke's abrupt ending of his romantic relationship with Person 3 in December 2021. Person 3 has been found to be a perjurer, the trial court in her Virginia divorce and custody case in 2009 finding her "not a credible witness" and to have "repeatedly misrepresented facts to the court on even the most basic matters." Va.Ct. App. Feb. 26, 2013. In that case she in fact subjected her minor daughter to unthinkable psychological damage in an attempt to destroy her former husband and gain control and custody of the child. As Person 3 has proven herself to be not only untruthful but lacking in basic morals, her recitation of "facts" should never be relied upon.

In her zeal to exact revenge on Admiral Burke, Person 3 lied, as is her custom, about the meeting on July 23, 2021. By embellishing certain elements of the conversation, Person 3 was able to recast an entirely legal conversation into a criminal transaction. With her prior perjury finding undisclosed to investigators Person 3 misled the IG and the FBI as to her credibility in all matters, instead reinforcing her senior position within the DoD as a false mantle of credibility.

## LEGAL STANDARD

This Circuit explained in *United States v. Tarantino*, 846 F.2d 1384, ( D.C. Cir. 1988):

> Severance may also be required in cases in which co-defendants rely on defenses that are mutually contradictory. The denial of a severance motion generally constitutes an abuse of discretion when 'the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.

8

*Id.* at 1399 (internal quotations omitted); *quoting United States v. Wright*, 783 F.2d 1091, 1094 (1986); *Rhone v. United States,* 365 F.2d 980, 981 (D.C. Cir. 1966)).

> ...the accounts of co-defendants be not merely divergent from one another but indeed "so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency. To warrant a severance, in short, the accounts of co-defendants must be on a collision course.

*United States v. Haldeman*, 559 F.2d 31, 71 ( D.C.Cir. 1976), *quoting United States v. Bolden*, , 514 F.2d 1301, 1310 (1975).

## ARGUMENT

### Co-Defendant's Intended Defense is on a "Collision Course" with Burke's Defense, Warranting Severance.

As outlined in their moving papers, Co-Defendants Kim and Messenger intend to advance a theory of the defense that is on a collision course with Admiral Burke's defense. Defendants will not merely be presenting contradictory evidence at trial but will be actively attempting to impeach each other's credibility.

Worse, while Admiral Burke contends that none of the Defendants committed any wrongdoing, co-defendants Kim and Messenger have shockingly stated in their moving papers that part of their defense is to try to convict Admiral Burke.  While Admiral Burke's defense will be presenting evidence on how all actions were legal, Kim and Messenger will present the opposite defense that actions were illegal but that they were unaware, these defenses cannot be reconciled or presented simultaneously without the obvious inference that someone is lying, and it is likely an improper inference will be made that it is Admiral Burke's defense.  As they correctly noted,[4] the 9th Circuit explained such a situation in *United States v. Tootick*, 952 F.2d  1078, 1082 (9thCir. 1991):

---

[4] Co-defendants also cited additional persuasive cases in Section II of their argument, which we will not repeat here, but adopt and incorporate by reference.

9

> Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant. In order to zealously represent his client, each codefendant's counsel must do everything possible to convict the other defendant. The existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor.

This Circuit has less case law on the issue of defense counsel becoming the "second prosecutor," although it was addressed briefly in *United States v. Wright*, 783 F.2d 1091, 1096 (D.C. Cir. 1986)). In *Wright*, the issue appears to have been raised after trial and the Circuit examined the trial record but found that the co-defendant's counsel had conducted only minimal cross-examination, none of which addressed the appellant's defense and was therefore insufficient to support a "second prosecutor" argument.

In this case, the issue is being raised pre-trial with both counsel outlining significant cross-examination issues to be anticipated. Co-defendants have stated that they intend to argue that they are not guilty of bribery because "it was reasonable for them to rely in good faith on Burke's representation that Company A was not a 'defense contractor'[5] and, accordingly, he could act as their ambassador in connection with their relationship with the Navy."

The proffered defense, on its face, puts co-defendants in the position of pushing a jury to convict Admiral Burke on all counts, making them the textbook "second prosecutor" warranting severance.

---

[5] Because of their lack of experience and understanding about the basics of government contracting, it appears that Kim and Messenger are confusing the issues here. As outlined in the Statement of Facts, Company A was unable to contract directly with the Navy until they had established a pattern of past performance and needed to have their contracts run through an existing contractor. This was the only reference to Company A not being a "defense contractor." Bribery, on the other hand, is unlawful whether you are a defense contractor or not.

Co-defendants motion fail to address how this proffered defense, even if true, would exculpate them from a charge of bribery. Advice of co-defendant is not an affirmative defense recognized under the law and while this false theory, if true, may be relevant as mitigation at sentencing, it is not a proper trial defense. This could, potentially even lead to litigation where co-defendants move to preclude each other from raising certain defenses. This alone warrants severance, as Kim and Messenger's inadvisable intended defense will substantially increase the likelihood that all defendants will be convicted.

Moreover, given the issues raised in the moving papers, it does appear that at least one of the co-defendants intends to testify in their defense. Counsel for Admiral Burke would need to conduct a lengthy cross-examination of either of these co-defendants to undermine the credibility of the messages to their investors. Although Admiral Burke's theory of the defense is that none of the defendants committed the offenses charged, the cross-examination necessary for either of these parties will increase the likelihood of conviction.

**Conclusion**

Admiral Burke did not engage in any criminal activity and the discovery produced by the Government has failed to produce any "smoking gun" that makes conviction likely. The biggest risk of conviction in this case is the stated intent by Kim and Messenger to pursue a defense that is on an absolute collision course with both Admiral Burke and the truth. Their decision to become the "second prosecutor" raises a substantial likelihood that a jury will convict based on the irreconcilable defenses. As this Circuit has stated, it would be an abuse of discretion to deny severance where "'the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably

infer that this conflict alone demonstrates that both are guilty." *United States v. Tarantino*, 846 F.2d 1384, 1399 ( D.C. Cir. 1988).

For these reasons, Defendant Burke respectfully submits that this Court should sever his case from that of his co-defendants, together with such other and further relief as this Court deems appropriate.

Respectfully submitted,

/s/ Timothy C. Parlatore

Timothy C. Parlatore
Parlatore Law Group, LLP
*Counsel for Admiral Robert P. Burke*
260 Madison Avenue, 17th Floor
New York, NY 10016


/s/ Antoinette O'Neill

Antoinette O'Neill
Parlatore Law Group, LLP