# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 24-265 (TNM)** |
| **v.** | : | |
| | : | |
| **ROBERT P. BURKE,** | : | |
| | : | |
| **YONGCHUL "CHARLIE" KIM, and** | : | |
| | : | |
| **MEGHAN MESSENGER,** | : | |
| | : | |
| Defendants. | : | |

## UNITED STATES' CONSOLIDATED
## RESPONSE TO DEFENDANTS' MOTIONS TO SEVER

The United States of America, by and through its undersigned attorneys, hereby opposes Defendants Yongchul "Charlie" Kim's and Meghan Messenger's Joint Motion to Sever (ECF No. 27) and Defendant Robert P. Burke's Response also seeking severance (ECF No 44).    Severance is not appropriate because, among other reasons: (1) the evidence against each of the defendants is equally damaging; (2) the defendants' defenses do not conflict nor are they irreconcilable—they each deny a *quid pro quo*; (3) to the extent there is any minimal prejudice, a jury instruction is the appropriate remedy.    The defendants are properly joined in the charged conspiracy and bribery offenses, and the law compels that they be tried together.    Because the defendants fail, both legally and factually, to meet their heavy burden of establishing that there is a serious risk of prejudice from a joint trial, and that no less drastic measure than severance is available, both motions should be denied.

## I.   LEGAL STANDARD

Rule 8(b) of the Federal Rules of Criminal Procedure provides that two or more defendants may be charged in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."   Fed. R. Crim. P. 8(b).   Rule 8(b) embodies the "preference in the federal system for joint trials of defendants who are indicted together."   *Zafiro v. United States*, 506 U.S. 534, 537 (1993).   Joint trials of defendants who are indicted together are preferred because "[t]hey promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."   *United States v. Tucker*, 12 F.4th 804, 824 (D.C. Cir. 2021) (quoting *Zafiro*, 506 U.S. at 537).[1]

Federal Rule of Criminal Procedure 14 permits the Court to sever properly joined defendants "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."   *Zafiro*, 506 U.S. at 539; Fed. R. Crim. P. 14(a).   "[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."   *Zafiro*, 506 U.S. at 540.

Severance may be appropriate under two exceptional circumstances: (1) the evidence against a co-defendant is "far more damaging" than the evidence against the moving defendant, or (2) "defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty."   *United States v. Tarantino*, 846 F.2d 1384, 1398, 1399 (D.C. Cir. 1988).[2]   It is the moving defendant's burden to

---

[1]   No defendant appears to dispute that the defendants were properly joined in the first instance.

[2]   Kim and Messenger, relying on *United States v. Gooch*, 665 F.3d 1318, 1336 (D.C. Cir. 2012), identify three types of prejudice which may warrant severance.   *See* ECF No. 27-1

demonstrate that joinder of defendants is prejudicial *and* that severance is the appropriate remedy. *See United States v. Gooch*, 665 F.3d 1318, 1326 (D.C. Cir. 2012) ("The defendant carries the burden of demonstrating prejudice resulting from a failure to sever, but such a showing does not result in an automatic grant of the motion.") (citations omitted).

In particular, courts are reluctant to sever defendants charged together in a single conspiracy. *See United States v. Ford*, 870 F.2d 729, 731 (D.C. Cir. 1989) ("The joinder presumption is especially strong where . . . the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve two defendants who are charged . . . with participating in the same illegal acts."); *United States v. Gray*, 173 F. Supp. 2d 1, 5 (D.D.C. 2001) ("[J]oint trials are the preferred method when multiple defendants are connected by a single alleged conspiracy."). Co-conspirators are properly charged together where there is "substantial and independent evidence of each defendant's significant involvement in the conspiracy." *United States v. Moore*, 651 F.3d 30, 96 (D.C. Cir. 2011) (quoting *Tarantino*, 846 F.2d at 1399).

Ultimately, whether to grant severance is committed to "the sound discretion of the trial court." *United States v. Mejia*, 448 F.3d 436, 446 (D.C. Cir. 2006) (internal quotation marks omitted). Moreover, even "[w]hen the risk of prejudice is high," severance is not necessarily required because Rule 14 "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 539. Regardless of why a defendant seeks severance, the primary inquiry is the degree to which the defendant will be prejudiced by a joint trial (the risk of prejudice must be substantial) and the secondary inquiry is whether the risk of

---

at 11-12. However, the third type—that "the defendant may become 'embarrassed or confounded' in presenting different defenses to the different charges"—only applies to severance of *charges*, not severance of defendants. *See Gooch,* 665 F.3d at 1336. It is therefore not relevant to this analysis.

prejudice can be adequately alleviated through "less drastic measures, such as limiting instructions," and it almost always can.   *Tucker*, 12 F.4th at 825 (internal quotation marks omitted); *see also Tarantino*, 846 F.2d at 1398 ("[J]ury instructions generally are sufficient to minimize" risk of prejudice due to "any disparities in evidence.").   For this reason, "[s]everance is the exception rather than the rule," and such motions should be granted "sparingly."   *Tucker*, 12 F.4th at 825 (internal quotation marks omitted).

## II.   BACKGROUND

### A.   The Indictment

On May 30, 2024, a federal grand jury sitting in the District of Columbia returned a five-count Indictment charging Defendants Robert P. Burke, Yongchul "Charlie" Kim, and Meghan Messenger with conspiracy to commit bribery, in violation of 18 U.S.C. § 371 and two counts of bribery, in violation of 18 U.S.C. § 201.   In addition, Burke was charged with a criminal conflict of interest, in violation of 18 U.S.C. § 208(a) and a scheme to conceal material facts, in violation of 18 U.S.C. § 1001(a)(1).   *See* ECF No. 1.

As alleged in the Indictment, Kim and Messenger, co-CEOs of Company A, and Burke, a four-star U.S. Navy Admiral, engaged in a scheme in which Burke agreed to provide a government contract from his command, U.S. Naval Forces Europe and Africa, in exchange for Kim's and Messenger's offer of future employment at Company A with a starting salary of $500,000 plus other benefits.   It was also part of the scheme for Burke to use his position, authority, relationships, and influence to help Company A convert the contract with Burke's command into larger contracts with the United States Navy and a Foreign Military, worth "triple digit millions." Burke accepted Kim and Messenger's proposal and, in December 2021, ordered his Navy staff to provide a contract for Company A.   The following spring, Burke, concealed the *quid pro quo*

from the Navy to create the false impression that his job offer from Company A did not arise until May 2022—when, in fact, the bribe was offered and accepted months earlier.   In the fall of 2022, Burke started working at Company A.

> B.  The Evidence

The evidence against each of the defendants is equally damaging and there is no "dramatic" disparity in the evidence against each defendant.

> i.  Company A Tried and Failed Repeatedly to Catch the "White Whale"—a Long Term, Durable Contract from the U.S. Armed Forces.

Company A has two businesses, an e-commerce platform that provides discounts on retail products for companies to offer their employees (Business 1) and a more recent effort to sell leadership training programs that used proprietary mobile apps (Business 2).

At least as early as June 2015, Kim and Messenger relentlessly pursued contracts with the U.S. military in order to obtain a marquee client for Business 2.   Indeed, Kim became obsessed with convincing high-ranking U.S. Navy officials to hire Company A, including Burke.   Kim stated that a business relationship with the Navy would launch Business 2, which had never (and has never) been profitable.   For example, in an email to an investor, Kim described a conference that he and Messenger had attended with Burke, noting that the "Navy was the most popular people" at the conference and that, after a kind word from Burke, he [Kim] and Messenger were subsequently "swarmed" with big business representatives "saying 'if the navy does it, we're all doing it.'"

In 2018, Company A subcontracted with a U.S. government prime contractor, Company B, to provide pilot program training for Burke's command at that time, which was known as OPNAV N1.   At that time, Burke was Chief of Naval Personnel (CNP) and his command essentially functioned as the Navy's human resources department.   The subcontracts tested

whether Company A's training services would be useful to the Navy's training and education enterprise.   They were not.

*First*, a core part of Company A's product to the Navy was their proprietary mobile application.   However, Company A never went through the Federal Risk and Authorization Management Program (FedRAMP) authorization process, which would allow their application to be downloaded onto government devices.   As a result, in order to use Company A's application, Navy personnel were instead asked to install Company A's application on their personal device. Unsurprisingly, many refused to do so.

*Second*, the application required wi-fi connection and access to a mobile device—something not readily accessible on a submarine 400 to 500 meters under the sea, an aircraft carrier in the middle of the Pacific Ocean, or in secure facilities or military bases where personal devices are not readily accessible or, in some cases, permitted, such as in a Sensitive Compartmented Information Facility.

Consequently, the Navy did not exercise an option to extend the subcontract with Company A and, by November 2019, their business relationship with the U.S. government ceased.   In total, Company A was paid approximately $2.75 million by Company B, which was far below the $10 million Company A could have earned pursuant to the subcontract.

After their subcontract was terminated, Kim and Messenger were desperate to salvage their goal of securing the Navy as a client for Business 2 and reached out to Burke (rather than a government contracting officer) via email.   At that time, Burke had been promoted to Vice Chief of Naval Operations (VCNO), the second-highest ranking uniformed officer in the Navy, and he did not respond to their attempts.   Kim's and Messenger's assistant replied all to the same email asking for a good time for Burke to meet with Kim and Messenger to discuss the contract.   This

forced a Captain subordinate to Burke to reply, "[g]iven Admiral Burke's role and the upcoming contracting actions, it is best that [Company A] and he not have contact at this time."   Refusing to follow the Navy's guidance, Kim forwarded the email chain to Burke's personal and official email accounts, leaving out the Captain, and said, "will stand by until we hear from you."

Months went by without a word from Burke.   In June 2020, Kim emailed the Navy Admiral who had replaced Burke as Chief of Naval Personnel.   Kim acknowledged that he and Messenger were not permitted to talk to Burke, and requested "any indication/insights into our status with the Navy," adding, "[u]nclear where things are now?"   The Admiral responded only by referring Kim the Navy's Contracting Office.

Kim and Messenger continuously chose to violate the Navy's directive not to contact Burke.   In September 2020, Kim emailed Burke at his official Navy email address for "insights or guidance" about their efforts to obtain a Navy contract for Company A.   Burke, then Commander, U.S. Naval Forces Europe and Africa, and headquartered in Naples, Italy, responded that he would get back to Kim and Messenger, but never did.

Kim and Messenger pressed Burke relentlessly.   On February 20, 2021, Kim again emailed Burke, asking to connect for "at least an hour or so to catch up," and promoting Company A's training program.   Four days later, not having received a response, Kim emailed Burke again, stating, "I know you must be very busy," but requesting "an hour of your time[.]" Burke finally responded that an aide would schedule a meeting "in the next week or two."   On March 5, 2021, Kim, copying Messenger, again emailed Burke, this time to invite Burke and his wife to attend the opening of Company A's new headquarters in New York City that summer, and offering to pay for first class plane tickets and accommodations.   Burke declined.

  *ii. Kim and Messenger's Desperation Led Them to Propose a Quid Pro Quo.*

  Kim and Messenger were desperate for a breakthrough with the Navy and settled on a new tactic for generating business—dangling a future financial incentive.   For instance, in March 2021, Kim and Messenger emailed a former Navy Rear Admiral that was currently working for the U.S. Navy at the United States Naval War College.   Kim, forwarding an email about the Company A's failed 2019 Naval engagement, wrote "not sure what you are up to these days.   If you get a chance, read the attachment, would love your thoughts. See below."   Kim went on to write, "we had an interesting discussion w/ [] to create a JV [joint venture] of former military officers to work to continue to upgrade the Navy/AirForce etc… We see this as a potential win win win, doing the work you love, helping the Navy/military you love and also being able to make a lot of money.   Per $100mm contract we would share $10mm."   The recipient of the email responded to the email but ignored the joint venture offer.

  On April 9, 2021, Kim and Messenger had a virtual meeting with Burke and some of his staff, including Person 2, Burke's Executive Director and the most senior civilian employee at the command.   Person 2, who had worked for Burke when Company A provided the pilot program, described the meeting as a "sales pitch" that did not change Person 2's opinion that Company A's offerings were not appropriate for the Navy.   Even so, Kim subsequently told investors that they "were finally able to engage with Bob Burke," who "wants to re-up our engagement for HR software."   In the same email to investors, Kim further claimed that he raised and Burke showed interest in Company A's "joint venture" during this April 9 meeting: "[B]efore [Burke] left told him about our JV with ¾ start Navy and AF veterans… that on $100MM we would give $10MM," which, as Kim explained in his email, would address retired officers' "FINANCIAL NEEDS (income needed after leaving military)."   Kim also reported that, in the meeting, following the

discussion of the joint venture and the financial incentives, Burke pitched himself as an "ambassador/custodian" for Company A.

On April 20, 2021, Kim and Messenger had an approximately one hour follow-up meeting with Burke via WhatsApp.   There is no evidence that anyone else from the Navy joined the private call.   Within hours of this meeting, Kim wrote to Company A personnel that it was the "the highest stakes meeting to date and the tiniest wrong move would/could lose all trust-come across slimy." Kim wrote that Messenger said she "felt slimy" during the call because Burke "*wants to work for us but we're asking for a deal first*," whereas Kim had been "nervous but calm."   (Emphasis added.)

Within two weeks of the April 20 meeting, Burke ordered Person 2 to explore options for securing a contract for Company A, and reported to Kim and Messenger that Person 2 was "working options and angles hard for funding our project[.]"   Kim and Messenger reported to an investor that Burke would work to get a $50 million contract to Company A through Burke's command, and added that Burke wanted to work at Company A.   However, unlike his prior internal company email, Kim's external message did not reveal that the two items were tied together or, as Messenger would later put it, "no contract no job."

On May 10, 2021, Kim, with Messenger copied, emailed Burke stating that a $20 million contract "is what would make the most sense inclusive of the technology, programs and support." In a follow-on email to Company A personnel, Messenger explained that they wanted a $20 million rather than $50 million contract because it would "look like we are taking advantage of Burke." In other words, Kim and Messenger realized that they now had significant leverage over Burke— the potential of a lucrative job offer.

      *iii.   The Conspirators Cemented the Quid Pro Quo in Person during Lunch in Washington, D.C.*

As of mid-July 2021, Burke was still "working on getting a contract in place."   Kim, who regularly emphasized the need to move quickly to secure deals for Company A,[3] asked Burke if he would be in D.C. to attend an upcoming retirement party for a senior enlisted Navy leader. Burke replied that he was planning on attending the event and proposed that he, Kim, and Messenger meet for lunch.

Burke invited Person 3, a Defense Department employee with whom he was in a relationship, to also attend the lunch.   On July 23, 2021, prior to the lunch, Burke texted Person 3 and said that Kim and Messenger "want to have a more intimate conversation" and "Meghan [Messenger] already talking about [a] job."

According to Person 3, during the lunch, Kim began to talk about a contract between Company A and the Navy.   On a napkin, Kim sketched his proposal—a contract for Company A, followed by a six-month period in which Burke would remain in the Navy to promote Company A, and the resulting compensation package, including both salary and stock options, for Burke when he joined Company A after the Navy.   Person 3 later recreated Kim's napkin diagram from memory:

---

[3]      For example, in one email concerning Company A's efforts to get a contract with a foreign military service, Kim advised a colleague about dealing with the military: "[B]e aggressive . . . find opportunities to strike asap vs later.   Things always go wrong later.   Momentum now always key."



The next day, July 24, Burke texted Person 3 that "Charlie [Kim] sent me a note . . . . I asked him to write out a job description – but I've essentially agreed to work for them . . . ."   Burke also described employment at Company A as a "real offer" that would get him "out of the DoD rut."   When Person 3 asked about the stock part of the offer because "[i]t was hard to hear with '500k base salary' ringing in my ears," Burke replied, "10% [ownership] in total co[mpany] … junior coowner behind Meghan [Messenger] . . ."   When Person 3 asked the extent to which the job was "tied" to the Navy contract, Burke answered, "technically – zero," but that Kim wanted Burke to be able to provide a "personal testimonial" about Company A's services.   In other words, to provide the "personal testimonial," Burke would need a new contract in place as something he could later sell to the larger Navy and other branches of the Armed Forces.

Kim and Messenger also memorialized their lunch meeting with Burke.   Kim emailed senior Company A personnel and reported, "Burke. Crazy day. Five hours. He would have stayed

all night if we stayed. In short [a contract] starting with his command almost ASAP." In the same email, Kim said that they had also discussed Burke coming to work at Company A after his retirement and including "salary equity etc." Kim reported that Burke was "very excited" and "wanted to resign next week," but Kim "[t]old him to hold off and first launch this part 1." Here, Kim emphasized that Company A's new Navy contract (part 1) was a necessary predicate to the job at Company A. Kim included a similar description of the arrangement in an email to investors, outlining a "3 phase" plan: "Navy relationship is progressing into 3 phases. In Phase 3, 4-Star Navy Admiral Burke is looking to join Next Jump as a full-time employee in July 2022 (please keep this information as privileged and confidential)."

Similarly, after the lunch, Messenger emailed members of her family, further showing that the lunch participants understood that Burke would give Company A a government contract and subsequently go to work for Company A:

> [T]he longest day of my life in DC . . .*[Company A] getting small few million-dollar deal with burke for navy europe deal to prove the result to then get bigger deal and offered Burke full time offer wants to be [with Company A] starting next July.* Surreal. A 4stsr [sic] working for us when he retires . . . longest day but worth it.

(Emphasis added.)

On August 26, 2021, about a month after the lunch meeting, Burke sent the Secretary of the Navy a memo requesting voluntary retirement in May 2022

> iv. *Company A's Training Product was so Bad that Burke Almost Failed to Deliver the Government Contract.*

During the summer of 2021, records show that Company A was still developing the application it intended to sell to the Navy as part of the deal with Burke. In late August, Company A sent the product to Burke to "test drive." Meanwhile, Messenger emailed Company A personnel and stated that the latest proposal to Burke was for a $1 million contract, substantially

less than the $20 to $50 million they had envisioned that spring.   Messenger explained, "We don't want Bob [Burke] to get off the hook…the $ amount is less significant at this stage [ . . . .] IN our POV [point of view] the contract size is less important than the things it triggers (including being able to say we're in partnership with the navy)[.]"

But the results of Burke's "test drive" were not good.   On September 22, 2021, Burke emailed Kim and Messenger that Company A's custom application "in and of itself does not stand on its own" and that Company A's "app-based approach" "just does not seem to be sustainable or scalable for us [the Navy]."   Burke concluded, "I just can't do this as structured."

The next day, September 23, Kim, copying Messenger, replied to Burke's email, claiming that he had not "had a chance to digest/ read your note below" (when, in fact, Kim had forwarded Burke's email to Company A personnel shortly after he received it expressing that Burke's comments about their app were "very embarrassing").   Without addressing any of Burke's substantive comments, Kim asked Burke to come visit Company A in New York City.   Burke replied that "mid-November" was a possibility and tentatively agreed to visit Company A.

*v.   "Back into Business with the Navy"*

On November 16, 2021, Burke visited Company A.   Burke told Person 3, who traveled to New York with him, that he was meeting Kim and Messenger.   This time, however, Person 3 was not invited.   When he returned after several hours from meeting with Kim and Messenger, Burke told Person 3 that Kim and Messenger had sweetened the job offer by increasing Burke's equity stake in Company A.

Kim later described the November 16 meeting in an email to Company A personnel, noting that Company A was about to be "back into business with the Navy":

> Meghan and I met for a little over 4 hours today with Admiral Burke. In short, we're about to go full force back into business with the Navy. We have 4 of his

senior most people coming in 2 weeks to our LAcademy.[4] They will be the drivers of the pilot program. Within one week of LA, he is going to propose back a ~$1MM engagement with [Company A] with goal of having it signed before Xmas. We will likely launch in the new year, the work will be in Naples, Italy and Rota, Spain. We will likely engage our entire Partners team to help with the coaching and training of the pilot Sailor population.

Two days later, Messenger commented to Kim via email: "Weird to think Burke gonna be on our team likely next summer eh[.]"

In early December 2021, four officers under Burke's command attended Company A's Leadership Academy.  Kim described Company A's strategy in an email to an associate that indicated the government contract and Burke's later employment at Company A were foregone conclusions:

Within one week of academy these 4 leaders are going to be tasked with how and what they need our help with. Contract signed before Xmas and then we're off to the races, ideally tangible success by March. Present April/ may for all navy deal to 640k sailors and 5000 commands globally. Then Burke ideally leaves navy joins [Company A] somewhere between July-oct next year in nyc.

>    vi.   *Burke Ordered His Staff to Give a Government Contract to Company A in Blatant Disregard of Basic Procurement Practices.*

On December 15, 2021, a Company A employee reached out to Burke's staff seeking hotel recommendations for the company's team traveling to Naples, Italy, and Rota, Spain.   The Navy staff member forwarded the email to Person 2, who replied, "why are they coming? We have no contact[5] with them.   Do not think it's appropriate to task anyone if this is personal support." Person 2 also wrote, in another email chain concerning the hotel request, "Comptroller is

---

[4]      This is a reference to Company A's "Leadership Academies"—retreat-style gatherings at which Company A would offer no-cost "coaching" to select "leaders" including members of the United States Armed Forces.

[5]      Person 2 sent a follow up email stating, "I meant to say contract not contact."

researching possible vehicles, but we don't even have proposals . . . I'm not sure how to stop this direct communication between he [Burke] and them [Company A]."

On or about December 15, 2021, Burke ordered Person 2 to get a contract to Company A to provide training to Burke's command.[6]   In response, Person 2 instructed Burke's staff to implement the order.   In a later email string among Burke's staff, one person commented, "I'm sorry, but I really don't like the pricing. They are screwing us."

On December 20, 2021, Burke emailed Kim and Messenger reporting that his staff did not think it could get the contract in place in time for the projected January 10 start date.   Kim replied immediately suggesting contracting through Company B—the same contractor used in 2018 for the pilot program—"for the sake of speed."

Burke forwarded Kim's response regarding Company B to Person 2.   The next day, officials under Burke's command developed a Performance Work Statement—which specifically named Company A and its proprietary app as the performance objectives for the contract—for awarding a training contract for Company A's services.   In other words, Burke's command issued a procurement request in such a way that guaranteed Company A would receive the subcontract from Company B.   The value of the contract was approximately $355,000.

On December 22, 2021, Company B signed the subcontract for Company A's services and the U.S. government moved the funds for payment.   On December 23, a Company A employee, reporting on comments received from Company B, said: "[Company B has] worked with

---

[6]     Notably, Burke's command was already contracted with a company to provide leadership training through a program called "Outward Mindset," which, according to multiple U.S. Navy officials, was in place throughout the Navy and would be available over the course of many years.   The total value of the "Outward Mindset" contract was approximately $150,000.   In other words, Burke ordered his staff to implement a contract with Company A to provide services that his command was already receiving.

government for many years.  They were SHOCKED how fast this moved."   In the same email, the employee cheered, "That is what happens when a 4* admiral is calling the shots."

> vii.   *Kim, Messenger, and Other Members of Company A Traveled to Europe to Train Members of Burke's Command.*

Company A's training occurred in January 2022.   Company A made lavish travel arrangements, ultimately spending around $90,000 for its personnel to travel to Italy and Spain.[7] While in Italy, Kim and Messenger socialized with Burke outside of Company A's training, including a $544.66 dinner out with Burke and his wife that Kim paid for with his company credit card.

The training provided by Company A was, for the most part, poorly received.   In one email chain, for example, an officer under Burke's command faulted the lack of time to meaningfully prepare for the training, stating, "[t]he biggest issue was that due to contracting rules, we didn't find out that this was going to happen until the week prior – so there was very little time for planning or preparation."   Burke, who was also on the emails, added, "I agree – we rushed into it."

Sailors who took Company A's training also submitted evaluations.   While the reviews were not universally bad, much of the feedback was decisively negative:

| Evaluation Question | Sailor Response |
| --- | --- |
| How would you improve this course? | -   "Bring in reputable leaders. Primarily people who have served or have some idea of what the military is about and how our lives are. These instructors have no perspective and lead this like we were children . . ." <br> -   "Remove any marketing or sales pitches." <br> -   "I don't think the team knew the audience We are not motivated or impressed with money, that is not why we serve, so 400 USD an hour does nothing for me other than think we wasted a lot of money.   I thought it was irresponsible to bring up and share their demons with a class full of strangers.   That was a room full of war |

---

[7]     Company A recouped about $12,000 of those expenses from the government.

| | | |
|---|---|---|
| | | fighters that have seen and been a part of horrific events and the Navy has paid licensed professional to help deal with the trauma. All you managed to do is piss us all off.   The training missed the mark." |
| | - | "Do not conduct this course.   Considering we had a world-class Cross-Fit instructor explicitly flown out only for a 20-minute cross-fit session, he could have at least provided some instruction instead of just telling people to do pushups, squats, and jump squats." |
| | - | "Course seemed thrown together at the last minute . . . Instructors should know more about our organization before teaching . . ." |
| | - | From a Rota attendee: "Charlie said the feedback from Naples was overwhelmingly positive – it makes me wonder if the Naples team received a different course than us . . . (or if Charlie lied, hid, or faked the real feedback)." |
| Why did you attend? | - | "Because it was mandatory" (Multiple such responses) |
| What aspects were most useful or valuable? | - | "I don't understand still exactly what was in it for me? . . . seems like a waste of time, money, and resources." |
| | - | "The whole course could be reduced to ~1.5 hours for this." |
| | - | "None." |

Based on the negative feedback, Person 2 terminated the program before Company A could extract further funds from the U.S. government.   In the end, after Company B extracted their fees, Company A received approximately $257,000 from the contract.

> *viii.   Despite the Poor Reviews and His Statement that He "Rushed Into" the Contract, Burke Promoted Company to Senior Navy Leaders Before Retiring and Accepting the Job at Company A.*

In the spring of 2022, Burke promoted Company A to a senior Navy official responsible for Navy-wide personnel training, and to a senior Admiral of a Foreign Military.   First, Burke, via email, introduced Kim and Messenger to another four-star Admiral whose role was to "train, certify, and provide combat-ready forces" to the entire Navy.   In the email, Burke promoted Company A and how it could be a good fit for the U.S. Navy.   The email was consistent with Kim's and Messenger's stated goal of obtaining a larger "all-Navy deal" following the "proof of concept" contract with Burke's command.   Second, Burke emailed the senior Admiral of a Foreign Navy, claiming that Company A's training program was helping his sailors personal

development side—a claim that was at odds with the negative reviews of the sailors who attended the training.

### ix. Burke Concealed the Quid Pro Quo from the Navy.

In March 2022, Burke requested from an ethics official under his command a "'generic' legal opinion letter" on seeking employment outside of the U.S. Navy." Burke also falsely claimed: "[T]o date, I have had no conversations, have no intent to aim for a specific company, and most likely will not actively seek employment until after 1 July."

Later, in May, Burke emailed the ethics official claiming that Company A had "just approached" him regarding post-government employment. Burke also falsely stated that he "let them know I could not" engage in employment conversations with them because he had not yet completed required ethical "prerequisites." Burke also falsely stated, with respect to the contract he had recently ordered for Company A, that the decision to contract with Company A was "through the ED [Person 2]," and not made by Burke himself.

On May 9, 2022, Burke signed a memorandum with the subject line "DISQUALIFICATION STATEMENT (EMPLOYMENT)." The memorandum falsely stated, among other things,

> "I anticipate commencing discussions related to employment with the company listed below, [Company A]." In accordance with section 208 of title 18 of the United States Code, and Section 2365.604 of title 5 of the Code of Federal Regulations, I am disqualified from participating personally and substantially as a government officer or employee in any particular matter that would have a direct and predicable effect on the financial interest of [Company A] . . ."[8]

Burke attached this disqualification memo to an email to Kim and Messenger and, despite the

---

[8] Despite Burke's voluntary "disqualification" from matters affecting the financial interests of Company A, as of May 25, 2022, Burke was still promoting Company A to foreign military leaders.

frequent communications throughout 2021 concerning Burke's employment at Company A discussed above, claimed to Kim and Messenger, "I have all my ducks in a row now with Navy to have discussions with you on employment." Everyone on the email knew that the discussions had already occurred and that no one on the email had waited for Burke to get his "ducks in a row" with the Navy.

On May 24, 2022, Kim and Messenger sent Burke a formal job offer. The compensation package mirrored what Kim and Messenger had offered Burke nearly a year earlier at their July 2021 lunch in D.C.—an annual base salary of $500,000 per year plus stock options in Company A.

> x. *Burke Briefly Worked at Company A Before Resigning When His Relationship with Kim and Messenger Soured.*

Burke retired from the Navy on August 1, 2022. He started work at Company A on October 1, 2022. His relationship with Kim and Messenger soon soured. Five days after Burke's start at Company A, Messenger texted Kim, expressing her frustration with how their deal with Burke had unfolded—specifically, she said that she had "been shoving down my anger except 1 outburst saying *no contract no job*. Go screw. The contract doesn't even cover 1 year salary. Feeling played." (Emphasis added.)

Four months later, in January 2023, Messenger emailed Kim hypothetical "Negative Predictions" for the upcoming year. Messenger's email exhibited her fears that Company A would collapse, investors and other naysayers would tear her and Kim apart, and it included the following in a section called "Burke":

> Burke - tells everyone Meghan and Charlie have no clue what they are doing, I got duped into a job, a facade of a successful company from the outside but nothing on the inside. They had no clue what doing and never did and sold beyond what capable of, borderline criminal. Meghan is a hot head, a figure head and has no leadership skills. *She baited me into a military government contract for a job offer.* Moved to nyc expenses ridic for a joke. The investigation goes through and he retires a 2-star blaming the whole thing on Meghan that *I baited him into a contract*

*for a job offer*, then brought my parents to visit him which I promoted and talked about and is big part of how this thing got out of control. She cares more about how she looks and spends more time dancing inappropriately than anything else. No clue how she got away with it for so long.

(Emphasis added.)   Kim did not dispute Messenger's well-founded fears and instead responded, "Wow that's a lot of detail."

On January 3, 2023, Kim and Messenger realized that, for the first time, Burke had seen the company's financial statements, which showed that Business 2's only client—ever—was the Navy.   Kim wrote to Messenger, "I'm assuming when seeing Biz 2 rev.   Total rev vs. the navy he sees how far reaching were for $100mm."   Messenger responded, "Yeah think he already knows that from shareholder deck our entire first slide is about the navy deal. And what happened as in that's the only biz2 client."   Messenger went on to write, "Yeah I was feeling that when we share the shareholder meeting despite no financials it shows navy navy navy and clearly Burke knows what happened. I feel exposed to them both our business and why listen."   Kim wrote back, "the navy one I wasn't concerned about because that was the truth he knew."   Messenger responded, "They don't know our cash so that has to make them question how we can afford this space so that's the part they prob don't get how we are f[u]nding all this."   Kim then said, "I'm sharing so we're not caught off guard.   Our tone can be smarter knowing this too."

On January 17, 2023, Burke resigned from Company A.   Ultimately, Burke received gross compensation of about $125,000 from Company A.

## III.   ARGUMENT

All three defendants have moved to sever their trials—Kim and Messenger jointly request a separate trial from Burke, and Burke, for his own reasons, desires a separate trial from Kim and Messenger.   None of the defendants have carried their heavy burden to establish sufficient prejudice to justify the extreme remedy of severance.

> A. *The evidence against Kim and Messenger is equally as damaging as the evidence against Burke.*

Kim and Messenger argue that they should have a separate trial because the evidence against Burke is far more damaging than the evidence against them.[9]   Their arguments are unsupported by the facts and the law.

*First*, Kim and Messenger claim the need for severance because Burke is charged separately in Counts Three, Four, and Five, and the evidence offered in support of those counts will cause prejudicial spillover.   However, the fact that Burke is charged separately in some counts is not a basis for severance.   *See United States v. Eiland*, 406 F. Supp. 2d 46, 53 (D.D.C. 2005) ("[T]he number and nature of the crimes vary among defendants.   This difference, in and of itself, does not require severance.").   And, in any event, evidence to support the Counts for which Burke is separately charged is admissible in the government's case-in-chief against Kim and Messenger.

*Second*, Kim and Messenger fail to establish the "dramatic" disparity of evidence the law requires to justify severance.   *See Tucker*, 12 F.4th at 825.   "Disparity in evidence requires severance when the evidence against one defendant is 'far more damaging' than the evidence against the moving party, but will not require severance in a conspiracy trial when there is 'substantial and independent evidence of each defendant's significant involvement in the conspiracy.'"   *Id.* (quoting *Moore*, 651 F.3d at 95-96).   To the extent that any disparity in the weight of the evidence risks prejudice to Kim and/or Messenger, the risk is not so great as to outweigh the strong presumption in favor of trying coconspirators together.   "[S]everance is not required even if prejudice is shown."   *Id.* (internal quotation marks omitted).   "[E]ven in cases

---

[9]   Burke does not appear to seek severance on this basis, only relying on the "irreconcilable defenses" prong.

where the risk of prejudice is high," the preferred remedy is to alleviate that risk through jury instructions.   *Id.*

Here, there is "substantial and independent evidence of each" of the defendants' "significant involvement in the conspiracy."   *See id.* (quoting *Moore,* 651 F.3d at 95-96).   Kim and Messenger's emails show they wanted a Navy contract for Company A at all costs (because Business 2 was in dire financial condition), and in Burke, they targeted a pliant and high-ranking officer, on the verge of retirement and seeking a golden parachute, to accomplish their goals with sufficient "speed."

In addition to instigating the conspiracy through his relentless and proscribed direct contact to Burke in late 2020 and early 2021, Kim put the scheme in plain terms in a July 2021 email to investors, describing three "phases": first, Company A would obtain the pilot program in Burke's command; next, Company A would turn this into an "All-Navy" deal; finally, Burke would join Company A.   As to the third phase, Kim asked investors to keep this "privileged and confidential."   Kim described the same in an email to Company A personnel immediately after his and Messenger's July 2021 lunch with Burke in D.C.—specifically that they (Company A) "would be starting with [Burke's] command almost ASAP," that Burke would later come work for Company A, and added that Burke was "very excited" and "wanted to resign next week," but Kim "[t]old him to hold off and first launch this part 1 [the contract]."

Kim repeatedly mentioned "the contract" and bringing Burke on as a Company A employee in the same breath, including in his November 2021 email to an associate explaining the outcome of Kim and Messenger's November 16 meeting with Burke: "Contract signed before Xmas and then we're off to the races … Then Burke ideally leaves navy joins [Company A] somewhere between July-oct next year in nyc."   In this January 2022 email, Kim laments Company A's paltry

contract, but affirms his commitment to giving Burke a job offer.   Further, according to Person 3, it was Kim who outlined the bribe scheme in explicit terms on a napkin during the conspirators' lunch in Washington, D.C. in July 2021.

So too does the evidence show Messenger's substantial participation in the scheme. Many of the inculpatory emails in this case were signed "Charlie & Meghan" or "Meghan & Charlie."   In each critical meeting with Burke, Kim and Messenger were both present.   Kim wrote that Messenger "felt slimy" during their April 20, 2021, meeting with Burke because "he wants to work for us but we're asking for a deal first."   And Messenger admitted, twice, in private messages to Kim that she understood they bribed Burke.   In October 2022, a mere two days after Burke began working at Company A, Messenger referenced an outburst in which she yelled "no contract no job."   And in her January 2023 "Negative Predictions" email, she wrote, referring to herself from Burke's perspective: "She baited me into a military government contract for a job offer."   Kim put the pieces of scheme in writing, but it was Messenger who said the quiet part out loud.

While Kim and Messenger make much of the fact that Burke is charged separately in two counts which relate to his specific obligations as a public official and his efforts to conceal the scheme from the government, they ignore that the conspiracy included the defendants' efforts to conceal the scheme, and that there is evidence that Kim and Messenger both knew of and tried to assist in concealing the scheme.   In May 2022, after Burke ordered the contract and while he was preparing to take the job at Company A, Burke emailed Kim and Messenger the "Disqualification Memo" in which he falsely claimed that he had not previously had employment discussions with Kim and Messenger.   Only thereafter did Kim and Messenger send Burke the formal job offer in writing—even though they had talked openly about Burke joining Company A for more than a

year.   In other words, because it is probative of their state of mind (and consciousness of guilt) among other things, the conduct underlying these counts against Burke is also relevant and admissible evidence on the conspiracy and bribery counts against Kim and Messenger.

*Third*, to the extent there is a disparity in the evidence between the defendants, it is minimal, at best, and does not support severance.   Indeed, the degree of disparity of evidence required to support severance must be "dramatic."   *Tucker*, 12 F.4th at 825.   Only "dramatic" disparities create impermissible risk of "spillover prejudice"—namely, the risk that "the jury would use evidence of one defendant's guilt against another."   *Id*.   Despite Kim and Messenger's claim to the contrary, evidence against Burke as to Counts 4 and 5 will be neither the bulk of nor "the most damning" of the government's evidence against the defendants.   *See* Kim/Messenger Br. at 16.   It is unlikely that a jury would be confused that evidence that Burke violated his ethical obligations must therefore mean that Kim and Messenger are complicit in the bribery scheme.   To the extent there is a risk or prejudice, the Court can instruct the jury that it must consider the evidence against each defendant separately.[10]   *See Tucker*, 12 F.4th at 825 ("[V]arying roles played by members of a conspiracy will 'not render joint trial inappropriate as long as the jury can reasonably compartmentalize the substantial and independent evidence against each defendant.'" (quoting *United States v. Straker*, 800 F.3d 570, 628 (D.C. Cir. 2015) (per curiam)).

*Fourth*, the cases that Kim and Messenger rely on do not support severance here.   *See Zafiro*, 506 U.S. at 540-41 (Petitioners showed no "legally cognizable prejudice" from joint trial where government "offered sufficient evidence" against each defendant, therefore district court's

---

[10]   For similar reasons, it is difficult to see how Kim and Messenger would be prejudiced by Burke's relationship with Person 3, as they argue, as that relationship was clearly personal to Burke.   As Kim and Messenger claim, they were not even aware of that relationship.

denial of motions to sever was proper); *United States v. Jett*, 908 F.3d 252, 276 (7th Cir. 2018) (holding that the complaining defendant "cannot overcome [the] preference" for jointly tried coconspirators); *United States v. Slade*, 627 F.2d 293, 310 (D.C. Cir. 1980) ("The record simply does not show that [moving defendant's] conviction was prejudicially based on evidence against his co-defendants.").

Nor do they cite cases that found severance warranted in circumstances analogous to this case. That is, the two cases that Kim and Messenger cite where severance was proper do not stand for the proposition that Kim and Messenger advance. *See* Kim/Messenger Br. at 17 (citing *United States v. Mardian*, 546 F.2d 973 (D.C. Cir. 1976) and *Gray*, 173 F. Supp. 2d at 1). In *Mardian*, the moving defendant (Mardian) was charged in a Watergate-related conspiracy and was not charged in any substantive counts. 546 F.3d at 977. Mardian made a "substantial pretrial showing" on a motion for severance that, due to his quite minimal involvement in the conspiracy, he would be prejudiced by the evidence against his codefendants. *Id.* at 979. Nevertheless, the district court denied Mardian's motion, relying on "the general rule that defendants jointly indicted should be tried together." *Id.* (internal quotation marks omitted). The D.C. Circuit held that the district court's pretrial denial was proper, concluding that Mardian's "substantial pretrial showing" was still "not so compelling that it was clear Mardian's interest in a separate trial outweighed these interests favoring joinder." *Id.* But the D.C. Circuit ultimately reversed Mardian's conviction due to the prejudice he suffered—not from a joint trial—but from the unexpected hospitalization of his lead attorney. *Id.* at 979-80. Upon his attorney's hospitalization, Mardian again moved to sever his trial and the government did not oppose, but the district court denied this motion to sever as well. "This ruling was in error." *Id.* at 980.

*Gray* involved a "mega-trial" of many defendants, so some severance of the defendants

was inevitable.[11]  173 F. Supp. 2d at 8.   The task before the court was the manner in which it should split up the defendants based on various types of possible prejudice.   *Id.*   Though several defendants sought a grant of severance based on disparity of the evidence, "none of the defendants [] made a valid claim of prejudice based on disparity of the evidence." *Id.* at 15.

Most notably, Kim and Messenger did not cite a single severance case holding that jury instructions were insufficient to cure whatever prejudice was associated with a joint trial.[12]   Nor did they cite a single case in which severance was granted in circumstances similar to this case. There is a reason for this—severance is rare, a remedy of last resort.   Accordingly, Kim and Messenger have failed to carry their burden to establish sufficient prejudice to justify the extreme measure of severing their trial from Burke's.[13]

> B.   *The defendants' prospective defenses are not so "conflicting and irreconcilable" as to warrant severance.*

The defendants all claim that there was never a *quid pro quo*—in other words they all advance the same ultimate defense.   Such defenses are not "conflicting and irreconcilable."

"While there are situations in which inconsistent defenses may support a motion for severance, the doctrine is a limited one."   *United States v. Haldeman*, 559 F.2d 31, 71 (D.C. Cir.

---

[11]   *Gray* also involved the need to select a "death-qualified jury," 173 F. Supp. 2d at 15-18, a source of potential prejudice obviously inapplicable here.

[12]   Kim and Messenger cite *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977) and *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974), in support of the proposition that jury instructions will be insufficient to cure any prejudice here, but neither case deals with severance of joint trials or the specific type of prejudice about which Kim and Messenger complain.

[13]   Because Burke does not advance the argument that the evidence against Kim and Messenger is far more damaging than the evidence against him, the government will not address any possible disparity in the evidence as to him, except to say that, as is clear from the Background section, there is also substantial and independent evidence of Burke's participation in the conspiracy.

1976).   A defendant seeking severance on this basis must show more than "some hostility" between defendants and "more than the fact that co-defendants whose strategies were generally antagonistic were tried together."   *United States v. Gilliam*, 167 F.3d 628, 635 (D.C. Cir. 1999) (internal quotation marks omitted).   To warrant severance, the respective defenses must be "not merely divergent from one another" but "so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency."   *Haldeman*, 559 F.2d at 71 (internal quotation marks omitted).   "Even where codefendants implicate each other, their defenses are not necessarily mutually antagonistic, and even when they are mutually antagonistic, they are not necessarily improperly prejudicial."   *Gilliam*, 167 F.3d at 635 (D.C. Cir. 1999); *see also Haldeman*, 559 F.2d at 71 ("The mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another have both been held to be insufficient grounds to require separate trials." (Internal quotation marks omitted)); *see also Zafiro*, 506 U.S. at 538 (1993) ("Mutually antagonistic defenses are not prejudicial *per se*.").   Again, the key inquiry is whether a defendant is improperly prejudiced by the inconsistency of the defenses alone, and whether that risk of prejudice is so great that the only available remedy is severance.

To the extent that defendants' respective defenses even conflict here, they are not "[m]utually antagonistic defenses."   *See Gilliam*, 167 F.3d at 635.   Kim's and Messenger's stated defense is that they relied on assurances from Burke that they could discuss future employment with him.   *See* Kim/Messenger Br. at 19.   By contrast, Burke states only that he "will be presenting evidence on how all actions were legal."   ECF No. 44 (Burke Br.) at 9.   Thus, the root of Burke's argument to sever is that Kim and Messenger will point the finger at him, which somehow "will substantially increase the likelihood that all defendants will be convicted."   *Id.* at 9-10.   And Burke suggests that if either Kim and Messenger chose to testify, he would be forced

to "conduct a lengthy-cross examination" of them to "undermine the credibility" of their many emails.   *Id.* at 10.

This argument fails because Burke is "not entitled to severance merely because [he] may have a better chance of acquittal" in a separate trial, *Zafiro*, 506 U.S. at 540, or because his codefendants may seek to implicate him to exculpate themselves, *Gilliam*, 167 F.3d at 635; *Haldeman*, 559 F.2d at 71.   Because Burke does not articulate what his defense is, moreover, the Court cannot conclude that it must be irreconcilably antagonistic to Kim's and Messenger's defense.   And Burke fails to identify any actual, specific prejudice to him posed by a joint trial. For example, even if Burke's trial was severed, all of Kim's and Messenger's communications would still be admissible against him as coconspirator statements.   *See* F. R. Evid. 801(d)(2)(E).

As for Kim and Messenger, the claim that Burke assured them it was acceptable to discuss a future job with him at Company A is not a defense to bribery (i.e., it does not excuse their corrupt offer of a thing of value for his official act), so they too cannot be prejudiced from Burke's defense strategy.   None of the elements of bribery or conspiracy to commit bribery require Kim or Messenger to have knowledge of government contracting rules or Burke's ethical obligations. The essential elements of bribery are that the defendant (1) gave, offered, or promised something of value; (2) to an official of the United States; (3) corruptly with the intent to influence an official act.   *See* 2 Fed. Jury Prac. & Instr. § 27:03 (6th ed.).   The offer itself—a job for a contract—with the requisite corrupt intent is sufficient to complete the offense.   In other words, Kim and Messenger could be charged with the exact same substantive bribery offense that they face now if, hypothetically, they propositioned Burke with the same *quid pro quo*—a job for a contract—and Burke immediately declined, citing his ethical obligations.   Of course, here, the evidence shows that Burke, Kim, and Messenger, all agreed to the *quid pro quo* and eventually made good on their

respective promises.   The evidence also shows that Kim and Messenger had corrupt intent when they offered Burke a job in exchange for an official act—Burke directing a contract with his command to Company A.   Whether Kim and Messenger understood government ethics rules is irrelevant to the offenses with which they are charged.   Importantly, Kim and Messenger do not assert as a defense that Burke ever told them it was permissible under Navy or Department of Defense regulations to offer him a job in exchange for a government contract.

The defendants do not cite a single case in this Circuit where severance has been granted on the basis of "mutually antagonistic defenses."   The defendants instead rely on out-of-circuit authority relating to the "second prosecutor" doctrine that does not appear to have been recognized in this Circuit.   Burke acknowledges this.   S*ee* Burke Br. at 10.   But Kim's and Messenger's cited cases do not stand for the stated propositions.   For example, Kim and Messenger appear to rely on *United States v. Lewis*, No. 1:19-CR-307-RCL, 2022 WL 1090612 (D.D.C. Apr. 11, 2022), which in turn cites *United States v. Wright*, 783 F.2d 1091, 1096 (D.C. Cir. 1986), to support the "second prosecutor" doctrine, but the quotations from these cases included in their brief are references to the defendants' arguments and not the courts' legal analysis or holdings.   In fact, while Kim and Messenger selectively quote from *Lewis*, the court in that case went on to say:

> [T]his Court has found no example of a court granting severance based on the presence of a "second prosecutor" in this Circuit. And the out-of-Circuit cases Lewis cites all arise in a different procedural posture—they are post-trial opinions, which determine that a co-defendant's counsel *actually acted* as a second prosecutor and remand for a new, severed trial.

2022 WL 1090612 at *4 (Emphasis in original).

In this Circuit, prejudice sufficient to warrant severance does not arise simply because hostile defendants may seek to exculpate themselves by inculpating a codefendant.   *Gilliam*, 167 F.3d at 635; *Haldeman*, 559 F.2d at 71.   Nevertheless, even if a "second prosecutor" doctrine was recognized in this Circuit, as shown by the discussion above, these defendants' positions are not

so diametrically opposed that, in order for one defendant to zealously seek to acquit themselves, they must establish the guilt of another defendant.

The core of this case is a bribery scheme—a job for a contract—involving all three defendants. Most of the evidence will be the same as to Counts 1 through 3. The evidence supporting Counts 4 and 5 that charge Burke for his conflict of interest and false statements is part and parcel of the conspiracy. Had Burke not lied, their criminal conduct would have been uncovered and Company A would have been prohibited from obtaining any future government contracts. None of the defendants have established, at this stage, a serious risk of sufficient prejudice to them posed by another defendant's proposed defense. Specifically, no defendant has identified any specific trial right that would be compromised by a joint trial. This Court should deny their motions.

## IV. CONCLUSION

For the foregoing reasons and any that may be stated at a hearing on these motions, the government respectfully requests that this Court deny all three defendants' motions to sever their trials.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

COREY R. AMUNDSON
Chief, Public Integrity Section
U.S. Department of Justice

By:     /s/     
Joshua S. Rothstein
Rebecca G. Ross
Assistant United States Attorneys
601 D Street N.W.
Washington, DC 20530
Office: (202) 252-4490

    /s/     
Trevor Wilmot
Kathryn E. Fifield
Trial Attorneys
1301 New York Ave. NW
Washington, D.C. 20530
Office: (202) 514-1412