## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 24–265 (1) (TNM)** |
| **v.** | : | |
| | : | |
| **ROBERT P. BURKE,** | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' MOTION TO ADMIT
### OUT-OF-COURT STATEMENTS BY DEFENDANT'S CO-CONSPIRATORS

The United States of America respectfully moves *in limine* to admit at the trial of Defendant Robert P. Burke statements made by co-Defendants Charlie Kim and Meghan Messenger pursuant to Federal Rule of Evidence 801(d)(2)(E), without limitation to other nonhearsay purposes for which the statements may be admitted.

The Indictment charges that, from September 2020 through October 2022, Burke, a U.S. Navy Admiral stationed in Europe, conspired with Kim and Messenger, co-CEOs of "Company A," to commit bribery, specifically, to accept and receive future employment in exchange for a government contract. (*See* ECF No. 1, ¶¶ 20-21, 23-24, 51). The Indictment further charges Burke with a criminal conflict of interest and a scheme to conceal material facts. (*See id*. (Counts 4 and 5)). As explained below, certain statements by Kim and Messenger, made during the conspiracy period to each other and to others, are admissible as statements by co-conspirators in furtherance of the bribe conspiracy.

### I.     SUMMARY OF THE EVIDENCE

In or about August 2018, Company A was subcontracted with the Navy to provide workforce training to a small component of personnel under Burke's command when Burke was stationed in the United States. *See* ECF No. 1 at ¶ 11. Under this "pilot program," Company A

could potentially obtain as much as $10 million; however, the Navy terminated the pilot program around November 2019. *See id*. at ¶ 12. Company A received far less than the money allotted for in the pilot program, and a mere fraction of the contract they had hoped to obtain. *See*, *e.g.*, DOJ-NXJ-000022 (April 2021 Kim email, noting the "non-success from the beta" and stating, "the initial $100MM commitment from the Navy, in hindsight should have been closed [in] July 2018.").

Kim and Messenger attempted to salvage their business from the Navy and went to Burke directly to pitch their proposal. Burke had transitioned to another position in the Navy, however, and Kim and Messenger received an instruction from a Navy officer to have no further contact with Burke.

By June 2020, Kim contacted Person 1, the Navy Admiral then in charge of the command Burke had previously held when he authorized the pilot program. Kim acknowledged, "[w]e've been told to not contact/communicate with Admiral Burke," and he asked where Company A stood with the Navy. Person 1 replied that he could not answer the question, and he referred Kim to contact the Navy Contracting Office for information. The investigation has not uncovered evidence that Kim, Messenger, or anyone at Company A did so.

Meanwhile, Company A was experiencing the effects on its bottom line from the COVID-19 pandemic. Messenger wrote to an investor in July 2020, for example, that "we are experiencing a 50% drop in weekly revenues." This decline presumably related to Company A's e-commerce business line, *see* ECF No. 1 at ¶ 18, because its other business line, workforce training, had reported no revenue since the pilot program ended in late 2019. *Id*. at ¶¶ 17-18.

Thus, Kim and Messenger initiated prohibited communications with Burke, who, at that time, was head of the Navy's European and African command. *Id*. at ¶¶ 27-30. Between September

2

2020 and February 2021, Kim and Messenger tried – repeatedly and unsuccessfully – to secure a meeting with Burke to promote Company A's recent efforts, a transparent effort to reestablish business with the Navy. Eventually, Burke acceded. A remote meeting occurred on April 8, 2021, with participants from the Navy remembering it as a marketing pitch.

But another remote meeting occurred on April 20, 2021, between Burke, Kim, and Messenger.  There is no evidence that anyone else from the Navy joined the call.  Within hours of this meeting, Kim wrote to certain Company A personnel that it was the "the highest stakes meeting to date and the tiniest wrong move would/could lose all trust-come across slimy."  Kim wrote that Messenger said she "felt slimy" during the call because Burke "*wants to work for us but we're asking for a deal first*," whereas Kim had been "nervous but calm."[1]  (Emphasis added.)

About two weeks later, Burke ordered Person 2, a staffer under his command, to explore options for securing a contract for Company A. He reported to Kim and Messenger that Person 2 was "working options and angles hard for funding our project[.]"  Kim and Messenger reported to an investor that Burke would work to get a $50 million contract to Company A through Burke's command, and added that Burke wanted to work at Company A. The message did not reveal that the contract and job were a bargained for exchange that as Messenger would later describe it, amounted to "no contract no job."

On May 10, 2021, Kim, with Messenger copied, emailed Burke proposing a $20 million contract – even though no contracting personnel under Burke's command had considered a

---

[1] Kim described the meeting with Burke to his employees in the context of demonstrating his and Messenger's openness with one another during a high stress meeting in a process he called "eggshell crushing." Based on a glossary of Company A's terms of art obtained in this investigation, "eggshells" are defined as "sensitive topics that we consciously or unconsciously avoid discussing. It comes from the expression 'walking on eggshells.'" In other words, Kim was demonstrating for his employees an instance of "eggshell crushing" in action.

potential procurement. Messenger explained in an email to certain Company A personnel that the quote was lowered because, at $50 million, it would "look like we are taking advantage of Burke."

On July 13, 2021, Kim emailed Burke's personal address only and, copying Messenger, arranged for a lunch meeting in Washington, DC for July 23, 2021. That day, Burke invited Person 3, a personal companion, and invited her to attend the lunch. Prior to the lunch, Burke texted Person 3 and said that Kim and Messenger "want to have a more intimate conversation" and "Meghan [Messenger] already talking about [a] job." According to Person 3, during the lunch, Kim began to talk about a contract between Company A and the Navy.  On a napkin, Kim sketched his proposal—a contract for Company A, followed by a six-month period in which Burke would remain in the Navy to promote Company A, and the resulting compensation package, including both salary and stock options, for Burke when he joined Company A after the Navy.

All three of the conspirators memorialized their lunch meeting. Kim emailed senior Company A personnel and reported, "Burke. Crazy day. Five hours. He would have stayed all night if we stayed. In short [a contract] starting with his command almost ASAP."  In the same email, Kim said that they had also discussed Burke coming to work at Company A after his retirement and including "salary equity etc."  Kim reported that Burke was "very excited" and "wanted to resign next week," but Kim "[t]old him to hold off and first launch this part 1."  Here, Kim emphasized that Company A's new navy contract (part 1) was a necessary predicate to the job at Company A.

Also that evening, Messenger emailed members of her family, revealing her state of ming and explaining that Burke would give Company A a government contract and subsequently go to work for Company A:

> [T]he longest day of my life in DC . . . getting small few million-dollar deal with burke for navy europe deal to prove the result to then get bigger deal and offered

Burke full time offer wants to be [with Company A] starting next July.  Surreal. A 4stsr [sic] working for us when he retires . . . longest day but worth it.

The next day, July 24, Burke texted Person 3, his personal companion, that "Charlie [Kim] sent me a note . . . . I asked him to write out a job description – but I've essentially agreed to work for them . . . ."  Burke also described employment at Company A as a "real offer" that would get him "out of the DoD rut."  When Person 3 asked about the stock part of the offer because "[i]t was hard to hear with '500k base salary' ringing in my ears," Burke replied, "10% [ownership] in total co[mpany] … junior coowner behind Meghan [Messenger] . . ."

On August 26, 2021, about a month after the lunch meeting, Burke sent the Secretary of the Navy a memo formalizing his intention to retire from the Navy in May 2022.

Throughout the summer of 2021, emails show that Company A was still developing the application it intended to provide to the Navy as part of the deal with Burke. In late August, Company A sent the product to Burke to "test drive." Meanwhile, Messenger emailed Company A personnel that the latest proposal to Burke was reduced to a $1 million contract. Messenger explained, "We don't want Bob [Burke] to get off the hook…the $ amount is less significant at this stage [ . . . .] IN our POV [point of view] the contract size is less important than the things it triggers (including being able to say we're in partnership with the navy)[.]"

The results of the Navy's "test drive" of Company A's software were not good.  On September 22, 2021, Burke emailed Kim and Messenger that Company A's application "in and of itself does not stand on its own" and that the "app-based approach" "just does not seem to be sustainable or scalable for us [the Navy]."  Burke concluded, "I just can't do this as structured."

Internally, Kim, copying Messenger, forwarded Burke's email to Company A personnel. A Company A employee replied and called the feedback "very embarrassing." Externally, Kim invited Burke to Company A's now-lavish New York City headquarters. Burke agreed.

On November 16, 2021, Burke visited Company A. Burke told Person 3, who traveled to New York with him, that he was meeting Kim and Messenger. This time Person 3 was not invited. According to Person 3, Burke said after the meeting that Kim and Messenger increased the equity stake they would give Burke in Company A.

From Kim's and Messenger's perspective, the meeting was a great success. Kim explained in a contemporaneous email to Company A personnel that the company was about to be "full force back into business with the Navy." Kim also described a detailed plan to work-around the significant flaws in Company A's app, which included bringing some of Burke's officers over for an in-person training in New York City, culminating in the contract to be "signed before Xmas." Executing the plan would require the assistance of much of Company A's "Partners team:"

> Meghan and I met for a little over 4 hours today with Admiral Burke. In short, we're about to go full force back into business with the Navy. We have 4 of his senior most people coming in 2 weeks . . . Within one week [of that visit] . . . he is going to propose back a ~$1MM engagement with [Company A] with goal of having it signed before Xmas. We will likely launch in the new year, the work will be in Naples, Italy and Rota, Spain. We will likely engage our entire Partners team to help with the coaching and training of the pilot Sailor population.

Two days later, Messenger replied to Kim only via email reflecting her ongoing belief that the conspiracy was driving toward its intended results: "Weird to think Burke gonna be on our team likely next summer eh[.]"

As the conspirators planned, in early December 2021 four of Burke's officers attended Company A's in person training. If Kim felt concern about the need to impress Burke's officers with the quality of the training, he did not appear to express it to anyone. To the contrary, in an

November email to a Company A partner, Kim seemed to consider the government contract a foregone conclusion.:

> Within one week of academy [training] these 4 leaders are going to be tasked with how and what they need our help with. Contract signed before Xmas and then we're off to the races, ideally tangible success by March. Present April/ may for all navy deal to 640k sailors and 5000 commands globally. Then Burke ideally leaves navy joins [Company A] somewhere between July-oct next year in nyc.

By December 2021, Company A personnel were contacting Burke's staff to arrange their travel – even though a contract had not been signed. As Person 2 put it, in response to the travel assistance request, "Comptroller is researching possible vehicles, but we don't even have proposals . . . I'm not sure how to stop this direct communication between he [Burke] and them [Company A]." Nevertheless, in mid-December Burke ordered Person 2 to get a contract to Company A to provide training to Burke's command, and Person 2 instructed Burke's staff to implement it. One training officer under Burke's command later remarked, in response to Company A's training proposal, "I'm sorry, but I really don't like the pricing. They are screwing us."

On December 22, 2021, Company B, which held the prime contract with the U.S. Government concerning certain training programs, signed the subcontract for Company A to provide the training to Burke's command. On December 23, describing the speed with which the contract was signed, a Company A employee cheered, "That is what happens when a 4* admiral is calling the shots."

The training was given in January 2022. While in Italy, Kim and Messenger socialized with Burke outside socially, paying $544.66 for dinner out with Burke and his wife paid for by Company A, which was prohibited under contracting rules and was not reported by Burke.

The training provided by Company A was, for the most part, poorly received.  In one email chain, for example, an officer under Burke's command faulted the lack of time to meaningfully prepare for the training, stating, "[t]he biggest issue was that due to contracting rules, we didn't

find out that this was going to happen until the week prior – so there was very little time for planning or preparation." Burke, who was also on the emails, added, "I agree – we rushed into it." Given the largely negative feedback, Person 2 terminated the program before Company A could extract further funds from the U.S. government.

Meanwhile, however, Burke connected Kim and Messenger with other Naval officers who were able to help it secure further government contracts. In making these introductions, Burke praised Company A's product – exactly as the conspirators agreed to do when they met the prior summer in Washington, DC. For example, Burke wrote to Person 4, a high-ranking Admiral responsible for training sailors throughout the Navy, promoted Company A and how it could be a good fit for the U.S. Navy. Burke also promoted Company A to a high-ranking foreign official from a Foreign Military. But despite Burke's attempts, the U.S. Navy did not enter into the high-dollar contract that Kim and Messenger and long hoped to attain. There is no evidence of Company A obtaining a contract from the Foreign Military, either.

Burke retired from the Navy in the summer of 2022. He began working at Company A in around October 2022, but only remained in the job for a few months before resigning. It appears that the relationship between Burke, on the one hand, and Kim and Messenger, on the other, was a marriage of convenience that did not last. For example, in October 2022, Messenger wrote to Kim remembering an argument with Burke, in which she had an "outburst" and said, "no contract no job."

## II.    LEGAL STANDARDS

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is offered against an opposing party and "was made by th[at] party's co-conspirator during and in furtherance of the conspiracy." The admission of co-conspirator statements under Rule

801(d)(2)(E) does not violate the Confrontation Clause. *Giles v. California*, 554 U.S. 353, 374 n.6 (2008).

There is a two-part test for the admission of a statement under this Rule: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). In determining whether the first prong of the test is satisfied, the Court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and it "must find that the government has offered 'independent evidence' apart from the statements themselves that a conspiracy exists and that the Defendant and the declarant were involved in the conspiracy." *United States v. Bailey*, 19-CR-156 (CKK), 2022 U.S. Dist. LEXIS 171874, at *6 (D.D.C. Sept. 22, 2022). Even so, "the content of the statement itself can also be considered in determining whether such independent evidence exists." *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996) (citations omitted); *see also* Fed. R. Evid 801(d)(2) ("The statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under [subsection] (E)."). Independent evidence "can take any number of forms, including contemporaneous acts suggestive of the charged conspiracy and/or corroborative of the contents of the purported co-conspirator statements." *Id.* To admit a statement under this rule, the Court "must find by a preponderance of the evidence that the person making the statement was a co-conspirator and that the statement was made during and in furtherance of the conspiracy." *Gatling*, 96 F.3d at 1520 (citing *Bourjaily*, 483 U.S. 175-76).

Procedurally, the Court "can preliminarily admit hearsay statements of co-conspirators, subject to connection through proof of conspiracy." *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006) (citation omitted). It is well-established in this Circuit that the government need

not prove the preliminary facts of an alleged conspiracy prior to disclosing the co-conspirators' statements at trial. *See United States v. Carson*, 455 F.3d 336, 365 n.26 (D.C. Cir. 2006). Indeed, a pretrial hearing is unnecessary and disfavored. *See United States v. Lorenzana-Cordon,* 1:03-cr-CKK, 2016 WL 11664060, *1 (D.D.C. Jan. 21, 2016) ("In fact, it is common practice for courts in the D.C. Circuit to admit co-conspirator statements conditionally, subject to connection through proof of conspiracy—*i.e.,* contingent upon the government's subsequent introduction at trial of sufficient evidence to persuade the Court that the requirements of Rule 801(d)(2)(E) have been met.") (internal citations and quotation marks omitted); *see also United States v. Jackson*, 627 F.2d 1198, 1218 (D.C. Cir. 1980) (finding that district courts are "vested with considerable discretion to admit particular items of evidence 'subject to connection'").

While admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not particularly restrictive. It is satisfied if the statement is "in some way . . . designed to promote or facilitate achievement of the goals of the on-going conspiracy, as by, for example, providing reassurance to a coconspirator, seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy." *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993); *accord United States v. Maldonado-Rivera*, 922 F.2d 934, 958–59 (2d Cir. 1990). Nor do the statements have to necessarily relate to ongoing events or future conduct. "[S]tatements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy." *United States v. Thai*, 29 F.3d 785, 813–14 (2d Cir. 1994); *accord United States v. Heinemann*, 801 F.2d 86, 95–96 (2d Cir. 1986); *see also United States v. Lozano-Reyes*, 101 F.3d 686, 1996 U.S. App. LEXIS 14182 at *5 (2d Cir. June 12, 1996) (unpublished opinion) (affirming trial court's admission of co-conspirator statement whose purpose was "to engender trust, to increase [the witness's] familiarity

with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits."). "Rule 801(d)(2)(E) does not require that the statement be made to a co-conspirator," *United States v. Edmond*, 52 F.3d 1080, 1111 (D.C. Cir. 1995), and statements aimed at "communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals" further the conspiracy and are admissible under Rule 801(d)(2)(E), *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). While "mere narratives of past successes and failures" or "casual comments to people outside or inside the conspiracy" are not admissible, a statement that "can reasonably be interpreted as encouraging a co-conspirator *or other person* to advance the conspiracy, or as enhancing a co-conspirator *or other person's* usefulness to the conspiracy" is admissible under Rule 801(d)(2)(E) *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir.) (emphasis added). This may include statements deployed to keep key personnel "current on the status of the business" as, for example, "statements regarding profits [may] serve[] as motivation for her continued participation." *Id.*

## III.    ARGUMENT

### A.  *A conspiracy existed in which Burke, Kim, and Messenger were all participants.*

The first prong of the *Bourjaily* test for admitting a co-conspirator statement under Federal Rule of Evidence 801(d)(2)(E) is whether a conspiracy existed that included the defendant, in this case Burke. *See* 483 U.S. at 175. The existence of this conspiracy is established by sufficient independent evidence in addition to the co-conspirator statements. *See Bailey*, 2022 U.S. Dist. LEXIS 171874, at *6; *Gatling*, 96 F.3d at 1520; Fed. R. Evid 801(d)(2). The earliest and best evidence is that Burke joined the conspiracy on or about April 20, 2021, during a remote meeting he had with Kim and Messenger. Kim wrote to Company A personnel that Burke "wants to work for us but we're asking for a deal first." Evidence that Burke joined the conspiracy in late April is borne out by his communication to Kim and Messenger on May 7, 2021, that he had directed

11

Person 2, a staff member, to "work[ ] options and angles hard for funding our project." It continued at the July 23, 2021, meeting in Washington, D.C., after which Burke texted Person 3 that he had "essentially agreed to work for them [Next Jump]." Burke's participation in the conspiracy lasted through that year, when he visited Company A's headquarters and agreed, as Kim put it, "go full force back into business," after, according to Person 3, Kim and Messenger offered Burke an increased equity stake in Company A. Burke's participation in the conspiracy culminated when he ordered his staff to implement a contract for Company A in December 2021. Burke's participation continued in the spring of 2022, when Burke, despite feeling that the Navy "rushed into" the contract with Company A, promoted its services to other officials in the U.S. Navy and a Foreign Military. Burke continued to be a member of the conspiracy while misleading Navy personnel by failing to honestly disclose the extent of his job discussions with Kim and Messenger, and the actions he took, despite this conflict, to award government business to Company A. In fact, Burke participated in the conspiracy through October 2022, when he accepted the promised employment at Company A.

So too does the evidence show that Kim and Messenger were a part of the conspiracy. For starters, in April 2021, Kim described the meeting with Burke as "the highest stakes meeting to date," called himself "nervous but calm," and recalled that Messenger said she "felt slimy" when they asked for "a deal first" in response to Burke's wanting to work for Company A. Kim and Messenger's participation in the conspiracy likewise persisted through October 2021: proposing the *quid pro quo* to Burke in July 2021, salvaging the government contract in November 2021, obtaining the contract in December and performing the generally poorly received training in January 2022. It endured during Burke's effort to promote Company A, unsuccessfully, to other Naval officers. In fact, with their end of the deal completed in October 2022, Messenger lamented

12

the fact that the scheme did not result in the sort of windfall she and Kim had hoped for.  [No contract, no job.]

> B. *Kim and Messenger made statements during and in furtherance of the conspiracy which are therefore admissible against Burke.*

The second prong of *Bourjaily* is also satisfied with respect to multiple categories of statements made by Kim and Messenger during the course of and in furtherance of the bribe conspiracy.  *See* 483 U.S. at 175.  Those categories of statements and examples of statements falling within each category are described below.[2]

> i. <u>Statements Between Kim and Messenger</u>

The government anticipates seeking to introduce several statements shared privately between Kim and Messenger.  Kim and Messenger are Burke's co-defendants and co-conspirators and their private statements to each other are admissible under Rule 801(d)(2)(E) for two primary reasons.  First, Kim and Messenger were the architects of the deal that they struck with Burke. Their statements to each other reflect their strategizing about how to keep the deal afloat and secure business for Company A.  Second, Kim and Messenger are incredibly close professional partners and friends.  Their statements to each other serve to continually reinforce their partnership and togetherness in the conspiracy.  *See Tracy*, 12 F.3d at 1196 (Admissible coconspirator statements may include those which "serve to foster trust and cohesiveness" between co-conspirators.).

Examples of such statements include:

- A November 18, 2021, email from Messenger to Kim:  "Weird to think Burke gonna be on our team likely next summer eh[.]"

---

[2]    Many statements in the three categories below may also be offered as statements of the declarant's then-existing state of mind.  *See* Fed. R. Evid. 803(3).

- A January 1, 2022, email from Kim to Messenger lamenting that, "navy deal feels awful, so little money and all the work we need to do to make upside. And time frame is tight … so many things have to go right and so many ways for things to go wrong," but affirming their commitment to hire Burke now that Company A had finally secured a Navy contract: "Burke job offer by April? What has to happen by then?"

- An October 5, 2022, text message from Messenger to Kim expressing her frustration with how their deal with Burke had unfolded—specifically, she said that she had "been shoving down my anger except 1 outburst saying no contract no job. Go screw. The contract doesn't even cover 1 year salary. Feeling played."

    ii.  <u>Internal Company A Communications</u>

The second category of statements that the government will seek to introduce includes Kim and Messenger's statements to certain Company A employees.  Kim and Messenger had a consistent, express practice of "informating" their employees, in particular key senior "partners," as to the progression of their "Navy relationship" and the status of their negotiations with Burke. "Informating" is another term of art used within Company A which refers to intentional sharing of information within teams to increase visibility, but also to empower and oppress individuals within the organization through strategic information-sharing.  It can also be employed as a surveillance tool when lower-level employees are acculturated to "informate" up to more senior leaders.  Kim and Messenger deployed this practice of "informating" to construct an "in-group" dynamic and a sense of being "in the know" amongst their employees.

More concretely, Kim and Messenger needed certain of their employees to actually develop and deploy the product that Company A would eventually deliver to the Navy. That effort by Company A employees (not Kim and Messenger) included developing a training curriculum, engineering the technology (specifically, proprietary applications) that training participants would use, and negotiating contract terms with potential "prime" contractors, not to mention actually delivering the training in person in Naples and Rota in January 2022.

These statements in which Kim or Messenger are "informating" (i.e., strategic information-sharing) or directing their employees with respect to the Navy contract are not "mere narratives" or "casual comments to people inside or outside the conspiracy." *See Tarantino*, 846 F.2d at 1412. Kim's and Messenger's to their employees can "reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *Id*.

Examples of internal Company A communications falling in this category include:

- Kim's April 20, 2021, email to senior Company A personnel explaining that, on their call with Burke earlier that day, that Messenger "felt slimy" because "[Burke] wants to work for us but we're asking for a deal first."

- A May 10, 2021, email to Company A personnel in which Messenger explained that they [Kim and Messenger] had decided to propose a $20 million rather than $50 million Navy contract because it would "look like we are taking advantage of Burke."

- Kim's July 23, 2021, email to senior Company A personnel in which he described their lunch meeting with Burke in Washington, D.C.: "Burke. Crazy day. Five hours. He would have stayed all night if we stayed. In short [a contract] starting with his command almost ASAP." In the same email, Kim said that they had also discussed Burke coming

to work at Company A after his retirement and including "salary equity etc." Kim reported that Burke was "very excited" and "wanted to resign next week," but Kim "[t]old him to hold off and first launch this part 1," referring to the "three-phase" structure of the deal that they had negotiated with Burke.

- A September 14, 2021, email to certain Company A personnel in which Messenger explained that she and Kim had, once again, agreed to a smaller contract—"the $ amount is less significant at this stage but ideally $1mm million"—because "[w]e don't want Bob [Burke] to get off the hook…"

- Kim's November 16, 2021, email to Company A personnel following their in-person meeting with Burke at Company A's offices:

  > Meghan and I met for a little over 4 hours today with Admiral Burke. In short, we're about to go full force back into business with the Navy. We have 4 of his senior most people coming in 2 weeks to our LAcademy. They will be the drivers of the pilot program. Within one week of LA, he is going to propose back a ~$1MM engagement with [Company A] with goal of having it signed before Xmas. We will likely launch in the new year, the work will be in Naples, Italy and Rota, Spain. We will likely engage our entire Partners team to help with the coaching and training of the pilot Sailor population.

- A November 17, 2021, email from Kim to a Company A partner:

  > Academy is kickoff into an accelerated pilot program to build success to scale to all navy …Within one week of academy these 4 leaders are going to be tasked with how and what they need our help with. Contract signed before Xmas and then we're off to the races, ideally tangible success by March. Present April/ may for all navy deal to 640k sailors and 5000 commands globally. Then Burke ideally leaves navy joins NxJ somewhere between July-oct next year in nyc.

  iii. <u>Statements to Company A Investors</u>

The government will also seek to introduce certain statements made by Kim to Company A investors. These statements are admissible under Rule 801(d)(2)(E) for similar reasons that

Kim's and Messenger's statements to their employees are admissible—Kim and Messenger needed their investors' buy-in so that the investors would continue to financially or otherwise support Company A. In these statements, Kim similarly "informates" investors as to the financial condition of Company A, in which the progression of Company A's "Navy relationship" features prominently. These statements serve to keep the investors on board, thereby "enhancing [the investors'] usefulness to the conspiracy." *Tarantino*, 846 F.2d at 1412. As in *Tarantino*, Kim's statements to investors are not mere updates; they are akin to "statements regarding profits" that serve[] as motivation for … continued participation." *Id.*

Examples of statements in this category include:

- Multiple nearly identical April 9, 2021, emails in which Kim told individual investors that he and Messenger had just had their "best meeting to date with Bob Burke" and that Burke had pitched himself to Kim and Messenger as an "ambassador/custodian" for Company A even while he was still serving in the Navy.

- A July 23, 2021, meeting in which Kim summarized the "three-phase plan" that they negotiated with Burke earlier that day in Washington, D.C.:

> This investor update has been sitting in our inbox as we've wanted to give an update[ ] timed with key developments in our Navy relationship. A series of meetings culminated to an in-person DC meeting with the 4-star Navy Admiral last Friday. Which was an important discussion to give a proper update on what is happening and what is next on the Navy and Business 2 ….
> BLUF (bottom-line-up-front): Navy relationship is progressing into 3 phases. In Phase 3, 4-Star Navy Admiral Burke is looking to join Next Jump as a full-time employee in July 2022 (please keep this information as privileged and confidential).
>
> In our engagement with Bob Burke, 4-Star Navy Admiral in charge of Europe & Africa (former Head of Navy HR (CNP), former #2 of Navy (VCNO)), he proposed 2 options as a way forward:

Option 1 – larger All-Navy deal (640K Sailors) where he would champion us to [the Chief and Vice Chief of Naval Operations].
Option 2 – smaller Europe & Africa Navy deal (14K Sailors), all under Bob Burke's command, before going for a larger All-Navy deal.

After much discussion and back and forth, as well as learning from the last pilot program, we decided Option 2 as the smarter, more strategic path to success.

## IV.    CONCLUSION

For the reasons stated herein and any that may be stated in a hearing on pretrial motions, the government respectfully requests that the Court admit certain statements by Burke's co-defendants and co-conspirators, Charlie Kim and Meghan Messenger, pursuant to Federal Rule of Evidence 801(d)(2)(E).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

COREY R. AMUNDSON
Chief, Public Integrity Section
U.S. Department of Justice

By _____/s/_____
Rebecca G. Ross
Assistant United States Attorney
601 D Street N.W.
Washington, DC 20530
Office: (202) 252-4490

_____/s/_____
Trevor Wilmot
Kathryn E. Fifield
Trial Attorneys
1301 New York Ave. NW
Washington, D.C. 20530
Office: (202) 514-1412

18

**<u>CERTIFICATE OF SERVICE</u>**

Undersigned counsel served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Dated:      November 29, 2024.

/s/ KATHRYN E. FIFIELD
*Trial Attorney*
*U.S. Department of Justice*