# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **CRIMINAL NO. 24–265 (TNM)** |
| **v.** | **:** | |
| | **:** | |
| **ROBERT P. BURKE,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## UNITED STATES' COMBINED OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS AND FOR A *FRANKS* HEARING

The United States of America, by and through its undersigned attorneys, respectfully submits this opposition to the defendants' Motions to Suppress (collectively, "the Motions").

## INTRODUCTION

Defendants Yongchul "Charlie" Kim and Meghan Messenger jointly filed a motion to suppress evidence obtained pursuant to two search warrants—a February 2023 warrant authorizing the search of Kim's and Messenger's work email accounts and a September 2023 warrant authorizing the search of Kim's and Messenger's personal electronic devices and various premises. ECF No. 61-1 (Kim/Messenger Motion) at 1.[1]  Kim and Messenger also request a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  Defendant Robert P. Burke joined Kim's and Messenger's Motion and seeks to suppress evidence obtained pursuant to the February and September 2023 warrants on an additional basis.  ECF No. 72 (Burke Motion) at 1.

As a threshold matter, Burke lacks standing to challenge certain of the search warrants for which he appears to be seeking suppression.  Kim and Messenger jointly seek to suppress two specific warrants authorizing the search of their property—specifically their mobile devices and

---

[1]    Pin citations to Kim's and Messenger's Motion refer to the pagination appearing at the bottom of the page of the Memorandum in Support rather than the pagination generated by ECF.

certain premises in their control.   Kim/Messenger Motion at 1.   Burke, on the other hand, obliquely asks the Court "to suppress evidence obtained pursuant to the search warrants executed in February and September 2023," which would include search warrants to Google for Burke's personal email account and Burke's devices and premises.   Burke further states that he "joins the motion filed by" Kim and Messenger and "incorporates their arguments by reference."   Reading Burke's motion generously, the government assumes that Burke is only seeking to challenge the warrants authorizing searches of his property, and that he seeks to incorporate Kim's and Messenger's arguments as to those warrants.   But, to the extent he is seeking to challenge warrants authorizing Kim's and Messenger's property, he lacks standing to do so and he should be denied that relief as to his upcoming trial in February.

Regardless, all three defendants fail to undermine the validity of the warrants because their Motions are based on collateral issues unrelated to whether the warrants were supported by probable cause.   The defendants confuse the showing required to obtain a warrant—probable cause—with what is required convict or what is required of the government to comply with its post-indictment discovery obligations.   These warrants were supported by probable cause and sought by law enforcement in good faith.   The defendants have not demonstrated any entitlement to the suppression of lawfully-obtained evidence or a *Franks* hearing.   Accordingly, their Motions should be denied.

## BACKGROUND

Defendant Robert P. Burke and co-defendants and co-conspirators, Defendants Yongchul "Charlie" Kim and Meghan Messenger were charged by indictment on May 30, 2024, with offenses arising out a bribery scheme between Burke, Kim, and Messenger, in which Burke agreed to direct a contract with his Navy command to Company A, of which Kim and Messenger are co-CEOs, in exchange for post-government employment with Company A.   *See generally* ECF No.

1 (Indictment). By way of a high-level summary,[2] the conspiracy began in or about September 2020 with Kim and Messenger reaching out to Burke regarding a potential contract for Company A while he was head of Naval Forces Europe/Africa (NAVEUR) despite having been told by Naval personnel to stop contacting Burke directly due to Company A's previous and possible future contracts with the Navy. On an April 20, 2021, WhatsApp call, according to Kim, Burke told Kim and Messenger that he "wanted to work for" Company A but that Kim and Messenger were "asking for a deal first." By July 2021, there still had been no real movement on the contract for Company A, Kim proposed that he and Messenger meet Burke for lunch while they were all in Washington D.C. for an event. Burke agreed. An individual identified in the Indictment as "Person 3" accompanied Burke to the lunch. At the meeting, Kim and Messenger pitched a "three-phase" *quid pro quo* to Burke—in Phase 1, Burke would secure a contract for Company A; in Phase 2, Burke would remain in the Navy for approximately six months to promote Company A and their services to the Navy; in Phase 3, Burke would join Company A as a partner. The proposed *quid pro quo* was discussed in emails written by Kim and Messenger and text messages sent by Burke to Person 3. Person 3 also personally witnessed Kim propose the *quid pro quo* to Burke at the lunch.

"Phase 1" was still incomplete as of November 2021. Kim invited Burke to meet with him and Messenger at their headquarters in New York City in November. Burke agreed and met alone with Kim and Messenger for "over 4 hours." Describing the meeting afterward, Kim stated, "we're about to go full force back into business with the Navy," and Burke would aim to have a contract in place and signed before Christmas. Kim stated the contract would include in-person

---

[2]     This Opposition incorporates the allegations in the Indictment by reference and refers the Court to the background sections of its previous filings, *see* ECF Nos. 48, 66-70, for additional background.

training to Burke's command in Naples, Italy, and Rota, Spain in early 2022.

Approximately a month after the November meeting, Burke ordered his staff to implement a contract for Company A such that Company A could conduct the trainings in Naples and Rota starting on Jan. 10, 2022.   Despite the "impossible" timeline, Kim, Messenger, and Company A personnel pushed Burke, Burke's staff, a prime government contractor (Company B), and staff in the Office of Personnel Management (OPM) to take steps to make sure the contract was implemented on time.   Company A personnel, including Kim and Messenger, traveled to Europe and delivered the training, as planned, in early January 2022.

Consistent with "Phase 2" as described by Kim in his July 2021 email, Burke remained in the Navy until mid-summer 2022—approximately six months after Company A's training.   Navy emails reflect that Burke promoted Company A, as promised.

During these six months while Burke was still in the Navy, he materially mislead Navy personnel and omitted information regarding his employment negotiations with Kim and Messenger as well as his involvement in the contract for the Naples/Rota training in an effort to conceal the conspiracy.

In or about October 2022, following his retirement from the Navy, Burke began employment with Company A as planned.

## I.   The Warrants

The instant investigation began in mid-2022 after Person 3 came forward with allegations that Robert Burke, with whom Person 3 was personally familiar, had engaged inappropriately with two co-CEOs of Company A—Charlie Kim and Meghan Messenger—while in his official capacity as a four-star U.S. Navy Admiral.   The investigation was opened by the Defense Criminal Investigative Service (DCIS) and came to include the Naval Criminal Investigative Service (NCIS) and the Federal Bureau of Investigation (FBI).

In the course of the investigation, agents sought and obtained certain search warrants. Those warrants, which are attached as exhibits under separate cover and under seal, included:

- A search warrant for the Google account associated with Burke's personal email address, issued in the District of Columbia on February 8, 2023 (Affiant: DCIS Special Agent Cordell "Trey" DeLaPena) (hereinafter "the Google Warrant") (Exhibit A);

- A search warrant for Microsoft accounts associated with Kim's and Messenger's official Company A email address, issued in the District of Columbia on February 8, 2023 (Affiant: DCIS Special Agent Cordell "Trey" DeLaPena) (hereinafter, "the Microsoft Warrant") (Exhibit B);

- A search warrant for Burke's residence and personal mobile device, issued in the Southern District of Florida on September 26, 2023 (Affiant: FBI Special Agent David Elias) (hereinafter, "the Burke Premises/Device Warrant") (Exhibit C);

- A search warrant for Company A's premises, Kim's and Messenger's persons and mobile devices, and Messenger's residence, issued in the Southern District of New York on September 28, 2023 (Affiant: FBI Special Agent David Elias) (hereinafter, the "Kim/Messenger Premises/Device Warrant") (Exhibit D).[3]

Paragraph 4, included in of all four of the Warrant affidavits, reads:

The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers and investigators; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and

---

[3]    In April 2024, the agents also sought and obtained a search warrant for Kim's and Messenger's Apple iCloud accounts.  No data was seized and the defendants do not appear to challenge the validity iCloud warrant.   It is therefore not considered as part of this Opposition.

circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

The Google and Microsoft Warrants obtained in February 2023 were supported by substantially similar affidavits.  Those affidavits describe relevant facts known to the affiant at the time of the search warrant applications in support of probable cause, subject to Paragraph 4. Further,

In sum and substance, those facts and evidence included the following:

- Correspondence between Burke's official Navy email address and Kim and Messenger's Company A email addresses, obtained from Burke's Navy email account, including:

  o A September 2020 email from Kim (Messenger copied) to Burke's official Navy email, in which Kim acknowledges that he and Messenger were told to stop contacting Burke directly due to a potential contractual agreement involving the Navy and Company A, but noting that they had not heard from "the Contracting Office" and asking if Burke had any "insights or guidance" as to how they should proceed.  Burke replied from his official Navy account that he would "pull the string … on the contract and get back to you…" Ex A., Google S.W., at ¶ 10; Ex. B, Microsoft S.W., at ¶ 10.

  o A May 2021 email from Burke's Navy email to Kim and Messenger in which Burke says that his Executive Director (Person 2 in the Indictment) was "working options and angles hard for funding our project . . ." Ex A., Google S.W., at ¶ 14; Ex. B, Microsoft S.W., at ¶ 14.

  o A May 2021 email from Kim (Messenger copied) to Burke's official Navy address, in which Kim writes: "Bob, working late night with Meghan . . . If the headcount [of personnel under Burke's command] is 20K, I think a $20MM proposal is what would make the most sense …" Ex A., Google S.W., at ¶ 15; Ex. B, Microsoft S.W., at ¶ 15.

  o A November 2021 email from Kim's work email to Burke's Navy email including New York City hotel recommendations. Ex A., Google S.W., at ¶ 23; Ex. B, Microsoft S.W., at ¶ 23.

  o A December 16, 2021, email from Kim (Messenger copied) to Burke:

"Bob, 2 files attached here. 1/ Proposal with more details on the programs by level… 2/ Pricing worksheet – this allows you to toggle/change inputs and either add more sailors per command, more commands, more level training (move around the variables to whatever budgetary or program needs by command). We think it should be fairly straightforward and a good summary of the discussions we've had."  Burke then forwarded this email to Person 2 and said, "Would like to get this in place to support kick off events in Early Jan if possible." Ex A., Google S.W., at ¶ 27; Ex. B, Microsoft S.W., at ¶ 27.

o  Emails exchanged between Burke's Navy account and Kim's and Messenger's work accounts on or about December 20, 2021, in which Burke told Kim and Messenger he did not believe that they could get a contract in place in the planned timeframe.  Kim responded that the Navy should use a different contracting vehicle, Company B, with which Company A had worked with in the past.  Government email records reflect that Burke forwarded Kim's suggestion to a subordinate and that later that day, a subordinate sent a contract package to the Office of Personnel Management (OPM) requesting an award to Company B.  Government records show that OPM, in fact, did award a task order to Company B which included licenses for proprietary Company A digital applications.  Ex A., Google S.W., at ¶ 29; Ex. B, Microsoft S.W., at ¶ 29.

- Other emails obtained from Burke's Navy email account, including:

o  A March 2022 email in which Burke promoted Company A to a fellow high-ranking Navy Admiral.  In May 2022, Burke promoted Company A to a high-ranking officer in a Foreign Military. Ex A., Google S.W., at ¶ 35; Ex. B, Microsoft S.W., at ¶ 35.

o  A March 2022 email in which Burke requested of a Navy lawyer "the 'generic' legal opinion letter … on seeking employment, although to date, I have had no conversations, have no intent to aim for a specific company, and most likely will not actively seek employment until after 1 July."  This statement was inconsistent with other evidence included in the affidavit, notably Burke's July 2021 text message stating that Company A had made him a "real offer" in July 2021, nearly eight months before Burke represented to the Navy lawyer that he'd had "no conversations, have no intent to aim for a specific company." Ex A., Google S.W., at ¶ 35; Ex. B, Microsoft S.W., at ¶ 35.

o  A May 2022 email exchange in which Burke informed the same Navy lawyer that, "[Company A] has approached me asking if I would be interested in having post-Navy employment discussions – I let them know

I could not, had some prerequisites to meet and would get back to them if/when I met those prerequisites. Full disclosure, I worked with them in 2017 as CNP [Chief of Naval Personnel] (one contract – I estimate $3-4M value), then we hired them for the pilot program here – contract decision was through the [Executive Director], ~300K."   Burke's representation that the "contract decision" was through Person 2, his Executive Director, was inconsistent with Person 2's interview statements and other emails that showed that Burke ordered his staff to implement a contract after Kim sent a proposal to Burke directly. Ex A., Google S.W., at ¶ 39; Ex. B, Microsoft S.W., at ¶ 39.

- o The Navy lawyer recommended that Burke disqualify himself from engaging with Company A on official business after Burke told the lawyer that Company A had approached him about employment.  Burke wrote in a disqualification memorandum that he "anticipate[d] commencing discussions related to employment with [Company A]," which was inconsistent with other evidence included in the warrant affidavit that Burke had had employment discussions with Kim and Messenger many months before. Ex A., Google S.W., at ¶ 39; Ex. B, Microsoft S.W., at ¶ 39.

- Return data from an order obtained under 18 U.S.C. § 2703(d) showing multiple contacts—July 13, 2021, Dec. 12, 2021, January 27, 2022, April 8, 2022, May 3, 13, 15, 16, 19, 20, 25, and 26, 2022—between Kim's and Messenger's work accounts and Burke's Google account without Burke's official Navy email copied. Ex A., Google S.W., at ¶ 16, 25, 34, 38, 41; Ex. B, Microsoft S.W., at ¶ 16, 25, 34, 38, 41, 43.

- o Returns from the same § 2703(d) order reflected that Burke continued to communicate, using his personal Google email, with U.S. Navy officials, including his former aide, a Senior Executive Service member acting as the U.S. Navy's senior advisor on digital transformation, and other government officials, as well as employees of Company A, including Kim and Messenger after he retired from the Navy in July 2022. Ex A., Google S.W., at ¶ 45; Ex. B, Microsoft S.W., at ¶ 45.

- Emails from other government personnel in December 2021, including:

- o From Person 2 expressing confusion as to why Company A personnel were reaching out regarding accommodations in Naples: "why are they coming? We have no cont[r]act with them. Do not think it's appropriate to task anyone if this is personal support."   Ex A., Google S.W., at ¶ 26; Ex. B, Microsoft S.W., at ¶ 26.

- o From Person 2 discussing options for implementing a contract with

Company A and expressing frustration about Company persistent direct contact with Burke: "Comptroller is researching possible vehicles, but we don't even have proposals . . . I'm not sure how to stop this direct communication between he [Burke] and them [Company A]." Ex A., Google S.W., at ¶ 26; Ex. B, Microsoft S.W., at ¶ 26.

o From a member of Burke's staff regarding Company A's proposed pricing for the contract: "I'm sorry, but I really don't like the pricing. They are screwing us." Ex A., Google S.W., at ¶ 27; Ex. B, Microsoft S.W., at ¶ 27.

o Emails in early January 2022 reflecting that Burke hosted a social reception for Company A personnel while they were in Naples for the planned leadership training. Ex A., Google S.W., at ¶ 30-31; Ex. B, Microsoft S.W., at ¶ 30-31.

• Interview statements of Burke's Navy staff, including Person 2, perplexed as to why Burke's command was engaging with Company A when the command already had a contract for a different, lower-priced leadership training program and expressing dismay about Burke's contact with Company A. Person 2 stated that she advised Burke of the need to "separate yourself [Burke] from any contracting discussions," and, "any e-mails that you get from them [Company A] you need to vector them to me and then we went to the appropriate legal review, contracting review, and all of those types of things. I need you to stop talking to them." Ex A., Google S.W., at ¶ 28; Ex. B, Microsoft S.W., at ¶ 28.

• Official government and personal travel records showing that Burke traveled:

o To Washington, D.C., from July 16 to July 21, 2021, and Burke did not claim official travel reimbursement for the first three nights. Ex A., Google S.W., at ¶ 17; Ex. B, Microsoft S.W., at ¶ 17.

o To New York City from November 16 to 17, 2021. Ex A., Google S.W., at ¶ 24; Ex. B, Microsoft S.W., at ¶ 24.

• Records reflecting Kim's and Messenger's travel to Naples and Rota in January 2022 Ex A., Google S.W., at ¶ 33; Ex. B, Microsoft S.W., at ¶ 33.

• Statements by Person 3 (referred to as "Witness 1" in the search warrants), including that Burke stayed with her at her residence for the first three nights of his July 2021 D.C. trip, that she attended a lunch with him and Kim and Messenger, that Kim and Messenger asked Burke to work for Company A and offered him approximately $800 thousand to $1 million in annual compensation, plus an ownership stake in Company A. Person 3 also stated that Kim drew a diagram on a restaurant napkin depicting Company A's receipt of the contract, followed by Burke remaining at the Navy for six months thereafter, and then Burke retiring to

accept a job from Company A.   Person 3 later recreated the diagram from memory. An image of the recreated diagram is included in the search warrant affidavits. Ex A., Google S.W., at ¶ 18-20; Ex. B, Microsoft S.W., at ¶ 18-20.

- WhatsApp messages exchanged between Burke and Person 3, verified by a forensic review of Person 3's phone:

> Person 3: The 10 percent thing
>
> Person 3: Did they use the word junior partner?
>
> Burke: I asked. He wants all his team to own some of the company – so he can pay lower salary and incentive performance through ownership.

And later that day:

> Person 3: Do u lean one way or the other? Aussies or [Company A]
>
> Burke: [Company A] for three reasons - there is now a real offer, it gets us out of the DoD rut, and it is different work than I've done before. You know I'm depending on you to run our LLC and become my EA?" Ex A., Google S.W., at ¶ 22; Ex. B, Microsoft S.W., at ¶ 22.

- Publicly available information reflecting that Burke did accept a position at Company A in the fall of 2022. Ex A., Google S.W., at ¶ 46; Ex. B, Microsoft S.W., at ¶ 46.

The Google and the Microsoft warrants were issued in the District of Columbia on February 8, 2023.

On September 26 and 28, 2023, agents sought and obtained warrants for Kim's, Messenger's and Burke's devices and premises.[4]   The affidavits supporting those warrants included the facts and evidence summarized above in reference to the Google and Microsoft warrants as well as references to the incriminating emails obtained pursuant to the Microsoft Warrant.   Those warrants were executed on October 3 and 4, 2022.

---

[4]    The affiant was not, as Kim and Messenger state in their Motion (*see* Kim/Messenger Motion at 10), SA DeLaPena.   As Kim and Messenger can see from pages 1 and 2 of their own Exhibit 9, the affiant for the September 2023 Warrants was FBI Special Agent David Elias.   *See* ECF No. 61-11.

## II.    Additional Relevant Procedural History

Prior to DCIS opening a criminal investigation into allegations against Burke, the Department of Defense (DoD) Office of the Inspector General (OIG) initiated an administrative investigation following Person 3's report of misconduct by Burke.   Person 3 was interviewed by DoD-OIG investigators twice.   Both interviews were recorded and transcribed.   In the second interview, Person 3 mentioned her "own divorce" in the context of assisting Burke with divorce paperwork, as Burke had told her that he was separated from his wife and wanted to marry Person 3 instead.

The defendants in their Motions heavily emphasize certain derogatory information regarding the credibility of Person 3 obtained by the government and duly produced in discovery following the defendants' indictment—in particular, sealed court records related to Person 3's prior custody and divorce case and files from an NCIS investigation in which Person 3 was identified as a victim.[5]  Relevant here, at the time of the applications of the September 2023 warrants, the warrant affiant, SA DeLaPena, was not in possession of any of the derogatory

---

[5]    The government has complied, in full, with its discovery obligations and the timing and manner in which the government obtained and produced the records relating to Person A's divorce are, for the reasons discussed herein, not relevant to the motion to suppress. Notably, Kim and Messenger falsely represent that "the government was aware pre-indictment of" an adverse credibility finding related to Person A.   Not so.   Reports produced to the defendants in discovery (well before the filing of the instant Motions) make clear the following: Person 3 informed SA DeLaPena of the adverse credibility finding in or about March 2024.   In April 2024, government began a process of trying to obtain a copy of the trial court's decision containing the adverse credibility finding, which was sealed and not publicly available.   The government received these records from the Virginia clerk of court on or about May 13, 2024.   Doing its own due diligence, the government had sought and obtained records related to the NCIS investigation in which Person 3 was identified as a victim prior to indictment.   Additionally, in his Motion, Burke discusses "references in the discovery to [Person 3's] participation in an Article 32, Uniform Code of Military Justice (UCMJ) Hearing, would have also made credibility determinations about [Person 3], which have not been disclosed to the Defense."   Burke Motion at 3.   The government has produced all records in its possession related to the NCIS investigative file involving Person 3 and is not aware of additional records existing related to that investigation.

information referenced in the defendants' Motions.   SA DeLaPena was aware only that Person 3 had previously been divorced and fought her former husband for custody.   Prior to applying for the warrants, a DCIS analyst conducted a standard DCIS witness "background check," the results of which SA DeLaPena reviewed.   The background check revealed, among other things, that Person 3 had no criminal history.   The background check did not capture civil actions in which Person 3 was a party, including Person's custody and divorce proceedings.   The background check did not reveal information that Person 3 testified or was the subject of an adverse credibility finding.   The background check revealed that Person 3 was a senior supervisory civilian in the military (GS-14) and that she was SCI eligible in terms of her security clearance, the highest level of security clearance.

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.   As a deterrent to Fourth Amendment violations, the Supreme Court established the so-called "exclusionary rule," permitting courts to remedy certain Fourth Amendment violations by precluding the use of improperly obtained evidence at trial.   *Herring v. United States*, 555 U.S. 135, 139-40, 129 S. Ct. 695, 699 (2009) ("[T]his judicially created rule is designed to safeguard Fourth Amendment rights generally through its deterrent effect."). "[T]he Supreme Court has stated, 'the Fourth Amendment has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons.'"   *Spencer*, 530 F.3d at 1006 (quoting *United States v. Leon*, 468 U.S. 897, 906 (1984)).   "Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy

evidence bearing on guilt or innocence."  *Davis v. United States*, 564 U.S. 229, 237 (2011).   "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."

## ARGUMENT

**I.**  **Burke Lacks Standing to Challenge the Validity of Warrants Authorizing Searches of Kim's and Messenger's Property.**

Not any criminal defendant in any set of circumstances may avail themselves of the exclusionary rule.  The Fourth Amendment protects personal property and privacy rights, not criminal trial rights.  *See Alderman v. United States*, 394 U.S. 165, at 174 (1969) ("We adhere to … the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."); *United States v. Sheffield*, 832 F.3d 296, 304 (D.C. Cir. 2016) ("Fourth Amendment jurisprudence does not countenance the assertion of another's right to be free from unreasonable searches and seizures." (Internal quotation marks omitted)).   As such, "[i]t has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure."  *United States v. Padilla*, 508 U.S. 77, 81 (1993) (emphasis in original).   The doctrine of Fourth Amendment standing requires that suppression as a result of a Fourth Amendment violation may "be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."  *Alderman*, 394 U.S. at 171-72. "Co-conspirators and codefendants have been accorded no special standing."  *Id.*; *see also Padilla*, 508 U.S. at 82 (same); *United States v. Gibson*, 353 F.3d 21, 25 (D.C. Cir. 2003) ("Coconspirators enjoy no special exemption from the rule that defendants may not invoke the exclusionary rule vicariously" (citing *Padilla* and *Alderman*)).   It is the defendant's burden to show that he has standing to seek suppression of search warrant material.  *United States v.*

*Sheffield*, 832 F.3d 296, 305 (D.C. Cir. 2016) (For the purposes of establishing Fourth Amendment standing, "defendants always bear the burden of establishing that the government violated a privacy interest that was protected by the Fourth Amendment."); *see also Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978).[6]

Burke has not established any privacy or property interest in either Kim's or Messenger's work email account, either Kim's or Messenger's personal electronic devices, or premises controlled by Kim or Messenger, such as their private residences and their office space. Burke therefore lacks standing to challenge the search of any of that property or suppress the evidence obtained as a result of those searches. Burke's desire to prevent the admission of damaging evidence against him does not confer him standing. *Alderman*, 394 U.S. at 171-72. To the extent that Burke's motion can be read as seeking to suppress such evidence—specifically, incriminating communications obtained from Kim's and Messenger's email accounts or personal devices—his motion should be denied in that respect entirely.

## II. No Fourth Amendment Violation Warranting a *Franks* Hearing or Suppression Occurred with Respect to the Warrants.

### A. The Challenged Search Warrants Were Each Supported by Probable Cause

Warrants must be supported by probable cause. U.S. Const. amend. IV. Here, they plainly were.

"The Supreme Court has described the task of evaluating probable cause as 'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is

---

[6]     Fourth Amendment standing is a merits issue, not a jurisdictional issue, meaning that analysis of the merits of Burke's suppression motion must include standing but, had the government not raised this issue in opposition, it could be considered forfeited or waived. *See United States v. Sheffield*, 832 F.3d 296, 304 (D.C. Cir. 2016) (listing supporting precedent from other Circuits). As discussed, because Burke lacks Fourth Amendment standing based on clear mandates from the U.S. Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit, his suppression motion is meritless as to Kim's and Messenger's property.

a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause is an objective standard 'to be met by applying a totality-of-the-circumstances analysis.'" *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016) (quoting *United States v. Vinton*, 594 F.3d 14, 21 (D.C. Cir. 2010)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232.

"[P]robable cause does not require certainty, or proof beyond a reasonable doubt, or proof by a preponderance of the evidence.   The Supreme Court has stated that probable cause requires a fair probability." *Id.* at 660.   Under this "fair probability" standards, probable cause "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands," *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975), and "it is and 'has always been thought sufficient to hear only the prosecutor's side,'" *Kaley v. United States*, 571 U.S. 320, 338 (2014) (quoting *United States v. Williams*, 504 U.S. 36, 51 (1992)).   Accordingly, "[p]robable cause 'is not a high bar,'" and requires "'only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley*, 571 U.S. at 338, and *Gates*, 462 U.S. at 232).

In evaluating a facially valid search warrant, the task of a reviewing court is not to decide, in the first instance, whether it would find that the warrant establishes probable cause. Under the well-accepted standard of review, the court need only satisfy itself that the Magistrate had a "substantial basis" in finding probable cause.

Prior to the February 2023 search warrant applications, the investigation had uncovered ample independent evidence of Burke's, Kim's, and Messenger's criminal conduct as described in

the search warrant affidavits.   That evidence included (1) Burke's Navy emails exchanged with Kim and Messenger, illustrating a pressure campaign on the part of Kim and Messenger, coordinating meetings between the coconspirators, discussing pricing proposals for a contract to Company A which reflected "a good summary of the discussions we've had," and other communications relevant to the conspiracy; (2) results of a 2703(d) order showing contacts between Kim, Messenger, and Burke's personal Google email account without Burke's official Navy account copied, lining up with significant events in the life of the conspiracy; (3) text messages, although supplied by Person 3, that were verified by a forensic extraction of her cell phone, in which Burke represented to Person 3 that he was motivated to accept Kim and Messenger's offer of employment; (4)  communications of Burke's Navy staff, who expressed dismay about Burke's repeated contact with Kim and Messenger and bewilderment as to why Burke was ordering them to implement a contract for Company A; and (5) inconsistent, contradictory, and false information regarding Burke's relationship with Kim, Messenger, and Company A that Burke provided to a Navy lawyer in the Spring of 2022.   The affidavits supporting the challenged warrants described this evidence and included ample facts supporting a finding of probable cause that Burke, Kim, and Messenger engaged in a conspiratorial *quid pro quo* in violation of 18 U.S.C. §§ 201 (bribery), 208 (conflicts of interest), and 371 (conspiracy).

The affidavits on their face provided a basis for the magistrate to conclude that there was "fair probability that contraband or evidence of a crime will be found in a particular place," and there was more than enough information for the magistrate to conclude that Kim, Messenger, and Burke had engaged in a bribery conspiracy.   Their emails demonstrate that Kim, Messenger, and Burke directly, and against the advice of Burke's staff, negotiated a contract for Company A, including by pricing proposals for a contract.   Their travel records suggest that they met in D.C.

and New York City in July 2021 and November 2021, respectively, which corresponds with Person 3's text messages with Burke regarding what happened at the lunch.   Burke texted Person 3 that Company A had given him a "real offer" of employment in July 2023.   The false and misleading information that Burke gave to the Navy lawyer supports an inference that Burke was attempting to cover up his agreement with Kim and Messenger, which in turn demonstrates consciousness of guilt.   And, the warrant affidavits aver that Burke did in fact accept a job at Company A after he retired.   Based on all of this evidence, there is much more than a "fair probability" that a crime occurred.

There was also more than a "fair probability" that evidence of Burke's, Kim's, and Messenger's crimes would be found on Kim's and Messenger's emails and in Burke's Google account, including returns from the § 2703(d) order showing back and forth between Burke's personal email and Kim's and Messenger's Company A emails and the frequent exchanges between Kim's and Messenger's Company A emails and Burke's official Navy email, with Burke's personal Google email copied.

The defendants' Motions largely ignore all of the other facts supplied in support of probable cause, suggesting that SA DeLaPena applied for and obtained a search warrant solely on the basis of Person 3's report, and that the statements of Person 3 are the only evidence of the defendants' conduct.   *See* Kim/Messenger Motion at 20 (referring to Person 3 as "the lynchpin of the February 2023 warrant application"); Burke Motion at 1 ("This entire case rests on the credibility of [Person 3]"). This is plainly not the case, as the Court can see in the search warrant affidavits themselves.

Instead, the defendants, particularly Kim and Messenger, improperly apply a substantially higher legal standard than probable cause.   Kim and Messenger mistakenly assert that the warrant

affidavits must have supplied evidence sufficient to "explicitly link[] the contract [for Company A] with the Navy to the job offer for Burke." *See* Kim/Messenger Motion at 9. That is higher even than the government's burden to prove bribery at trial. *See United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) (No "explicit *quid pro quo* required outside the campaign contribution context"). Kim and Messenger also improperly suggest that the warrant affidavits needed to "prove" Kim and Messenger's "scienter," corrupt intent, and "consciousness of wrongdoing." That is not the standard for probable cause required to obtain a warrant. *First*, probable cause does not involve "proving" an offense as the government would be required to do at trial. Probable cause is a *substantially* lower standard. *United States v. Holder*, 990 F.2d 1327, 1329 (D.C. Cir. 1993) (citing *United States v. DeLeon*, 979 F.2d 761, 769 (9th Cir.1992), for a proposition "suggesting that probable cause requires less than a 'more likely than not' standard").

*Second*, in general, a warrant affiant need not provide probable cause sufficient to prove any one person (such as any of the defendants) committed a particular crime. *See Mays v. City of Dayton*, 134 F.3d 809, 814 (6th Cir. 1998) ("When reviewing an application, courts must bear in mind that search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found." (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 (1978)). To be clear, the challenged warrant affidavits set forth probable cause to believe that all three defendants engaged in bribery and a conspiracy to commit bribery. Notably, Kim's and Messenger's Motion makes no mention of Burke's scienter, corrupt intent, or consciousness of wrongdoing. They cannot credibly say there was not probable cause to believe, based on the affidavit, that, at the very least, Burke committed a violation of 18 U.S.C. § 208. And they cannot credibly claim that there was not a "fair probability" that evidence of at least that offense could be found in their Microsoft email accounts based on the information provided in the

search warrant affidavit.

   *B.   The Defendants Have Not Made the Requisite Showing for Franks Hearing*

   "[A]n affidavit offered in support of a search warrant enjoys a 'presumption of validity,'"
*United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010) (quoting *Franks*, 438 U.S. at 171),
and an issuing magistrate's probable cause determination is entitled to "great deference," *United
States v. Spencer*, 530 F.3d 1003, 1006 (D.C. Cir. 2008) (quoting *Gates*, 462 U.S. at 236).   But
suppression may be appropriate if a warrant affidavit contains false statements that render it so
misleading as to undermine a magistrate's finding of probable cause.   *Spencer*, 530 F.3d at 1007
(quoting *Leon*, 468 U.S. at 925 (in turn citing generally *Franks*, 438 U.S. 154)).   In some
circumstances, this rule also applies to "material" omissions of fact.   *Id.*   An omission of fact is
only "material" if the inclusion of those facts would defeat probable cause.   *Id.*

   *Franks v. Delaware* and its progeny allow defendants "to challenge the truthfulness of
factual statements made in an affidavit supporting the warrant."   *Franks*, 438 U.S., at 155-56.   A
defendant may seek an evidentiary hearing (known as a *Franks* hearing) on the validity of a search
warrant application upon a "substantial preliminary showing" that (1) "the affidavit contained false
statements" or omitted certain facts; (2) those false statements or omissions were "material to the
issue of probable cause"; and (3) the false statements or omissions "were made knowingly and
intentionally, or with reckless disregard for the truth."   *United States v. Richardson*, 861 F.2d 291,
293 (D.C. Cir. 1988); *see Spencer*, 530 F.3d at 1007 (D.C. Cir. 2008) (applying *Franks* standard
to material omissions).   "To mandate an evidentiary hearing, the challenger's attack must be more
than conclusory and must be supported by more than a mere desire to cross-examine. There must
be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations
must be accompanied by an offer of proof."   *Franks*, 438 U.S. at 171.   Accordingly, allegations
of mere negligence on the part of an affiant is insufficient.   *Id.* at 170.

In seeking a *Franks* hearing and suppression of search warrant material, the defendants argue that the challenged Warrants are "fatally defective" because the warrant affidavits "omit" certain information, specifically (then unknown) information regarding the credibility of a witness (Person 3), whose statements were included in the affidavits in support of probable cause.   Kim's and Messenger's Motion also asserts that the absence of information which (according to them) mitigates the wrongfulness of Kim's and Messenger's conduct.   Kim/Messenger Motion at 1. Burke additionally argues that SA DeLaPena's "omissions" included not referencing the contents of NCIS investigative records, but these were also not in his possession at the time of the February 2023 search warrant applications.

The defendants' arguments for a *Franks* hearing fail for two primary reasons.   *First*, the affidavits did not "omit" any information within the meaning of *Franks* or Fourth Amendment jurisprudence, in that he could not "omit" what he did not know and was not required to know. The defendants inappropriately seek to conflate the government's post-indictment discovery and trial obligations with what is required to procure a search warrant under the Fourth Amendment. A search warrant affidavit is required to supply probable cause that a federal criminal offense has been committed and that evidence or fruits of the crime will be found in the place to be searched. *Gates*, 462 U.S. at 238; *Zurcher*, 436 U.S. 558; *Mays*, 134 F.3d 809, 814.   The challenged warrants satisfied these requirements.

*Second*, any "omissions" were not material because, even if the affidavits included the information that the defendants say was improperly omitted, probable cause is not undermined. Person 3's statements were corroborated and the magistrate's finding of probable cause was supported by evidence independent of Person 3's statements.

Because the defendants cannot make the "substantial preliminary showing" required to

obtain a *Franks* hearing or suppression of evidence, their Motions should be denied.

       i.  <u>The challenged affidavits did not "omit" information within the meaning of</u>
<u>*Franks* and Fourth Amendment jurisprudence.</u>

The defendants' argument appears to rest entirely on whether the February 2023 search warrant affidavits "omitted" information within the meaning of *Franks* jurisprudence. But, in order for the affiant to have "omitted" information from the affidavit, he must have known that information at the time he applied for the search warrant, or had a duty to know. *See United States v. Tanguay*, 787 F.3d 44, 52–53 (1st Cir. 2015) (referring to a general rule that "a *Franks* violation could not arise out of a failure to include in a warrant affidavit facts not actually known to the affiant." (Dicta))*; United States v. Harding*, 273 F. Supp. 2d 411, 426 (S.D.N.Y. 2003) ("Embedded in [the *Franks*] standard is the requirement that the affiant knew or, presumably, had reason to know the fact that she or he omitted.")

SA Trey DeLaPena, the affiant on the February 2023 Google and Microsoft warrants, did not "omit" adverse credibility information regarding Person 3 because he did not know that information, which the defendants appear to concede. *See* Kim/Messenger Motion at 13. In arguing that SA DeLaPena deliberately or recklessly "omitted" this information from the February 2023 search warrant affidavits, the defendants instead appear to rely on an argument that SA DeLaPena "should" have known the adverse credibility information and was "reckless" if he did not.

Though they couch their argument in *Franks* and its progeny, in reality, the defendants are misconstruing the law by conflating post-indictment discovery principles with Fourth Amendment principles, which require a meaningfully distinct analysis. *See Mays*, 134 F.3d at 815 (finding clear error where district court improperly "imputed the rationale of *Brady v. Maryland*, 373 U.S. 83, 83 (1963), into the warrant application process … the warrant process differs significantly from

the trial process").   The obligations of a law enforcement officer seeking a search warrant are not the same as the government's post-indictment discovery obligations.

Here, the warrant affidavits plainly present sufficient facts to support a finding of probable cause.  *See* Argument Section II.A., *supra*.   The investigation may have began with Person 3's report, but an investigation followed which (a) independently established probable cause and (b) substantially corroborated Person 3's statements.   Once an officer is in possession of information sufficient to support probable cause, the law does not impose an affirmative duty on law enforcement officers to seek out exculpatory information.  *See Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) ( "[A]fter the officer determines, on the basis of the facts and circumstances known to him, that probable cause exists, the officer has no further duty to investigate or to search for exculpatory evidence"); *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996) (an officer who has probable cause to arrest is not required to conduct further investigation for exculpatory evidence or to pursue the possibility that the suspected offender is innocent); *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir.1995) (for purposes of assessing whether officers had "probable cause" a court focuses on the information that officers had available to them at the time of their alleged unlawful conduct, "not on whether the information resulted from exemplary police work."); *Simkunas v. Tardi*, 930 F.2d 1287, 1292 (7th Cir. 1991) ("Having uncovered sufficient evidence to establish probable cause, [law enforcement] had no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence") (internal quotations and citation omitted)).

Nor is there an affirmative obligation for an affiant to independently investigate the credibility of civilian informant witnesses where, as here, SA DeLaPena had probable cause and no particularized reason to question the credibility of Person 3.   *See Tanguay*, 787 F.3d 52-53 n.4

(citing cases where general rule applied that an affiant does not need to conduct further inquiry because "the affiant had no reason to doubt the truthfulness of the allegations that undergirded the showing of probable cause."); *see also United States v. Miller*, 753 F.2d 1475, 1478 (9th Cir. 1985) ("It might have been prudent for the federal agents to check on [an informant's] background and criminal record, but their failure to do so is not reckless disregard."); *Reynolds v. Jamison*, 488 F.3d 756, 762 (7th Cir. 2007) (For the purposes of probable cause to arrest, "when acting on the complaint of a reasonably believable putative victim, an officer is under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." (Internal quotations omitted).   DCIS conducted a standard DCIS "background check" on Person 3 before SA DeLaPena applied for the February 2023 warrants.   That background check did not reveal the existence of any adverse credibility information.   Moreover, the background check revealed that Person 3 was a senior supervisory civilian in the military (GS-14) and that she was SCI eligible in terms of her security clearance, the highest level of security clearance, weighing in favor of Person 3's credibility.

Independent investigation following Person 3's original report substantially corroborated Person 3's allegations regarding Burke, as reflected in the search warrant affidavits.   The Supreme Court has recognized that, where the report of an informant of unknown credibility is corroborated by independent evidence, an informant may be properly relied on by a law enforcement officer for the purposes of establishing probable cause.   *Gates*, 462 at 244 ("Because an informant is right about some things, he is more probably right about other facts." (Internal quotation marks omitted)).

The defendants seek to apply the government's post-indictment discovery obligations to what was required of SA DeLaPena under the Fourth Amendment.   While none of the defendants

explicitly invoke *Brady v. Maryland*, 373 U.S. 83 (1963), the subtext is apparent.   That is, the defendants invoke a prosecutor's duties to seek and disclose exculpatory information and apply them to a warrant affiant.   But this is not the law, as two cases from the Sixth and Fourth Circuits make clear.

In *Mays v. Dayton*, 134 F.3d 809, the circuit court reversed a district court's denial of summary judgment for a police officer whom plaintiffs claimed violated their Fourth Amendment rights in connection with a search pursuant to a warrant obtained by the officer.   The district court denied summary judgment because, *inter alia*, the district court found "a genuine issue of material fact existed as to whether the omission of allegedly exculpatory material from the affidavit violated the rule established in *Franks* […]."   *Id.* at 813.   The circuit court held that the district court clearly erred on this point because the district court did not "apply a *Franks* analysis."   Instead, "the district court, apparently misconstruing the meaning of *Franks*, imputed the rationale of *Brady v. Maryland*, [citation omitted], into the warrant application process. This is clear error as the warrant process differs significantly from the trial process."   *Id.* at 815.   The circuit court thoroughly distinguished *Brady* principles from *Franks* principles.   The court emphasized that a defendant's rights under *Brady* are "derived from due process" to help "ensure fair criminal trials," "protect[] the presumption of innocence," and ensure that the government's is held to its burden to convict beyond a reasonable doubt.   *Id.*   By contrast, "*Franks* [is] derived from the Fourth Amendment [and] involves no definitive adjudication of innocence or guilt and has no due process implications."   *Id.* at 816.   The circuit court further distinguished "the duties imposed by *Brady* and *Franks*":   "In the *Brady* context, the constitutional obligation to disclose material exculpatory information attaches regardless of the prosecutor's intent and constitutional error can be found without a demonstration of moral culpability," while "[a] *Franks* violation … does require a

showing of intent, i.e., a 'deliberate falsehood' or 'reckless disregard for the truth.'" *Id.* (internal quotation marks omitted).   The court distinguished the relative severity of "consequences of error in the two contexts," arrest versus and an "adverse criminal verdict," and underscored the "recognition that the non-lawyers who normally secure warrants in the heat of a criminal investigation should not be burdened with the same duty to assess and disclose information as a prosecutor who possesses a mature knowledge of the entire case and is not subject to the time pressures inherent in the warrant process." *Id.*   Accordingly, the respective "obligations" imposed under *Brady* and *Franks* should not be confused.   *Id.*

Similarly, in *United States v. Colkley*, the Fourth Circuit strongly cautioned against "importing the panoply of *Brady* protections from trial practice into warrant application proceedings."  899 F.2d 297, 303 (4th Cir. 1990).   Relying on many of the same principles as the *Mays* court, the *Colkley* court emphasized the different roots in the law between *Brady* and *Franks* principles (due process versus the Fourth Amendment), the differing burdens of proof at the warrant stage versus at trial, the disparity in the severity of the consequences of error during investigation versus the adjudication of criminal guilt, and the requisite finding of a search warrant affiant's intent to mislead in the *Franks* context that does not exist for prosecutors in the *Brady* context.   *Id.* at 302-03.   The *Colkley* court also stressed that "a requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process":

> [Such a] rule would place an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded. It would perforce result in perniciously prolix affidavits that would distract police officers from more important duties and render the magistrate's determination of probable cause unnecessarily burdensome. In addition, a broad duty of inclusion would turn every arrest or search into a warrant contest. Such consequences would, in turn, discourage reliance on warrants, a result the Supreme Court has stated should be avoided in shaping Fourth Amendment doctrine.

*Id.* at 303 (citing *Gates*, 462 U.S. at 236-37). "In short, a rule requiring affiants to disclose all potentially exculpatory information has nothing to recommend it." *Id.*[7]

If this Court were to accept the defendants' arguments that law enforcement affiants are obligated to exhaustively research the backgrounds of lay-witness informants on a hunt for adverse credibility information, that would lead to absurd results that are inconsistent with long-established law and policy. Warrants are tools of criminal investigation. *Zurcher*, 436 U.S. at 560-61. Accordingly, the law presumes that, as an investigation evolves, the facts known to agents at the time of an early search warrant application may not be the same as facts that are known to a prosecutor preparing for trial and that affiants "cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Mays*, 134 F.3d at 815; *United States v. Domitrovich*, 852 F. Supp. 1460, 1465 (E.D.Wash.1994) ("Every affidavit will omit facts which, in retrospect, seem significant."); *see also Colkley*, 899 F.2d at 303 (4th Cir. 1990) ("*Franks* … recognizes that the information an affiant reports from an informant may not ultimately be accurate, and is willing to tolerate such a result so long as the affiant did not deliberately mislead the magistrate."). The standard that the defendants advocate for affiants to

---

[7]    Throughout Kim's and Messenger's Motion, they refer to the obligations or "recklessness" of "the government" in reference to the challenged search warrant applications, most starkly in Kim's and Messenger's Motion, where they argue that "The government also should have exercised special care" and attributed "recklessness" to the government regarding the February 2023 affidavits because SA DeLaPena was the affiant. They reference previous litigation of which SA DeLaPena was a subject. The defendants' references to the "government's … recklessness" in this context only underscores that the defendants have been unable to show that SA DeLaPena deliberately or recklessly mislead the magistrate in the case of the affidavits at issue in this case. Rather, they rely on an effort to impute quasi-*Brady* obligations onto a search warrant affiant, which is squarely inconsistent with well-established legal principles. In *Franks*/Fourth Amendment jurisprudence, there is no "the government"—there is the affiant and the magistrate. The inquiry is whether the affiant deliberately or recklessly mislead the magistrate, and whether that had any impact on the magistrate's finding of probable cause in issuing the warrant. The defendants have not shown that SA DeLaPena did that here.

verify the credibility of corroborated lay-witness informants in the early stages of an investigation would impermissibly hamper law enforcement.

For many of the reasons discussed in this subsection, Kim's and Messenger's additional arguments regarding purported omissions from the February 2023 affidavits should be summarily rejected. Those purported "omissions" include (1) Person 3's subjective opinion Kim's and Messenger's state of mind during the July 2021 lunch in D.C., (2) Person 3 may have disguised her identity when meeting Kim and Messenger, and (3) Person 3 may have been "excited" rather than apprehensive about a deal between Company A and Burke. Kim's and Messenger's interpretive gloss on the evidence is appropriate for trial. It is not required to be included in a search warrant affidavit. There is no obligation to include every piece of "exculpatory information" in a warrant affidavit that is otherwise supported by probable cause. *See supra.* Moreover, there is no requirement that a warrant affidavit establish that any one person (such as any of the defendants) a particular criminal offense. *Mays*, 134 F.3d at 814 ("When reviewing an application, courts must bear in mind that search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found." (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 (1978)).

> The affidavit in support of the warrant need not present information that would justify the arrest of the individual in possession of or in control of the property. The owner of the property to be searched need not be suspected of having committed a crime. Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant.

*Id.* (citing throughout *Zurcher*, 436 U.S. at 555-57).

Accordingly, the defendants cannot make the requisite substantial preliminary showing that SA DeLaPena omitted information from the search warrant affidavits that he was obligated to include, or that he was reckless in not exhaustively searching for information in a corroborated

witness's background.   On the first and third prongs of the *Franks* analysis, the defendants'
arguments fail.

        ii.  <u>Any "omissions" from the challenged affidavits were not material to the</u>
             <u>finding of probable cause.</u>

The defendants also cannot satisfy the requisite "substantial preliminary showing" under
*Franks* because, even assuming the affiant was in possession of information that he should have
provided to the magistrate (he was not), such "omissions" would not defeat probable cause.   As
discussed above, an omission of fact is only "material" if the inclusion of the omitted information
would defeat probable cause.   *Spencer*, 530 F.3d at 1007.

Even if Person 3's statements were completely excised from the challenged warrant
affidavits, the affidavit contains facts sufficient to support a finding of probable cause.   This is
because, as stated above, the investigation uncovered incriminating evidence that substantially
corroborated Person 3's report to the DoD OIG.   Assuming, *arguendo*, that the affiant was aware
of Person 3's adverse credibility finding by the Virginia state court and the NCIS investigation
emphasized by Burke, if he had included a statement in the affidavit to the effect of, "I am in
possession of information that calls into question the credibility of [Person 3]" and explaining the
details, it would have no material impact on probable cause because DCIS's investigation
following Person 3's source reporting substantially corroborated her allegation that Burke engaged
inappropriately with Company A, specifically Kim and Messenger.   *See Gates*, 462 at 244
(affirming that when an investigation corroborates information provided by informants, a law
enforcement officer may more safely rely on the informant); *id.* ("Because an informant is right
about some things, he is more probably right about other facts." (Internal quotation marks
omitted)).

Because the defendants cannot demonstrate that any later-learned information regarding

the credibility of Person 3 would have undermined the magistrate's finding of probable cause to issue the February 2023 warrants, they cannot make a substantial preliminary showing as required by *Franks*.   Therefore, they are entitled to neither a *Franks* hearing, nor suppression.   Their Motions should be denied.

### III.    There is no Fruit of the Poisonous Tree, so the Evidence Obtained from the September 2023 Warrants Should Not be Suppressed

Kim's and Messenger's Motion argues that, because the February 2023 warrant (specifically, the Microsoft Warrant – they do not address the warrant authorizing a search of Burke's Google account) are "fatally defective," evidence supplied in the September 2023 warrants authorizing the search of their personal devices and premises under their control are similarly defective because they rely on evidence that is "fruit of the poisonous tree," and must be suppressed.   *See* Kim/Messenger Motion at 22-23.   As discussed at length in this Opposition, the Microsoft Warrant is valid because it was supported by probable cause, the affiant did not recklessly or deliberately mislead the magistrate.   Here, there is no fruit of the poisonous tree. Assuming, *arguendo*, however that the Microsoft Warrant was invalid, the September 2023 warrants would still stand because they are supported by probable cause that includes the facts included in the Microsoft Warrant affidavit and additional facts learned in the course of the investigation between February and September 2023.   Even if all of the facts learned as a result of the Microsoft Warrant were excised from the September 2023 warrants, sufficient facts to support probable cause would exist.   Based on the principles of law discussed elsewhere in this Opposition, the September 2023 warrants would stand because they are supported by probable cause.

**CONCLUSION**

For the foregoing reasons and any that may be stated at a hearing on the defendants'
motions, the government respectfully requests that this Court deny the defendants' Motions to
Suppress and for a *Franks* hearing.

Respectfully submitted,

MATTHEW M. GRAVES                    COREY R. AMUNDSON
UNITED STATES ATTORNEY               Chief, Public Integrity Section
D.C. Bar No. 481052                  U.S. Department of Justice

By          /s/                          /s/
:   Rebecca G. Ross                  Trevor Wilmot
    Assistant United States Attorney Kathryn E. Fifield
    601 D Street N.W.                Trial Attorneys
    Washington, DC 20530             1301 New York Ave. NW
    Office: (202) 252-4490           Washington, D.C. 20530
                                     Office: (202) 514-1412