# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 24–265 (TNM)** |
| | : | |
| **ROBERT P. BURKE,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S TRIAL BRIEF

In April 2021, Defendant Robert Burke ("Burke") was ready to retire from the United States Navy. He told a colleague that he was "out of gas" and "looking at the earliest [he] can go." Burke's co-defendants, Yongchul "Charlie" Kim ("Kim") and Meghan Messenger ("Messenger"), were at a tipping point of their own—they were desperate for a revenue-producing contract for Company A's leadership training business to appease frustrated investors. So, the Defendants came to an illicit, corrupt agreement that solved their respective problems. They agreed that Burke would use his position as a four-star Admiral in the United States Navy to order his subordinates to give a contract to Company A and, subsequently, to influence other high-ranking Navy officials to give another, more valuable contract to the company. In exchange, Kim and Messenger promised to and did employ Burke as a Senior Partner at Company A at an annual salary of $500,000 plus stock options and other benefits. Because he knew that this *quid pro quo* was illegal, Burke concealed material information from the Navy about the nature of his relationship and discussions with Kim and Messenger. Starting on May 6, Burke will stand trial for his role in this bribery scheme and the subsequent cover up.[1] The Government is ready for trial.

---

[1]     The Indictment also charges Kim and Messenger in connection with the bribery scheme. The trial against Kim and Messenger is set for August 18, 2025.

This memorandum describes how the Defendants' bribery scheme worked, how the Government will prove the charges against Defendant Burke at trial, and the legal issues that the Government anticipates may arise.

## I.    FACTUAL BACKGROUND

### A.    The Defendants' Bribery Scheme

#### 1.  Company A Seeks Government Contracts

In or about August 2018, Company A was subcontracted with the Navy to provide workforce training to the Office of the Chief of Naval Personnel, which was then under Burke's command. Under the contract, Company A had the potential to obtain as much as $10 million from a pilot program, and Kim believed the pilot program could ripen to a $100 million contract. But the pilot program was poorly received, and the Navy terminated it after roughly a year. Government Exhibit ("GOVEX") 5. In the end, Company A received a mere fraction of the revenue they had hoped to obtain.  Kim later noted the pilot's "non-success," stating, "the initial $100MM commitment from the Navy, in hindsight should have been closed [in] July 2018." GOVEX 20.

By November 2019, Kim and Messenger tried to reestablish business with the Navy and went to Burke directly to pitch their proposal. But Burke had already transitioned to another position in the Navy, and they were instructed by a Navy officer to have no further contact with him. GOVEX 58. Kim and Messenger confirmed that they understood the message, telling Burke that they would "stand by until we hear from you."  GOVEX 10.

Yet not long after losing the coveted Navy contract, Company A came under financial strain from the economic disruptions of the COVID-19 pandemic.  Messenger wrote to an investor in July 2020, for example, that "we are experiencing a 50% drop in weekly revenues." This decline related to Company A's e-commerce business line ("Business-1") because its other business line,

workforce and leadership development training ("Business-2"), had reported zero revenue since the Navy pilot program ended in late 2019. The precipitous loss of revenue for Business-1 and the lack of other prospects for Business-2 formed a clear motive for Kim and Messenger to enter into the corrupt agreement with Burke—they needed the money, needed to prove Business-2 had value, and were getting nowhere by following the Navy contracting procedures.

### 2. April 2021 Prohibited Contact with Burke

Kim and Messenger were desperate. So they reneged on their pledge to "stand by until we hear from" Burke, who, at that time, was head of the Navy's European and African command. Between September 2020 and February 2021, they tried repeatedly to secure a meeting with Burke to promote Company A, a transparent effort to reestablish business with the Navy. *See, e.g.*, GOVEX 12, 15. Eventually, Burke acceded and met with Kim, Messenger, and senior members of Burke's staff on April 8, 2021. GOVEX 19.  Burke's civilian Executive Director, "Person 2," attended the meeting and described it as an unremarkable marketing pitch.

Nevertheless, the Defendants had a second meeting via WhatsApp on April 21. This time only the Defendants participated. GOVEX 20.  The seeds of the bribery scheme were sown: Kim and Messenger asked for a deal before agreeing to hire Burke. Within hours of this meeting, Kim, copying Messenger, described the call to senior Company A leadership as "the highest stakes meeting to date and the tiniest wrong move would/could lose all trust-come across slimy." GOVEX 23. Kim added that, during a short break in the meeting, Messenger said she "felt slimy he wants to work for us but we're asking for a deal first." *Id*. About two weeks later, Burke emailed Kim and Messenger stating that Person 2 was "working options and angles hard for funding our project[.]" GOVEX 27.

On May 10, 2021, Kim, with Messenger copied, emailed Burke proposing a $20 million contract – to provide basically the same programming that had failed two years earlier.

### 3. *July 23, 2021: Cementing the Quid Pro Quo*

On July 13, 2021, the Defendants exchanged emails to arrange a lunch meeting in Washington, D.C., on July 23, 2021, where they finalized their corrupt arrangement. Knowing his conduct was a crime, Burke concealed his meeting from the Navy. Burke arranged the meeting using his personal email account and without copying any Navy personnel. What's more, Burke's official itinerary for the afternoon of July 23 stated "Executive Time" rather than disclosing a meeting with Company A. Burke invited Person 3, a personal companion, to attend the lunch, and told her the meeting was about a job. As he wrote in a text beforehand, Kim and Messenger "want to have a more intimate conversation" and "Meghan [Messenger] already talking about [a] job." And talk about the job they did: At lunch Messenger and Kim, through Company A, agreed to hire Burke with a $500,000 salary and stock options in exchange for the government contract they so desperately sought.

The Defendants thoroughly memorialized the lunch meeting. After the meeting, Kim emailed senior Company A personnel and reported, "Burke. Crazy day. Five hours. He would have stayed all night if we stayed. In short [a contract] starting with his command almost ASAP." In the same email, Kim said that they had also discussed Burke coming to work at Company A after his retirement and including "salary equity etc." *Id.* Kim reported that Burke was "very excited" and "wanted to resign next week," but Kim "[t]old him to hold off and first launch this part 1," referencing the stage of the agreement in which Burke would direct his staff to provide a contract to Company A. *Id.* That evening, Messenger also emailed members of her family, revealing her state of mind as to the unfolding of the illicit agreement with Burke; that is, using his command to springboard to a "bigger deal" with the Navy, followed by Burke joining Company A:

> I'm so out of it so tired longest day of my life in DC was well worth it . . . getting small few million-dollar deal with [Burke] for navy europe deal to prove the result to then get bigger deal and offered [Burke] full time offer wants to be a

Company A]er starting next July. Surreal. A 4stsr [sic] working for us when he retires . . . longest day but worth it . . . . complicated as shit to get this done but goals aligned I can see it happen[.]

GOVEX 43.

The next day, July 24, 2021, Burke texted Person 3 that "[Kim] sent me a note  . . . . I asked him to write out a job description – but I've essentially agreed to work for them . . . ."

### i.    The Quid

Why did Burke enter into this illicit agreement? In describing his own motivation to corruptly agree with Kim and Messenger, Burke indicated that employment at Company A was a "real offer" that would get him "out of the DoD rut." GOVEX 42. And, at bottom, there was the money: Person 3 asked how big an equity stake Kim and Messenger offered Burke, because "[i]t was hard to hear with '500k base salary' ringing in my ears." Burke replied, "10% [ownership] in total co[mpany] … junior coowner behind [Messenger]. . . " GOVEX 42. Showing that Burke considered the future equity stake to be a value driver, Burke explained that Kim "wants all his team to own some of the company – so he can pay lower salary and incentive performance through ownership."

Person 3 asked to what extent the job at Company A was "tied" to his providing a Navy contract; Burke answered, "technically - zero. But he desires that I be able to have a personal testimonial."  In other words, Burke's employment was contingent on providing a contract to Company A so that Burke could attest to Company A's product. Underscoring Burke's agreement to work for Company A, on August 26, 2021, about a month after the lunch meeting, Defendant Burke sent the Secretary of the Navy a memo announcing his intention to retire from the Navy in May 2022. GOVEX 50.

### ii.    The Quo

The Defendants developed a three-phased approach to their efforts to unlawfully obtain

Navy contracts for Company A. In Phase One, Burke would take official action to deliver an initial contract for Company A to train a portion of his command, Navy Europe and Africa, to "make data showing results." GOVEX 46. In Phase Two, Burke, armed with the results of the initial contract, would influence other senior Navy officials to obtain a second, Navy-wide (and thus more valuable) contract for Company A. *Id.* And in Phase Three, Burke would retire from the Navy and join Company A as a Senior Partner. *Id.*

Throughout the summer of 2021, emails show that Company A was still developing the tech application that it intended to present to the sailors under Burke's command for Phase One of the illegal bribery agreement. In this context, Messenger emailed select Company A personnel indicating that she and Kim decided to further reduce their $20 million proposal down to a $1 million contract. GOVEX 53. Messenger explained, "We don't want Bob [Burke] to get off the hook…the $ amount is less significant at this stage [. . . .] IN our POV [*i.e.*, point of view] the contract size is less important than the things it triggers (including being able to say we're in partnership with the navy)[.]" *Id.*

But when Company A's product was ready and made informally available to some Navy personnel to "test drive," the results were so bad that on September 22, 2021, Burke emailed Kim and Messenger that Company A's application "in and of itself does not stand on its own" and that the "app-based approach" "just does not seem to be sustainable or scalable for us [*i.e.*, the Navy]." GOVEX 56.  Burke stated that, "I just can't do this as structured." *Id.* Tellingly, however, Burke did not close the door to Kim and Messenger; instead, he instructed them how to modify their proposal so that he could ram it through his administration and, in that respect, he offered "to talk this week or next if helpful." *Id.* Kim then invited Burke to Company A's new and lavish New York City headquarters, and Burke quickly agreed to visit them. *Id.*

4. *Phase One: Burke Performed a Corrupt Official Act on Company A's Behalf to Direct a Contract to Next Jump*

To complete Phase One of their illegal bribery agreement, in mid-December 2021, Burke used his official position as Commander of Navy Europe and Africa to order his subordinates to ensure Company A had a contract with the Navy to provide a training program in Naples, Italy, and Rota, Spain, the following month – an order that Navy contracting officials felt was inappropriate and, under normal circumstances, impossible.

Preceding Burke's official action to direct a contract to Company A, the Defendants continued to meet to discuss their corrupt bribery agreement and finalize its execution. On November 16, 2021, Burke visited Company A's headquarters in New York City. GOVEX 65. Immediately after the meeting, Kim emailed select Company A personnel that the company was about to be "full force back into business with the Navy." GOVEX 66. Kim also described a detailed plan that would work around (but not fix) the significant flaws in Company A's app—the plan was to send four officers under Burke's command to attend an in-person training at Company A and report back to Burke and his senior staff about the program's utility. *Id.* This plan was conceived in deception because the Defendants pre-determined that the contract would be "signed before Xmas" no matter the officers' review of the training. *Id.* Executing the plan would require the assistance of Company A's "Partners" team, whom Kim emailed to "informate" as to what transpired in their meeting with Burke:

> [Messenger] and I met for a little over 4 hours today with [Burke]. In short, we're about to go full force back into business with the Navy. We have 4 of his senior most people coming in 2 weeks . . . Within one week [of that visit] . . . he is going to propose back a ~$1MM engagement with [Company A] with goal of having it signed before Xmas. We will likely launch in the new year, the work will be in Naples, Italy and Rota, Spain. We will likely engage our entire Partners team to help with the coaching and training of the pilot Sailor population.

*Id.* And Kim clearly believed, based on that meeting, that their three-phased plan with Burke was

moving forward, as he later wrote to an associate:

> Contract signed before Xmas and then we're off to the races, ideally tangible success by March. Present April/ may for all navy deal to 640k sailors and 5000 commands globally. Then [Burke] ideally leaves navy joins [Company A] somewhere between July-oct next year in nyc.

GOVEX 67.

Two days later, Messenger emailed Kim alone and expressed her ongoing belief that the conspiracy was driving toward its intended results: "Weird to think Bob [Burke] gonna be on our team likely next summer eh[.]" GOVEX 68.

In mid-December 2021, Company A personnel were contacting Burke's staff to arrange their travel – even though a contract had not been signed. When Person 2 learned about this, she wrote, "Why are they coming? We have no contact with them," and then clarified, "I mean contract not contact. Comptroller is researching possible vehicles, but we don't even have proposals . . . I'm not sure how to stop this direct communication between [Burke] and [Company A]." GOVEX 74. Nevertheless, on or about December 17, 2021, Burke took official action to fulfill his end of the illegal bribery agreement and ordered Person 2 to provide a contract for Company A to train to his command. GOVEX 78. In turn, Person 2 instructed Burke's staff to follow Burke's order, including Burke's directive that the contract be "in place by 10 Jan." *Id*. Burke's staff had approximately 10 working days to get the contract in place, whereas, in the ordinary course, constructing and implementing federal government contracts takes months. As to Company A's "pricing proposal" for their proposed training, one training specialist under Burke's command remarked, "I'm sorry, but I really don't like the pricing. They are screwing us." GOVEX 157.

The Navy ordered the contract for Company A to train Navy personnel in Naples, Italy, and Rota, Spain, in January 2022. While in Italy, Kim and Messenger took Burke and his wife to a $544.66 dinner. GOVEX 93. Burke accepted the dinner – a gift from a prohibited source under

government ethics rules – but did not report it to anyone in the Navy.

The training provided by Company A was widely disparaged. In fact, a post-training survey was compiled showing the mostly negative reviews.

### 5. Phase Two: Burke Promotes Company A to Other High-Ranking Officials

Even though Burke knew that Company A's training received mostly negative feedback, Burke worked to complete Phase Two of the illegal bribery agreement by promoting Next Jump to other high-ranking officials with the hope that Next Jump would receive a larger contract in the future. *See* GOVEX 47. For example, Burke wrote to a high-ranking Admiral responsible for training sailors throughout the Navy and promoted Company A, asserting that Company A could provide Navy-wide training. GOVEX 101. Burke also promoted Company A to a high-ranking foreign official of a Foreign Military. GOVEX 123. Of course, in using his official position to advocate for Company A within the Navy, Burke was advancing his own financial interests because he had already agreed to join Company A later that year with a large equity stake. In other words, Burke's future ownership of part of Company A was incentivizing his performance even before Burke retired from the Navy.

### 6. Phase Three: Kim and Messenger Offer Burke a Job at Company A

Burke fulfilled Phases One and Two of the illegal bribery agreement by taking official action to direct a contract to Next Jump and by promoting Next Jump to other high-ranking officials. It was time for Kim and Messenger to complete Phase Three and hire him. But first, Kim and Messenger visited Burke and his wife in Naples and stayed at their home. A few weeks later, Burke received his Company A offer letter, which mirrored the terms discussed at the lunch in July 2023 when the Defendants cemented the *quid pro quo*. GOVEX 126. Kim and Messenger offered Burke a position at Next Jump with a $500,000 base salary and 100,000 stock options.

**B.      Burke's Concealment and Conflict of Interest**

To fulfill his end of corrupt agreement with Kim and Messenger – and to receive the "real offer" of a lucrative pay package from Company A that would get him out of the "DoD rut" – Burke's responsibility was to direct a contract to Company A and promote Company A to other high-ranking officials. *See* GOVEX 47.  To be able to do so, Burke could not allow himself to be recused or conflicted out of handling matters concerning Company A. Accordingly, at no point from July 2021 to May 2022 did Burke report to the Navy that Kim and Messenger had offered him a job at Company A, or that he had discussed with them the possibility of working for Company A as early as April 2021. GOVEX 9. On the contrary, Burke actively concealed the job offer while performing certain tasks necessary for him to retire and obtain post-government employment. For example, on August 26, 2021, Burke sent the Secretary of the Navy a memo requesting voluntarily retirement in May 2022, affirming that he was aware of the directive governing pre- and post-retirement standards of conduct and employment activities – and thereby falsely implying that he was following those standards. GOVEX 50. Despite knowing he had engaged in job negotiations with Kim and Messenger, Burke implied that he would continue to follow that directive. *See id.* But, of course, Burke continued to actively ignore it.

Burke's ethics counselor advised Burke that prior to seeking post-government employment it would be wise to request a post-government employment opinion. *See* GOVEX 111. Seeking a post-government opinion is consistent with typical practice when a high-ranking Navy official is retiring from the Navy and considering post-government employment options. The opinion is intended to ensure that retiring officials do not run afoul of the Navy's code of conduct and the law. On March 28, 2022, Burke emailed his Navy Ethics Counselor ("NEC") to request a generic post-government employment opinion. GOVEX 111. In his March 28, 2022, email to the NEC, Burke falsely stated that he "had no conversations, have no intent to aim for a specific company,

and most likely will not actively seek employment until after 1 July." *Id.* Then, on May 6, 2022, Burke again emailed the NEC and falsely implied that Company A had just approached him to ask if he "would be interested in having post-navy employment discussions." GOVEX 111. Burke falsely reported to the NEC that he rejected Company A's entreaty out-of-hand. A few days later, Burke subsequently signed a memorandum disqualifying himself from participating in any matters with Company A, effectively snowing the Navy into believing that Burke's conduct was above board and in line with government ethics rules, with which Burke was intimately familiar. GOVEX 113. By that time, it had been almost ten months since Burke "basically agreed to work for" Kim and Messenger following their D.C. lunch meeting. It had been over five months since Burke ordered Person 2 to provide the contract to Company A. And Burke had already used his position to promote Company A to other high-ranking officials.

In one of his final deceptive acts, in July 2022, Burke withheld material information – his employment agreement – from his mandatory public financial disclosure report (OGE-278e). Burke joined Company A in October 2022. GOVEX 151.

## II.    THE GOVERNMENT'S EVIDENTIARY PRESENTATION

At trial, the Government intends to call law enforcement agents and witnesses who will present the substantial documentary evidence chronicling the Defendants' bribery and concealment, including key records obtained from the Navy, Company A, and financial institutions. The Government also plans to introduce Burke's own recorded statements. And, for ease of the jury's review, the Government intends to use summary charts in its presentation consistent with Federal Rule of Evidence 1006.

### A.  Documentary Evidence

#### 1.  Navy Records

The Government intends to introduce records obtained from the Navy, including

documents related to: (1) contracts with Company A; (2) ethics policies and training; (3) Burke's travel; (4) email from numerous official Navy accounts; and (5) Burke's annual public financial disclosures. These documents are authentic, and not hearsay. The Government intends to introduce them as certified domestic records of a regularly conducted activity pursuant to Federal Rule of Evidence 902(11).   These records have been produced to defense counsel, along with their certifications, *see* ECF Nos. 66 at Att. B, 144 at Att. 1. The records are originals of domestic (United States) business records of the Navy. The records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters, and the records were kept in the course of a regularly conducted business activity.   The records were kept in the regular course of business and made by the regularly conducted business activity as a regular practice.  *See* Fed. R. Evid. 806(3).

The Government also intends to introduce email communications sent and received by Burke and other Navy employees, using official Navy email accounts, that relate to Company A and Company A's contract with the Navy. These email communications have also been produced to defense counsel, along with their certifications, *see* ECF No. 144 at Att. 1. These records are authenticated pursuant to Federal Rule of Evidence 901, as indicated by the accompanying certifications. Furthermore, these communications are not hearsay because they are either statements made in furtherance of the conspiracy or are not offered for the truth of the matter asserted.

Burke, while reserving his right to object to these records on other grounds, indicated that he did not object to the authenticity of any of the Navy records produced with a certification. [2]

---

[2]     On April 2, 2025, the Government filed a supplemental Motion *in Limine* to Admit Certain Evidence and Argument, seeking the Court to admit evidence pursuant to Federal Rules of

### 2. Company A Records

The Government intends to introduce Company A emails, including emails between Kim and Messenger, Kim and Messenger and Burke, and Kim and Messenger and Company A employees and investors. These emails were obtained pursuant to duly authorized search warrants and directly from Company A in response to subpoenas. These records have been produced to defense counsel, along with their certifications, *see* 144 at Att. 1. Burke, while reserving his right to object to these records on other grounds, indicated that he did not object to the authenticity of these records and this Court has admitted these records.[3]

During the April 20, 2025, pretrial conference in this case, this Court ruled that statements made by Kim and Messenger in furtherance of the conspiracy with Burke would be "presumptively admissible" in Burke's trial pursuant to Federal Rule of Evidence 801(d)(2)(E) absent any "specific" basis for an objection by Burke. Pretrial Hearing Transcript, *see* ECF No. 152, at 112. Specifically, the Court ruled that three "buckets" of statements are "generally … admissible." *Id.* at 114. Those buckets include (1) "communications between Co-Defendants Kim, Messenger, and Company A personnel," (2) "statements between Mr. Kim and Ms. Messenger themselves as well as statements between all three Co-Defendants," and (3) "statements made by Defendants Kim

---

Evidence 901 and 902(11). ECF No. 144. Attached to the Government's motion was the declarations the Government obtained from the Navy attesting to authenticity of the vast majority of the records and communications the Government intends to introduce. In an email to Chambers, Burke indicated that he did not object to the authenticity of these records, but reserved his right to object on other grounds, and notified Chambers that he would file his position in a notice on the docket.

[3]     Also attached to the Government's April 25, 2025, Motion *in Limine* to Admit Certain Evidence was a certificate of authenticity attesting to the authenticity of Company A records. Also in his email to Chambers, Burke indicated that he did not object to the authenticity of these records, but reserved his right to object on other grounds, and notified Chambers that he would file his position in a notice on the docket.

and Messenger to Company A investors." *Id*. at 114-16.

### 3. Business Records

The Government intends to introduce business records, including financial records of Company A's corporate credit cards and others. The Government has provided these documents and their certification to the defense, *see* ECF Nos. 66 at Att. B. The Government intends to introduce these documents as certified domestic records of a regularly conducted activity pursuant to Federal Rule of Evidence 902(11). Burke, while reserving his right to object to these records on other grounds, did not object to the authenticity of these records and this Court has admitted these records. *See* ECF Nos. 144.

### B.     Burke's Statements

On October 3, 2023, Burke participated in a voluntary interview with federal law enforcement that was recorded.  The Government intends to introduce four clips, and a transcript of those clips, from the recording of the interview.  Burke's statements on the recorded clips include statements about: (1) his interactions with Kim and Messenger; (2) his role in helping Company A secure a contract with the Navy; (3) the July 2021, meeting with Kim and Messenger in Washington, D.C.; and (4) the influence Kim and Messenger had on him. The Government intends to admit these clips through NCIS Investigator Mary Beth Eversman, who was present at that interview.  These clips, and the transcript of those clips, are admissible as party-opponent admissions under Rule 801(d)(2)(A).

The Government also intends to admit seven clips, and a transcript of those clips, from an April 15, 2022, recorded call between Burke and Person 3. On November 29, 2024, the Government filed a motion seeking to its intent to introduce this recorded call pursuant to Federal Rule of Evidence 404(b). ECF No. 68. On April 10, 2025, this Court granted that motion. ECF No. 150.

It is important to note that under the Rules of Evidence, a defendant may not introduce his own self-serving statements.  *See* Fed. R. Evid. 801(c); *see also, e.g.*, *United States v. Wilkins*, 538 F. Supp. 3d 49, 68 (D.D.C. 2021) ("While the Federal Rules of Evidence set forth various exceptions to hearsay, self-serving hearsay is not one of those.").  Should Burke invoke Federal Rule of Evidence 106, known as the "rule of completeness," to introduce his own self-serving interview statements, the Court should not admit them.  The rule of completeness is properly invoked "rarely and for a limited purpose" and only to alleviate "distortion that otherwise would accompany the prosecution's evidence."  *United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986).  In other words, Rule 106 does not overcome the normal prohibition against a party introducing their own statements and may only be used to provide *necessary* clarification contemporaneous to a misleading presentation of evidence, which, of course, the Government seeks to avoid.

The recorded clips of Burke's statements that the Government will introduce will be fully understandable to the jury standing on their own and, if necessary, with contextualizing testimony by a witness who was present and contemporaneously heard the statements.  Self-serving statements by Burke during his interview also stand alone, and do not provide helpful context to the inculpatory portions.  Rule 106 is inapplicable in this context. Burke is not permitted to introduce his statements on his own behalf either on cross-examination or in his own case-in-chief, unless, of course, he testifies.[4]

---

[4]    The Government anticipates that Burke will argue that a relatively recent (2023) amendment to Rule 106 topples the Government's argument on this point.  Specifically, Burke will argue that the last sentence of Rule 106—stating that "The adverse party may [seek the introduction of additional statements] over a hearsay objection"—means that Rule 106 now trumps the prohibition against a party introducing their own statements, rooted in Rule 801(d)(2)(A). Burke is wrong.  The commentary to the 2023 amendment to Rule 106 states:

### C.      Summary Charts

The Government anticipates introducing the following summary charts through FBI Special Agent Gardner, all of which have already been provided to the Defendant:

- July 23, 2021, text communications between Burke and Person 3;

- July 24, 2021, text communications between Burke and Person 3; and

- Timeline of relevant calls, meetings, communications, and events described above.

The summary charts of the text communications put dozens of pages of text communications in a more digestible format for the jury, making the messages easier to visualize and understand. The Government also intends to admit the underlying cell phone extraction report of these communications, which will have already been admitted pursuant to Federal Rule of Evidence 902(14), *see* 04/03/2025 Min. Ord. The timeline summary chart summarizes dozens of pages of documents and puts those documents in chronological order, making it easier to visualize and understand the context of events important to the charged conspiracy.  The Government also intends to admit the documents underlying this summary chart prior to the introduction of the summary chart.

Documentary evidence that is too voluminous for a jury to readily examine is properly

---

The [2023] amendment does not give a green light of admissibility to all excised portions of statements. It does not change the basic rule, which applies only to the narrow circumstances in which a party has created a misimpression about the statement, and the adverse party proffers a statement that in fact corrects the misimpression. The mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion under Rule 106.

Fed. R. Evid. 106 cmt. *See also, e.g.*, *United States v. Dupree*, No. CR 22-275 (CKK), 2024 WL 2746963, at *4–5 (D.D.C. May 29, 2024); *Russell v. WADOT Cap., Inc.*, No. C22-0531JLR, 2025 WL 331304, at *6 (W.D. Wash. Jan. 29, 2025); *United States v. Bryan*, No. 3:21-CR-17-DPJ-LGI, 2023 WL 8360073, at *1 (S.D. Miss. Dec. 1, 2023).

summarized by a case agent pursuant to Federal Rule of Evidence 1006, which provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent in produce them in court.

Fed. R. Evid. 1006; *see also, United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014); *United States v. Weaver*, 281 F.3d 228, 232 (D.C. Cir. 2002) (finding that chart demonstrating extensive payroll records was a proper summary exhibit and served as evidence in substitute of the actual payroll records). The D.C. Circuit previously approved of the introduction of witnesses to summarize testimony. In *United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983), the Court of Appeals allowed a witness to provide a summary of lengthy and complex testimony and documents acknowledging the value of summary witness testimony in helping the jury to organize and evaluate information revealed in the testimony of a multitude of witnesses. *See also United States v. Johnson*, 54 F.3d 1150, 1160 (4th Cir. 1995) (summarizing witness testimony in seven day trial not an abuse of discretion and "likely helpful to the jury as a summary of the witnesses' recollections" although adding the weights of drugs sold did not require any specialized knowledge).

## III.    WITNESSES

### A.  Navy Personnel

Most of the Government's witnesses will be current or former employees of the Navy, such as Person 2. Some will testify about the Navy's normal contracting policies and procedures. They will also testify about Burke's relationship with Kim and Messenger from the Navy's perspective, and events preceding and around Burke's contract order in December 2021, and all the ways in which that contracting procedure differed from the standard contracting procedure. The Navy

witnesses will further testify about their impressions of Company A and the value of the Navy's contract with Company A.

Other Navy witnesses will testify about the Navy's ethics rules and policies, such as the NEC, who will testify about training that Burke received on the Navy's ethics policies and Burke's annual financial disclosure forms. He will also testify about the Navy's procedures for retiring from the Navy and obtaining post-government employment, and his role in assisting Burke through those procedures.

### B.    Law Enforcement Witnesses

The Government intends to call two law enforcement witnesses. As mentioned above, the Government intends to call NCIS Investigator Mary Beth Eversman to testify about her October 3, 2023, interview with Burke. The Government also intends to call FBI Special Agent Gardner, who will discuss the investigation into the charged offenses and much of the documentary evidence summarized above.

### C.    Person 3

The Government also may call Person 3, who attended the July 2021 meeting between Burke, Kim, and Messenger, in Washington, D.C., and communicated with Burke about that meeting the next day. Person 3 would discuss what she witnessed at that meeting, the context of her communications with Burke about that meeting, as well as additional information she learned about Burke's employment at Company 3. Person 3 would also introduce the recording of the April 15, 2022, call with Burke, which, as discussed above, the Government intends to admit as 404(b) evidence.

## IV.    ANTICIPATED LEGAL ISSUES

The objective facts of this case are not in serious dispute: Burke was promised and did receive employment from Next Jump, and Burke took acts to advance Next Jump's business

interests.  The central contested issue in this case is not what the defendants did, but rather why they did it. Burke appears likely to argue that in his mind he never committed to work at Company A until mid-2022, and that his conduct vis-à-vis Company A before that time was performed in good faith. The Government will prove beyond a reasonable doubt that the Defendants agreed to these exchanges—job for contracts—with corrupt intent, as evidenced in-part by Burke's concealment.

### A.  The *Quid Pro Quo* Requirement

"Bribery requires intent to influence an official act or to be influenced in an official act." *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404 (1999).  "In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *Id.* (emphasis in original). Though the Government phrases bribery as a *quid pro quo*, there is no requirement that the *quid* actually be paid or that the *quo* actually be performed. The crime of bribery is promising to pay or "agreeing to take money for a promise to act in a certain way." *United States v. Brewster*, 408 U.S. 501, 526 (1972).  As the Supreme Court explained, it is the unlawful agreement that controls in a bribery case:

> [A] public official is not required to actually make a decision or take an action . . . ; it is enough that the official agree to do so.  The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.  Nor must the public official in fact intend to perform the "official act," so long as he agrees to do so.  A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an "official act" in return.

*McDonnell v. United States*, 136 S. Ct. 2355, 2370-71 (2016).

### B.    The *Quo*: Performance of an Official Act

As charged, the *quo* in this case is the performance of an official action. Specifically, to establish bribery in this case, the Government must show Burke demanded, sought, received,

accepted, and/or agreed to receive and accept Kim and Messenger's offer to work at Company A for a $500,000 salary and stock options in return for being influenced in the performance of an action, that is, directing a Navy contract to Company A. *See Sun-Diamond*, 526 U.S. at 404-05 (explaining that a *quid pro quo* is a "a specific intent to give or receive something of value *in exchange* for an official act"); *see also* ECF No. 1 at ¶ 51.

As explained in the Government's Opposition to Burke's Motion to Dismiss, *see* ECF No. 84, for a public official to be guilty of bribery, he must have "agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *McDonnell*, 579 U.S. at 572-573 (2016). An official act is defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). Whether alleged conduct constitutes an "official act" is a factual question for the jury to determine: "It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *McDonnell,* 579 U.S. at 572-73; *see also United States v. Miserendino*, 283 F. Supp. 3d 489, 492-93 (E.D. Va. 2017) (denying motion to dismiss and leaving for jury whether defendant committed "official act").

### C.    Impermissible Defenses

Defendant Burke may suggest that he would have given Company A a contract anyway, and therefore he did not accept or agree to accept a bribe. But it is neither material nor a defense to bribery that Burke would have given a contract to Company A even without Kim and Messenger's July 2021 job offer, or that he intended his actions to benefit the Navy. *See, e.g.*, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379 (1991) ("A [public official] is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid. That is frequently the defense asserted to a criminal bribery

charge-and though it is never valid in law, it is often plausible in fact.") (citation omitted); *United States v. Orenuga*, 430 F.3d 1158, 1165 (D.C. Cir. 2005) (It "is not a defense to the crime of bribery that[,] had there been no bribe, the public official might have lawfully and properly performed the same act."); *United States v. McDonough*, 727 F.3d 143, 161 (1st Cir. 2013) ("The issue in this case is not whether the defendants truly thought the software was a benefit to the Commonwealth; instead it is whether they intended to exchange payments to [a politician] for assistance to [a contractor]."); *United States v. Quinn*, 359 F.3d 666, 675 (4th Cir. 2004) ("It is not necessary for conviction under § 201(b) that the official act offered in exchange for the bribe be harmful to the government or inconsistent with the official's legal obligations . . . . [I]t does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations."). The reason for this is clear:

> It is a major concern of organized society that the community have the benefit of objective evaluation and unbiased judgment on the part of those who participate in the making of official decisions. Therefore, society deals sternly with bribery which would substitute the will of an interested person for the judgment of a public official as the controlling factor in official decision. The statute plainly proscribes such corrupt interference with the normal and proper functioning of government.

*United States v. Labovitz*, 251 F.2d 393, 394 (3d Cir. 1958) (rejecting argument that bribery under 18 U.S.C. § 201 must be directed at accomplishment of unlawful action).

It is similarly not a defense to bribery that the contract to Company A would benefit the Navy. *See United States v. Morgan*, 635 F. App'x 423, 465 (10th Cir. 2015) ("Bribery is not illegal because it leads to inferior legislation; it is illegal because it betrays the public trust") (internal quotations and citations omitted); *see also Skilling v. United States*, 561 U.S. 358, 400 (2010) ("Even if the scheme occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party's right to the offender's "honest services.'"); *United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 n.13 (11th Cir. 1997) (Statutes prohibiting bribery "do

not address the wisdom or results of a legislative decision; rather, they concern the *manner* in which officials make their decisions.") (emphasis added). This makes sense because the proscribed conduct under § 201 is "the acceptance of the bribe" and "not [the] performance of the illegal promise." *Brewster*, 408 U.S. at 525. As it follows, the Government is not required to demonstrate that the official action would be harmful to the public, nor should the defense be allowed to confuse the issues with the jury.

Nevertheless, limited evidence regarding the merits of Company A's workforce training program will be admissible at trial because it is intrinsic to the bribery scheme. For example, the Government anticipates that several witnesses will testify that they considered the program to be substandard, overpriced, and ill-matched to the needs of the Navy. Further, the Government expects testimony that after Company A performed training in January 2022, those who attended the program generally derided it as out of touch and even insulting – and the summary of negative reviews was shared with Burke before he promoted the same training to other senior Navy officers anyway. To this extent, the quality of the training is relevant to Burke's state or mind, knowledge, and motive. However, the introduction of additional evidence or argument regarding the benefits of the training program to the Navy will serve only to mislead and confuse the jury, which is faced with deciding whether the Defendant's decision to give Company A the contract was part of a *quid pro quo* with Kim and Messenger.

Accordingly, the law does not permit the Defendant to introduce evidence or argument that he did not accept a bribe because he intended to give the contract to Company A even without Kim and Messenger's job offer, or his actions were intended to benefit the Navy.

## V.    ANTICIPATED EVIDENTIARY ISSUES

### A.  Emails from Messenger to Members of Her Family

#### 1.  Rule 803 Hearsay Exceptions

The Government may seek to admit two emails from Messenger to members of her family, including: (1) an email Messenger wrote to her mother and sister on July 24, 2021 that describes the nature of her and Kim's criminal bribery agreement with Burke, *see* GOVEX 43; and (2) an email Messenger wrote to her sister on May 25, 2022 – right after Kim and Messenger sent their official job offer to Burke, which highlights Burke's promotion of Company A under the guise of official communication between Burke and a foreign official of a Foreign Military, *see* GOVEX 124.[5] The Government may seek to offer these statements by Messenger under various exceptions to the rule against hearsay laid out in Federal Rule of Evidence 803.  Specifically, the Government may seek to rely on Rules 803(1) ("Present Sense Impression"), 803(2) ("Excited Utterance"), or 803(3) ("Then-Existing Mental … Condition").[6]

GOVEX 43 and 124 are admissible as Excited Utterances.  *See* Fed. R. Evid. 803(2).  Rule 803(2) permits the admission of "statement[s] relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  *Id.*  "The rationale underlying the excited utterance exception is that excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable."  *United States v. Alexander*, 331 F.3d 116, 122 (D.C.

---

[5]     The Government will be providing the Court advance copies of its exhibits for the purpose of examining these and other exhibits.  The Government has provided preliminary copies of its exhibits to the defense and will provide finalized copies before trial commences.

[6]     The Government may also seek to rely on Rule 804(b)(3), Statements Against Interest, should it become clear that all of the requirements of that Rule are or will be satisfied.  Fed. R. Evid. 804(a), 804(b)(3); *see also United States v. Slatten*, 865 F.3d 767, 805 (D.C. Cir. 2017).

Cir. 2003) (internal quotation marks omitted).  "For a statement to qualify as an excited utterance, the proponent of the exception must establish: (1) the occurrence of a startling event; (2) that the declarant made the statement while under the stress of excitement caused by the event; and (3) that the declarant's statement relates to the startling event."  *Id.*  GOVEX 43 clearly satisfies these requirements.  There is ample proof that the "startling event"—the July 23, 2021, lunch meeting that Messenger and Kim had with Burke in D.C. at which the coconspirators ironed out details of the bribe scheme—occurred.  *See, e.g.*, GOVEX 32, 38-42.  In describing the lunch to her mother and sister, Messenger emphasizes how tired she was—"I'm so tired longest day of my life"—and expresses how it was "surreal" to think about "A 4stsr [sic] working for [Company A] when he retires," followed by "worth it."  GOVEX 43; *see also supra* at 4-5.  Messenger's expressions establish that, when she wrote the email, Messenger was both dazzled and overwhelmed.  That is, she was very much still "under the stress of excitement caused by the" the lunch meeting.  Fed. R. Evid. 803(2).  It is also clear that her excited expressions relate directly to "the event" – that being the coconspirators lunch in D.C. and the conspiratorial plan that was hatched therein.

GOVEX 124 likewise satisfies the requirements of Rule 803(2).  The "startling event" is an email from Burke to Kim and Messenger, in turn forwarding an email in which Burke was promoting Company A to a Foreign Military leader; proof of the event is contained in the exhibit itself.  Messenger, on the same day, forwards the email to her mother and says: "Ridic ... bob[ Burke]'s email to head of royal navy ... it's so good ... we sent bob his offer letter last night after we spoke to him to formalize the details."  Messenger's use of "Ridic" (short for ridiculous) and "it's so good," referring to Burke's promotion of Company A communicates her excitement about the event, apparently as she is reacting to having received the forwarded email from Burke.  Messenger's excitement about Burke promoting and joining Company A establishes the reliability

of the truth of her statements. *See Alexander*, 331 F.3d 116, 122 ("[E]xcitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable."). Moreover, though Rule 803(2) does not require additional circumstantial indicia of reliability, the fact that, in both GOVEX 43 and 124, Messenger is sharing confidences with close family members also increases the likelihood that Messenger was, in her statements, telling the truth.

Alternatively, the Government may seek to offer GOVEX 43 as a "Present Sense Impression." *See* Fed. R. Evid. 803(1). To admit out-of-court statements under Rule 803(1), the proponent must satisfy three elements by a preponderance of the evidence: "(1) the statement describes or explains an event or condition, (2) which the declarant perceived firsthand, and (3) the statement was made contemporaneously – while the declarant perceived the event or condition or immediately thereafter. Fed. R. Evid. 803(1); *see also United States v. Wills*, No. CR 18-0117 (PLF), 2018 WL 6716096, at *3 (D.D.C. Dec. 21, 2018) (citing Fed. R. Evid. 803(1) and cases). The key inquiry under Rule 803(1) is the length of time that has passed between the subject matter of the statement and when the statement was made, *see id.*, because "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." Fed. R. Evid. 803 cmt. The commentary to Rule 803 recognizes, however, "that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable." *Id.* "Thus, instead of recognizing a bright-line rule for specific time intervals and admissibility, courts have held that 'the admissibility of statements under hearsay exceptions depends upon the facts of the particular case.'" *United States v. Lovato*, 950 F.3d 1337, 1344 (10th Cir. 2020) (quoting U*nited States v. Blakey*, 607 F.2d 779, 785 (7th Cir. 1979), overruled on other grounds by *United States v. Harty*, 930 F.2d 1257, 1263 (7th Cir. 1991))).

25

Messenger sent the email in GOVEX 43 within hours of the "event or condition" that she was explaining.  It is reasonable to infer that Messenger sent the email upon arriving home after the lengthy July lunch meeting and a long travel day from D.C. back to New York. The email appears to have been sent around 3:37 AM the "morning" after the July 23 lunch meeting.  As asserted above, in the email, Messenger appears to still be reacting emotionally from the lunch and their (her and Kim's) arrangement with Burke.  But it is also arguable that Messenger is reacting to and explaining the entire latter portion of the day (July 23) to her mother and sister.  In other words, Messenger's statements appear to have been made at her earliest opportunity—after arriving home from travel—and explain the hours that immediately preceded the email.

Finally, GOVEX 43 and 124 may be admissible as statements of Messenger's then-existing state of mind.  *See* Fed. R. Evid. 803(3).  An out-of-court statement "of the declarant's then-existing state of mind [or] emotion … (such as intent, plan, motive, design, mental feeling, pain and bodily health)," is admissible to prove the declarant's state of mind or emotional state, but "statement[s] of memory or belief to prove the fact remembered or believed" are excluded from this hearsay exception ("unless it relates to the execution, revocation, identification or terms of declarant's will").  *Id.*  In other words, statements are admissible under Rule 803(3) to the extent that they explain the declarant's contemporaneous thinking or feeling, but "does not permit the declarant to relate what caused the state of mind."  *United States v. Slatten*, 395 F. Supp. 3d 45, 87 (D.D.C. 2019).  The Government may seek to offer GOVEX 43 and/or 124 as proof of Messenger's then existing state of mind, or her "intent, plan, motive, design, [or] mental feeling."  Fed. R. Evid. 803(3)

### 2.  *Residual Hearsay Exception (Fed. R. Evid. 807)*

These emails are alternatively admissible under the residual hearsay exception. Federal Rule of Evidence 807 allows for the admission of out-of-court statements that do not strictly fit

the technical requirements of other hearsay exemptions and exceptions. Fed. R. Evid. 807. "[T]he

legislative history of Rule 807 indicates that it should be applied sparingly." *Slatten*, 865 F.3d

767, 805 (internal quotation marks omitted). The Rule is appropriately invoked only when "it is

apparent that no other exception renders a hearsay statement admissible." *Id.* The D.C. Circuit

has identified five criteria for the admission of out-of-court statements under Rule 807:

> (1) "[T]he statement must have equivalent circumstantial guarantees of trustworthiness comparable to those found in Rule 803's and Rule 804's enumerated hearsay exceptions."
>
> (2) The statement "must be offered as evidence of a material fact."
>
> (3) "[T]he statement must be more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."
>
> (4) Admitting the statement must "serve the purposes of these rules and the interests of justice."
>
> (5) "[T]he proponent of the statement must have given an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it."[7]

*Slatten*, 865 F.3d at 806 (internal quotation marks and citations omitted). Should the Court find

that Messenger's emails to her family are not admissible under a Rule 803 hearsay exception, it

should nonetheless admit them under Rule 807.

As shown above, these statements "have equivalent circumstantial guarantees of

trustworthiness comparable to those found in Rule 803's … enumerated hearsay exceptions." *Id.*

The statements are highly probative of material facts, including the existence of a conspiracy

between Burke and his codefendants, and the contours of the conspiratorial agreement as described

by Messenger, Burke's coconspirator. Admission of these statements serves the interests of

justice. Not only were the statements produced to Burke nearly a year ago, but they are critical

---

[7]    This memorandum serves as notice to the Court and the Defendant of the Government's intent to rely on Rule 807 if necessary.

evidence that demonstrates the existence of a conspiratorial agreement by which Burke profited from an abuse of his official position.[8]

### B.    Text Messages Exchanged Between Burke and Person 3

The Government will seek to introduce text messages between Burke and Person 3 that contain certain statements or questions posed by Person 3, the contents of which are admissible pursuant to Federal Rule of Evidence 801(d)(2)(B) as adopted admissions. *See* GOVEX 42. Rule 801(d)(2)(B) holds that an out-of-court statement offered against an opposing party that "is one the party manifested that it adopted or believed to be true" is not hearsay.  Under the Rule, the defendant must have "understood and unambiguously assented to" the declarant's statement, "but his understanding and assent may be established through conduct as well as through words." *United States v. Beckham*, 968 F.2d 47, 52 (D.C. Cir. 1992).  "In addition to overt action, silence can also manifest adoption depending on the circumstances."  *United States v. Rivera*, No. CR 21-060 (CKK), 2022 WL 2239800, at *2 (D.D.C. June 17, 2022) (citing *Naples v. United States*, 344 F.2d 508, 512 (D.C. Cir. 1964), overruled in part on other grounds, *Fuller v. United States*, 407 F.2d 1199, 1221-22, 1230 n. 42 (D.C. Cir. 1968) (en banc), *cert. denied*, 393 U.S. 1120, 89 S. Ct. 999 (1969)).

As relevant here, following the July 23, 2021, meeting in D.C., which Person 3 attended, Person 3 and Burke exchanged messages about what transpired at the meeting. Person 3 asked Burke to confirm the details of the job offer as she had understood it: "Was it ten percent equity in entire biz or just whatever project(s) you'd work on? It was hard to hear with '500k base salary' ringing in my ears lol."  Burke replied, "10% in total co[mpany]. I would be a junior coowner,

---

[8]    This memorandum serves as notice to the Court and the Defendant of the Government's intent to rely on Rule 807 if necessary for GOVEX 43 and/or 124.

third behind Meghan [Messenger]." GOVEX 42. Burke's reply demonstrates that he not only understood what Person 3 had asked, but that he adopted the substantive details of what was offered to him at the lunch meeting. Burke confirmed that he had been offered the ten percent equity in Company A as part of the job offer, and by his silence or lack of correction, he also adopted Person 3's recitation of "500k base salary" as part of the offer.

Later in the same message chain, Person 3 asked, "To what extent to u think /believe the job for you is tied (or not?) to the contract/ trial w naveur? That made me nervous." Burke replied "technically – zero. But he [Kim] desires that I be able to have a personal testimonial." For starters, Person 3's question to Burke is a question, which is not hearsay because it makes no assertion and has no truth value. In addition, "That part made me nervous" is offered not to prove that is how Person 3 felt, but rather as context to explain the justification for the question about whether the contract and job were linked, and as context for Burke's half-hearted response of assurance.

### C.    GOVEX 69 – Internal Company A Draft Email

The Government has previously argued that communications from Kim and Messenger to Company A employees qualify for admission as co-conspirator statements under Rule 801(d)(2)(E), and the Court presumptively agreed at the Pre-Trial Conference. One of the exhibits identified by the Government for admission on this basis is Government Exhibit 69 ("GOVEX 69"), which is a draft email of notes taken by a Company A employee at a November 2021 all hands meeting concerning the company's plans to furnish training to the Navy. GOVEX69 was produced to the Government in response to a trial subpoena, together with a certificate of authenticity.

The Government submits that the record is alternatively admissible under the residual

hearsay exception.[9] First, GOVEX 69 has "circumstantial guarantees of trustworthiness comparable to those found in Rule 803's and Rule 804's enumerated hearsay exceptions." *Slatten*, 865 F.3d at 806. Specifically, the draft email of a Company A employee and was produced from records held by Company A. The document was created within days of the Defendants meeting on November 16 at which Kim and Messenger believed Burke had committed to provide a contract to Company A. Indeed, the notes and charts reflected in the draft email closely track Kim and Messenger's prior recorded account of their meeting with Burke. Second, GOVEX 69 is material in that it reflects a note that Burke "promised" a contract for Company A several weeks before he gave the order. In fact, this promise occurred almost contemporaneously to Messenger's email to Kim writing about Burke's future employment at the company. Third, the Government cannot obtain evidence reflecting the Defendants' November 16, 2021, meeting through other means because the only participants to that meeting that the Government has identified were the charged Defendants. Fourth, admitting GOVEX 69 serves the purposes of the Federal Rules of Evidence and is in the interests of justice because it is key evidence that Kim and Messenger believed – based on their private meeting with Burke – that they would be promised a contract at the same time that they understood Burke would be accepting a job at Company A thereafter.

---

[9] This memorandum serves as notice to the Court and the Defendant of the Government's intent to rely on Rule 807 if necessary for Government Exhibit 69.

## VI.    CONCLUSION

The Government offers this Trial Brief for the purpose of assisting the Court in preparing for trial and to put both the Court and Defendant on notice as to anticipated issues to streamline the trial. The Government welcomes any follow-up or supplementation requested by the Court and invites the Defendant to reach out to the Government in advance of trial to address any foreseeable issues.

Respectfully Submitted,

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY
D.C. Bar No. 481866

By:    _____/s/_____
Rebecca G. Ross
Assistant United States Attorney
601 D Street N.W.
Washington, DC 20530
Office: (202) 252-4490

EDWARD P. SULLIVAN
Acting Chief, Public Integrity Section
U.S. Department of Justice

By:    _____/s/_____
Trevor Wilmot
Kathryn E. Fifield
Trial Attorneys
Public Integrity Section
1301 New York Ave. N.W.
Washington, DC 20530
Office: (202) 514-1412