UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | Case No. 1:24-cr-00265-TNM |
| YONGCHUL "CHARLIE" KIM, and MEGHAN MESSENGER, | |
| Defendants. | |

YONGCHUL "CHARLIE" KIM AND MEGHAN MESSENGER'S
**OMNIBUS MOTION *IN LIMINE***

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................................................1

BACKGROUND ...........................................................................................................................1

LEGAL STANDARD ....................................................................................................................2

I.    THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM HAVING AN AGENT SUMMARIZE NON-VOLUMINOUS EVIDENCE, TESTIFY ABOUT FACTS BASED ON INADMISSIBLE HEARSAY, INTERPRET EMAILS SENT TO AND FROM OTHERS, AND OTHERWISE TESTIFY ABOUT FACTS OF WHICH HE HAS NO PERSONAL KNOWLEDGE. ......................3

II.    THE COURT SHOULD EXCLUDE EVIDENCE AND ARGUMENT THAT NEXT JUMP WAS A NEGATIVE WORKPLACE, AS WELL AS OTHER IRRELEVANT AND UNDULY PREJUDICIAL NEGATIVE OPINIONS OF MOVANTS. ..........................................................................................................14

III.    THE COURT SHOULD EXCLUDE TESTIMONY THAT NEXT JUMP'S PRODUCTS WERE NOT WELL RECEIVED (OR, ALTERNATIVELY, ADMIT POSITIVE REVIEWS)........................................................................................15

IV.    THE COURT SHOULD EXCLUDE TESTIMONY FROM PERSON 3 REGARDING CERTAIN PRIVATE CONVERSATIONS SHE HAD WITH ADMIRAL BURKE. .....................................................................................20

V.    THE COURT SHOULD EXCLUDE EVIDENCE CONCERNING PERSON 3'S GOVERNMENT-ISSUED SECURITY CLEARANCE. ....................................20

VI.    MOVANTS SHOULD BE PERMITTED TO CROSS-EXAMINE DCIS DE LA PENA REGARDING PRIOR MISCONDUCT AND TO INTRODUCE EVIDENCE CONCERNING THE SAME. ....................................................22

CONCLUSION.............................................................................................................................26

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*,
   37 F.3d 1460 (11th Cir. 1994) ...............................................................................24

*Alford v. United States*,
   282 U.S. 687 (1931)...............................................................................................2

*Crane v. Kentucky*,
   476 U.S. 683 (1986)...............................................................................................19

*Davis v. Alaska*,
   415 U.S. 308 (1974)...............................................................................................3

*Delaware v. Van Arsdall*,
   475 U.S. 673 (1986)...............................................................................................3

*Douglas v. Alabama*,
   380 U.S. 415 (1965)...............................................................................................3

*Holmes v. South Carolina*,
   547 U.S. 319 (2006)...........................................................................................3, 19

*Kirby v. United States*,
   174 U.S. 47 (1899)................................................................................................2

*Martinez v. City of New York*,
   2022 WL 20042798 (E.D.N.Y. Dec. 4, 2022) ......................................................24

*Old Chief v. United States*,
   519 U.S. 172 (1997)..........................................................................................15, 18

*Skilling v. United States*,
   561 U.S. 358 (2010)...............................................................................................16

*United States v. Brewster*,
   408 U.S. 501 (1972)...............................................................................................16

*United States v. Cedeno*,
   644 F.3d 79 (2d Cir. 2011)......................................................................................23

*United States v. Darui*,
   545 F. Supp. 2d 108 (D.D.C. 2008) ........................................................................2

*United States v. Evans*,
   216 F.3d 80 (D.C. Cir. 2000) .................................................................15

*United States v. Fonseca*,
   435 F.3d 369 (D.C. Cir. 2006) ...............................................................24

*United States v. George*,
   532 F.3d 933 (D.C. Cir. 2008) .................................................................3

*United States v. Hayes*,
   369 F.3d 564 (D.C. Cir. 2004) ...............................................................23

*United States v. Khanu*,
   664 F. Supp. 2d 35 (D.D.C. 2009) ...........................................................2

*United States v. Lathern*,
   488 F.3d 1043 (D.C. Cir. 2007) .............................................................19

*United States v. Miller*,
   738 F.3d 361 (D.C. Cir. 2013) ...............................................................24

*United States v. Moore*,
   589 F. Supp. 3d 87 (D.D.C. 2022) .........................................................15

*United States v. Napolitano*,
   552 F. Supp. 465 (S.D.N.Y. 1982) .......................................................2, 3

*United States v. Reyes*,
   18 F.3d 65 (2d Cir. 1994) .......................................................................15

*United States v. Ring*,
   706 F.3d 460 (D.C. Cir. 2013) ............................................................2, 17

*United States v. Scheffer*,
   523 U.S. 303 (1998) ...............................................................................19

*United States v. Straker*,
   800 F.3d 570 (D.C. Cir. 2015) ...............................................................15

*United States v. Terry*,
   702 F.2d 299 (2d Cir. 1983) ...................................................................23

*United States v. Whitmore*,
   359 F.3d 609 (D.C. Cir. 2004) ............................................................3, 23

*United States v. Wilkerson*,
   361 F.3d 717 (2d Cir. 2004) ...................................................................23

**Statutes**

18 U.S.C. § 201(b)(1) ................................................................................................2

18 U.S.C. § 371 ............................................................................................................2

**Other Authorities**

Fed. R. Evid. 401 ...............................................................................................2, 16

Fed. R. Evid. 402 ......................................................................................................16

Fed. R. Evid. 403 ..........................................................................2, 14, 17, 18, 23, 25

Fed. R. Evid. 602 ........................................................................................................4

Fed. R. Evid. 608(b) .................................................................................................24

Fed. R. Evid. 801 ......................................................................................................20

Fed. R. Evid. 802 ...............................................................................................2, 3, 20

Fed. R. Evid. 1006 ......................................................................................................3

## PRELIMINARY STATEMENT

Defendants Yongchul "Charlie" Kim and Meghan Messenger ("Movants"), by and through their undersigned counsel, respectfully submit this omnibus motion *in limine*.  Movants move to preclude the government from using a federal agent to impermissibly summarize hearsay evidence and testify about matters of which he has no personal knowledge.  In addition, Movants move for an order precluding the government from presenting evidence and argument regarding: (i) Next Jump's allegedly negative work environment and other irrelevant and prejudicial claims about Movants; (ii) negative reviews of Next Jump and its products; (iii) certain private conversations between a key government witness discussed in the indictment ("Person 3") and Admiral Burke; and (iv) Person 3's maintenance of her security clearance.  Finally, Movants move for a pretrial ruling that they may offer evidence and argument regarding judicial findings that call into question the credibility of DCIS Special Agent Cordell "Trey" De La Pena ("SA De La Pena")—the former lead case agent—in previous U.S. Navy corruption prosecutions.

## BACKGROUND

Movants are co-CEOs of Next Jump, a privately held New York City-based company that operates an employee benefits platform for a number of corporate clients.  Next Jump also offers leadership training and coaching, helping employees, management, and organizations achieve their full potential.[1]  In early 2022, Next Jump held trainings for U.S. Navy sailors under the command of Admiral Robert P. Burke (Ret.) in Naples, Italy, and Rota, Spain.  Admiral Burke retired months later, and, in October 2022, he began working at Next Jump.

---

[1] Among other recognitions, Next Jump was featured in the book *An Everyone Culture: Becoming a Deliberately Developmental Organization*, published by the Harvard Business Review.

Unbeknownst to Movants, in mid-2022, the government had begun a sprawling multi-agency investigation into Admiral Burke.  This investigation ultimately led to a five-count indictment being returned in this District (the "Indictment").  ECF No. 1.  The Indictment charges Movants with bribery of a public official in violation of 18 U.S.C. § 201(b)(1), and conspiracy to commit bribery in violation of 18 U.S.C. § 371.  *Id*.  These charges stem from Movants' purported scheme to bribe Admiral Burke by allegedly offering him a job at Next Jump in return for the January 2022 Navy training contract.

## LEGAL STANDARD

Under the Federal Rules of Evidence, evidence should only be admitted if it is relevant, meaning it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Darui*, 545 F. Supp. 2d 108, 110 (D.D.C. 2008) (citing Fed. R. Evid. 401).  But under Rule 403, "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id*. (citing Fed. R. Evid. 403); *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (Rule 403 bars evidence with an "undue tendency to suggest decision on an improper basis" (citation omitted)).  Furthermore, hearsay, even if relevant, "is inadmissible unless it falls under one of the applicable exceptions in the Federal Rules of Evidence."  *United States v. Khanu*, 664 F. Supp. 2d 35, 42 (D.D.C. 2009) (citing Fed. R. Evid. 802).

Separately, "[t]he Supreme Court has repeatedly held that the rights of confrontation and cross-examination are fundamental requirements for the protection of defendants in criminal cases." *United States v. Napolitano*, 552 F. Supp. 465, 486 (S.D.N.Y. 1982) (citing *Kirby v. United States*, 174 U.S. 47, 55, 56 (1899)).  These rights are essential "for the kind of fair trial which is

this country's constitutional goal." *Id*. (citing *Alford v. United States*, 282 U.S. 687, 692 (1931)). Cross-examination "is the principal way to test the believability and truth of a witnesses' testimony." *Id*. (citing *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). "Subject to the trial judge's broad discretion to prevent repetitive and harassing questions, the cross-examiner is not only permitted to delve into the witness' story in order to test the witness' memory and perception, but also has traditionally been allowed to impeach and discredit the witness." *Id*. Impeachment may be accomplished by "introducing evidence of prior crimes or by revealing 'possible biases, prejudices or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.'" *Id*. (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).

Aside from the Federal Rules' limitations, criminal defendants have a "fundamental" constitutional right to cross-examine the government's witnesses and impeach their credibility. *United States v. George*, 532 F.3d 933, 935 (D.C. Cir. 2008) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 678–79 (1986)). While the Court has discretion to limit cross-examination, *United States v. Whitmore*, 359 F.3d 609, 615–16 (D.C. Cir. 2004), that discretion is constrained by the defendant's constitutional right to present a complete defense. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).

I.    **THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM HAVING AN AGENT SUMMARIZE NON-VOLUMINOUS EVIDENCE, TESTIFY ABOUT FACTS BASED ON INADMISSIBLE HEARSAY, INTERPRET EMAILS SENT TO AND FROM OTHERS, AND OTHERWISE TESTIFY ABOUT FACTS OF WHICH HE HAS NO PERSONAL KNOWLEDGE.**

During the trial of Movants' co-defendant, Admiral Burke, the government improperly elicited testimony from a government agent in which he summarized documentary and testimonial evidence, which was neither voluminous nor admissible. Such evidence falls outside Rule 1006 and should be excluded. *See* Fed. R. Evid. 1006. Such evidence should be excluded on the further grounds that it violates the rule against hearsay and is not based on personal knowledge. *See* Fed.

R. Evid. 802. Indeed, the agent testified repeatedly about out-of-court statements from documents and interviews that were offered for the truth of the matters asserted—statements that he only learned through his investigation and about which he lacked personal knowledge. *See* Fed. R. Evid. 802. Finally, the government elicited testimony from the case agent about what *other* fact-finders determined about the evidence, including the magistrate judge's review of search warrants (which has the same probable cause standard as the Indictment, and is equally impermissible for the jury to consider as evidence of guilt). Such evidence is irrelevant and only serves to prejudice the jury against Movants. The Court should not allow the government to elicit such testimony again. Rather, the government must call witnesses who have personal knowledge of the facts about which they are testifying, Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."), and the government must offer evidence consistent with the Federal Rules of Evidence.

Specifically, the Court should preclude the government from eliciting the following types of inadmissible agent testimony, which was elicited from Agent Gardner during Admiral Burke's trial:

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| The reason why the government investigation focused on a certain date range, and characterizing the allegations in conclusory, ultimate-issue terms. | Q So I want to start by asking you, what dates were the focus of your investigation?<br><br>A Our investigation focused primarily on the years of 2021 to 2022.<br><br>Q And why is that?<br><br>A So that is the time period that I mentioned the alleged contract and job offer kind of swap occurred, over the 2021 to 2022 time period.<br><br>(Ex. A (Day 2 pm) Tr. at 99:05–13.) |

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| The fact that search warrant affidavits were reviewed and approved by an "independent court," which determined that there was probable cause to find evidence of a crime or fruits of a crime. | Q What are search warrants?<br><br>A So search warrants, if you think of it like a spectrum, a subpoena, you're getting a lot less substance for information. They are a lower threshold and easier to obtain. A search warrant is a lot more invasive and intrusive on the subject of the search warrant.<br><br>So in a case of a search warrant, an agent will have to write an affidavit and swear to it to the Court, and an independent court will determine whether or not there's probable cause to find evidence of a crime or fruits of a crime wherever a search warrant is going to be executed. In our instance, this could be emails through a telecommunications provider or even a physical premises, like a business.<br><br>(Ex. A (Day 2 pm) 103:16–104:03.) |
| Summaries of what Next Jump is, who Movants are, and what roles they played at Next Jump and in the contracting process. | Q What is Next Jump?<br><br>A Next Jump is a company based out of New York City. They primarily have two different types of business. They call it Biz 1 and Biz 2. Biz 1 is an ecommerce business, and that focuses -- they call it Perks At Work. For those who know what GOVX is for government employees, I think of it as a way for clients of the business, their employees who purchase or work with Perks at Work get discounts, like, tickets or merchandise.  Biz 2, which is kind of where this investigation focused, is their leadership training or kind of HR technology type of their business.<br>(Ex. A (Day 2 pm) Tr. at 99:16–100:01.)<br><br>* * *<br><br>Q. I won't have you read all this, Agent Gardner. But we do see a reference here to the U.K. What was Next Jump's ties to the U.K.?<br><br>A. They have an office located in the U.K.<br><br>(Ex. B (Day 3 am) Tr. at 31:05–08.)<br><br>* * *<br><br>Q. Agent Gardner, during the time period of your investigation, did Next Jump's U.S. offices change locations?<br><br>A. Their New York office did, yes.<br><br>Q. And where did they move to? |

5

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| | A. They moved to a pretty swanky place in New York City.<br><br>(Ex. B (Day 3 am) Tr. at 31:18–23.)<br><br>* * *<br><br>Q. Did Kim and Messenger attend this retirement party for Rob Thomas?<br><br>A. They did.<br><br>Q. Did the Defendant?<br><br>A. He did.<br><br>Q. Did they meet for lunch?<br><br>A. They did.<br><br>(Ex. B (Day 3 am) Tr. at 48:16–22.) |
| Summaries of who Admiral Burke is and what roles he played in contracting with Next Jump. | Q Now, I want to ask you about [Admiral Burke] in a little bit more detail. First, beginning in 2019, where was he working?<br><br>A 2019. So up until mid 2019, he was chief of Naval personnel at N1, which is kind of like the HR. It's very layman's terms and there's much more to it, but kind of like the HR of the Navy. Then he became VCNO, the Vice Chief of Naval Operations, in mid of 2019, and he stayed in that role until about mid 2020.<br><br>Q And if you know, where was he stationed at that time?<br><br>A In 2019, 2020, Washington, DC, the DMV area.<br><br>Q And then where did he go from there?<br><br>A He then moved over to NAVAF and NAVEUR, which is Navy Africa and Navy Europe.<br><br>Q And where was he based in that role?<br><br>A He was in Italy.<br><br>Q And when he was based in Italy, what was his rank?<br><br>A He was a four-star admiral.<br><br>Q When did the defendant retire?<br><br>A In July 2022.<br><br>Q And how many years did the defendant serve in the military?<br><br>A Nearly 40 years. |

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| | Q If you know, what, if any, was the defendant's involvement with Next Jump's first two contracts, so the ones in the 2018 to 2019 period? |
| | A Those contracts were both with N1, where he was in charge of at that time. |
| | Q And based on your review of the evidence, after those first two contracts ended, did Kim and Messenger want another Navy contract? |
| | A They did. |
| | Q Did Kim and Messenger continue to reach out to the defendant about that? |
| | A Yes. |
| | (Ex. A (Day 2 pm) Tr. at 110:21–112:04.) |
| | * * * |
| | Q Agent Gardner, in the course of your investigation, did you find evidence that the defendant was involved in a procurement larger than $150,000 with Next Jump? |
| | A Yes. |
| | Q How was he involved? |
| | A As I mentioned, while at N1, Next Jump had two contracts that exceeded $150,000, and then when -- with NAVAF and NAVEUR, as he was commander there, they also had a contract over $150,000. |
| | (Ex. A (Day 2 pm) Tr. at 122:12–20.) |
| | * * * |
| | Q Agent Gardner, in the course of your investigation and in some of the evidence we reviewed today, did you find evidence that Next Jump had approached the defendant much earlier, asking if he would be interested in joining Next Jump? |
| | A Yes. |
| | Q Based on your review of the evidence, did the defendant engage in those? |
| | A Yes. |
| | Q And did he tell [Person 3] that he had essentially agreed to work for Next Jump back in July of 2021? |

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| | A Yes.<br><br>(Ex. C (Day 3 pm) Tr. at 76:15–76:25.) |
| Summaries of who Person 3 is, what her relationship was to Admiral Burke, and what her roles were in the events relevant to the Indictment. | Q. Now, did the Defendant stay at the Ritz-Carlton alone, Agent Gardner?<br>A. He did not.<br>Q. Who was with him?<br>A. [Person 3].<br>Q. Who is [Person 3]?<br>A. She's an individual that Robert Burke was having a sexual extramarital affair with at the time.<br>(Ex. B (Day 3 am) Tr. at 57:12–19.) |
| Summaries of the number and nature of contracts Next Jump had with the Navy. | Q Based on your review of the evidence, how many contracts did Next Jump have with the Navy?<br>A They had two in the late 2018s, 2018 to 2019, and another in the 2021 to 2022 timeframe.<br>Q So focusing on the first and second contract first. When did those end?<br>A Those were both concluded by the fall of 2019.<br>Q In 2021, did Next Jump have an active contract with the Navy?<br>A When in 2021?<br>Q Up until December of 2021.<br>A No.<br>Q And then beginning in 2021, did the Navy make progress towards having another contract with Next Jump?<br>A In the beginning of 2021?<br>Q Yes.<br>A No.<br>Q How about towards the end of 2021?<br>A Towards the very end of 2021, yes.<br>(Ex. A (Day 2 pm) at 110:02–20.) |

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| | * * * |
| | Q. So we see here that the Defendant described his call with Next Jump as another sales pitch. At this point, March 5th, 2021, did Next Jump have a contract with the Navy? |
| | A. They did not. |
| | Q. And we see that this was March 5th, 2021. When was the last time that Next Jump had an active contract with the Navy? |
| | A. That would have been approximately two years prior, in the fall of 2019. |
| | (Ex. B (Day 3 am) Tr. at 11:11–20.) |
| | * * * |
| Summaries of what evidence did <u>not</u> exist regarding the contracting process between Next Jump and Admiral Burke, as well as Admiral Burke's disclosures about it. | Q Did you find any evidence that Next Jump was informed that it was okay for them to reach out to the defendant again after receiving Brett Mietus's email? |
| | A No. |
| | (Ex. A (Day 2 pm) Tr. at 16:16–19.) |
| | * * * |
| | Q Did you find any evidence that he ever reported any conversations he had with Kim and Messenger about potential employment at Next Jump prior to that involvement in Next Jump's third contract, the one with NAVEUR? |
| | A No. |
| | (Ex. A (Day 2 pm) Tr. at 122:21–25.) |
| | * * * |
| | Just to be clear, Agent Gardner, did Next Jump have a contract with the Navy at this point? |
| | A. They did not. |
| | (Ex. B (Day 3 am) Tr. at 38:16–18.) |
| | * * * |
| | Q. So, for example, did [Admiral Burke] ever disclose to Captain Appleman or anyone else at the Navy that he had told Kim and Messenger he wanted to work for them during that hour-long WhatsApp call back in April of 2021? |

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
|  | A. No.<br><br>Q. Did he ever disclose to Captain Appleman or anybody at the Navy that he had agreed to work for Next Jump after that Belga Cafe meeting in July of 2021?<br><br>A. No.<br><br>Q. Did he ever disclose he had asked Kim and Messenger for a job description in July of 2021?<br><br>A. No.<br><br>Q. Did he ever disclose he had made verbal agreements to Kim and Messenger with a contract with the Navy?<br><br>A. No.<br><br>(Ex. D (Day 4 pm) Tr. at 24:06–20.)<br><br>* * *<br><br>Q. Let me ask again, Agent Gardner. At any point while the Defendant was in the District of Columbia, so around July 23rd and July 24th, 2021, did you find any evidence that the Defendant told anyone at the Navy that he had discussed a job at Next Jump with Kim and Messenger at the Belga Café?<br><br>A. No.<br><br>Q. How about after the Defendant left the District of Columbia? At any point did you find any evidence that the Defendant reported to the Navy that he had discussed a job at Next Jump at the Belga Café --<br><br>A. No.<br><br>Q. -- on July 23rd or 24th?<br><br>A. No.<br><br>(Ex. B (Day 3 am) Tr. at 96:10–23.) |
| Summaries of what training, legal requirements, and paperwork Admiral Burke and/or Movants were required to attend, observe, fill out, or sign. | Q Agent Gardner, was the defendant required to complete that annual training [The Annual Ethics Audit Review Checklist]?<br><br>A Yes.<br><br>(Ex. A (Day 2 pm) Tr. at 119:19–21)<br><br>* * *<br><br>Q It mentions a Form OGE-278. What kind of forms are those?<br><br>A It's an official financial disclosure form. |

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| | Q And if you know, was the defendant required to fill out those forms as well? |
| | A He was. |
| | (Ex. A (Day 2 pm) Tr. at 120:08–12.) |
| | * * * |
| | Q Agent Gardner, this memo that the defendant sent out [Public financial disclosure reporting, OGE Form 278], was he also bound by the policies and procedures it outlined? |
| | A Yes. |
| | Q Does that include the policies and procedures it outlined related to outside employment? |
| | A Yes. |
| | Q And how about conflicts of interest? |
| | A Yes. |
| | Q And the OGE-278 forms? |
| | A Yes. |
| | (Ex. A (Day 2 pm) Tr. at 123:21–124:05.) |
| | * * * |
| | Q. We see here that the Defendant mentioned a legal review. If you know, what is that referring for? |
| | A. Given their positions within the Navy – given their positions with the Navy, their interactions with commercial business, events such as this need to be combed over by members of their legal team within the Navy for an ethics review to ensure that they can or cannot attend. |
| | (Ex. B (Day 3 am) Tr. at 33:23–34:04.) |
| Summaries of who senders and recipients of emails are and what they allegedly did or did not do. | Q. Who does the Defendant send this email to? |
| | A. Jim Raimondo. |
| | Q. And who is Jim Raimondo? |
| | A. He's a member of the military who served with Burke. |
| | (Ex. B (Day 3 am) Tr. at 10:20–23.) |
| | * * * |
| | Q. If you know, who is Herm referring to there? |

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| | A. Herm Shelanski. |
| | Q. And who is that? |
| | A. He's a Navy inspector general. |
| | Q. And we see a reference there to Bill Moran. If you know, who is that? |
| | A. He's a former senior member of the Navy. |
| | (Ex. B (Day 3 am) Tr. at 12:22–13:03.) |
| | * * * |
| | Q. Agent Gardner, I want to focus at the email in the bottom of Page 1. We see that this is an email from Robert Thomas. Who is that? |
| | A. He was a senior enlisted in the United States Navy. |
| | (Ex. B (Day 3 am) Tr. at 46:07–10.) |
| Interpretation of emails that the agent did not send or receive. | Q. Now, when Messenger says, Next step, roll out to all Navy, if you know, what is that referring to? |
| | A. That's referring to their overall plan to get a smaller deal with the Navy and then expand and become a larger contract where they're offering training to the entire Navy. |
| | (Ex. B (Day 3 am) Tr. at 40:20–24.) |
| | * * * |
| | Q. And see here that Kim wrote: He was very excited. He wanted to resign next week. Told him to hold off and first launch this Part 1. Agent Gardner, based on your review of the evidence, what is your understanding of Part 1 there? |
| | A. Part 1 was the plan to get a smaller deal in with the Navy, expand it to a larger deal, and then eventually Burke would retire and join Next Jump as an employee. |
| | Q. In other words, is that the increased contract that Kim referenced earlier in this email? |
| | A. Yes. |
| | (Ex. B (Day 3 am) Tr. at 81:06–16.) |
| | * * * |
| | Q You see that he wrote: Will make happen. What is that referring to? |

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| | A A Navy contract. |
| | (Ex. B (Day 3 am) Tr. at 42:10–12.) |
| | * * * |
| | Q. Agent Gardner, when the defendant wrote here "full disclosure," was that a full disclosure? |
| | A. No. |
| | (Ex. D (Day 4 pm) 24:03–05.) |
| | * * * |
| | Q. If you know, what is the reference to the Aussies |
| | here? |
| | A. That would be the Australian Navy. |
| | Q. What is he talking about or referencing here, if you know? |
| | A. Obviously as a senior leader in the U.S. Navy, and the Aussies being our ally, Robert Burke had connections over there, and had contemplated potentially working with the Aussie Navy upon retirement. |
| | Q. And did he end up working with the Aussies after he retired? |
| | A. No. |
| | Q. Where did he end up working? |
| | A. He worked at Next Jump, or NJ. |
| | (Ex. B (Day 3 am) Tr. at 95:11–24.) |
| | * * * |
| | Q. Agent Gardner, just to be clear, based on your review of the evidence, what was your understanding of Phase 1 of the Defendant's engagement with Kim and Messenger? |
| | A. Phase 1 was effectively getting a foot in the door so then they can get results to expand to Phase 2 and then, after Phase 2, Burke would join Next Jump upon retirement from the Navy. |
| | Q. And again, Phase 2 more specifically, what is your understanding of what Phase 2 was there? |
| | A. Burke would sponsor discussions towards getting larger deals with the Navy. |

| Types of Evidence | Examples of Such Inadmissible Evidence Admitted at the Trial of Admiral Burke |
|---|---|
| | (Ex. B (Day 3 am) Tr. at 104:07–17.) |
| | * * * |
| | Q Based on your review of this exhibit, what did you conclude it to be? |
| | A It appeared to be meeting notes from an all-hands meeting, including graphs and schematics for a plan with the Navy. |
| | Q Why do you say that? |
| | A Well, on this last page here, you can see the four bios we previously discussed, the location of each member of the Navy, two in Rota, Spain, and two in Naples, Italy, as well as notes on each of them and a potential plan in the previous slides. |
| | (Ex. C (Day 3 pm) Tr. at 23:24–24:07.) |

The government is free to summarize the expected evidence in its opening statements, and the government is free to interpret admitted evidence and argue from it in the government's closing. Those statements and arguments by counsel are not themselves evidence. ECF No. 160 (Adm. Burke's Final Jury Instructions). The government should be prohibited, however, from having an agent admit into evidence the improper summaries and hearsay discussed above. The agent, in Admiral Burke's trial, functioned more like an agent in grand jury, summarizing and interpreting evidence he had no first-hand knowledge of. That type of hearsay and opinion testimony is prohibited.

## II. THE COURT SHOULD EXCLUDE EVIDENCE AND ARGUMENT THAT NEXT JUMP WAS A NEGATIVE WORKPLACE, AS WELL AS OTHER IRRELEVANT AND UNDULY PREJUDICIAL NEGATIVE OPINIONS OF MOVANTS.

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "Regardless of the reason for which" the government believes "the evidence [i]s being offered, the prejudice inquiry asks whether 'the jury [will] likely . . . consider the statement[s] for

14

the truth of what was stated with significant resultant prejudice.'" *United States v. Evans*, 216 F.3d 80, 87 (D.C. Cir. 2000) (quoting *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994)). "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

During government interviews, witnesses provided opinions that Next Jump had a negative workplace atmosphere, as well as negative opinions of Movants. For instance, one witness, C.R., a former Next Jump employee, repeatedly conveyed to investigators that Next Jump "was a toxic work environment," "'cult like,'" "sponsored H1B visa employees who felt they were stuck and had no choice but to comply with [the company's] requests for self-improvement," and "would make your life miserable and you would choose to quit." (Ex. E at 1–2.) Another witness, N.N., stated that Next Jump was "pretty slimy," (Ex. F at 86:7. And finally, a witness described Mr. Kim as "a jerk", who "gossiped and spoke down about people too much." (Ex. G at 2–33.).

These and other similar opinions are irrelevant to the conspiracy and bribery charges and would serve only to inflame the jury against Movants. As such, they should be excluded. *See Old Chief*, 519 U.S. at 180; *United States v. Moore*, 589 F. Supp. 3d 87, 91 (D.D.C. 2022) ("'Even if it is concededly relevant, unduly prejudicial evidence may be excluded to prevent jurors from,' among other things, 'impermissibly relying on biases, dislikes, or the emotional impact of the evidence.'" (quoting *United States v. Straker*, 800 F.3d 570, 589 (D.C. Cir. 2015)).

## III. THE COURT SHOULD EXCLUDE TESTIMONY THAT NEXT JUMP'S PRODUCTS WERE NOT WELL RECEIVED (OR, ALTERNATIVELY, ADMIT POSITIVE REVIEWS).

During the period relevant to this case, Movants' company, Next Jump, provided workforce training programs to the Navy under a pilot program from August 2018 through July 2019, and under the 2021-2022 contract that is the subject of the indictment. The government has made clear

it intends to introduce evidence that Next Jump's services were not well received or that the services were of poor quality. *See, e.g.*, ECF No. 155 at 22. Any such evidence should be excluded for at least two reasons.

*First*, such evidence lacks relevance under Federal Rules of Evidence 401 and 402. The substantive charges in this case revolve around alleged bribery and corruption—not the quality of services provided. Whether Navy personnel were dissatisfied with Next Jump's services has no tendency to make any fact of consequence in determining the current charges more or less probable.

The government seeks to introduce service quality evidence on the theory that it demonstrates "Burke's state of mind, knowledge, and motive." ECF No. 155 at 22. But any relevance that the quality of Next Jump's services might have to Burke's state of mind, knowledge, or motive is beside the point for Movants' trial. The issue here is Movants' intent, not what motivated Burke. Moreover, this theory directly contradicts the Government's own position that bribery criminalizes a corrupt deal, regardless of whether it would have been a "good" deal. ECF No. 155 at 21–22. In the Government's words, "[t]he crime of bribery is promising to pay or 'agreeing to take money for a promise to act in a certain way,'" ECF No. 155 at 19 (quoting *United States v. Brewster*, 408 U.S. 501, 526 (1972)), and "[i]t is [] not a defense to bribery that the contract to Company A would benefit the Navy," *id.* at 21. The bribery statute criminalizes the corrupt exchange itself; it does not require proof that the services provided were of a certain quality or value. *See* ECF No. 155 at 22 ("[T]he Government is not required to demonstrate that the official action would be harmful to the public. . . ."). As the government itself acknowledges, the Supreme Court has repeatedly emphasized that bribery turns on the corrupt intent of the defendant rather than whether the recipient received legitimate services. ECF No. 155 at 21 (citing *Skilling v.*

*United States*, 561 U.S. 358, 400 (2010) ("Even if the scheme occasioned a money or property gain for the betrayed party, courts reasoned, actionable harm lay in the denial of that party's right to the offender's 'honest services.'").

Furthermore, any connection between service quality and the alleged bribery is purely speculative. Numerous legitimate factors influence procurement decisions, including features, price, vendor reputation, and compatibility with existing systems. Whether Next Jump's services were good or bad has no bearing on whether the contract was procured through alleged improper means. A contract can simultaneously be obtained through improper influence and provide valuable services—the two concepts are not mutually exclusive. Indeed, as the D.C. Circuit has recognized, "the official need not accept [an] offer for the act of bribery to be complete." *Ring*, 706 F.3d at 467 . If an offer need not be accepted, there can be no argument that the offer must be accepted, implemented, and a success. The relevant question is whether Movants engaged in bribery, not whether Next Jump's services met subjective expectations.

*Second*, even if marginally relevant, such testimony should be excluded under Rule 403 because its probative value is substantially outweighed by multiple dangers: unfair prejudice, confusion of issues, misleading the jury, and wasting time. *See* Fed. R. Evid. 403. Again, the government itself recognizes that evidence about whether the contract would have been helpful or "harmful to the public," will "confuse the issues with the jury." ECF No. 155 at 22. It would create collateral disputes on the quality of Next Jump's services, potentially involving complex expert testimony and extensive documents, leading to undue delay and waste of time. Evaluating the quality of training services would require specialized expertise, comparisons to industry standards, and assessments of user experiences—all matters irrelevant to the core bribery allegations.

Furthermore, the prejudicial effect is particularly acute here. Evidence suggesting poor quality services would improperly invite the jury to infer criminal propensity based on unrelated business performance rather than on the specific acts charged in the indictment. The jury might improperly conclude that if Next Jump's services were inadequate, Movants must have resorted to bribery—a form of propensity reasoning that Rule 403 explicitly guards against. *See Old Chief*, 519 U.S. at 180–81 (discussing the risk that jurors may "generaliz[e] a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged").

If the Court nonetheless permits the government to introduce evidence suggesting Next Jump's services were poorly received, fundamental fairness requires that Movants be permitted to present evidence of positive reception. The government takes the untenable position that *negative* evidence "regarding the merits of Company A's workforce training program [is] admissible" yet "the introduction of additional evidence or argument regarding the *benefits* of the training program to the Navy" is not. ECF No. 155 at 22 (emphasis added). This argument is manifestly unjust and, if sanctioned by the court, raises serious constitutional concerns about Movants' ability to mount a defense.

The government suggests that it has cherry-picked "several witnesses [who] will testify that they considered the program to be substandard, overpriced, and ill-matched to the needs of the Navy." ECF No. 155 at 22. However, the complete picture of service reception is far more nuanced. Many Navy personnel found value in Next Jump's training, as evidenced by: (i) testimonials from Navy personnel who found Next Jump's training valuable; (ii) internal Navy communications demonstrating satisfaction with Next Jump's services; (iii) performance metrics showing positive outcomes from the training programs; and (iv) evidence that budget constraints, not performance issues, influenced contract decisions.

Yet, the government would only permit the jury to hear negative evidence about Next Jump. The government's approach represents a stark asymmetry: negative reviews are deemed relevant to state of mind, while positive reviews are considered irrelevant. This selective presentation will create a fundamentally misleading impression for the jury.

The government's attempt to introduce negative service reviews while excluding positive ones also raises serious constitutional concerns about Movants' right to present a complete defense. The Supreme Court has recognized that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes*, 547 U.S. at 324 (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Restrictions on a defendant's ability to present evidence may not be "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998). "[W]hen [such an] error deprives a defendant of a fair trial," "it amount[s] to a constitutional violation." *United States v. Lathern*, 488 F.3d 1043, 1046 (D.C. Cir. 2007) (Kavanaugh, J.). By seeking to present only negative reviews of Next Jump's services while deeming positive reviews to be irrelevant, the government would arbitrarily deny Movants their constitutional right to present evidence that may be crucial to their defense.

For the foregoing reasons, the Court should grant Movants' motion to exclude any testimony, evidence, or argument suggesting that Next Jump's products or services were poorly received by the Navy, whether from the 2018-2019 pilot program or the 2021-2022 contract. Alternatively, if such evidence is admitted, the Court should permit Movants to present evidence of positive reception of Next Jump's services in order to provide the jury with a complete and accurate picture.

## IV.    THE COURT SHOULD EXCLUDE TESTIMONY FROM PERSON 3 REGARDING CERTAIN PRIVATE CONVERSATIONS SHE HAD WITH ADMIRAL BURKE.

In interviews and before the grand jury, Person 3 stated that she had a private, animated conversation with Admiral Burke following the July 2021 lunch meeting she attended with him and Movants.  (*See* Ex. H at 39:17–40:5.)  Indeed, Person 3 testified that, following the lunch, Admiral Burke "was furious with" her.  (*Id.* at 39:17–18.)  Namely, Admiral Burke "immediately chided [her] and" said he could not "believe how rude and aggressive [she] w[as] with" Movants. (*Id.* at 39:20–22.)  Person 3 allegedly responded, "what do you mean? . . . [Y]ou're kidding, right? . . . [W]hat they said was incredibly inappropriate. . . . [Y]ou should've jumped in and shut that conversation down. That was not okay."  (*Id.* at 39:22–25.)

Person 3 should be precluded from testifying about her private conversation with Admiral Burke because it is inadmissible hearsay and would mislead the jury if elicited.[2]  Although this evidence might be probative of Admiral Burke's state of mind, it has no bearing on Movants' mental states, because Movants were not present for the alleged conversation.  And to the extent that Person 3's out-of-court statements would be offered for their truth—*i.e.*, that the July 2021 lunch conversation *was* inappropriate—it is inadmissible hearsay.  *See* Fed. R. Evid. 801, 802.

## V.    THE COURT SHOULD EXCLUDE EVIDENCE CONCERNING PERSON 3'S GOVERNMENT-ISSUED SECURITY CLEARANCE.

The Court should preclude the government from using Person 3's security clearance—in particular the fact that she retained clearance *after* being found not credible in her divorce proceedings—to rehabilitate her credibility.

---

[2]  Should the government decline to call Person 3 as a witness, Movants may call her to testify.

As this Court is aware, a state trial court in Virginia found that Person 3 lied repeatedly, including under oath at trial, throughout her divorce and child custody proceedings. ECF No. 62-1 at 1–4. That finding speaks directly to Person 3's credibility as a witness, and Movants intend to cross-examine her on this topic at trial. The government may, of course, attempt to address Person 3's character for truthfulness on direct or to rehabilitate her on re-direct. But in either case, the government should be precluded from offering evidence that Person 3 retained her government security clearance even after she was found to have lied under oath by the Virginia court. That evidence improperly and counterfactually tends to suggest that Person 3 is trustworthy because she disclosed—and the government considered—her adverse credibility finding before her clearance was granted. But, Person 3 did not disclose the Virginia court's finding in her security clearance submissions.

After the Virginia court's finding, Person 3 submitted six SF-86 forms—the questionnaire the government uses to gather information about individuals seeking government positions with access to classified information—in which she disclosed that her divorce had been finalized and that she had appealed the court's rulings. Not a single submission included any description of the Virginia court's ruling or the fact that the ruling was subsequently upheld on appeal. To be sure, the SF-86 does not specifically request that applicants disclose adverse credibility findings. But the SF-86 does request information about pending legal proceedings. Person 3 disclosed the existence of her divorce proceedings (and that she had filed an appeal) but, in a document the government uses to gauge the credibility of an applicant requesting access to classified information, Person 3 did not mention that she was found to have lied under oath.

Thus, evidence that Person 3 retained her national security clearance even after her adverse credibility finding must be excluded because it implies that Person 3 did something she did not—

disclose her adverse credibility finding in her SF-86 submissions.  And introducing this evidence would invite additional evidence about what is, and is not, required to be disclosed in an SF-86, and what information reviewing officials would have considered to be material.

## VI.   MOVANTS SHOULD BE PERMITTED TO CROSS-EXAMINE DCIS DE LA PENA REGARDING PRIOR MISCONDUCT AND TO INTRODUCE EVIDENCE CONCERNING THE SAME.

In the event that DCIS Special Agent De La Pena testifies, whether as a witness for the government or for Movants,[3] Movants seek permission from the Court to examine or cross-examine SA De La Pena on prior instances of misconduct and to admit as evidence judicial findings and a government filing concerning the same.

SA De La Pena, the prosecution's lead case agent, was involved in two well-known and mismanaged federal bribery cases involving the Navy: *United States v. Rafaraci* and *United States v. Newland*.  As relevant here, in *United States v. Rafaraci*, 1:21-cr-00610 (D.C.C.), SA De La Pena was found to have sworn out a materially inaccurate criminal complaint.  In *United States v. Newland*, the court found that SA De La Pena's testimony misrepresented the origin of certain key evidence supporting the government's theory of the case and that SA De La Pena instructed agents to offer up to $5,000 to foreign witnesses in return for their testimony.  3:17-cr-00623 (S.D. Cal.) ECF No. 1009 at 3–4, 8–9.  The court also chastised the government for, among other things, failing to disclose in *Newland* SA De La Pena's misrepresentations in *Rafaraci*, and the court ultimately determined that "at a minimum, [SA De La Pena] made misrepresentations in his sworn affidavit, which resulted in significantly reduced charges in *Rafaraci*."  3:17-cr-00623 (S.D. Cal.)

---

[3]  Movants may call SA De La Pena to testify as to certain evidentiary issues and omissions in the investigation.

ECF No. 1020.  Even the government conceded SA De La Pena's misconduct in its motion to vacate the defendants' guilty pleas.  *Newland*, ECF Nos. 1311, 1329 (Exs. I & J).

Movants are entitled to cross-examine SA De La Pena on these topics because they are relevant to his character for truthfulness.  Making misrepresentations in a prior sworn affidavit, for example, is directly relevant to whether SA De La Pena is telling the truth now.  And Movants should be permitted to introduce the related judicial findings and government filing because they are evidence of SA De La Pena's bias.  SA De La Pena's conduct in *Rafaraci* and *Newland* indicates that he is willing to be dishonest to further an investigation.  This is a concept broader than mere credibility and suggests a motive to slant testimony (or representations in affidavits), or fail to collect certain evidence, to secure a conviction.  This is an area that Movants should not simply be permitted to explore but to prove up with evidence of SA De La Pena's prior misconduct.

On cross-examination, prior acts of dishonesty, especially under oath, are highly probative of a witness's truthfulness.  *See Whitmore,* 359 F.3d at 619 ("Nothing could be more probative of a witness's character for untruthfulness than evidence that the witness has previously lied under oath."); *United States v. Cedeno*, 644 F.3d 79, 82 (2d Cir. 2011) (upholding "cross-examin[ation] based on 'prior occasions when his testimony in other cases had been criticized by [a] court as unworthy of belief'" (quoting *United States v. Terry,* 702 F.2d 299, 316 (2d Cir. 1983)).  Rule 403 allows courts to limit the scope of cross-examination, *United States v. Wilkerson*, 361 F.3d 717, 745 (2d Cir. 2004); however, courts may not preclude an otherwise legitimate line of questioning meant to give the jury "a significantly different impression of [the witness's] credibility."  *United States v. Hayes,* 369 F.3d 564, 566 (D.C. Cir. 2004) (citation omitted).

Here, SA De La Pena's prior dishonesty—under oath—in similar public integrity cases involving the Navy is highly probative of his credibility in this case not just as a witness but as the

lead case agent. *United States v. Miller*, 738 F.3d 361, 375–76 (D.C. Cir. 2013) ("'[E]vidence that would contradict [a witness's] trial testimony, even on a collateral subject,' is ordinarily probative because it 'would undermine [the witness's] credibility as a witness regarding facts of consequence.'" (quoting *United States v. Fonseca,* 435 F.3d 369, 375 (D.C. Cir. 2006))); *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1464 (11th Cir. 1994) ("Acts probative of untruthfulness under Rule 608(b) include such acts as . . . perjury."). The related judicial findings and government filing further strengthen this point. *Martinez v. City of New York*, 2022 WL 20042798, at *4 (E.D.N.Y. Dec. 4, 2022) ("[A]n adverse credibility determination by a state or federal judge may be particularly probative of a witness's character for truthfulness. . . .").

As described above, SA De La Pena's prior misconduct is not limited to making misrepresentations in a sworn affidavit. In *Newland*, for example, SA De La Pena made misrepresentations under oath concerning crucial government evidence. SA De La Pena testified that he had obtained hard drives containing key evidence from a private investigator in Singapore but that he did not know the source of the hard drives. *See Newland*, ECF No. 1200; *Newland*, April 12, 2022 Trial Tr. 3627–29. But SA De La Pena's own text messages revealed that he did know the source of the hard drives and, one could reasonably infer, may have deliberately concealed the source's identity because of its potential to diminish the strength of the evidence the source provided. The source was one of the defendant's IT managers who had previously helped that defendant "evade and clean up" servers containing potentially incriminating evidence. *Newland*, March 21, 2022 Trial Tr. 1313; ECF No. 1200-2. SA De La Pena's "false testimony regarding the origin" of the hard drives was so egregious that it was a key factor in the government's decision to move to vacate defendants' guilty pleas and the court's decision to permit

the defendants to replead to misdemeanor offenses. (Ex. J); *Newland*, ECF No. 1329 at 7. Additionally, during trial, the defendant learned that SA De La Pena had instructed agents to offer foreign witnesses up to $5,000 in return for their testimony. *Newland*, ECF No. 873 at 26; ECF No. 1009 at 3–4, 8–9 (finding SA De La Pena did instruct agents to pay witnesses, but finding no *Brady* violation because defendants discovered the information with time to use it). Offering to pay witnesses for their testimony highlights the lengths to which SA De La Pena was willing to go to achieve a conviction and is directly relevant to SA De La Pena's motivations in this case.

The jury in this case should know that the lead agent responsible for gathering evidence has this history. It is important to the jury's assessment of what evidence was collected and what evidence was not collected. Each instance of SA De La Pena's past dishonesty calls into question his general character for truthfulness. But an additional and equally permissible inference from SA De La Pena's misconduct is that he is willing to be dishonest to further an investigation. In that context, the jury is entitled to hear, for example, that SA De La Pena attempted to pay witnesses for their testimony, misrepresented the collection of evidence he authenticated, falsely testified as to the origin of critical evidence, and made key misrepresentations in a sworn affidavit. Although Movants recognize that Rule 403 limits the extent to which they may dive into De La Pena's misconduct, this evidence is directly relevant to SA De La Pena's credibility in this case. Any prejudice, to the extent there is any, is greatly outweighed by the probative value of the evidence.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court grant Movants' Omnibus Motion *in limine*.

Respectfully submitted,

DATED May 30, 2025

*/s/ William A. Burck*
William A. Burck

Rocco F. D'Agostino (Bar No. NY0592)
445 Hamilton Ave., Suite 605
White Plains, NY 10601
Tel: (914) 682-1993

*Counsel for Defendant Meghan Messenger*

William A. Burck (DC Bar No. 979677)
Avi Perry (DC Bar No. 90023480)
Rachel G. Frank (DC Bar No. 1659649)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
williamburck@quinnemanuel.com
aviperry@quinnemanuel.com
rachelfrank@quinnemanuel.com

Christopher Clore (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 5th Ave
New York, NY 10016
Tel: (212) 849-7000
Fax: (212) 849-8100
christopherclore@quinnemanuel.com

*Counsel for Defendant Yongchul "Charlie" Kim*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this date, a copy of the foregoing motion was electronically filed with the Clerk of the U.S. District Court for the District of Columbia via CM/ECF and served to all counsel of record via electronic mail.

*/s/ William A. Burck*
William A. Burck (DC Bar No. 979677)

Dated: May 30, 2025