```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,      )
                                    )
 4            Plaintiff,            )
                                    )
 5        vs.                       ) CASE NO. 1:24-cv-00265-TNM
                                    )
 6   ROBERT P. BURKE,               )
                                    )
 7            Defendant.            )
     _____  )
 8

 9             TRANSCRIPT OF TRIAL BY JURY - TRIAL DAY 2
                        (Afternoon Session)
10      BEFORE THE HONORABLE TREVOR N. McFADDEN, DISTRICT JUDGE
                      Wednesday - May 7, 2025
11                    1:31 p.m. - 4:57 p.m.
                        Washington, DC
12

13   FOR THE GOVERNMENT:
            Office of the United States Attorney
14          BY:  REBECCA G. ROSS
            601 D Street, NW
15          Washington, DC 20530

16          DOJ-CRM
            BY:  TREVOR C. WILMOT and KATHRYN E. FIFIELD
17          1301 New York Avenue, NW, Suite 1000
            Washington, DC 20530
18

19   FOR THE DEFENDANT:
            Parlatore Law Group, LLP
20          BY:  TIMOTHY PARLATORE and ANTOINETTE QUINN O'NEILL
            260 Madison Avenue, 17th Floor
21          New York, New York 10016

22   _____
                        SONJA L. REEVES
23                 Registered Diplomate Reporter
                   Certified Realtime Reporter
24                 Federal Official Court Reporter
                   333 Constitution Avenue, NW
25                      Washington, DC 20001
            Transcript Produced from the Stenographic Record
```

<pre>
 1                          I N D E X

 2   WITNESSES CALLED BY THE GOVERNMENT:              PAGE

 3   JULIET BEYLER
          Cross-Examination By Mr. Parlatore            5
 4        Redirect Examination By Mr. Wilmot           18

 5   AMANDA KRAUS
          Direct Examination By Ms. Ross              32
 6        Cross-Examination By Mr. Parlatore          74
          Redirect Examination By Ms. Ross            95
 7
     SEBASTIAN GARDNER
 8        Direct Examination By Ms. Ross              97

 9
                            EXHIBITS
10   GOVERNMENT'S                                  ADMITTED
     9                                                117
11   58                                               113
     79                                                43
12   80                                                53
     91                                                62
13   95                                                67
     135                                              101
14

15

16

17

18

19

20

21

22

23

24

25
</pre>

1          (Call to Order of the Court at 1:31 p.m.)

2          (Jury absent)

3          THE COURT:  Let's go back to this 106 issue.  So,

4    Ms. O'Neill, I have had an opportunity to read the documents.

5    I guess I'm really not sure --

6          MS. O'NEILL:  Your Honor, if I can interrupt you.

7    We're going to withdraw that one.

8          THE COURT:  So that's -- we're all settled, then?

9          MS. O'NEILL:  We are all settled, yes, sir.

10         THE COURT:  Terrific.  As to the other two, I think I

11   directed the government that to the extent you're going to

12   admit that one excerpt, you need to add in the additional parts

13   that we just discussed.

14         MR. WILMOT:  Yes, sir.

15         THE COURT:  Okay.  Mr. Parlatore, how much longer are

16   you expecting on your cross?

17         MR. PARLATORE:  Probably about 15 minutes, not much.

18         THE COURT:  Who is up next for the government?

19         MS. ROSS:  Amanda Kraus, Your Honor.

20         THE COURT:  She's nearby?

21         MS. ROSS:  She's in the building.

22         THE COURT:  Thank you.

23         Mr. Parlatore, I don't think I got an exhibit list

24   from you.  Is that because you're not expecting to introduce

25   any exhibits?

1          MR. PARLATORE:  Correct, Your Honor.  We don't have

2     any exhibits that we expect to introduce yet.  Although,

3     sometimes things come up on -- during the direct where, as with

4     today, all of a sudden I had a couple of Bates-stamped things

5     that I was not expecting to use.  But as of right now, I don't

6     have any specific intent to introduce any substantive exhibits.

7          THE COURT:  I'm going to give you a little latitude

8     with this, but my preference would be, you give us a premarked

9     list, and even if you don't end up introducing any of them,

10    that's fine.  But I'm not a fan of marking exhibits on the fly.

11         MR. PARLATORE:  I understand that, Judge.  Like I

12    said, I think I can mostly deal with everything just on their

13    exhibits.  And, yes, there are things that I'm having to

14    refresh their recollection and things like that, but I don't

15    intend as of right now to move anything in.

16         THE COURT:  Okay.  All right.  Thanks.

17         We're a little early, but, Ms. Chaclan, why don't we

18    see if the jury is ready.

19     (Pause)

20         THE COURT:  Somebody can get Ms. Beyler.

21         MR. WILMOT:  I'm so sorry, Judge.

22     (Pause)

23     (Jury present)

24         THE COURT:  Welcome back, ladies and gentlemen.  We're

25    ready to resume the cross-examination of Ms. Beyler.

1          Ma'am, I'll remind you you're still under oath.

2          JULIET BEYLER, GOVERNMENT WITNESS, SWORN

3                    CROSS-EXAMINATION

4   BY MR. PARLATORE:

5   Q    Good afternoon, Ms. Beyler.

6   A    Good afternoon.

7   Q    When Admiral Burke asked you to get a contract with

8   Next Jump, he didn't tell you exactly how to do it, did he?

9   A    No, he didn't.

10  Q    That was something that he said what he wanted and then you

11  passed it down to your subordinates and they figured it out

12  from there, correct?

13  A    Correct.

14  Q    So, for example -- well, there were several different ways

15  they could have done it, correct?

16  A    I believe so, yes.

17  Q    Timing being one limiting factor, but if you want to get a

18  contract with Next Jump, they could have done it through a

19  competitive bid, correct?

20  A    Yes.

21  Q    They could have gone through the process of getting them a

22  sole source?

23  A    Yes.

24  Q    And, ultimately, they did it as a subcontractor on an

25  existing contract, right?

1    A    My understanding, yes.

2    Q    You're aware that when you do it by that method, the amount

3    of money that gets paid out, only a portion of that goes to the

4    subcontractor, correct?

5    A    I don't know the details of that.  But that makes sense.

6    Q    So a portion of the money, you don't know how much, you

7    know, would probably go to the prime, right?

8    A    That makes sense, yes.

9    Q    And there was no other company involved in this, you know,

10   in the actual provision of the training, correct?

11   A    Correct.

12   Q    And if you were able to cut out the prime by giving a

13   contract directly to Next Jump, that could have potentially

14   saved the Navy some money, right?

15   A    I don't really understand how that works, but in theory, I

16   guess, yes.

17   Q    If you send the contract to the prime, they take a piece

18   off the top, give the rest of it to the subcontractor.  If you

19   were to be able to go directly to the subcontractor, you could

20   save this piece that the prime is taking for just happening to

21   be there, right?

22   A    Yes.  That makes sense.

23   Q    And so you could have put this through a competitive bid

24   process, correct?

25   A    That, I don't know.

1  Q   Well, when it went down to the contracting people and the

2  lawyers, that's something that -- it was an option that was to

3  be looked at, correct?

4           MR. WILMOT:  Objection.  Witness just said she didn't

5  know.

6           THE COURT:  Sustained.

7  BY MR. PARLATORE:

8  Q   Now, you understand what a competitive bid process is,

9  correct?

10 A   Yes.

11 Q   Competitive bid process is where you, you know, write up

12 the requirement of what you need and you put it out to several

13 different contractors and they each bid to say whether they can

14 provide it and how much it would cost, correct?

15 A   Correct.

16 Q   So, for example, if you were to put out, you know, we need

17 resiliency training, Next Jump and Outward Mindset, both show

18 us what you have, and Outward Mindset says, well, we don't

19 really do that, then they won't get the contract, right?

20 A   Yes.

21 Q   If you have several different contractors that each put in

22 fairly similar proposals of what they can provide, but each one

23 of those proposals has a different dollar figure, you end up

24 getting it to the lower bidder, correct?

25 A   I think so.  That's a level of detail I don't really quite

1  understand.

2  Q   And in the past, when you have had situations with where

3  Admiral Burke has come to you and said, I want something, and

4  you have pushed back on him and said, sir, there's a process we

5  need to follow, he's followed your advice, correct?

6         MR. WILMOT:  Objection.  Facts not in evidence.  There

7  is no testimony from the witness that that's ever happened

8  previously.  I think more foundation needs to be laid there.

9         THE COURT:  Overruled.

10        THE WITNESS:  Could you repeat?

11 BY MR. PARLATORE:

12 Q   Have there been occasions in the past where Admiral Burke

13 has told you, I want something, and you have told him, well,

14 sir, there's a process that we have to follow and he's accepted

15 that?

16 A   Yes.

17 Q   For example, do you remember when he wanted to hire a new

18 CAG director?

19 A   Yes.

20 Q   And when he came to you and said, I wanted to a hire a CAG

21 director, he had a specific person he wanted to hire for that

22 position, right?

23 A   Yes.

24 Q   And you told him, no, we can't do that, we need to

25 advertise the position and have a competitive process?

1    A    Yes.

2    Q    And you told him at that time, if the person you want is

3    the best qualified through the process --

4    A    Yes.

5    Q    And he trusted you, right?

6    A    Yes.

7    Q    And in that particular process, the person he wanted

8    actually didn't even end up on the slate, right?

9    A    The first time, correct.

10    Q    Okay.  And that was because the initial advertisement

11    didn't have really the right job description on it, right?

12    A    Yes.

13    Q    And so you told him, well, we could cancel it.  We have to

14    wait 90 days before restarting the process, right?

15    A    Yes.  There were a couple different ways we could have done

16    it.  That was one of the options, I think.

17    Q    And, obviously, he wanted a CAG director now, not five,

18    six months from now, right?

19    A    Yes.

20    Q    But in that circumstance where you told him this is the

21    process, this is what we have to do, he looked at you and said

22    yes?

23    A    Yes.

24    Q    Now, you testified on direct about the dollar value of this

25    contract that he had come to you and said, I want it for

1    $350,000, right?

2    A   Well, I think the conversation was, that's how much we had

3    left, and so that's what was available to put on contract.

4    Q   And how much was the proposal for with Next Jump, if you

5    recall?

6    A   I don't remember.

7    Q   I'm going to show you what's been marked but is not in

8    evidence.  This is Government's 75.  See if this refreshes your

9    recollection.

10       Can you see that?

11   A   Yes.

12   Q   Does that -- what I've shown you is the pricing sheet from

13   Next Jump.  Does this reflect -- refresh your recollection as

14   to what their proposal was?

15   A   Yes.

16   Q   And what was their proposal?

17   A   $413,500.

18   Q   So he didn't ask you to take it down from, like, a

19   $10 million proposal?

20   A   No.

21   Q   And this was something that was to be actually spread

22   through several different commands, correct?

23   A   Correct.

24   Q   When you say that's all we had left, some of those other

25   commands had their own training budget, right, like the CTFs?

1    A    I can't remember if we gave them a separate training budget

2    or not, but probably.

3    Q    And, certainly, you can get additional training money from

4    U.S. forces as part of the Culture of Excellence program,

5    right?

6    A    We were trying to, yes.

7    Q    I want to go back to what we were talking about, how you

8    had gotten the feedback from people.

9        Now, this was after you had initially, you know, written

10   that draft email to Meghan Messenger that's in this Exhibit 48,

11   correct?

12   A    Correct.

13   Q    And when you drafted that, you went and discussed it with

14   Admiral Burke, right?

15   A    I did, yes.

16   Q    You said don't send it.  I want to the hear some more

17   opinions, right?

18   A    Correct.

19   Q    You went and got those opinions and sent it to him?

20   A    Correct.

21   Q    And I think the email that we already saw, it's Exhibit 51,

22   he said, "Thank you," right?

23   A    Yes.

24   Q    He was grateful that you had sent that to him.

25       And then he actually took those opinions and sent them to

1    Next Jump, didn't he?

2    A    Yeah, I think so.

3    Q    And in sending them to Next Jump, he parroted basically the

4    same thing you said about we can't do this, correct?

5            MR. WILMOT:  Objection.  Hearsay.

6            THE COURT:  Overruled.

7    BY MR. PARLATORE:

8    Q    When he forwarded the survey results that you provided to

9    him to Next Jump, he essentially then parroted the points that

10   you had written about this does not make sense for us, so we're

11   not going to move forward, correct?

12   A    I'm not sure.  I don't know, actually.  Probably.

13   Q    Okay.  Can we put DOJ 6292 just for her?

14        That's the wrong one.  34490.  I apologize.

15        Take a look at this and see if this refreshes your

16   recollection.

17   A    It does.

18            MR. WILMOT:  I'll object at this time.  The witness

19   said she didn't know in answer to the last question, and I

20   don't see a foundation here that Ms. Beyler received the email

21   in question.

22            THE COURT:  I think a witness can be refreshed with

23   just about anything.

24            MR. WILMOT:  I beg your pardon.  I missed the header.

25   I see that she received it now.  I apologize.

1          THE COURT:  Has your memory been refreshed?

2          THE WITNESS:  It has.

3          THE COURT:  All right.  You can take that down.  Take

4     it down.

5     BY MR. PARLATORE:

6     Q   So, in fact, Admiral Burke took the feedback you gave him

7     and the recommendations you gave him and forwarded it to

8     Next Jump and said, we can't move forward with this, right?

9     A   He did, yes.

10    Q   And that was in September of 2021?

11         MR. PARLATORE:  I'm sorry.  Put it back up real quick

12    for date purpose.

13         THE WITNESS:  Yes.

14         MR. PARLATORE:  Okay.  Take it down again.

15    BY MR. PARLATORE:

16    Q   So in September, he had told Next Jump, we're not moving

17    forward with this, based on your recommendation, correct?

18    A   Based on our collective, yes.

19    Q   And it was a month or so later that Next Jump came back and

20    offered to bring four people out to their leadership academy,

21    right?

22    A   Correct.

23    Q   And based on those four people -- as we discussed before

24    lunch, based on those four people going and then making the

25    recommendation to Admiral Burke, that's why the pilot program

1  went forward with the units that they commanded, correct?

2  A    Yes.

3        MR. WILMOT:  Objection.  Argumentative.  Calls for

4  speculation as to what Admiral Burke was thinking.

5        THE COURT:  Overruled.

6        THE WITNESS:  Yes.

7  BY MR. PARLATORE:

8  Q    Now, the other one that we saw this morning, Exhibit 96,

9  where you had said it's a hard no, and I believe you testified

10 that you were comfortable sending this because you were in a

11 different space at that point, correct?

12 A    Yes.

13 Q    And part of that different space is that a couple of weeks

14 earlier, Admiral Burke had delegated responsibility to you,

15 right?

16 A    For?

17 Q    For dealing with Next Jump and whether they were going to

18 continue?

19 A    I don't --

20 Q    Why don't I bring up something to help you.

21 A    Thank you.

22       MR. PARLATORE:  Can we put up DOJ 6292 for the

23 witness?  We'll get the highlighted portion in the middle of

24 the page.

25 BY MR. PARLATORE:

1    Q    Does that refresh your recollection that towards the end of

2    January, after the training had been completed, that

3    Admiral Burke informed them you could act on this?

4    A    Yes.

5         MR. PARLATORE:    Take that down.

6    Q    Now, after you had sent that email saying this is a hard no

7    and we need to discuss it with COM, meaning Admiral Burke, did

8    you have that discussion?

9    A    I don't remember.    That's where it gets a little fuzzy.    I

10   don't remember.

11   Q    Well, certainly the contract at that point was over,

12   correct?    There was no extension.    There was no additions, no

13   options or anything?

14   A    From what I remember, I think there were still discussions

15   about potentially doing more.    We were still a little back and

16   forth at that point.

17   Q    But you had said it's a hard no, and ultimately

18   Admiral Burke agreed with you?

19   A    Yes.

20   Q    You had provided him, or somebody had provided him, with

21   all of the feedback from that January session, right?

22   A    So we had the package and then I forwarded it, but what I

23   can't remember is if I discussed the package with him.    But,

24   yes.

25   Q    You do recall him concurring with you to not move forward,

1  whether there was a discussion or based on the email?

2  A   I don't remember, but I think so, because I would have

3  discussed it with him.

4  Q   Okay.  You certainly don't remember him yelling at you,

5  saying no, no, no, we're not doing this?

6  A   No, he didn't do that.

7  Q   All right.  One final area I want to go through with you.

8      As much as you didn't believe that Next Jump was something

9  that would work for the Navy, from your perception, did

10  Admiral Burke believe it?

11  A   Yes.

12  Q   Did he believe in it very strongly?

13  A   Yes.

14  Q   So when he told you that he was going to go work for

15  Next Jump, you weren't surprised at all, were you?

16  A   No.

17  Q   And that is for a couple of reasons.  First, that you knew

18  that he believed in their product, correct?

19  A   Correct.

20  Q   And second of all, you said that Next Jump does this all

21  the time, whenever they talk to a military audience, they are

22  always trying to recruit people, right?

23          MR. WILMOT:  I beg your pardon, Counsel.  Would you

24  restate the question.

25  BY MR. PARLATORE:

1  Q   Based on your observations, when Charlie Kim and Next Jump

2  are addressing military audiences, they're often trying to

3  recruit people to work for Next Jump, correct?

4        MR. WILMOT:  I'm going to object to the question.  It

5  calls for hearsay.  While it's couched in the precursor of

6  observations, it's asking Ms. Beyler to confirm something that

7  Mr. Kim and Ms. Messenger said outside of court.

8        THE COURT:  But I don't think it's for the truth of

9  the matter, so I'm overruling the objection.

10        MR. WILMOT:  Okay.

11        THE WITNESS:  I think the context of that conversation

12  was about defense -- what I remember is it was about defense

13  contractors in general.  And so that's what I think I remember

14  about that, is, yes, is defense contractors regularly court

15  retiring flag officers.  That's something that happens.

16  BY MR. PARLATORE:

17  Q   What about Next Jump specifically, did you ever see them

18  doing that?

19  A   Yes.  Charlie -- again, we talked about Admiral Moran.

20  They talked about other flag officers they work with regularly.

21  Q   Okay.  And on direct, you were asked about the ethics

22  rules.  If they are basically always trying to recruit people,

23  as long as you say no, that's fine, right?

24  A   Correct.  That's part of the training.

25        MR. PARLATORE:  Just one moment.

1      (Pause)

2           MR. PARLATORE:  Thank you, Ms. Beyler.  I have no

3    further questions for you at this time.

4           THE COURT:  Thank you, Mr. Parlatore.

5           Mr. Wilmot, any redirect?

6           MR. WILMOT:  Yes, sir.

7                         REDIRECT EXAMINATION

8    BY MR. WILMOT:

9    Q   Good afternoon, Ms. Beyler.  To begin with, the period

10   after Next Jump performed the contract over at Navy Europe and

11   Africa, would it be an accurate characterization of your

12   testimony to say that after Admiral Burke pressed to get the

13   contract done, he generally stopped caring about Next Jump,

14   from your point of view?

15   A   Yes.

16   Q   Mr. Parlatore asked you some questions about occasions

17   where Admiral Burke followed your advice when you explained to

18   him what the proper process was for things.  Do you remember

19   that?

20   A   Yes.

21   Q   And he gave the example of something called a CAG director?

22   A   Yes.

23   Q   What does CAG stand for?

24   A   The Commander Action Group director, so kind of the person

25   that works on specific projects, speeches, things like that,

1    for the commander.

2    Q    Okay.  On direct, you testified that in early 2021, when

3    Mr. Kim reached out to Admiral Burke, the one that caused your

4    heart to sink, that you gave Admiral Burke certain advice.  Is

5    that right?

6    A    I think so.

7    Q    And do you remember testifying that the advice was that

8    there was a process to be followed and that he should avoid

9    communicating directly with Kim and Messenger?

10   A    Yes, something along those lines.

11   Q    You gave that advice to Admiral Burke repeatedly?

12   A    Yes, over time.

13   Q    That is a process that Admiral Burke didn't follow?

14   A    Correct.

15   Q    Mr. Parlatore asked you some questions about Navy Europe

16   and Africa and the contracting authority that it had and didn't

17   have.  Do you remember that line of questions?

18   A    Yes.

19   Q    He described other areas of the Navy, other sections of the

20   Navy?

21   A    Yes.

22   Q    Like Fleet Logistics Command?

23   A    Yes.

24   Q    Something called NAVSUP?  What's that?

25   A    Navy supply command.

1  Q    To the best of the your knowledge, are those organizations

2  that are designed to support commands like Navy Europe and

3  Africa?

4  A    Fleet Logistics Center is.  So they're -- that what's their

5  job is, to support the NAVEUR specific -- NAVEUR, NAVAF

6  specifically, and Europe and Africa.  The other one is -- no.

7  That's a larger command back in Washington.  I don't remember

8  where they are.  Pennsylvania, I think.

9  Q    Mr. Parlatore asked you some questions about the mechanisms

10 to stand up a contract.  He was asking about competitive bid

11 processes and things of that nature.  Do you remember that?

12 A    Yes.

13 Q    To the best of your knowledge around this area of

14 contracting, is the reason that you compete contracts is to

15 ensure you're getting a good price?

16 A    Yes.

17 Q    Is it to ensure you're getting transparency in the

18 contracting decision?

19 A    Yes.

20 Q    Is it to ensure that contracts are being pursued ethically

21 and legally?

22 A    Yes.

23 Q    Is it to provide an opportunity for other people to have a

24 crack at that potential contract?

25 A    Yes.

1   Q   In this case, it was a sole-source contract, right?

2   A   I believe so.

3   Q   And recognizing the complexity around some of the Navy

4   procedures for a contract, can Admiral Burke still give an

5   order to mobilize that machinery to fulfill what he wanted?

6   A   Yes.

7           MR. WILMOT:  Can we look at Exhibit 78, please, in

8   evidence?

9           Would you please highlight the email in the middle of

10  the page from Admiral Burke to Ms. Beyler on December 16th?

11  BY MR. WILMOT:

12  Q   Mr. Parlatore asked you a couple of questions about this on

13  cross-examination, and he said -- or he pointed you to the

14  second sentence, "Would like to get this in place to support

15  kickoff events in early January if possible."

16      Do you see that?

17  A   Yes.

18  Q   And to be clear, is this email what you're saying was the

19  order from Admiral Burke?

20  A   This combined with our conversation, yes.

21  Q   So the conversation was the part that you testified was the

22  order?

23  A   Yes.  I advise, and the commander makes the decision.

24  Q   I asked you on direct, like, 40 years of military service,

25  you knew an order when you heard one?

1  A    Yes.  Admiral Burke never spoke to me like that.  It was

2  very conversational, but it was -- we understood what he wanted

3  and we would work to do that.

4  Q    You were asked some questions by Mr. Parlatore going to the

5  scope of Admiral Burke's responsibilities as commander, and he

6  talked about things like exercises, Afghanistan and so on.  Do

7  you remember that?

8  A    I do.

9  Q    In the context of those responsibilities, did you find it

10  odd that the defendant was spending time throughout 2021 on a

11  $350,000 services contract?

12  A    I wouldn't characterize -- it was a little unusual, but not

13  odd, per se, given the history.

14  Q    Okay.  And I want to be clear on the subject of the

15  deadline.

16      When you received the order in middle December 2021 and the

17  deadline was 10 January of the following year, your testimony

18  was that, from Admiral Burke's perspective, the driver of that

19  deadline was that Next Jump had already purchased tickets.  Is

20  that accurate?

21  A    They were already coming, yes.

22  Q    You said a few times in your cross-examination that you

23  were a fan of Next Jump initially, and I want to clarify what

24  you meant by initially.

25      Did you mean back at N1 in 2018 and 2019, when you did the

1  pilot program?

2  A    Yes.  When we went to New York, when we did the pilot

3  program, when we worked with them over time on a couple

4  different things, yes.

5  Q    And your conclusions after that was that it's not -- wasn't

6  scalable to the Navy?

7  A    Correct.

8  Q    Okay.  In 2021, when you said that your heart sank when you

9  saw an email from Mr. Kim, were you a fan of Next Jump at that

10  time?

11  A    No.

12          MR. WILMOT:  Can we show up Exhibit 17, please?  The

13  top email that Ms. Beyler wrote.

14  BY MR. WILMOT:

15  Q    Do you see that there is a sentence in sort of the middle

16  of that email, before the web address?  It starts on the

17  right-hand side.  "Although their tech isn't scalable for us,

18  their ideas are good."

19      Do you see that?

20  A    Yes.

21          MR. WILMOT:  You can take it down.

22  BY MR. WILMOT:

23  Q    What was your motivation in writing that their ideas were

24  good relative to your invitation to people who hadn't heard of

25  Next Jump before?

1  A   One, I still believed their ideas were good, but I was also

2  trying not to bias anybody.  I was trying -- I was just trying

3  to be neutral and say their ideas are good, and should attend

4  and listen.

5  Q   And is there a difference between having a good idea and

6  being able to execute that idea?

7  A   Yes.

8  Q   At any point in the first half of 2021, or really

9  thereafter, leading up to the contract, do you remember

10 Next Jump having an execution plan to provide a product that

11 would identify or prevent suicidal ideation?

12 A   I don't remember that.  Maybe.

13 Q   You were asked some questions about the difference between

14 the app that Next Jump was providing and some training that

15 they offered that wasn't requiring a phone.

16     Do you remember that?

17 A   Yes.

18 Q   In the context of that discussion, Mr. Parlatore asked you

19 a question.  You answered and said, "There was more to it than

20 that."

21     Do you remember that?

22 A   Could you remind me what the question was?

23 Q   I don't have the transcript in front of me.  If sitting

24 here you don't remember what the more to it was --

25 A   I don't remember.  I'm sorry.

1   Q   There was some questions asked about NIPRNet computers.  Do

2   you remember that?

3   A   Yes.

4   Q   And you're familiar with, like, a NIPRNet computer?

5   A   Yes.

6   Q   Did the defendant ever say to you that a NIPRNet computer

7   was a reason that a contract with Next Jump became tenable?

8   A   No.

9   Q   Mr. Parlatore was asking you some questions about the four

10  officers that went over to New York and took the training from

11  Next Jump.  Do you remember that?

12  A   Yes.

13  Q   Do you remember that that occurred at the end of November

14  in 2021?

15  A   I do.

16  Q   You mentioned in your cross-examination, it was not

17  explored, but that there was a gift involved in that process.

18      Do you remember the gift issue?

19  A   Yes.  Again, because we were potentially considering doing

20  a contract with Next Jump, in order for these folks to go to

21  the class free of charge, the lawyers recommended we run this

22  package called a gift acceptance so that we could say that the

23  command, Admiral Burke, accepted a gift on behalf of the

24  government so that they could go to the training.

25  Q   Right.  And it was a gift because it was a thing of value

1    they were offering, and they were waiving tuition and that's

2    what made it a gift?

3    A    That's my understanding, yes.

4    Q    And the person who accepted that gift had to be a person in

5    a position of authority, right?

6    A    Yes.

7    Q    And who accepted that gift?

8    A    Admiral Burke did.

9    Q    So in your cross-examination -- I think it's my final area

10   for you -- Mr. Parlatore was suggesting that you told those

11   four officers to lie to Admiral Burke about their experience in

12   that training.

13        Do you remember he was asking you questions suggesting

14   that?

15   A    Yes.

16   Q    First of all, do you have any animus for Admiral Burke as

17   you sit here?

18   A    No.

19   Q    Do you have any reason to lie about your testimony here

20   today?

21   A    No.

22   Q    Is that actually how it happened, that you told those four

23   people to snow Admiral Burke about their impressions?

24   A    No.

25   Q    How did it really happen?

1  A    It really happened is that they went to the training, they

2  came in, they said here is what I thought of it, I'm not really

3  sure what I do with this, and --

4  Q    What did they think of it?

5            MR. PARLATORE:  Objection.

6            THE COURT:  Overruled.

7            THE WITNESS:  So I didn't talk to all four of them,

8  but --

9            MR. PARLATORE:  Objection.  Hearsay.

10           MR. WILMOT:  Judge overruled the objection.

11           THE COURT:  You can speak to what you heard from them.

12           THE WITNESS:  Okay.  So Admiral Reynolds in

13  particular, because he worked in the same location as I did, we

14  had several conversations about I just don't know what I do

15  with this, it was interesting, I don't know -- I'm struggling

16  to understand how I would use this.  And so then that's what I

17  told him.  I said, you need to tell the boss that.  We were

18  going to have a teleconference with Admiral Burke, and I said

19  he needs to hear that from you, right?  It can't come from me

20  because I'm already sort of -- I have a bias and so, right, I

21  need to sort of leave myself off to the side of this.

22           And so it was Admiral Reynolds and then

23  Captain Merchant, who is our N-2.  He had misgiving, again,

24  because of the timeframe.  He was the director of our

25  intelligence, and in particular, he didn't know if he had time

1  with everything that was going on with his staff.  They were

2  all very busy.  So he was like, I just don't think I can

3  actually do this with my people.  And that's what I told him.

4  I said, then you need to tell Admiral Burke that again.  Nobody

5  likes to tell the boss no.

6         And so when we had the teleconference in

7  Admiral Black's office prior to Admiral Burke dialing in, I

8  said, right, you guys tell him what you thought.  It's your

9  opinion.  And then it was not kind of -- it was a

10  back-and-forth conversation, and toward the end of the

11  conversation, they all just kind of said, well, I guess we

12  could try to figure something out.  And so they all just said,

13  yes, we could do something, and we'll come up with a proposal,

14  sir, that we can do something with it.

15  BY MR. WILMOT:

16  Q   And your view was that they said that because they were

17  giving Admiral Burke the answer that he already wanted to hear,

18  right?

19  A   Everybody wants to get a yes to support the boss if they

20  know it's something they know the boss wants to do.  They were

21  trying to find a way to get to yes.  I laughingly told them

22  that they all rolled, but that was their opinion.

23  Q   Thank you.

24         MR. WILMOT:  Those are all my questions.

25         THE COURT:  Thank you, Ms. --

1              MR. PARLATORE:  Can I do a brief recross?

2              THE COURT:  No.

3              Ms. Beyler, thank you for your testimony here today?

4              MR. PARLATORE:  May we approach?

5              THE COURT:  All right.

6          (Begin bench conference)

7              MR. PARLATORE:  Mr. Wilmot asked her about whether the

8     timeline was driven by them already having tickets.  One, they

9     did not already have tickets.  And two, in her prior testimony

10    before the IG, she specifically said that the timeline was

11    driven by Ukraine, not by travel.  And so based on that

12    specific issue, I just want to cross-examine on that specific

13    point to -- you know, because this is something that he brought

14    up in the redirect, I should be able to confront her with her

15    prior inconsistent statement of what he said to the IG.  It's

16    very clear.

17             MR. WILMOT:  I did not bring that up for the first

18    time in redirect.  I elicited that during the direct

19    examination.  I have a clear memory of doing so.  And I wanted

20    to reconfirm that on redirect to make sure there was no

21    ambiguity about the reason that in Ms. Beyler's view the

22    deadline existed as it did.

23             So he's just trying to get the last word here, not

24    examine something that I raised for the first time on redirect,

25    sir.

1          MR. PARLATORE:  In direct examination, she said that
2    it was driven by Ukraine and that she believed Charlie Kim was
3    trying to put pressure on the process by booking travel.  She
4    did not say in the direct examination -- because this is
5    something that I had in my cross that, because of how it came
6    out in the direct examination, because she didn't say that it
7    was driven by the fact that they had tickets, I cut that piece
8    of my cross out, because that is something she said to the
9    grand jury, which was completely inconsistent with what she
10   said to the IG.

11         What she said in direct examination was, it was
12   primarily driven by Ukraine, but that she believes that Charlie
13   was also trying to put pressure on it by booking travel.  And
14   then in redirect, he brings out, no, it was driven by the
15   travel.  That is something that I think, in fairness, we need
16   to have a recross on because the way that it was presented in
17   direct and redirect is different.

18         THE COURT:  All right.  I appreciate your point.  I'm
19   very reluctant to do recross.  I think you already have -- you
20   point out she has said two different things, once in direct and
21   once in redirect.  I think you can make that point in closing.
22   But I'm denying the request to do redirect -- or do recross.

23         (End bench conference)

24         THE COURT:  Ms. Beyler, thank you for your testimony
25   here today.  You may step down.

1        (Witness excused)

2            THE COURT:  The government may call its next witness.

3            MS. ROSS:  The government calls Amanda Kraus.

4            MR. PARLATORE:  Your Honor, before Ms. Kraus begins,

5    may we have a session to discuss legal issues?

6            THE COURT:  If you can approach.

7        (Begin bench conference)

8            MR. PARLATORE:  Through the -- her testimony to the IG

9    99 percent of it is completely inadmissible.  She never

10   actually spoke with Admiral Burke about this.  All she's --

11           THE COURT:  I don't know who this is.

12           MR. PARLATORE:  Okay.  So this is the person -- one of

13   the people that -- on the staff that was actually working to

14   put the contract into place, and she's talking about how they

15   had to do all this stuff because Admiral Burke had ordered them

16   to do it, this is what Admiral Burke wanted.  She's never

17   spoken to Admiral Burke.  She -- she heard him speak twice at a

18   large group setting.  She's never spoken to him.  Certainly,

19   she can testify as to what she did, but to the extent that

20   we're going to have the same kind of repetitive, oh,

21   Admiral Burke wanted this, Admiral Burke wanted that.

22           And a lot of what she says is based on false rumors.

23   So, like, for example, when she talks about the four officers

24   going to the leadership academy, she said to the IG that they

25   were -- Next Jump was enticing them with free gifts, they were

 1  giving them free iPads, things like that, things that nobody
 2  else has said.  I don't know what the direct examination is
 3  intended to be, but to the extent that it's going to track her
 4  prior interviews, I'm going to be bouncing up and down a lot,
 5  so that's what I wanted to raise.
 6          THE COURT:  I appreciate that.  Obviously, the IG was
 7  not bound by hearsay rules, but Ms. Ross is, and I'm sure
 8  you're going to make sure to keep it to what she knows.
 9          MS. ROSS:  Yes, Your Honor.
10      (End bench conference)
11          THE COURT:  Ma'am, if you can approach the witness
12  stand.
13      (Oath administered to the witness)
14              AMANDA KRAUS, GOVERNMENT WITNESS, SWORN
15                      DIRECT EXAMINATION
16  BY MS. ROSS:
17  Q   Good afternoon, Ms. Kraus.  Can you please state and spell
18  your name for the record.
19  A   Good afternoon.  Amanda Kraus, A-m-a-n-d-a, K-r-a-u-s.
20  Q   Where do you currently work, Ms. Kraus?
21  A   I currently work for the Navy Office of Community Outreach.
22  Q   Are you a civilian employee?
23  A   Yes.  I'm a federal civilian employee.
24  Q   Where are you based out of?
25  A   Millington, Tennessee.

1    Q    Have you worked with other branches of the military?

2    A    Yes, I have.  My career began in the early '90s, and I've

3    worked as a civilian employee for the Army, the Air Force, and

4    now Navy.

5    Q    And were you ever with the Marine Corps?

6    A    I was.  I was active duty in the Marine Corps.

7    Q    For how long?

8    A    About three years.

9    Q    I'm going to focus just on 2021 to 2022.  Where did you

10   work during that time?

11   A    In April of 2021, I took a position at Naval Forces Europe,

12   Africa and Sixth Fleet.  I was the workforce development

13   specialist there.

14   Q    Is that often referred to as NAVEUR?

15   A    Yes, NAVEUR.

16   Q    What did you do there, more specifically?

17   A    As a management analyst and a workforce development

18   specialist, my responsibility was to acquire training, set up

19   training, any type of professional development that the service

20   members or civilian employees were required to have.

21   Q    Who was in your chain of command?

22   A    I worked for the manpower and personnel directorate.  So

23   Ms. Jeannie English was the deputy director.  Captain

24   Nina Nicasio was the director.  And then above them was the

25   deputy chief of staff, the chief of staff, executive director,

1    and the COM.

2    Q    Was Juliet Beyler in your chain of command?

3    A    She was the executive director.

4    Q    Who was the commander at NAVEUR at the time?

5    A    Admiral Burke.

6    Q    Do you see Robert Burke in the courtroom today?

7    A    I do.  He is --

8    Q    Can you please identify him by a piece of clothing?

9    A    He's the gentleman in the gray suit behind you.

10         MS. ROSS:  May the record so reflect that the witness

11   has identified the defendant as Robert Burke.

12         THE COURT:  It will so reflect.

13   BY MS. ROSS:

14   Q    Are you familiar with a company called Next Jump?

15   A    Yes, I am.

16   Q    How did you become familiar with Next Jump?

17   A    December 17th of 2021, I received an email from my

18   supervisor, who was on vacation, saying that we needed to

19   acquire training from a company called Next Jump.

20   Q    So I'm going to focus on that time period, around the time

21   you got that email.  Were you involved in the contracting

22   process at NAVEUR at that time?

23   A    Yes, I was.  Anything that was related to acquiring

24   training would be in my purview, yes.

25   Q    And prior to joining NAVEUR, did you have experience with

1  government contracts?

2  A    Yes, I did.  While I worked with the Army in particular, I

3  had several years of experience either writing portions of or

4  following the process from start to finish.  So in all, I have

5  probably touched 8 to 12 contracts.

6  Q    Did you receive training on government contracting?

7  A    Yes, I did.  As a contracting officer representative, I was

8  required to take extensive ethics training, training about the

9  process of acquisition in general.

10  Q    Now, focusing more specifically on NAVEUR, what was your

11  role with contracting within NAVEUR?

12  A    In NAVEUR, if training -- if we needed training that

13  required to be contracted, then it would be on myself and the

14  team that I worked with to provide documentation to create a

15  contract or submit requirements for a contract.

16  Q    So I want to talk a little bit about what goes into

17  submitting a contract.

18      So let's start at the beginning.  If it was determined that

19  NAVEUR had a request for service or a need for a contract, what

20  type of information would the requester, the person who needed

21  that contract, have to provide you?

22  A    Well, it always begins with the requirements, what are the

23  government requirements.  And that is details, in this case

24  like who is going to be trained, when, how often, what's the

25  period of performance, meaning when is this going to end, who

1    provides the training, who receives it, and so on.  And then

2    there is also the cost factors there.  So we have some research

3    to do.  And that's all to make sure that the government doesn't

4    overpay or that the contractor doesn't under-deliver.

5    Q    Is it also to identify the government's need specifically

6    for that contract?

7    A    Yes.  The requirements piece is very specifically for that.

8    Q    And would that information go into a document called a

9    statement of work?

10   A    Yes.  That's the initiating document, and it's sometimes

11   called performance work statement or statement of work.  It's

12   virtually the same thing.  And that is all of the detail that

13   would eventually be given so that a contractor could bid on a

14   contract.

15   Q    What was your role in creating the statement of work?

16   A    In this case, because it was for training, it was my

17   responsibility to write the statement of work for the contract.

18   Q    For the contract with Next Jump?

19   A    Yes.

20   Q    So typically, after you create a statement of work or have

21   enough information that goes into the statement of work, what

22   happens after that?

23   A    It goes through an extensive review process.  It's checks

24   and balances.  So it would go to Naval Supply Systems Command.

25   That's where -- and Fleet Logistics Command, which is where the

1  contracting officer function resides.

2  Q   Does that go into what's called an acquisition package?

3  A   Yes.  There are several items that go in there.  The

4  statement of work is just sort of what starts it.

5  Q   And so beyond just a statement of work, what else goes into

6  an acquisition package?

7  A   There's a research portion, and that is basically on the

8  government's side.  We have to research what the product or

9  service is enough to determine a rough estimate of what it will

10  cost and whether it's a fair cost.

11      There is also, let's see, a -- let's see.  The government

12  estimate.  So that's the cost piece.  But there's also a legal

13  review.  Typically, that happens in the contracting process as

14  well.

15  Q   Is it a difficult process to build an acquisition package?

16  A   It can be.  It is very, very detailed.  And that's on

17  purpose, so that we're ensuring that, number one, there's a

18  bona fide need for a contract; number two, that all of the

19  information about, in this case, Navy requirements or

20  government requirements are spelled out so that we're ensuring

21  that taxpayers dollars are being properly used.

22  Q   So after you have the acquisition package ready, what

23  happens after that?

24  A   Ultimately, it goes through to the contracting office, and

25  then it's typically open to the public for bidding.  There is

1    usually a time period where -- you know, a few weeks or a month

2    or something like that, where potential companies or interested

3    companies will see the bid -- or excuse me, decide to bid, and

4    then they submit a proposal.

5    Q    Is that bid process an important part of the contracting

6    process?

7    A    Yes.  That's very much key to ensuring that the contracting

8    process is fair and equitable.  It also ensures that the

9    government is providing fair opportunities for the competition.

10   Q    And after a company is chosen from that bid process, what

11   happens after that, typically?

12   A    There is usually a review, a final review.  So it's with

13   the requester or contract specialist and those involved, where

14   we have the opportunity to look at the proposals and make a

15   determination on which one would best suit the needs of the

16   government.  At that point, it goes back to the contracting

17   officer and is signed by their warrant.

18   Q    From start to finish, from the time you receive a request

19   for service to the time that a contract is signed, how long

20   does that typically take?

21   A    It varies.  It depends on the complex nature of the

22   services or the materials.  I have seen them take as long as a

23   year, but I have not experienced anything that was shorter than

24   several months.

25   Q    And generally, who makes requests for a service contract?

1   A    It depends.  In this case, because it had to do with

2   training, that came from my department.

3   Q    And, typically, who would make that request for service,

4   more specifically?  Who identifies the need for a service

5   contract?

6   A    In this case, it would be -- it would have been myself or

7   the team.  Usually when we're talking about training, it begins

8   with identifying a gap in something.  That could be conducting

9   surveys and finding out that people, the unit or organization

10  feels that there's a lack of something.  Or maybe mission

11  change, and there's a reason for new types of training.  But if

12  it was training and if it was NAVEUR in 2021, that would have

13  been the training department, which was mine.

14  Q    Did the contract for Next Jump, did that request for

15  service come from your department?

16  A    No.  There was not any -- this was a surprise.  It was not

17  anything that we were tracking.  In fact, we already had a

18  contract that was related to workforce development, leadership

19  development, at NAVEUR.

20  Q    In your experience, was it typical for a training service

21  request to come straight from the commander of NAVEUR?

22  A    No.  Typically, that would be someone on the staff.  If it

23  was training, it would be from my directorate.  If it was, say,

24  a public affairs support-type contract, that would be from the

25  PAO.

1   Q   In all of your experience working on government contracts,

2   did you ever have a service request come directly from the

3   commander?

4   A   No, I haven't.

5   Q   Okay.  So now I'm going to focus on the work that you did

6   specifically for the Next Jump contract starting in December

7   of 2021.

8           MS. ROSS:  Can we please bring up, just for the

9   witness, what has been marked as Government Exhibit 79, please?

10  BY MS. ROSS:

11  Q   Do you recognize this email?

12  A   Yes, I do.

13          MS. ROSS:  The government is going to move to admit

14  Government Exhibit 79 and publish it for the jury.

15          MR. PARLATORE:  My monitor turned off.  Give me a

16  moment.

17     (Pause)

18          MR. PARLATORE:  Defense would object on hearsay

19  grounds.

20          THE COURT:  Parties approach.

21     (Begin bench conference)

22          THE COURT:  What's the basis for admitting this?

23          MS. ROSS:  She received it, so it's going to forming

24  her basis, her knowledge about what's going on here.  We have

25  admitted an earlier thread of this email, so most of this email

1    is already in evidence.  She's on the chain.  The highlights

2    just go to forming her impression and her thoughts.  Not

3    offering it for the truth.  It's going to her state of mind

4    about the contract and the work that she had to do on it.

5          MR. PARLATORE:  The hearsay is all this back and forth

6    between, you know, the various employees giving their opinions

7    about things, can we take Admiral Burke's phone away from him.

8          THE COURT:  That's not hearsay.

9          MR. PARLATORE:  Well, I would make a separate argument

10   on that.

11         THE COURT:  I can tell you don't want it in, but

12   what's your argument there?

13         MR. PARLATORE:  Certainly, the derisive comment.  I

14   would argue that that is a 403.  It's not relevant.  You know,

15   the fact that somebody had this negative opinion of

16   Admiral Burke is not relevant, and to put that in, it does, you

17   know, have unfair prejudice.  So whatever minimal hearsay value

18   that this -- or non-hearsay value that this has, she can

19   testify about what she did, you know, what she was basing the

20   things that she was doing on, but to put it in this email of

21   the back and forth between employees that has all of this other

22   hearsay information in it, whether hearsay relevance or 403, on

23   all of these grounds, this document should not be admitted.

24         THE COURT:  Is it just this one page, Ms. Ross?

25         MS. ROSS:  I think it's more than one page, but the

1  new portions are really, I think, just the top.  Most of this

2  email has already been admitted.

3          MR. PARLATORE:  It's primarily the top that we're

4  objecting to.

5          MS. ROSS:  I would submit that in the grand scheme of

6  evidence, this really is not that prejudicial.  It goes to

7  showing the --

8          THE COURT:  Hold on.

9      (Pause)

10          THE COURT:  There's enough hearsay in here, I agree

11  with Mr. Parlatore on hearsay grounds.

12          MS. ROSS:  So Ms. Parker is going to testify later in

13  this trial.  She's going to testify about this email as well.

14  Can we admit it conditionally and put it up when she testifies?

15          THE COURT:  It's still hearsay, though.  Thank you.

16          MS. ROSS:  We'll redact the top.  We won't show the

17  top email.

18          MR. PARLATORE:  It's already in.  It's already in

19  evidence.

20          MS. ROSS:  We'll redact that top portion and just put

21  up the bottom portion.

22          THE COURT:  I've only seen this one page.  So I don't

23  think you've -- I'm not admitting this page.  If there's

24  something else you think is admissible, I'm happy to consider

25  it, but what I see is inadmissible.

1     (End bench conference)

2         THE COURT:  You may proceed, Ms. Ross.

3     (Pause)

4         MS. ROSS:  With the appropriate redactions, the

5  Government moves to admit and publish Government Exhibit 79.

6         MR. PARLATORE:  No objection.

7         THE COURT:  Without objection, a redacted version of

8  79 is in.

9     (Exhibit 79 admitted)

10  BY MS. ROSS:

11  Q   We're going to look at the bottom email.

12     Looking at the bottom email, who is Nina Nicasio?

13  A   Nina Nicasio, Captain Nicasio was the director of manpower

14  and personnel and my senior supervisor.

15  Q   And do you see your email address on the top line?

16  A   Yes, I do.

17  Q   What's your email address?

18  A   Amanda.kraus@eu.navy.mil

19  Q   What is the subject line of this email?

20  A   Subject line is a Forward Pricing Proposal For Navy.

21  Q   Can you please read this email?

22  A   "Amanda, Pam, and ETC, please take for action.  All

23  information is listed below.  Due date no later Monday 27

24  December.  The COM returns from leave on 3 Jan and will want an

25  updated status by then.  If you need more time, please advise

1  soonest.  Thanks."

2  Q    First, FORAC, F-O-R-A-C, is that for action?

3  A    Yes, it is.

4  Q    And what was Nina Nicasio asking you to do here?

5  A    She was asking me to -- further down the line, there's a

6  request for training, and she was basically passing this task

7  to myself and my division -- or department, excuse me.

8  Q    She said that the due date was no later than Monday,

9  December 27th.  What was your impression of meeting that

10  deadline?

11  A    This was Friday the 17th that I received it, so I was not

12  sure at that point how we could possibly get training in place

13  in that quick of a timeframe.

14  Q    Why is that?

15  A    I really had no idea that this was coming my way.  We

16  weren't expecting this training.  At this point, I didn't know

17  what it was or the purpose, who it was for.  I literally had no

18  information.  Further down, there was a reference to some --

19  the proposal, and that came with, like, a sticky note,

20  essentially, of what I'm not exactly sure.

21  Q    We see -- so we'll get to that bottom in a second.  But

22  before moving on, we see that Nina Nicasio wrote, "The COM

23  returns from leave on 3 Jan and will want an updated status by

24  then."

25        Who is the COM?

1    A    That was Admiral Burke.

2    Q    And, in general, what was your understanding of the

3    defendant's role in this contract?

4    A    I understood that this was something that he specifically

5    wanted.

6    Q    Was that unusual?

7    A    It was a first for me.

8    Q    How did it make you feel to have to get that contract in

9    place?

10   A    Initially, I was really confused, because I really did not

11   have enough information to begin the process.  And then I felt

12   quite frustrated, honestly, because that time period we were on

13   block leave for the holidays.  So many of the other

14   directorates, the resource managers and so on, had basically a

15   skeleton crew for the holidays, and so trying to get help was a

16   little hard.  And it just didn't -- it just didn't follow the

17   process in any way that I was trained on as far as contracting

18   goes.

19   Q    I want to go to page 3 and talk a little bit more about

20   this email.

21        So looking first at the bottom of the page, the one from

22   Charlie Kim.  First, do you know who Charlie Kim is?

23   A    Yes, I do.

24   Q    Who is that?

25   A    One of the CEOs for Next Jump.

1  Q    Who did he send this to?

2  A    He sent this to Admiral Burke.

3  Q    Can you please read this email?

4  A    "Bob, two files attached here.  One, proposal with more

5  details on the programs by level, seven pages including title

6  slide.  Two, pricing worksheet.  This allows you to toggle

7  change inputs and either add more sailors per command, more

8  commands, more level training, move around the variables to

9  whatever budgetary or program needs by command.

10      We think it should be fairly straightforward and a good

11  summary of the discussions we've had.  Let us know any

12  questions and what else you need.  We're excited to get

13  started.  Regards, Charlie and Meghan."

14  Q    What was your impression of this email being directly sent

15  to the defendant?

16  A    It was unusual.  And, initially, we didn't even receive

17  those attachments.  So, again, I was, in those early hours of

18  receiving the email, just desperate for information and also

19  very concerned about that timeline.

20  Q    Did it raise red flags for you?

21  A    Yes.

22  Q    How?

23  A    That information was coming from a potential contractor, so

24  a civilian entity, that -- secondly, that we had leadership

25  development training already in the works, and it was a pretty

1    robust program that we were about to launch.  When I did get

2    the details, they were confusing and I really didn't understand

3    the purpose.  I didn't feel that there was -- in the time

4    period given, that it wouldn't be possible for us to get to the

5    level of detailed information and critical thinking required

6    for the contract process.

7    Q    Did you ultimately review the attachments, the proposal,

8    and the pricing worksheet?

9    A    I did.

10   Q    What were your impressions of those documents?

11   A    It was, frankly, unprofessional.  One of them was literally

12   a sticky.  It was also very confusing.  I really could not

13   discern initially.  There was references to training, but it

14   did not appear to me that this was for training.  It seemed to

15   be more about a web app.

16   Q    Now we're going to look at the next email in this thread,

17   the one from the defendant.

18       So we see here that he wrote, "Juliet, last page has

19   costing data as I outlined are used to Charlie/Meghan.  Would

20   like to get this in place to support kickoff events in early

21   Jan if possible."

22       What was your impression of this email, Ms. Kraus?

23   A    It was unreasonable.  That was one.  Two, it really seemed

24   like it was a done deal and our -- my department's inclusion in

25   this was almost an afterthought.

1  Q   Was it inappropriate for it to be considered a done deal at

2  this time?

3  A   Yes.

4  Q   Why is that?

5  A   Because literally, at this point -- well, this is dated the

6  16th.  But the 17th, there was not any -- any statement of

7  work, there was not any documentation that would go into an

8  acquisition package, nor was any package announced.

9  Q   What did you do after you received this email?

10 A   What I was trained to do, which was immediately go to my

11 supervisor.  I raised questions about the timeline and the

12 method that we received this information on.  I also asked for

13 more information.  But more than anything else, I asked for

14 more time.

15 Q   What were the instructions that you got?

16 A   Ultimately --

17        MR. PARLATORE:  Objection.  Hearsay.

18        THE COURT:  Sustained.

19 BY MS. ROSS:

20 Q   Ms. Kraus, based on your meeting with your supervisor, what

21 did you feel like you had to do after that?

22 A   I had to do whatever it took to get this contract in place.

23 Q   Did you also talk to somebody named Ray Johansmeier?

24 A   Yes, I did.  So Ray Johansmeier was the NAVEUR lead

25 counsel.

1  Q   Why did you go talk to him?

2  A   Because I had concerns over the contract in general and

3  lack of information, how it came to us and whether or not it

4  was -- it was legal and appropriate for us to continue.

5  Q   Can we please go back to page 1?

6      So looking at this email, Ms. Kraus, in your experience,

7  how common is it for the commander to receive pricing proposals

8  direct from a contractor?

9  A   I'm sorry.  I don't have the reference there.

10         MR. PARLATORE:  Your Honor --

11         THE COURT:  All right.

12     (Begin bench conference)

13         MR. PARLATORE:  I know that it wasn't intentional, but

14  the redaction did not work.  When they just put back to page 1,

15  they showed the redacted portion to the jury.

16         THE COURT:  The unredacted?

17         MR. PARLATORE:  Correct.

18         THE COURT:  Okay.

19         MR. PARLATORE:  I know it wasn't intentional.  It's a

20  tech issue, I guess.  But when they -- so I don't know if --

21  because it seems like they just kind of put a bubble over it

22  for now.

23         THE COURT:  Okay.  Do you want me to tell the jury to

24  disregard it?

25         MR. PARLATORE:  I think probably tell them to

1    disregard it, and also just figure out -- whatever happened,

2    just make sure it doesn't happen again.

3            MS. ROSS:  Must have --

4            MR. PARLATORE:  You didn't even see it because you

5    were asking her about it and you had a black screen.  Ms. Creel

6    saw it and immediately pulled it down.

7            THE COURT:  All right.  Thank you.

8        (End bench conference)

9            THE COURT:  Ladies and gentlemen, possibly some of you

10    may have briefly seen something that had been redacted there.

11    But if you did see it, I'll just instruct you to disregard that

12    and only focus on the admitted part of the document.

13            Why don't we go ahead and take our midafternoon break.

14            Ms. Kraus, I'll direct you not to discuss the contents

15    of your testimony with anyone over the break.

16            And ladies and gentlemen, I'll ask you to be back at

17    3 o'clock.

18        (Jury absent)

19        (Recessed from 2:49 p.m. to 3:04 p.m.)

20        (Jury present)

21            THE COURT:  Welcome back, ladies and gentlemen.

22    Ms. Kraus, I remind you you're still under oath.

23    BY MS. ROSS:

24    Q   We want to pull back up where we left off, which was

25    Government Exhibit 79, please.  I'm going to ask you a couple

1    more questions about this email.

2        First, Ms. Kraus, in your experience, how common is it for

3    the commander to receive pricing proposals direct from a

4    contractor?

5    A    It's not common at all.  In fact, it's really not even

6    appropriate.  That's something that comes out later in the

7    process.  So it would have been the contracting officer or his

8    or her representative working on that, that would have received

9    the proposals.

10   Q    In your experience, how common is it for a commander to

11   forward a pricing proposal the commander received from a

12   contractor?

13   A    This was a first for me.

14   Q    In your experience, how common is it for a commander to

15   order a contract to be put in place in ten working days?

16   A    Also a first.  I have not seen that before, ever.

17             MS. ROSS:  Okay.  We can take that exhibit down.

18   Thank you.

19   BY MS. ROSS:

20   Q    I want to ask you a couple questions about a company called

21   Outward Mindset.  Are you familiar with that?

22   A    Yes, I am.

23   Q    What is it?

24   A    Outward Mindset is an organizational leadership development

25   curriculum that NAVEUR had -- well, at that time, we were in

1    the process of.  We were very near completing the contract for

2    it.  The contract specifically was to train roughly 10 to 20 of

3    NAVEUR's personnel to then, in turn, train the remaining, or

4    the rest, of the command.

5    Q    And were you involved in that contracting process of

6    bringing Outward Mindset to NAVEUR?

7    A    I was.  The initial discussion and data and things were

8    gathered before I actually got there, but yes, I was

9    responsible for completing the statement of work and

10   documentation to acquire the company.

11   Q    Did you have any concerns about the contracting process as

12   it related to Outward Mindset?

13   A    No.  It followed the process that I was trying to follow

14   and was familiar with.  So, no.

15   Q    What was your impression of Next Jump's potential services

16   and any overlap with Outward Mindset?

17   A    I had several.  One was just not really sure of what the

18   purpose of the training was.  Even with those documents

19   provided, it was not clear to myself or the team what the

20   training was.

21   Q    I'm sorry to interrupt you.  But are you referring to

22   Next Jump?

23   A    Yes, I am.  I'm sorry.

24   Q    As it relates to Next Jump and Outward Mindset, what was

25   your impression of the overlap of their services?

1   A   Well, the concern was, we were about to begin this other

2   training that it would seem would be competitive, and so that

3   was confusing.  It was confusing to the staff.  It also

4   dramatically impacted our timeline.  We operate on a one-year

5   training calendar.  This process had been initiated the

6   previous year.

7   Q   Did you think it was necessary to contract with Next Jump

8   after you had already contracted with Outward Mindset?

9   A   No.  Not only did it not make any sense, but the cost was

10  approximately double or more.

11          MS. ROSS:  Next, can we please bring up, just for the

12  witness, what has been marked as Government Exhibit 80, please?

13  BY MS. ROSS:

14  Q   Do you recognize this email?

15  A   Yes, I do.

16          MS. ROSS:  The Government moves to admit and publish

17  to the jury what's been marked as Government Exhibit 80.

18          MR. PARLATORE:  One moment, Your Honor.

19      (Pause)

20          MR. PARLATORE:  No objection.

21          THE COURT:  Without objection, 80 is in and may be

22  published to the jury.

23      (Exhibit 80 admitted)

24  BY MS. ROSS:

25  Q   I want to focus at the email on the bottom of the page

1   there.  We see here that it's from Kimberly Foxx.  Who is

2   Kimberly Foxx?

3   A    Kimberly Foxx is an attorney who works at -- or at that

4   time, worked at Naval System Supply Command and the Fleet

5   Logistics Center.  So basically, she's representing the

6   contracting group.

7   Q    And what's the subject of this email?

8   A    Training requirement.

9   Q    Can we go to page 2, please?  I'm not going to have you

10  read the entire email, but starting with "Finally, at a

11  minimum."  Can you just read that paragraph, please?

12  A    Yes.  "Finally, at a minimum, the following docs are needed

13  for a requirements package.  I imagine the Norfolk 8(a) folks

14  would have additional requirements.  I'm trying to get samples

15  and will forward them once I do.  One, purchase request funding

16  document.  Two, performance work statement.  Three, market

17  research memo.  Four, IGE, government estimate.  Five,

18  nonpersonal services form.  Six, IGF, inherently governmental

19  functions form.  Seven, in this case, a sole-source

20  justification."

21  Q    So we see that Kimberly Foxx references a requirements

22  package.  Is this what was necessary to get Next Jump the

23  contract?

24  A    Yes.  This is necessary for all government contracts.

25  Q    So typically, looking at the list of requirements,

1  typically, how long do all of these requirements take to get in

2  place?

3  A   It depends, because there's more than one person involved.

4  So for instance, if I'm writing the performance work statement,

5  I would submit that and might get some feedback from the

6  contracting team, and/or questions, and need to provide more

7  detail.  So it's a process of going back and forth.  It's very

8  much checks and balances to make sure that every bit of

9  information is in the contract and that the pricing is fair.

10 Q   Is it typical for these seven steps to take 11 working

11 days?

12 A   No, not at all.

13 Q   And the email that the defendant sent, that he passed on

14 and that you received later, asking for the contract be awarded

15 to Next Jump, did that bypass any of these seven steps?

16 A   It bypassed all of them.

17 Q   How?

18 A   There was no -- to my knowledge, any bona fide need for --

19 or requirement by the Government to have this contract.  We

20 were not budgeted for that.  So that's why we have a one-year

21 contract, so that we can plan or, you know, include that in our

22 spending process and planning.

23 Q   So -- sorry to cut you off.

24 A   I was just going to say, no market research had been done,

25 or any of the other steps in there.

1  Q    Looking at number 7, it says, "A sole-source

2  justification."

3       What is that?

4  A    In general, the contracting process is meant to be public

5  facing as far as opportunities to compete for contracts, but

6  there are cases where a particular company is the only one that

7  could provide that.  And so if, for instance, the company owns

8  the proprietary rights for the materials, training materials,

9  or if they have patented products, there is the case to provide

10 something called a sole-source justification saying,

11 absolutely, contract company X is the only one that could

12 provide this, for these reasons.

13 Q    And why was a sole-source justification needed for this

14 Next Jump contract?

15 A    Honestly, I don't know, other than the only thing that I

16 could think of is was so a specific company would be awarded

17 the contract.

18 Q    Is that Next Jump?

19 A    Yes.

20 Q    In your years of experience in contracting, how many other

21 sole-source justification contracts had you worked on?

22 A    One.

23 Q    And what was the nature surrounding that one?

24 A    That was the Arbinger contract, and the source

25 justification was because they did, in fact, hold all

1  proprietary rights to produce the books that accompany the

2  training.

3  Q   When you say Arbinger, is that the company that's involved

4  with Outward Mindset?

5  A   Yes.

6  Q   Now, going back to page 1 of this email, and we're going to

7  look at Ray Johansmeier's email there.  Are you CCed?

8  A   Yes, I am.

9  Q   And what does he write?

10  A   "ED team, just FYI, we made preliminary contact with one of

11  the attorneys at FLC.  At the bottom of her email, she lists

12  the documents FLC will need from the command to start the

13  contracting process and cautions about our aggressive

14  timeline."

15  Q   Did you agree that the timeline sounded aggressive?

16  A   Yes, I did.

17  Q   Now, I want to focus the email at the top from

18  Juliet Beyler.  Can you just read what she says there, please?

19  A   "Copy, Ray.  Thanks for running the traps.  Understand, and

20  I outlined that it would be tough to COM already.  He wants to

21  press to get it done.  Adding N1, Roger, and COS/DCOS to keep

22  all in the loop.

23  Q   When she says that she understands and "I outlined it will

24  be tough to COM already," who did you understand COM to be?

25  A   Admiral Burke.

1  Q   When she writes, "He wants to press to get it done," what

2  did you understand her to be talking about there?

3  A   That we absolutely needed to acquire this training.  We had

4  even had a meeting about it with her to voice concerns, and she

5  said that she had talked to COM and that we absolutely needed

6  this.

7          MR. PARLATORE:  Objection.  Hearsay.

8          THE WITNESS:  I was in the meeting.

9          THE COURT:  I'm going to sustain the objection.

10  BY MS. ROSS:

11  Q   Ms. Kraus, what did you understand Ms. Beyler to mean or be

12  referring to when she wrote, "Get it done"?  What did you

13  interpret it to mean there?

14  A   I interpreted that to mean that the contract needed to be

15  in place in the timeline specified, so January.

16  Q   Thank you.

17          MS. ROSS:  We can take that exhibit down.

18  BY MS. ROSS:

19  Q   I want to ask you a few questions about the next steps

20  here.

21      After you were told that the defendant wanted to press

22  forward to get it done, did you have to write the statement of

23  work?

24  A   I did.

25  Q   And how were you able to do that?

1  A    Initially, I really didn't know how I was going to do that.

2  And when I repeatedly asked and brought up the questions that I

3  didn't have enough information, Ray Johansmeier said that there

4  may be another option for us to acquire the training.

5  Q    And what was that other option?

6  A    There existed a contract already with the Office of

7  Personnel Management under something called USA Learning, which

8  is federal training for employees, and even though there was no

9  funding on it at the moment, it was a contract with Next Jump

10 as the subcontractor, and so he said that we might be able to

11 meet the timeline and get some help to get this done.

12 Q    So in order to write the statement of work, did you have to

13 work directly with Next Jump to write the statement of work?

14 A    They were in the meetings, yes.  I really couldn't have

15 done it without input from Next Jump.

16 Q    How common was it to work directly with the contractor to

17 write a statement of work?

18 A    Not common.  It's actually backwards to the process.  It

19 would always begin -- it does always begin with the government

20 identifying a very specific need and relaying that to the

21 contracting officer.

22 Q    How did it make you feel to have to write the statement of

23 work with Next Jump directly?

24       MR. PARLATORE:  Objection.

25       THE COURT:  Relevance?

```
 1              MR. PARLATORE:  Yes.

 2              THE COURT:  Sustained.

 3  BY MS. ROSS:

 4  Q   In your history as a -- working on government contracts, in

 5  any other time had you had to go directly to a company to write

 6  a statement of work?

 7  A   This seemed wrong.  It just -- that's not the process.

 8  There was no check and balance.  There was no oversight in this

 9  process that we followed.

10  Q   Did you also have to perform due diligence into Next Jump?

11  A   To the best of my ability, yes.  In the allotted time, that

12  was extremely difficult.

13  Q   How long does it normally take to do due diligence into a

14  company?

15  A   Research, direct research on products, services, in terms

16  of a training need in this case, that can be days, hours,

17  weeks, I would say days for sure, if a single person is only

18  focused on that task.

19  Q   How long did you have here?

20  A   Well, if we had -- well, we had less than ten business days

21  for the entire process, not just that one.

22  Q   And based on what you learned from that due diligence and

23  from working on the statement of work with Next Jump, did you

24  believe that the Navy should contract with Next Jump?

25  A   No, I did not believe that.
```

1  Q   Did you go forward anyways to make that contract happen?

2  A   Yes, I did, because I was afraid.

3  Q   Why did you do that?

4  A   I was afraid I would lose my job if this did not happen.

5  Q   Why is that?

6  A   Because I had, along with others, but I had repeatedly

7  brought up that we were lacking critical information, that we

8  needed more time in order to conduct appropriate research, make

9  sure that this is something that the command really needed, and

10 to de-conflict it with the existing training and to ensure we

11 had the budget to the support this.  It was very expensive.

12 Q   Were you ultimately successful in finalizing a contract

13 with Next Jump?

14 A   Ultimately, yes.

15 Q   And how much of your time did that take?

16 A   From the 17th of December, which was when I received that

17 notification, I worked every day through, really, the date that

18 the team got there, and beyond, so through the holidays,

19 weekends, after hours.

20 Q   Did it impact your holiday plans?

21 A   Yes, definitely.

22 Q   Who did you understand to be forcing that tight deadline?

23 A   I understood that that came from COM and that Next Jump in

24 particular had a reason for the deadline of the 10th and it was

25 related to --

1          MR. PARLATORE:  Objection.

2          THE COURT:  Sustained.

3     BY MS. ROSS:

4     Q   When you said the COM, who were you referring to there?

5     A   Admiral Burke.

6          MS. ROSS:  Can we please bring up, just for the

7     witness, what has been marked as Government Exhibit 91, please?

8     BY MS. ROSS:

9     Q   Do you recognize this, Ms. Kraus?

10    A   Yes, I do.

11         MS. ROSS:  The government moves to admit and publish

12    what's been marked as Government Exhibit 91.

13         MR. PARLATORE:  No objection.

14         THE COURT:  Without objection, 91 is in and may be

15    published to the jury.

16     (Exhibit 91 admitted)

17    BY MS. ROSS:

18    Q   Looking at this email, Ms. Kraus, first, who is

19    Valerie Feemster?

20    A   Valerie Feemster is a federal employee.  She works for the

21    Office of Personnel Management and USA Learning.  And in terms

22    of this action, she was the one who was -- who oversaw the

23    existing contract with Next Jump.

24    BY MS. ROSS:

25    Q   When you say "the existing contract," what are you

1   referring to?

2   A   So OPM, at one point previously, had a contract that was

3   executed.   The performance period, I don't know if it was

4   ended, but since there was the existence of this contract,

5   there was the potential that in order to reach this timeline,

6   that our command could essentially provide a modification, so a

7   new statement of work, and funding so that we could all writ --

8   basically, to shorten the process.

9   Q   And did that involve -- when you say an existing contract,

10  was that with another company who could then subcontract with

11  Next Jump?

12  A   Yes.   That's correct.

13  Q   Okay.   And was that other company called PowerTrain?

14  A   Yes.

15  Q   Can you explain a little bit what PowerTrain's role was in

16  this contract with Next Jump here in 2022?

17  A   PowerTrain would have been the primary company contracted

18  by the government, and essentially, in this case they were like

19  a passthrough, so that it was a way that the command could

20  acquire the specific training and establish the relationship

21  with Next Jump.

22  Q   Without using PowerTrain, would it have been possible to

23  get a contract with Next Jump in place?

24  A   In that timeline?

25  Q   Yes.

1  A    I really don't believe that's possible because there just

2  wasn't enough information already existing.

3  Q    And you mentioned that this was a modification.  Why did

4  Next Jump need a modification?

5  A    The modification in procurement terms, when there's a

6  contract and there's some detail that needs to be added, or a

7  change, it's called a modification.  We needed it because we

8  were asking Next Jump to essentially perform work for NAVEUR in

9  the European Theater in Rota and Naples.

10  Q    Can you read this email, Ms. Kraus?

11  A    Yes.  "Amanda/Ray, please see the fully executed task order

12  and modification.  The modification allows for the OCONUS

13  travel prior to the start of required performance.  Please

14  provide a time when you are available on Friday so that I can

15  schedule a kickoff call.  I look forward to working with you

16  both."

17  Q    So in addition to the modification that allowed Next Jump

18  to get this contract, was there a second modification?

19  A    Yes.  There was an immediate modification.  So this is

20  dated January 6th, and they immediately had to modify because

21  the team from Next Jump was, like, just a day or two away from

22  initiating travel.

23  Q    When was that travel initiated with respect to the start of

24  the contract?

25  A    Well, without this modification, they would have been

1   traveling before the contract was completed and signed.

2   Q   How common is it to need that modification before the start

3   of a contract?

4   A   It's the first time I've seen it.

5   Q   Can we go to page 3, please?

6       We see here the name of the contractor is PowerTrain.

7   Again, is that just the vehicle through which Next Jump was

8   able to perform the work on behalf of NAVEUR?

9   A   Yes.  That's correct.

10  Q   So again, just to be clear, even though Next Jump's

11  contract was awarded through PowerTrain, Next Jump was

12  performing work for the Navy?

13  A   That is also correct.

14  Q   With Outward Mindset's contract, did they have to use

15  PowerTrain?

16  A   No, they didn't.

17  Q   I'm going to look at the supplies of services box there.

18  That's box B.  What does it say there?

19  A   "This document establishes a firm fixed price task order

20  between the Office of Personnel Management and PowerTrain, Inc.

21  for Navy leadership and decision-making, training and

22  licenses."

23  Q   And what is the grand total of the contract that was

24  awarded there?

25  A   $322,850.

1    Q    Does PowerTrain get a portion of that?

2    A    I would assume that they would, but I don't know that for

3    sure.

4    Q    Would Next Jump get a portion of that as well?

5    A    Yes.

6    Q    Can we just scroll through page 4 and page 5 and page 6?

7    And we'll go to page 7, please.

8         So looking at these pages, did those just have the cost of

9    the breakdown of the training?

10   A    Yes.  So that $322,000 was broken down by those various

11   task orders.  So there was a kickoff event in Rota, Spain, and

12   one in Naples, Italy.  There were some references there to the

13   training itself as well, I think.

14   Q    And what does this executed task order mean?

15   A    So this is the list of what the government paid for.

16   Q    Does this mean that Next Jump had a contract?

17   A    Yes, it does.

18   Q    Thank you.  We can take that exhibit down.

19        Did Next Jump conduct the training in Naples per the terms

20   of the contract?

21   A    Yes, they did.

22   Q    Did you attend that training?

23   A    I attended part of it, yes.

24   Q    What was your role after the Next Jump training ended?

25   A    My role afterwards, and would be for any training, was

1  survey those that attended, so asking them what their

2  experience was, should we continue, did they -- trying to

3  ascertain whether learning and development, in fact, happened.

4  Q   And, generally, how was Next Jump's training evaluated?

5  A   It was an anonymous survey, and we gave each of the

6  participants, both in Rota, Spain, and in Naples, Italy, a

7  link.

8           MS. ROSS:  Can we please bring up, just for the

9  witness, what has been marked Government Exhibit 95, please?

10  BY MS. ROSS:

11  Q   Do you recognize this email?

12  A   Yes, I do.

13  Q   Did you send this email?

14  A   I did.

15           MS. ROSS:  The government moves to admit and publish

16  for the jury what's been marked as Government Exhibit 95.

17           MR. PARLATORE:  No objection.

18           THE COURT:  Without objection, 95 is in and may be

19  published to the jury.

20      (Exhibit 95 admitted)

21  BY MS. ROSS:

22  Q   Ms. Kraus, when did you send this email?

23  A   I'm sorry.  Could you repeat that?

24  Q   When did you send this email?

25  A   I sent the email February 8, 2022.

1   Q   Can you just read what you wrote there, please?

2   A   "Good afternoon, everyone.  I've prepared a draft staffing

3   package of the Next Jump training evaluation for your review.

4   Please let me know if you have comments or edits for

5   improvement.

6       "Captain Nicasio, I didn't want to disturb you, so I left

7   the hard copy on my desk."

8   Q   What is a draft staffing package?

9   A   A draft staffing package is the way we move information

10  from the staff level through the chain of command.

11  Q   And in this case, were you moving the training evaluations?

12  A   Yes.  So it would be appropriate for that staffing package

13  to go through my supervisory chain.

14  Q   And you mentioned training evaluation.  Who filled those

15  out?

16  A   The training evaluations were filled out by the

17  participants.

18  Q   Is it common to ask participants of a training to fill out

19  evaluations?

20  A   Yes, after every single class that we offer.

21  Q   Can we go to page 2 of this exhibit, please?

22      What is this document?

23  A   So this is a staff action processing form.  This is

24  basically the documentation for the record of -- of the package

25  that we were sending and the surveys.

 1                    MS. ROSS:  And can we go to page 3, please?

 2    BY MS. ROSS:

 3    Q    What is this document?

 4    A    This is the summary document that we're looking at on the

 5    first page, so basically a recap of the training, just a little

 6    bit of information for everyone to remind them that, hey, it

 7    was two days, you can see that we trained 54 people in Naples,

 8    103 in Rota, the dates.  We also just put in the highlights.

 9    Q    Did you write this document?

10    A    I did.

11    Q    And based on what information?

12    A    The data collected.

13    Q    And under "Response Highlights," can you read that, please?

14    A    "Response Highlights.  Purpose, unclear objective, 23 out

15    of 30."

16        Meaning 23 out of 30 participants really weren't sure why

17    they were there.

18        "Facilitators were ineffective, unclear, unengaging, poorly

19    organized, 20 out of 30.

20        "Content and tools.  No link between the training apps and

21    participant's duty or development, 23 of 30.

22        "App and online content did not add to learning, 23 of 30.

23        "Positive takeaways, opportunity to talk."

24    Q    And what was your impression of that general feedback?

25    A    The feedback was absolutely the worst I have ever seen in

1  the training class.  It was embarrassing.  It was two days.

2  The ops tempo at this command at that time was very, very high,

3  and to get folks into something for two full days was a great

4  lift, we'll say.

5  Q   And can we go to page 4, please?

6      And can you just read the positive takeaways there?

7  A   Positive takeaways were basketball skills, identifying

8  leadership shortfalls, and none.

9  Q   What did you think of the positive takeaways?

10 A   This was embarrassing to me to see that -- I almost felt

11 like some of the responses, especially the basketball skills, I

12 wondered if someone was being sarcastic.  I have never been in

13 a class or been part of a training that had such poor results

14 and I felt like it was a waste of money.

15 Q   Can we go to page 5, please?

16     What is this?

17 A   This is the feedback survey.

18         MS. ROSS:  And can we just scroll to page 6 and to

19 page 7, please?

20         And then to page 8.

21 BY MS. ROSS:

22 Q   Did you attach the filled-out evaluations to an email to

23 Nina Nicasio?

24 A   I did.

25 Q   And did you review those evaluations?

1    A    I did.

2    Q    And I won't have you read each one.  But are the highlights

3    on that slide, on the summary slide that you put together?

4    A    Yes, that's correct.

5    Q    How did the evaluations of Next Jump's training compare to

6    that of other trainings that were held at NAVEUR?

7    A    The evaluations were night and day.  The Next Jump training

8    was very negative.  Again, people were generally dissatisfied

9    with what they were there for.  Some were confused.  Many

10   wondered if it was just about an app.  On the opposite end of

11   the spectrum, the Outward Mindset training that we held later

12   was one of the best reviewed and most meaningful trainings for

13   most participants.  And that was data driven.  That's not just

14   me saying it.

15   Q    Thank you.

16          MS. ROSS:  Can we please put up, just for the witness,

17   what's been marked as Government Exhibit 146, please?

18   BY MS. ROSS:

19   Q    And do you recognize this document?

20   A    Yes, I recognize this document.

21          MS. ROSS:  The government moves to admit and publish

22   to the jury what's been marked as Government Exhibit 146.

23          THE COURT:  I think that's already in.

24          MS. ROSS:  I'm sorry, Your Honor.  Thank you.

25          Can we publish that for the jury, please?

1          Your Honor, based on our records, we have 147 and 148

2     and 156, but I do not believe 146 is in evidence.

3          MS. O'NEILL:  We have it in.

4          MS. ROSS:  Sorry about that, Your Honor.  Thank you.

5     BY MS. ROSS:

6     Q   What is a deliverable receipt form, Ms. Kraus?

7     A   This is an invoice that you're looking at right now.

8     Q   And what is the purpose of this document?

9     A   The purpose of the document is to make sure that the

10    contractor, in this case PowerTrain, delivers everything per

11    the agreed-upon contract.

12    Q   And looking at the deliverable details, what is that

13    detailing?

14    A   Those are supplies or services rendered.

15          MS. ROSS:  Can we go to page 2, please?

16    BY MS. ROSS:

17    Q   Did you sign this document?

18    A   I did.

19    Q   What did that acknowledge?

20    A   That acknowledged receipt of the supplies and services

21    rendered.

22    Q   What was your impression of the value of that contract?

23    A   This contract was roughly double what we were paying for a

24    far superior class.  I felt like it was wasteful.

25    Q   Thank you.

1          MS. ROSS:  We can take that exhibit down.

2    BY MS. ROSS:

3    Q   Ms. Kraus, did you file a complaint about what you were

4    asked to do for this contract with Next Jump?

5    A   I did complain, yes.  I complained to my supervisor and the

6    lead attorney, Ray Johansmeier, and -- and, ultimately, I went

7    to our command inspector general.

8    Q   Why did you do that?

9    A   Because I felt that the way this contract came about wasn't

10   correct, wasn't appropriate.

11   Q   Something you said earlier, Ms. Kraus, was that it felt

12   predetermined.  In all your years working in government

13   contracting, how many times was a specific company

14   predetermined, in your mind, for which the government was

15   supposed to contract with?

16   A   I haven't seen that before.

17   Q   When you were told to implement the contract with Next Jump

18   in December of 2021, what was your overall impression about the

19   benefit of that?

20   A   I did not see the benefit of this.  In fact, it just seemed

21   wasteful.  We weren't -- we didn't have the resources planned

22   out for it.  It seemed like a farce.

23   Q   If you had not been under orders to implement the contract

24   with Next Jump, would you have taken the steps to contract with

25   Next Jump?

1    A    Absolutely not.

2            MS. ROSS:  Thank you.  No further questions.

3            THE COURT:  Mr. Parlatore?

4                        CROSS-EXAMINATION

5    BY MR. PARLATORE:

6    Q    Good afternoon, Ms. Kraus.

7    A    Good afternoon.

8    Q    Did you break any laws?

9    A    Did I break any laws?

10   Q    Yes.

11   A    That would be up to a contract attorney to determine.

12   Q    Have you been charged with breaking any laws in relation

13   with creating this contract?

14   A    No.

15   Q    Have you been investigated for breaking any laws in

16   relation to this contract?

17   A    I have been questioned in regards to the contract, yes.

18   Q    Well, you're familiar with the laws regarding contracting,

19   right?

20   A    I'm familiar with the experience and the processes I was

21   trained to follow.

22   Q    Okay.  Do you -- based on the laws as you know them, did

23   you break any laws?

24   A    No.

25   Q    Okay.  And, in fact, throughout this entire process, you

1    had a lawyer that was involved at every step, right,

2    Ray Johansmeier, correct?

3    A    He was there, yes.

4    Q    And at every step, when you went and told him your

5    concerns, the lawyer said that this was okay, right?

6    A    He did.

7    Q    You're not a lawyer?

8    A    I am not a lawyer.

9    Q    Do you have any reason not to trust Mr. Johansmeier?

10    A    No.

11    Q    Okay.  When you talk about "in your experience," at the

12    time of this contract, how vast was your experience in

13    government contracting?

14    A    I had several years of experience.

15    Q    How many contracts had you personally dealt with at that

16    time?

17    A    I have written on, at that point, several.

18    Q    Several meaning like eight, six to eight?

19    A    Six to eight.

20    Q    Okay.  So you've done six to eight contracts at this time.

21    So every time that Ms. Ross asked you, "in your experience,

22    have you ever seen this before," you're talking about six to

23    eight contracts, right?

24    A    Yes.

25    Q    And that's one of the reasons why you would want to have

1  the lawyer involved, to make sure that you're doing everything

2  according to the rules, right?

3  A    That's also correct.  And the contracting specialist and,

4  ultimately, the contracting officer.

5  Q    And they were all involved, weren't they?

6  A    Yes.

7  Q    Okay.  And as far as you know, based on what everybody else

8  was doing, all the rules were followed, weren't they?

9  A    Ultimately, yes.

10 Q    So even though this may have looked different to you, based

11 on your vast experience of the six to eight contracts, the

12 rules were followed, weren't they?

13 A    There was a contract, but there was not -- the process was

14 not followed initially.

15 Q    You didn't follow the process.  Which process did you not

16 follow?

17 A    We modified an existing contract.  That is correct.

18 Q    That is something that the law provides for, correct?

19 A    It does.

20 Q    It's something that -- you know, when we talked earlier

21 about how -- or when you talked earlier about how there was a

22 modification that had to be done and you had never seen that

23 done so quickly, right?

24 A    That's true.

25 Q    That's why there's a modification process, isn't there?

1   A    That would be one reason.  I don't know that it's always a

2   speed thing.

3   Q    No.  But the law -- the procedures do allow for

4   modifications to be made?

5   A    Yes, they do.

6   Q    And the process, the laws certainly allow for you to take

7   an existing contract and do a new task order in that contract,

8   right?

9   A    They do.

10  Q    In fact, the person that told you -- that suggested to you

11  to do this was the lawyer, Mr. Johansmeier, wasn't it?

12  A    That is also correct.

13  Q    Okay.  So all this time that you're talking about how you

14  were uncomfortable with it and you felt that it was wrong, the

15  lawyers were telling you it was fine, right?

16  A    Not initially, no, because remember, at the very start, the

17  17th, we didn't know that there was an existing contract, that

18  didn't come out that day.

19  Q    What rules did you break on the 17th?

20  A    I didn't break any rules on the 17th.

21  Q    At any point here in this entire process, were you -- did

22  you break any rules?

23  A    No.

24  Q    Okay.  So you followed the rules the whole time to try to

25  get what the commander wanted, right?

1    A    Yes.

2    Q    And you talked about how in your vast experience that it's

3    unusual for a commander to be involved in deciding what type of

4    training his command should get; is that right?

5    A    It's unusual for the commander to designate a company to

6    provide a specific training.

7    Q    Because you hadn't seen that in the six to eight contracts

8    that you had done before, right?

9    A    Correct.

10   Q    But it's normal for a commander to say, this is what I want

11   in my command, right?

12   A    Absolutely.

13   Q    And so certainly when we -- let me ask you this.

14        Did you have a chance to personally review the results of

15   the DEOCS survey?

16   A    I believe that it was completed before I was there.  I

17   would have to see the dates and the survey results to know.

18   Q    November of 2021, did you review the November 2021 DEOCS

19   survey results?

20   A    I believe that I was part of -- I would not have been the

21   one to sit on the review of that, but if there was pertinent

22   information from it, it would have come to me through my

23   leadership chain.

24   Q    But it's not your job to review those DEOCS survey results,

25   right?

1   A    No.  There's someone else that does that.

2   Q    Like the commander?

3   A    There is actually a DEOCS survey coordinator.

4   Q    But, ultimately, that does go to the commander because the

5   commander is the one that has ultimate responsibility, right?

6   A    Yes.

7   Q    The commander is the one who has to take those survey

8   results and decide what is best to fix any problems within his

9   or her command, correct?

10  A    Yes, that's correct.

11  Q    And you have been working in DoD for many years, right?

12  A    Yes.

13  Q    So you're aware that sometimes commanders, particularly

14  higher level commanders, will say something they want, and then

15  that, through the chain of command, gets modified a little bit,

16  right?

17  A    Sure.

18  Q    So like -- you said you were an enlisted Marine, right?

19  A    I was, yes.

20  Q    Okay.  And frequently what happens in the Marine Corps, the

21  battalion commander will say, I want everybody there at

22  8 o'clock.  Company commanders will say, okay, everybody be

23  here at 7:45.  Platoon commander says everybody be here at

24  7:30.  Gets down to the squad leaders.  By the time you get

25  down to the lowest level, they're showing up at 5 o'clock in

1    the morning, aren't they?

2    A   I don't think quite that early, but yes, I understand your

3    point.

4    Q   And so in this case, going to the emails that you saw and

5    testified about here, Admiral Burke's statement was, he would

6    like to get this in place to support kickoff events in early

7    January, if possible, correct?

8    A   That is what he stated.  But then --

9    Q   And you never spoke to Admiral Burke, did you?

10    A   Not directly, no.

11    Q   Have you ever spoken with Admiral Burke directly?

12    A   In passing.

13    Q   But just, "Good morning, sir"?

14    A   Generally.

15    Q   And, in fact, the only time you have ever really heard him

16    speak was twice at an all-hands call, correct?

17    A   I would think more than that, but yes, I have.

18    Q   And so you never sent him your thoughts on this contracting

19    process, did you?

20    A   I sent them to the executive director who was there.

21    Admiral Burke was on vacation.

22    Q   Did you send your thoughts to Admiral Burke at any point in

23    time?

24    A   No.

25    Q   You used the chain of command?

```
 1   A    I did.

 2   Q    Went up through intermediaries.

 3        So for example --

 4        (Pause)

 5   BY MR. PARLATORE:

 6   Q    So, Ms. Kraus, looking at this, you see where Ms. Beyler

 7   takes what Admiral Burke has said and passes it down, correct?

 8   A    Are you referring to the --

 9   Q    Yeah, down at the bottom.

10   A    Where it says "comptroller"?

11   Q    Yes.

12   A    Yes, I do see that.

13   Q    And this is essentially what comes to you of how do you

14   turn that into a contract, correct?

15   A    Yes.

16   Q    So she talks about how she wants -- he wants two to three

17   pilot groups, approximately six months in length, correct?

18   A    Yes.

19   Q    Talks about it being a subset of the DESRON, correct?

20   A    Yes.

21   Q    It says in here, "no apps, no licenses," right?

22   A    It does say that.

23            MR. PARLATORE:  We can take that down.

24   BY MR. PARLATORE:

25   Q    So we're going to look at Government's Exhibit 91 now.
```

1  Item 0001, what is that?

2  A    That is licenses for GPS assessment tool 210, DEV GPS

3  assessment tool application web access licensing for 12 months.

4  Q    So is that an app for a license?

5  A    It appears.

6  Q    How much did that cost the government?

7  A    $23,100.

8  Q    And Admiral Burke specifically said, "No apps, no

9  licenses," right?

10  A    That email was from Ms. Beyler.

11  Q    But she was passing on what Admiral Burke had supposedly

12  told her, right?

13  A    Yes.

14  Q    So the orders that came down to you said, "No apps, no

15  licenses," right?

16  A    It did.  However, I was told --

17  Q    $23,100 charge here.

18       What is line item 0005?

19  A    Licenses for On My Mind application.

20  Q    How much is that?

21  A    $3,300.

22       MR. PARLATORE:  Take that down.

23  BY MR. PARLATORE:

24  Q    Now, you talked about Outward Mindset versus Next Jump.

25  How much research did you do into their various methods?

1  A   Well, we had -- I work on a team, or at that time I was

2  working on a team, so I had some of those teammates who were

3  working on the research part of that.  Now, the research for

4  Outward Mindset, that was actually done before I had arrived at

5  NAVEUR.  However, there was certainly further discussion about

6  products and so on, and so I was part of those details.

7  Q   Okay.  What research did you do on Next Jump's method?

8  A   So the research was conducted by Pam Hooker, who was on our

9  team and that was part of her job.  She was a curriculum

10  specialist.  She conducted research and said that she really --

11  this seemed like an app and not training.  I took her results,

12  and that was what I brought to my leadership.

13  Q   So you didn't verify that yourself, right?

14  A   I did look at the website, yes.

15  Q   Did you look at their YouTube channel?

16  A   No, I didn't.

17  Q   Are you aware that Next Jump has a YouTube channel with

18  probably hundreds of hours of leadership training lectures?

19  A   No.

20  Q   Was there a link to their YouTube channel on their website?

21  A   I honestly don't remember if there was or not.

22  Q   Would you have looked for that?

23  A   If I was checking the research, I think that I probably

24  would.  But...

25  Q   Would you have expected Ms. Hooker to look for that?

1   A    Yes.

2   Q    Were there videos actually embedded on their website?

3   A    I couldn't say, since I didn't see it.

4   Q    So you didn't look at the website at all?

5   A    Oh, I thought you were talking about the YouTube channel.

6   Sorry.

7   Q    Were there videos embedded on the Next Jump website?

8   A    I honestly don't remember.

9   Q    Okay.  So when you're here testifying about the differences

10  between Outward Mindset and Next Jump's methods, you don't

11  remember even looking at their website and you didn't look at

12  their YouTube channel at all, did you?

13  A    I remember looking for curriculum and outcome, learning

14  outcome.  That is my background.  I'm an educational

15  specialist.

16  Q    Right.  But my question was, because we're talking about

17  the two different methods, you didn't do the research into that

18  at all, did you?

19  A    Me personally, no.

20  Q    Yes, you.

21       So were you able to provide a proper report, as required in

22  the contracting process, as to how Next Jump and

23  Outward Mindset's approaches differed, aside from just simply

24  saying it looks like an app?

25  A    I was able to say that the curriculum from Next Jump was

1   only available if you logged into their website, and that what

2   we had from Outward Mindset were actual textbooks.

3   Q   And Outward Mindset, you said that that started before you

4   got there, right?

5   A   Yes.

6   Q   And Outward Mindset, that's -- it's also a leadership

7   development training program?

8   A   Yes.

9   Q   That one was also directed by Admiral Burke to be acquired?

10  A   I don't know that that's true.

11  Q   Well, you testified about how it would be unusual for a

12  commander to do that.  Do you have any idea whether

13  Admiral Burke is the one that directed the acquisition of

14  Outward Mindset for NAVEUR?

15  A   I understood that it was actually the chaplain who

16  suggested that, but I don't know.

17  Q   So when you testified about that, you really don't know, do

18  you?

19  A   I couldn't know Admiral Burke's mind, no.

20  Q   Well, I'm not asking you to know Admiral Burke's mind.  I'm

21  asking you, when you told this jury that it's unusual for the

22  commander to have directed that I want training program from

23  this company, you have no idea whether or not Admiral Burke is

24  the one that directed Outward Mindset, do you?

25  A   I do, because we were in a meeting with the executive

1    director, who said, "I just got off the phone with

2    Admiral Burke, and, yes, I pointed out that this timeline was

3    very aggressive, but he said he wanted" --

4    Q   Ms. Kraus, I'm asking about Outward Mindset.

5    A   Oh, I'm sorry.  I thought you were talking about Next Jump.

6    Q   I'm asking about Outward Mindset.  When you told them it

7    was unusual that Admiral Burke wanted Next Jump, you have no

8    idea whether he had also been the driving force behind getting

9    the Outward Mindset contract as well, do you?

10   A   It's possible.

11   Q   Possible meaning you don't know?

12   A   I don't know.

13   Q   Okay.  You have no idea how much money PowerTrain got from

14   this?

15   A   It's probably in that document there.

16   Q   Exhibit 91?

17   A   The task order.

18   Q   This document?

19   A   Yes.

20   Q   Okay.  Where on this would it say how much PowerTrain got

21   versus how much Next Jump got?

22   A   I don't know.  I'm not sure what they got.

23   Q   Is this a form that you prepared?

24   A   No.

25   Q   But this is a form that you're familiar with, correct?

1   A    Yes.

2   Q    Where should we look at this form to try and figure out how

3   much money PowerTrain made versus how much money Next Jump

4   made?

5   A    Honestly, I'm not sure if it would be in there because it's

6   really about the delivery of the services and what that cost

7   the government.

8   Q    Okay.  Now, you had talked about the evaluations that were

9   submitted that was Exhibit 95.  This whole Next Jump contract

10  started with what was supposed to be a small pilot program,

11  correct?

12  A    Started with an email to me on the 17th.

13  Q    Right.  But the goal was to create a small pilot program;

14  is that correct?

15  A    I don't know if that was the goal.

16  Q    Well, how many people are assigned to NAVEUR?

17  A    I would say, at that time, maybe 800 people.

18  Q    And how many people went through the Next Jump training?

19  A    We would have to look back at the exact figures.

20  Q    Was it all 800?

21  A    No.

22  Q    Was it 400?  200?

23  A    No.  I think that if we go back to the exhibit, it says.

24  That was the summary, the staff summary sheet.  We had a little

25  over 100 in one group, and I forgot the number for the other.

1  Q   I mean, this is a contract that you worked on almost

2  exclusively for about two weeks, right?

3  A   It is.

4  Q   And you have no idea whether this was just a pilot or

5  whether this was a long-term contract?

6  A   No.  As I said, it was extremely confusing.  It was

7  convoluted information and I wasn't sure.

8  Q   What is the purpose of the pilot program?

9  A   To try.

10  Q   So if you do do a pilot program, even though you have no

11  idea whether this one is, you do do a pilot program and the

12  evaluations come back poorly, what do you do?

13  A   Well, I think it depends on whether you're the government

14  or you're the person that's conducting the training.

15  Q   You work for the government.  So what does have the

16  government usually do when a pilot program comes back as an

17  absolute failure?

18  A   I recommended that we not contract with Next Jump again and

19  we not have the training again.

20  Q   And as far as you're aware, they did exactly that, correct?

21  A   Correct.

22  Q   And you had, you know, filled out that -- you had signed

23  that final invoice from PowerTrain, correct?  This is 95.

24  A   This is a survey.

25  Q   That's not the right one.

1      (Pause)

2    BY MR. PARLATORE:

3    Q    While she's looking for that, let me ask you a different

4    question.

5         Do you know Denese Canedo?

6    A    I'm sorry.  Could you repeat that?

7    Q    Do you know Denese Canedo?

8    A    I'm not sure if I do or not.

9    Q    Okay.  You've never spoken with her?

10            MS. ROSS:  Objection, Your Honor.  This is outside the

11   scope of direct.

12            THE COURT:  Sustained.

13   BY MR. PARLATORE:

14   Q    What is a CPARS?

15   A    Are we looking at the contract?

16   Q    No.  I'm asking you, based on your experience working in

17   government contracts, what is a CPARS?

18   A    It's an acronym, but I honestly don't know what that is

19   unless I have some more context.

20   Q    Contract Performance Assessment Reports System.  Are you

21   familiar with that?

22   A    It sounds like the system that the government uses to

23   receive invoices and then pay the contractor.

24   Q    Okay.  And you also put in -- it's right in the name --

25   performance assessment, correct?

1    A    Yes.

2    Q    So if you have universally poor reviews, that would be

3    something that would be annotated in that system, correct?

4    A    It would usually be the contracting officer representative

5    to do that.

6    Q    Okay.  Was that done in this case?

7    A    I don't know if it was or not.  I wasn't the contracting

8    officer representative.

9    Q    Okay.  But you were the one that signed the final invoice,

10    right?

11    A    I did sign the invoice saying we had received the goods and

12    services.

13    Q    When did you sign that invoice?

14    A    I think we would have to pull it up again.  I don't

15    remember the exact date.

16    Q    You got the reviews fairly soon thereafter, back in January

17    of 2022, right?

18    A    The survey was February 8th, I believe.

19    Q    Okay.  And very shortly thereafter is when the decision was

20    made, we're not doing anything else with Next Jump, correct?

21    A    I'd have to look at the exact date.

22    Q    Okay.  Why would you wait until February of 2023 to sign

23    the final invoice?

24    A    Could we look at the invoice again?

25    Q    Sure.

1   A    That is most likely because -- so in a contract, there's a

2   period of performance, and so it's usually at the very end of

3   the period of performance that it would be written.  I don't

4   know why that's dated then, but --

5   Q    You're the one that did it, right?

6   A    I did sign this, yes.

7   Q    Why did you wait over a year?

8   A    I'm sure it's not the only thing that I signed.  But,

9   again, I would say we'd have to look at the period of

10  performance on the original contract.  Usually, the

11  contracting -- so the contracting folks, in their system, we

12  rely -- I was a technical point of contact on this.  So we rely

13  on that system to tell us, okay, we are -- we need this piece

14  of information from you.  Or it could even be possible that

15  this is an invoice that came in late.  I don't know.

16  Q    Scroll up to the top and see if there's a date on it.  It

17  looks like it was sent in December of 2012.

18  A    So if you look right under "Prime Contract Number," you

19  will see that the date is January 9, 2023.  Where it says "POP

20  end," that means the period of performance.  So at the end of a

21  period of performance, that's when, if there's anything

22  outstanding, there's usually a final document.  So this would

23  make sense that I would sign it in 2023.

24  Q    Okay.  And then once you sign this, that's when they would

25  be able to put the reviews into that contractor performance

1  assessment reporting system?

2  A   That, I don't know at what point that happens.

3  Q   Okay.  Well, when you're researching a new contract, you'd

4  be able to see how they performed in previous contracts,

5  correct?

6  A   I believe so.

7  Q   Okay.  And with the reviews that you had in this contract,

8  the likelihood of Next Jump ever getting another contract with

9  the Navy is probably pretty slim, right?

10  A   I don't know.  I'm not a contracting officer.

11  Q   Yet, you're the one that was doing this contract and

12  opining to this jury about whether it was a good idea to

13  contract with them, right?

14  A   That was my role as a technical point of contact.

15  Q   Your role was to decide whether it was a good idea or not?

16  A   My role was -- as a workforce development specialist for

17  NAVEUR, was to acquire training that was appropriate to the

18  command's need.

19  Q   And that was your decision to make, which one was

20  appropriate, or is that the commander's decision?

21  A   The type of training or the contractor?

22  Q   The type of training.

23  A   The type of training, usually that would be input from

24  someone such as myself and the team.

25  Q   So you decide -- you say you're a GS-13?

1   A   At that time I was, yes.

2   Q   So you're the one who decides, not the admiral, what type

3   of training is best for the people in his command?

4   A   No.

5   Q   Is that what you're saying?

6   A   I'm saying that I was on his staff and that the purpose of

7   being on a flag officer's staff is to advise based on my

8   expertise.

9   Q   Okay.  And did you provide alternates in this case?

10  A   I did.  My alternate that I suggested was that we already

11  have a contract that we had initiated with another company for

12  leadership development.

13  Q   And what about personal resilience?  Does Outward Mindset

14  offer resilience training?

15  A   I believe that is part of the curriculum, yes.

16  Q   Is that something that you brought up at the time?

17  A   I don't believe I did.  I don't remember.

18  Q   Well, if what he was seeking was that, wouldn't it have

19  made sense for you to bring that up at the time?

20  A   It would.  I understood that this was about organizational

21  leadership development.

22  Q   Did you ask?

23  A   I asked a lot of questions, sir.

24  Q   Did you get answers?

25  A   No.  Very few.

1  Q    So you just went forward and did what the lawyers told you

2  was legal, correct?

3  A    Because COM had said we had to have this training in place

4  by a certain time, yes.

5  Q    And who is in command of Naval Forces Europe?

6  A    Admiral Burke.

7  Q    And who has the ultimate responsibility for deciding what's

8  best for Naval Forces Europe?

9  A    Admiral Burke.

10  Q    Okay.

11        MR. PARLATORE:   One moment.

12     (Pause)

13  BY MR. PARLATORE:

14  Q    One final point.

15     This whole Next Jump exchange ruined your Christmas that

16  year, right?

17  A    Yes.

18  Q    Is that something you were upset about?

19  A    I was upset because none of this made sense and this

20  timeline was preposterous.

21  Q    My question was whether you were upset about it messing

22  with your Christmas.

23  A    Yes.

24  Q    Okay.  Are you still upset about that?

25  A    No.

1          MR. PARLATORE:  No further questions.

2          THE COURT:  Ms. Ross, any redirect?

3          MS. ROSS:  Briefly, Your Honor.

4                    REDIRECT EXAMINATION

5   BY MS. ROSS:

6   Q   Ms. Kraus, Mr. Parlatore asked you some questions about how

7   many contracts you had worked on.  Do you remember that?

8   A   Yes.

9   Q   I just want to be clear.  Was that about eight?

10  A   Yes.

11  Q   And in order to be available to work on those contracts,

12  did you have to receive training?

13  A   I did.

14  Q   How much training did you have to receive?

15  A   I don't remember exactly how many classes, but it is a bit

16  of a process because it goes through the acquisition process in

17  general, and ethics and what to look for, red flags, also how

18  to write some of these very detailed documents.

19  Q   Would you say that you're integrally familiar with the

20  contracting process?

21  A   From my purview, I actually have more experience on the

22  contracts than most other management analysts.

23  Q   Did you supervise people who were involved in the

24  contracting process?

25  A   I supervised people who had input into the process, yes.

1   Q   Does that mean you know the proper way things should be

2   done?

3   A   Yes.

4   Q   In your experience, was the way the Next Jump contract came

5   to you proper?

6   A   No, it was not.

7   Q   Do you remember Mr. Parlatore asked you some questions

8   about the Next Jump contract ruining your Christmas?

9   A   Yes.

10  Q   As I just want to clarify.  Did you being upset change

11  anything, any steps that you took, to make that contract

12  happen?

13  A   Absolutely not.

14  Q   Did it impact your testimony here today?

15  A   No.

16          MS. ROSS:  Thank you.  No further questions.

17          THE COURT:  Ms. Kraus, thank you for your testimony

18  here today.  You may step down, and you're free to go.

19      (Witness excused)

20          THE COURT:  Government may call its next witness.

21          MS. ROSS:  Your Honor, the next witness is

22  Sebastian Gardner.

23          THE COURT:  Good afternoon, sir.  If you can remain

24  standing for just a moment.

25      (Oath administered to the witness)

1              SEBASTIAN GARDNER, GOVERNMENT WITNESS, SWORN

2                          DIRECT EXAMINATION

3    BY MS. ROSS:

4    Q    Good afternoon, Agent Gardner.  Can you please state and

5    spell your name for record?

6    A    My name is Sebastian Gardner, S-e-b-a-s-t-i-a-n,

7    G-a-r-d-n-e-r.

8    Q    Where do you currently work?

9    A    I'm a special agent at the FBI, at the Washington field

10   office.

11   Q    What do you do for the FBI?

12   A    I work at a public corruption squad.  Our squad is called

13   CR-15, but I specifically work on the public corruption --

14   federal public corruption squad.

15   Q    What type of training do you receive as a special agent?

16   A    I would receive training across all investigative methods,

17   including interviews, subpoena, search warrants, things along

18   those lines.

19   Q    What did you do before you became a special agent?

20   A    I was an engineer.

21   Q    So you mentioned that you're assigned to the public

22   corruption squad.  Could you describe in a little bit more

23   detail what exactly the responsibilities of that squad are?

24   A    Absolutely.  So Washington field office is a very large

25   office, and we have several public corruption squads.  We kind

1    of parse that out into different specific types.  My squad

2    deals with, specifically, federal public corruption, so

3    investigations that deal with federal employees or members of

4    Congress, members of the military, things along those lines.

5    Q    What are some of your specific duties as a special agent

6    assigned to that public corruption squad?

7    A    Well, I specifically investigate any sort of allegations of

8    violations of federal law by the parties I mentioned, federal

9    employees, senior members of the military, things along those

10   lines.  That includes providing open-source research,

11   subpoenas, search warrants, interviews, surveillance, kind of

12   the whole gamut of investigative methods.

13   Q    And are you one of the case agents assigned to the

14   investigation involving the Defendant Robert Burke?

15   A    I am.

16   Q    And what were you investigating?

17   A    Our investigation basically focuses on the allegations that

18   the Defendant Robert Burke accepted a job with a company called

19   Next Jump in exchange for steering contracts for that company

20   to the Navy under his command.

21   Q    And as one of the case agents, what specifically was your

22   role in furthering that investigation?

23   A    Absolutely.  So I'm a case agent, one of several on this

24   matter.  We have case agents from NCIS and DCIS as well.  I

25   specifically tried to handle most of the things that occurred

1  locally in this area, since we're kind of geographically spread

2  out.  But we all, as part of the investigative team, performed

3  interviews, served subpoenas, executed search warrants and

4  arrest warrants.  Wherever we could plug in as a kind of

5  cohesive team, we would do so.

6  Q   So I want to start by asking you, what dates were the focus

7  of your investigation?

8  A   Our investigation focused primarily on the years of 2021 to

9  2022.

10  Q   And why is that?

11  A   So that is the time period that I mentioned the alleged

12  contract and job offer kind of swap occurred, over the 2021 to

13  2022 time period.

14  Q   Are you familiar with Next Jump?

15  A   I am.

16  Q   What is Next Jump?

17  A   Next Jump is a company based out of New York City.  They

18  primarily have two different types of business.  They call it

19  Biz 1 and Biz 2.  Biz 1 is an ecommerce business, and that

20  focuses -- they call it Perks At Work.  For those who know what

21  GOVX is for government employees, I think of it as a way for

22  clients of the business, their employees who purchase or work

23  with Perks at Work get discounts, like, tickets or merchandise.

24  Biz 2, which is kind of where this investigation focused, is

25  their leadership training or kind of HR technology type of

1    their business.

2           MS. ROSS:  Can we please bring up what has previously

3    been admitted as Government's Exhibit 147 and 148 next to each

4    other, please?

5    BY MS. ROSS:

6    Q    Agent Gardner, what are these exhibits?

7    A    These are DMV photos of the co-CEOs of Next Jump,

8    Charlie Kim on the left and Meghan Messenger on the right.

9    Q    Do they run Next Jump together?

10   A    Yes, they do.

11   Q    Thank you.

12          MS. ROSS:  We can take those exhibits down.

13   BY MS. ROSS:

14   Q    Now, you mentioned that Next Jump had two different

15   businesses.  How did Kim and Messenger and other Next Jump

16   employees often refer to those two businesses?

17   A    Biz 1 was their ecommerce or Perks At Work, and Biz 2 was

18   HR, or leadership training part of their business.

19   Q    Was one of those businesses the primary focus of your

20   investigation?

21   A    Yes.

22   Q    Which one?

23   A    Biz 2.

24   Q    And why was that the primary focus of your investigation?

25   A    The contracts that Next Jump exchanged with Robert Burke

1    for the job all had to do with leadership training.

2            MS. ROSS:  Next, can we bring up, just for the

3    witness, what has been marked as Government Exhibit 135,

4    please?

5    BY MS. ROSS:

6    Q    What is this?

7    A    This is an email from Danny Chavez-Bello.

8            MS. ROSS:  The government moves to admit and publish

9    135.

10           MS. O'NEILL:  No objection.

11           THE COURT:  Without objection, 145 [sic] is in and may

12   be published to the jury.

13           MS. O'NEILL:  Your Honor, I just want to double-check.

14   135.

15           MS. ROSS:  It's 135, Your Honor.

16           THE COURT:  My mistake.  135.

17       (Exhibit 135 admitted)

18   BY MS. ROSS:

19   Q    Agent Gardner, what is this document?

20   A    This document is a glossary of terms that are used within

21   the Next Jump culture, with their employees.

22   Q    Who is Daniel Chavez-Bello?

23   A    He's an employee of Next Jump.

24   Q    Who did he send this to?

25   A    To Robert Burke.

1    Q    And we'll come back and forth to this exhibit a little bit

2    more throughout your testimony.

3          MS. ROSS:  But can we just zoom in and look at the

4    first bullet point 4, please?

5    BY MS. ROSS:

6    Q    And can you read where it says Biz 1/Biz 2?

7    A    "Biz 1/Biz 2.  A, Biz 1 is our employee benefit ecommerce

8    platform, Perks At Work.  Biz 2 is our HR technology, including

9    the feedback app, performance evals app, et cetera."

10   Q    Thank you.

11         MS. ROSS:  We can take that exhibit down.

12   BY MS. ROSS:

13   Q    I want to talk a bit more about your investigation.

14        As part of your investigation in to the defendant, did you

15   and other case agents issue grand jury subpoenas?

16   A    We did.

17   Q    What are grand jury subpoenas?

18   A    Grand jury subpoenas are issued by a federal grand jury in

19   support of an investigation, and they are basically a mechanism

20   for us to compel documents or testimony from different entities

21   or individuals.

22   Q    Can you describe some of the entities and individuals that

23   you issued grand jury subpoenas to?

24   A    Of course.  We looked at financial institutions,

25   telecommunications institutions, businesses such as Next Jump,

1    hotels.

2    Q    You mentioned financial institutions.  Why did you issue

3    grand jury subpoenas on financial institutions?

4    A    In cases like this that are more like white-collar cases,

5    money is kind of where a lot of this hinges on.  So we want to

6    see how money moved between entities involved in the case,

7    subjects, and see who was paying who and how money was spent to

8    kind of corroborate any allegations that we had received.

9    Q    Did you review the materials you obtained pursuant to grand

10   jury subpoenas in this case?

11   A    Yes.

12   Q    Now, something else that you've mentioned are search

13   warrants.  As part of your investigation, did you also issue or

14   execute search warrants?

15   A    We did.

16   Q    What are search warrants?

17   A    So search warrants, if you think of it like a spectrum, a

18   subpoena, you're getting a lot less substance for information.

19   They are a lower threshold and easier to obtain.  A search

20   warrant is a lot more invasive and intrusive on the subject of

21   the search warrant.

22        So in a case of a search warrant, an agent will have to

23   write an affidavit and swear to it to the Court, and an

24   independent court will determine whether or not there's

25   probable cause to find evidence of a crime or fruits of a crime

1    wherever a search warrant is going to be executed.  In our

2    instance, this could be emails through a telecommunications

3    provider or even a physical premises, like a business.

4    Q    And can you describe in a little bit more detail which

5    search warrants you executed in this case?

6    A    Yes.  We searched a -- executed search warrants for

7    physical devices from Charlie Kim, Meghan Messenger, and

8    Robert Burke, as well as emails through Microsoft or Gmail.

9    Q    So let's talk first about Microsoft.

10        Why did you execute a search warrant on Microsoft?

11   A    Microsoft is the business that sustains and runs Next Jump

12   email services.

13   Q    Why did you execute a search warrant on Google?

14   A    Robert Burke has a personal Gmail account, and Google is

15   the parent company that manages and sustains Gmail.

16   Q    And you mentioned phones.  You mentioned Charlie Kim's

17   phone, Meghan Messenger's phone, and the defendant's phone.

18   Why did you execute search warrants on those phones?

19   A    Yes.  Our investigation showed that all three individuals

20   communicated with each other using their cell phones.  In an

21   effort to see those communications and verify those

22   communications, we executed search warrants on their physical

23   devices.

24   Q    And you mentioned a premises search warrant.  Did you

25   execute a premises search warrant in this case?

```
 1   A    We did.

 2   Q    Where?

 3   A    At Next Jump.

 4   Q    Did you view the evidence you received from the search

 5   warrants you executed in this case?

 6   A    Yes, we did.

 7   Q    In addition to subpoenas and search warrants, did you also

 8   obtain evidence directly from the Navy?

 9   A    We did.

10   Q    How did you obtain that evidence?

11   A    As I mentioned, I'm just one of the agents on this

12   investigative team.  We have partners from DCIS and NCIS as

13   well, and in their positions, they're able to request records

14   from the Department of Defense and Navy, and it's -- really

15   smoothes things out because they're able to work within their

16   agencies to get those records easier than me as a member of the

17   Department of Justice.

18   Q    What type of records did you receive from the Navy?

19   A    Personnel records, travel records, training records, and

20   official communications.

21   Q    Did you also receive records related to the Navy's policies

22   and procedures?

23   A    We did.

24   Q    How about contracting records, did you also receive

25   contracting records from the Navy?
```

1  A    Yes, we did.

2  Q    Did you review those records?

3  A    Yes.

4  Q    Before moving on, I just want to ask you questions about

5  the emails you reviewed in this case.

6      When you receive emails pursuant to a search warrant, what

7  format is the time that the email was sent generally in?

8  A    Depending on where you look on the email, because a lot of

9  these are email chains.  If you look later on in the email, it

10 will be converted into the time zone of the emails we're

11 looking at.  However, at the top email of the chain, it's

12 usually in coordinated universal time, or UTC.

13         MS. ROSS:  Can we please bring up what has been marked

14 as Government Exhibit D1, please?

15 BY MS. ROSS:

16 Q    What is this?

17 A    This is kind of something we put together that we think

18 will help everyone understand UTC.  It can be confusing and

19 kind of messy, so hopefully it helps.

20 Q    Did you help verify and prepare this demonstrative?

21 A    Yes.

22 Q    Will this demonstrative help the jury understand UTC time?

23 A    I really hope so.

24         MS. ROSS:  The government seeks permission to publish

25 this for the jury.

1              MS. O'NEILL:  No objection, Your Honor.

2              THE COURT:  Without objection, this may be published.

3              Ladies and gentlemen, this isn't going into evidence.

4    You won't have this back with you when you deliberate.  But you

5    can review this here for the purposes of the agent's testimony.

6    BY MS. ROSS:

7    Q    First, Agent Gardner, what is UTC time?

8    A    UTC time, or it's also known as coordinated universal time.

9    Q    Is there a standard way to convert UTC time to different

10   time zones?

11   A    There is.

12   Q    What time zones were most relevant to your investigation,

13   Agent Gardner?

14   A    Eastern time, what we're in right now, as well as central

15   European time, which is where Robert Burke was stationed in

16   Italy.

17             MS. ROSS:  And can we go to page 3 of this exhibit,

18   please?

19   BY MS. ROSS:

20   Q    How do you convert UTC time to eastern daylight time?

21   A    You would take four hours away, or minus four hours.

22   Q    So if the UTC time reflected on the top of an email chain

23   says 1:00 p.m., what time would that be if it's converted to

24   eastern daylight time?

25   A    9:00 a.m.

1   Q   How about if it says 9:00 p.m.?

2   A   5:00 p.m.

3          MS. ROSS:   Then can we go to page 5 of this exhibit,

4   please?

5   BY MS. ROSS:

6   Q   How about if it's converted to eastern standard time,

7   what's the conversion rate there?

8   A   You subtract five hours.

9   Q   And what time if the top of the an email chain says

10  2:00 p.m. UTC time would that be in eastern standard time?

11  A   9:00 a.m.

12  Q   How about 10:00 p.m.?

13  A   5:00 p.m.

14  Q   Can we go to page 9 of this exhibit, please?

15      How would you convert UTC to the central European

16  summertime?

17  A   Add two hours.

18  Q   And then how about to the central European time?

19  A   Add one hour.

20  Q   And does UTC make it so it's a standard conversion rate

21  depending on the time zone?

22  A   Yes.

23  Q   So does this stay the same?

24  A   Yes.

25  Q   Thank you.  We can take that exhibit down.

1        So you testified that the email at the top of an email

2    chain is normally in UTC; is that right?

3    A    Correct.

4    Q    Now, because the emails at the top are often in UTC, does

5    that sometimes mean, based on the conversion, that an email at

6    the top may look like it was sent really early in the morning

7    on one day, but it was really sent late at night on the day

8    before?

9    A    Yeah, that can happen.

10   Q    And you said that just because the top of the email chain

11   is in UTC time, normally the emails following that earlier in

12   the chain are not in UTC time.  Is that right?

13   A    That is correct.

14   Q    Is it possible to know what time zone they are in?

15   A    Yes.

16   Q    How is that?

17   A    You can look at the conversion of the time where they're

18   at.

19   Q    And does the time that's reflected in those emails, is that

20   the time zone of the person whose email inbox you are getting

21   that email from?

22   A    Correct.

23   Q    So now I want to start walking through your investigation

24   chronologically as much as possible.

25        So first I want to ask you a couple questions about

 1  Next Jump and the Navy before we do that.

 2       Based on your review of the evidence, how many contracts

 3  did Next Jump have with the Navy?

 4  A   They had two in the late 2018s, 2018 to 2019, and another

 5  in the 2021 to 2022 timeframe.

 6  Q   So focusing on the first and second contract first.  When

 7  did those end?

 8  A   Those were both concluded by the fall of 2019.

 9  Q   In 2021, did Next Jump have an active contract with the

10  Navy?

11  A   When in 2021?

12  Q   Up until December of 2021.

13  A   No.

14  Q   And then beginning in 2021, did the Navy make progress

15  towards having another contract with Next Jump?

16  A   In the beginning of 2021?

17  Q   Yes.

18  A   No.

19  Q   How about towards the end of 2021?

20  A   Towards the very end of 2021, yes.

21  Q   Now, I want to ask you about the defendant in a little bit

22  more detail.

23       First, beginning in 2019, where was he working?

24  A   2019.  So up until mid 2019, he was chief of Naval

25  personnel at N1, which is kind of like the HR.  It's very

1   layman's terms and there's much more to it, but kind of like

2   the HR of the Navy.  Then he became VCNO, the Vice Chief of

3   Naval Operations, in mid of 2019, and he stayed in that role

4   until about mid 2020.

5   Q    And if you know, where was he stationed at that time?

6   A    In 2019, 2020, Washington, DC, the DMV area.

7   Q    And then where did he go from there?

8   A    He then moved over to NAVAF and NAVEUR, which is Navy

9   Africa and Navy Europe.

10  Q    And where was he based in that role?

11  A    He was in Italy.

12  Q    And when he was based in Italy, what was his rank?

13  A    He was a four-star admiral.

14  Q    When did the defendant retire?

15  A    In July 2022.

16  Q    And how many years did the defendant serve in the military?

17  A    Nearly 40 years.

18  Q    If you know, what, if any, was the defendant's involvement

19  with Next Jump's first two contracts, so the ones in the 2018

20  to 2019 period?

21  A    Those contracts were both with N1, where he was in charge

22  of at that time.

23  Q    And based on your review of the evidence, after those first

24  two contracts ended, did Kim and Messenger want another Navy

25  contract?

1  A    They did.

2  Q    Did Kim and Messenger continue to reach out to the

3  defendant about that?

4  A    Yes.

5        MS. ROSS:  Can we please bring up, just for the

6  witness, Government Exhibit 58, please?

7  BY MS. ROSS:

8  Q    What is this, Agent Gardner?

9  A    This is an email.

10       MS. ROSS:  And the government moves to admit and

11 publish what's been marked as Government Exhibit 58.

12       MS. O'NEILL:  Objection, Your Honor.  Hearsay.

13       THE COURT:  Parties approach.

14    (Begin bench conference)

15       THE COURT:  Why isn't this hearsay?

16       MS. ROSS:  It's going to the defendant's state of

17 mind.  In that email, you can see that Kim and Messenger were

18 told not to contract him.  Kim and Messenger then forwarded and

19 say, we'll stand by.  So it's going to his state of mind in

20 terms of understanding what was proper contract with Kim and

21 Messenger and what was not.

22       THE COURT:  Why isn't that?

23       MS. O'NEILL:  Your Honor, I think there's been a big

24 misunderstanding through all of this about the not to contact

25 Admiral Burke thing.  It's because that's not his job now.

1    Like, his job used to be Chief of Navy Personnel in charge of

2    training and all of that.  He's got a different role now, so

3    contact the person that's in that role.  It wasn't a you can't

4    talk to him thing.  So I think this just -- this just goes to,

5    you know, confusion of the issues.  If the government wants to

6    lay the foundation there was some sort of rule they couldn't

7    contact him, they need to do that through the proper witness

8    and this is not that person.

9         We also have a 403 objection to this, as well.

10        MS. ROSS:  In our view, that goes to argument.  That

11   isn't part of the admissibility of the exhibit.

12        MR. PARLATORE:  That's part of the hearsay problem, is

13   they're trying to interpret something that an out-of-court

14   declarant said without having the proper witness to say what it

15   actually means.  So that way, we've got to totally invent the

16   meaning.

17        THE COURT:  I'm overruling the objection.  I think the

18   government's argument for effect and state of mind is

19   appropriate.

20     (End bench conference)

21        THE COURT:  Over objection, I'm admitting Exhibit 58.

22        Is that correct, Ms. Ross, 58?

23        MS. ROSS:  Yes, that's right, Your Honor.

24     (Exhibit 58 admitted)

25        THE COURT:  And it may be published to the jury.

1   BY MS. ROSS:

2   Q    I want to start at the earliest email in this chain.  So

3   just looking at the heading at the bottom of the page.  Who is

4   this from?

5   A    This email is from Charlie Kim.

6   Q    What email address does he use?

7   A    Ckim@nextjump.com.

8   Q    Were you able to verify that belonged to Charlie Kim?

9   A    We were.

10  Q    How did you verify it?

11  A    Search warrant.

12  Q    Who does he send it to?

13  A    He sends the email to Robert Burke at his official Navy

14  address.

15  Q    And he also CCs Meghan Messenger?

16  A    He does.

17  Q    Do you see the email that's listed there for

18  Meghan Messenger, mmmessenger@nextjump.com?

19  A    Yes.

20  Q    Were you able to verify that?

21  A    Yes.

22  Q    How?

23  A    Same as with Charlie Kim, a search warrant.

24  Q    And who is Brett Mietus listed there?

25  A    He's a member of the United States Navy.

1    Q    Who is Darrell Platz?

2    A    A number of Next Jump.

3              MS. ROSS:  Can we go to page 2 of this exhibit,

4    please?

5    BY MS. ROSS:

6    Q    Can you please read the first paragraph of this email?

7    A    "Bob, great seeing you at the two-star iflex event.  We're

8    excited to hear of CNO's backing and hoping to get some time

9    next week to strawman/walk you through our approach."

10   Q    And can you read the last paragraph, beginning "Next week"?

11   A    "Next week is fairly flexible on our end, except for

12   Friday.  Copied Brett, as well as Darrell.  I'm hoping that

13   they can find some time for us, 60 to 90 minutes ideally."

14   Q    Can you read the PS there at the bottom?

15   A    "Lastly, if you could email connect us to Geurts.  He

16   mentioned he has a New York City trip in the next few weeks and

17   can visit.  It would be great to get him more acquainted with

18   our work."

19   Q    How does Darrell Platz follow up there at 2:49 p.m.?

20   A    Mr. Platz responds to Mr. Mietus.  Want me to read it?

21   Q    Yes, please.

22   A    "Hi, Brett.  Hope you're doing well.  When able, please let

23   me know if next week works for the VCNO.  As Charlie mentions

24   below, we are pretty flexible Monday through Thursday next

25   week.  Friday is a little tougher."

1    Q    Can you please read Brett Mietus's response?

2    A    "Thanks, Darrell.  Given Admiral Burke's role in the

3    upcoming contracting actions, it is best that Next Jump and he

4    not contact -- not have contact at this time.  We'll let you

5    know when contact can be regenerated.  Have a wonderful holiday

6    weekend."

7    Q    What does Darrell Platz do with the email?

8    A    He forwards it to Kim and Messenger.

9    Q    And after receiving that email from Darrell Platz, what

10   does Kim do with it?

11   A    He responds and emails Burke at both his personal and his

12   official email, and CCs Meghan Messenger.

13   Q    What does Kim write there?

14   A    "Bob, we're on the train back to NYC.  Just reading this.

15   We'll stand by until we hear from you."

16   Q    Did you find any evidence that Next Jump was informed that

17   it was okay for them to reach out to the defendant again after

18   receiving Brett Mietus's email?

19   A    No.

20        MS. ROSS:  Can we please bring up, just for the

21   witness, what's been marked as Government's Exhibit 9, please?

22        THE COURT:  And while you're doing that, I'll just

23   say, I considered the argument about Rule 403 and I do not find

24   it convincing as to that last exhibit.

25        MS. ROSS:  Thank you, Your Honor.

1   BY MS. ROSS:

2   Q    Agent Gardner, what is this email?

3   A    This is an email with the subject line "Standards of

4   Conduct Guidance."

5        MS. ROSS:  The government moves to admit and publish

6   what's been marked as Government Exhibit 9.

7        MS. O'NEILL:  No objection, Your Honor.

8        THE COURT:  Without objection, 9 is in and may be

9   published to the jury.

10       (Exhibit 9 admitted)

11  BY MS. ROSS:

12  Q    Agent Gardner, what is the subject line of this email?

13  A    Standards of Conduct Guidance.

14  Q    Who sends this email?

15  A    Robert Burke.

16  Q    I won't have you read all of these names.  But who does he

17  send this email to?

18  A    Senior leaders at the United States Navy.

19  Q    Can we go to page 8 of this exhibit, please?

20       What date does the defendant send this email?

21  A    May 7, 2020.

22  Q    What was the defendant's position at that time?

23  A    He was the VCNO, or Vice Chief of Naval Operations.

24  Q    I won't have you read this whole email.  Can you read the

25  first two paragraphs, please?

A    "Admirals and senior leaders, I've attached the latest
edition of the annual standards of conduct guidance, a familiar
and important reminder that as leaders we have to own our
ethics.  Like readiness, ethics require a steady investment in
ourselves and others.  We must continuously check and calibrate
our decision-making, our influence, and our example to the
sailors we lead.  Please review the revised guidance, and as
you routinely communicate with your people, please reinforce
that the expectation is that we routinely exceed the minimal
acceptable standards of conduct.  As you all know, exceptional
professionalism and integrity are force multipliers."

Q    We see that the defendant wrote that he attached the latest
edition of the annual standards of conduct guidance.  Did he,
in fact, attach that to this email?

A    Yes.

        MS. ROSS:  Can we go to page 9 of this exhibit?

BY MS. ROSS:

Q    And what is this, Agent Gardner?

A    This is the memorandum with the annual standards of conduct
guidance.

Q    And who signs this memorandum?

A    Robert Burke.

Q    We'll talk about this memorandum in more detail later at
trial, but I just want to discuss a few things with you here.

        MS. ROSS:  Can we go to page 19, please?

1  BY MS. ROSS:

2  Q    What is this document?

3  A    This is a section called "The Annual Ethics Audit Review

4  Checklist."

5  Q    And what are the different categories listed on this

6  checklist?

7  A    Within this section, there is program administration,

8  training, official travel, leave, speaking engagements/support

9  to nonfederal entities (NFE), use of government vehicles, use

10  of personnel, does not include enlisted aides and use of

11  enlisted aides.

12  Q    Under training, what does it say there?

13  A    First bullet point says:

14      "Flag officer completed annual ethics training no later

15  than 30 November of each calendar year.  Personal staff

16  received in-person training with the ethics counselor in the

17  calendar year with a preference for leader-led training where

18  possible.  Spouse received an annual ethics brief."

19  Q    Agent Gardner, was the defendant required to complete that

20  annual training?

21  A    Yes.

22          MS. ROSS:  Can we go to page 20, please?

23  BY MS. ROSS:

24  Q    And can you read the categories that are listed on the

25  second page of the checklist?

1    A    Absolutely.

2        "Official representation funds (ORF).  Command coins.

3   Gifts.  Financial disclosures.  Records retention."

4    Q    Under financial disclosure, what is written there?

5    A    "Required financial disclosure forms filed on time to

6   include Stock Act transaction reports, OGE Form 278T, conflict

7   letters issued, if necessary."

8    Q    It mentions a Form OGE-278.  What kind of forms are those?

9    A    It's an official financial disclosure form.

10   Q    And if you know, was the defendant required to fill out

11  those forms as well?

12   A    He was.

13        MS. ROSS:  Can we go to page 35, please?

14  BY MS. ROSS:

15   Q    Agent Gardner, what is this part of the memorandum

16  detailing?

17   A    This section is called "Communications With Industry."

18   Q    Now, under General Rules, can you read the impartiality

19  paragraph, please?

20   A    Yes.  "Duty officials must act impartially and not give

21  preferential treatment to any private organization.  Exercise

22  caution to ensure that your actions do not give a competitive

23  advantage to a particular company."

24   Q    And where it says "Commitments," can you read that, please?

25   A    Of course.

1    "Do not make any commitments or promises that could bind

2    the government.  Only a warranted contracting officer or real

3    estate contracting officer is authorized to bind the government

4    by entering into or changing a contractual agreement or real

5    property interest.  Although you may ask informational and

6    clarifying questions during a meeting or ask contractors to

7    send follow-up information, you must always preface these

8    requests with a specific disclaimer that you are not

9    authorizing an award of any new contract or agreement or

10   authorizing changes to an existing contract/agreement scope of

11   work."

12   Q    And the last one, Conflicts of Interest, could you read

13   that, please?

14   A    Yes.  "DoD officials must not participate personally and

15   substantially in an official capacity in any particular matter

16   that has a direct and predictable effect on their financial

17   interest or those imputed to them by virtue of family or

18   business relationships.  DoD officials must also avoid the

19   appearance of conflicts of interest."

20        MS. ROSS:  And can we go to page 46, please?

21   BY MS. ROSS:

22   Q    What part of the memo is this portion detailing?

23   A    This portion is with regards to post-government employment.

24   Q    Looking at the Searching For Job While on Active Duty

25   category.  Can you please read just the top three bullets

1  there?

2  A    Yes.  "If negotiating or seeking employment, you must

3  disqualify yourself from taking official action which affects

4  financial interests of a potential employer.  The Stock Act of

5  2012 requires you to notify your ethics counselor of the

6  commencement of any employment negotiations or agreements

7  within three days, as well as recusal if necessary.

8       "If you are personally and substantially involved in a

9  procurement greater than $150,000, you must promptly report all

10  contacts from bidders regarding potential employment, even if

11  promptly rejected."

12  Q    Agent Gardner, in the course of your investigation, did you

13  find evidence that the defendant was involved in a procurement

14  larger than $150,000 with Next Jump?

15  A    Yes.

16  Q    How was he involved?

17  A    As I mentioned, while at N1, Next Jump had two contracts

18  that exceeded $150,000, and then when -- with NAVAF and NAVEUR,

19  as he was commander there, they also had a contract over

20  $150,000.

21  Q    Did you find any evidence that he ever reported any

22  conversations he had with Kim and Messenger about potential

23  employment at Next Jump prior to that involvement in

24  Next Jump's third contract, the one with NAVEUR?

25  A    No.

1          MS. ROSS:  Can we please go to page 51 of this

2     exhibit?

3     BY MS. ROSS:

4     Q    What is this part of the memo detailing?

5     A    Public financial disclosure reporting, OGE Form 278 --

6     sorry I can't see if that's a C or an E -- or 278T reports.

7     Q    Can you please read the first two bullet points under

8     "Goal:  Complete Accurate Disclosure"?

9     A    Of course.

10          First bullet point:  "Substantive Purpose.  These required

11     reports help you and your ethics counselor, supervisor, and

12     designated agency ethics official identify potential conflicts

13     of interest that may exist between your official duties and

14     your private financial interests and affiliations.

15          "Technical Completeness.  To perform a meaningful conflicts

16     review, all required information must be reported with the

17     requisite level of detail.  The required contents in your

18     public financial disclosure report is spelled out in the law.

19     DON must certify you are current on all filings before acting

20     on retirement or nomination requests."

21     Q    Agent Gardner, this memo that the defendant sent out, was

22     he also bound by the policies and procedures it outlined?

23     A    Yes.

24     Q    Does that include the policies and procedures it outlined

25     related to outside employment?

```
 1   A    Yes.

 2   Q    And how about conflicts of interest?

 3   A    Yes.

 4   Q    And the OGE-278 forms?

 5   A    Yes.

 6        MS. ROSS:  Next, can we please put up for the witness

 7   what's been marked as Government Exhibit 11, please?

 8   BY MS. ROSS:

 9   Q    Agent Gardner, what is this email?

10   A    This is an email from Meghan Messenger with the subject

11   Line Investor.

12        MS. ROSS:  The government moves to admit and publish

13   what's been marked as Government Exhibit 11.

14        MS. O'NEILL:  Your Honor, objection.  Hearsay and 403.

15   Your Honor --

16        THE COURT:  All right.  I think this is probably a

17   good point for us to break for the day, ladies and gentlemen.

18   Thanks for your attention.  I'll ask you to return for us to

19   continue trial by 9:30 tomorrow.  Again, remember, we all need

20   to be here to start at 9:30.

21        And I'll just remind you not to do any investigating

22   or communicating about the case this evening.  Have a great

23   evening, folks.

24        Agent Gardner, while the jury is here, I'm going to

25   direct you not to discuss the content of your testimony with
```

1  anyone this evening.

2          THE WITNESS:  Yes, Your Honor.

3      (Jury absent)

4          THE COURT:  You all can have a seat.  What exhibit

5  number is this?

6          MS. ROSS:  Government Exhibit 11, Your Honor.

7          THE COURT:  So why isn't this hearsay, ma'am?

8          MS. ROSS:  Your Honor, this goes to your ruling on the

9  government's motion to co-conspirators' statements.  This falls

10  into that bucket of Meghan Messenger and Charlie Kim relaying

11  information to their investors and to their staff.

12      (Pause)

13          THE COURT:  Ms. O'Neill, why isn't this covered by my

14  prior ruling?

15          MS. O'NEILL:  Your Honor, my understanding was that we

16  were going to take them one by one as they came up

17  substantively and you were just kind of giving an overarching

18  I'm not keeping them all out because of what they are.  So this

19  one specifically is before the charged timeframe, and this one

20  specifically is not talking directly about Admiral Burke, and

21  it's referencing lots of other people that may be involved in

22  this.  Several senior Navy leaders have told us that they've

23  been told they couldn't engage with Next Jump until legal gives

24  us the go-ahead.  A lot of this is also not relevant, and it's

25  talking about what's going on at Next Jump.  There is just

1    simply not enough background here to know that this is related

2    here.  Yeah.  And -- yeah.  And if it's prior to the

3    conspiracy, the government's theory is the conspiracy began in

4    2021.  Admiral Burke would not be a part of that conspiracy in

5    2020 when these emails were sent.

6         THE COURT:  So I don't think the law requires that he

7    be part of it at the time.  I think the question is whether

8    this is conspiracy statement, part of the conspiracy that he

9    ultimately joined.

10         MS. O'NEILL:  Your Honor, but in this case, if this

11    case were being charged jointly, Meghan Messenger and

12    Charlie Kim were not charged with being in part of the

13    conspiracy in 2020 either.  Their indictment also begins in

14    2021.

15         THE COURT:  All right.  So, yeah, I think we had

16    talked about April 2021.  Am I remembering that as the date

17    that you believe the conspiracy began?

18         MS. ROSS:  As to the defendant and Kim and Messenger.

19    But just because the defendant, that's when he entered it,

20    doesn't mean that's when Charlie Kim and Meghan Messenger

21    started it.  As this email demonstrates, they were relaying

22    information to an investor.  This provides the motive to bribe.

23    They say things like, we are experiencing 50 percent drop in

24    weekly revenue.  They're talking about a contract with the

25    Navy.  They're making those promises.  They're trying to make

1  sure that their investors stay in line and on target with their

2  plan, which is to get a Navy contract.

3           THE COURT:  So when do you believe any conspiracy

4  began?

5           MS. ROSS:  I think, arguably, before this time, Your

6  Honor.  I think that the conspiracy to -- as we saw prior in

7  that email from 2019, when they were told not to reach out to

8  the defendant and they kept doing that anyway, they had this

9  plan formed.  They're going to try to get Burke on their side.

10  They're going to try to get him to join the conspiracy.  And

11  this is part of laying the foundation to do that.  They were

12  told not to contact the defendant in 2019, and you saw what

13  they did immediately.  They forwarded that email and said they

14  would stand by to wait for him, and clearly they did not do

15  that.

16           THE COURT:  All right.

17           MS. O'NEILL:  Your Honor, the email that they sent to

18  Admiral Burke after being told not to contact him said, hey,

19  we've been told not to contact you, so we're going to wait to

20  hear from you.  These emails don't go to Admiral Burke.

21           THE COURT:  I understand.

22           MS. O'NEILL:  The indictment of Kim and messenger, the

23  government alleges that the conspiracy began in September

24  of 2020, as early as September 2020, through October 2022.  So,

25  again, this is before.

1          And it's also very misleading, Your Honor.  I'd like

2    to be heard on my 403 objection.  The first paragraph, about a

3    50 percent drop in revenue, is talking entirely about

4    business 1.  It's not talking about business 2.  So the fact

5    that there's a drop in revenue because we're in the middle of

6    COVID is not related to a bribery scheme that they may or may

7    not come up with a year later in 2021 when they meet at

8    Belga Cafe with Admiral Burke.

9          MS. ROSS:  Just because this is talking about

10   business 1 does not mean it's not motive to further their

11   conspiracy.  Their business was failing and they saw, like, an

12   inroad with the defendant to boost business to profits to help

13   Next Jump as a whole.

14         THE COURT:  All right.  So I agree with the defense

15   that this is several months before even the government's

16   indictment suggests the conspiracy began, and so I find that it

17   is inadmissible hearsay.

18         MS. ROSS:  Your Honor, if I could make just a couple

19   additional points on that.

20         I do just want to point out that for conspiracy, the

21   timeframe can be factually different from the indictment.

22   The -- furthermore, this exhibit can be admitted not just for

23   the truth but to the mindset of Meghan Messenger and

24   Charlie Kim in terms of their motive.  It can be admitted as

25   motive for entering into the conspiracy with Robert Burke.  So

1    if we can't admit it as substantive evidence, I would argue

2    that it's additionally not hearsay because we can admit it as

3    to go to their state of mind as well as motive.

4         THE COURT:  I agree with the defense that this is

5    inadmissible.  I do want to be clear.  I tried to give the

6    buckets how I saw these, so I'm not expecting that you're going

7    to be objecting on every email that comes up.  As I say, I

8    think you're right here, Ms. O'Neill, but my prior ruling was

9    intended to give both parties guidance about what we should and

10   should not be admitting, and I'll just -- I'll ask the parties

11   to look to and find both the motion -- the emails the

12   government is moving and the objections within those buckets.

13   This is going to go very slowly if we're having to argue each

14   of these emails.

15        Anything else this evening, folks?

16        MS. ROSS:  No, Your Honor.  Thank you so much.

17        MS. O'NEILL:  No, Your Honor.

18        THE COURT:  I'll see you all at 9:30 tomorrow.

19      (Proceedings concluded at 4:57 p.m.)

20

21

22

23

24

25

1                          CERTIFICATE

2        I, Sonja L. Reeves, Federal Official Court Reporter in and
    for the United States District Court of the District of
3    Columbia, do hereby certify that the foregoing transcript is a
    true and accurate transcript from the original stenographic
4    record in the above-entitled matter and that the transcript
    page format is in conformance with the regulations of the
5    Judicial Conference of the United States.

6        Dated this 7th day of May, 2025.

7

8                              /s/ Sonja L. Reeves
                           SONJA L. REEVES, RDR-CRR
9                          FEDERAL OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$10** [1] - 10:19
**$150,000** [4] - 122:9,
122:14, 122:18,
122:20
**$23,100** [2] - 82:7,
82:17
**$3,300** [1] - 82:21
**$322,000** [1] - 66:10
**$322,850** [1] - 65:25
**$350,000** [2] - 10:1,
22:11
**$413,500** [1] - 10:17

**'**
**-**

**'90s** [1] - 33:2

**/**

**/s** [1] - 130:8

**0**

**0001** [1] - 82:1
**0005** [1] - 82:18

**1**

**1** [9] - 49:5, 49:14,
57:6, 99:19, 100:17,
102:7, 128:4, 128:10
**1/Biz** [2] - 102:6,
102:7
**10** [2] - 22:17, 52:2
**100** [1] - 87:25
**1000** [1] - 1:17
**10016** [1] - 1:21
**101** [1] - 2:13
**103** [1] - 69:8
**106** [1] - 3:3
**10:00** [1] - 108:12
**10th** [1] - 61:24
**11** [4] - 55:10, 124:7,
124:13, 125:6
**113** [1] - 2:11
**117** [1] - 2:10
**12** [2] - 35:5, 82:3
**1301** [1] - 1:17
**135** [7] - 2:13, 101:3,
101:9, 101:14,
101:15, 101:16,
101:17
**145** [1] - 101:11
**146** [3] - 71:17,
71:22, 72:2
**147** [2] - 72:1, 100:3
**148** [2] - 72:1, 100:3
**15** [1] - 3:17

**156** [1] - 72:2
**16th** [2] - 21:10, 48:6
**17** [1] - 23:12
**17th** [1] - 1:20,
34:17, 44:11, 48:6,
61:16, 77:17, 77:19,
77:20, 87:12
**18** [1] - 2:4
**19** [1] - 118:25
**1:00** [1] - 107:23
**1:24-cv-00265-TNM**
- 1:5
**1:31** [2] - 1:11, 3:1

**2**

**2** [13] - 1:9, 54:9,
68:21, 72:15, 99:19,
99:24, 100:17,
100:23, 102:6, 102:7,
102:8, 115:3, 128:4
**20** [3] - 52:2, 69:19,
119:22
**200** [1] - 87:22
**20001** [1] - 1:25
**2012** [2] - 91:17,
122:5
**2018** [3] - 22:25,
110:4, 111:19
**2018s** [1] - 110:4
**2019** [11] - 22:25,
110:4, 110:8, 110:23,
110:24, 111:3, 111:6,
111:20, 127:7, 127:12
**2020** [7] - 111:4,
111:6, 117:21, 126:5,
126:13, 127:24
**2021** [29] - 13:10,
19:2, 22:10, 22:16,
23:8, 24:8, 25:14,
33:9, 33:11, 34:17,
39:12, 40:7, 73:18,
78:18, 99:8, 99:12,
110:5, 110:9, 110:11,
110:12, 110:14,
110:16, 110:19,
110:20, 126:4,
126:14, 126:16, 128:7
**2022** [9] - 33:9,
63:16, 67:25, 90:17,
99:9, 99:13, 110:5,
111:15, 127:24
**2023** [3] - 90:22,
91:19, 91:23
**2025** [2] - 1:10, 130:6
**20530** [2] - 1:15, 1:17
**210** [1] - 82:2
**23** [4] - 69:14, 69:16,
69:21, 69:22
**260** [1] - 1:20

**27** [1] - 43:23
**278** [1] - 123:5
**278T** [2] - 120:6,
123:6
**27th** [1] - 44:9
**2:00** [1] - 108:10
**2:49** [2] - 50:19,
115:19

**3**

**3** [7] - 43:24, 44:23,
45:19, 50:17, 65:5,
69:1, 107:17
**30** [6] - 69:15, 69:16,
69:19, 69:21, 69:22,
119:15
**32** [1] - 2:5
**333** [1] - 1:24
**34490** [1] - 12:14
**35** [1] - 120:13
**3:04** [1] - 50:19

**4**

**4** [3] - 66:6, 70:5,
102:4
**40** [2] - 21:24, 111:17
**400** [1] - 87:22
**403** [6] - 41:14,
41:22, 113:9, 116:23,
124:14, 128:2
**43** [1] - 2:11
**46** [1] - 121:20
**48** [1] - 11:10
**4:57** [2] - 1:11,
129:19

**5**

**5** [5] - 2:3, 66:6,
70:15, 79:25, 108:3
**50** [2] - 126:23, 128:3
**51** [2] - 11:21, 123:1
**53** [1] - 2:12
**54** [1] - 69:7
**58** [6] - 2:11, 112:6,
112:11, 113:21,
113:22, 113:24
**5:00** [2] - 108:2,
108:13

**6**

**6** [2] - 66:6, 70:18
**60** [1] - 115:13
**601** [1] - 1:14
**62** [1] - 2:12
**6292** [2] - 12:13,
14:22

**67** [1] - 2:13
**6th** [1] - 64:20

**7**

**7** [5] - 1:10, 56:1,
66:7, 70:19, 117:21
**74** [1] - 2:6
**75** [1] - 10:8
**78** [1] - 21:7
**79** [7] - 2:11, 40:9,
40:14, 43:5, 43:8,
43:9, 50:25
**7:30** [1] - 79:24
**7:45** [1] - 79:23
**7th** [1] - 130:6

**8**

**8** [5] - 35:5, 67:25,
70:20, 79:22, 117:19
**8(a** [1] - 54:13
**80** [5] - 2:12, 53:12,
53:17, 53:21, 53:23
**800** [2] - 87:17, 87:20
**8th** [1] - 90:18

**9**

**9** [8] - 2:10, 91:19,
108:14, 116:21,
117:6, 117:8, 117:10,
118:16
**90** [2] - 9:14, 115:13
**91** [7] - 2:12, 62:7,
62:12, 62:14, 62:16,
81:25, 86:16
**95** [8] - 2:6, 2:13,
67:9, 67:16, 67:18,
67:20, 87:9, 88:23
**96** [1] - 14:8
**97** [1] - 2:8
**99** [1] - 31:9
**9:00** [3] - 107:25,
108:1, 108:11
**9:30** [3] - 124:19,
124:20, 129:18

**A**

**a.m** [2] - 107:25,
108:11
**ability** [1] - 60:11
**able** [16] - 6:12, 6:19,
24:6, 29:14, 58:25,
59:10, 65:8, 84:21,
84:25, 91:25, 92:4,
105:13, 105:15,
114:8, 114:20, 115:22
**above-entitled** [1] -

130:4
**absent** [3] - 3:2,
50:18, 125:3
**absolute** [1] - 88:17
**absolutely** [10] -
56:11, 58:3, 58:5,
69:25, 74:1, 78:12,
96:13, 97:24, 98:23,
120:1
**academy** [2] - 13:20,
31:24
**acceptable** [1] -
118:10
**acceptance** [1] -
25:22
**accepted** [5] - 8:14,
25:23, 26:4, 26:7,
98:18
**access** [1] - 82:3
**accompany** [1] -
57:1
**according** [1] - 76:2
**account** [1] - 104:14
**accurate** [3] - 18:11,
22:20, 130:3
**Accurate** [1] - 123:8
**acknowledge** [1] -
72:19
**acknowledged** [1] -
72:20
**acquainted** [1] -
115:17
**acquire** [7] - 33:18,
34:19, 52:10, 58:3,
59:4, 63:20, 92:17
**acquired** [1] - 85:9
**acquiring** [1] - 34:23
**acquisition** [8] -
35:9, 37:2, 37:6,
37:15, 37:22, 48:8,
85:13, 95:16
**acronym** [1] - 89:18
**act** [2] - 15:3, 120:20
**Act** [2] - 120:6, 122:4
**acting** [1] - 123:19
**Action** [1] - 18:24
**action** [4] - 43:22,
44:2, 62:22, 68:23,
122:3
**actions** [2] - 116:3,
120:22
**active** [2] - 33:6,
110:9
**Active** [1] - 121:24
**actual** [2] - 6:10,
85:2
**add** [5] - 3:12, 46:7,
69:22, 108:17, 108:19
**added** [1] - 64:6
**adding** [1] - 57:21

**addition** [2] - 64:17, 105:7
**additional** [4] - 3:12, 11:3, 54:14, 128:19
**additionally** [1] - 129:2
**additions** [1] - 15:12
**address** [5] - 23:16, 43:15, 43:17, 114:6, 114:14
**addressing** [1] - 17:2
**administered** [2] - 32:13, 96:25
**administration** [1] - 119:7
**Admiral** [74] - 5:7, 8:3, 8:12, 11:14, 13:6, 13:25, 14:4, 14:14, 15:3, 15:7, 15:18, 16:10, 17:19, 18:12, 18:17, 19:3, 19:4, 19:11, 19:13, 21:4, 21:10, 21:19, 22:1, 22:5, 22:18, 25:23, 26:8, 26:11, 26:16, 26:23, 27:12, 27:18, 27:22, 28:4, 28:7, 28:17, 31:10, 31:15, 31:16, 31:17, 31:21, 34:5, 41:7, 41:16, 45:1, 46:2, 57:25, 62:5, 80:5, 80:9, 80:11, 80:21, 80:22, 81:7, 82:8, 82:11, 85:9, 85:13, 85:19, 85:20, 85:23, 86:2, 86:7, 94:6, 94:9, 112:25, 116:2, 125:20, 126:4, 127:18, 127:20, 128:8
**admiral** [2] - 93:2, 111:13
**Admirals** [1] - 118:1
**admissibility** [1] - 113:11
**admissible** [1] - 42:24
**admit** [14] - 3:12, 40:13, 42:14, 43:5, 53:16, 62:11, 67:15, 71:21, 101:8, 112:10, 117:5, 124:12, 129:1, 129:2
**ADMITTED** [1] - 2:10
**admitted** [14] - 40:25, 41:23, 42:2, 43:9, 50:12, 53:23, 62:16, 67:20, 100:3, 101:17, 113:24, 117:10, 128:22,

128:24
**admitting** [4] - 40:22, 42:23, 113:21, 129:10
**advantage** [1] - 120:23
**advertise** [1] - 8:25
**advertisement** [1] - 9:10
**advice** [5] - 8:5, 18:17, 19:4, 19:7, 19:11
**advise** [3] - 21:23, 43:25, 93:7
**affairs** [1] - 39:24
**affects** [1] - 122:3
**affidavit** [1] - 103:23
**affiliations** [1] - 123:14
**Afghanistan** [1] - 22:6
**afraid** [2] - 61:2, 61:4
**Africa** [6] - 18:11, 19:16, 20:3, 20:6, 33:12, 111:9
**Afternoon** [1] - 1:9
**afternoon** [10] - 5:5, 5:6, 18:9, 32:17, 32:19, 68:2, 74:6, 74:7, 96:23, 97:4
**afterthought** [1] - 47:25
**afterwards** [1] - 66:25
**agencies** [1] - 105:16
**agency** [1] - 123:12
**Agent** [15] - 97:4, 100:6, 101:19, 107:7, 107:13, 112:8, 117:2, 117:12, 118:18, 119:19, 120:15, 122:12, 123:21, 124:9, 124:24
**agent** [6] - 97:9, 97:15, 97:19, 98:5, 98:23, 103:22
**agent's** [1] - 107:5
**agents** [5] - 98:13, 98:21, 98:24, 102:15, 105:11
**aggressive** [3] - 57:13, 57:15, 86:3
**agree** [4] - 42:10, 57:15, 128:14, 129:4
**agreed** [2] - 15:18, 72:11
**agreed-upon** [1] - 72:11
**agreement** [2] - 121:4, 121:9

**agreements** [1] - 122:6
**ahead** [2] - 50:13, 125:24
**aides** [2] - 119:10, 119:11
**Air** [1] - 33:3
**all-hands** [1] - 80:16
**allegations** [3] - 98:7, 98:17, 103:8
**alleged** [1] - 99:11
**alleges** [1] - 127:23
**allotted** [1] - 60:11
**allow** [2] - 77:3, 77:6
**allowed** [1] - 64:17
**allows** [2] - 46:6, 64:12
**almost** [3] - 47:25, 70:10, 88:1
**alternate** [1] - 93:10
**alternates** [1] - 93:9
**AMANDA** [3] - 2:5, 32:14, 32:19
**Amanda** [4] - 3:19, 31:3, 32:19, 43:22
**Amanda.kraus@eu** **.navy.mil** [1] - 43:18
**Amanda/Ray** [1] - 64:11
**ambiguity** [1] - 29:21
**AMERICA** [1] - 1:3
**amount** [1] - 6:2
**analyst** [1] - 33:17
**analysts** [1] - 95:22
**animus** [1] - 26:16
**annotated** [1] - 90:3
**announced** [1] - 48:8
**annual** [6] - 118:2, 118:13, 118:19, 119:14, 119:18, 119:20
**Annual** [1] - 119:3
**anonymous** [1] - 67:5
**answer** [2] - 12:19, 28:17
**answered** [1] - 24:19
**answers** [1] - 93:24
**ANTOINETTE** [1] - 1:20
**anyway** [1] - 127:8
**anyways** [1] - 61:1
**apologize** [2] - 12:14, 12:25
**app** [9] - 24:14, 47:15, 69:22, 71:10, 82:4, 83:11, 84:24, 102:9
**appear** [1] - 47:14

**appearance** [1] - 121:19
**application** [2] - 82:3, 82:19
**appreciate** [2] - 30:18, 32:6
**approach** [6] - 29:4, 31:6, 32:11, 40:20, 112:13, 115:9
**approaches** [1] - 84:23
**appropriate** [9] - 43:4, 49:4, 51:6, 61:8, 68:12, 73:10, 92:17, 92:20, 113:19
**apps** [4] - 69:20, 81:21, 82:8, 82:14
**April** [2] - 33:11, 126:16
**Arbinger** [2] - 56:24, 57:3
**area** [5] - 16:7, 20:13, 26:9, 99:1, 111:6
**areas** [1] - 19:19
**arguably** [1] - 127:5
**argue** [3] - 41:14, 129:1, 129:13
**argument** [5] - 41:9, 41:12, 113:10, 113:18, 116:23
**argumentative** [1] - 14:3
**Army** [2] - 33:3, 35:2
**arrest** [1] - 99:4
**arrived** [1] - 83:4
**ascertain** [1] - 67:3
**aside** [1] - 84:23
**assessment** [4] - 82:2, 82:3, 89:25, 92:1
**Assessment** [1] - 89:20
**assigned** [4] - 87:16, 97:21, 98:6, 98:13
**assume** [1] - 66:2
**attach** [2] - 70:22, 118:14
**attached** [3] - 46:4, 118:1, 118:12
**attachments** [2] - 46:17, 47:7
**attend** [2] - 24:3, 66:22
**attended** [2] - 66:23, 67:1
**attention** [1] - 124:18
**attorney** [3] - 54:3, 73:6, 74:11
**Attorney** [1] - 1:13

**attorneys** [1] - 57:11
**audience** [1] - 16:21
**audiences** [1] - 17:2
**Audit** [1] - 119:3
**authority** [2] - 19:16, 26:5
**authorized** [1] - 121:3
**authorizing** [2] - 121:9, 121:10
**available** [4] - 10:3, 64:14, 85:1, 95:11
**Avenue** [3] - 1:17, 1:20, 1:24
**avoid** [2] - 19:8, 121:18
**award** [1] - 121:9
**awarded** [4] - 55:14, 56:16, 65:11, 65:24
**aware** [4] - 6:2, 79:13, 83:17, 88:20

**B**

**back-and-forth** [1] - 28:10
**background** [2] - 84:14, 126:1
**backing** [1] - 115:8
**backwards** [1] - 59:18
**balance** [1] - 60:8
**balances** [2] - 36:24, 55:8
**based** [24] - 13:17, 13:18, 13:23, 13:24, 16:1, 17:1, 29:11, 31:22, 32:24, 48:20, 60:22, 69:11, 72:1, 74:22, 76:7, 76:10, 89:16, 93:7, 99:17, 109:5, 110:2, 111:10, 111:12, 111:23
**basing** [1] - 41:19
**basis** [2] - 40:22, 40:24
**basketball** [2] - 70:7, 70:11
**Bates** [1] - 4:4
**Bates-stamped** [1] - 4:4
**battalion** [1] - 79:21
**became** [2] - 25:7, 97:19, 111:2
**become** [1] - 34:16
**BEFORE** [1] - 1:10
**beg** [2] - 12:24, 16:23
**began** [6] - 33:2, 126:3, 126:17, 127:4,

127:23, 128:16
**Begin** [5] - 29:6, 31:7, 40:21, 49:12, 112:14
**begin** [5] - 18:9, 45:11, 53:1, 59:19
**beginning** [5] - 35:18, 110:14, 110:16, 110:23, 115:10
**begins** [4] - 31:4, 35:22, 39:7, 126:13
**behalf** [2] - 25:23, 65:8
**behind** [2] - 34:9, 86:8
**Belga** [1] - 128:8
**believes** [1] - 30:12
**Bello** [2] - 101:7, 101:22
**belonged** [1] - 114:8
**below** [2] - 43:23, 115:24
**bench** [10] - 29:6, 30:23, 31:7, 32:10, 40:21, 43:1, 49:12, 50:8, 112:14, 113:20
**benefit** [3] - 73:19, 73:20, 102:7
**best** [10] - 9:3, 20:1, 20:13, 38:15, 60:11, 71:12, 79:8, 93:3, 94:8, 116:3
**between** [9] - 24:5, 24:13, 41:6, 41:21, 65:20, 69:20, 84:10, 103:6, 123:13
**BEYLER** [2] - 2:3, 5:2
**Beyler** [16] - 4:20, 4:25, 5:5, 12:20, 17:6, 18:2, 18:9, 21:10, 23:13, 29:3, 30:24, 34:2, 57:18, 58:11, 81:6, 82:10
**Beyler's** [1] - 29:21
**beyond** [2] - 37:5, 61:18
**bias** [2] - 24:2, 27:10
**bid** [11] - 5:19, 6:23, 7:8, 7:11, 7:13, 20:10, 36:13, 38:3, 38:5, 38:10
**bidder** [1] - 7:24
**bidders** [1] - 122:10
**bidding** [1] - 37:25
**big** [1] - 112:23
**bind** [2] - 121:1, 121:3
**bit** [12] - 35:16,

45:19, 55:8, 63:15, 69:6, 79:15, 95:15, 97:22, 102:1, 102:13, 104:4, 110:21
**Biz** [8] - 99:19, 99:24, 100:17, 102:6, 102:7
**biz** [3] - 100:17, 100:23, 102:8
**black** [1] - 50:5
**Black's** [1] - 28:7
**block** [1] - 45:13
**Bob** [3] - 46:4, 115:7, 116:14
**bona** [2] - 37:18, 55:18
**booking** [2] - 30:3, 30:13
**books** [1] - 57:1
**boost** [1] - 128:12
**boss** [4] - 27:17, 28:5, 28:19, 28:20
**bottom** [10] - 42:21, 43:11, 43:12, 44:21, 45:21, 53:25, 57:11, 81:9, 114:3, 115:14
**bouncing** [1] - 32:4
**bound** [2] - 32:7, 123:22
**box** [2] - 65:17, 65:18
**branches** [1] - 33:1
**break** [9] - 50:13, 50:15, 74:8, 74:9, 74:23, 77:19, 77:20, 77:22, 124:17
**breakdown** [1] - 66:9
**breaking** [2] - 74:12, 74:15
**Brett** [5] - 114:24, 115:12, 115:22, 116:1, 116:18
**bribe** [1] - 126:22
**bribery** [1] - 128:6
**brief** [2] - 29:1, 119:18
**briefly** [2] - 50:10, 95:3
**bring** [13] - 13:20, 14:20, 29:17, 40:8, 53:11, 62:6, 67:8, 93:19, 100:2, 101:2, 106:13, 112:5, 116:20
**bringing** [1] - 52:6
**brings** [1] - 30:14
**broken** [1] - 66:10
**brought** [5] - 29:13, 59:2, 61:7, 83:12, 93:16
**bubble** [1] - 49:21

**bucket** [1] - 125:10
**buckets** [2] - 129:6, 129:12
**budget** [3] - 10:25, 11:1, 61:11
**budgetary** [1] - 46:9
**budgeted** [1] - 55:20
**build** [1] - 37:15
**building** [1] - 3:21
**bullet** [4] - 102:4, 119:13, 123:7, 123:10
**bullets** [1] - 121:25
**Burke** [78] - 5:7, 8:3, 8:12, 11:14, 13:6, 13:25, 14:4, 14:14, 15:3, 15:7, 15:18, 16:10, 18:12, 18:17, 19:3, 19:4, 19:11, 19:13, 21:4, 21:10, 21:19, 22:1, 25:23, 26:8, 26:11, 26:16, 26:23, 27:18, 28:4, 28:7, 28:17, 31:10, 31:15, 31:16, 31:17, 31:21, 34:5, 34:6, 34:11, 41:16, 45:1, 46:2, 57:25, 62:5, 80:9, 80:11, 80:21, 80:22, 81:7, 82:8, 82:11, 85:9, 85:13, 85:23, 86:2, 86:7, 94:6, 94:9, 98:14, 98:18, 100:25, 101:25, 104:8, 104:14, 107:15, 112:25, 114:13, 116:11, 117:15, 118:22, 125:20, 126:4, 127:9, 127:18, 127:20, 128:8, 128:25
**BURKE** [1] - 1:6
**Burke's** [7] - 22:5, 22:18, 41:7, 80:5, 85:19, 85:20, 116:2
**business** [14] - 60:20, 99:18, 99:19, 99:22, 100:1, 100:18, 104:3, 104:11, 121:18, 128:4, 128:10, 128:11, 128:12
**businesses** [4] - 100:15, 100:16, 100:19, 100:25
**busy** [1] - 28:2
**but..** [1] - 83:24
**BY** [75] - 1:9, 1:14, 1:16, 1:20, 2:2, 5:4, 7:7, 8:11, 12:7, 13:5, 13:15, 14:7, 14:25,

16:25, 17:16, 18:8, 21:11, 23:14, 23:22, 28:15, 32:16, 34:13, 40:10, 43:10, 48:19, 50:23, 51:19, 53:13, 53:24, 58:10, 58:18, 60:3, 62:3, 62:8, 62:17, 62:24, 67:10, 67:21, 69:2, 70:21, 71:18, 72:5, 72:16, 73:2, 74:5, 81:5, 81:24, 82:23, 89:2, 89:13, 94:13, 95:5, 97:3, 100:5, 100:13, 101:5, 101:18, 102:5, 102:12, 106:15, 107:6, 107:19, 108:5, 112:7, 114:1, 115:5, 117:1, 117:11, 118:17, 119:1, 119:23, 120:14, 121:21, 123:3, 124:8
**bypass** [1] - 55:15
**bypassed** [1] - 55:16

## C

**Cafe** [1] - 128:8
**CAG** [5] - 8:18, 8:20, 9:17, 18:21, 18:23
**calendar** [3] - 53:5, 119:15, 119:17
**calibrate** [1] - 118:5
**CALLED** [1] - 2:2
**cancel** [1] - 9:13
**Canedo** [2] - 89:5, 89:7
**capacity** [1] - 121:15
**captain** [1] - 68:6
**Captain** [3] - 27:23, 33:23, 43:13
**career** [1] - 33:2
**caring** [1] - 18:13
**CASE** [1] - 1:5
**case** [30] - 21:1, 35:23, 36:16, 37:19, 39:1, 39:6, 54:19, 56:9, 60:16, 63:18, 68:11, 72:10, 80:4, 90:6, 93:9, 98:13, 98:21, 98:23, 98:24, 102:15, 103:6, 103:10, 103:22, 104:5, 104:25, 105:5, 106:5, 124:22, 126:10, 126:11
**cases** [3] - 56:6, 103:4
**categories** [2] - 119:5, 119:24

**category** [1] - 121:25
**caused** [1] - 19:3
**caution** [1] - 120:22
**cautions** [1] - 57:13
**CCed** [1] - 57:7
**CCs** [2] - 114:15, 116:12
**cell** [1] - 104:20
**Center** [2] - 20:4, 54:5
**central** [3] - 107:14, 108:15, 108:18
**CEOs** [2] - 45:25, 100:7
**certain** [2] - 19:4, 94:4
**certainly** [8] - 11:3, 15:11, 16:4, 31:18, 41:13, 77:6, 78:13, 83:5
**CERTIFICATE** [1] - 130:1
**Certified** [1] - 1:23
**certify** [2] - 123:19, 130:3
**cetera** [1] - 102:9
**Chaclan** [1] - 4:17
**chain** [15] - 33:21, 34:2, 41:1, 68:10, 68:13, 78:23, 79:15, 80:25, 106:11, 107:22, 108:9, 109:2, 109:10, 109:12, 114:2
**chains** [1] - 106:9
**chance** [1] - 78:14
**change** [4] - 39:11, 46:7, 64:7, 96:10
**changes** [1] - 121:10
**changing** [1] - 121:4
**channel** [5] - 83:15, 83:17, 83:20, 84:5, 84:12
**chaplain** [1] - 85:15
**characterization** [1] - 18:11
**characterize** [1] - 22:12
**charge** [4] - 25:21, 82:17, 111:21, 113:1
**charged** [4] - 74:12, 125:19, 126:11, 126:12
**Charlie** [18] - 17:1, 17:19, 30:2, 30:12, 45:22, 46:13, 100:8, 104:7, 104:16, 114:5, 114:8, 114:23, 115:23, 125:10, 126:12, 126:20, 128:24

**Charlie/Meghan** [1] - 47:19

**Chavez** [2] - 101:7, 101:22

**Chavez-Bello** [2] - 101:7, 101:22

**check** [3] - 60:8, 101:13, 118:5

**checking** [1] - 83:23

**Checklist** [1] - 119:4

**checklist** [2] - 119:6, 119:25

**checks** [2] - 36:23, 55:8

**chief** [3] - 33:25, 110:24

**Chief** [3] - 111:2, 113:1, 117:23

**chosen** [1] - 38:10

**Christmas** [3] - 94:15, 94:22, 96:8

**chronologically** [1] - 109:24

**circumstance** [1] - 9:20

**City** [2] - 99:17, 115:16

**civilian** [5] - 32:22, 32:23, 33:3, 33:20, 46:24

**ckim@nextjump.com** [1] - 114:7

**clarify** [2] - 22:23, 96:10

**clarifying** [1] - 121:6

**class** [5] - 25:21, 68:20, 70:1, 70:13, 72:24

**classes** [1] - 95:15

**clear** [8] - 21:18, 22:14, 29:16, 29:19, 52:19, 65:10, 95:9, 129:5

**clearly** [1] - 127:14

**clients** [1] - 99:22

**closing** [1] - 30:21

**clothing** [1] - 34:8

**CNO's** [1] - 115:8

**co** [2] - 100:7, 125:9

**co-CEOs** [1] - 100:7

**co-conspirators'** [1] - 125:9

**cohesive** [1] - 99:5

**coins** [1] - 120:2

**collar** [1] - 103:4

**collected** [1] - 69:12

**collective** [1] - 13:18

**Columbia** [1] - 130:3

**COLUMBIA** [1] - 1:1

**COM** [12] - 15:7,

34:1, 43:24, 44:22, 44:25, 57:20, 57:24, 58:5, 61:23, 62:4, 94:3

**combined** [1] - 21:20

**comfortable** [1] - 14:10

**coming** [3] - 22:21, 44:15, 46:23

**Command** [4] - 19:22, 36:24, 36:25, 54:4

**command** [24] - 19:25, 20:7, 25:23, 33:21, 34:2, 46:7, 46:9, 52:4, 57:12, 61:9, 63:6, 63:19, 68:10, 70:2, 73:7, 78:4, 78:11, 79:9, 79:15, 80:25, 93:3, 94:5, 98:20, 120:2

**command's** [1] - 92:18

**commanded** [1] - 14:1

**Commander** [1] - 18:24

**commander** [24] - 19:1, 21:23, 22:5, 34:4, 39:21, 40:3, 49:7, 51:3, 51:10, 51:11, 51:14, 77:25, 78:3, 78:5, 78:10, 79:2, 79:4, 79:5, 79:7, 79:21, 79:23, 85:12, 85:22, 122:19

**commander's** [1] - 92:20

**commanders** [3] - 79:13, 79:14, 79:22

**commands** [4] - 10:22, 10:25, 20:2, 46:8

**commencement** [1] - 122:6

**comment** [1] - 41:13

**comments** [1] - 68:4

**Commitments** [1] - 120:24

**commitments** [1] - 121:1

**common** [9] - 49:7, 51:2, 51:5, 51:10, 51:14, 59:16, 59:18, 65:2, 68:18

**communicate** [1] - 118:8

**communicated** [2] - 104:20

**communicating** [2] -

19:9, 124:22

**Communications** [1] - 120:17

**communications** [3] - 104:21, 104:22, 105:20

**Community** [1] - 32:21

**companies** [2] - 38:2, 38:3

**company** [26] - 6:9, 34:14, 34:19, 38:10, 51:20, 52:10, 56:6, 56:7, 56:11, 56:16, 57:3, 60:5, 60:14, 63:10, 63:13, 63:17, 73:13, 78:5, 79:22, 85:23, 93:11, 98:18, 98:19, 99:17, 104:15, 120:23

**compare** [1] - 71:5

**compel** [1] - 102:20

**compete** [2] - 20:14, 26:5

**competition** [1] - 38:9

**competitive** [8] - 5:19, 6:23, 7:8, 7:11, 8:25, 20:10, 53:2, 120:22

**complain** [1] - 73:5

**complained** [1] - 73:5

**complaint** [1] - 73:3

**Complete** [1] - 123:8

**complete** [1] - 119:19

**completed** [4] - 15:2, 65:1, 78:16, 119:14

**completely** [2] - 30:9, 31:9

**Completeness** [1] - 123:15

**completing** [2] - 52:1, 52:9

**complex** [1] - 38:21

**complexity** [1] - 21:3

**comptroller** [1] - 81:10

**computer** [2] - 25:4, 25:6

**computers** [1] - 25:1

**concern** [1] - 53:1

**concerned** [1] - 46:19

**concerns** [4] - 49:2, 52:11, 58:4, 75:5

**concluded** [2] - 108:3, 129:19

**conclusions** [1] -

23:5

**concurring** [1] - 15:25

**conditionally** [1] - 42:14

**conduct** [6] - 61:8, 66:19, 118:2, 118:10, 118:13, 118:19

**Conduct** [2] - 117:4, 117:13

**conducted** [2] - 83:8, 83:10

**conducting** [2] - 39:8, 88:14

**Conference** [1] - 130:5

**conference** [10] - 29:6, 30:23, 31:7, 32:10, 40:21, 43:1, 49:12, 50:8, 112:14, 113:20

**confirm** [1] - 17:6

**conflict** [2] - 61:10, 120:6

**Conflicts** [1] - 121:12

**conflicts** [4] - 121:19, 123:12, 123:15, 124:2

**conformance** [1] - 130:4

**confront** [1] - 29:14

**confused** [2] - 45:10, 71:9

**confusing** [6] - 47:2, 47:12, 53:3, 88:6, 106:18

**confusion** [1] - 113:5

**Congress** [1] - 98:4

**connect** [1] - 115:15

**consider** [1] - 42:24

**considered** [2] - 48:1, 116:23

**considering** [1] - 25:19

**conspiracy** [15] - 126:3, 126:4, 126:8, 126:13, 126:17, 127:3, 127:6, 127:10, 127:23, 128:11, 128:16, 128:20, 128:25

**conspirators'** [1] - 125:9

**Constitution** [1] - 1:24

**contact** [2] - 57:10, 91:12, 92:14, 112:24, 113:3, 113:7, 116:4, 116:5, 127:12,

127:18, 127:19

**contacts** [1] - 122:10

**content** [3] - 69:20, 69:22, 124:25

**contents** [2] - 50:14, 123:17

**context** [4] - 17:11, 22:9, 24:18, 89:19

**continue** [5] - 14:18, 49:4, 67:2, 112:2, 124:19

**continuously** [1] - 118:5

**contract** [130] - 5:7, 5:18, 5:25, 6:13, 6:17, 7:19, 9:25, 10:3, 15:11, 18:10, 18:13, 20:10, 20:24, 21:1, 21:4, 22:11, 24:9, 25:7, 25:20, 31:14, 35:15, 35:17, 35:19, 35:21, 36:6, 36:14, 36:17, 36:18, 37:18, 38:13, 38:19, 38:25, 39:5, 39:14, 39:18, 39:24, 40:6, 41:4, 45:3, 45:8, 47:6, 48:22, 49:2, 51:15, 52:1, 52:2, 53:7, 54:23, 55:9, 55:14, 55:19, 55:21, 56:11, 56:14, 56:17, 56:24, 58:14, 59:6, 59:9, 60:24, 61:1, 61:12, 62:23, 62:25, 63:2, 63:4, 63:9, 63:16, 63:23, 64:6, 64:18, 64:24, 65:1, 65:3, 65:11, 65:14, 65:23, 66:16, 66:20, 72:11, 72:22, 72:23, 73:4, 73:9, 73:15, 73:17, 73:23, 73:24, 74:11, 74:13, 74:16, 74:17, 75:12, 76:13, 76:17, 77:7, 77:17, 81:14, 86:9, 87:9, 88:1, 88:5, 88:18, 89:15, 89:20, 91:1, 91:10, 92:3, 92:7, 92:8, 92:11, 92:13, 93:11, 96:4, 96:8, 96:11, 99:12, 110:6, 110:9, 110:15, 111:25, 112:18, 112:20, 121:9, 122:19, 122:24, 126:24, 127:2

**Contract** [1] - 91:18

**contract/ agreement** [1] -

121:10
**contracted** [3] - 35:13, 53:8, 63:17
**contracting** [43] - 7:1, 19:16, 20:14, 20:18, 34:21, 35:6, 35:7, 35:11, 37:1, 37:13, 37:24, 38:5, 38:7, 38:16, 45:17, 51:7, 52:5, 52:11, 54:6, 55:6, 56:4, 56:20, 57:13, 59:21, 73:13, 74:18, 75:13, 76:3, 76:4, 80:18, 84:22, 90:4, 90:7, 91:11, 92:10, 95:20, 95:24, 105:24, 105:25, 116:3, 121:2, 121:3
**contractor** [12] - 36:4, 36:13, 46:23, 49:8, 51:4, 51:12, 59:16, 65:6, 72:10, 89:23, 91:25, 92:21
**contractors** [5] - 7:13, 7:21, 17:13, 17:14, 121:6
**contracts** [26] - 20:14, 20:20, 35:1, 35:5, 40:1, 54:24, 56:5, 56:21, 60:4, 75:15, 75:20, 75:23, 76:11, 78:7, 89:17, 92:4, 95:7, 95:11, 95:22, 98:19, 100:25, 110:2, 111:19, 111:21, 111:24, 122:17
**contractual** [1] - 121:4
**conversation** [6] - 10:2, 17:11, 21:20, 21:21, 28:10, 28:11
**conversational** [1] - 22:2
**conversations** [2] - 27:14, 122:22
**conversion** [4] - 108:7, 108:20, 109:5, 109:17
**convert** [3] - 107:9, 107:20, 108:15
**converted** [3] - 106:10, 107:23, 108:6
**convincing** [1] - 116:24
**convoluted** [1] - 88:7
**coordinated** [2] - 106:12, 107:8
**coordinator** [1] -

79:3
**copied** [1] - 115:12
**copy** [2] - 57:19, 68:7
**Corps** [3] - 33:5, 33:6, 79:20
**correct** [70] - 4:1, 5:12, 5:13, 5:15, 5:19, 6:4, 6:10, 6:11, 6:24, 7:3, 7:9, 7:14, 7:15, 7:24, 8:5, 9:9, 10:22, 10:23, 11:11, 11:12, 11:18, 11:20, 12:4, 12:11, 13:17, 13:22, 14:1, 14:11, 15:12, 16:18, 16:19, 17:3, 17:24, 19:14, 23:7, 49:17, 63:12, 65:9, 65:13, 71:4, 73:10, 75:2, 76:3, 76:17, 76:18, 77:12, 78:9, 79:9, 79:10, 80:7, 80:16, 81:7, 81:14, 81:17, 81:19, 86:25, 87:11, 87:14, 88:20, 88:21, 88:23, 89:25, 90:3, 90:20, 92:5, 94:2, 109:3, 109:13, 109:22, 113:22
**corroborate** [1] - 103:8
**corruption** [7] - 97:12, 97:13, 97:14, 97:22, 97:25, 98:2, 98:6
**COS/DCOS** [1] - 57:21
**cost** [9] - 7:14, 36:2, 37:10, 37:12, 53:9, 66:8, 82:6, 87:6
**costing** [1] - 47:19
**couched** [1] - 17:5
**counsel** [1] - 48:25
**Counsel** [1] - 16:23
**counselor** [3] - 119:16, 122:5, 123:11
**couple** [10] - 4:4, 9:15, 14:13, 16:17, 21:12, 23:3, 50:25, 51:20, 109:25, 128:18
**course** [4] - 102:24, 120:25, 122:12, 123:9
**Court** [5] - 1:24, 3:1, 103:23, 130:2, 130:2
**court** [4] - 17:7, 17:14, 103:24, 113:13
**COURT** [91] - 1:1, 3:3, 3:8, 3:10, 3:15, 3:18, 3:20, 3:22, 4:7, 4:16, 4:20, 4:24, 7:6,

8:9, 12:6, 12:22, 13:1, 13:3, 14:5, 17:8, 18:4, 27:6, 27:11, 28:25, 29:2, 29:5, 30:18, 30:24, 31:2, 31:6, 31:11, 32:6, 32:11, 34:12, 40:20, 40:22, 41:8, 41:11, 41:24, 42:8, 42:10, 42:15, 42:22, 43:2, 43:7, 48:18, 49:11, 49:16, 49:18, 49:23, 50:7, 50:9, 50:21, 53:21, 58:9, 59:25, 60:2, 62:2, 62:14, 67:18, 71:23, 74:3, 89:12, 95:2, 96:17, 96:20, 96:23, 101:11, 101:16, 107:2, 112:13, 112:15, 112:22, 113:17, 113:21, 113:25, 116:22, 117:8, 124:16, 125:4, 125:7, 125:13, 126:6, 126:15, 127:3, 127:16, 127:21, 128:14, 129:4, 129:18, 130:9
**courtroom** [1] - 34:6
**covered** [1] - 125:13
**COVID** [1] - 128:6
**CPARS** [2] - 89:14, 89:17
**CR-15** [1] - 97:13
**crack** [1] - 20:24
**create** [3] - 35:14, 36:20, 87:13
**creating** [2] - 36:15, 74:13
**Creel** [1] - 50:5
**crew** [1] - 45:15
**crime** [2] - 103:25
**critical** [2] - 47:5, 61:7
**CRM** [1] - 1:16
**Cross** [2] - 2:3, 2:6
**cross** [9] - 3:16, 4:25, 21:13, 22:22, 25:16, 26:9, 29:12, 30:5, 30:8
**CROSS** [2] - 5:3, 74:4
**Cross-Examination** [2] - 2:3, 2:6
**cross-examination** [5] - 4:25, 21:13, 22:22, 25:16, 26:9
**CROSS-EXAMINATION** [2] -

5:3, 74:4
**cross-examine** [1] - 29:12
**CRR** [1] - 130:8
**CTFs** [1] - 10:25
**culture** [1] - 101:21
**Culture** [1] - 11:4
**current** [1] - 123:19
**curriculum** [5] - 51:25, 83:9, 84:13, 84:25, 93:15
**cut** [3] - 6:12, 30:7, 55:23

**D**

**D1** [1] - 106:14
**Daniel** [1] - 101:22
**Danny** [1] - 101:7
**Darrell** [6] - 115:1, 115:12, 115:19, 116:2, 116:7, 116:9
**data** [4] - 47:19, 52:7, 69:12, 71:13
**date** [10] - 13:12, 43:23, 44:8, 61:17, 90:15, 90:21, 91:16, 91:19, 117:20, 126:16
**Dated** [1] - 130:6
**dated** [3] - 48:5, 64:20, 91:4
**dates** [3] - 69:8, 78:17, 99:6
**DAY** [1] - 1:9
**daylight** [2] - 107:20, 107:24
**days** [10] - 9:14, 51:15, 55:11, 60:16, 60:17, 60:20, 69:7, 70:1, 70:3, 122:7
**DC** [5] - 1:11, 1:15, 1:17, 1:25, 111:6
**DCIS** [2] - 98:24, 105:12
**de** [1] - 61:10
**de-conflict** [1] - 61:10
**deadline** [7] - 22:15, 22:17, 22:19, 29:22, 44:10, 61:22, 61:24
**deal** [4] - 4:12, 47:24, 48:1, 98:3
**dealing** [1] - 14:17
**deals** [1] - 98:2
**dealt** [1] - 75:15
**December** [10] - 21:10, 22:16, 34:17, 40:6, 43:24, 44:9, 61:16, 73:18, 91:17, 110:12

**decide** [4] - 38:3, 79:8, 92:15, 92:25
**decides** [1] - 93:2
**deciding** [2] - 78:3, 94:7
**decision** [7] - 20:18, 21:23, 65:21, 90:19, 92:19, 92:20, 118:6
**decision-making** [2] - 65:21, 118:6
**declarant** [1] - 113:14
**Defendant** [3] - 1:7, 98:14, 98:18
**defendant** [24] - 22:10, 25:6, 34:11, 46:15, 47:17, 55:13, 58:21, 102:14, 110:21, 111:14, 111:16, 112:3, 116:17, 117:20, 118:12, 119:19, 120:10, 122:13, 123:21, 126:18, 126:19, 127:8, 127:12, 128:12
**DEFENDANT** [1] - 1:19
**defendant's** [5] - 45:3, 104:17, 111:18, 112:16, 117:22
**Defense** [1] - 105:14
**defense** [6] - 17:12, 17:14, 40:18, 128:14, 129:4
**definitely** [1] - 61:21
**delegated** [1] - 14:14
**deliberate** [1] - 107:4
**deliver** [1] - 36:4
**deliverable** [2] - 72:6, 72:12
**delivers** [1] - 72:10
**delivery** [1] - 87:6
**demonstrates** [1] - 126:21
**demonstrative** [2] - 106:20, 106:22
**Denese** [2] - 89:5, 89:7
**denying** [1] - 30:22
**DEOCS** [4] - 78:15, 78:18, 78:24, 79:3
**Department** [2] - 105:14, 105:17
**department** [4] - 39:2, 39:13, 39:15, 44:7
**department's** [1] - 47:24
**deputy** [2] - 33:23,

33:25
**derisive** [1] - 41:13
**describe** [3] - 97:22, 102:22, 104:4
**described** [1] - 19:19
**description** [1] - 9:11
**designate** [1] - 78:5
**designated** [1] - 123:12
**designed** [1] - 20:2
**desk** [1] - 68:7
**desperate** [1] - 46:18
**DESRON** [1] - 81:19
**detail** [9] - 7:25, 36:12, 55:7, 64:6, 97:23, 104:4, 110:22, 118:23, 123:17
**detailed** [3] - 37:16, 47:5, 95:18
**detailing** [4] - 72:13, 120:16, 121:22, 123:4
**details** [6] - 6:5, 35:23, 46:5, 47:2, 72:12, 83:6
**determination** [1] - 38:15
**determine** [3] - 37:9, 74:11, 103:24
**determined** [1] - 35:18
**DEV** [1] - 82:2
**development** [13] - 33:12, 33:17, 33:19, 39:18, 39:19, 46:25, 51:24, 67:3, 69:21, 85:7, 92:16, 93:12, 93:21
**devices** [2] - 104:7, 104:23
**dialing** [1] - 28:7
**differed** [1] - 84:23
**difference** [2] - 24:5, 24:13
**differences** [1] - 84:9
**different** [22] - 5:14, 7:13, 7:21, 7:23, 9:15, 10:22, 14:11, 14:13, 23:4, 30:17, 30:20, 76:10, 84:17, 89:3, 98:1, 99:18, 100:14, 102:20, 107:9, 113:2, 119:5, 128:21
**difficult** [2] - 37:15, 60:12
**diligence** [3] - 60:10, 60:13, 60:22
**Diplomate** [1] - 1:23
**direct** [20] - 4:3, 9:24, 17:21, 19:2,

21:24, 29:18, 30:1, 30:4, 30:6, 30:11, 30:17, 30:20, 32:2, 49:8, 50:14, 51:3, 60:15, 89:11, 121:16, 124:25
**DIRECT** [2] - 32:15, 97:2
**Direct** [2] - 2:5, 2:8
**directed** [5] - 3:11, 85:9, 85:13, 85:22, 85:24
**directly** [3] - 6:13, 6:19, 19:9, 40:2, 46:14, 59:13, 59:16, 59:23, 60:5, 80:10, 80:11, 105:8, 125:20
**director** [13] - 8:18, 8:21, 9:17, 18:21, 18:24, 27:24, 33:23, 33:24, 33:25, 34:3, 43:13, 80:20, 86:1
**directorate** [2] - 33:22, 39:23
**directorates** [1] - 45:14
**discern** [1] - 47:13
**disclaimer** [1] - 121:8
**Disclosure** [1] - 123:8
**disclosure** [5] - 120:4, 120:5, 120:9, 123:5, 123:18
**disclosures** [1] - 120:3
**discounts** [1] - 99:23
**discuss** [5] - 15:7, 31:5, 50:14, 118:24, 124:25
**discussed** [5] - 3:13, 11:13, 13:23, 15:23, 16:3
**discussion** [5] - 15:8, 16:1, 24:18, 52:7, 83:5
**discussions** [2] - 15:14, 46:11
**disqualify** [1] - 122:3
**disregard** [3] - 49:24, 50:1, 50:11
**dissatisfied** [1] - 71:8
**District** [2] - 130:2
**DISTRICT** [3] - 1:1, 1:1, 1:10
**disturb** [1] - 68:6
**division** [1] - 44:7
**DMV** [2] - 100:7, 111:6

**docs** [1] - 54:12
**document** [21] - 36:8, 36:10, 41:23, 50:12, 54:16, 65:19, 68:22, 69:3, 69:4, 69:9, 71:19, 71:20, 72:8, 72:9, 72:17, 86:15, 86:18, 91:22, 101:19, 101:20, 119:2
**documentation** [4] - 35:14, 48:7, 52:10, 68:24
**documents** [6] - 3:4, 47:10, 52:18, 57:12, 95:18, 102:20
**DoD** [3] - 79:11, 121:14, 121:18
**DOJ** [3] - 1:16, 12:13, 14:22
**DOJ-CRM** [1] - 1:16
**dollar** [1] - 7:23, 9:24
**dollars** [1] - 37:21
**DON** [1] - 123:19
**done** [20] - 5:15, 5:18, 9:15, 18:13, 47:24, 48:1, 55:24, 57:21, 58:1, 58:12, 58:22, 59:11, 59:15, 75:20, 76:22, 76:23, 78:8, 83:4, 90:6, 96:2
**double** [3] - 53:10, 72:23, 101:13
**double-check** [1] - 101:13
**down** [29] - 5:11, 7:1, 10:18, 13:3, 13:4, 13:14, 15:5, 23:21, 30:25, 32:4, 44:5, 44:18, 50:6, 51:17, 58:17, 66:10, 66:18, 73:1, 79:24, 79:25, 81:7, 81:9, 81:23, 82:14, 82:22, 96:18, 100:12, 102:11, 108:25
**draft** [4] - 11:10, 68:2, 68:8, 68:9
**drafted** [1] - 11:13
**dramatically** [1] - 53:4
**driven** [7] - 29:8, 29:11, 30:2, 30:7, 30:12, 30:14, 71:13
**driver** [1] - 22:18
**driving** [1] - 86:8
**drop** [3] - 126:23, 128:3, 128:5
**due** [5] - 43:23, 44:8, 60:10, 60:13, 60:22
**during** [4] - 4:3,

29:18, 33:10, 121:6
**duties** [2] - 98:5, 123:13
**duty** [3] - 33:6, 69:21, 120:20
**Duty** [1] - 121:24

**E**

**earliest** [1] - 114:2
**early** [10] - 4:17, 19:2, 21:15, 33:2, 46:17, 47:20, 80:2, 80:6, 109:6, 127:24
**easier** [2] - 103:19, 105:16
**eastern** [5] - 107:14, 107:20, 107:24, 108:6, 108:10
**ecommerce** [3] - 99:19, 100:17, 102:7
**ED** [1] - 57:10
**edition** [2] - 118:2, 118:13
**edits** [1] - 68:4
**educational** [1] - 84:14
**effect** [2] - 113:18, 121:16
**effort** [1] - 104:21
**eight** [8] - 75:18, 75:19, 75:20, 75:23, 76:11, 78:7, 95:9
**either** [3] - 35:3, 46:7, 126:13
**elicited** [1] - 29:18
**email** [96] - 11:10, 11:21, 12:20, 15:6, 16:1, 21:9, 21:18, 23:9, 23:13, 23:16, 34:17, 34:21, 40:11, 40:25, 41:20, 42:2, 42:13, 42:17, 43:11, 43:12, 43:15, 43:17, 43:19, 43:21, 45:20, 46:3, 46:14, 46:18, 47:16, 47:22, 48:9, 49:6, 51:1, 53:14, 53:25, 54:7, 54:10, 55:13, 57:6, 57:7, 57:11, 57:17, 62:18, 64:10, 67:11, 67:13, 67:22, 67:24, 67:25, 70:22, 82:10, 87:12, 101:7, 104:12, 106:7, 106:8, 106:9, 106:11, 107:22, 108:9, 109:1, 109:5, 109:10, 109:20, 109:21, 112:9, 112:17, 114:2,

114:5, 114:6, 114:13, 114:17, 115:6, 115:15, 116:7, 116:9, 116:12, 116:18, 117:2, 117:3, 117:12, 117:14, 117:17, 117:20, 117:24, 118:14, 124:9, 124:10, 126:21, 127:7, 127:13, 127:17, 129:7
**emails** [14] - 80:4, 104:2, 104:8, 106:5, 106:6, 106:10, 109:4, 109:11, 109:19, 116:11, 126:5, 127:20, 129:11, 129:14
**embarrassing** [2] - 70:1, 70:10
**embedded** [2] - 84:2, 84:7
**employee** [6] - 32:22, 32:23, 33:3, 62:20, 101:23, 102:7
**employees** [10] - 33:20, 41:6, 41:21, 59:8, 98:3, 98:9, 99:21, 99:22, 100:16, 101:21
**employer** [1] - 122:4
**employment** [6] - 121:23, 122:2, 122:6, 122:10, 122:23, 123:25
**End** [5] - 30:23, 32:10, 43:1, 50:8, 113:20
**end** [15] - 4:9, 7:23, 9:8, 15:1, 25:13, 28:10, 35:25, 71:10, 91:2, 91:20, 110:7, 110:19, 110:20, 115:11
**ended** [3] - 63:4, 66:24, 111:24
**engage** [1] - 125:23
**engagements/ support** [1] - 119:8
**engineer** [1] - 97:20
**English** [1] - 33:23
**enlisted** [3] - 79:18, 119:10, 119:11
**ensure** [5] - 20:15, 20:17, 20:20, 61:10, 120:22
**ensures** [1] - 38:8
**ensuring** [3] - 37:17, 37:20, 38:7
**entered** [1] - 126:19

entering [2] - 121:4, 128:25

enticing [1] - 31:25

entire [4] - 54:10, 60:21, 74:25, 77:21

entirely [1] - 128:3

entities [4] - 102:20, 102:22, 103:6, 119:9

entitled [1] - 130:4

entity [1] - 46:24

equitable [1] - 38:8

especially [1] - 70:11

essentially [6] - 12:9, 44:20, 63:6, 63:18, 64:8, 81:13

establish [1] - 63:20

establishes [1] - 65:19

estate [1] - 121:3

estimate [3] - 37:9, 37:12, 54:17

et [1] - 102:9

ETC [1] - 43:22

ethically [1] - 20:20

ethics [11] - 17:21, 35:8, 95:17, 118:4, 119:14, 119:16, 119:18, 122:5, 123:11, 123:12

Ethics [1] - 119:3

Europe [8] - 18:10, 19:15, 20:2, 20:6, 33:11, 94:5, 94:8, 111:9

European [4] - 64:9, 107:15, 108:15, 108:18

evals [1] - 102:9

evaluated [1] - 67:4

evaluation [2] - 68:3, 68:14

evaluations [9] - 68:11, 68:16, 68:19, 70:22, 70:25, 71:5, 71:7, 87:8, 88:12

evening [4] - 124:22, 124:23, 125:1, 129:15

event [2] - 66:11, 115:7

events [3] - 21:15, 47:20, 80:6

eventually [1] - 36:13

evidence [18] - 8:6, 10:8, 21:8, 41:1, 42:6, 42:19, 72:2, 103:25, 105:4, 105:8, 105:10, 107:3, 110:2, 111:23, 116:16, 122:13, 122:21, 129:1

exact [3] - 87:19, 90:15, 90:21

exactly [5] - 5:8, 44:20, 88:20, 95:15, 97:23

Examination [6] - 2:3, 2:4, 2:5, 2:6, 2:6, 2:8

examination [11] - 4:25, 21:13, 22:22, 25:16, 26:9, 29:19, 30:1, 30:4, 30:6, 30:11, 32:2

EXAMINATION [6] - 5:3, 18:7, 32:15, 74:4, 95:4, 97:2

examine [2] - 29:12, 29:24

example [7] - 5:14, 7:16, 8:17, 18:21, 31:23, 81:3, 118:6

exceed [1] - 118:9

exceeded [1] - 122:18

Excellence [1] - 11:4

except [1] - 115:11

exceptional [1] - 118:10

excerpt [1] - 3:12

exchange [2] - 94:15, 98:19

exchanged [1] - 100:25

excited [2] - 46:12, 115:8

exclusively [1] - 88:2

excuse [2] - 38:3, 44:7

excused [2] - 31:1, 96:19

execute [6] - 24:6, 103:14, 104:10, 104:13, 104:18, 104:25

executed [9] - 63:3, 64:11, 66:14, 99:3, 104:1, 104:5, 104:6, 104:22, 105:5

execution [1] - 24:10

executive [4] - 33:25, 34:3, 80:20, 85:25

exercise [1] - 120:21

exercises [1] - 22:6

exhibit [21] - 3:23, 51:17, 58:17, 66:18, 68:21, 73:1, 87:23, 102:1, 102:11, 107:17, 108:3, 108:14, 108:25,

113:11, 115:3, 116:24, 117:19, 118:16, 123:2, 125:4, 128:22

Exhibit [38] - 11:10, 11:21, 14:8, 21:7, 23:12, 40:9, 40:14, 43:5, 43:9, 50:25, 53:12, 53:17, 53:23, 62:7, 62:12, 62:16, 67:9, 67:16, 67:20, 71:17, 71:22, 81:25, 86:16, 87:9, 100:3, 101:3, 101:17, 106:14, 112:6, 112:11, 113:21, 113:24, 116:21, 117:6, 117:10, 124:7, 124:13, 125:6

EXHIBITS [1] - 2:9

exhibits [3] - 3:25, 4:2, 4:6, 4:10, 4:13, 100:6, 100:12

exist [1] - 123:13

existed [2] - 29:22, 59:6

existence [1] - 63:4

existing [10] - 5:25, 61:10, 62:23, 62:25, 63:9, 64:2, 76:17, 77:7, 77:17, 121:10

expect [1] - 4:2

expectation [1] - 118:9

expected [1] - 83:25

expecting [5] - 3:16, 3:24, 4:5, 44:16, 129:6

expensive [1] - 61:11

experience [21] - 26:11, 34:25, 35:3, 39:20, 40:1, 49:6, 51:2, 51:10, 51:14, 56:20, 67:2, 74:20, 75:11, 75:12, 75:14, 75:21, 76:11, 78:2, 89:16, 95:21, 96:4

experienced [1] - 38:23

experiencing [1] - 126:23

expertise [1] - 93:8

explain [1] - 63:15

explained [1] - 18:17

explored [1] - 25:17

extension [1] - 15:12

extensive [1] - 35:8, 36:23

extent [3] - 3:11,

31:19, 32:3

extremely [2] - 60:12, 88:6

F

facilitators [1] - 69:18

facing [1] - 56:5

fact [13] - 13:6, 30:7, 39:17, 41:15, 51:5, 56:25, 67:3, 73:20, 74:25, 77:10, 80:15, 118:14, 128:4

factor [1] - 5:17

factors [1] - 36:2

facts [1] - 8:6

factually [1] - 128:21

failing [1] - 128:11

failure [1] - 88:17

fair [4] - 37:10, 38:8, 38:9, 55:9

fairly [4] - 7:22, 46:10, 90:16, 115:11

fairness [1] - 30:15

fall [1] - 110:8

falls [1] - 125:9

false [1] - 31:22

familiar [12] - 25:4, 34:14, 34:16, 51:21, 52:14, 74:18, 74:20, 86:25, 89:21, 95:19, 99:14, 118:2

family [1] - 121:17

fan [2] - 4:10, 22:23, 23:9

far [5] - 45:17, 56:5, 72:24, 76:7, 88:20

farce [1] - 73:22

FBI [2] - 97:9, 97:11

February [3] - 67:25, 90:18, 90:22

Federal [1] - 130:2

FEDERAL [1] - 130:9

federal [10] - 1:24, 32:23, 59:8, 62:20, 97:14, 98:2, 98:3, 98:8, 102:18

feedback [8] - 11:8, 13:6, 15:21, 55:5, 69:24, 69:25, 70:17, 102:9

Feemster [2] - 62:19, 62:20

felt [7] - 45:11, 70:10, 70:14, 72:24, 73:9, 73:11, 77:14

few [2] - 22:22, 38:1, 58:19, 93:25, 115:16, 118:24

fide [2] - 37:18, 55:18

field [2] - 97:9, 97:24

FIFIELD [1] - 1:16

figure [4] - 7:23, 28:12, 50:1, 87:2

figured [1] - 5:11

figures [1] - 87:19

file [1] - 73:3

filed [1] - 120:5

files [1] - 46:4

filings [1] - 123:19

fill [2] - 68:18, 120:10

filled [4] - 68:14, 68:16, 70:22, 88:22

filled-out [1] - 70:22

final [8] - 16:7, 26:9, 38:12, 88:23, 90:9, 90:23, 91:22, 94:14

finalizing [1] - 61:12

Finally [1] - 54:10

finally [1] - 54:12

financial [12] - 102:24, 103:2, 103:3, 120:3, 120:4, 120:5, 120:9, 121:16, 122:4, 123:5, 123:14, 123:18

fine [4] - 4:10, 17:23, 77:15

finish [2] - 35:4, 38:18

firm [1] - 65:19

first [31] - 9:9, 16:17, 24:8, 26:16, 29:17, 29:24, 44:2, 45:7, 45:21, 45:22, 51:2, 51:13, 51:16, 62:18, 65:4, 69:5, 102:4, 104:9, 107:7, 109:25, 110:6, 110:23, 111:19, 111:23, 115:6, 117:25, 119:13, 123:7, 123:10, 128:2

five [3] - 9:17, 54:17, 108:8

fix [1] - 79:8

fixed [1] - 65:19

flag [4] - 17:15, 17:20, 93:7, 119:14

flags [2] - 46:20, 95:17

FLC [2] - 57:11, 57:12

Fleet [5] - 19:22, 20:4, 33:12, 36:25, 54:4

flexible [2] - 115:11, 115:24

Floor [1] - 1:20

**fly** [1] - 4:10
**focus** [9] - 33:9, 34:20, 40:5, 50:12, 53:25, 57:17, 99:6, 100:19, 100:24
**focused** [3] - 60:18, 99:8, 99:24
**focuses** [2] - 98:17, 99:20
**focusing** [2] - 35:10, 110:6
**folks** [6] - 25:20, 54:13, 70:3, 91:11, 124:23, 129:15
**follow** [10] - 8:5, 8:14, 19:13, 45:16, 52:13, 74:21, 76:15, 76:16, 115:19, 121:7
**follow-up** [1] - 121:7
**followed** [9] - 8:5, 18:17, 19:8, 52:13, 60:9, 76:8, 76:12, 76:14, 77:24
**following** [4] - 22:17, 35:4, 54:12, 109:11
**FOR** [3] - 1:1, 1:13, 1:19
**FORAC** [2] - 44:2
**Force** [1] - 33:3
**force** [2] - 86:8, 118:11
**forces** [1] - 11:4
**Forces** [3] - 33:11, 94:5, 94:8
**forcing** [1] - 61:22
**foregoing** [1] - 130:3
**forgot** [1] - 87:25
**form** [8] - 54:18, 54:19, 68:23, 72:6, 86:23, 86:25, 87:2, 120:9
**Form** [3] - 120:6, 120:8, 123:5
**format** [2] - 106:7, 130:4
**formed** [1] - 127:9
**forming** [2] - 40:23, 41:2
**forms** [4] - 120:5, 120:8, 120:11, 124:4
**forth** [6] - 15:16, 28:10, 41:5, 41:21, 55:7, 102:1
**forward** [11] - 12:11, 13:8, 13:17, 14:1, 15:25, 51:11, 54:15, 58:22, 61:1, 64:15, 94:1
**Forward** [1] - 43:20
**forwarded** [5] - 12:8,

13:7, 15:22, 112:18, 127:13
**forwards** [1] - 116:8
**foundation** [4] - 8:8, 12:20, 113:6, 127:11
**four** [12] - 13:20, 13:23, 13:24, 25:9, 26:11, 26:22, 27:7, 31:23, 54:17, 107:21, 111:13
**four-star** [1] - 111:13
**Foxx** [4] - 54:1, 54:2, 54:3, 54:21
**frankly** [1] - 47:11
**free** [4] - 25:21, 31:25, 32:1, 96:18
**frequently** [1] - 79:20
**Friday** [4] - 44:11, 64:14, 115:12, 115:25
**front** [1] - 24:23
**fruits** [1] - 103:25
**frustrated** [1] - 45:12
**fulfill** [1] - 21:5
**full** [1] - 70:3
**fully** [1] - 64:11
**function** [1] - 37:1
**functions** [1] - 58:1
**funding** [3] - 54:15, 59:9, 63:7
**funds** [1] - 120:2
**furthering** [1] - 98:22
**furthermore** [1] - 128:22
**fuzzy** [1] - 15:9
**FYI** [1] - 57:10

## G

**G-a-r-d-n-e-r** [1] - 97:7
**gamut** [1] - 98:12
**gap** [1] - 39:8
**Gardner** [17] - 96:22, 97:4, 97:6, 100:6, 101:19, 107:7, 107:13, 112:8, 117:2, 117:12, 118:18, 119:19, 120:15, 122:12, 123:21, 124:9, 124:24
**GARDNER** [2] - 2:7, 97:1
**gathered** [1] - 52:8
**General** [1] - 120:18
**general** [8] - 17:13, 35:9, 45:2, 49:2, 56:4, 69:24, 73:7, 95:17
**generally** [6] - 18:13, 38:25, 67:4, 71:8,

80:14, 106:7
**gentleman** [1] - 34:9
**gentlemen** [6] - 4:24, 50:9, 50:16, 50:21, 107:3, 124:17
**geographically** [1] - 99:1
**Geurts** [1] - 115:15
**gift** [8] - 25:17, 25:18, 25:22, 25:23, 25:25, 26:2, 26:4, 26:7
**gifts** [2] - 31:25, 120:3
**given** [4] - 22:13, 36:13, 47:4, 116:2
**glossary** [1] - 101:20
**Gmail** [3] - 104:8, 104:14, 104:15
**go-ahead** [1] - 125:24
**goal** [2] - 87:13, 87:15
**Goal** [1] - 123:8
**goods** [1] - 90:11
**Google** [2] - 104:13, 104:14
**Government** [23] - 40:9, 40:14, 43:5, 50:25, 53:12, 53:16, 53:17, 55:19, 62:7, 62:12, 67:9, 67:16, 71:17, 71:22, 101:3, 106:14, 112:6, 112:11, 117:6, 124:7, 124:13, 125:6
**government** [48] - 3:11, 3:18, 25:24, 31:2, 31:3, 35:1, 35:6, 35:23, 36:3, 37:11, 37:20, 38:9, 38:16, 40:1, 40:13, 54:17, 54:24, 59:19, 60:4, 62:11, 63:18, 66:15, 67:15, 71:21, 73:12, 73:14, 75:13, 82:6, 87:7, 88:13, 88:15, 88:16, 89:17, 89:22, 96:20, 99:21, 101:8, 106:24, 112:10, 113:5, 117:5, 119:9, 121:2, 121:3, 121:23, 124:12, 127:23, 129:12
**GOVERNMENT** [5] - 1:13, 2:2, 5:2, 32:14, 97:1
**government's** [6] - 36:5, 37:8, 113:18, 125:9, 126:3, 128:15

**GOVERNMENT'S** [1] - 2:10
**Government's** [4] - 10:8, 81:25, 100:3, 116:21
**governmental** [1] - 54:18
**GOVX** [1] - 99:21
**GPS** [2] - 82:2
**grand** [10] - 30:9, 42:5, 65:23, 102:15, 102:17, 102:18, 102:23, 103:3, 103:9
**grateful** [1] - 11:24
**gray** [1] - 34:9
**great** [4] - 70:3, 115:7, 115:17, 124:22
**greater** [1] - 122:9
**grounds** [3] - 40:19, 41:23, 42:11
**group** [3] - 31:18, 54:6, 87:25
**Group** [2] - 1:19, 18:24
**groups** [1] - 81:17
**GS-13** [1] - 92:25
**guess** [4] - 3:5, 6:16, 28:11, 49:20
**Guidance** [2] - 117:4, 117:13
**guidance** [6] - 118:2, 118:7, 118:13, 118:20, 129:9
**guys** [1] - 28:8

## H

**half** [1] - 24:8
**hand** [1] - 23:17
**handle** [1] - 98:25
**hands** [1] - 80:16
**happy** [1] - 42:24
**hard** [5] - 14:9, 15:6, 15:17, 45:16, 68:7
**header** [1] - 12:24
**heading** [1] - 114:3
**hear** [6] - 11:16, 27:19, 28:17, 115:8, 116:15, 127:20
**heard** [6] - 21:25, 23:24, 27:11, 31:17, 80:15, 128:2
**hearsay** [23] - 12:5, 17:5, 27:9, 32:7, 40:18, 41:5, 41:8, 41:17, 41:18, 41:22, 42:10, 42:11, 42:15, 48:17, 58:7, 112:12, 112:15, 113:12, 124:14, 125:7,

128:17, 129:2
**heart** [2] - 19:4, 23:8
**held** [2] - 71:6, 71:11
**help** [8] - 14:20, 45:15, 59:11, 106:18, 106:20, 106:22, 123:11, 128:12
**helps** [1] - 106:19
**hereby** [1] - 130:3
**hi** [1] - 115:22
**high** [1] - 70:2
**higher** [1] - 79:14
**highlight** [1] - 21:9
**highlighted** [1] - 14:23
**highlights** [3] - 41:1, 69:8, 71:2
**Highlights** [2] - 69:13, 69:14
**hinges** [1] - 103:5
**hire** [3] - 8:17, 8:20, 8:21
**history** [2] - 22:13, 60:4
**hold** [2] - 42:8, 56:25
**holiday** [2] - 61:20, 116:5
**holidays** [3] - 45:13, 45:15, 61:18
**honestly** [6] - 45:12, 56:15, 83:21, 84:8, 87:5, 89:18
**Honor** [34] - 3:6, 3:19, 4:1, 31:4, 32:9, 49:10, 53:18, 71:24, 72:1, 72:4, 89:10, 95:3, 96:21, 101:13, 101:15, 107:1, 112:12, 112:23, 113:23, 116:25, 117:7, 124:14, 124:15, 125:2, 125:6, 125:8, 125:15, 126:10, 127:6, 127:17, 128:1, 128:18, 129:16, 129:17
**HONORABLE** [1] - 1:10
**Hooker** [2] - 83:8, 83:25
**hope** [2] - 106:23, 115:22
**hopefully** [1] - 106:19
**hoping** [2] - 115:8, 115:12
**hotels** [1] - 103:1
**hour** [1] - 108:19
**hours** [8] - 46:17,

60:16, 61:19, 83:18, 107:21, 108:8, 108:17
**HR** [5] - 99:25, 100:18, 102:8, 110:25, 111:2
**hundreds** [1] - 83:18

## I

**idea** [11] - 24:5, 24:6, 44:15, 85:12, 85:23, 86:8, 86:13, 88:4, 88:11, 92:12, 92:15
**ideally** [1] - 115:13
**ideas** [4] - 23:18, 23:23, 24:1, 24:3
**ideation** [1] - 24:11
**identified** [1] - 34:11
**identifies** [1] - 39:4
**identify** [4] - 24:11, 34:8, 36:5, 123:12
**identifying** [3] - 39:8, 59:20, 70:7
**iflex** [1] - 115:7
**IG** [6] - 29:10, 29:15, 30:10, 31:8, 31:24, 32:6
**IGE** [1] - 54:17
**IGF** [1] - 54:18
**imagine** [1] - 54:13
**immediate** [1] - 64:19
**immediately** [4] - 48:10, 50:6, 64:20, 127:13
**impact** [2] - 61:20, 96:14
**impacted** [1] - 53:4
**impartiality** [1] - 120:18
**impartially** [1] - 120:20
**implement** [2] - 73:17, 73:23
**important** [2] - 38:5, 118:3
**impression** [9] - 41:2, 44:9, 46:14, 47:22, 52:15, 52:25, 69:24, 72:22, 73:18
**impressions** [2] - 26:23, 47:10
**improvement** [1] - 68:5
**imputed** [1] - 121:17
**in-person** [1] - 119:16
**inadmissible** [4] - 31:9, 42:25, 128:17, 129:5

**inappropriate** [1] - 48:1
**inbox** [1] - 109:20
**Inc** [1] - 65:20
**include** [4] - 55:21, 119:10, 120:6, 123:24
**includes** [1] - 98:10
**including** [3] - 46:5, 97:17, 102:8
**inclusion** [1] - 47:24
**inconsistent** [2] - 29:15, 30:9
**independent** [1] - 103:24
**indictment** [4] - 126:13, 127:22, 128:16, 128:21
**individuals** [3] - 102:21, 102:22, 104:19
**Industry** [1] - 120:17
**ineffective** [1] - 69:18
**influence** [1] - 118:6
**information** [29] - 35:20, 36:8, 36:21, 37:19, 41:22, 43:23, 44:18, 45:11, 46:18, 46:23, 47:5, 48:12, 48:13, 49:3, 55:9, 59:3, 61:7, 64:2, 68:9, 69:6, 69:11, 78:22, 88:7, 91:14, 103:18, 121:7, 123:16, 125:11, 126:22
**informational** [1] - 121:5
**informed** [2] - 15:3, 116:16
**inherently** [1] - 54:18
**initial** [2] - 9:10, 52:7
**initiated** [3] - 53:5, 64:23, 93:11
**initiating** [1] - 36:10, 64:22
**input** [3] - 59:15, 92:23, 95:25
**inputs** [1] - 46:7
**inroad** [1] - 128:12
**inspector** [1] - 73:7
**instance** [3] - 55:4, 56:7, 104:2
**institutions** [4] - 102:24, 102:25, 103:2, 103:3
**instruct** [1] - 50:11
**instructions** [1] - 48:15
**integrally** [1] - 95:19
**integrity** [1] - 118:11

**intelligence** [1] - 27:25
**intend** [1] - 4:15
**intended** [2] - 32:3, 129:9
**intent** [1] - 4:6
**intentional** [2] - 49:13, 49:19
**interest** [5] - 121:5, 121:17, 121:19, 123:13, 124:2
**Interest** [1] - 121:12
**interested** [1] - 38:2
**interesting** [1] - 27:15
**interests** [2] - 122:4, 123:14
**intermediaries** [1] - 81:2
**interpret** [2] - 58:13, 113:13
**interpreted** [1] - 58:14
**interrupt** [2] - 3:6, 52:21
**interviews** [4] - 32:4, 97:17, 98:11, 99:3
**introduce** [3] - 3:24, 4:2, 4:6
**introducing** [1] - 4:9
**intrusive** [1] - 103:20
**invasive** [1] - 103:20
**invent** [1] - 113:15
**investigate** [1] - 98:7
**investigated** [1] - 74:15
**investigating** [2] - 98:16, 124:21
**investigation** [16] - 98:14, 98:17, 98:22, 99:7, 99:8, 99:24, 100:20, 100:24, 102:13, 102:14, 102:19, 103:13, 104:19, 107:12, 109:23, 122:12
**investigations** [1] - 98:3
**investigative** [4] - 97:16, 98:12, 99:2, 105:12
**investment** [1] - 118:4
**investor** [1] - 126:22
**Investor** [1] - 124:11
**investors** [2] - 125:11, 127:1
**invitation** [1] - 23:24
**invoice** [8] - 72:7, 88:23, 90:9, 90:11,

90:13, 90:23, 90:24, 91:15
**invoices** [1] - 89:23
**involve** [1] - 63:9
**involved** [17] - 6:9, 25:17, 34:21, 38:13, 52:5, 55:3, 57:3, 75:1, 76:1, 76:5, 78:3, 95:23, 103:6, 122:8, 122:13, 122:16, 125:21
**involvement** [2] - 111:18, 122:23
**involving** [1] - 98:14
**iPads** [1] - 32:1
**issue** [7] - 3:3, 25:18, 29:12, 49:20, 102:15, 103:2, 103:13
**issued** [3] - 102:18, 102:23, 120:7
**issues** [2] - 31:5, 113:5
**Italy** [5] - 66:12, 67:6, 107:16, 111:11, 111:12
**item** [2] - 82:1, 82:18
**items** [1] - 37:3
**itself** [1] - 66:13

## J

**Jan** [3] - 43:24, 44:23, 47:21
**January** [9] - 15:2, 15:21, 21:15, 22:17, 58:15, 64:20, 80:7, 90:16, 91:19
**Jeannie** [1] - 33:23
**Job** [1] - 121:24
**job** [10] - 9:11, 20:5, 61:4, 78:24, 83:9, 98:18, 99:12, 101:1, 112:25, 113:1
**Johansmeier** [7] - 48:23, 48:24, 59:3, 73:6, 75:2, 75:9, 77:11
**Johansmeier's** [1] - 57:7
**join** [1] - 127:10
**joined** [1] - 126:9
**joining** [1] - 34:25
**jointly** [1] - 126:11
**JUDGE** [1] - 1:10
**Judge** [3] - 4:11, 4:21, 27:10
**Judicial** [1] - 130:5
**Juliet** [3] - 34:2, 47:18, 57:18
**JULIET** [2] - 2:3, 5:2

**July** [1] - 111:15
**Jump** [119] - 5:8, 5:18, 6:13, 7:17, 10:4, 10:13, 12:1, 12:3, 12:9, 13:8, 13:16, 13:19, 14:17, 16:8, 16:15, 16:20, 17:1, 17:3, 17:17, 18:10, 18:13, 22:19, 22:23, 23:9, 23:25, 24:10, 24:14, 25:7, 25:11, 25:20, 31:25, 34:14, 34:16, 34:19, 36:18, 39:14, 40:6, 45:25, 52:22, 52:24, 53:7, 54:22, 55:15, 56:14, 56:18, 59:9, 59:13, 59:15, 59:23, 60:10, 60:23, 60:24, 61:13, 61:23, 62:23, 63:11, 63:16, 63:21, 63:23, 64:4, 64:8, 64:17, 64:21, 65:7, 65:11, 66:4, 66:16, 66:19, 66:24, 68:3, 71:7, 73:4, 73:17, 73:24, 73:25, 82:24, 83:17, 84:7, 84:22, 84:25, 86:5, 86:7, 86:21, 87:3, 87:9, 87:18, 88:18, 90:20, 92:8, 94:15, 96:4, 96:8, 98:19, 99:14, 99:16, 99:17, 100:7, 100:9, 100:14, 100:15, 100:25, 101:21, 101:23, 102:25, 104:11, 105:3, 110:1, 110:3, 110:9, 110:15, 115:2, 116:3, 116:16, 122:14, 122:17, 122:23, 125:23, 125:25, 128:13
**Jump's** [8] - 52:15, 65:10, 67:4, 71:5, 83:7, 84:10, 111:19, 122:24
**JURY** [1] - 1:9
**Jury** [5] - 3:2, 4:23, 50:18, 50:20, 125:3
**jury** [27] - 4:18, 30:9, 40:14, 49:15, 49:23, 53:17, 53:22, 62:15, 67:16, 67:19, 71:22, 71:25, 85:21, 92:12, 101:12, 102:15, 102:17, 102:18, 102:23, 103:3, 103:10, 106:22, 106:25, 113:25,

117:9, 124:24
**Justice** [1] - 105:17
**justification** [6] -
54:20, 56:2, 56:10,
56:13, 56:21, 56:25

## K

**K-r-a-u-s** [1] - 32:19
**KATHRYN** [1] - 1:16
**keep** [2] - 32:8, 57:21
**keeping** [1] - 125:18
**kept** [1] - 127:8
**key** [1] - 38:7
**kickoff** [5] - 21:15,
47:20, 64:15, 66:11,
80:6
**Kim** [29] - 17:1, 17:7,
19:3, 19:9, 23:9, 30:2,
45:22, 100:8, 100:15,
104:7, 111:24, 112:2,
112:17, 112:18,
112:20, 114:5, 114:8,
114:23, 116:8,
116:10, 116:13,
122:22, 125:10,
126:12, 126:18,
126:20, 127:22,
128:24
**Kim's** [1] - 104:16
**Kimberly** [4] - 54:1,
54:2, 54:3, 54:21
**kind** [10] - 18:24,
28:9, 28:11, 31:20,
49:21, 97:25, 98:11,
99:1, 99:4, 99:12,
99:24, 99:25, 103:5,
103:8, 106:17,
106:19, 110:25,
111:1, 120:8, 125:17
**knowledge** [4] -
20:1, 20:13, 40:24,
55:18
**known** [1] - 107:8
**knows** [1] - 32:8
**KRAUS** [2] - 2:5,
32:14
**Kraus** [25] - 3:19,
31:3, 31:4, 32:17,
32:19, 32:20, 47:22,
48:20, 49:6, 50:14,
50:22, 51:2, 58:11,
62:9, 62:18, 64:10,
67:22, 72:6, 73:3,
73:11, 74:6, 81:6,
86:4, 95:6, 96:17

## L

**lack** [2] - 39:10, 49:3

**lacking** [1] - 61:7
**ladies** [6] - 4:24,
50:9, 50:16, 50:21,
107:3, 124:17
**laid** [1] - 8:8
**large** [2] - 31:18,
97:24
**larger** [2] - 20:7,
122:14
**last** [6] - 12:19,
29:23, 47:18, 115:10,
116:24, 121:12
**lastly** [1] - 115:15
**late** [3] - 91:15,
109:7, 110:4
**latest** [2] - 118:1,
118:12
**latitude** [1] - 4:7
**laughingly** [1] -
28:21
**launch** [1] - 47:1
**Law** [1] - 1:19
**law** [5] - 76:18, 77:3,
98:8, 123:18, 126:6
**laws** [8] - 74:8, 74:9,
74:12, 74:15, 74:18,
74:22, 74:23, 77:6
**lawyer** [6] - 75:1,
75:5, 75:7, 75:8, 76:1,
77:11
**lawyers** [4] - 7:2,
25:21, 77:15, 94:1
**lay** [1] - 113:6
**laying** [1] - 127:11
**layman's** [1] - 111:1
**lead** [3] - 48:24, 73:6,
118:7
**leader** [1] - 119:17
**leader-led** [1] -
119:17
**leaders** [5] - 79:24,
117:18, 118:1, 118:3,
125:22
**leadership** [16] -
13:20, 31:24, 39:18,
46:24, 51:24, 65:21,
70:8, 78:23, 83:12,
83:18, 85:6, 93:12,
93:21, 99:25, 100:18,
101:1
**leading** [1] - 24:9
**learned** [1] - 60:22
**learning** [3] - 67:3,
69:22, 84:13
**Learning** [2] - 59:7,
62:21
**leave** [5] - 27:21,
43:24, 44:23, 45:13,
119:8
**lectures** [1] - 83:18

**led** [1] - 119:17
**left** [5] - 10:3, 10:24,
50:24, 68:6, 100:8
**legal** [5] - 31:5,
37:12, 49:4, 94:2,
125:23
**legally** [1] - 20:21
**length** [1] - 81:17
**less** [2] - 60:20,
103:18
**letters** [1] - 120:7
**level** [8] - 7:25, 46:5,
46:8, 47:5, 68:10,
79:14, 79:25, 123:17
**license** [1] - 82:4
**licenses** [6] - 65:22,
81:21, 82:2, 82:9,
82:15, 82:19
**licensing** [1] - 82:3
**lie** [2] - 26:11, 26:19
**lift** [1] - 70:4
**likelihood** [1] - 92:8
**likely** [1] - 91:1
**limiting** [1] - 5:17
**line** [9] - 19:17,
43:15, 43:19, 43:20,
44:5, 82:18, 117:3,
117:12, 127:1
**Line** [1] - 124:11
**lines** [4] - 19:10,
97:18, 98:4, 98:10
**link** [3] - 67:7, 69:20,
83:20
**list** [4] - 3:23, 4:9,
54:25, 66:15
**listed** [5] - 43:23,
114:17, 114:24,
119:5, 119:24
**listen** [1] - 24:4
**lists** [1] - 57:11
**literally** [3] - 44:17,
47:11, 48:5
**LLP** [1] - 1:19
**locally** [1] - 99:1
**location** [1] - 27:13
**logged** [1] - 85:1
**Logistics** [4] - 19:22,
20:4, 36:25, 54:5
**long-term** [1] - 88:5
**look** [27] - 12:15,
21:7, 38:14, 43:11,
47:16, 57:7, 64:15,
65:17, 81:25, 83:14,
83:15, 83:25, 84:4,
84:11, 87:2, 87:19,
90:21, 90:24, 91:9,
91:18, 95:17, 102:3,
106:8, 106:9, 109:6,
109:17, 129:11
**looked** [5] - 7:3,

9:21, 76:10, 83:22,
102:24
**looking** [18] - 43:12,
45:21, 49:6, 54:25,
56:1, 62:18, 66:8,
69:4, 72:7, 72:12,
81:6, 84:11, 84:13,
89:3, 89:15, 106:11,
114:3, 121:24
**looks** [2] - 84:24,
91:17
**loop** [1] - 57:22
**lose** [1] - 61:4
**lower** [2] - 7:24,
103:19
**lowest** [1] - 79:25
**lunch** [1] - 13:24

## M

**ma'am** [3] - 5:1,
32:11, 125:7
**machinery** [1] - 21:5
**Madison** [1] - 1:20
**Management** [3] -
59:7, 62:21, 65:20
**management** [2] -
33:17, 95:22
**managers** [1] - 45:14
**manages** [1] -
104:15
**manpower** [2] -
33:22, 43:13
**Marine** [4] - 33:5,
33:6, 79:18, 79:20
**marked** [11] - 10:7,
40:9, 53:12, 53:17,
62:7, 62:12, 67:9,
67:16, 71:17, 71:22,
101:3, 106:13,
112:11, 116:21,
117:6, 124:7, 124:13
**market** [2] - 54:16,
55:24
**marking** [1] - 4:10
**materials** [4] - 38:22,
56:8, 103:9
**matter** [4] - 17:9,
98:24, 121:15, 130:4
**McFADDEN** [1] -
1:10
**mean** [11] - 22:25,
58:11, 58:13, 58:14,
66:14, 66:16, 88:1,
96:1, 109:5, 126:20,
128:10
**meaning** [6] - 15:7,
35:25, 69:16, 75:18,
86:11, 113:16
**meaningful** [2] -

71:12, 123:15
**means** [2] - 91:20,
113:15
**meant** [2] - 22:24,
56:4
**mechanism** [1] -
102:19
**mechanisms** [1] -
20:9
**meet** [2] - 59:11,
128:7
**meeting** [6] - 44:9,
48:20, 58:4, 58:8,
85:25, 121:6
**meetings** [1] - 59:14
**Meghan** [11] - 11:10,
46:13, 100:8, 104:7,
104:17, 114:15,
114:18, 116:12,
124:10, 125:10,
126:11, 126:20,
128:23
**member** [2] - 105:16,
114:25
**members** [4] - 33:20,
98:3, 98:4, 98:9
**memo** [4] - 54:17,
121:22, 123:4, 123:21
**memorandum** [4] -
118:19, 118:21,
118:23, 120:15
**memory** [2] - 13:1,
29:19
**mentioned** [15] -
25:16, 64:3, 68:14,
97:21, 98:8, 99:11,
100:14, 103:2,
103:12, 104:16,
104:24, 105:11,
115:16, 122:17
**mentions** [2] -
115:23, 120:8
**merchandise** [1] -
99:23
**Merchant** [1] - 27:23
**messenger** [1] -
127:22
**Messenger** [22] -
11:10, 17:7, 19:9,
100:8, 100:15, 104:7,
111:24, 112:2,
112:17, 112:18,
112:21, 114:15,
114:18, 116:8,
116:12, 122:22,
124:10, 125:10,
126:11, 126:18,
126:20, 128:23
**Messenger's** [1] -
104:17

**messing** [1] - 94:21
**messy** [1] - 106:19
**method** [3] - 6:2, 48:12, 83:7
**methods** [5] - 82:25, 84:10, 84:17, 97:16, 98:12
**Microsoft** [4] - 104:8, 104:9, 104:10, 104:11
**mid** [3] - 110:24, 111:3, 111:14
**midafternoon** [1] - 50:13
**middle** [5] - 14:23, 21:9, 22:16, 23:15, 128:5
**Mietus** [2] - 114:24, 115:20
**Mietus's** [2] - 116:1, 116:18
**might** [2] - 55:5, 59:10
**military** [7] - 16:21, 17:2, 21:24, 33:1, 98:4, 98:9, 111:16
**millington** [1] - 32:25
**million** [1] - 10:19
**mind** [8] - 41:3, 73:14, 85:19, 85:20, 112:17, 112:19, 113:18, 129:3
**Mind** [1] - 82:19
**Mindset** [23] - 7:17, 7:18, 51:21, 51:24, 52:6, 52:12, 52:16, 52:24, 53:8, 57:4, 71:11, 82:24, 83:4, 84:10, 85:2, 85:3, 85:6, 85:14, 85:24, 86:4, 86:6, 86:9, 93:13
**mindset** [1] - 128:23
**Mindset's** [2] - 65:14, 84:23
**mine** [1] - 39:13
**minimal** [2] - 41:17, 118:9
**minimum** [2] - 54:11, 54:12
**minus** [1] - 107:21
**minutes** [2] - 3:17, 115:13
**misgiving** [1] - 27:23
**misleading** [1] - 128:1
**missed** [1] - 12:24
**mission** [1] - 39:10
**mistake** [1] - 101:16
**misunderstanding** [1] - 112:24

**mmmessenger@ nextjump.com** [1] - 114:18
**mobilize** [1] - 21:5
**modification** [14] - 63:6, 64:3, 64:4, 64:5, 64:7, 64:12, 64:17, 64:18, 64:19, 64:25, 65:2, 76:22, 76:25
**modifications** [1] - 77:4
**modified** [2] - 76:17, 79:15
**modify** [1] - 64:20
**moment** [6] - 17:25, 40:16, 53:18, 59:9, 94:11, 96:24
**Monday** [3] - 43:23, 44:8, 115:24
**money** [11] - 6:3, 6:6, 6:14, 11:3, 70:14, 86:13, 87:3, 103:5, 103:6, 103:7
**monitor** [1] - 40:15
**month** [2] - 13:19, 38:1
**months** [5] - 9:18, 38:24, 81:17, 82:3, 128:15
**Moran** [1] - 17:19
**morning** [4] - 14:8, 80:1, 80:13, 109:6
**most** [8] - 40:25, 42:1, 71:12, 71:13, 91:1, 95:22, 98:25, 107:12
**mostly** [1] - 4:12
**motion** [2] - 125:9, 129:11
**motivation** [1] - 23:23
**motive** [5] - 126:22, 128:10, 128:24, 128:25, 129:3
**move** [7] - 4:15, 12:11, 13:8, 15:25, 40:13, 46:8, 68:9
**moved** [2] - 103:6, 111:8
**moves** [9] - 43:5, 53:16, 62:11, 67:15, 71:21, 101:8, 112:10, 117:5, 124:12
**moving** [5] - 13:16, 44:22, 68:11, 106:4, 129:12
**MR** [86] - 3:14, 3:17, 4:1, 4:11, 4:21, 5:4, 7:4, 7:7, 8:6, 8:11, 12:5, 12:7, 12:18,

12:24, 13:5, 13:11, 13:14, 13:15, 14:3, 14:7, 14:22, 14:25, 15:5, 16:23, 16:25, 17:4, 17:10, 17:16, 17:25, 18:2, 18:6, 18:8, 21:7, 21:11, 23:12, 23:14, 23:21, 23:22, 27:5, 27:9, 27:10, 28:15, 28:24, 29:1, 29:4, 29:7, 29:17, 30:1, 31:4, 31:8, 31:12, 40:15, 40:18, 41:5, 41:9, 41:13, 42:3, 42:18, 43:6, 48:17, 49:10, 49:13, 49:17, 49:19, 49:25, 50:4, 53:18, 53:20, 58:7, 59:24, 60:1, 62:1, 62:13, 67:17, 74:5, 81:5, 81:23, 81:24, 82:22, 82:23, 89:2, 89:13, 94:11, 94:13, 95:1, 113:12
**MS** [134] - 3:6, 3:9, 3:19, 3:21, 31:3, 32:9, 32:16, 34:10, 34:13, 40:8, 40:10, 40:13, 40:23, 41:25, 42:5, 42:12, 42:16, 42:20, 43:4, 43:10, 48:19, 50:3, 50:23, 51:17, 51:19, 53:11, 53:13, 53:16, 53:24, 58:10, 58:17, 58:18, 60:3, 62:3, 62:6, 62:8, 62:11, 62:17, 62:24, 67:8, 67:10, 67:15, 67:21, 69:1, 69:2, 70:18, 70:21, 71:16, 71:18, 71:21, 71:24, 72:3, 72:4, 72:5, 72:15, 72:16, 73:1, 73:2, 74:2, 89:10, 95:3, 95:5, 96:16, 96:21, 97:3, 100:2, 100:5, 100:12, 100:13, 101:2, 101:5, 101:8, 101:10, 101:13, 101:15, 101:18, 102:3, 102:5, 102:11, 102:12, 106:13, 106:15, 106:24, 107:1, 107:6, 107:17, 107:19, 108:3, 108:5, 112:5, 112:7, 112:10, 112:12, 112:16, 112:23, 113:10, 113:23, 114:1, 115:3,

115:5, 116:20, 116:25, 117:1, 117:5, 117:7, 117:11, 118:16, 118:17, 118:25, 119:1, 119:22, 119:23, 120:13, 120:14, 121:20, 121:21, 123:1, 123:3, 124:6, 124:8, 124:12, 124:14, 125:6, 125:8, 125:15, 126:10, 126:18, 127:5, 127:17, 127:22, 128:9, 128:18, 129:16, 129:17
**multipliers** [1] - 118:11
**must** [10] - 50:3, 118:5, 120:20, 121:7, 121:14, 121:18, 122:2, 122:9, 123:16, 123:19

## N

**N-2** [1] - 27:23
**N1** [5] - 22:25, 57:21, 110:25, 111:21, 122:17
**name** [5] - 32:18, 65:6, 89:24, 97:5, 97:6
**named** [1] - 48:23
**names** [1] - 117:16
**Naples** [4] - 64:9, 66:12, 66:19, 67:6, 69:7
**nature** [3] - 20:11, 38:21, 56:23
**NAVAF** [3] - 20:5, 111:8, 122:18
**Naval** [8] - 33:11, 36:24, 54:4, 94:5, 94:8, 110:24, 111:3, 117:23
**NAVEUR** [27] - 20:5, 33:14, 33:15, 34:4, 34:22, 34:25, 35:10, 35:11, 35:12, 35:19, 39:12, 39:19, 39:21, 48:24, 51:25, 52:6, 64:8, 65:8, 71:6, 83:5, 85:14, 87:16, 92:17, 111:8, 122:18, 122:24
**NAVEUR's** [1] - 52:3
**NAVSUP** [1] - 19:24
**Navy** [38] - 6:14, 16:9, 18:10, 19:15, 19:19, 19:20, 19:25,

20:2, 21:3, 23:6, 32:21, 33:4, 37:19, 43:20, 60:24, 65:12, 65:21, 92:9, 98:20, 105:8, 105:14, 105:18, 105:25, 110:1, 110:3, 110:10, 110:14, 111:2, 111:8, 111:9, 111:24, 113:1, 114:13, 114:25, 117:18, 125:22, 126:25, 127:2
**Navy's** [1] - 105:21
**NCIS** [2] - 98:24, 105:12
**near** [1] - 52:1
**nearby** [1] - 3:20
**nearly** [1] - 111:17
**necessary** [5] - 53:7, 54:22, 54:24, 120:7, 122:7
**need** [27] - 3:12, 7:12, 7:16, 8:5, 8:24, 15:7, 27:17, 27:21, 28:4, 30:15, 35:19, 36:5, 37:18, 39:4, 43:25, 46:12, 55:6, 55:18, 57:12, 59:20, 60:16, 64:4, 65:2, 91:13, 92:18, 113:7, 124:19
**needed** [11] - 34:18, 35:12, 35:20, 54:12, 56:13, 58:3, 58:5, 58:14, 61:8, 61:9, 64:7
**needs** [5] - 8:8, 27:19, 38:15, 46:9, 64:6
**negative** [2] - 41:15, 71:8
**negotiating** [1] - 122:2
**negotiations** [1] - 122:6
**neutral** [1] - 24:3
**never** [9] - 22:1, 31:9, 31:16, 31:18, 70:12, 76:22, 80:9, 80:18, 89:9
**New** [7] - 1:17, 1:21, 23:2, 25:10, 99:17, 115:16
**new** [7] - 8:17, 39:11, 42:1, 63:7, 77:7, 92:3, 121:9
**Next** [128] - 5:8, 5:18, 6:13, 7:17, 10:4, 10:13, 12:1, 12:3, 12:9, 13:8, 13:16,

13:19, 14:17, 16:8, 16:15, 16:20, 17:1, 17:3, 17:17, 18:10, 18:13, 22:19, 22:23, 23:9, 23:25, 24:10, 24:14, 25:7, 25:11, 25:20, 31:25, 34:14, 34:16, 34:19, 36:18, 39:14, 40:6, 45:25, 52:15, 52:22, 52:24, 53:7, 54:22, 55:15, 56:14, 56:18, 59:9, 59:13, 59:15, 59:23, 60:10, 60:23, 60:24, 61:13, 61:23, 62:23, 63:11, 63:16, 63:21, 63:23, 64:4, 64:8, 64:17, 64:21, 65:7, 65:10, 65:11, 66:4, 66:16, 66:19, 66:24, 67:4, 68:3, 71:5, 71:7, 73:4, 73:17, 73:24, 73:25, 82:24, 83:7, 83:17, 84:7, 84:10, 84:22, 84:25, 86:5, 86:7, 86:21, 87:3, 87:9, 87:18, 88:18, 90:20, 92:8, 94:15, 96:4, 96:8, 98:19, 99:14, 99:16, 99:17, 100:7, 100:9, 100:14, 100:15, 100:25, 101:21, 101:23, 102:25, 104:11, 105:3, 110:1, 110:3, 110:9, 110:15, 111:19, 115:2, 115:10, 116:3, 116:16, 122:14, 122:17, 122:23, 122:24, 125:23, 125:25, 128:13

**next** [15] - 3:18, 31:2, 47:16, 53:11, 58:19, 96:20, 96:21, 100:3, 101:2, 115:9, 115:11, 115:16, 115:23, 115:24, 124:6

**NFE** [1] - 119:9

**Nicasio** [8] - 33:24, 43:12, 43:13, 44:4, 44:22, 68:6, 70:23

**night** [2] - 71:7, 109:7

**Nina** [6] - 33:24, 43:12, 43:13, 44:4, 44:22, 70:23

**NIPRNet** [3] - 25:1, 25:4, 25:6

**NO** [1] - 1:5

**nobody** [2] - 28:4, 32:1

**nomination** [1] - 123:20

**non** [1] - 41:18

**non-hearsay** [1] - 41:18

**none** [2] - 70:8, 94:19

**nonfederal** [1] - 119:9

**nonpersonal** [1] - 54:18

**Norfolk** [1] - 54:13

**normal** [1] - 78:10

**normally** [3] - 60:13, 109:2, 109:11

**note** [1] - 44:19

**notification** [1] - 61:17

**notify** [1] - 122:5

**November** [4] - 25:13, 78:18, 119:15

**number** [6] - 37:17, 37:18, 56:1, 87:25, 115:2, 125:5

**Number** [1] - 91:18

**NW** [3] - 1:14, 1:17, 1:24

**NYC** [1] - 116:14

## O

**o'clock** [3] - 50:17, 79:22, 79:25

**O'NEILL** [16] - 1:20, 3:6, 3:9, 72:3, 101:10, 101:13, 107:1, 112:12, 112:23, 117:7, 124:14, 125:15, 126:10, 127:17, 127:22, 125:17

**O'Neill** [3] - 3:4, 125:13, 129:8

**Oath** [2] - 32:13, 96:25

**oath** [2] - 5:1, 50:22

**object** [3] - 12:18, 17:4, 40:18

**objecting** [2] - 42:4, 129:7

**objection** [34] - 7:4, 8:6, 12:5, 14:3, 17:9, 27:5, 27:9, 27:10, 43:6, 43:7, 48:17, 53:20, 53:21, 58:7, 58:9, 59:24, 62:1, 62:13, 62:14, 67:17, 67:18, 89:10, 101:10,

101:11, 107:1, 107:2, 112:12, 113:9, 113:17, 113:21, 117:7, 117:8, 124:14, 128:2

**objections** [1] - 129:12

**objective** [1] - 69:14

**observations** [2] - 17:1, 17:6

**obtain** [3] - 103:19, 105:8, 105:10

**obtained** [1] - 103:9

**obviously** [2] - 9:17, 32:6

**occasions** [2] - 8:12, 18:16

**occurred** [3] - 25:13, 98:25, 99:12

**OCONUS** [1] - 64:12

**October** [1] - 127:24

**odd** [2] - 22:10, 22:13

**OF** [3] - 1:1, 1:3, 1:9

**offer** [3] - 68:20, 93:14, 99:12

**offered** [2] - 13:20, 24:15

**offering** [2] - 26:1, 41:3

**Office** [5] - 1:13, 32:21, 59:6, 62:21, 65:20

**office** [5] - 28:7, 37:24, 97:10, 97:24, 97:25

**officer** [12] - 35:7, 37:1, 38:17, 51:7, 59:21, 76:4, 90:4, 90:8, 92:10, 119:14, 121:2, 121:3

**officer's** [1] - 93:7

**officers** [5] - 17:15, 17:20, 25:10, 26:11, 31:23

**official** [10] - 105:20, 114:13, 116:12, 119:8, 120:2, 120:9, 121:15, 122:3, 123:12, 123:13

**Official** [2] - 1:24, 130:2

**OFFICIAL** [1] - 130:9

**officials** [3] - 120:20, 121:14, 121:18

**often** [5] - 17:2, 33:14, 35:24, 100:16, 109:4

**OGE** [2] - 120:6, 123:5

**OGE-278** [2] - 120:8, 124:4

**once** [4] - 30:20, 30:21, 54:15, 91:24

**one** [75] - 3:7, 3:12, 5:17, 7:22, 9:16, 12:14, 14:8, 16:7, 17:25, 19:3, 20:6, 21:25, 24:1, 29:8, 31:12, 37:17, 38:15, 41:24, 41:25, 42:22, 45:21, 45:25, 46:4, 47:11, 47:17, 47:23, 52:17, 53:4, 53:18, 54:15, 55:3, 55:20, 56:6, 56:11, 56:22, 56:23, 57:10, 60:21, 62:22, 63:2, 66:12, 71:2, 71:12, 75:25, 77:1, 78:21, 79:5, 79:7, 85:9, 85:13, 85:24, 87:25, 88:11, 88:25, 90:9, 91:5, 92:11, 92:19, 93:2, 94:11, 94:14, 98:13, 98:21, 98:23, 100:19, 100:22, 105:11, 108:19, 109:7, 121:12, 122:24, 125:16, 125:19

**one-year** [2] - 53:4, 55:20

**ones** [1] - 111:19

**online** [1] - 69:22

**open** [2] - 37:25, 98:10

**open-source** [1] - 98:10

**operate** [1] - 53:4

**Operations** [2] - 111:3, 117:23

**opining** [1] - 92:12

**opinion** [3] - 28:9, 28:22, 41:15

**opinions** [4] - 11:17, 11:19, 11:25, 41:6

**OPM** [1] - 63:2

**opportunities** [2] - 38:9, 56:5

**opportunity** [4] - 3:4, 20:23, 38:14, 69:23

**opposite** [1] - 71:10

**ops** [1] - 70:2

**option** [3] - 7:2, 59:4, 59:5

**options** [2] - 9:16, 15:13

**Order** [1] - 3:1

**order** [16] - 21:5, 21:19, 21:22, 21:25,

22:16, 25:20, 51:15, 59:12, 61:8, 63:5, 64:11, 65:19, 66:14, 77:7, 86:17, 95:11

**ordered** [1] - 31:15

**orders** [3] - 66:11, 73:23, 82:14

**ORF)** [1] - 120:2

**organization** [2] - 39:9, 120:21

**organizational** [2] - 51:24, 93:20

**organizations** [1] - 20:1

**organized** [1] - 69:19

**original** [2] - 91:10, 130:3

**ourselves** [1] - 118:5

**out-of-court** [1] - 113:13

**outcome** [2] - 84:13, 84:14

**outlined** [5] - 47:19, 57:20, 57:23, 123:22, 123:24

**Outreach** [1] - 32:21

**outside** [3] - 17:7, 89:10, 123:25

**outstanding** [1] - 91:22

**Outward** [24] - 7:17, 7:18, 51:21, 52:6, 52:12, 52:16, 52:24, 53:8, 57:4, 65:14, 71:11, 82:24, 83:4, 84:10, 84:23, 85:2, 85:3, 85:6, 85:14, 85:24, 86:4, 86:6, 86:9, 93:13

**outward** [1] - 51:24

**overall** [1] - 73:18

**overarching** [1] - 125:17

**overlap** [2] - 52:16, 52:25

**overpay** [1] - 36:4

**overruled** [5] - 8:9, 12:6, 14:5, 27:6, 27:10

**overruling** [2] - 17:9, 113:17

**oversaw** [1] - 62:22

**oversight** [1] - 60:8

**own** [2] - 10:25, 118:3

**owns** [1] - 56:7

## P

**p.m** [13] - 1:11, 3:1,

50:19, 107:23, 108:1, 108:2, 108:10, 108:12, 108:13, 115:19, 129:19

**package** [16] - 15:22, 15:23, 25:22, 37:2, 37:6, 37:15, 37:22, 48:8, 54:13, 54:22, 68:3, 68:8, 68:9, 68:12, 68:24

**PAGE** [1] - 2:2

**page** [42] - 14:24, 21:10, 41:24, 41:25, 42:22, 42:23, 45:19, 45:21, 47:18, 49:5, 49:14, 53:25, 54:9, 57:6, 65:5, 66:6, 66:7, 68:21, 69:1, 69:5, 70:5, 70:15, 70:18, 70:19, 70:20, 72:15, 107:17, 108:3, 108:14, 114:3, 115:3, 117:19, 118:16, 118:25, 119:22, 119:25, 120:13, 121:20, 123:1, 130:4

**pages** [2] - 46:5, 66:8

**paid** [2] - 6:3, 66:15

**Pam** [2] - 43:22, 83:8

**PAO** [1] - 39:25

**paragraph** [5] - 54:11, 115:6, 115:10, 120:19, 128:2

**paragraphs** [1] - 117:25

**pardon** [2] - 12:24, 16:23

**parent** [1] - 104:15

**Parker** [1] - 42:12

**PARLATORE** [64] - 1:20, 3:17, 4:1, 4:11, 5:4, 7:7, 8:11, 12:7, 13:5, 13:11, 13:14, 13:15, 14:7, 14:22, 14:25, 15:5, 16:25, 27:5, 27:9, 29:1, 29:4, 29:7, 30:1, 31:4, 31:8, 31:12, 40:15, 40:18, 41:5, 41:9, 41:13, 42:3, 42:18, 43:6, 48:17, 49:10, 49:13, 49:17, 49:19, 49:25, 50:4, 53:18, 53:20, 58:7, 59:24, 60:1, 62:1, 62:13, 67:17, 74:5, 81:5, 81:23, 81:24, 82:22, 82:23, 89:2, 89:13, 94:11,

94:13, 95:1, 113:12

**Parlatore** [18] - 1:19, 2:3, 2:6, 3:15, 3:23, 18:4, 18:16, 19:15, 20:9, 21:12, 22:4, 24:18, 25:9, 26:10, 42:11, 74:3, 95:6, 96:7

**parroted** [2] - 12:3, 12:9

**parse** [1] - 98:1

**part** [27] - 11:4, 14:13, 17:24, 21:21, 38:5, 50:12, 66:23, 70:13, 78:20, 83:3, 83:6, 83:9, 93:15, 99:2, 100:18, 102:14, 103:13, 113:11, 113:12, 120:15, 121:22, 123:4, 126:4, 126:7, 126:8, 126:12, 127:11

**participant's** [1] - 69:21

**participants** [5] - 67:6, 68:17, 68:18, 69:16, 71:13

**participate** [1] - 121:14

**particular** [8] - 9:7, 27:13, 27:25, 35:2, 56:6, 61:24, 120:23, 121:15

**particularly** [1] - 79:13

**parties** [5] - 40:20, 98:8, 112:13, 129:9, 129:10

**partners** [1] - 105:12

**parts** [1] - 3:12

**passed** [2] - 5:11, 55:13

**passes** [1] - 81:7

**passing** [3] - 44:6, 80:12, 82:11

**passthrough** [1] - 63:19

**past** [2] - 8:2, 8:12

**patented** [1] - 56:9

**Pause** [11] - 4:19, 4:22, 18:1, 40:17, 42:9, 43:3, 53:19, 81:4, 89:1, 94:12, 125:12

**pay** [1] - 89:23

**paying** [2] - 72:23, 103:7

**Pennsylvania** [1] - 20:8

**people** [24] - 7:1,

11:8, 13:20, 13:23, 13:24, 16:22, 17:3, 17:22, 20:23, 23:24, 26:23, 28:3, 31:13, 39:9, 69:7, 71:8, 87:16, 87:17, 87:18, 93:3, 95:23, 95:25, 118:8, 125:21

**per** [4] - 22:13, 46:7, 66:19, 72:10

**percent** [3] - 31:9, 126:23, 128:3

**perception** [1] - 16:9

**perform** [4] - 60:10, 64:8, 65:8, 123:15

**performance** [14] - 35:25, 36:11, 54:16, 55:4, 63:3, 64:13, 89:25, 91:2, 91:3, 91:10, 91:20, 91:21, 91:25, 102:9

**Performance** [1] - 89:20

**performed** [3] - 18:10, 92:4, 99:2

**performing** [1] - 65:12

**period** [5] - 18:9, 34:20, 35:25, 38:1, 45:12, 47:4, 63:3, 91:2, 91:3, 91:9, 91:20, 91:21, 99:11, 99:13, 111:20

**Perks** [4] - 99:20, 99:23, 100:17, 102:8

**permission** [1] - 106:24

**person** [16] - 8:21, 9:2, 9:7, 18:24, 26:4, 31:12, 35:20, 55:3, 60:17, 77:10, 88:14, 109:20, 113:3, 113:8, 119:16

**personal** [4] - 93:13, 104:14, 116:11, 119:15

**personally** [5] - 75:15, 78:14, 84:19, 121:14, 122:8

**personnel** [6] - 33:22, 43:14, 52:3, 105:19, 110:25, 119:10

**Personnel** [4] - 59:7, 62:21, 65:20, 113:1

**perspective** [1] - 22:18

**pertinent** [1] - 78:21

**phone** [6] - 24:15, 41:7, 86:1, 104:17

**phones** [3] - 104:16, 104:18, 104:20

**photos** [1] - 100:7

**physical** [3] - 104:3, 104:7, 104:22

**piece** [7] - 6:17, 6:20, 30:7, 34:8, 36:7, 37:12, 91:13

**pilot** [11] - 13:25, 23:1, 23:2, 81:17, 87:10, 87:13, 88:4, 88:8, 88:10, 88:11, 88:16

**place** [12] - 21:14, 31:14, 44:12, 45:9, 47:20, 48:22, 51:15, 55:2, 58:15, 63:23, 80:6, 94:3

**Plaintiff** [1] - 1:4

**plan** [4] - 24:10, 55:21, 127:2, 127:9

**planned** [1] - 73:21

**planning** [1] - 55:22

**plans** [1] - 61:20

**platform** [1] - 102:8

**platoon** [1] - 79:23

**Platz** [5] - 115:1, 115:19, 115:20, 116:7, 116:9

**plug** [1] - 99:4

**point** [27] - 14:11, 15:11, 15:16, 18:14, 24:8, 29:13, 30:18, 30:20, 30:21, 38:16, 44:12, 44:16, 48:5, 63:2, 75:17, 77:21, 80:3, 80:22, 91:12, 92:2, 92:14, 94:14, 102:4, 119:13, 123:10, 124:17, 128:20

**pointed** [2] - 21:13, 86:2

**points** [3] - 12:9, 123:7, 128:19

**policies** [3] - 105:21, 123:22, 123:24

**poor** [2] - 70:13, 90:2

**poorly** [2] - 69:18, 88:12

**POP** [1] - 91:19

**portion** [11] - 6:3, 6:6, 14:23, 37:7, 42:20, 42:21, 49:15, 66:1, 66:4, 121:22, 121:23

**portions** [2] - 35:3, 42:1

**position** [5] - 8:22, 8:25, 26:5, 33:11,

117:22

**positions** [1] - 105:13

**positive** [4] - 69:23, 70:6, 70:7, 70:9

**possible** [12] - 21:15, 47:4, 47:21, 63:22, 64:1, 80:7, 86:10, 86:11, 91:14, 109:14, 109:24, 119:18

**possibly** [2] - 44:12, 50:9

**post** [1] - 121:23

**post-government** [1] - 121:23

**potential** [9] - 20:24, 38:2, 46:23, 52:15, 63:5, 122:4, 122:10, 122:22, 123:12

**potentially** [3] - 6:13, 15:15, 25:19

**PowerTrain** [13] - 63:13, 63:17, 63:22, 65:6, 65:11, 65:15, 65:20, 66:1, 72:10, 86:13, 86:20, 87:3, 88:23

**PowerTrain's** [1] - 63:15

**precursor** [1] - 17:5

**predetermined** [2] - 73:12, 73:14

**predictable** [1] - 121:16

**preface** [1] - 121:7

**preference** [2] - 4:8, 119:17

**preferential** [1] - 120:21

**prejudice** [1] - 41:17

**prejudicial** [1] - 42:6

**preliminary** [1] - 57:10

**premarked** [1] - 4:8

**premises** [3] - 104:3, 104:24, 104:25

**prepare** [1] - 106:20

**prepared** [2] - 68:2, 86:23

**preposterous** [1] - 94:20

**present** [2] - 4:23, 50:20

**presented** [1] - 30:16

**press** [3] - 57:21, 58:1, 58:21

**pressed** [1] - 18:12

**pressure** [2] - 30:3, 30:13

**pretty** [3] - 46:25,

92:9, 115:24
**prevent** [1] - 24:11
**previous** [2] - 53:6, 92:4
**previously** [3] - 8:8, 63:2, 100:2
**price** [2] - 20:15, 65:19
**Pricing** [1] - 43:20
**pricing** [7] - 10:12, 46:6, 47:8, 49:7, 51:3, 51:11, 55:9
**primarily** [4] - 30:12, 42:3, 99:8, 99:18
**primary** [3] - 63:17, 100:19, 100:24
**Prime** [1] - 91:18
**prime** [4] - 6:7, 6:12, 6:17, 6:20
**private** [2] - 120:21, 123:14
**probable** [1] - 103:25
**problem** [1] - 113:12
**problems** [1] - 79:8
**procedures** [5] - 21:4, 77:3, 105:22, 123:22, 123:24
**proceed** [1] - 43:2
**Proceedings** [1] - 129:19
**process** [58] - 5:21, 6:24, 7:8, 7:11, 8:4, 8:14, 8:25, 9:3, 9:7, 9:14, 9:21, 18:18, 19:8, 19:13, 25:17, 30:3, 34:22, 35:4, 35:9, 36:23, 37:13, 37:15, 38:5, 38:6, 38:8, 38:10, 45:11, 45:17, 47:6, 51:7, 52:1, 52:5, 52:11, 52:13, 53:5, 55:7, 55:22, 56:4, 57:13, 59:18, 60:7, 60:9, 60:21, 63:8, 74:25, 76:13, 76:15, 76:25, 77:6, 77:21, 80:19, 84:22, 95:16, 95:20, 95:24, 95:25
**processes** [2] - 20:11, 74:20
**processing** [1] - 68:23
**procurement** [3] - 64:5, 122:9, 122:13
**produce** [1] - 57:1
**Produced** [1] - 1:25
**product** [3] - 16:18, 24:10, 37:8
**products** [3] - 56:9,

60:15, 83:6
**professional** [1] - 33:19
**professionalism** [1] - 118:11
**profits** [1] - 128:12
**program** [15] - 11:4, 13:25, 23:1, 23:3, 46:9, 47:1, 85:7, 85:22, 87:10, 87:13, 88:8, 88:10, 88:11, 88:16, 119:7
**programs** [1] - 46:5
**progress** [1] - 110:14
**projects** [1] - 18:25
**promises** [2] - 121:1, 126:25
**promptly** [2] - 122:9, 122:11
**proper** [7] - 18:18, 84:21, 96:1, 96:5, 112:20, 113:7, 113:14
**properly** [1] - 37:21
**property** [1] - 121:5
**Proposal** [1] - 43:20
**proposal** [10] - 10:4, 10:14, 10:16, 10:19, 28:13, 38:4, 44:19, 46:4, 47:7, 51:11
**proposals** [6] - 7:22, 7:23, 38:14, 49:7, 51:3, 51:9
**proprietary** [2] - 56:8, 57:1
**provide** [15] - 7:14, 7:22, 20:23, 24:10, 35:14, 35:21, 55:6, 56:7, 56:9, 56:12, 63:6, 64:14, 78:6, 84:21, 93:9
**provided** [4] - 12:8, 15:20, 52:19
**provider** [1] - 104:3
**provides** [3] - 36:1, 76:18, 126:22
**providing** [3] - 24:14, 38:9, 98:10
**provision** [1] - 6:10
**PS** [1] - 115:14
**public** [12] - 37:25, 39:24, 56:4, 97:12, 97:13, 97:14, 97:21, 97:25, 98:2, 98:6, 123:5, 123:18
**publish** [12] - 40:14, 43:5, 53:16, 62:11, 67:15, 71:21, 71:25, 101:8, 106:24, 112:11, 117:5, 124:12

**published** [7] - 53:22, 62:15, 67:19, 101:12, 107:2, 113:25, 117:9
**pull** [2] - 50:24, 90:14
**pulled** [1] - 50:6
**purchase** [2] - 54:15, 99:22
**purchased** [1] - 22:19
**purpose** [10] - 13:12, 37:17, 44:17, 47:3, 52:18, 69:14, 72:8, 72:9, 88:8, 93:6
**Purpose** [1] - 123:10
**purposes** [1] - 107:5
**pursuant** [2] - 103:9, 106:6
**pursued** [1] - 20:20
**purview** [2] - 34:24, 95:21
**pushed** [1] - 8:4
**put** [25] - 6:23, 7:12, 7:16, 7:21, 10:3, 12:13, 13:11, 14:22, 30:3, 30:13, 31:14, 41:16, 41:20, 42:14, 42:20, 49:14, 49:21, 51:15, 69:8, 71:3, 71:16, 89:24, 91:25, 106:17, 124:6

## Q

**qualified** [1] - 9:3
**questioned** [1] - 74:17
**questions** [28] - 18:3, 18:16, 19:15, 19:17, 20:9, 21:12, 22:4, 24:13, 25:1, 25:9, 26:13, 28:24, 46:12, 48:11, 51:1, 51:20, 55:6, 58:19, 59:2, 74:2, 93:23, 95:1, 95:6, 96:7, 96:16, 106:4, 109:25, 121:6
**quick** [2] - 13:11, 44:13
**quickly** [1] - 76:23
**QUINN** [1] - 1:20
**quite** [3] - 7:25, 45:12, 80:2

## R

**raise** [2] - 32:5, 46:20

**raised** [2] - 29:24, 48:11
**rank** [1] - 111:12
**rate** [2] - 108:7, 108:20
**Ray** [7] - 48:23, 48:24, 57:7, 57:19, 59:3, 73:6, 75:2
**RDR** [1] - 130:8
**RDR-CRR** [1] - 130:8
**reach** [4] - 63:5, 112:2, 116:17, 127:7
**reached** [1] - 19:3
**read** [26] - 3:4, 43:21, 46:3, 54:10, 54:11, 57:18, 64:10, 68:1, 69:13, 70:6, 71:2, 102:6, 115:6, 115:10, 115:14, 115:20, 116:1, 117:16, 117:24, 119:24, 120:18, 120:24, 121:12, 121:25, 123:7
**readiness** [1] - 118:4
**reading** [1] - 116:14
**ready** [3] - 4:18, 4:25, 37:22
**real** [3] - 13:11, 121:2, 121:4
**really** [33] - 3:5, 6:15, 7:19, 7:25, 9:11, 24:8, 26:25, 27:1, 27:2, 42:1, 42:6, 44:15, 45:10, 47:2, 47:12, 47:23, 51:5, 52:17, 59:1, 59:14, 61:9, 61:17, 64:1, 69:16, 80:15, 83:10, 85:17, 87:6, 105:14, 106:23, 109:6, 109:7
**Realtime** [1] - 1:23
**reason** [8] - 20:14, 25:7, 26:19, 29:21, 39:11, 61:24, 75:9, 77:1
**reasons** [3] - 16:17, 56:12, 75:25
**REBECCA** [1] - 1:14
**recap** [1] - 69:5
**receipt** [2] - 72:6, 72:20
**receive** [14] - 35:6, 38:18, 46:16, 49:7, 51:3, 89:23, 95:12, 95:14, 97:15, 97:16, 105:18, 105:21, 105:24, 106:6
**received** [17] - 12:20, 12:25, 22:16, 34:17, 40:23, 44:11, 48:9,

48:12, 51:8, 51:11, 55:14, 61:16, 90:11, 103:8, 105:4, 119:16, 119:18
**receives** [1] - 36:1
**receiving** [3] - 46:18, 116:9, 116:18
**Recessed** [1] - 50:19
**recognize** [6] - 40:11, 53:14, 62:9, 67:11, 71:19, 71:20
**recognizing** [1] - 21:3
**recollection** [5] - 4:14, 10:9, 10:13, 12:16, 15:1
**recommendation** [2] - 13:17, 13:25
**recommendations** [1] - 13:7
**recommended** [2] - 25:21, 88:18
**reconfirm** [1] - 29:20
**Record** [1] - 1:25
**record** [5] - 32:18, 34:10, 68:24, 97:5, 130:4
**records** [12] - 72:1, 105:13, 105:16, 105:18, 105:19, 105:21, 105:24, 105:25, 106:2, 120:3
**recross** [4] - 29:1, 30:16, 30:19, 30:22
**recruit** [3] - 16:22, 17:3, 17:22
**recusal** [1] - 122:7
**red** [2] - 46:20, 95:17
**redact** [2] - 42:16, 42:20
**redacted** [3] - 43:7, 49:15, 50:10
**redaction** [1] - 49:14
**redactions** [1] - 43:4
**redirect** [10] - 18:5, 29:14, 29:18, 29:20, 29:24, 30:14, 30:17, 30:21, 30:22, 95:2
**Redirect** [2] - 2:4, 2:6
**REDIRECT** [2] - 18:7, 95:4
**Reeves** [2] - 130:2, 130:8
**REEVES** [2] - 1:22, 130:8
**refer** [1] - 100:16
**reference** [2] - 44:18, 49:9
**references** [3] -

47:13, 54:21, 66:12
  **referencing** [1] -
125:21
  **referred** [1] - 33:14
  **referring** [5] - 52:21,
58:12, 62:4, 63:1,
81:8
  **reflect** [3] - 10:13,
34:10, 34:12
  **reflected** [2] -
107:22, 109:19
  **refresh** [3] - 4:14,
10:13, 15:1
  **refreshed** [2] -
12:22, 13:1
  **refreshes** [2] - 10:8,
12:15
  **regarding** [2] -
74:18, 122:10
  **regards** [3] - 46:13,
74:17, 121:23
  **regenerated** [1] -
116:5
  **Registered** [1] - 1:23
  **regularly** [2] - 17:14,
17:20
  **regulations** [1] -
130:4
  **reinforce** [1] - 118:8
  **rejected** [1] - 122:11
  **related** [8] - 34:23,
39:18, 52:12, 61:25,
105:21, 123:25,
126:1, 128:6
  **relates** [1] - 52:24
  **relation** [2] - 74:12,
74:16
  **relationship** [1] -
63:20
  **relationships** [1] -
121:18
  **relative** [1] - 23:24
  **relaying** [3] - 59:20,
125:10, 126:21
  **relevance** [2] -
41:22, 59:25
  **relevant** [4] - 41:14,
41:16, 107:12, 125:24
  **reluctant** [1] - 30:19
  **rely** [2] - 91:12
  **remain** [1] - 96:23
  **remaining** [1] - 52:3
  **remember** [39] -
8:17, 10:6, 11:1, 15:9,
15:10, 15:14, 15:23,
16:2, 16:4, 17:12,
17:13, 18:18, 19:7,
19:17, 20:7, 20:11,
22:7, 24:9, 24:12,
24:16, 24:21, 24:24,

24:25, 25:2, 25:11,
25:13, 25:18, 26:13,
77:16, 83:21, 84:8,
84:11, 84:13, 90:15,
93:17, 95:7, 95:15,
96:7, 124:19
  **remembering** [1] -
126:16
  **remind** [5] - 5:1,
24:22, 50:22, 69:6,
124:21
  **reminder** [1] - 118:3
  **rendered** [2] - 72:14,
72:21
  **repeat** [3] - 8:10,
67:23, 89:6
  **repeatedly** [3] -
19:11, 59:2, 61:6
  **repetitive** [1] - 31:20
  **report** [3] - 84:21,
122:9, 123:18
  **reported** [2] -
122:21, 123:16
  **REPORTER** [1] -
130:9
  **Reporter** [4] - 1:23,
1:23, 1:24, 130:2
  **reporting** [2] - 92:1,
123:5
  **reports** [3] - 120:6,
123:6, 123:11
  **Reports** [1] - 89:20
  **representation** [1] -
120:2
  **representative** [4] -
35:7, 51:8, 90:4, 90:8
  **representing** [1] -
54:5
  **request** [10] - 30:22,
35:19, 38:18, 39:3,
39:14, 39:21, 40:2,
44:6, 54:15, 105:13
  **requester** [2] -
35:20, 38:13
  **requests** [3] - 38:25,
121:8, 123:20
  **require** [1] - 118:4
  **required** [12] - 33:20,
35:8, 35:13, 47:5,
64:13, 84:21, 119:19,
120:5, 120:10,
123:10, 123:16,
123:17
  **requirement** [3] -
7:12, 54:8, 55:19
  **requirements** [11] -
35:15, 35:22, 35:23,
36:7, 37:19, 37:20,
54:13, 54:14, 54:21,
54:25, 55:1

  **requires** [2] - 122:5,
126:6
  **requiring** [1] - 24:15
  **requisite** [1] - 123:17
  **research** [17] - 36:2,
37:7, 37:8, 54:17,
55:24, 60:15, 61:8,
82:25, 83:3, 83:7,
83:8, 83:10, 83:23,
84:17, 98:10
  **researching** [1] -
92:3
  **resides** [1] - 37:1
  **resilience** [2] -
93:13, 93:14
  **resiliency** [1] - 7:17
  **resource** [1] - 45:14
  **resources** [1] - 73:21
  **respect** [1] - 64:23
  **responds** [2] -
115:20, 116:11
  **Response** [1] - 69:13
  **response** [2] - 69:14,
116:1
  **responses** [1] -
70:11
  **responsibilities** [3] -
22:5, 22:9, 97:23
  **responsibility** [5] -
14:14, 33:18, 36:17,
79:5, 94:7
  **responsible** [1] -
52:9
  **rest** [2] - 6:18, 52:4
  **restarting** [1] - 9:14
  **restate** [1] - 16:24
  **results** [8] - 12:8,
70:13, 78:14, 78:17,
78:19, 78:24, 79:8,
83:11
  **resume** [1] - 4:25
  **retention** [1] - 120:3
  **retire** [1] - 111:14
  **retirement** [1] -
123:20
  **retiring** [1] - 17:15
  **return** [1] - 124:18
  **returns** [2] - 43:24,
44:23
  **revenue** [3] - 126:24,
128:3, 128:5
  **review** [18] - 36:23,
37:13, 38:12, 47:7,
68:3, 70:25, 78:14,
78:18, 78:21, 78:24,
103:9, 106:2, 107:5,
110:2, 111:23, 118:7,
123:16
  **Review** [1] - 119:3
  **reviewed** [2] - 71:12,

106:5
  **reviews** [4] - 90:2,
90:16, 91:25, 92:7
  **revised** [1] - 118:7
  **Reynolds** [2] - 27:12,
27:22
  **right-hand** [1] -
23:17
  **rights** [2] - 56:8, 57:1
  **ROBERT** [1] - 1:6
  **Robert** [3] - 34:6,
34:11, 98:14, 98:18,
100:25, 101:25,
104:8, 104:14,
107:15, 114:13,
117:15, 118:22,
128:25
  **robust** [1] - 47:1
  **Roger** [1] - 57:21
  **role** [15] - 35:11,
36:15, 45:3, 63:15,
66:24, 66:25, 92:14,
92:15, 92:16, 98:22,
111:3, 111:10, 113:2,
113:3, 116:2
  **rolled** [1] - 28:22
  **Ross** [9] - 2:5, 2:6,
2:8, 32:7, 41:24, 43:2,
75:21, 95:2, 113:22
  **ROSS** [120] - 1:14,
3:19, 3:21, 31:3, 32:9,
32:16, 34:10, 34:13,
40:8, 40:10, 40:13,
40:23, 41:25, 42:5,
42:12, 42:16, 42:20,
43:4, 43:10, 48:19,
50:3, 50:23, 51:17,
51:19, 53:11, 53:13,
53:16, 53:24, 58:10,
58:17, 58:18, 60:3,
62:3, 62:6, 62:8,
62:11, 62:17, 62:24,
67:8, 67:10, 67:15,
67:21, 69:1, 69:2,
70:18, 70:21, 71:16,
71:18, 71:21, 71:24,
72:4, 72:5, 72:15,
72:16, 73:1, 73:2,
74:2, 89:10, 95:3,
95:5, 96:16, 96:21,
97:3, 100:2, 100:5,
100:12, 100:13,
101:2, 101:5, 101:8,
101:15, 101:18,
102:3, 102:5, 102:11,
102:12, 106:13,
106:15, 106:24,
107:6, 107:17,
107:19, 108:3, 108:5,
112:5, 112:7, 112:10,

112:16, 113:10,
113:23, 114:1, 115:3,
115:5, 116:20,
116:25, 117:1, 117:5,
117:11, 118:16,
118:17, 118:25,
119:1, 119:22,
119:23, 120:13,
120:14, 121:20,
121:21, 123:1, 123:3,
124:6, 124:8, 124:12,
125:6, 125:8, 126:18,
127:5, 128:9, 128:18,
129:16
  **Rota** [4] - 64:9,
66:11, 67:6, 69:8
  **rough** [1] - 37:9
  **roughly** [2] - 52:2,
72:23
  **routinely** [2] - 118:8,
118:9
  **ruined** [1] - 94:15
  **ruining** [1] - 96:8
  **rule** [1] - 113:6
  **rules** [9] - 17:22,
32:7, 76:2, 76:8,
76:12, 77:19, 77:20,
77:22, 77:24
  **Rules** [1] - 120:18
  **ruling** [2] - 125:8,
125:14, 129:8
  **rumors** [1] - 31:22
  **run** [2] - 25:21, 100:9
  **running** [1] - 57:19
  **runs** [1] - 104:11

**S**

  **sailors** [2] - 46:7,
118:7
  **samples** [1] - 54:14
  **sank** [1] - 23:8
  **sarcastic** [1] - 70:12
  **save** [1] - 6:20
  **saved** [1] - 6:14
  **saw** [9] - 11:21, 14:8,
23:9, 50:6, 80:4,
127:6, 127:12,
128:11, 129:6
  **scalable** [1] - 23:6,
23:17
  **schedule** [1] - 64:15
  **scheme** [2] - 42:5,
128:6
  **scope** [3] - 22:5,
89:11, 121:10
  **screen** [1] - 50:5
  **scroll** [3] - 66:6,
70:18, 91:16

se [1] - 22:13
search [24] - 97:17, 98:11, 99:3, 103:12, 103:14, 103:16, 103:17, 103:19, 103:21, 103:22, 104:1, 104:5, 104:6, 104:10, 104:13, 104:18, 104:22, 104:24, 104:25, 105:4, 105:7, 106:6, 114:11, 114:23
searched [1] - 104:6
Searching [1] - 121:24
seat [1] - 125:4
Sebastian [2] - 96:22, 97:6
SEBASTIAN [3] - 2:7, 97:1, 97:6
second [6] - 16:20, 21:14, 44:21, 64:18, 110:6, 119:25
secondly [1] - 46:24
section [3] - 119:3, 119:7, 120:17
sections [1] - 19:19
see [43] - 4:18, 10:8, 10:10, 12:15, 12:20, 12:25, 17:17, 21:16, 23:15, 23:19, 34:6, 37:11, 38:3, 42:25, 43:15, 44:21, 44:22, 47:18, 50:4, 50:11, 54:1, 54:21, 64:11, 65:6, 69:7, 70:10, 73:20, 78:17, 81:6, 81:12, 84:3, 91:16, 91:19, 92:4, 103:6, 103:7, 104:21, 112:17, 114:17, 118:12, 123:6, 129:18
seeing [1] - 115:7
seeking [2] - 93:18, 122:2
seeks [1] - 106:24
seem [1] - 53:2
send [12] - 6:17, 11:16, 46:1, 67:13, 67:22, 67:24, 80:22, 101:24, 114:12, 117:17, 117:20, 121:7
sending [3] - 12:3, 14:10, 68:25
sends [2] - 114:13, 117:14
senior [5] - 43:14, 98:9, 117:18, 118:1, 125:22
sense [8] - 6:5, 6:8,

6:22, 12:10, 53:9, 91:23, 93:19, 94:19
sent [17] - 11:19, 11:24, 11:25, 15:6, 46:2, 46:14, 55:13, 67:25, 80:18, 80:20, 91:17, 106:7, 109:6, 109:7, 123:21, 126:5, 127:17
sentence [2] - 21:14, 23:15
separate [2] - 11:1, 41:9
September [4] - 13:10, 13:16, 127:23, 127:24
serve [1] - 111:16
served [1] - 99:3
service [11] - 21:24, 33:19, 35:19, 37:9, 38:19, 38:25, 39:3, 39:4, 39:15, 39:20, 40:2
services [12] - 22:11, 38:22, 52:15, 52:25, 54:18, 60:15, 65:17, 72:14, 72:20, 87:6, 90:12, 104:12
session [2] - 15:21, 31:5
Session [1] - 1:9
set [1] - 33:18
setting [1] - 31:18
settled [2] - 3:8, 3:9
seven [4] - 46:5, 54:19, 55:10, 55:15
several [16] - 5:14, 7:12, 7:21, 10:22, 27:14, 35:3, 37:3, 38:24, 52:17, 75:14, 75:17, 75:18, 97:25, 98:23, 125:22, 128:15
sheet [2] - 10:12, 87:24
shorten [1] - 63:8
shorter [1] - 38:23
shortfalls [1] - 70:8
shortly [1] - 90:19
show [4] - 7:17, 10:7, 23:12, 42:16
showed [2] - 49:15, 104:19
showing [2] - 42:7, 79:25
shown [1] - 10:12
sic [1] - 101:11
side [4] - 23:17, 27:21, 37:8, 127:9
sign [7] - 72:17, 90:11, 90:13, 90:22,

91:6, 91:23, 91:24
signed [6] - 38:17, 38:19, 65:1, 88:22, 90:9, 91:8
signs [1] - 118:21
similar [1] - 7:22
simply [2] - 84:23, 126:1
single [2] - 60:17, 68:20
sink [1] - 19:4
sit [2] - 26:17, 78:21
sitting [1] - 24:23
situations [1] - 8:2
six [9] - 9:18, 54:18, 75:18, 75:19, 75:20, 75:22, 76:11, 78:7, 81:17
Sixth [1] - 33:12
skeleton [1] - 45:15
skills [2] - 70:7, 70:11
slate [1] - 9:8
slide [3] - 46:6, 71:3
slim [1] - 92:9
slowly [1] - 129:13
small [2] - 87:10, 87:13
smoothes [1] - 105:15
snow [1] - 26:23
sole [7] - 5:22, 21:1, 54:19, 56:1, 56:10, 56:13, 56:21
sole-source [6] - 21:1, 54:19, 56:1, 56:10, 56:13, 56:21
someone [4] - 39:22, 70:12, 79:1, 92:24
sometimes [4] - 4:3, 36:10, 79:13, 109:5
SONJA [2] - 1:22, 130:8
Sonja [1] - 130:2, 130:8
soon [1] - 90:16
soonest [1] - 44:1
sorry [14] - 4:21, 13:11, 24:25, 49:9, 52:21, 52:23, 55:23, 67:23, 71:24, 72:4, 84:6, 86:5, 89:6, 123:6
sort [6] - 23:15, 27:20, 27:21, 37:4, 98:7, 113:6
sounded [1] - 57:15
sounds [1] - 89:22
source [9] - 5:22, 21:1, 54:19, 56:1,

56:10, 56:13, 56:21, 56:24, 98:10
space [2] - 14:11, 14:13
Spain [2] - 66:11, 67:6
speaking [1] - 119:8
special [4] - 97:9, 97:15, 97:19, 98:5
specialist [7] - 33:13, 33:18, 38:13, 76:3, 83:10, 84:15, 92:16
specific [14] - 4:6, 8:21, 18:25, 20:5, 29:12, 56:16, 59:20, 63:20, 73:13, 78:6, 98:1, 98:5, 121:8
specifically [19] - 17:17, 20:6, 29:10, 33:16, 35:10, 36:5, 36:7, 39:4, 40:6, 45:4, 52:2, 82:8, 97:13, 98:2, 98:7, 98:21, 98:25, 125:19, 125:20
specified [1] - 58:15
spectrum [2] - 71:11, 103:17
speculation [1] - 14:4
speeches [1] - 18:25
speed [1] - 77:2
spell [2] - 32:17, 97:5
spelled [2] - 37:20, 123:18
spending [2] - 22:10, 55:22
spent [1] - 103:7
spoken [4] - 31:17, 31:18, 80:11, 89:9
spouse [1] - 119:18
spread [2] - 10:21, 99:1
squad [8] - 79:24, 97:12, 97:14, 97:22, 97:23, 98:1, 98:6
squads [1] - 97:25
staff [13] - 28:1, 31:13, 33:25, 39:22, 53:3, 68:10, 68:23, 87:24, 93:6, 93:7, 119:15, 125:11
staffing [4] - 68:2, 68:8, 68:9, 68:12
stamped [1] - 4:4
stand [6] - 18:23, 20:10, 32:12, 112:19, 116:15, 127:14
standard [4] - 107:9, 108:6, 108:10, 108:20

Standards [1] - 117:3
standards [5] - 117:13, 118:2, 118:10, 118:13, 118:19
standing [1] - 96:24
star [2] - 111:13, 115:7
start [12] - 35:4, 35:18, 38:18, 57:12, 64:13, 64:23, 65:2, 77:16, 99:6, 109:23, 114:2, 124:20
started [5] - 46:13, 85:3, 87:10, 87:12, 126:21
starting [2] - 40:6, 54:10
starts [2] - 23:16, 37:4
state [7] - 32:17, 41:3, 97:4, 112:16, 112:19, 113:18, 129:3
statement [24] - 29:15, 36:9, 36:11, 36:15, 36:17, 36:20, 36:21, 37:4, 37:5, 48:6, 52:9, 54:16, 55:4, 58:22, 59:12, 59:13, 59:17, 59:22, 60:6, 60:23, 63:7, 80:5, 126:8
statements [1] - 125:9
STATES [2] - 1:1, 1:3
States [5] - 1:13, 114:25, 117:18, 130:2, 130:5
stationed [2] - 107:15, 111:5
status [2] - 43:25, 44:23
stay [2] - 108:23, 127:1
stayed [1] - 111:3
steady [1] - 118:4
steering [1] - 98:19
stenographic [1] - 130:3
Stenographic [1] - 1:25
step [4] - 30:25, 75:1, 75:4, 96:18
steps [6] - 55:10, 55:15, 55:25, 58:19, 73:24, 96:11
sticky [2] - 44:19, 47:12
still [8] - 5:1, 15:14,

15:15, 21:4, 24:1, 42:15, 50:22, 94:24
**Stock** [2] - 120:6, 122:4
**stopped** [1] - 18:13
**straight** [1] - 39:21
**straightforward** [1] - 46:10
**strawman/walk** [1] - 115:9
**Street** [1] - 1:14
**strongly** [1] - 16:12
**struggling** [1] - 27:15
**stuff** [1] - 31:15
**subcontract** [1] - 63:10
**subcontractor** [5] - 5:24, 6:4, 6:18, 6:19, 59:10
**subject** [8] - 22:14, 43:19, 43:20, 54:7, 103:20, 117:3, 117:12, 124:10
**subjects** [1] - 103:7
**submit** [4] - 35:15, 38:4, 42:5, 55:5
**submitted** [1] - 87:9
**submitting** [1] - 35:17
**subordinates** [1] - 5:11
**subpoena** [2] - 97:17, 103:18
**subpoenas** [9] - 98:11, 99:3, 102:15, 102:17, 102:18, 102:23, 103:3, 103:10, 105:7
**subset** [1] - 81:19
**substance** [1] - 103:18
**substantially** [2] - 121:15, 122:8
**substantive** [3] - 4:6, 123:10, 129:1
**substantively** [1] - 125:17
**subtract** [1] - 108:8
**successful** [1] - 61:12
**sudden** [1] - 4:4
**suggested** [3] - 77:10, 85:16, 93:10
**suggesting** [2] - 26:10, 26:13
**suggests** [1] - 128:16
**suicidal** [1] - 24:11
**suit** [2] - 34:9, 38:15

**Suite** [1] - 1:17
**summary** [5] - 46:11, 69:4, 71:3, 87:24
**summertime** [1] - 108:16
**superior** [1] - 72:24
**supervise** [1] - 95:23
**supervised** [1] - 95:25
**supervisor** [6] - 34:18, 43:14, 48:11, 48:20, 73:5, 123:11
**supervisory** [1] - 68:13
**supplies** [3] - 65:17, 72:14, 72:20
**supply** [1] - 19:25
**Supply** [2] - 36:24, 54:4
**support** [9] - 20:2, 20:5, 21:14, 28:19, 39:24, 47:20, 61:11, 80:6, 102:19
**support-type** [1] - 39:24
**supposed** [2] - 73:15, 87:10
**supposedly** [1] - 82:11
**surprise** [1] - 39:16
**surprised** [1] - 16:15
**surrounding** [1] - 56:23
**surveillance** [1] - 98:11
**survey** [12] - 12:8, 67:1, 67:5, 70:17, 78:15, 78:17, 78:19, 78:24, 79:3, 79:7, 88:24, 90:18
**surveys** [2] - 39:9, 68:25
**sustain** [1] - 58:9
**sustained** [5] - 7:6, 48:18, 60:2, 62:2, 89:12
**sustains** [1] - 104:11, 104:15
**swap** [1] - 99:12
**swear** [1] - 103:23
**SWORN** [3] - 5:2, 32:14, 97:1
**system** [5] - 89:22, 90:3, 91:11, 91:13, 92:1
**System** [2] - 54:4, 89:20
**Systems** [1] - 36:24

**T**

**takeaways** [4] - 69:23, 70:6, 70:7, 70:9
**talks** [3] - 31:23, 81:16, 81:19
**target** [1] - 127:1
**task** [8] - 44:6, 60:18, 64:11, 65:19, 66:11, 66:14, 77:7, 86:17
**taxpayers** [1] - 37:21
**team** [14] - 35:14, 39:7, 52:19, 55:6, 57:10, 61:18, 64:21, 83:1, 83:2, 83:9, 92:24, 99:2, 99:5, 105:12
**teammates** [1] - 83:2
**tech** [2] - 23:17, 49:20
**technical** [3] - 91:12, 92:14, 123:15
**technology** [2] - 99:25, 102:8
**telecommunications** [2] - 102:25, 104:2
**teleconference** [2] - 27:18, 28:6
**tempo** [1] - 70:2
**ten** [2] - 51:15, 60:20
**tenable** [1] - 25:7
**Tennessee** [1] - 32:25
**term** [1] - 88:5
**terms** [8] - 60:15, 62:21, 64:5, 66:19, 101:20, 111:1, 112:20, 128:24
**terrific** [1] - 3:10
**testified** [8] - 9:24, 14:9, 19:2, 21:21, 80:5, 85:11, 85:17, 109:1
**testifies** [1] - 42:14
**testify** [4] - 31:19, 41:19, 42:12, 42:13
**testifying** [1] - 19:7, 84:9
**testimony** [15] - 8:7, 18:12, 22:17, 26:19, 29:3, 29:9, 30:24, 31:8, 50:15, 96:14, 96:17, 102:2, 102:20, 107:5, 124:25
**textbooks** [1] - 85:2
**THE** [103] - 1:1, 1:10, 1:13, 1:19, 2:2, 3:3, 3:8, 3:10, 3:15, 3:18, 3:20, 3:22, 4:7, 4:16,

4:20, 4:24, 7:6, 8:9, 8:10, 12:6, 12:22, 13:1, 13:2, 13:3, 13:13, 14:5, 14:6, 17:8, 17:11, 18:4, 27:6, 27:7, 27:11, 27:12, 28:25, 29:2, 29:5, 30:18, 30:24, 31:2, 31:6, 31:11, 32:6, 32:11, 34:12, 40:20, 40:22, 41:8, 41:11, 41:24, 42:8, 42:10, 42:15, 42:22, 43:2, 43:7, 48:18, 49:11, 49:16, 49:18, 49:23, 50:7, 50:9, 50:21, 53:21, 58:8, 58:9, 59:25, 60:2, 62:2, 62:14, 67:18, 71:23, 74:3, 89:12, 95:2, 96:17, 96:20, 96:23, 101:11, 101:16, 107:2, 112:13, 112:15, 112:22, 113:17, 113:21, 113:25, 116:22, 117:8, 124:16, 125:2, 125:4, 125:7, 125:13, 126:6, 126:15, 127:3, 127:16, 127:21, 128:14, 129:4, 129:18
**Theater** [1] - 64:9
**theory** [2] - 6:15, 126:3
**thereafter** [3] - 24:9, 90:16, 90:19
**they've** [1] - 125:22
**thinking** [2] - 14:4, 47:5
**third** [1] - 122:24
**thoughts** [3] - 41:2, 80:18, 80:22
**thread** [2] - 40:25, 47:16
**three** [6] - 33:8, 54:16, 81:16, 104:19, 121:25, 122:7
**threshold** [1] - 103:19
**throughout** [3] - 22:10, 74:25, 102:2
**Thursday** [1] - 115:24
**tickets** [5] - 22:19, 29:8, 29:9, 30:7, 99:23
**tight** [1] - 61:22
**timeframe** [5] - 27:24, 44:13, 110:5,

125:19, 128:21
**timeline** [13] - 29:8, 29:10, 46:19, 48:11, 53:4, 57:14, 57:15, 58:15, 59:11, 63:5, 63:24, 86:2, 94:20
**timing** [1] - 5:17
**TIMOTHY** [1] - 1:20
**title** [1] - 46:5
**today** [7] - 4:4, 26:20, 29:3, 30:25, 34:6, 96:14, 96:18
**together** [3] - 71:3, 100:9, 106:17
**toggle** [1] - 46:6
**tomorrow** [2] - 124:19, 129:18
**took** [7] - 11:25, 13:6, 25:10, 33:11, 48:22, 83:11, 96:11
**tool** [2] - 82:2, 82:3
**tools** [1] - 69:20
**top** [18] - 6:18, 23:13, 42:1, 42:3, 42:16, 42:17, 42:20, 43:15, 57:17, 91:16, 106:11, 107:22, 108:9, 109:1, 109:4, 109:6, 109:10, 121:25
**total** [1] - 65:23
**totally** [1] - 113:15
**touched** [1] - 35:5
**tough** [2] - 57:20, 57:24
**tougher** [1] - 115:25
**toward** [1] - 28:10
**towards** [4] - 15:1, 110:15, 110:19, 110:20
**track** [1] - 32:3
**tracking** [1] - 39:17
**train** [3] - 52:2, 52:3, 116:14
**trained** [5] - 35:24, 45:17, 48:10, 69:7, 74:21
**training** [101] - 6:10, 7:17, 10:25, 11:1, 11:3, 15:2, 17:24, 24:14, 25:10, 25:24, 26:12, 27:1, 33:18, 33:19, 34:19, 34:24, 35:6, 35:8, 35:12, 36:1, 36:16, 39:2, 39:7, 39:11, 39:12, 39:13, 39:20, 39:23, 44:6, 44:12, 44:16, 46:8, 46:25, 47:13, 47:14, 52:18, 52:20, 53:2, 53:5, 54:8, 56:8,

57:2, 58:3, 59:4, 59:8, 60:16, 61:10, 63:20, 65:21, 66:9, 66:13, 66:19, 66:22, 66:24, 66:25, 67:4, 68:3, 68:11, 68:14, 68:16, 68:18, 69:5, 69:20, 70:1, 70:13, 71:5, 71:7, 71:11, 78:4, 78:6, 83:11, 83:18, 85:7, 85:22, 87:18, 88:14, 88:19, 92:17, 92:21, 92:22, 92:23, 93:3, 93:14, 94:3, 95:12, 95:14, 97:15, 97:16, 99:25, 100:18, 101:1, 105:19, 113:2, 119:8, 119:12, 119:14, 119:16, 119:17, 119:20
**trainings** [2] - 71:6, 71:12
**transaction** [1] - 120:6
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:9
**transcript** [4] - 24:23, 130:3, 130:3, 130:4
**transparency** [1] - 20:17
**traps** [1] - 57:19
**travel** [9] - 29:11, 30:3, 30:13, 30:15, 64:13, 64:22, 64:23, 105:19, 119:8
**traveling** [1] - 65:1
**treatment** [1] - 120:21
**TREVOR** [2] - 1:10, 1:16
**trial** [3] - 42:13, 118:24, 124:19
**TRIAL** [2] - 1:9
**tried** [2] - 98:25, 129:5
**trip** [1] - 115:16
**true** [3] - 76:24, 85:10, 130:3
**trust** [1] - 75:9
**trusted** [1] - 9:5
**truth** [3] - 17:8, 41:3, 128:23
**try** [6] - 28:12, 77:24, 87:2, 88:9, 127:9, 127:10
**trying** [17] - 11:6, 16:22, 17:2, 17:22, 24:2, 28:21, 29:23,

30:3, 30:13, 45:15, 52:13, 54:14, 67:2, 113:13, 126:25
**tuition** [1] - 26:1
**turn** [2] - 52:3, 81:14
**turned** [1] - 40:15
**twice** [2] - 31:17, 80:16
**two** [26] - 3:10, 29:9, 30:20, 37:18, 46:4, 46:6, 47:23, 54:16, 64:21, 69:7, 70:1, 70:3, 81:16, 84:17, 88:2, 99:18, 100:14, 100:16, 108:17, 110:4, 111:19, 111:24, 115:7, 117:25, 122:17, 123:7
**two-star** [1] - 115:7
**type** [11] - 33:19, 35:20, 39:24, 78:3, 92:21, 92:22, 92:23, 93:2, 97:15, 99:25, 105:18
**types** [3] - 39:11, 98:1, 99:18
**typical** [2] - 39:20, 55:10
**typically** [9] - 36:20, 37:13, 37:25, 38:11, 38:20, 39:3, 39:22, 54:25, 55:1

## U

**U.S** [1] - 11:4
**Ukraine** [3] - 29:11, 30:2, 30:12
**ultimate** [1] - 79:5, 94:7
**ultimately** [12] - 5:24, 15:17, 37:24, 47:7, 48:16, 61:12, 61:14, 73:6, 76:4, 76:9, 79:4, 126:9
**unclear** [2] - 69:14, 69:18
**uncomfortable** [1] - 77:14
**under** [12] - 5:1, 36:4, 50:22, 59:7, 69:13, 73:23, 91:18, 98:20, 119:12, 120:4, 120:18, 123:7
**under-deliver** [1] - 36:4
**understood** [5] - 22:2, 45:4, 61:23, 85:15, 93:20
**unengaging** [1] -

69:18
**unfair** [1] - 41:17
**unit** [1] - 39:9
**UNITED** [2] - 1:1, 1:3
**United** [5] - 1:13, 114:25, 117:18, 130:2, 130:5
**units** [1] - 14:1
**universal** [2] - 106:12, 107:8
**universally** [1] - 90:2
**unless** [1] - 89:19
**unprofessional** [1] - 47:11
**unreasonable** [1] - 47:23
**unredacted** [1] - 49:16
**unusual** [8] - 22:12, 45:6, 46:16, 78:3, 78:5, 85:11, 85:21, 86:7
**up** [47] - 3:18, 4:3, 4:9, 7:11, 7:23, 9:8, 13:11, 14:20, 14:22, 20:10, 23:12, 24:9, 28:13, 29:14, 29:17, 32:4, 33:18, 40:8, 42:14, 42:21, 50:24, 53:11, 59:2, 61:7, 62:6, 67:8, 71:16, 74:11, 79:25, 81:2, 90:14, 91:16, 93:16, 93:19, 100:2, 101:2, 106:13, 110:12, 110:24, 112:5, 115:19, 116:20, 121:7, 124:6, 125:16, 128:7, 129:7
**upcoming** [1] - 116:3
**updated** [2] - 43:25, 44:23
**upset** [5] - 94:18, 94:19, 94:21, 94:24, 96:10
**USA** [2] - 59:7, 62:21
**uses** [1] - 89:22
**UTC** [15] - 106:12, 106:18, 106:22, 107:7, 107:8, 107:9, 107:20, 107:22, 108:10, 108:15, 108:20, 109:2, 109:4, 109:11, 109:12

## V

**vacation** [2] - 34:18, 80:21
**Valerie** [2] - 62:19,

62:20
**value** [5] - 9:24, 25:25, 41:17, 41:18, 72:22
**variables** [1] - 46:8
**varies** [1] - 38:21
**various** [3] - 41:6, 66:10, 82:25
**vast** [3] - 75:12, 76:11, 78:2
**VCNO** [3] - 111:2, 115:23, 117:23
**vehicle** [1] - 65:7
**vehicles** [1] - 119:9
**verify** [6] - 83:13, 104:21, 106:20, 114:8, 114:10, 114:20
**version** [1] - 43:7
**versus** [3] - 82:24, 86:21, 87:3
**Vice** [2] - 111:2, 117:23
**videos** [2] - 84:2, 84:7
**view** [5] - 18:14, 28:16, 29:21, 105:4, 113:10
**violations** [1] - 98:8
**virtually** [1] - 36:12
**virtue** [1] - 121:17
**visit** [1] - 115:17
**voice** [1] - 58:4
**vs** [1] - 1:5

## W

**wait** [5] - 9:14, 90:22, 91:7, 127:14, 127:19
**waiving** [1] - 26:1
**walking** [1] - 109:23
**wants** [7] - 28:19, 28:20, 57:20, 58:1, 81:16, 113:5
**warrant** [12] - 38:17, 103:20, 103:21, 103:22, 104:1, 104:10, 104:13, 104:24, 104:25, 106:6, 114:11, 114:23
**warranted** [1] - 121:2
**warrants** [14] - 97:17, 98:11, 99:3, 99:4, 103:13, 103:14, 103:16, 103:17, 104:5, 104:6, 104:18, 104:22, 105:5, 105:7
**Washington** [8] - 1:11, 1:15, 1:17, 1:25, 20:7, 97:9, 97:24, 111:6

**waste** [1] - 70:14
**wasteful** [2] - 72:24, 73:21
**ways** [2] - 5:14, 9:15
**web** [3] - 23:16, 47:15, 82:3
**website** [7] - 83:14, 83:20, 84:2, 84:4, 84:7, 84:11, 85:1
**Wednesday** [1] - 1:10
**week** [5] - 115:9, 115:10, 115:11, 115:23, 115:25
**weekend** [1] - 116:6
**weekends** [1] - 61:19
**weekly** [1] - 126:24
**weeks** [5] - 14:13, 38:1, 60:17, 88:2, 115:16
**welcome** [2] - 4:24, 50:21
**white** [1] - 103:4
**white-collar** [1] - 103:4
**whole** [6] - 77:24, 87:9, 94:15, 98:12, 117:24, 128:13
**Wilmot** [3] - 2:4, 18:5, 29:7
**WILMOT** [24] - 1:16, 3:14, 4:21, 7:4, 8:6, 12:5, 12:18, 12:24, 14:3, 16:23, 17:4, 17:10, 18:6, 18:8, 21:7, 21:11, 23:12, 23:14, 23:21, 23:22, 27:10, 28:15, 28:24, 29:17
**withdraw** [1] - 3:7
**witness** [23] - 7:4, 8:7, 12:18, 12:22, 14:23, 31:2, 32:11, 32:13, 34:10, 40:9, 53:12, 62:7, 67:9, 71:16, 96:20, 96:21, 96:25, 101:3, 112:6, 113:7, 113:14, 116:21, 124:6
**Witness** [2] - 31:1, 96:19
**WITNESS** [12] - 5:2, 8:10, 13:2, 13:13, 14:6, 17:11, 27:7, 27:12, 32:14, 58:8, 97:1, 125:2
**WITNESSES** [1] - 2:2
**wondered** [2] - 70:12, 71:10
**wonderful** [1] - 116:5

**word** [1] - 29:23
**workforce** [4] -
33:12, 33:17, 39:18,
92:16
**works** [6] - 6:15,
18:25, 46:25, 54:3,
62:20, 115:23
**worksheet** [2] - 46:6,
47:8
**worst** [1] - 69:25
**writ** [1] - 63:7
**write** [13] - 7:11,
36:17, 57:9, 58:22,
59:12, 59:13, 59:17,
59:22, 60:5, 69:9,
95:18, 103:23, 116:13
**writes** [1] - 58:1
**writing** [3] - 23:23,
35:3, 55:4
**written** [5] - 11:9,
12:10, 75:17, 91:3,
120:4
**wrote** [6] - 23:13,
44:22, 47:18, 58:12,
68:1, 118:12

## Y

**year** [10] - 22:17,
38:23, 53:4, 53:6,
55:20, 91:7, 94:16,
119:15, 119:17, 128:7
**years** [10] - 21:24,
33:8, 35:3, 56:20,
73:12, 75:14, 79:11,
99:8, 111:16, 111:17
**yelling** [1] - 16:4
**York** [7] - 1:17, 1:21,
23:2, 25:10, 99:17,
115:16
**yourself** [2] - 83:13,
122:3
**YouTube** [5] - 83:15,
83:17, 83:20, 84:5,
84:12

## Z

**zone** [4] - 106:10,
108:21, 109:14,
109:20
**zones** [2] - 107:10,
107:12
**zoom** [1] - 102:3