```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,     )
                                   )
 4            Plaintiff,           )
                                   )
 5        vs.                      ) CASE NO. 1:24-cv-00265-TNM
                                   )
 6   ROBERT P. BURKE,              )
                                   )
 7            Defendant.           )
     _____)
 8

 9              TRANSCRIPT OF TRIAL BY JURY - TRIAL DAY 4
                        (Afternoon Session)
10      BEFORE THE HONORABLE TREVOR N. McFADDEN, DISTRICT JUDGE
                       Monday - May 12, 2025
11                    1:38 p.m. - 5:16 p.m.
                         Washington, DC
12

13   FOR THE GOVERNMENT:
          Office of the United States Attorney
14        BY:  REBECCA G. ROSS
          601 D Street, NW
15        Washington, DC 20530

16        DOJ-CRM
          BY:  TREVOR C. WILMOT and KATHRYN E. FIFIELD
17        1301 New York Avenue, NW, Suite 1000
          Washington, DC 20530
18

19   FOR THE DEFENDANT:
          Parlatore Law Group, LLP
20        BY:  TIMOTHY PARLATORE and ANTOINETTE QUINN O'NEILL
          260 Madison Avenue, 17th Floor
21        New York, New York 10016

22   _____
                          SONJA L. REEVES
23                  Registered Diplomate Reporter
                     Certified Realtime Reporter
24                  Federal Official Court Reporter
                     333 Constitution Avenue, NW
25                        Washington, DC 20001
           Transcript Produced from the Stenographic Record
```

1                          I N D E X

2    WITNESSES CALLED BY THE GOVERNMENT:              PAGE

3    SEBASTIAN GARDNER
          Cross-Examination By Ms. O'Neill            11
4         Redirect Examination By Ms. Ross            21

5    JOHN HANNINK
          Direct Examination By Ms. Ross              36
6         Cross-Examination By Mr. Parlatore          69
          Redirect Examination By Ms. Ross            87
7
     BRADLEY APPLEMAN
8         Direct Examination By Ms. Fifield           89

9
                         EXHIBITS
10   GOVERNMENT'S                                ADMITTED
          41                                          92
11        60                                         102

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to Order of the Court at 1:38 p.m.)

 2              (Jury absent)

 3              MS. O'NEILL:  Your Honor, if I could be heard briefly

 4  on 806, on our exhibit that was not admitted, because we have

 5  another exhibit under the same rule.

 6              Would that be all right?

 7              THE COURT:  Yes.

 8              MS. O'NEILL:  Okay.  Thank you, Your Honor.

 9              So I just want to read Rule 806, attacking and

10  supporting the declarant.

11              "When a hearsay statement or statement described in

12  Rule 801(d)(2)(c), (d) or (e) -- and my understanding is that

13  all of the messages from Charlie Kim and/or Meghan Messenger

14  were admitted under 801(d)(2)(e) as co-conspirators -- has been

15  admitted into evidence, the declarant's credibility may be

16  attacked and supported by any evidence that would be admissible

17  for those purposes if the declarant had testified as a witness.

18              "The Court may admit evidence of the declarant's

19  inconsistent statement or conduct regardless of when it

20  occurred or whether the declarant had an opportunity to explain

21  or deny it.

22              "If the party against whom the statement was admitted

23  calls the declarant as a witness, the party may examine the

24  declarant on the statement as if on cross-examination."

25              The advisory committee rules goes on further.
```

1          "The declarant of a hearsay statement which is

2    admitted in evidence is, in effect, a witness.  His credibility

3    should, in fairness, be subject to impeachment and support as

4    though he had, in fact, testified.  See Rules 608 and 609."

5          There are, however, some special aspects that talks

6    about not requiring them to be able to be confronted with them

7    because of the problem with them not being a witness, but it

8    goes on to say that "They arise from factual differences which

9    exist between the use of hearsay and an actual witness, and

10   also between various kinds of hearsay."

11         It involved the question of applying to declarants the

12   general rules disallowing evidence of an inconsistent statement

13   to impeach a witness unless he is afforded an opportunity to

14   deny or explain, but -- but it goes on to say that without the

15   opportunity to do this, then they are deprived of

16   cross-examining on a statement.

17         And that's what's happening here, is that the

18   government was allowed to introduce the statements they chose

19   under 801(d)(2)(e).  And because these people are not

20   declarants, the defense is now being barred from

21   cross-examination because they're not called, but also from

22   impeaching them through other statements.  And we believe that

23   Rule 806 allows what we were trying to introduce through

24   Defense Exhibit A.

25         THE COURT:  So I'm just trying to think if -- I mean,

1    if Mr. Kim was actually testifying, I'm not sure that I would

2    be allowing you to admit unrelated emails that purportedly show

3    that he wasn't truthful.  Would I?

4         MS. O'NEILL:  An email that he sent where he said

5    something that was not true?  So the problem here is that I

6    would be able to ask him about it, and if he denied it, I'd be

7    able to impeach him.  But because he's not a witness, I need to

8    still be able to bring forward to the jury the same evidence

9    that he has said something that is untrue because by making him

10   a declarant by introducing statements of him, they've called

11   his, you know, credibility into question.  I mean, credibility

12   is always an issue when somebody is a declarant, whether

13   they're a witness or not.  By not allowing me to point out

14   instances other than in the government's own evidence, but the

15   instances I want to point out outside of their evidence, that

16   he's been inconsistent or untruthful it's denying me the

17   opportunity to essentially expose the declarant to the jury,

18   and they're left with the impression that he's truthful."

19        THE COURT:  I guess I thought the rule was, if you had

20   evidence of his inconsistent statements as to the testimony,

21   sure, you could bring it in.  But I wouldn't think that this

22   means you can, any time he's ever been untruthful or

23   inconsistent in his life, bring in intrinsic evidence of that.

24        MS. O'NEILL:  But 806(d) says, "The Court may admit

25   the declarant's inconsistent statement or conduct, regardless

1    of when it occurred or whether the declarant had an opportunity

2    to explain or deny."

3            So, I mean, for example, if Mr. Kim had been --

4            THE COURT:  But you're not looking at the prior

5    sentence, "By any evidence that would be admissible for those

6    purposes if the declarant had testified as a witness."

7            And so I'm saying, again, if Mr. Kim had testified,

8    I'm not sure that it would have been admissible to admit

9    another email on an unrelated purpose.  Would it?

10            MS. O'NEILL:  If it was an untruthful email.  If there

11    was portions of it that were untruthful.  If he had said

12    something had happened that hadn't happened, I -- I would be

13    able to say, you sent a similar email to your investors, trying

14    to convince them that your company was still viable, and you

15    did that by saying you had a $100 million verbal contract.

16            THE COURT:  But then if he said no, wouldn't you be

17    stuck with that?

18            MS. O'NEILL:  I would be -- no.  I believe under

19    608(c), I would be able to attack his credibility with

20    extrinsic evidence.

21            In Defense Exhibit A, though, it's not only other

22    things that he's been inconsistent or untruthful about.  In

23    Defense Exhibit A that we marked, there's also discussion of

24    the 9 April meeting that Juliet Beyler was at where he makes

25    statements in that email about the 9 April meeting that are

1    inconsistent with what Juliet Beyler testified to.  So it's an

2    inconsistent statement.

3          THE COURT:  I'm looking at Exhibit A.  Where should I

4    be looking?

5          MS. O'NEILL:  On the last page, Your Honor.  There is

6    an entire paragraph that's like, "best meeting ever," or

7    something like, that, with Burke, or "best day ever" with

8    Burke, and it very clearly describes that meeting.  And it

9    could only be that meeting because it happened on that same day

10   with the same people.  And it talks about how the meeting was

11   cut short because they had something else, but it would have

12   gone on forever.

13         THE COURT:  All right.  Ms. Ross?

14         MS. ROSS:  A couple things here, Your Honor.

15         I think Your Honor nailed it on the head in saying it

16   has to be admissible as if the declarant was testifying, and

17   none of these emails would be.  You'd be stuck with the answer

18   of the defendant.

19         They've already asked Agent Gardner questions about

20   the veracity of Charlie Kim's statements in various email, and

21   they're stuck with his answers.  The way Agent Gardner answered

22   was that there were statements that he made that he did not --

23   that it is very possible that Kim believed to be true at that

24   time.  Doesn't mean they were false.  Just because they didn't

25   end up happening didn't mean they were inconsistent at that

1    time.  So you have to impeach with inconsistent statements that

2    would be admissible if he were to testify, but at this point

3    there's nothing to show that they would be.

4         THE COURT:  Why isn't this last email on Exhibit A,

5    why isn't that admissible as an inconsistent statement?

6         MS. ROSS:  I'm not sure I see anything inconsistent

7    with this.  This is about Charlie Kim's impression of the

8    meeting.  There was nothing to suggest that his impression of

9    that meeting are inconsistent with what he's writing here.  We

10   don't know what he was thinking or what he believed to be true.

11        As Agent Gardner testified, Charlie Kim made

12   statements and emails that at the time are very possible he

13   believed to be true.  And so we have no reason to doubt there

14   is anything in there that is potentially inconsistent with

15   Charlie Kim's recollection of what happened at that meeting.

16        THE COURT:  You agree, though, that if it is

17   inconsistent with his other statements, then that would be

18   admissible.

19        MS. ROSS:  Statements in other emails?

20        THE COURT:  Yeah.

21        MS. ROSS:  I would still disagree with that.  Just

22   because they may be inconsistent with stuff that was written

23   later doesn't mean they are inconsistent with what he believed

24   at the time, which is what Agent Gardner testified to, which

25   there are times when Charlie Kim would make statements that may

1    not have come to fruition.  But that doesn't necessarily mean

2    that they were -- that what Charlie Kim was saying in those

3    emails was wrong at the time.  And defense counsel crossed

4    Agent Gardner on that, and they're stuck with the answer on

5    that.  There is nothing to suggest that anything in there is

6    inconsistent at the time.

7            THE COURT:  Understand.

8            Ms. O'Neill, you want to respond to that?  You're just

9    saying that this description is inconsistent with what

10   Ms. Beyler testified to, or with what he said elsewhere?

11           MS. O'NEILL:  It is inconsistent with what Ms. Beyler

12   testified to.  But also, my point would be that by him not

13   being here to answer the question of did this -- you know, did

14   you send this email, were you inconsistent, did you lie, and

15   being stuck with his answer, by them introducing it the way

16   that they did and me not even being able to ask that of

17   Agent Gardner on this limits our ability --

18           THE COURT:  You did ask.  The question is whether you

19   get to admit the evidence.  And I guess I'm not -- I understand

20   the Rule 806 about -- about his -- being his prior inconsistent

21   statements, not how he might be inconsistent with somebody

22   else's testimony.

23           MS. O'NEILL:  It would just be that it's not

24   inconsistent with the facts, that he's not being consistent

25   with the facts of the case.  We don't have two times in which

1  he discussed this meeting, but we do have him being

2  inconsistent with facts of this meeting, which if he were to

3  testify, I'd be able to question him on; this meeting, you

4  know, in fact, happened with Juliet Beyler present and, you

5  know, you didn't get to get through your entire spiel because

6  it was cut short because of your -- and you claim that

7  Admiral Burke offered to be an ambassador and nobody else heard

8  that statement.  It would give him the opportunity to explain

9  if this was just his impression that he wanted to be ambassador

10  or if it's something he actually said, and I don't get that

11  opportunity because they didn't call him.

12        THE COURT:  All right.  I understand.  I agree with

13  the government.  I don't think it's about inconsistency with

14  other facts elsewhere.  I think 806 is about the defendant --

15  the declarant being inconsistent with the testimony that he

16  gave.  So I'm standing by my earlier ruling.

17        Let's bring out the jury, Ms. Chaclan.

18    (Jury present)

19        THE COURT:  Welcome back, ladies and gentlemen.  Sorry

20  for the delay.  The attorneys and I had to deal with an issue.

21  But we're ready to resume Agent Gardner's cross-examination.

22        And, Agent Gardner, of course, you're reminded you're

23  still under oath.

24        Ms. O'Neill.

25         SEBASTIAN GARDNER, GOVERNMENT WITNESS, SWORN

1                            CROSS-EXAMINATION
2    BY MS. O'NEILL:
3    Q    Agent Gardner, within your investigation, is it your
4    understanding that Admiral Burke was first told that he was
5    under an ethics investigation before he knew that there was a
6    criminal investigation?
7    A    I don't recall the timeline for sure, but I do know there
8    was an ethics investigation.  I believe it predated this one.
9    Q    Predated the criminal one?
10   A    Yes, ma'am.
11   Q    And you're aware that this -- that he knew he was under an
12   ethics investigation before he started work at Next Jump; is
13   that correct?
14   A    Yes, ma'am.
15          MS. O'NEILL:  Can you pull up Defense Exhibit C just
16   for the counsel and the witness?
17   BY MS. O'NEILL:
18   Q    Agent Gardner, can you take a look at this email and
19   familiarize yourself with it?
20   A    Yes.
21   Q    Have you seen that email before?
22   A    I need to review the whole thing.  I imagine I have.
23   Q    Okay.
24          (Pause)
25          THE WITNESS:  Could you scroll down, please?  Thank

1    you.

2        (Pause)

3    BY MS. O'NEILL:

4    Q   Before you read the whole thing, do you recognize this

5    email as being an email from Admiral Burke to Charlie Kim?

6    A   I believe the top email that I'm reading right now is from

7    Charlie Kim.

8    Q   Part of an email chain; is that correct?

9    A   Yes.

10          MS. O'NEILL:  Your Honor, at this time, defense would

11   offer Defense Exhibit C into evidence.

12          MS. ROSS:  Objection, Your Honor.  Lack of foundation.

13   Relevance.  Hearsay.

14          THE COURT:  Parties approach.

15        (Begin bench conference)

16          MS. O'NEILL:  Your Honor, this comes in.  It's not

17   hearsay because it's offered for the effect on the listener,

18   that Charlie Kim's response to Admiral Burke's concerns about

19   why he might want him hired, the effect on the listener that he

20   then took what Charlie Kim said and came to work for him

21   anyways, even though he knew there was an ethics investigation.

22   And it would also, this rebuts other evidence the government

23   has introduced of Charlie Kim's statements of the fact that

24   Admiral Burke was offered a job for a contract.  Instead, this

25   lays out from Charlie Kim that he offered Admiral Burke a job

1    because of the potential he saw in Admiral Burke and how he's a

2    great leader and how they want to bring that to Next Jump, you

3    know, all of these other positive things, not because we're

4    giving you a job because you gave us a contract.  So it rebuts

5    the statements in evidence by the prosecution of what

6    Charlie Kim said about why Admiral Burke was getting a job.

7            THE COURT:  Should I be looking on page 2?

8            MS. O'NEILL:  I believe so.  I believe that's where --

9    because there was -- if you go all the way to the bottom of the

10   chain, there's conversations about, hey, can you go to the

11   Space Command visit, and Admiral Burke has to tell them, no, I

12   told you I can't represent Next Jump for a period of time, and

13   if it that's the only reason that you want me, then maybe I

14   shouldn't come to work.

15           And then Charlie Kim then explains in an email, I

16   believe on page 2, why he wants Admiral Burke, and it's not

17   because Admiral Burke agreed to give him a contract.  And it's

18   also inconsistent with the phase one, phase two, phase three

19   that they've introduced.

20           MS. ROSS:  Your Honor, I think it's clear they're

21   offering this for the truth of the matter asserted.  They can't

22   introduce self-serving statements of their own party.  They're

23   not introducing a statement against the party.  And to be

24   entirely clear, they haven't stated who the listener is, who

25   the effect is going to, because they can't.  They're trying to

1    admit the entire thing for the truth of the matter asserted.

2           MS. O'NEILL:  Your Honor, the listener is

3    Admiral Burke.  He's listening to what Charlie Kim says about

4    why they want to hire him and what he's going to do at

5    Next Jump, and the effect on him is that he takes the job

6    instead of says, never mind, that's not what I want to do.

7           MS. ROSS:  He's already taken the job at that point.

8    He already signed the offer letter.  It's confusing the issue.

9    They're trying to get this in for the truth as to why

10   Charlie Kim and Meghan Messenger hired the defendant.  It's

11   going to the effect on the listener.  It's going to asserting

12   the truth that that's why they hired him.  And he's already

13   accepted the job, Your Honor, so this is irrelevant to the

14   arguments they're trying to make.

15          MS. O'NEILL:  I would argue that accepting the job is

16   different than starting when there's a period of time when you

17   find out you're under an ethics investigation.

18          And I would also say the non-hearsay reason is effect

19   on listener, but this also comes in under 806.  And when it

20   comes in under 806, it does come in for the truth of the matter

21   asserted as an inconsistent statement of Charlie Kim as to why

22   he wants Admiral Burke.

23          THE COURT:  What's the -- what's that inconsistent

24   statement?

25          MS. O'NEILL:  Inconsistent with, phase one is we want

1   Burke to get also a smile pilot program; phase two, he comes to

2   work with Next Jump; and phase three is that he goes out to the

3   whole Navy with our product.  And so --

4           THE COURT:  All right.  How is this inconsistent?

5           MS. O'NEILL:  Because this is saying, we want you

6   because you're a great leader.  It doesn't say anything about

7   we want you because you got us a small pilot program.

8           THE COURT:  All right.  I agree with the government.

9   I think this is not inconsistent with the other evidence and I

10  think it's not the relevant timeframe, as Ms. Ross points out.

11  The bargain has already been made.  I'm sustaining the

12  objection.

13      (End bench conference)

14          THE COURT:  The objection is sustained.

15  BY MS. O'NEILL:

16  Q   Under your investigation in this case, you found out that

17  at some point after Admiral Burke found out that he was under

18  investigation with the Navy for an ethics violation with

19  Next Jump, that he was represented by counsel?

20  A   At some point he was represented by counsel.  I'm not sure

21  when.

22  Q   By military counsel?

23  A   I don't recall specifically.

24  Q   Did you find in your investigation information as to other

25  reasons why Next Jump wanted Admiral Burke to work for their

1    company?

2    A    As opposed to what?

3    Q    As opposed to the charges in this case?

4    A    Sure.  There was something written down somewhere, but

5    nothing specifically is coming to mind.

6    Q    You found emails where they talked about how Admiral Burke

7    was a strong leader that they wanted at Next Jump?

8    A    Without seeing the email specifically, I can't say.

9    Q    Who did the interview of Amanda Kraus?  Do you know?

10   A    It was not me, but other members of my investigative team.

11   Q    Were you familiar that she was interviewed?

12   A    Yes.

13   Q    Are you familiar enough with this case and how it started

14   to know that this case did not come about because of an IG

15   complaint by Amanda Kraus?

16   A    Again, as far as the initial initiation of the case, I

17   can't say specifically how it was originally started.

18   Q    Can you point us to an IG investigation complaint filed by

19   Amanda Kraus?

20   A    I'm not aware of a specific filing.  Again, I didn't

21   participate in those interviews and didn't follow up

22   accordingly with any of them.

23   Q    It would be important to find out what she said in an IG

24   complaint if she had made one, correct?

25   A    If it was relevant, yes.

1  Q   So if she had made a relevant complaint, it would be

2  important to know that and know what she said, correct?

3  A   It would be helpful, yes.

4  Q   Did you ever see one in your review of all of the evidence?

5  A   I don't recall reviewing one.

6  Q   It would be possible for any of you, for you or

7  Investigator Eversman or Agent DeLaPena, to go to the Navy IG

8  and ask for a copy of any such complaint, correct?

9  A   Yes.

10 Q   Any reason you have to believe the Navy IG wouldn't give it

11 to you?

12 A   I'm not aware of any reason they would not.

13 Q   The text messages that were provided by Ms. Canedo -- the

14 agent that actually collected the phone from Ms. Canedo was

15 Agent DeLaPena; is that correct?

16 A   Sounds correct.  But, again, I wasn't there, so I don't

17 know specifically.

18 Q   It was not you?

19 A   It was not me.

20 Q   It's important when you're working with other agents on an

21 investigation that you trust each other; is that correct?

22 A   Of course.

23 Q   It's important that you can trust the evidence that they

24 bring, that they find?

25 A   Yes.

```
 1   Q   When you were working with Agent DeLaPena, did you discover
 2   that he had been found in a courtroom in this building to
 3   have --
 4          MS. ROSS:  Objection, Your Honor.  Relevance.
 5   Mischaracterization.  Defense counsel is testifying.
 6          THE COURT:  Sustained.
 7   BY MS. O'NEILL:
 8   Q   Would it be important in your investigation to know whether
 9   any other investigators had ever given false information in an
10   affidavit?
11   A   Yes.
12   Q   Did you become aware at any time that another one of the
13   investigators had given false information in an affidavit?
14   A   I became aware that there were issues previously with a
15   member of the team.
16   Q   What member was that?
17   A   Special Agent DeLaPena.
18   Q   Is it your understanding that Agent DeLaPena is the one who
19   wrote the -- I apologize.  Withdraw that question.
20          MS. O'NEILL:  Can you pull up Defense Exhibit B,
21   please?
22   BY MS. O'NEILL:
23   Q   Do you recognize this email from your investigation?
24   A   Yes.
25   Q   When you saw this email in the investigation about
```

1    Next Jump's instructions to its employees, did this cause you

2    to take any action against Next Jump?

3            MS. ROSS:  Objection, Your Honor.  This exhibit hasn't

4    been admitted and we object to its admittance.

5            THE COURT:  Parties approach.

6        (Begin bench conference)

7            MS. O'NEILL:  I was going to lay a foundation.  I was

8    going to seek to admit.  This is evidence --

9            THE COURT:  What's the basis for admitting this?

10           MS. O'NEILL:  Yes, Your Honor.  The basis for this is

11   806 as well, and also just the credibility of the declarant,

12   Charlie Kim, whose been made -- and Meghan Messenger, who has

13   been -- I guess this one specifically, Meghan Messenger, who

14   has been a declarant by the government, that this is evidence

15   of her instructing her team on how to avoid giving investors

16   the information they need.

17           THE COURT:  Is it inconsistent with other evidence in

18   front of the jury at this point?

19           MS. O'NEILL:  No, I don't believe so, Your Honor.

20           THE COURT:  I'm going to sustain the government's

21   objection.

22           MS. O'NEILL:  Yes, Your Honor.

23        (End bench conference)

24           THE COURT:  Objection is sustained.  Please move on,

25   Ms. O'Neill.

1           MS. O'NEILL:  Yes, Your Honor.

2    BY MS. O'NEILL:

3    Q    Ultimately, your investigation was also about Charlie Kim

4    and Meghan Messenger; is that correct?

5    A    Correct.

6    Q    They were subjects of your investigation as well?

7    A    Yes, ma'am.

8    Q    You're familiar with Charlie Kim and Meghan Messenger?

9    A    I am.

10   Q    And you were investigating them for committing crimes as

11   well?

12   A    Yes.

13   Q    And did you look into what they said to their investors

14   specifically and whether they were honest with their investors?

15   A    The communications that were relevant to pretty much

16   anything with this captioned mattered included communications

17   with investors.

18   Q    Did you speak to any of the investors?

19   A    Yes.

20   Q    Did you ultimately arrest them for securities fraud for

21   things that they said to their investors that were not true?

22          MS. ROSS:  Objection.  Your Honor.  Relevance.

23   Outside of the scope.

24          THE COURT:  Sustained.

25   BY MS. O'NEILL:

1  Q   Did you see them sitting in the courtroom today and the

2  last time you testified?

3  A   Yes.

4          MS. O'NEILL:  May I have a moment, Your Honor?

5      (Pause)

6          MS. O'NEILL:  That's all I have, Your Honor.

7          Thank you, Agent Gardner.

8          THE COURT:  Thank you, Ms. O'Neill.

9          Any redirect, Ms. Ross?

10         MS. ROSS:  Thank you, Your Honor.

11                         REDIRECT EXAMINATION

12  BY MS. ROSS:

13  Q   Good afternoon, Agent Gardner.

14  A   Good afternoon.

15         MS. ROSS:  Can we please bring up what's already been

16  admitted as Government Exhibit 59, please?

17         All right.  Can we please bring up Government

18  Exhibit 109, please?

19  BY MS. ROSS:

20  Q   Agent Gardner, do you remember Ms. O'Neill asking you

21  questions about this exhibit?

22  A   I believe so.

23  Q   And just to be clear, this was on May 4, 2022; is that

24  right?

25  A   That is correct.

1   Q    And where were Kim and Messenger and Messenger's family

2   before this email?

3   A    They were in Italy with Burke and Burke's wife.

4   Q    And where did they stay during that trip?

5   A    At Burke's villa or home in Italy.

6   Q    And just to highlight the top there, the defendant said,

7   "Was good to finally be able to talk"; is that right?

8   A    Yes.

9   Q    And this is on his personal email account, right?

10  A    That is correct.

11  Q    And so Juliet Beyler didn't have access to this; is that

12  right?

13  A    That I can see, not that I know of.

14  Q    And would the Navy have access to his personal email

15  account?

16  A    Not that I would be aware of.

17  Q    And when the -- when Kim and Messenger and her parents were

18  staying in Italy, any evidence that the defendant reported that

19  to the Navy?

20  A    Not that I have seen.

21  Q    Or that any anybody else from the Navy stayed at the

22  defendant's house at the same time as Kim and Messenger and her

23  parents?

24  A    Not that I have seen.

25  Q    And here we see the defendant said, "Was good to finally be

1   able to talk," in response to an email that Charlie Kim sent;

2   is that right?

3   A   Yes.

4   Q   And in that email, Charlie Kim wrote, "As you two get to

5   know us better, your new family."  Is that right?

6   A   That is correct.

7        MS. ROSS:  Can we please bring up Government

8   Exhibit 111, please?  And can we go to page 3?  Can we go to

9   the bottom of page 2, please?  Just scroll up a little bit to

10  see the header there.

11  BY MS. ROSS:

12  Q   This was the email that the defendant sent to

13  Captain Appleman on May 6th; is that right?

14  A   Yes.

15  Q   And in this email, he wrote, "Next Jump has approached me,

16  asking if I would be interested in having post Navy employment

17  discussions.  I let them know I could not."

18       That's what he said there, right?

19  A   Correct.

20  Q   And then he went down to say "full disclosure."  Is that

21  right?

22  A   Yes.

23  Q   And, Agent Gardner, was that a full disclosure?

24       MS. O'NEILL:  Objection.  Your Honor.  Calls for a

25  conclusion.

```
 1              THE COURT:  Overruled.
 2   BY MS. ROSS:
 3   Q    Agent Gardner, when the defendant wrote here "full
 4   disclosure," was that a full disclosure?
 5   A    No.
 6   Q    So, for example, did he ever disclose to Captain Appleman
 7   or anyone else at the Navy that he had told Kim and Messenger
 8   he wanted to work for them during that hour-long WhatsApp call
 9   back in April of 2021?
10   A    No.
11   Q    Did he ever disclose to Captain Appleman or anybody at the
12   Navy that he had agreed to work for Next Jump after that
13   Belga Cafe meeting in July of 2021?
14   A    No.
15   Q    Did he ever disclose he had asked Kim and Messenger for a
16   job description in July of 2021?
17   A    No.
18   Q    Did he ever disclose he had made verbal agreements to Kim
19   and Messenger with a contract with the Navy?
20   A    No.
21              MS. ROSS:  Can we please bring up Government
22   Exhibit 56, please?
23   BY MS. ROSS:
24   Q    And, Agent Gardner, do you remember Ms. O'Neill asking you
25   questions about this email?
```

A    Possibly.  I recognize this email.  I can't recall if it

was from your questions or from Ms. O'Neill's.

Q    We see at the bottom email there where the defendant wrote,

"The tool in and of itself does not stand on its own"?

A    Yes.

        MS. ROSS:  And then going to page 2 of this exhibit.

BY MS. ROSS:

Q    We see in paragraph -- on the second paragraph on that

page, he wrote, "I just can't do this as structured"; is that

right?

A    Yes.

Q    That's because Next Jump had just received bad feedback,

right?

A    Yes.  Some of the feedback is listed below in that.

Q    If we look at the feedback at the bottom, for example, we

see that the E-6 wrote, "Confusing and unclear how to use the

material."

        That's what he said, right?

A    Correct.

Q    And this is after the defendant suggested that for --

high-ranking officials attend the Leadership Academy; isn't is

right?

        MS. O'NEILL:  Your Honor, objection.  A

mischaracterization of the evidence.  It was not Admiral Burke

that suggested they attend.

```
 1              THE COURT:  Overruled.
 2   BY MS. ROSS:
 3   Q    This was after the defendant had provided four names of
 4   high-ranking Navy officials to attend that Leadership Academy
 5   hosted by Next Jump, right?
 6   A    So this -- what is the date of this email?
 7              THE WITNESS:  If you could scroll up, please.
 8              This is in September.  I believe the four bios were
 9   sent later.
10   BY MS. ROSS:
11   Q    The defendant still sent the four high-ranking officials
12   that to Leadership Academy, right?
13   A    Correct.
14   Q    And he also took steps to promote Next Jump to people like
15   Admiral Caudle; is that right?
16   A    That is correct.
17   Q    And Ms. O'Neill asked you some questions about
18   Admiral Caudle.  Do you remember those?
19   A    The questions specifically?
20   Q    Did she ask you questions about Admiral Caudle?
21   A    Correct.
22   Q    And about some of the defendant's communications with
23   Admiral Caudle?
24   A    Yes.
25   Q    And did you find evidence that the defendant took steps to
```

1  promote Next Jump to Admiral Caudle?

2  A    Yes.  And more than one occasion, he sent an introduction

3  or an email to outline some stuff with Admiral Caudle and his

4  command.

5        MS. ROSS:  Can we pull up Government Exhibit 101,

6  please?  And going to page 5, can we zoom in on the email at

7  418, please?

8  BY MS. ROSS:

9  Q    Who wrote this email at the bottom there, Agent Gardner?

10  A    Robert Burke.

11  Q    What does he say in the first sentence?

12  A    "Sending you an electronic introduction to Admiral

13  Daryl Caudle, Commander U.S. Fleet Forces.

14  Q    And then looking at the fourth paragraph, what does the

15  defendant write?

16  A    Starting with, "I described"?

17  Q    Yes.

18  A    "I described to him how you've evolved your approach in

19  tools, a current small-scale pilot we're running at NAVEUR, and

20  how your programs might be adapted for use as part of the

21  overall developing Navy program."

22  Q    Just to be very clear, Agent Gardner, when in respect to

23  the training in Naples was this?

24  A    This was approximately two months later.

25  Q    Was this after the negative feedback on the training?

1    A    Yes.

2    Q    Anywhere in this email did the defendant share those

3    negative reviews about the Next Jump training with

4    Admiral Caudle?

5    A    No.

6             MS. ROSS:  Can we please pull up Government

7    Exhibit 99, please?

8    BY MS. ROSS:

9    Q    And just looking at the top email, what did the defendant

10   send Admiral Caudle?

11   A    He sent a draft pilot program that the Royal Navy was

12   considering with Next Jump.

13   Q    And this was March 28th, correct?

14   A    That is correct.

15   Q    And anywhere in this email did the defendant share those

16   negative reviews about the Next Jump training with

17   Admiral Caudle?

18   A    No.

19            MS. ROSS:  Can we pull up Exhibit 100 and zoom in on

20   the top two emails, please.

21   BY MS. ROSS:

22   Q    So we see here, just looking at the bottom email, that

23   Meghan Messenger forwarded Cameron Chen's feedback; is that

24   right?

25   A    Correct.

1    Q    Then just looking briefly at Kim and Chen's feedback that

2    she provided, we see, for example, that Cameron Chen wrote --

3           MS. ROSS:  Can we zoom in on the feedback at the

4    bottom, please?

5    BY MS. ROSS:

6    Q    So just to highlight one sentence, we see in the middle

7    there that he wrote, "I have a list of things we could have

8    done better.  Need to identify the right people, facilities to

9    accommodate the events, and early messaging to the troops."

10          Do you see that?

11   A    Yes.

12   Q    And then looking at the very top email, the defendant says,

13   "I agree we rushed it," right?

14   A    Yes.

15   Q    And this is the day after that March 28th email that he

16   sent to Admiral Caudle promoting the business plan that could

17   work for Next Jump; is that right?

18   A    Correct.

19   Q    And did you find any evidence that the defendant went back

20   to Admiral Caudle to share this negative opinion of Next Jump?

21   A    I did not see anything to that effect.

22          MS. ROSS:  And next, can we please bring up Government

23   Exhibit 114 and go to page 2, please?

24   BY MS. ROSS:

25   Q    What is the date of this disqualification statement?

1    A    May 9, 2022.

2    Q    And what does it -- and then we see that the defendant is

3    disqualified from participating personally and substantially as

4    a government officer or employee in any particular matter that

5    has a direct and predictable effect on financial interests of

6    Next Jump.  Is that right?

7    A    Yes.

8    Q    In other words, he was recused from matters having to deal

9    with Next Jump.  Is that fair to say?

10   A    That's fair to say.

11         MS. ROSS:  And so can we please go to Exhibit 130,

12   please?

13   BY MS. ROSS:

14   Q    Then what is the date of this email?

15   A    Wednesday, June 1st, 2022.

16   Q    So approximately three months after -- or three weeks after

17   the defendant had been disqualified.  Is that fair to say?

18   A    Yes.

19   Q    And what does the defendant say in the first sentence

20   there?

21   A    "I'd try going directly to Daryl again, first proposing

22   either he come see your HQ or you coming to brief him."

23        Want the full paragraph or the first sentence?

24   Q    That's perfect.  Thank you.

25        And then can we -- can you please read the second

1  paragraph?

2  A    "My last note to him and our conversations after that

3  centered on adapting a version of the modular approach the

4  Royal Navy would use to the U.S. Navy under what Daryl has

5  coined total sailor fitness, an expansion of the current Navy

6  culture of excellence program.

7  Q    And then what does he write in the fifth paragraph there?

8  A    "He's an engineer with a Ph.D. in statistical math.  You

9  can appeal to him with your dev GPS model as one example of

10 individual growth.  While the Navy already has many mechanisms

11 in place to approximate a measure of team growth, but they are

12 resulting oriented and don't really factor in people factors

13 yet.  And finally, the train the trainers aspect of your

14 current program.

15 Q    Again, he sent this after he had been disqualified, right?

16 A    Correct.

17 Q    Using which email account, Agent Gardner?

18 A    His personal email.

19 Q    The account that the Navy did not have access to?

20 A    Correct.

21        MS. ROSS:  Can we please bring up Government

22 Exhibit 42B, please?

23 BY MS. ROSS:

24 Q    Agent Gardner, Ms. O'Neill asked a lot about the text

25 messages between the defendant and Denese Canedo.

1    A    Yes.

2    Q    To be clear, what messaging platform did the defendant

3    exchange these messages with Denese Canedo?  What did he use?

4    A    WhatsApp.

5    Q    And you testified on direct that WhatsApp is an encrypted

6    messaging application.  Is that fair to say?

7    A    Yes.

8    Q    And so would encrypted messaging messages going back and

9    forth appear on toll records.

10    A    Unclear.  I don't know if going through a

11    telecommunications provider like Verizon or AT&T, or insert

12    whatever provider they use, would show, as it's a third-party

13    app.  And, actually, I have not dealt directly with WhatsApp on

14    toll records before.

15    Q    So WhatsApp messages, they're sent over Wi-Fi; is that

16    right?

17    A    They can be, or I believe they can be sent via 5G or -- you

18    know.

19    Q    And messages sent over Wi-Fi do not appear in toll records,

20    right?

21         MS. O'NEILL:  Objection, Your Honor.  Counsel is

22    testifying.

23         THE COURT:  Overruled.  You're going to ask a

24    question, yes?

25    BY MS. ROSS:

1  Q   Agent Gardner, if a WhatsApp message or any message, like

2  an iMessage, is sent over Wi-Fi, does that appear on a toll

3  record?

4  A   I'm not sure.  I haven't dealt with it enough personally.

5          MS. ROSS:  Next, can we please pull up Government

6  Exhibit -- can we pull back up Government Exhibit 59, please?

7          I'm sorry.  56.  I apologize.

8  BY MS. ROSS:

9  Q   So, Agent Gardner, this was the email we looked at a little

10 bit earlier discussing the negative feedback about that kind of

11 initial Next Jump app; is that right?

12 A   Yes.

13 Q   And in this same email, did the defendant and Kim and

14 Messenger make plans to meet?

15 A   Yes.

16 Q   So this was after they were kind of discussing the negative

17 feedback and the defendant said he couldn't do this as

18 structured.  Is that fair to say?

19 A   Correct.  They scheduled the meeting after that.

20 Q   Did they, in fact, meet in New York City at Next Jump's

21 offices?

22 A   They did.

23         MS. ROSS:  Can we pull up Government Exhibit 66,

24 please?

25 BY MS. ROSS:

1  Q    And when did Charlie Kim send this email in relation to

2  that meeting?

3  A    To that meeting?

4  Q    In New York City at Next Jump's offices?

5          MS. O'NEILL:  Your Honor, I'm going to object that

6  this is outside of my cross.  I didn't bring any of this up at

7  all.

8          MS. ROSS:  She talked about the Leadership Academy,

9  Your Honor, and that's where these questions are going.

10          THE COURT:  Overruled for now.  Give you a little

11  latitude.

12  BY MS. ROSS:

13  Q    When in relation to the defendant and Kim and Messenger

14  meeting in New York City was this?

15  A    This was the same day.

16  Q    And so we see here that Charlie Kim wrote, within one week

17  of LA, he's going to propose back a $1 million engagement with

18  Next Jump, with goal of having it signed before Christmas.

19  That's what he said there, right?

20  A    Approximately 1 million, yes.

21  Q    Just to be clear on our timeline, is this after the

22  defendant had suggested the four high-ranking officials to

23  attend that Leadership Academy?

24  A    This was after the four officials were -- their bios were

25  sent over.

1  Q   And this is before the Leadership Academy actually

2  happened, right?

3  A   Correct.  This is approximately two weeks before the

4  academy happened.

5  Q   But Kim said that the defendant was going to propose a

6  $1 million engagement within one week of that training being

7  over; is that correct?

8  A   Yes.

9  Q   So the feedback from that Leadership Academy was irrelevant

10  to the defendant's proposal, correct?

11  A   That is the suggestion with this, yes.

12  Q   The feedback from that leadership training academy was not

13  going to impact the contract proposal, was it?

14  A   Things were already forward leaning at that point.

15  Q   And Ms. O'Neill asked you about whether former --

16        MS. ROSS:  Thank you.  We can take that down.

17  BY MS. ROSS:

18  Q   Ms. O'Neill asked you about whether former CNO Bill Moran

19  ordered a $100 million contract.  Do you remember her asking

20  you that?

21  A   That sounds familiar.

22  Q   Did you uncover that the defendant in this case gave a

23  verbal order to his staff to contract with Next Jump?

24  A   A verbal order to contract with Next Jump?

25  Q   Or an order.

1  A    I mean, on top of the email sent to Ms. Beyler in December

2  where they verbally added some things to it.

3  Q    So did you find evidence the defendant ordered a contract

4  to happen with Next Jump in this case?

5  A    Yes.

6  Q    Did you see evidence that his staff followed that order?

7  A    Yes.

8          MS. ROSS:  Thank you, Your Honor.  No further

9  questions.

10          THE COURT:  Thank you, Agent Gardner.  You may step

11  down and you're free to go.

12          THE WITNESS:  Thank you so much.

13     (Witness excused)

14          THE COURT:  Government may call its next witness.

15          MS. ROSS:  Thank you, Your Honor.  The next witness is

16  Admiral Hannink.

17     (Oath administered to the witness)

18              JOHN HANNINK, GOVERNMENT WITNESS, SWORN

19                      DIRECT EXAMINATION

20  BY MS. ROSS:

21  Q    Good afternoon.  Can you please state and spell your name

22  for the record.

23  A    My name is John G. Hannink, first name J-o-h-n, middle

24  initial only is G.  H-a-n-n-i-n-k.

25  Q    Where do you currently work?

1  A    I work with the Department of Defense, the Defense Office

2  of Hearings and Appeals.

3  Q    Are you currently active-duty military?

4  A    I am not.

5  Q    Were you previously active-duty military?

6  A    I was.

7  Q    With which branch?

8  A    The United States Navy.

9  Q    How many years did you serve?

10  A    I was commissioned for 36 years.

11  Q    And when did you retire?

12  A    2021.

13  Q    I'm going to focus your attention from 2018 until your

14  retirement.

15      What position did you hold with the Navy?

16  A    I was the Judge Advocate General of the Navy.

17  Q    Is that what you refer to as JAG for short?

18  A    That's correct.

19  Q    Can you explain what that is?

20  A    The JAG is a position that is the senior military legal

21  advisor to the Secretary of the Navy.  He is the civilian

22  leader of the department and chief of naval operations who is

23  the most senior uniform person.  The judge advocate general in

24  that role also supervises a number of what we call divisions or

25  codes within the office of the judge advocate general that deal

1    with issues under our cognizance, like international law,

2    admiralty law, litigation and claims, some environmental law,

3    military personnel law, legislation, regulations, standards of

4    conduct, and a few others.  Then finally, the JAG supervises

5    the provision of legal support to the fleet through a number of

6    offices that are in different fleet concentration areas.

7    Q    And prior to becoming the JAG, how long had you been part

8    of the JAG Corps more generally?

9    A    I went to law school in 1991, graduated in 1994, when I

10   joined the JAG Corps, and served in the JAG Corps from then

11   until my retirement.

12   Q    And as part of the JAG Corps and then your role as the JAG,

13   did you work closely with flag officers?

14   A    I did, in a number of tours, including the last six years

15   of my service.

16   Q    As the JAG?

17   A    As first the deputy JAG for three years and then as the JAG

18   for three.

19   Q    Can you explain, what is a flag officer?

20   A    A flag officer is anyone in the pay grade of O7 or above.

21   In the Navy, the O6 rank is called captain.  Once an officer is

22   selected for Rear Admiral, then they become what's known as a

23   flag officer, and that's a title that applies to them through

24   the various admiral ranks, one star, two star, three star, and

25   four star.

1  Q   What kind of training do flag officers receive with respect
2  to ethics in the Navy's code of conduct?
3  A   So the -- the training for flag officers, in part, stems
4  from the -- the fact that they are filers of the public
5  financial disclosure form.  And so they receive annual training
6  on ethics topics.
7      The way that works is the Department of Defense generally,
8  at the DoD General Counsel's Office, specifies certain topic
9  areas that touch on legal -- the standards of conduct.  And
10 materials are created, and those come to the services, and
11 attorneys, whether they are uniform judge advocates or civilian
12 general counsel attorneys, can and will and are required to
13 provide training to -- to flag officers.
14 Q   Does the -- excuse me.
15 A   Yeah.  In addition, there are other venues at which
16 training is provided.  For example, there is a new flag officer
17 conference where the chief of naval operations usually convenes
18 all the new flag officers in a particular year, and one of the
19 training sessions at that is often dealing with ethics.
20 Q   And does the training that flag officers receive with
21 respect to the Navy's ethics rules and the code of conduct
22 include post-government employment rules?
23 A   It will.  As I mentioned, on the annual basis, there are
24 selected topics that are picked for training.  And so that
25 wouldn't necessarily be a topic every year, but it would be one

1  that would be routinely revisited.

2  Q   And how about training on when it is appropriate to discuss

3  contracts with companies outside the Navy, is that something

4  flag officers also receive training on?

5  A   Similarly, that would be one that is a periodic topic as

6  part of the annual training.

7  Q   And how about training on the OGE 278 form?

8  A   I'm not familiar with specific training on the 278 form,

9  but the flag officers do know that they are required to

10  complete one, and they can do that in consultation with their

11  general counsel attorney with their judge advocate.  The form

12  that you've described as the financial disclosure form comes

13  with directions on how to fill it out, what needs to be

14  disclosed.

15  Q   And can you just describe -- you started to mention it, but

16  can you describe in a little more detail, what is the OGE 278

17  form?

18  A   The 278 is the public financial disclosure form.  I believe

19  it stems from federal statute that requires certain people in

20  government to complete it annually, and that includes flag

21  officers in the military services.  It lists -- has various

22  sections, and it lists assets that are owned.  It lists income

23  and investments.  It may include mortgages, liabilities, and

24  other things that are intended, upon review, to give a

25  reflection of the financial status and help identify whether

1    there are any conflicts.

2    Q    Are flag officers required to answer those forms

3    truthfully?

4    A    Yes, they are.

5    Q    Does that mean they cannot withhold relevant information?

6    A    That's correct.

7    Q    In your experience, is that widely understood?

8    A    It is.

9    Q    And what sort of resources do flag officers have if they

10   have questions about ethics or the Navy's code of conduct?

11   A    The primary resource is their ethics counselor.  There are

12   Navy judge advocates who are designated as Navy counselors

13   assigned to the major staffs.  Flag officers in command would

14   have immediate access to that attorney.  On some staffs, there

15   are multiple flag officers, and not every flag would have their

16   own lawyer, but the flag officers on that staff would know that

17   there is a person they can go to with questions.

18   Q    Are admirals assigned specific ethics counselors?

19   A    For example, an admiral who is in charge of a certain

20   command or a staff would have on that staff a judge advocate,

21   and that judge advocate is normally on our list of designated

22   ethics counselors and they -- flag officers know that that is

23   the person that they can go to, and the judge advocates know

24   that they are the ethics counselor serving that flag officer

25   and the staff.

1       Similarly, there are some ethics counselors who are general

2    counsel, civilian attorneys.  In a similar fashion, they are

3    known and they know it's their responsibility to provide legal

4    counsel on ethics matters.

5    Q    Were you trained on the Navy's ethics, rules, and code of

6    conduct?

7    A    I was.

8    Q    What type of training did you receive?

9    A    As an attorney, I went through the Army JAG school, which

10   is in Charlottesville.  There was a week- or two-week-long

11   course on standards of conduct.  In addition, in the Navy JAG

12   Corps, there is a program to re-certify ethics counselors.  We

13   have to go through periodic refresher training to be an ethics

14   counselor, and that continues throughout the career.  And then

15   also, as a flag officer, I went through the same training that

16   every flag officer goes to.  So I had someone on my staff who

17   was an ethics counselor, and they gave me briefings like they

18   would any flag officer for that year, and they would be

19   available, also, to answer any questions that I had.

20   Q    Do you know somebody named Robert Burke?

21   A    I do.

22   Q    How do you know him?

23   A    I know Admiral Burke from the Navy.  I worked with him, in

24   particular, over the last about six years of my career.

25   Q    Okay.  I want to ask you a little bit more about your

1    relationship with Robert Burke.

2        Do you remember the first time you met him?

3    A    Yes, I do.  I believe it was in 2015.  I recently had been

4    selected as a Navy flag officer.  Admiral Burke was already an

5    admiral assigned to the Navy personnel command.  And my

6    recollection is, the first time I met him was an office call in

7    the Pentagon.

8    Q    And what was your relationship with the defendant?

9    A    Well, it was one where the judge advocate's office and the

10   judge advocate general's corps -- obviously, we -- like every

11   other area of specialty in the military, we rely on people, and

12   that takes billets, right, that people fill.  And so if we have

13   legal needs for certain number of attorneys or paralegals, the

14   Navy personnel command would be the place that we would go.

15   And my recollection is that the billet Admiral Burke was in at

16   the time was very important, not just for us, but Navy wide, in

17   allocating the Navy personnel monetary resources.  And so it

18   was very appropriate and I was very pleased to be able to meet

19   with him.

20   Q    And is that because he was the CNO at the time, the Chief

21   Naval Officer?

22   A    No.  He was -- at the time, he was in Navy personnel

23   command.  I don't recall the exact title, but I believe his

24   billet dealt with personnel and budget decisions.

25   Q    Did Admiral Burke ultimately become the chief naval

1    officer, the CNO, the chief naval officer?

2            THE COURT:  You mean vice chief?

3            MS. ROSS:  DCNO.  I'm sorry.

4            Eventually, he did become the vice chief of naval

5    operations.

6    BY MS. ROSS:

7    Q    What is the role of the vice chief of naval operations?

8    A    The vice chief is the number-two ranking officer in the

9    Navy.  Like the CNO, the vice chief is a four-star admiral as

10   the number-two officer right under the CNO.  They have a very

11   close working relationship.  And so in the absence of the CNO,

12   the vice chief becomes acting CNO.  The CNO also implements,

13   you would say, and ensures that the guidance given by the CNO,

14   the vice chief ensures that that is put out, complied with,

15   that the CNO's priorities are being worked, and generally, the

16   material that comes back to the CNO is -- is one that the CNO

17   would expect.

18       Another role for the vice chief as the -- we call them the

19   Navy.  On a ship, there's a commanding officer and an executive

20   officer.  As the vice chief, right under the chief of naval

21   operations, in general, if there is a flag officer

22   administrative issue, a misconduct issue, normally it's the

23   vice chief who is assigned to handle that administratively.

24   Q    And does that include violations of the Navy's ethics rules

25   and standards of conduct?

1   A    Yes, it would include.

2   Q    I want to talk about those ethics rules and standards of

3   conduct in a little bit more detail.

4           MS. ROSS:  Can we please bring up what's already been

5   admitted as Government Exhibit 9, please, and can we publish it

6   for the jury?

7   BY MS. ROSS:

8   Q    And, Admiral Hannink, do you see your email address here?

9   I know there is a lot of names here.  It's about halfway

10  through the page.

11  A    I do.  I see it in the middle of the page.

12  Q    Is that your address, john.hannink@navy.mil?

13  A    That's correct.

14  Q    Did you receive this email?

15  A    Yes.

16  Q    What's the subject line at the top there?

17  A    The words are "The Standard of Conduct Guidance,"

18  apparently indicating the subject matter of the email.

19          MS. ROSS:  And can we please go to page 8?

20  BY MS. ROSS:

21  Q    Looking at the date that's listed there, what is the date

22  of this email?

23  A    This would be Thursday, 7th of May, 2020.

24  Q    And what was your position at that time?

25  A    I was the judge advocate general.

1  Q    I'm not going to have you read this whole email, but can

2  you read the first paragraph, please?

3  A    "Admirals and senior leaders, I've attached the latest

4  edition of the annual standards of conduct guidance, a familiar

5  and important reminder that as leaders we have to own our

6  ethics.  Like readiness, ethics require a steady investment in

7  ourselves and others.  We must continuously check and calibrate

8  our decision-making, our influence, and our example to the

9  sailors we lead."

10  Q    Then going back to page 1, please.

11       Was this email sent out by the defendant?

12  A    Sent out by Admiral Burke.

13  Q    And why was Admiral Burke responsible for sending out the

14  annual standards of conduct guidance?

15  A    If I can provide some history.  This is a document that, to

16  my knowledge, began maybe before this, but at least by the 2008

17  to 2010 timeframe.  And my understanding is that there are a

18  lot of different ethics rules and they cover different

19  subjects.  Some of them are statutes.  Some are in the Code of

20  Federal Regulations.  Some are more DoD oriented.

21       And at one point, I believe it was frustration with a

22  number of Navy officers, Navy flag officers included, who ran

23  afoul of standards of conduct, and over time, one of the

24  mechanisms to address this was an annual guidance message.  The

25  decision was to have it go out from the CNO.  And I think for

1  some of the reasons I testified earlier, the CNO was the

2  perfect place for this to come out, being the number-two

3  officer in the Navy.

4      And so this document was intended to be a balance of, hey,

5  let's provide the rule in sufficient detail, but not too much

6  detail, in -- compiled in a user-friendly understandable

7  fashion that goes to the flag officer, can be made available to

8  the staff, and that will help everybody have visibility on what

9  the rules are, awareness of the rules.  The other benefit is it

10 makes standard of ethics and standards of conduct commanders'

11 business and not just something that resides in a judge

12 advocate office, for example.  But as the message I read is

13 clear, this is commanders leading the fleet in ethics as well

14 as other things.

15 Q   So who else -- we know you received this.  Who else got

16 this email that the defendant sent out?

17 A   From my read of the blind copy line, this is flag officers

18 through the Navy.  I can't tell if there may be the senior

19 enlisted service civilians in here, but it is what we would

20 call the flag ward room, to every flag officer in the Navy.

21 Q   And is it standard for the VCNO to send out the standards

22 of conduct guidance every year to all of the flag officers?

23 A   Yes.  There may be an exception, but my recollection is

24 year after year after year, this was a standard document to be

25 sent out.

1    Q   Can we please go back to page 8, please?  Can you just read

2    the second paragraph of the defendant's email, please?

3    A   "Please review the revised guidance, and as you routinely

4    communicate with your people, please reinforce that the

5    expectation is that we routinely exceed the minimum acceptable

6    standard of conduct.  As you all know, exceptional

7    professionalism and integrity are force multipliers."

8    Q   So in addition to reviewing this guidance that the

9    defendant sent out, I want to be clear, are the ethics rules

10   taught in other ways as well?

11   A   Yes, they are.  The standard career, it may vary from

12   person to person.  For example, officers will get some initial

13   ethics indoctrination as they join the Navy, but when they're

14   junior officers, more junior ranking and less responsibility,

15   they don't have a requirement for annual training, for example.

16   But as they become more senior and they would attend what we

17   would call a department head school, where they're middle-grade

18   leaders, and then even more often, as they're getting ready to

19   be executive officers and commanding officers at about the 16-,

20   17-year point, then they would go to a commanding officer's

21   type school, and frequently there would be training there as

22   well.  And then as I mentioned, for new flag officers, there's

23   training where ethics is a block in addition to the annual

24   training that we discussed.

25   Q   And through your training and experience, are you familiar

1   with the Navy's ethics rules?

2   A   I am familiar with them.  I don't claim to be an expert.  I

3   have never tried to memorize them.  But I did practice in this

4   area and I'm familiar.

5   Q   And is it the same with the Navy's code of conduct?

6   A   Pardon?

7   Q   Is that the same with the Navy's code of conduct?

8   A   Well, the words "code of conduct" bring a different

9   connotation because that deals with the code of conduct in time

10  of war if one is taken prisoner.  But I think what you really

11  mean is, these are the standards of conduct that generally

12  apply throughout the executive branch, but they apply in the

13  Navy as well.

14  Q   And you're familiar with those standards of conduct?

15  A   Yes.

16         MS. ROSS:  And can we go to page 9 of this exhibit,

17  please?

18  BY MS. ROSS:

19  Q   And what is the subject line of this document?

20  A   The subject line is Annual Standards of Conduct Guidance.

21  Q   And what's the date on this guidance?

22  A   5 May 2020.

23  Q   How is the annual standards of conduct guidance memo

24  created?

25  A   There is a process.  The process itself is a bit informal,

1    but the basis is the document that went out the prior year.

2    And attorneys from the judge advocate general's Office who work

3    in the ethics field, along with their Navy general counsel

4    counterparts, along with a lawyer who works on the vice chief's

5    staff and a few other attorneys, review last year's document.

6    They would consider whether there have been any changes in the

7    statutes or regulations that are incorporated.  They would also

8    consider whether there had been any inspector general reports

9    with lessons that ought to be incorporated here.

10       Over time, they also began thinking not just of giving a

11   recitation of the rules, but putting in templates and

12   frameworks that if the staff followed guidance, it would be

13   difficult to err in certain areas.  And so there is always a

14   balance between the length of the detail.  You don't want to be

15   too long, but you want it to be long enough so the context is

16   clear, so that the reader can actually use this.

17       And, like I did, you print it out.  The staff has it.  I

18   would have it.  It's a very useful ready reference.  And what

19   it means is that you don't need to memorize the rules, but you

20   know where they're found and you can find the guidance readily.

21       That discussion then leads into a revised document.  Some

22   year there may not be very many changes at all.  Other years it

23   may be a flag officer would say, hey, I want something else put

24   in.  We would craft it and finalize it.  As the judge advocate

25   general, I would see it before it went for final signature up

1   to the vice chief.  I was never involved in the signature

2   process with the vice chief, but the way that normally works is

3   the lawyer that's in the vice chief's office, the Navy judge

4   advocate, summarizes the changes from one year to the other,

5   would make a briefing memo that would be sent through the

6   staff.  It would go to the vice chief.  There could be an

7   in-person discussion about it.  I don't have the details on

8   that.  But then when the vice chief would be confident this is

9   the guidance to go put out this year, then it would be signed

10  and disseminated.

11  Q   What is the goal of this, sending out this code of the

12  standards of conduct to all the flag officers?

13  A   Yeah.  As I said, it's visibility and awareness.  Maybe on

14  the awareness side, you know, it's a reminder that the rules

15  are there, you have to understand generally what they are.

16  It's awareness that it's a flag officer responsibility for

17  their own compliance, but also to share it with the staff.  It

18  makes it -- as I mentioned before, it makes it commander's

19  business, and the expectation that is sent out through this

20  document makes it clear to Navy admirals that our compliance

21  with the standards of conduct is not just a nice to have, that

22  it's expected.

23  Q   So kind of piggybacking on that, just to be clear, were

24  active-duty members of the Navy required to follow the standard

25  of conduct?

```
 1  A    Yes, because the standards of conduct apply generally.
 2  It's more broadly than the Navy, right?  It's members of the
 3  executive branch.  And what this does is it brings the higher
 4  guidance into a document that our people will recognize and
 5  that they can use as they go about their daily business.
 6  Q    Just to be clear, was the Navy part of the executive
 7  branch?
 8  A    It is.
 9  Q    Were you required to follow these standards of conduct?
10  A    Yes.
11  Q    Was the defendant required to follow the standards of
12  conduct?
13  A    Pardon?
14  Q    Was the defendant required to follow the standards of
15  conduct?
16  A    Yes.
17  Q    Can we please go to page 19 of this exhibit?
18       What is the annual ethics audit review checklist?
19  A    This is a checklist that was developed.  I don't know the
20  exact year.  It was inserted into the standards of conduct
21  guidance, the thought being that, as I mentioned, sometimes
22  it's good to know the rules, but sometimes you can do better
23  than just lay the rules out in a document.
24       The idea of the checklist is that once a year the flag
25  officer staff, judge advocate general taking -- the JAG officer
```

1    taking an important role, would review the items on this list

2    with the flag officer and the staff, and that would give them a

3    chance to self-assess.  If you read a bullet on here, for

4    example, and you say, wow, do you think we've been complying

5    with that, well, it gives you a chance to dig down to

6    understand why.  If you think your procedures are solid, it

7    gives you a chance to relook at those and -- and understand

8    there's areas that you're strong.  But the thought is that

9    doing this once a year, because you have staff turnover, flag

10   officer turnover, would help make the ethics within an office

11   run smoother and better and with strong compliance.

12   Q    In your experience, was it widely understood that Navy

13   officials had to abide by the items listed here?

14   A    Yes.  I mean, this is a review checklist, right, that would

15   be used for the staff review, but each of the items on here

16   relates to something in the standards of conduct guidance, and

17   compliance is required with those.

18   Q    And I'm not going to have you read this whole thing.  But

19   under "Training," can you read that first bullet point,

20   beginning with "Flag officer"?

21   A    "Flag officer completed annual ethics training no later

22   than 30 November of each calendar year."

23   Q    As a flag officer, would the defendant have had to complete

24   an annual ethics training?

25   A    Yes.

1    Q    Would it include similar information to what is provided in

2    this memorandum?

3    A    Yes.  As I said, the annual training is, it's a collection

4    of topics.  It wouldn't necessarily cover everything in here,

5    but those topics would rotate from year to year.

6              MS. ROSS:  Can we please go to page 20 of this

7    exhibit?

8    BY MS. ROSS:

9    Q    And can you read the first bullet point under "Financial

10   Disclosure," please?

11   A    "Required financial disclosure forms filed on time to

12   include STOCK Act transaction reports, OGE Form 278T."

13   Q    What does that second bullet point say?

14   A    "Conflict letters issued, if necessary."

15   Q    What is a conflict letter?

16   A    Well, out of the financial disclosure form process, when a

17   flag officer completes the form, it would go to their

18   supervisor for review, and also to the ethics counselor for

19   review.  And when those two people had looked at it, it would

20   go to the -- there's an office in the office of the judge

21   advocate general we call Code 213, administrative law, who

22   would do a final review.  And if there are any indications on

23   the flag officer's 278, an actual conflict would have to be

24   addressed.  For example, if it turns out that flag officer's

25   spouse maybe had gained new employment and it was employment

maybe with a company that you could foresee some conflict with

a flag officer responsibility, something like that would have

to be addressed.

You would also look through the form.  You look at stocks

held, for example, and other investments.  And based on that

form, even if there were no apparent conflicts that had to work

through, at the end of this process, generally, there is a

letter that goes to the flag officer that would say, no

conflicts were identified.  However, if you have official

business with any of -- it would list the assets being held,

then you shall consult your ethics counselor for potential

disqualification.  It's either a conflict letter or letter of

advisement saying if in the event of a conflict, that recusal

may be required.

Q   Just to be clear, those letters are issued based on the

information provided by the flag officer in the form itself?

A   That's correct.

Q   If it is determined that the flag officer has a conflict,

what generally happens after that?

A   The supervisor and the ethics counselor would generally

send that on Navy JAG Code 13, and even the ethics counselor or

Code 13 would write up a document.  And the objective is to

find some way to resolve the conflict, and there would be,

generally, two ways to do it.

One is that if it was a flag officer spouse, for example,

1    you may move to a different job.  That would resolve a

2    conflict.  Or if there are potential issues that come within

3    the flag officer's duties, there might be a recusal letter

4    requirement that if anything related to a certain company would

5    come before the flag officer, the flag officer is recused from

6    any decision, advice, recommendation, et cetera, related to

7    that company, and that could resolve a conflict.

8              MS. ROSS:  All right.  Next, can we please go to page

9    24?

10             THE COURT:  Why don't we take a pause here for a

11   midafternoon break.

12             Ladies and gentlemen of the jury, I'll ask you to be

13   back in 15 minutes.

14             And, Admiral Hannink, I'll direct you not to discuss

15   the contents of your testimony with anyone over the break.

16       (Jury absent)

17             THE COURT:  All right.  We still looking to wrap up in

18   the next day or two, Ms. Ross?

19             MS. ROSS:  Yes, Your Honor.

20             THE COURT:  All right.  Mr. Parlatore?

21             MR. PARLATORE:  Just a quick scheduling question for

22   this afternoon.

23             Your Honor had previously indicated you want to have

24   the charging conference this afternoon.  Is that still in the

25   offering?

1    THE COURT:  I think so.  I mean, why don't we plan to
2 go until 4:30 today and then see how far we can get with the
3 jury instructions after that.  And I'll plan to tell the jury
4 that we're -- we certainly expect to get the case to them this
5 week and that they should plan on potentially deliberating on
6 Friday.
7    Other thing, Ms. Edwards reminded me, I don't think
8 we've have had any sidebars that should be sealed.  But if any
9 of you can think of one, let me know.  But I think at this
10 point, none of them have been sealed.
11    All right.  Thanks, folks.  See you in 15 minutes.
12    (Recessed from 3:02 p.m. to 3:19 p.m.)
13    (Jury present)
14    THE COURT:  Welcome back, ladies and gentlemen.  We're
15 ready to hear the continued testimony of Admiral Hannink.
16    Sir, I want to remind you you're still under oath.
17    Ms. Ross.
18    MS. ROSS:  Thank you, Your Honor.
19    We can pull back up and publish for the jury
20 Government Exhibit 9, please.  And we're going to start off on
21 page 24.
22 BY MS. ROSS:
23 Q   All right, Admiral Hannink.  We're just going to continue
24 going through this document in a little bit more detail.  We're
25 going to pick up here on the principles of ethical conduct.

1    What are the principles of ethical conduct,

2  Admiral Hannink?

3  A    This is a list of, as you can see, 14 very high-level

4  principles.  The key references are listed at the top.  I don't

5  know exactly which parts are drawn from which document, but I

6  think it's fully in the CFR.  And it lists the basic principles

7  that apply to government employees, and this is often the start

8  of ethics training, simply because it's a succinct statement

9  that any employee at whatever level can read, can -- can see

10  how it relates to their position.  And if, you know, government

11  employees follow these principles, government business will be

12  done efficiently, effectively.

13  Q    If your experience, are these principles of ethical conduct

14  widely understood?

15  A    Yes, they are.  And I think, as you see here, this is one

16  document that's contained in the annual guidance, and my

17  recollection is this, the list of principles, is included in

18  many, many standards of conduct guidance training sessions.

19  Q    We're not going to go through all of those principles.  I

20  want to highlight two.  I'm going to focus first on number 6

21  there.  Can you read that for the jury, please?

22  A    "Employees shall not knowingly make unauthorized

23  commitments or promises of any kind purporting to bind the

24  government."

25  Q    Would a Navy admiral promising a contract to a company

1  without permission violate this principle, Admiral Hannink?

2  A    Certainly if that officer was not in a position with the

3  proper authority and circumstances to enter into that

4  commitment, then it would be unauthorized.

5        MS. ROSS:  And can we go to bullet point 10, please?

6  BY MS. ROSS:

7  Q    Can you please read bullet point 10?

8  A    "Employees shall not engage in outside employment or

9  activities, including seeking or negotiating for employment,

10  that conflict with official government duties and

11  responsibilities."

12  Q    What does "negotiating" mean here, Admiral Hannink?

13  A    Well, negotiating for employment, I think this is meant not

14  to be any legal trickery in this document.  It means you're

15  negotiating in some respect with a company or other outside

16  entity for potential employment.

17  Q    How about "seeking"?

18  A    Seeking is a little bit broader.  You may not be in the

19  negotiation stage, but if you are looking for employment with a

20  company and there is the potential, even that can put an

21  employee in a position where hoping for something in the future

22  might impair their proper performance of the duties in the

23  present.

24  Q    So if an admiral with the Navy is seeking employment at a

25  company and then helps that company get a contract with the

1   Navy, would that be a conflict?

2   A    Yes, if they are an active-duty admiral and if, you know,

3   the activities of that company would have a chance to fall

4   within their -- their official duties.  As it says here, that

5   it conflicts with their official duties, that would be

6   inappropriate.

7   Q    All right.  Thank you.

8            MS. ROSS:  Can we please go to page 35?

9   BY MS. ROSS:

10  Q    What does this part of the memo detail, Admiral Hannink?

11  A    This is the section dealing with communications with

12  industry.  Again, the key references are listed at the top,

13  going all the way from statutes to various memorandums of the

14  Secretary of Defense, the last item being an ethics ground from

15  the office of the judge advocate general.  And it just lays out

16  some of the general concepts of rules and then best practices

17  for engaging with industry.  It's not uncommon for senior

18  military leaders, senior Navy leaders, to engage with industry,

19  and, in fact, many positions require that to some extent.  But

20  the guidance on this page is meant to ensure that those

21  communications are appropriate, that they follow the right

22  procedures, they cover the right topics, and that the officer

23  doesn't inadvertently or intentionally stray from what the

24  appropriate actions would be.

25  Q    And what does "industry" mean in this context?

1   A    Here, industry is truly the non-federal entities.  It's the

2   people, companies who are contracting with the Department of

3   Defense.

4   Q    You mentioned the key references at the top there.  What

5   are those supposed to be?

6   A    You can see the first couple of references are statutes in

7   the criminal title of the United States Code.  There's a

8   reference to the DoD 5500.07-R.  It's been a while since I've

9   looked at it, but I think that's our joint ethics regulation

10  that applies to all the military departments within the

11  Department of Defense.  There's several secretary of defense

12  and deputy secretary of defense memoranda.  There's an under

13  secretary of the Navy memoranda, a provision from the Code of

14  Federal Regulations, and then ethics gram, which is the general

15  informal guidance that the office of the judge advocate general

16  would put out.

17  Q    And what is the point of these key references?

18  A    Well, the point of the references is, because the

19  information can be drawn from a number of sources, you give the

20  reader this document ready accessibility to the references.

21       Quite often in my experience of giving legal advice to flag

22  officers, there's a fair question, right, show me where it says

23  that.  And so what the key references do is it equips the

24  reader of this document to pull out the appropriate guidance,

25  to look at them in context as you're looking at what the

1  situation is, in order to give the best advice and make the

2  best decision.

3  Q   So again, we're not going to read the entire page.  I just

4  want to highlight two things here.

5      First, under "Impartiality" under the general rules, can

6  you read that, please?

7  A   "DoD officials must act impartially and not give preferable

8  treatment to any private organization.  Exercise caution to

9  ensure that your actions do not give a competitive advantage to

10  a particular company."

11  Q   What does that mean?

12  A   Well, it means that in working for the government, the

13  first sentence emphasizes that you can't treat two similarly

14  situated companies differently, because when you do that, it

15  raises at least an inference, right, of unfair treatment.

16      And then the second sentence, I think goes more to the

17  business side.  There are a lot of companies that want to

18  contract with the government.  DoD being part of the

19  government, there's a lot of people that want to get a contract

20  with DoD, and DoD officials cannot afford a competitive

21  advantage to one company over the other.

22  Q   Okay.  And the second thing I want to highlight here is the

23  "Conflicts of Interest" bullet point.  Can you please read

24  that?

25  A   "DoD officials must not participate personally and

1    substantially in an official capacity in any particular matter

2    that has a direct and predictable effect on their financial

3    interests or those imputed to them by virtue of family or

4    business relationships.  DoD officials must also avoid the

5    appearance of conflicts of interest."

6    Q   If you know, Admiral Hannink, is this a legal obligation as

7    well?

8    A   Yes.  My recollection is this language is drawn heavily

9    from the statutes in Title 18.

10    Q   Thank you.

11         MS. ROSS:  Can we please next to go to page 46?

12    BY MS. ROSS:

13    Q   What is this part of the memo detailing?

14    A   This is the section dealing with the post-government

15    employment.  Every military personnel goes through this phase

16    at some point.  None of us stays in the Navy forever.  And so

17    there comes a point when uniformed people are looking for

18    their -- normally we call it a transition to civilian life.

19    And what this document does is provide some of the -- again,

20    key reference, and then the touchstones grouped by these

21    categories about how to go about that process, find a civilian

22    job while complying with the ethical rules.

23    Q   On this page, we're only going to focus on the searching

24    for job while on active-duty category, and we're only going to

25    focus on the top two bullet points.

1      Can you first read that top bullet point, please?

2   A    "If negotiating or seeking employment, you must disqualify

3   yourself from taking official action which affects financial

4   interests of a potential employer."

5   Q    And can you describe what that means?

6   A    Yeah.  This goes back to the -- one of the 14 principles of

7   public service is a public trust, and if we're working for the

8   government, we're giving our full duty and diligence to the

9   government.  And it's a realization that when people are

10  seeking or negotiating employment with a company, if they were

11  to retain within their official duties decisions with respect

12  to that company, that that would clearly be seen as being

13  unfair and inappropriate.

14      And so the remedy is, if you're seeking a position with a

15  company and there are things about that company that fall in

16  your official duties, you disqualify yourself from taking those

17  actions.

18  Q    And can you please read the second bullet point?

19  A    "The STOCK Act of 2012 requires you to notify your ethics

20  counselor of the commencement of any employment negotiations or

21  agreements within three days, as well as recusal, if

22  necessary."

23  Q    We talked about what negotiation means -- meant a little

24  bit earlier, but we haven't discussed agreements.  What does

25  that mean?

1    A    Well, I'm not familiar with that -- agreements as any

2    particular technical term here.  The way I would read this is

3    that once you've -- negotiation has turned into an agreement,

4    it's no longer a negotiation and there is an agreement between

5    the person and the company that maybe when the officer leaves

6    active duty, there will be a job at that company.

7    Q    What does it mean by recusal?

8    A    Recusal is the action of disqualification.  In the first

9    bullet, we read the phrase, "You must disqualify yourself."

10   When someone would do that, that's called recusal.

11   Q    Why would someone have to recuse themselves if they're

12   engaging in negotiations or agreements with a company?

13   A    Did you ask why?

14   Q    Yes.

15   A    Well, I think as humans, we all understand that we're

16   subject to different forces and pressures and incentives, and

17   continuing to do an official job that can potentially benefit

18   that same person's future, future finances, future job,

19   et cetera, is not consistent with public service being in

20   public trust.  And so that's where disqualification, recusal is

21   required.

22   Q    So we also see that in this bullet point it mentions an

23   ethics counselor.  Just to be clear, would Admiral Burke have

24   been assigned an ethics counselor?

25   A    Yes, he would have been assigned an ethics counselor.

1  Q    Okay.  And I do want to touch briefly upon the third bullet

2  point as well.  Can you please read that one?

3  A    "If you are personally and substantially involved in

4  procurement greater than $150,000, you must promptly report all

5  contacts from bidders regarding potential employment, even if

6  promptly rejected."

7  Q    Promptly rejected, what does that mean?

8  A    Well, I have never had the chance to delve into that, but

9  the plain reading of it in my mind would distinguish this

10 bullet from another context of seeking employment.  In other

11 words, usually if a company were to approach an officer and

12 want to discuss potential job offers, if that officer

13 immediately says no, then generally, that's not reportable

14 because they're declined, they're not seeking employment.  But

15 this bullet goes to being involved in procurement greater than

16 150,000, which by my read of this brings more context to here.

17 And so even if that job offer would have been promptly

18 rejected, if they were a bidder on a contract, you have to

19 report it because it goes to transparency.

20 Q    I want to ask you a hypothetical.

21     Assume that a Navy officer sat down for a meeting with a

22 company that was seeking a government contract from that

23 employee.  During the meeting, the company offered the officer

24 a future job, and after that meeting the officer, wrote a

25 friend saying that he had asked the company for a job

1   description and had essentially agreed to work for them.

2      Is the officer seeking employment under the standards of

3   conduct document that we've been looking at here?

4   A   Yes.

5   Q   What would the officer be required to do with respect to

6   that action?

7   A   There would be two things.  One would be to notify ethics

8   counselor and address the situation.  Then, as the first bullet

9   indicates, disqualify themselves from taking any official

10  action because it could affect their financial interest.

11  Q   Can we please go to page 51 of this document?

12      And what is this section of the memo detailing?

13  A   This details information regarding the public financial

14  disclosure report that we discussed previously.

15  Q   So I know we talked about these forms a little bit earlier,

16  so there's a few things that I want to discuss here.

17      Generally, what type of information do filers have to

18  report on the OGE 278 forms?

19  A   Yeah.  The general information includes assets owned.  It

20  would include investments like stocks and bonds, real estate,

21  if there is a rental real estate owned, mortgages, liabilities.

22  I believe there's also a section on there about any kind of

23  agreements.  But it's -- it's that kind of information intended

24  to just give a financial portrait of the officer's life and

25  situation.

1   Q    And what was the goal of these disclosures?  Can you please

2   just read the first bullet under "Goal, Complete Accurate

3   Disclosure," please?

4   A    "Substantive Purpose.  These required reports help you and

5   your ethics counselor, supervisor, and designated agency ethics

6   official identify potential conflicts of interest that may

7   exist between your official duties and your private financial

8   interests and affiliations."

9   Q    And why is it important to identify any potential conflicts

10  of interest that may exist?

11  A    Well, it goes back to the principle of public service being

12  a public trust.  It ensures that officers, when they're working

13  for the government, the government can rely that the decisions

14  they make, the advice they give, are for the full benefit of

15  the government and not for the potential financial benefit to

16  the individual.

17  Q    And can you please read the next bullet, "Technical

18  Completeness"?

19  A    "To perform a meaningful conflicts review, all required

20  information must be reported with a requisite level of detail.

21  The required contents in your public financial disclosure

22  report is spelled out in the law."

23  Q    Does this mean that relevant information should not be

24  withheld from an OGE 278 form?

25  A    It does.

1  Q   Just to be clear, if an admiral has questions about the

2  information that is necessary to report on an OGE 278 form, are

3  there resources and people they can consult?

4  A   There are.

5  Q   Before submitting an OGE 278 form, does a filer have to

6  attest to the statements they made in the forms are true,

7  complete, and correct to the best of their knowledge?

8  A   Yes.  There is a certification.

9  Q   Can we please go back to page 9 of this exhibit?

10      Just to be clear, Admiral Hannink, who is responsible for

11  sending out the memo that we just went through in May of 2020?

12  A   You used the word "responsible."  I would just say that

13  it's a decision every year.  The vice chief could say, no,

14  we're not going to send it, but I think the practice has shown

15  that this is a good practice.  It's helpful.  It benefits flag

16  officers.  It's protective of them.  It's protective of the

17  organization.  And the standard for the Navy, for many years,

18  has been the vice chief of naval operations sends it.

19  Q   And in May of 2020, did the defendant endorse this

20  document?

21  A   He did.

22          MS. ROSS:  Thank you.  No further questions.

23          THE COURT:  All right.  Mr. Parlatore?

24                      CROSS-EXAMINATION

25  BY MR. PARLATORE:

1  Q   Good afternoon, Admiral.

2  A   Good afternoon.

3  Q   You and I have haven't met before, have we?

4  A   I don't think so.

5  Q   I want to go through some of these things you just

6  discussed.

7      You talked about how the flag officers receive annual

8  ethics training, correct?

9  A   Correct.

10 Q   The VCNO doesn't receive any specialized ethics training

11 beyond that which every other flag officer receives, do they?

12 A   That's correct.

13 Q   When the VCNO signs this document, it's the same document

14 everybody else has to read, correct, the standards of conduct?

15 A   It's the same document he sends that others receive.

16 Q   Okay.  And he doesn't draft it himself, does he?

17 A   He does not do the drafting.  He can review it to the

18 extent he desires before signature.

19 Q   When you say "to the extent he desires," as an admiral,

20 frequently papers get put in front of you that you sign,

21 correct?

22 A   It all depends on the admiral, depends on the subject

23 matter and how much attention they want to put on it.

24 Q   And so it's fair to say there are at least some admirals

25 out there that essentially sign whatever you put in front of

1   them, right?

2   A    My experience, I wouldn't go that far.

3   Q    I'm not talking about Admiral Burke.  I mean in general.

4   A    There are some, given the subject matter, given their

5   either familiarity with it or assessment of the importance,

6   might put less time.  There are others, though, who would want

7   to read every word before they put their signature.

8   Q    Sure.  But, ultimately, the fact that Admiral Burke signed

9   this doesn't really give any indication as to whether he spent

10  any more time reading it than any of the other flag officers on

11  that email, does it?

12  A    Not necessarily.

13  Q    Okay.  And you talked about the ethics counselors that are

14  really the people that know this stuff much more in depth,

15  correct?

16  A    Correct.

17  Q    And the ethics counselors, they receive initial training

18  and then annual refreshers training; is that correct?  And the

19  initial training, you said that when you did it, it was one to

20  two weeks at the Army JAG school?

21  A    That's correct.

22  Q    At the Navy JAG school, do they now offer a three-day

23  online course?

24  A    That sounds right.

25  Q    And when you become an ethics counselor, are you actually

1  representing the government or the individual that you're

2  counseling?

3  A   We all work for the government.  But the role of the ethics

4  counselor is to be a counselor for the person, but it's not as

5  kind of a private attorney, in that kind of role.

6  Q   There are certainly plenty of JAG attorneys that do serve

7  the role of representing individual service members?

8  A   That's correct.

9  Q   But the ethics counselor would not be one of those, right?

10  A   That's correct.

11  Q   So there is no attorney-client privilege between you and

12  the ethics counselor, correct?

13  A   That's correct.  There is a confidential relationship, but

14  it's not the attorney-client privilege.

15  Q   Okay.  Now, you said that you initially met Admiral Burke

16  when he was at the N1?

17  A   Yes.  My recollection is he was in the Navy personnel

18  command, the chief naval personnel office.

19  Q   And then you later worked with him more when he was the

20  VCNO, correct?

21  A   I did.

22  Q   So, for example, you took part in preparing that standards

23  of ethical conduct for him, or at least reviewing it?

24  A   Yes.

25  Q   Now, the standards of ethical conduct, legally that doesn't

1    constitute an order, does it?

2    A   In the sense of an order right to be enforced immediately

3    under the Uniform Code of Military Justice, as a violation of

4    an order, no, it wouldn't.  But these do outline the standards

5    that, if they are violated, can result in generally

6    administrative, sometimes criminal, sanction.

7    Q   So, for example, in each one of those sections at the top,

8    it has the references, right?

9    A   Correct.

10   Q   And the references will talk about what the actual law is,

11   right?

12   A   Correct.

13   Q   And it's based on what those references are that they draft

14   the rest of the document, correct?

15   A   Correct.

16   Q   And some of those references are criminal statutes and some

17   are regulations, correct?

18   A   Correct.

19   Q   And so depending on which reference the section down below

20   is derived from will change what its -- what a violation would

21   potentially entail, correct?

22   A   Correct.

23   Q   And if there's a conflict between what's in that document

24   and what's in the regulation, the regulation would control,

25   correct?

1    A    Yes.  The law and the regulations would control.

2    Q    For example, if one of the JAGs didn't update the document

3    appropriately and the CFR had changed in the interim, the flag

4    officers would not be held to the standards, they would be held

5    to what the CFR says, correct?

6    A    They would.

7    Q    Okay.  Now, you talked about how the importance of having

8    this come from the VCNO is to make it commanders' business and

9    not JAG business, correct?

10    A    Yes.  My recollection is that was one of the benefits of

11    having it come from the vice chief.

12    Q    Even the vice chief doesn't himself have any specialized

13    training beyond what the JAGs have, correct?

14    A    That's correct.

15    Q    Beyond any other flag officer other than JAG I mean,

16    correct?

17    A    Right.  The vice chief has the normal training that others

18    have received.

19    Q    Okay.  So, for example, no other flag officers are going to

20    call the vice chief and say, hey, can you explain this ethics

21    rule to me.  They're going to go to a JAG, right?

22    A    That's correct.

23    Q    So you said that you believe that the principles of ethical

24    conduct are widely understood.  Is that correct?

25    A    I do.

1  Q   And some of the terms in there would they be considered

2  what we lawyers like to call "term of art"?

3  A   There may be a few, but only a few.  I think the language

4  is written in -- intended for the common average federal

5  employee.

6  Q   Okay.  But there are certainly portions of this that the

7  common average employee may want to get advice from their JAG

8  to figure out what it actually means, correct?

9  A   That's true.  Are you talking about the 14 principles or

10 the document writ large?

11 Q   The document writ large, really.

12 A   Yeah.  There are some, particularly those derived from

13 statute, I think, where there are legal definitions would be

14 involved.

15 Q   So for example, the term "negotiating," is that considered

16 a term of art?

17 A   I don't -- there probably is a definition somewhere, but I

18 think it would match what we would all contemplate as

19 negotiating.

20 Q   And so a lot of us would contemplate as negotiating is

21 somebody says, I'll give you a job for 50,000, and you come

22 back and say, no, no, I want 60,000, right?  There's a back and

23 forth in negotiation, correct?

24 A   Correct.

25 Q   And seeking, you talked about that being somebody who is

1  looking for a job, right?

2  A   Well, seeking, I think is a -- is broader than just

3  negotiating.  You don't have to be in the back and forth.

4  Q   Right.

5  A   But, you know, if there are discussions going on between an

6  officer and a company, even if you're not talking salary --

7  Q   Right.

8  A   -- with the view of potential employment, that would

9  qualify as seeking employment.

10  Q   And if that discussion ultimately results in no employment

11  agreement and somebody says, hey, maybe you come work for us,

12  that would be interesting, what kind of salary would you offer,

13  this is what we'd offer, and then the officer says, that's

14  interesting, but I got a couple of years until retirement, so

15  I'm not interested in that right now, would that be the end of

16  seeking?

17  A   Yeah, as I understand it, if I may, that company approaches

18  an officer, hey, we have this offer, we'd like to work this

19  with you, if the answer is a clear and unequivocal no, then

20  that officer is not seeking employment.

21  Q   Okay.  When you say clear and unequivocal -- and I guess

22  I'm going to ask this in two ways, first the legal definition

23  and then what everybody else knows.

24      Clear and unequivocal to a lawyer, that means you have to

25  say, absolutely not, no interest, correct?

1    A    Correct.

2    Q    But what if an officer were to say something to the effect

3    of that's very interesting, I'm not ready to retire right now,

4    so I can't entertain this now, would that be considered an

5    unequivocal rejection?

6    A    I would love to really know the circumstances, but the risk

7    for the officer is that you're leaving it open.  And in that

8    case, what the rules would require, because there's something

9    left open, is that you're still seeking employment.

10   Q    Then going back to what you said earlier about how these

11   rules are widely understood, the hypothetical I just gave, is

12   that the type of thing that people may, in a well-meaning way,

13   get the wrong answer on?

14   A    It's potential, which is why I believe the language is

15   meant to be clear that it has to be a rejection in order to not

16   be seeking employment.

17   Q    Okay.

18          MR. PARLATORE:  Can we please put up Exhibit 9, page

19   46?

20   BY MR. PARLATORE:

21   Q    So can you see this on your screen?

22   A    I can.

23   Q    So in the section about searching for a job while on active

24   duty, could you please point out where in here you have tried

25   to make clear about what does and does not constitute a

1   rejection?

2   A    Yeah.  In this particular section, that point is not

3   discussed.

4   Q    Okay.  Is there another section of this document that is

5   more clear on what constitutes a rejection?

6   A    I do not know.

7   Q    It's a long -- it's a 55-page document, so I don't want to

8   make you go through the whole thing.  But do you have any guess

9   as to where that might be made more clear?

10  A    I do not know.

11  Q    If it isn't clear in any other section of this document, do

12  you think that's something that might be open to interpretation

13  and confusion?

14  A    Potentially.  But I think you would want to look at other

15  places where that kind of training is provided.

16  Q    While we're on the section, you talked about the third

17  bullet point, personally and substantially involved in

18  procurement greater than $150,000.  Where does that number come

19  from?

20  A    Where does the --

21  Q    The $150,000, where does that number come from?

22  A    I don't know where that comes from.

23  Q    Would it be in one of those references up above?

24  A    Most likely it would.

25  Q    Okay.  Do you have any idea which one?

1    A    I do not.

2    Q    Do you know whether whatever reference it came from might

3    have a tendency to change?

4    A    It could have changed.  I don't know.

5    Q    So, for example, if it came from 41 U.S.C. 2103 there, are

6    you familiar with that statute?

7    A    I'm not.

8    Q    Okay.  Do you know what the simplified acquisition

9    threshold is?

10   A    I've heard of it, but I do not know the exact number.

11   Q    Okay.  Do you know what it is generally, if not the number?

12   A    Well, what I believe it is, it's a number below which

13   certain acquisition procedures can be using that term

14   "simplified," but above that, it would require a more normal,

15   more detailed acquisition process.

16   Q    Okay.  So if somebody were to receive an offer, even though

17   they promptly reject it and it's below -- is it $149,000?

18   Correct?

19   A    Pardon?

20   Q    Using what's in here, if you're involved in a procurement

21   that is $149,000 instead of 150, do they have to report that

22   offer at that point?

23   A    By my reading of this -- and, again, a good ethics

24   counselor would go back to the rule and look at the number.

25   But if you met the situation where you weren't at this 150,

1    what this bullet would mean, that if it was promptly rejected,

2    you would not have to report it.

3    Q    Okay.  And if that 150 is -- is based on the simplified

4    acquisition threshold, is it possible that that number changes

5    depending on the circumstances as well?

6    A    I don't know.

7    Q    Like, for example, are you familiar with whether the

8    simplified acquisition threshold is different depending on

9    whether a contract is to be performed in the continental

10   United States or outside of it?

11   A    I do not know.

12   Q    And if the key references up there at the top conflict with

13   what's written in this bullet point here, what would any flag

14   officer be required to follow?

15   A    The key references is the statutes and regulations are what

16   would govern.  If there were a mistake, based on a good-faith

17   compliance with what the ethics counselor, with what this

18   document said, then I think that the flag officer would fall

19   under what we call the safe harbor provision, which is, if you

20   in good faith fully disclose, rely on advice that turns out to

21   be erroneous, you shouldn't be penalized for that.

22   Q    Well, what about the other direction?  What if, for

23   example, the CFR was modified and the simplified acquisition

24   threshold was raised to $500,000 for any contract that is to be

25   performed overseas?

1   A    Then the 500,000 is the one that should govern.

2   Q    Okay.  Who is responsible for making sure this is updated?

3   A    As I testified, this is -- it's a team effort.  It starts

4   with OG JAG, what we call Code 13, which is our ethics group,

5   the counsel for the vice chief, usually the counsel for the

6   CNO, would include the judge advocate general.

7   Q    Who do all of those people report to?

8   A    The chief naval operations and the secretary of the Navy.

9   Q    Well, all the people at Code 13, who else do they report

10  to?

11  A    They report to the judge advocate general.

12  Q    So you at the time, correct?

13  A    Correct.

14           MR. PARLATORE:  Can you go to page 51, please?

15  BY MR. PARLATORE:

16  Q    So you talked about the 278 form, correct?

17  A    Correct.

18  Q    Now, you're aware that the 278 form is often considered the

19  starting point for conversations between the officer and their

20  ethics counselor, correct?

21  A    It quite often is, yes, sir.

22  Q    And so frequently when an officer fills out their 278 form,

23  their initial draft doesn't necessarily look like the one

24  that's finally filed, does it?

25  A    There can be changes made.

1   Q    So an officer will fill it out to the best of their

2   ability, they'll turn it in to the ethics counselor, after

3   which there will be conversations?

4   A    Quite often, yes, sir.

5   Q    Those conversations may lead to edits, yes?

6   A    They could.

7   Q    And it then goes up the chain of command, correct?  It gets

8   reviewed by other people?

9   A    Yes, sir, after it's signed.

10  Q    And, ultimately, who files it?

11  A    The flag officer 278s would go to the Office of the Judge

12  Advocate General, Code 13.

13  Q    And when it's in Code 13, it could be edited further,

14  correct?

15  A    Potential.  But usually what Code 13 would do is add the

16  final document for finding no conflicts, but giving the

17  warning, and that's typically what happens.

18  Q    Okay.  And when you were asked about whether that document

19  should include employment agreements, the section specifically

20  says "filer's employment agreements and arrangements," correct?

21  A    I don't recall the exact wording of it.

22          MR. PARLATORE:  Can we bring up 88, Government's 88?

23          MS. ROSS:  88 is not in evidence.

24          MR. PARLATORE:  I thought it was.

25          MS. ROSS:  It's not.

1          MR. PARLATORE:  Did I pick the wrong one?

2      (Pause)

3          MR. PARLATORE:  134.  Sorry.  134.

4          Thank you.

5   BY MR. PARLATORE:

6   Q   So looking at Section Number 3, Filer's Employment

7   Agreements and Arrangements.

8   A   I see it.

9   Q   So if somebody were to have a conversation with somebody

10  that does not ultimately result in an employment agreement,

11  would that have to go in here?

12  A   I'm not 100 percent sure, but I don't think so.

13          MR. PARLATORE:  Okay.  Take that down.

14          One moment.

15      (Pause)

16  BY MR. PARLATORE:

17  Q   Just a few more things here.

18      So you talked about impartiality earlier with -- it was in

19  the standards of conduct.  You were talking about how you can't

20  treat similar companies differently, correct?

21  A   That's correct.

22  Q   And you're aware that sometimes there is no similar

23  company, right?

24  A   That's possible.

25  Q   So that's when you would start with, for example, a sole

1 source acquisition, correct?

2 A    I'm not an acquisition person.  I really don't have

3 familiarity with that.

4 Q    And in fairness, in the Navy, all the contract and

5 acquisitions is usually in the office of general counsel and

6 not the judge advocate general, correct?

7 A    Yes, sir, that's correct.

8 Q    But it is certainly okay to have communications with

9 industry for a flag officer, correct?

10 A    Yes.  There are good reasons for communication with

11 industry, that's correct.

12 Q    And the big -- the big thing is to make sure that you

13 don't, you know, verbally agree to anything, correct?

14 A    Don't make unauthorized commitments, yes, sir.

15 Q    So, for example, certainly the CNO would also be somebody

16 who knows these rules, correct?

17 A    That's correct.

18 Q    So like Admiral Richardson was the CNO while you were judge

19 advocate general?

20 A    That's correct.

21 Q    Admiral Richardson would have been allowed to give somebody

22 a verbal $100 million, you know, contract thumbs up, correct?

23 A    My understanding, that would not be allowed.  It would have

24 to go through the contracting process.

25 Q    Okay.  What about Bill Moran, would he have done that -- or

1  would he have been allowed to do that?

2  A   I don't believe that would be the case.  He was the chief

3  naval personnel and the vice chief.

4  Q   Okay.  You were the judge advocate general, I think you

5  said from 2018 to 2021?

6  A   Yes, sir.

7  Q   That's a three-year period, correct?

8  A   Yes, sir.

9  Q   And that's -- most judge advocate generals get appointed

10  for a four-year term and then retire after three years,

11  correct?

12  A   Yes.  They -- the statute, I believe, said four years, but

13  tradition had been retire after three.

14  Q   Okay.  The reason why you retire after three years is

15  because when you're elevated -- as opposed to two, for example,

16  is because when you're elevated to the judge advocate general

17  position, you get another star, correct?

18  A   That's correct.

19  Q   And you want to have three years wearing that third star

20  before you retire, correct?

21  A   That's correct.

22  Q   Because three years time in grade is what you need to be

23  able to retire at that rank absent a waiver?

24  A   Yes, sir.

25  Q   And it also goes into what is your pension that's going to

1  be based on the high three years?

2        MS. ROSS:  Objection, Your Honor.  Scope.  Relevance.

3  We're beyond this now.

4        THE COURT:  I'm inclined to agree.  You want to come

5  up?

6     (Begin bench conference)

7        MR. PARLATORE:  Your Honor, aside from the fact that

8  he talked about the three years he was there, this goes to

9  Admiral Burke's retirement date because he spent one year as

10 vice chief of naval operations, a four-star position, and then

11 two years in Europe.  All of the talk about him wanting to

12 resign early and everything, his retirement date was

13 specifically chosen because it is three years time in grade.

14 Had he left earlier than that, he would have potentially

15 retired as a three-star.  This is something they have been

16 bringing out through their witnesses, and yes, it certainly is

17 beyond the scope.  But at the same time, we have a witness who

18 can explain it, and so it's easier to do it this way than to

19 have -- you know, to start going through other methods of doing

20 it on our case in chief.  I'm just trying to do a little bit of

21 judicial economy here.

22        THE COURT:  All right.  It sounds to me like you've

23 gotten --

24        MR. PARLATORE:  I am done.  That's all I wanted, was

25 just, you don't want to retire at two, you want to retire at

1    three.

2             THE COURT:  Okay.  Great.  Thanks.

3        (End bench conference)

4             THE COURT:  Any more questions for this witness,

5    Mr. Parlatore?

6             MR. PARLATORE:  Let me just check.

7        (Pause)

8             MR. PARLATORE:  No further questions.

9             THE COURT:  Thank you, Mr. Parlatore.

10            Any redirect, Ms. Ross?

11                         REDIRECT EXAMINATION

12   BY MS. ROSS:

13   Q    Admiral Hannink, Mr. Parlatore asked you questions about

14   whether the VCNO has any specialized training on the Navy's

15   ethics.  Is that right?

16   A    He did.

17   Q    And in your experience, are VCNOs typically experienced

18   flag officers?

19   A    They are experienced flag officers.

20   Q    So would they have undergone and received annual ethics

21   training throughout their career?

22   A    Yes, certainly within their flag officer tenure.

23   Q    And are the Navy's standards of conduct designed for Navy

24   officers to memorize each and every rule?

25   A    They are not.

1  Q    What are they designed to do with respect to awareness of

2  the rules?

3  A    The guidance that was put out in the exhibit we discussed,

4  it's intended to familiarize and educate people that there

5  are -- there's a rule set out there.  In fact, this document is

6  meant to be one tool in the tool set to be aware of the rules,

7  understand when a situation might call upon good sense to look

8  further.

9      As I always thought about it, ethics is a team sport, but

10  if you understand when you're running into a potential problem,

11  well, that's when you pull out the guidance, you talk to the

12  judge advocate, and you come to a good resolution.

13  Q    So you mentioned that the rules are kind of a team sport.

14  Does that mean that if a flag officer finds himself in a

15  situation where he's facing a potential ethical issue, are

16  there team members or resources that the officer can reach out

17  to?

18  A    Well, the first, obviously, is the staff, and the judge

19  advocate -- staff judge advocate is there to be the consultant

20  to work through a situation appropriately.  It's not meant to

21  be one person.  You know, there's individual responsibility,

22  but there are team members to reach out to help get to the

23  right answer.

24  Q    And just a quick question on the OGE 278 form.  Would it be

25  material to evaluating the truthfulness of a 278 form if the

1  filer purposely withheld information that would reveal an

2  actual conflict of interest?

3  A    Say the question one more time.

4  Q    Would it be material to evaluating the truthfulness of a

5  278 form that an officer has filled out if the officer

6  purposefully withheld information that would reveal an actual

7  conflict of interest?

8  A    If there is any information that doesn't reveal an actual

9  conflict of interest, that would materially affect the review

10  of the form.

11        THE COURT:  Admiral Hannink, thank you for your

12  testimony here today.  You may step down and you're free to go.

13    (Witness excused)

14        THE COURT:  The government may call its next witness.

15        MS. FIFIELD:  Your Honor, the government calls Captain

16  Bradley Appleman.

17    (Oath administered to the witness)

18        BRADLEY APPLEMAN, GOVERNMENT WITNESS, SWORN

19                    DIRECT EXAMINATION

20  BY MS. FIFIELD:

21  Q    Good afternoon.

22  A    Good afternoon.

23  Q    Sir, could you please state your first and last name and

24  spell your last name for the court reporter.

25  A    Bradley Appleman, A-p-p-l-e-m-a-n.

1    Q    Where do you currently work?

2    A    The United States Navy.  I'm currently detailed to the

3    National Security Council.

4    Q    So you are currently active-duty military?

5    A    I am.

6    Q    In the Navy?

7    A    Yes.

8    Q    Okay.  How long have you been active-duty military?

9    A    Approximately 28 years.

10   Q    What is your rank in the United States Navy?

11   A    Captain.

12   Q    And can you explain sort of where your rank falls within

13   the ranks of Navy officers?

14   A    Yes.  It's the rank that's right below flag officers, so

15   the admiral ranks begin right after captain.

16   Q    All right.  Could you give the jury a little bit of

17   background about your education?

18   A    I have a Bachelor of Arts in international relations and

19   political science and a law degree from the University of

20   Wisconsin Madison, a Master of Arts in national security and

21   strategic studies from the Naval War College in Newport, Rhode

22   Island, and I have master of laws from Georgetown University in

23   national security law.

24   Q    So are you a practicing attorney?

25   A    Yes.

1  Q   Could you give us a summary of some of the positions that

2  you have held throughout your career?

3  A   I have been a defense counsel, prosecutor, a legal

4  assistance attorney, and most recently a staff judge advocate,

5  which is in-house counsel to commanders.

6  Q   Okay.  We're going to get into a little bit more detail

7  about that role.

8      All the positions you just listed, were those all within

9  the United States Navy?

10 A   Yes.

11 Q   Did you previously work for Naval Forces Europe and Africa?

12 A   Yes.

13 Q   Is that command sometimes known as NAVEUR-NAVAF?

14 A   Yes.

15 Q   What was your position title at NAVEUR-NAVAF?

16 A   A force judge advocate.

17 Q   Is that a type of staff judge advocate?

18 A   Yes.

19 Q   Okay.  When did you start in that role?

20 A   August of 2021.

21 Q   Were you still in that position approximately a year later,

22 in August of 2022?

23 A   Yes.

24 Q   Are you familiar with the defendant in this case,

25 Robert Burke?

1    A    Yes.

2    Q    Did you know -- did you work for him at NAVEUR-NAVAF?

3    A    Yes.

4    Q    As his force judge advocate?

5    A    Yes.

6    Q    Did you know him before that?

7    A    Yes.

8    Q    How?

9    A    We had met professionally at a previous tour in Naples in

10   the 2012 timeframe.

11          MS. FIFIELD:  Can we please have, just for the

12   witness, Court, and counsel, what has been marked as Government

13   Exhibit 41?

14   BY MS. FIFIELD:

15   Q    Captain Appleman, do you recognize Government Exhibit 41?

16   A    Yes.

17   Q    What is Government Exhibit 41?

18   A    It's a photograph of Admiral Burke.

19          MS. FIFIELD:  At this time, the government would move

20   to admit Government Exhibit 41.

21          MR. PARLATORE:  No objection.

22          THE COURT:  Without objection, 41 is in and may be

23   published to the jury.

24      (Exhibit 41 admitted)

25   BY MS. FIFIELD:

1  Q   What was Burke's role at NAVEUR-NAVAF while you worked for

2  him?

3  A   He was the commander.

4  Q   And is that a four-star?

5  A   Yes.

6  Q   An admiral?

7  A   Yes.

8  Q   Was he in charge of the entire command?

9  A   Yes.

10  Q   Where did Burke's rank, four stars, fall within the ranks

11  of U.S. Naval officers?

12  A   It's the most senior rank.

13  Q   And what do we see on our screens here in Government

14  Exhibit 41?

15  A   It's a photograph of Admiral Burke.

16  Q   Thank you.

17        MS. FIFIELD:  We can take that exhibit down.

18  BY MS. FIFIELD:

19  Q   So you just told us that Burke's rank of four stars, I

20  believe you just testified that it's the top of the chain in

21  the Navy.  Is that right?

22  A   That's correct.

23  Q   Would an officer of Admiral Burke's rank also have been

24  called a flag officer?

25  A   Yes.

1    Q    As a flag officer, is Burke an officer and employee of the

2    U.S. Navy?

3    A    Yes.

4    Q    And is the Navy a part of the executive branch of the

5    United States Government?

6    A    Yes.

7    Q    Are you aware of the position that Admiral Burke held

8    before he became commander of NAVEUR-NAVAF?

9    A    Yes.

10   Q    Where in the hierarchy of the Navy does -- well, let me

11   back up.

12        What was that position?

13   A    The vice chief of naval operations.

14   Q    Is that also sometimes called VCNO?

15   A    Yes.

16   Q    Where in the hierarchy of the Navy is the VCNO?

17   A    Positionally, it's the second highest position.

18   Q    Is the second highest uniformed officer?

19   A    Yes.

20   Q    Okay.  And who is above the VCNO?

21   A    The chief of naval operations.

22   Q    And that would be the highest ranking uniformed officer in

23   the Navy?

24   A    That's correct.

25   Q    To your knowledge, does the VCNO issue an annual standards

1  of conduct memorandum?

2  A    Yes.

3  Q    What is the purpose of that annual standards of conduct

4  memorandum?

5  A    It's to issue supplemental guidance to the flag officers

6  throughout the Navy about the standards of conduct.

7          THE COURT:  So CNO is top-ranking admiral.  I take it

8  going from VCNO to being a fleet commander is not necessarily a

9  demotion, though.  Is that correct?

10          THE WITNESS:  That's correct.

11          THE COURT:  There are -- several of those top

12  four-star billets would be more or less equally prestigious?

13          THE WITNESS:  That's correct.

14          THE COURT:  Okay.  You may continue.

15  BY MS. FIFIELD:

16  Q    You said to supplement -- when I asked what is the purpose

17  of the annual standards of conduct memo, I believe you

18  testified it was to supplement flag officer knowledge regarding

19  Navy standards of conduct.  Would that include ethical rules?

20  A    Yes.

21          MS. FIFIELD:  If we could have what's previously been

22  admitted into evidence as Government Exhibit 9 and go to page

23  9.

24  BY MS. FIFIELD:

25  Q    Captain Appleman, do you recognize Government's Exhibit 9?

```
 1    A    Yes.
 2    Q    Is this the standards of conduct memorandum that we have
 3    been talking about?
 4    A    Yes.
 5    Q    Who issued this memorandum?
 6    A    Admiral Burke.
 7              MS. FIFIELD:  Could we go up one page to page 8,
 8    please?
 9    BY MS. FIFIELD:
10    Q    Calling your attention to the first paragraph of the email
11    here.
12         First of all, who is this email from?
13    A    On the screen, I can't see the "from."
14    Q    Apologies.
15    A    It's from Admiral Burke.
16              MS. FIFIELD:  Okay.  Back to page 8, please.
17    BY MS. FIFIELD:
18    Q    And could you just please read the first sentence of the
19    body of the email?
20              MR. PARLATORE:  Objection.  Lack of foundation.  He's
21    not a recipient of this email.
22              MS. FIFIELD:  This is already in evidence.
23              THE COURT:  I'm sustaining the objection.
24              MS. FIFIELD:  We can take down Exhibit 9.
25    BY MS. FIFIELD:
```

1   Q   Turning back to your role as force judge advocate at

2   NAVEUR-NAVAF, can you explain the role of the force judge

3   advocate for the jury?

4   A   Yes.  I was the senior uniformed lawyer at the command, and

5   I would advise on a full range of legal issues, ranging from

6   national security issues to military justice, to administrative

7   law, which included being an ethics counselor.

8   Q   You mentioned ethics counselor.  We're going to get back to

9   that in just a moment.  But before going there, did you serve

10  in the capacity as force judge advocate to Admiral Burke during

11  your time at NAVEUR-NAVAF?

12  A   Yes, I did.

13  Q   And tell us about the role of the ethics counselor

14  specifically.

15  A   The ethics counselor would provide advice to the commander,

16  and as well as the staff, on all things related to ethics and

17  ethical compliance.

18  Q   Okay.  Advise the commander?

19  A   Yes.

20  Q   Are there laws, rules, and regulations that govern the

21  ethical conduct of federal employees?

22  A   Yes.

23  Q   Do those laws, rules, and regulations also impose

24  restrictions on federal employees?

25  A   Yes.

1  Q    Would that include flag officers such as Admiral Burke?

2  A    Yes.

3  Q    Are flag officers such as Admiral Burke required to undergo

4  annual ethics training?

5  A    Yes.

6  Q    Why do flag officers such as Admiral Burke have to undergo

7  annual ethics training?

8  A    It's a requirement for public financial disclosure form

9  filers to undergo annual training every year.

10  Q    Okay.  And did you personally train Burke on the ethics

11  rules and other topics when you were his ethics counselor?

12  A    Yes.

13  Q    How many times did you do that?

14  A    Once.

15  Q    Was that training conducted in person?

16  A    Yes.

17  Q    Do you recall approximately when you trained Admiral Burke

18  on his ethical obligations?

19  A    November of 2021.

20  Q    And how did you personally become familiar with the ethical

21  rules on which you trained Admiral Burke?

22  A    Initial training for judge advocates, which is the

23  schoolhouse, the initial training for judge advocates when you

24  join the Navy as basic ethics training, and then throughout

25  your career, you go to courses, short courses, a week or two,

1    that cover the topics specifically, and then over the years

2    through self-study.

3    Q    Do you have an estimate for, ballpark, how many hours

4    you've spent being trained on ethics yourself?

5    A    Hundreds.  Hundreds of hours.

6    Q    Okay.  In your in-person training of Admiral Burke in

7    November of 2021, for that purpose, did you prepare a

8    PowerPoint to facilitate your training?

9    A    Yes.

10           MS. FIFIELD:  Could we have, just for the witness,

11   Court, and counsel, what's been marked as Government

12   Exhibit 60?

13   BY MS. FIFIELD:

14   Q    Okay, Captain Appleman, can you see Government's

15   Exhibit 60?

16   A    Yes.

17   Q    Do you recognize it?

18   A    I do.

19   Q    What is Government's Exhibit 60?

20   A    It's the PowerPoint brief that I used to train

21   Admiral Burke and his staff in November of 2021.

22   Q    Did you make this from scratch?

23   A    I did not.

24   Q    What did you do with it?

25   A    I received a template brief that was prepared by the Office

1    of the Judge Advocate General, which is the emblem on the title

2    slide there, and then I tailored it to the specific training

3    that I was going to give.

4    Q    Have you reviewed Government Exhibit 60 prior to your

5    testimony here today?

6    A    I did.

7    Q    Is Government Exhibit 60 a true and accurate copy of your

8    ethics training PowerPoint as delivered in November of 2021?

9    A    Yes.

10           MS. FIFIELD:  At this time, the government would move

11   to admit Exhibit 60.

12           MR. PARLATORE:  Your Honor, defense objects on hearsay

13   grounds.

14           THE COURT:  Parties approach.

15      (Begin bench conference)

16           THE COURT:  Why is this not hearsay?

17           MS. FIFIELD:  It's a record of regularly conducted

18   activity.  That's why I asked him whether he -- what role he

19   had in -- with the PowerPoint before he gave his ethics

20   training.  But the ethics training is annual.  It is a

21   regularly conducted annual activity.  And this PowerPoint is a

22   standard preparation by the ethics counselor for the admiral.

23           THE COURT:  And I take it this is thus for the truth

24   of the matter, rather than showing that this is what the

25   defendant saw?

1          MS. FIFIELD:  Your Honor, my understanding of 8036

2    allows this to come in as an exception of hearsay.  But the

3    purpose for which the government is offering the PowerPoint,

4    Exhibit 60, is to demonstrate that Admiral Burke was trained on

5    specific topics and --

6          THE COURT:  I got it.

7          MR. PARLATORE:  Well, it is not a record of regularly

8    conducted activity.  It's an annual brief that they created a

9    PowerPoint each time.  I don't think that that hearsay

10   exception is applicable here.  Ultimately, the witness is here,

11   he can testify as to what happened, but to put in the prior

12   statements of this witness from all this time ago, I think is

13   hearsay.

14         THE COURT:  I disagree.  I think it goes to show what

15   your client was taught.  And it's not for the truth of the

16   matter asserted.  Rather, it's effect on listener, and that is

17   your client.

18         So I'm overruling the objection.  Let's go back.

19         MR. PARLATORE:  With the instruction it's not for the

20   truth?

21         THE COURT:  That's fine.

22      (End bench conference)

23         THE COURT:  Ladies and gentlemen, I'm overruling the

24   objection.  You should take this PowerPoint not for the truth

25   of the statements in them, but rather for the effect on

1  listener, that is, for you to see what the defendant heard from

2  this witness.

3           All right.  Ms. Fifield.

4           MS. FIFIELD:  Thank you, Your Honor.

5           THE COURT:  And so I'm admitting over objection

6  Exhibit 60.

7      (Exhibit 60 admitted)

8  BY MS. FIFIELD:

9  Q   Captain Appleman, what kinds of topics did your ethics

10  training cover?

11  A   It ranged from flag officer travel to gifts to misuse of

12  position to conflicts of interest and post-government

13  employment.

14  Q   Let's focus first on conflicts of interest.

15      At a high level, what does it mean for a public official to

16  have a conflict of interest?

17  A   It's basically a personal interest or relationship that

18  interferes or conflicts with your faithful performance of your

19  official duties.

20           MS. FIFIELD:  Okay.  In Exhibit 60, could we please

21  have page 26?  If we could call out the green box in the lower

22  left-hand side.

23  BY MS. FIFIELD:

24  Q   Captain Appleman, could you please read the text of this

25  box?

1   A   "Do not take official action that will affect your personal

2   financial interests or those of your spouse, children, or

3   prospective employers, 18 U.S.C. 208."

4           MS. FIFIELD:  Okay.  We can drop that callout.  And

5   the gray box at the bottom of the slide, please call that out.

6   BY MS. FIFIELD:

7   Q   Captain Appleman, could you please read the text of that

8   box?

9   A   "Do not participate in a particular matter involving

10  specific parties if a reasonable person with knowledge of the

11  relevant facts would question your impartiality in the matter."

12          MS. FIFIELD:  Okay.  We can drop the callout.

13  BY MS. FIFIELD:

14  Q   Why are conflicts of interest problematic?

15  A   Because it potentially calls into question the public's

16  trust in the operations of the Navy and the government.

17  Q   Okay.  And is it fair to infer if a topic is included in

18  your PowerPoint that you trained Admiral Burke on that topic in

19  November of 2021?

20  A   Yes.

21          MS. FIFIELD:  Can we have page 24 of Exhibit 60,

22  please?

23  BY MS. FIFIELD:

24  Q   What's the title of this slide?

25  A   "Misuse of Position."

1  Q   In this case, whose position would you have been talking

2  about in your training?

3  A   Admiral Burke's, as well as everyone on the staff that was

4  in the training.

5  Q   Would you please read the first bullet point?

6  A   "Public service is a public trust."

7  Q   What does that mean?

8  A   Meaning if people take official actions as part of their

9  duties, that they are acting in the public interest and not

10 private interest.

11 Q   Would that include one's own personal interests?

12 A   Yes.

13 Q   Financial interest of another?

14 A   Yes.

15 Q   Could you please read the second bullet point and its

16 sub-points?

17 A   "Employees may not use public office for private gain,

18 allow the improper use of nonpublic information.  Nonpublic

19 information is not available to the public, obtained in the

20 course of one's official DoD duties or position, which would

21 normally not be releasable under FOIA."

22 Q   Okay.  Thank you.

23         MS. FIFIELD:  Can we have page 24, please, of

24 Government's Exhibit 60 -- oh, my apologies.  31.

25 BY MS. FIFIELD:

1    Q    Did your training cover post-government employment?

2    A    It did.

3    Q    Is that the title of this slide?

4    A    Yes.

5    Q    What does it mean to be seeking employment?

6    A    Basically, you're -- you're making an unsolicited

7    communication or -- I'm sorry.

8        You're making a solicited communication or an unsolicited

9    communication, or responding to one, about employment outside

10   of the government.

11   Q    Is that just general interest in a different job?

12   A    For seeking employment, there has to be some sort of

13   affirmative action or communication from another.

14   Q    Thank you.

15       When does seeking employment become negotiating employment?

16   A    When there's a discussion or an agreement or discussions

17   with a view towards an agreement for a position within a

18   company or an employer.

19   Q    A particular company?

20   A    Yes.

21   Q    So if a federal employee or officer wants to avoid seeking

22   or negotiating employment, what is -- and is approached by a

23   prospective employer, what must that person do?

24   A    Basically, make an unconditional rejection of that offer.

25   Q    What would an unconditional rejection look like?

1  A   A statement that says, I am not interested in a position

2  with your company.

3  Q   What about, I'm not interested right now, but maybe some

4  day?

5  A   A deferral, no, that would not be an unconditional

6  rejection.

7  Q   If a federal employee or officer wants to discuss future

8  employment with a prospective employer, what must that person

9  do?

10  A   They would have to recuse themselves from any official

11  actions related to that prospective employer.

12  Q   In the case of a flag officer, and specifically

13  Admiral Burke, would Admiral Burke have some additional

14  obligations?

15  A   As a filer, yes, there would be a requirement to inform

16  your supervisor in writing of a potential -- I'm sorry, of the

17  seeking or negotiating employment.

18  Q   Okay.  Just a few more questions with respect to

19  Exhibit 60.

20       MS. FIFIELD:  Could we have page 3, please?

21  BY MS. FIFIELD:

22  Q   Okay.  What is the title of this slide?

23  A   "Lessons Learned."

24  Q   Would you please read the contents of the slide for us?

25  A   "Best practices concerning your staff judge advocate.

1    Provide full disclosure of all relevant facts.  Continuously

2    ensure your staff is keeping your judge advocate in the loop.

3    And if there was no time to consult with your staff judge

4    advocate before an event, still take the time to consult with

5    your staff judge advocate after the event.  SJAs don't just get

6    DS.  They get to right."

7    Q   As you mentioned earlier, is a force judge advocate a type

8    of staff judge advocate?

9    A   Yes.

10   Q   So that's you in this case?

11   A   Yes.

12   Q   Why is it important for you, the force judge advocate and

13   ethics counselor, to get complete information from the flag

14   officer whom you advise, in this case Burke?

15   A   It's important to get accurate information so I can provide

16   an accurate legal opinion.

17   Q   What are the implications if you receive incomplete or

18   inaccurate information?

19   A   The opinion itself may be inaccurate and it could lead to

20   violations of law.

21   Q   In some cases, criminal law?

22   A   Yes.

23         MS. FIFIELD:  We can take down Exhibit 60.

24         THE COURT:  Folks, why don't we stop there for the

25   evening.

1          Captain Appleman, I'll excuse you for the evening.

2    I'll direct you to return for your continued testimony tomorrow

3    at 9:30 a.m., and instruct you not to discuss the content of

4    your testimony with anyone between now and then.

5          Ladies and gentlemen, I wanted to give you a little

6    update on where we are.  Good news, we're moving along more

7    quickly than I had expected.  I appreciate the fact that you

8    all have been here and so attentive, been here promptly.

9    That's one of the things that has helped us move so quickly.  I

10   think you all will get the case this week, possibly as soon as

11   Wednesday, probably Wednesday or Thursday.

12         Wednesday is going to be a shorter day.  I've got

13   another obligation in the afternoon, later in the afternoon.

14   So we'll have a shorter day on Wednesday.  But you all should

15   plan to be here on Friday.  Assuming the case is to you by

16   then, you all would presumably be deliberating then.  This also

17   means, though, that for those of you who have Memorial Day

18   plans and what have you, I think we're going to be well in the

19   clear there.  So good news.

20         The last couple days, though, things get a little

21   slower as the attorneys and I have to take care of odds and

22   ends outside of your presence.  So I hope you'll forgive the

23   little more interruptions we'll have the next couple days.  I

24   want to ensure you, we are making good progress and, really, I

25   think you will have the case within the next couple days.

1          The attorneys and I do need to talk now about some

2     other issues, so let me excuse you for the day, ask you to

3     return for 9:30 tomorrow.  Of course, don't do any research on

4     the case and don't discuss it with anyone.  Thanks, folks.

5          (Jury absent)

6          THE COURT:  All right.  You all may have a seat.

7          I think it sounds like you all are pretty much on the

8     same page as to the final jury instructions, and I just want to

9     go over the last few, the areas where there are potential

10    disagreements.

11         MR. PARLATORE:  Your Honor, we will have one

12    additional request to add to the jury instructions.

13         THE COURT:  Okay.  What is that, sir?

14         MR. PARLATORE:  Missing witness charge.

15         THE COURT:  Okay.  Happy to consider that.  I want to

16    see -- this is not necessarily the speak now or forever hold

17    your peace.  I know things are still coming through.  But if

18    you don't speak now, you need to make sure to speak up later

19    because we're kind of assuming we're heading on that path.

20         MR. PARLATORE:  And not something I would normally

21    bring up before they rested, but I think --

22         THE COURT:  Yeah, that's fine.

23         MR. PARLATORE:  I think we already know.

24         THE COURT:  Have you submitted a proposed theory of

25    the case?

1          MR. PARLATORE:  We have not.

2          THE COURT:  All right.  Are you looking to submit one?

3    Obviously, you don't need to.

4          MR. PARLATORE:  I was not planning on it.

5          THE COURT:  All right.

6          MS. FIFIELD:  Your Honor, respectfully, if I may.

7          Given that the parties did largely agree, as the Court

8    noted, on proposed -- joint proposed jury instructions prior to

9    trial and the objections or the proposed changes come from

10   Mr. Parlatore, I think it would be appropriate for him to

11   address the Court first and have the government stand up in

12   response.  But the government would ask to -- the Court to

13   adopt the joint proposed jury instructions as written without

14   Mr. Parlatore's modifications.

15         THE COURT:  And any -- I take it the government is

16   comfortable with the instructions as you provided them at this

17   point?

18         MS. FIFIELD:  Yes, that is true.  Ms. Grant approached

19   us about one potential question she had, and we're prepared to

20   address that question with her.  But other than that, yes, we

21   anticipate we are asking the Court to go forward with those

22   jury instructions that we proposed pretrial as written.

23         THE COURT:  Okay.  All right.  And, Mr. Burke, happy

24   to hear from you.

25         MR. PARLATORE:  So I would actually kind of go the

 1   other way, that I had submitted these proposed edits.  You

 2   know, at the time, the government said, because of the short

 3   time, they hadn't had an opportunity to consider them.  We put

 4   them in here with the authority -- supporting authority behind

 5   them.  So I don't -- at the time, the government said that

 6   because the time was short and they didn't have the ability to

 7   really consider it, we should just leave it in, but I don't

 8   know if they still oppose any or all of these.

 9              THE COURT:  It sounds like they do.

10              Am I right, Ms. Fifield?

11              MS. FIFIELD:  My apologies, Your Honor.  I was writing

12   something down.

13              THE COURT:  You all still oppose the defendant's

14   proposed additions?

15              MS. FIFIELD:  Yes.

16              THE COURT:  All right.  Happy to hear.

17              So it looks like, is the first one 2306 that you're

18   looking to add in, Mr. Parlatore?

19              MR. PARLATORE:  The first proposed edit that we had

20   was, you know, that we object to the inclusion of the

21   nonofficial acts as part of the overt acts.  This is on -- we

22   had the list of the proposed edits at the end.  So this is

23   Docket Number 102, Exhibit 1, on page 22 and 23 are all of our

24   proposed edits.

25              THE COURT:  Okay.  Is that evaluation on prior

1   inconsistent statement?  I'm not quite sure where you are, sir.

2           MR. PARLATORE:  So I'm on page 22 of docket entry

3   102-2.  Our proposed edits are relatively minor.

4           THE COURT:  All right.  And you're looking to -- what

5   instruction is that on?  That's for --

6           MR. PARLATORE:  This is the overt acts starting on

7   page 7.

8           THE COURT:  All right.  So is that -- in this case,

9   the charged overt acts are --

10          MR. PARLATORE:  Correct.  The ones that are under the

11  McDonnell standard that are not official acts.

12          THE COURT:  And so which one specifically are you

13  looking at?

14          MR. PARLATORE:  19 is the one that's the most

15  significant.  That's the one related to the foreign military

16  officer, because under the McDonnell standard, sending an email

17  to a foreign officer, British Naval officer, cannot be

18  considered an official act.

19          THE COURT:  Okay.  So that's two -- you're looking at

20  paragraph 19 and then A?

21          MR. PARLATORE:  Pretty much the entirety of 19.  In

22  fairness, Judge, this was a proposed instruction that we put

23  together before Your Honor ruled on our motions to strike all

24  the unofficial acts from the indictment.  So I recognize --

25          THE COURT:  Yeah.

 1          MR. PARLATORE:  I recognize you've already dissected

 2    these somewhat.

 3          THE COURT:  Right.

 4          MR. PARLATORE:  In a slightly different form.

 5          THE COURT:  Okay.  But you're looking to just take out

 6    19 in toto?

 7          MR. PARLATORE:  Yes, we are.

 8          THE COURT:  All right.  And then what's next?

 9          MR. PARLATORE:  So next is on the necessity of

10    specific intent.  This would go into the section entitled

11    "Corruptly Defined," that we wanted to just propose, "The

12    prosecution must prove beyond a reasonable doubt that the

13    defendant had a specific intent to engage in a quid pro quo

14    arrangement where the benefit received was intended to

15    influence an official act."

16          THE COURT:  What page are you looking on there,

17    Mr. Parlatore?

18          MR. PARLATORE:  Again, I'm going -- on page 22 is

19    where we put our suggestion, but the section we're trying to

20    adjust is on page 13, where it says "Corruptly Defined."  It

21    says in here, "A public official acts corruptly if a public

22    official demands, seeks, receives, accepts, or agrees to accept

23    something of value with the understanding, at least in part, in

24    an exchange the public official is suspected to be influenced

25    in the performance of an official act."

1              Based on the --

2         THE COURT:  I got you now.  So is corruptly defined --

3    you want to --

4         MR. PARLATORE:  We would like to make it, you know, a

5    little bit more explicit for the jury as to how this is

6    defined, that they must prove beyond a reasonable doubt that

7    the defendant had a specific intent to engage in a quid pro quo

8    arrangement for the benefit --

9         THE COURT:  Is that right?  I mean, specific intent, I

10   know is -- obviously, like, there's relatively limited specific

11   intent crimes.  Corruptly is kind of its own mens rea, but I

12   didn't think it's a specific intent mens rea.

13        MR. PARLATORE:  Well, there has to be under 18 U.S.C.

14   1512, you know, the actions have to be done knowingly with the

15   intent to influence.  Again, a lot of this kind of goes to the

16   idea of if there's a job discussion and there's also a contract

17   discussion, if those two things aren't linked, then that's --

18   that is the necessity.  They have to prove the linkage between

19   the two.

20        THE COURT:  And so are you looking to add that

21   sentence on, "The prosecution must prove beyond a reasonable

22   doubt" --

23        MR. PARLATORE:  Yes.

24        THE COURT:  -- just at the bottom of that paragraph?

25        MR. PARLATORE:  Yes.

1           THE COURT:  All right.  And then what's the next one?

2           MR. PARLATORE:  So the next one is, we're suggesting

3   adding a sentence, "Jurors should distinguish between legal

4   acceptance of gifts or benefits and illegal conduct requiring

5   proof of corrupt intent."

6           THE COURT:  And where -- where -- is that on that same

7   instruction?

8           MR. PARLATORE:  Yes.  And this one, we had written at

9   an earlier time, when there was -- through the discovery, there

10  was a lot more -- it seemed there was a lot more emphasis on,

11  you know, the value of a bottle of wine and things like that.

12          THE COURT:  All right.  So do you think it's still --

13          MR. PARLATORE:  I mean, given the proof that's come

14  out.  We haven't really, you know, gotten into this whole

15  bottle of wine thing, so I don't think -- I don't know if

16  that's something the government plans to rely upon.

17          MS. ROSS:  No, Your Honor.  I don't anticipate that

18  coming out throughout the rest of trial.

19          MR. PARLATORE:  Okay.  That simplifies that one.

20          THE COURT:  Okay.  So you're happy to leave out the

21  distinction between legal and illegal contract division?

22          MR. PARLATORE:  Right.

23          THE COURT:  Okay.  Next?

24          MR. PARLATORE:  Next is the mixed motive

25  clarification.  We recommend including instructions that

highlight the presence of mixed motives do not automatically imply corrupt intent unless the primary intent was to influence an official act corruptly.

So what we proposed is, the presence of mixed motives does not suffice to establish corrupt intent unless it is proven through competent evidence that the primary purpose was to corruptly influence an official act.

THE COURT:  And you're just looking to add that on to the end of that paragraph?

MR. PARLATORE:  Correct.

THE COURT:  Okay.

MR. PARLATORE:  Again, we have the supporting authority there that there has to be an emphasis on specific intent even when mixed motives are present.

THE COURT:  And does that Sixth Circuit case, does that use the term "specific intent" or is that your gloss on it?

MR. PARLATORE:  It's been a few months since I've read the case, Judge.

THE COURT:  Sure.

MR. PARLATORE:  I think, but I don't want to say something I might regret.

And then finally, the circumstantial evidence consideration, the "Exchange Need Not Be Explicit" section.  We think that that -- that it should be strengthened a little bit

1    to distinguish between ambiguous actions and those that

2    demonstrate corrupt intent to simply just add the sentence of,

3    "Jurors should also consider circumstantial evidence as they

4    would any evidence, but must ensure that the evidence clearly

5    demonstrates proof of corrupt intent."

6            THE COURT:  Where is that?  Is this circumstantial

7    evidence versus direct evidence?

8            MR. PARLATORE:  This is, "Exchange need not be

9    explicit," on page 15.

10           THE COURT:  Instruction 2109?  Or is that a

11   different -- I've got different page numbers than you,

12   unfortunately.

13           MR. PARLATORE:  On page 15, the middle of page 15 of

14   the docket entry 102-1, there's a section, "Exchange needs not

15   be explicit."

16           THE COURT:  Yeah.  What's the heading, though, sir?

17           MR. PARLATORE:  "Exchange Need Not Be Explicit."

18           THE COURT:  That's the instruction?

19           MR. PARLATORE:  Yes.  I can read it.  It's a short

20   paragraph.

21           "The defendant's intent to engage in an exchange of a

22   bribe for an official act need not be explicit.  Otherwise, the

23   law's effect can be frustrated by knowing winks and nods.

24   Rather, the government must prove the defendant's intent -- can

25   prove the defendant's intent by circumstantial evidence based

1    on his words, conduct, acts, and all the surrounding

2    circumstances and rational or logical inferences that may be

3    drawn from them."

4         And then we would suggest adding a sentence in,

5    "Jurors should consider circumstantial evidence as they would

6    any evidence, but must ensure that the evidence clearly

7    demonstrates proof of a corrupt intent."

8         THE COURT:  Anything else, Mr. Parlatore?

9         MR. PARLATORE:  Aside from the missing witness issue,

10   which I don't know if you want to address now or later.

11        THE COURT:  We can deal with that later.  Thanks.

12        Maybe you can send around the proposed instruction.

13   Are you just talking about the red book instruction?

14        MR. PARLATORE:  I'm just talking about the red book

15   instruction, you know, generally speaking, obviously modified

16   specifically to Ms. Canedo.

17        THE COURT:  And why is it particularly within the

18   power of the government to subpoena Ms. Canedo?

19        MR. PARLATORE:  Hold on a second, Judge.  I did the

20   research on this last night.  All right.  The question of

21   whether a witness is peculiar within the parties' power to

22   produce is judged by practical considerations.  In *U.S. v.*

23   *Young*, 463 F.2d 934, the Court explained that availability must

24   be assessed in practical as well as physical terms.  That

25   means, if the government has developed a relationship with the

1   witness, such as the original complainant, by relying upon her,

2   meeting with her throughout the pretrial process, the

3   government is generally considered to have the practical

4   ability to produce her at trial.

5         I have some other cases, but it is based on -- you

6   know, she is the complainant.  She has met with them many

7   times.  She has been, from the beginning, very openly hostile

8   to my client.  You know, she very much desires him to be in

9   jail.  And so given these circumstances, you know, the

10  practical considerations, as the case law demonstrates, she is

11  within their ability to produce.  So it is not a situation of

12  where either side could have called her.

13        THE COURT:  I mean, but --

14        MR. PARLATORE:  If you want, I can prepare something

15  written for you.

16        THE COURT:  That's fine.  My instinct, this is not

17  like somebody you all didn't know about, where I think it would

18  be a very different situation.  Obviously, she's been widely

19  discussed throughout.  So I get you expected the government to

20  call her, but I'd be interested if you can find a case where

21  there's someone the defense knew about who the government chose

22  not to call and it's still appropriate for a missing witness

23  instruction.

24        MR. PARLATORE:  Sure.

25        THE COURT:  Okay.  Ms. Fifield?

1          MS. FIFIELD:  Brief indulgence, Your Honor.

2     (Pause)

3          THE COURT:  While you're looking for that, unless

4  something happens in the next couple of days, not expecting, I

5  take it you both agree that the effect of refusal of witness to

6  answer a question, if applicable, is not applicable and we can

7  remove it?

8          MS. FIFIELD:  Your Honor, on the missing witness

9  instruction, the government --

10          THE COURT:  No, no.  This is a different question.

11          Effect of a witness refusal to answer a question.

12  That's 211.  I take it I can remove that?

13          MS. FIFIELD:  Yes.

14          MR. PARLATORE:  Unless Captain Appleman does something

15  really unexpected.

16          THE COURT:  You can ask for it back in, but I'm taking

17  it out for the moment.

18          All right.  Evaluation of a prior consistent

19  statement.  Is that applicable?

20          MS. FIFIELD:  Not in the government's view.

21          MR. PARLATORE:  No, Your Honor.

22          THE COURT:  Okay.  So I'm taking out 2217.

23          So 2306, statements of the defendant, corroboration.

24  I think you all proposed that.  It looks to me like the red

25  book suggests this instruction should not be given in district

1    court.  I mean, I'll give it if both parties are specifically

2    asking me to, but I want to make sure that defense in

3    particular considered this.

4         MR. PARLATORE:  I think we can remove it, Judge.

5         THE COURT:  All right.  So 2306, statements of the

6    defendant, corroboration, I'm removing.

7         You also suggested 23100, defendant's state of mind.

8    Is there actually an instruction for that?

9         MS. FIFIELD:  This is the issue I mentioned earlier

10   that --

11        THE COURT:  So you're going to circle back if you find

12   something?

13        MS. FIFIELD:  Let me just briefly confer with my

14   colleagues, but I think we have an answer for you.

15        THE COURT:  Okay.  There's like 3101.  I wonder if

16   that's what you had in mind.

17     (Pause)

18        MR. PARLATORE:  Judge, could I ask -- because it

19   sounds like they got the communication about this.  It may be

20   stuck somewhere in my inbox, what I haven't taken a look at.

21   Was there a specific request --

22        THE COURT:  We're just wondering.  You all had listed

23   3100, defendant's state of mind, but it looks like it's not

24   actually an instruction, more just kind of a note.  I'm not

25   sure that there's anything to put for that.

1        MS. FIFIELD:  Your Honor, the government is

2   deliberating, and we'll have an answer for you before we leave

3   today.

4        THE COURT:  Okay.  Well, we're going to be leaving

5   very soon.

6        MS. FIFIELD:  We'll have an answer for you soon.

7        THE COURT:  Mr. Parlatore, can you take a look at

8   3100?  We don't need to decide this right now.  It looks to me

9   like I should be giving 3101, proof of state of mind, but I

10  don't know there's any language they actually give on

11  defendant's state of mind, which is 3100.

12        MR. PARLATORE:  Okay.

13        THE COURT:  So right now, I don't have anything to

14  give, and I'm not expecting to give anything.  But if you all

15  have language you think I should be giving there, I need to

16  hear.

17        MS. FIFIELD:  From the government's perspective, we

18  can take that one out.

19        THE COURT:  Okay.  All right.  Ms. Fifield, can you

20  respond to Mr. Parlatore?

21        MS. FIFIELD:  So as I stated several minutes ago, with

22  the exception of the modifications that we all just went

23  through, the government would ask that the Court deliver the

24  jury instructions as written in the joint proposed jury

25  instructions that we filed pretrial.

1          Now, Mr. Parlatore's objections, generally speaking,

2    fall into three categories, and one of them is sort of the

3    definition of bribery under the law.  I would like to address

4    that last.

5          The other two, the first objection of Mr. Parlatore's,

6    nonofficial acts, first of all, I think it's very important

7    that we all be very precise about which instruction

8    Mr. Parlatore is asking to have modified.

9          The overt acts list is included under Count 1, which

10   is conspiracy.  It's not bribery.  And these, each of the --

11   well, I guess now the one paragraph that Mr. Parlatore wants to

12   have removed is an overt act in furtherance of the conspiracy,

13   which does not itself have to be unlawful.  And as the Court

14   observed when it denied the defendant's motion to dismiss, I

15   think this argument falls flat for similar reasons.

16         THE COURT:  Okay.

17         MS. FIFIELD:  The next objection that I'd like to

18   address before getting into the bribery specific request --

19         THE COURT:  Ms. Fifield, do you have anything post

20   McDonnell that supports that?

21         MS. FIFIELD:  McDonell?

22         THE COURT:  McDonald, the Supreme Court case that

23   Mr. Parlatore is pointing to, the Virginia governor who was --

24         MS. FIFIELD:  Yes.  McDonnell.

25         THE COURT:  Okay.  Thank you.

1          MS. FIFIELD:  I don't see a citation in his objections

2    to McDonnell.  I don't think McDonnell has any impact on the

3    overt acts request that the defendant makes here.  So I would

4    say yes, is the short answer to your question.  I don't think

5    McDonnell had any effect on whether or not the indictment can

6    list overt acts.

7          THE COURT:  Right.  But I'm asking, do you have any

8    case law post McDonnell on that?

9          MS. FIFIELD:  I mean, respectfully, Your Honor, I

10   think that they are distinct issues.  There is no crossover

11   between McDonnell and the issues that McDonnell addressed and

12   the request that the defendant makes.

13         So again, the short answer to your question would be

14   no, but that's not because we're not aware of case law.  I just

15   respectfully, I would submit that the issues are so distinct,

16   there would be no case law.

17         THE COURT:  Because it's conspiracy rather than

18   bribery?

19         MS. FIFIELD:  Correct.  This is about conspiracy.

20   That is a case about bribery.  And what he appears to be asking

21   for, Mr. Parlatore, is to modify the instruction under Count 1,

22   which is the conspiracy charge, and it's black letter law that

23   not every overt act in furtherance of a conspiracy needs to be

24   itself illegal.

25         THE COURT:  But it's conspiracy to commit bribery?

1    Right.  Bribery isn't a substantive offense in itself.

2          MS. FIFIELD:  It's a conspiracy to do a number of

3    things, one of which was also to conceal the bribery scheme

4    from the Navy.

5          So the government would submit this is a multifaceted

6    conspiracy and that Mr. Parlatore has not identified any law

7    that would support a request to omit an overt act from the jury

8    instructions when it's the Court's practice to list overt acts

9    as supplied in the indictment, which, again, this Court

10   declined to dismiss.

11         THE COURT:  I mean, isn't the Count 1, it's pointing

12   to 18 U.S.C. 201(b), right?  Isn't this the bribery statute?

13         MS. FIFIELD:  Is the Court looking at the indictment

14   or the jury instructions?

15         THE COURT:  The indictment.

16         MS. FIFIELD:  Let me pull it up here, if the Court

17   wouldn't mind a brief moment.

18      (Pause)

19         MS. FIFIELD:  The Court is right in that the statutory

20   reference is to 18 U.S.C. 201, but the government has clearly

21   pled this as a conspiracy to do a number of things, the purpose

22   of which, looking at paragraph 21 of the indictment, was all in

23   service of using Burke's official position as a Navy Admiral to

24   benefit and enrich themselves through bribery.  And the

25   concealment portion of the scheme was, you know, as I sort of

1  talked about in opening, it was an essential aspect of the

2  scheme.  Burke had to conceal it or he would not have been able

3  to use his position to further the interest of himself or his

4  own personal financial interests.

5         THE COURT:  I understand your argument.  Again, I

6  think it would be helpful if you actually look for

7  post McDonnell case law on conspiracy.

8         MS. FIFIELD:  If the Court is interested, the

9  government will, of course, be happy to oblige.

10        THE COURT:  Thank you.  Next.

11        MS. FIFIELD:  Okay.  Looking to Mr. Parlatore's mixed

12  motive request, I will just say I have yet to locate any DC

13  case law that directly addresses this issue.  The Sixth Circuit

14  case that Mr. Parlatore offered the Court in support of this

15  request does not appear to even be a bribery case, and the

16  Court specifically asked, do the words "mixed motive" or

17  "specific intent" appear in that case, and the answer is no.

18  That much is -- you know, those words do not appear.  So I

19  don't feel at this point the government is capable of providing

20  a meaningful response because I do not understand the argument

21  that he's making legally.

22        THE COURT:  Okay.  Do you agree with me that specific

23  intent -- or corruptly is a mens rea that's not necessarily

24  synonymous with specific intent?

25        MS. FIFIELD:  I think that's an excellent bridge to

 1    the last bucket of instructions.  So in service of answering

 2    the Court's question, what I will say is that corruptly is

 3    specific intent, and the case law is very clear that that is

 4    the specific intent that is required, and no more than that,

 5    under the context of 18 U.S.C. 201.

 6          THE COURT:  All right.  So corruptly is essentially

 7    specific intent.  So why not spell that out and say that, then,

 8    as he's requesting?

 9          MS. FIFIELD:  Due respect to counsel here, that is a

10    misstatement of the law on bribery.  Counsel made a reference

11    to 18 U.S.C. 1512, which I know from past experience that this

12    court has a lot of experience with.  The case law, especially

13    in DC, is abundantly clear that the mens rea required for an

14    obstruction statute is different than a mens rea required for a

15    bribery statute.  I can give you some citations as to that.

16          That's *United States versus Ring*, 706 F.3d 460, *United*

17    *States versus Robertson*, 103 F.4th 1.  And those are cases out

18    of the DC Circuit.  So they're appellate binding case law in

19    this circuit that says that corruptly, the exchange of a thing

20    of value for an intent to be influenced in the performance of

21    an official act in the bribery context, that is inherently

22    corrupt.

23          And the Supreme Court in *Snyder* recently said, albeit

24    in dicta, that American law considers bribery inherently

25    corrupt.  It is meaningfully distinct from the obstruction

1    context.  And so to expand upon the definition of corruptly in

2    the manner that Mr. Parlatore is requesting would not

3    accurately reflect the law.

4         THE COURT:  So you're saying defense is trying to take

5    the obstruction mens rea and import it into bribery?

6         MS. FIFIELD:  Correct.  And the defendant cites, as

7    support for these requests, *Arthur Anderson versus*

8    *United States*, which I know that as the Court has gone into

9    depth on that case and the meaning of corruption in obstruction

10   context, but that is the point.  That case is an obstruction

11   case.  It is not a bribery case.  It does not inform the

12   definition of corruptly in the context of 18 U.S.C. 201.

13        THE COURT:  Okay.  Anything else, Ms. Fifield?

14        MS. FIFIELD:  I'll just make one more brief note

15   before I confer with my colleagues quick and sit down.

16        Counsel mentioned -- I'm not -- I'm not quite sure

17   that I will capture this, what the argument was, but he

18   mentioned knowing winks and nods that currently appears in the

19   bribery instruction.  That is not just fancy rhetoric.  That's

20   the law.  That phraseology comes from a case called *Evans*

21   *versus United States*.

22        THE COURT:  You're not looking to take that out, are

23   you?

24        MR. PARLATORE:  No, I'm not.

25        MS. FIFIELD:  Perhaps I misunderstood.

1              THE COURT:  I think he wants to add things in.

2              MS. FIFIELD:  The government would oppose for the

3    reasons I've stated for each one of his requests.

4              If I could just check my notes quick here before I sit

5    down.

6              (Pause.)

7              MS. FIFIELD:  I would just sum up by saying that the

8    language offered by the parties jointly in the joint proposed

9    jury instructions is an accurate statement of the law, and to

10   grant the defendant's objections to that would result in a

11   misstatement of the law, would not be correct in the

12   government's view.

13             Just one moment to briefly confer with my colleagues

14   before I --

15             THE COURT:  Sure.

16        (Pause)

17             MS. FIFIELD:  And as the Court stated, this will be

18   sort of an ongoing conversation as we approach the -- giving

19   the case to the jury.  So if the Court would like to request

20   any additional briefing or case law, the government is happy to

21   provide it.

22             THE COURT:  All right.  So I'm asking you to check on

23   McDonnell.

24             And I'm asking you, Mr. Parlatore, to look on the

25   missing witness case law.  As I say, my very quick look just at

1    the red book suggests that someone like Ms. Canedo, who both

2    parties are very aware of, is equally available to them both,

3    and so missing witness would not be appropriate.

4         Anything else you want to say now, Mr. Parlatore?  I

5    don't intend to rule, but if you wanted to respond to

6    Ms. Fifield, feel free to.

7         MR. PARLATORE:  Not on this subject at this time.

8         THE COURT:  Okay.  And then also, just we talked about

9    limiting instruction on the texts.  I don't have anything

10   currently.  If defense wants to propose one, I'm happy to

11   consider it.

12        MR. PARLATORE:  Okay.

13        THE COURT:  Anything else we should talk about today?

14        MS. FIFIELD:  Your Honor, just one brief clarifying

15   question regarding the scheduling information that the Court

16   communicated to the jury.

17        If in a circumstance where the jury gets the case

18   prior to Wednesday afternoon, would you request that they stay

19   here and deliberate or stand with they have Wednesday afternoon

20   free?

21        THE COURT:  Yeah.  I'm out of the building on

22   Wednesday, so -- well, so Wednesday, I think -- I'm thinking

23   it's going to be about ten until 2:00.  So we'll have a short

24   day, but -- and probably a quick lunch in there.  But, yeah, I

25   need to go to the Supreme Court at 2 o'clock.  So I'm not

1    available and I can't have them deliberate.

2            MS. FIFIELD:  Understood.  Thank you, Your Honor.

3            MR. PARLATORE:  All right.  I guess just my only

4    question would be, you know, looking forward, how many

5    witnesses are left?

6            THE COURT:  All right.  Ms. Fifield, who is up next

7    after, I take it, Captain Appleman isn't going to be too much

8    longer.

9            MR. PARLATORE:  I mostly want to make sure they're not

10   going to rest tomorrow morning and all of a sudden I have

11   closing tomorrow afternoon that I was not ready for.

12           THE COURT:  Yeah.  Yeah.

13           MS. FIFIELD:  Your Honor, I think Captain Appleman

14   probably has another 45 minutes or so on direct, followed by

15   the next two witnesses whom the government will call are Mary

16   Beth Eversman and Pamela Hooker.

17           THE COURT:  Okay.  And do you expect, kind of very

18   rough estimation, just are we finishing up tomorrow, do you

19   think, or Wednesday?

20           MS. FIFIELD:  I think it's quite possible that we will

21   finish up by the end of the day tomorrow, of course excepting

22   the government doesn't have total control over the pacing that

23   we're operating under.  I do think it's quite likely we will

24   rest tomorrow.

25           MR. PARLATORE:  If they rest ever so slightly earlier

1    than expected, can we still do closings on Wednesday?

2          THE COURT:  I think probably.  I should also tell you,

3    I instruct before closing.  So it's conceivable that we would

4    try to do most of the instructions tomorrow.  Unless things go

5    very quickly, I kind of imagine Wednesday is for closings.

6          MR. PARLATORE:  Okay.

7          THE COURT:  Thanks, folks.  Why don't we get back at

8    9:15 a.m. tomorrow.  You can let me know what you've found on

9    those two issues.

10       (Proceedings concluded at 5:16 p.m.)

11

12                         CERTIFICATE

13    I, Sonja L. Reeves, Federal Official Court Reporter in and
for the United States District Court of the District of
14    Columbia, do hereby certify that the foregoing transcript is a
true and accurate transcript from the original stenographic
15    record in the above-entitled matter and that the transcript
page format is in conformance with the regulations of the
16    Judicial Conference of the United States.

17       Dated this 12th day of May, 2025.

18

19                      /s/ Sonja L. Reeves
                        SONJA L. REEVES, RDR-CRR
20                      FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**$**

**$100** [3] - 6:15, 35:19, 84:22
**$149,000** [2] - 79:17, 79:21
**$150,000** [3] - 66:4, 78:18, 78:21
**$500,000** [1] - 80:24

**/**

**/s** [1] - 132:19

**0**

**06** [1] - 38:21
**07** [1] - 38:20

**1**

**1** [9] - 34:17, 34:20, 35:6, 46:10, 111:23, 123:9, 124:21, 125:11, 127:17
**10** [2] - 59:5, 59:7
**100** [2] - 28:19, 83:12
**1000** [1] - 1:17
**10016** [1] - 1:21
**101** [1] - 27:5
**102** [2] - 2:11, 111:23
**102-1** [1] - 117:14
**102-2** [1] - 112:3
**103** [1] - 127:17
**109** [1] - 21:18
**11** [1] - 2:3
**111** [1] - 23:8
**114** [1] - 29:23
**12** [1] - 1:10
**12th** [1] - 132:17
**13** [8] - 55:21, 55:22, 81:4, 81:9, 82:12, 82:13, 82:15, 113:20
**130** [1] - 30:11
**1301** [1] - 1:17
**134** [2] - 83:3
**14** [3] - 58:3, 64:6, 75:9
**15** [5] - 56:13, 57:11, 117:9, 117:13
**150** [3] - 79:21, 79:25, 80:3
**150,000** [1] - 66:16
**1512** [2] - 114:14, 127:11
**16** [1] - 48:19
**17-year** [1] - 48:20
**17th** [1] - 1:20
**18** [8] - 63:9, 103:3, 114:13, 125:12,

**2**

**2** [6] - 13:7, 13:16, 23:9, 25:6, 29:23, 130:25
**20** [1] - 54:6
**20001** [1] - 1:25
**2008** [1] - 46:16
**201** [3] - 125:20, 127:5, 128:12
**201(b** [1] - 125:12
**2010** [1] - 46:17
**2012** [2] - 64:19, 92:10
**2015** [1] - 43:3
**2018** [2] - 37:13, 85:5
**2020** [1] - 45:23, 49:22, 69:11, 69:19
**2021** [11] - 24:9, 24:13, 24:16, 37:12, 85:5, 91:20, 98:19, 99:7, 99:21, 100:8, 103:19
**2022** [4] - 21:23, 30:1, 30:15, 91:22
**2025** [2] - 1:10, 132:17
**20530** [2] - 1:15, 1:17
**208** [1] - 103:3
**21** [2] - 2:4, 125:22
**2103** [1] - 79:5
**2109** [1] - 117:10
**211** [1] - 120:12
**213** [1] - 54:21
**22** [3] - 111:23, 112:2, 113:18
**2217** [1] - 120:22
**23** [1] - 111:23
**2306** [1] - 111:17, 120:23, 121:5
**23100** [1] - 121:7
**24** [4] - 56:9, 57:21, 103:21, 104:23
**26** [1] - 102:21
**260** [1] - 1:20
**278** [15] - 40:7, 40:8, 40:16, 40:18, 54:23, 67:18, 68:24, 69:2,

**125**:20, 127:5, 127:11, 128:12
**19** [5] - 52:17, 112:14, 112:20, 112:21, 113:6
**1991** [1] - 38:9
**1994** [1] - 38:9
**1:24-cv-00265-TNM** [1] - 1:5
**1:38** [2] - 1:11, 3:1
**1st** [1] - 30:15

**3**

**3** [3] - 23:8, 83:6, 106:20
**30** [1] - 53:22
**31** [1] - 104:24
**3100** [3] - 121:23, 122:8, 122:11
**3101** [2] - 121:15, 122:9
**333** [1] - 1:24
**35** [1] - 60:8
**36** [2] - 2:5, 37:10
**3:02** [1] - 57:12
**3:19** [1] - 57:12

**4**

**4** [2] - 1:9, 21:23
**41** [9] - 2:10, 79:5, 92:13, 92:15, 92:17, 92:20, 92:22, 92:24, 93:14
**418** [1] - 27:7
**42B** [1] - 31:22
**45** [1] - 131:14
**46** [2] - 63:11, 77:19
**460** [1] - 127:16
**463** [1] - 118:23
**4:30** [1] - 57:2

**5**

**5** [2] - 27:6, 49:22
**50,000** [1] - 75:21
**500,000** [1] - 81:1
**51** [2] - 67:11, 81:14
**55-page** [1] - 78:7
**5500.07-R** [1] - 61:8
**56** [2] - 24:22, 33:7
**59** [2] - 21:16, 33:6
**5:16** [2] - 1:11, 132:10
**5G** [1] - 32:17

**6**

**6** [1] - 58:20
**60** [15] - 2:11, 99:12, 99:15, 99:19, 100:4,

**69**:5, 81:16, 81:18, 81:22, 88:24, 88:25, 89:5
**278s** [1] - 82:11
**278T** [1] - 54:12
**28** [1] - 90:9
**28th** [2] - 28:13, 29:15
**2:00** [1] - 130:23

**3**

**3** [3] - 23:8, 83:6, 106:20
**30** [1] - 53:22
**31** [1] - 104:24
**3100** [3] - 121:23, 122:8, 122:11
**3101** [2] - 121:15, 122:9
**333** [1] - 1:24
**35** [1] - 60:8
**36** [2] - 2:5, 37:10
**3:02** [1] - 57:12
**3:19** [1] - 57:12

**100**:7, 100:11, 101:4, 102:6, 102:7, 102:20, 103:21, 104:24, 106:19, 107:23
**60,000** [1] - 75:22
**601** [1] - 1:14
**608** [1] - 4:4
**608(c** [1] - 6:19
**609** [1] - 4:4
**66** [1] - 33:23
**69** [1] - 2:6
**6th** [1] - 23:13

**7**

**7** [1] - 112:7
**706** [1] - 127:16
**7th** [1] - 45:23

**8**

**8** [4] - 45:19, 48:1, 96:7, 96:16
**801(d)(2)(c** [1] - 3:12
**801(d)(2)(e** [1] - 3:14
**801(d)(2)(e)** [1] - 4:19
**8036** [1] - 101:1
**806** [8] - 3:4, 3:9, 4:23, 9:20, 10:14, 14:19, 14:20, 19:11
**806(d** [1] - 5:24
**87** [1] - 2:6
**88** [3] - 82:22, 82:23
**89** [1] - 2:8

**9**

**9** [12] - 6:24, 6:25, 30:1, 45:5, 49:16, 57:20, 69:9, 77:18, 95:22, 95:23, 95:25, 96:24
**92** [1] - 2:10
**934** [1] - 118:23
**99** [1] - 28:7
**9:15** [1] - 132:8
**9:30** [2] - 108:3, 109:3

**A**

**A-p-p-l-e-m-a-n** [1] - 89:25
**a.m** [2] - 108:3, 132:8
**abide** [1] - 53:13
**ability** [5] - 9:17, 82:2, 111:6, 119:4, 119:11
**able** [13] - 4:6, 5:6,

**5**:7, 5:8, 6:13, 6:19, 9:16, 10:3, 22:7, 23:1, 43:18, 85:23, 126:2
**above-entitled** [1] - 132:15
**absence** [1] - 44:11
**absent** [4] - 3:2, 56:16, 85:23, 109:5
**absolutely** [1] - 76:25
**abundantly** [1] - 127:13
**Academy** [7] - 25:21, 26:4, 26:12, 34:8, 34:23, 35:1, 35:9
**academy** [2] - 35:4, 35:12
**accept** [1] - 113:22
**acceptable** [1] - 48:5
**acceptance** [1] - 115:4
**accepted** [1] - 14:13
**accepting** [1] - 14:15
**accepts** [1] - 113:22
**access** [4] - 22:11, 22:14, 31:19, 41:14
**accessibility** [1] - 61:20
**accommodate** [1] - 29:9
**accordingly** [1] - 16:22
**account** [4] - 22:9, 22:15, 31:17, 31:19
**Accurate** [1] - 68:2
**accurate** [5] - 100:7, 107:15, 107:16, 129:9, 132:14
**accurately** [1] - 128:3
**acquisition** [8] - 79:8, 79:13, 79:15, 80:4, 80:8, 80:23, 84:1, 84:2
**acquisitions** [1] - 84:5
**act** [11] - 62:7, 112:18, 113:15, 113:25, 116:3, 116:7, 117:22, 123:12, 124:23, 125:7, 127:21
**Act** [2] - 54:12, 64:19
**acting** [2] - 44:12, 104:9
**action** [7] - 19:2, 64:3, 65:8, 67:6, 67:10, 103:1, 105:13
**actions** [6] - 60:24, 62:9, 64:17, 104:8, 106:11, 114:14, 117:1

**active** [9] - 37:3,
37:5, 51:24, 60:2,
63:24, 65:6, 77:23,
90:4, 90:8

**active-duty** [7] -
37:3, 37:5, 51:24,
60:2, 63:24, 90:4,
90:8

**activities** [2] - 59:9,
60:3

**activity** [3] - 100:18,
100:21, 101:8

**acts** [13] - 111:21,
112:6, 112:9, 112:11,
112:24, 113:21,
118:1, 123:6, 123:9,
124:3, 124:6, 125:8

**actual** [6] - 4:9,
54:23, 73:10, 89:2,
89:6, 89:8

**adapted** [1] - 27:20

**adapting** [1] - 31:3

**add** [7] - 82:15,
109:12, 111:18,
114:20, 116:8, 117:2,
129:1

**added** [1] - 36:2

**adding** [2] - 115:3,
118:4

**addition** [4] - 39:15,
42:11, 48:8, 48:23

**additional** [3] -
106:13, 109:12,
129:20

**additions** [1] -
111:14

**address** [9] - 45:8,
45:12, 46:24, 67:8,
110:11, 110:20,
118:10, 123:3, 123:18

**addressed** [3] -
54:24, 55:3, 124:11

**addresses** [1] -
126:13

**adjust** [1] - 113:20

**administered** [2] -
36:17, 89:17

**administrative** [4] -
44:22, 54:21, 73:6,
97:6

**administratively** [1] -
44:23

**Admiral** [77] - 10:7,
11:4, 12:5, 12:18,
12:24, 12:25, 13:1,
13:6, 13:11, 13:16,
13:17, 14:3, 14:22,
15:17, 15:25, 16:6,
25:24, 26:15, 26:18,
26:20, 26:23, 27:1,

27:3, 27:12, 28:4,
28:10, 28:17, 29:16,
29:20, 36:16, 38:22,
42:23, 43:4, 43:15,
43:25, 45:8, 46:12,
46:13, 56:14, 57:15,
57:23, 58:2, 59:1,
59:12, 60:10, 63:6,
65:23, 69:10, 70:1,
71:3, 71:8, 72:15,
84:18, 84:21, 86:9,
87:13, 89:11, 92:18,
93:15, 93:23, 94:7,
96:6, 96:15, 97:10,
98:1, 98:3, 98:6,
98:17, 98:21, 99:6,
99:21, 101:4, 103:18,
104:3, 106:13, 125:23

**admiral** [14] - 38:24,
41:19, 43:5, 44:9,
58:25, 59:24, 60:2,
69:1, 70:19, 70:22,
90:15, 93:6, 95:7,
100:22

**admirals** [3] - 41:18,
51:20, 70:24

**Admirals** [1] - 46:3

**admiralty** [1] - 38:2

**admissible** [7] -
3:16, 6:5, 6:8, 7:16,
8:2, 8:5, 8:18

**admit** [9] - 3:18, 5:2,
5:24, 6:8, 9:19, 14:1,
19:8, 92:20, 100:11

**admittance** [1] - 19:4

**admitted** [11] - 3:4,
3:14, 3:15, 3:22, 4:2,
19:4, 21:16, 45:5,
92:24, 95:22, 102:7

**ADMITTED** [1] - 2:10

**admitting** [2] - 19:9,
102:5

**adopt** [1] - 110:13

**advantage** [2] - 62:9,
62:21

**advice** [7] - 56:6,
61:21, 62:1, 68:14,
75:7, 80:20, 97:15

**advise** [3] - 97:5,
97:18, 107:14

**advisement** [1] -
55:13

**advisor** [1] - 37:21

**advisory** [1] - 3:25

**Advocate** [3] - 37:16,
82:12, 100:1

**advocate** [39] -
37:23, 37:25, 40:11,
41:20, 41:21, 43:10,
45:25, 47:12, 50:2,

50:24, 51:4, 52:25,
54:21, 60:15, 61:15,
81:6, 81:11, 84:6,
84:19, 85:4, 85:9,
85:16, 88:12, 88:19,
91:4, 91:16, 91:17,
92:4, 97:1, 97:3,
97:10, 106:25, 107:2,
107:4, 107:5, 107:7,
107:8, 107:12

**advocate's** [1] - 43:9

**advocates** [5] -
39:11, 41:12, 41:23,
98:22, 98:23

**affect** [3] - 67:10,
89:9, 103:1

**affects** [1] - 64:3

**affidavit** [2] - 18:10,
18:13

**affiliations** [1] - 68:8

**afford** [1] - 62:20

**afforded** [1] - 4:13

**afoul** [1] - 46:23

**Africa** [1] - 91:11

**afternoon** [14] -
21:13, 21:14, 36:21,
56:22, 56:24, 70:1,
70:2, 89:21, 89:22,
108:13, 130:18,
130:19, 131:11

**Afternoon** [1] - 1:9

**agency** [1] - 68:5

**Agent** [28] - 7:19,
7:21, 8:11, 8:24, 9:4,
9:17, 10:21, 10:22,
11:3, 11:18, 17:7,
17:15, 18:1, 18:17,
18:18, 21:7, 21:13,
21:20, 23:23, 24:3,
24:24, 27:9, 27:22,
31:17, 31:24, 33:1,
33:9, 36:10

**agent** [1] - 17:14

**agents** [1] - 17:20

**ago** [2] - 101:12,
122:21

**agree** [9] - 8:16,
10:12, 15:8, 29:13,
84:13, 86:4, 110:7,
120:5, 126:22

**agreed** [3] - 13:17,
24:12, 67:1

**agreement** [6] - 65:3,
65:4, 76:11, 83:10,
105:16, 105:17

**Agreements** [1] -
83:7

**agreements** [8] -
24:18, 64:21, 64:24,
65:1, 65:12, 67:23,

82:19, 82:20

**agrees** [1] - 113:22

**albeit** [1] - 127:23

**allocating** [1] - 43:17

**allow** [1] - 104:18

**allowed** [4] - 4:18,
84:21, 84:23, 85:1

**allowing** [2] - 5:2,
5:13

**allows** [2] - 4:23,
101:2

**Amanda** [3] - 16:9,
16:15, 16:19

**ambassador** [2] -
10:7, 10:9

**ambiguous** [1] -
117:1

**AMERICA** [1] - 1:3

**American** [1] -
127:24

**Anderson** [1] - 128:7

**annual** [26] - 39:5,
39:23, 40:6, 46:4,
46:14, 46:24, 48:15,
48:23, 49:23, 52:18,
53:21, 53:24, 54:3,
58:16, 70:7, 71:18,
87:20, 94:25, 95:3,
95:17, 98:4, 98:7,
98:9, 100:20, 100:21,
101:8

**Annual** [1] - 49:20

**annually** [1] - 40:20

**answer** [17] - 7:17,
9:4, 9:13, 9:15, 41:2,
42:19, 76:19, 77:13,
88:23, 120:6, 120:11,
121:14, 122:2, 122:6,
124:4, 124:13, 126:17

**answered** [1] - 7:21

**answering** [1] -
127:1

**answers** [1] - 7:21

**anticipate** [2] -
110:21, 115:17

**ANTOINETTE** [1] -
1:20

**anyways** [1] - 12:21

**apologies** [3] -
96:14, 104:24, 111:11

**apologize** [2] -
18:19, 33:7

**app** [2] - 32:13,
33:11

**apparent** [1] - 55:6

**appeal** [1] - 31:9

**Appeals** [1] - 37:2

**appear** [2] - 32:9,
32:19, 33:2, 126:15,
126:17, 126:18

**appearance** [1] -
63:5

**appellate** [1] -
127:18

**Appleman** [15] -
23:13, 24:6, 24:11,
89:16, 89:25, 92:15,
95:25, 99:14, 102:9,
102:24, 103:7, 108:1,
120:14, 131:7, 131:13

**APPLEMAN** [2] - 2:7,
89:18

**applicable** [4] -
101:10, 120:6, 120:19

**application** [1] - 32:6

**applies** [2] - 38:23,
61:10

**apply** [4] - 49:12,
52:1, 58:7

**applying** [1] - 4:11

**appointed** [1] - 85:9

**appreciate** [1] -
108:7

**approach** [7] - 12:14,
19:5, 27:18, 31:3,
66:11, 100:14, 129:18

**approached** [3] -
23:15, 105:22, 110:18

**approaches** [1] -
76:17

**appropriate** [8] -
40:2, 43:18, 60:21,
60:24, 61:24, 110:10,
119:22, 130:3

**appropriately** [2] -
74:3, 88:20

**approximate** [1] -
31:11

**April** [3] - 6:24, 6:25,
24:9

**area** [2] - 43:11, 49:4

**areas** [5] - 38:6,
39:9, 50:13, 53:8,
109:9

**argue** [1] - 14:15

**argument** [4] -
123:15, 126:5,
126:20, 128:17

**arguments** [1] -
14:14

**arise** [1] - 4:8

**Army** [2] - 42:9,
71:20

**arrangement** [2] -
113:14, 114:8

**arrangements** [1] -
82:20

**Arrangements** [1] -
83:7

**arrest** [1] - 20:20

**art** [2] - 75:2, 75:16
**Arthur** [1] - 128:7
**Arts** [2] - 90:18, 90:20
**aside** [2] - 86:7, 118:9
**aspect** [2] - 31:13, 126:1
**aspects** [1] - 4:5
**asserted** [4] - 13:21, 14:1, 14:21, 101:16
**asserting** [1] - 14:11
**assess** [1] - 53:3
**assessed** [1] - 118:24
**assessment** [1] - 71:5
**assets** [3] - 40:22, 55:10, 67:19
**assigned** [6] - 41:13, 41:18, 43:5, 44:23, 65:24, 65:25
**assistance** [1] - 91:4
**assume** [1] - 66:21
**assuming** [2] - 108:15, 109:19
**AT&T** [1] - 32:11
**attached** [1] - 46:3
**attack** [1] - 6:19
**attacked** [1] - 3:16
**attacking** [1] - 3:9
**attend** [5] - 25:21, 25:25, 26:4, 34:23, 48:16
**attention** [3] - 37:13, 70:23, 96:10
**attentive** [1] - 108:8
**attest** [1] - 69:6
**attorney** [3] - 40:11, 41:14, 42:9, 72:5, 72:11, 72:14, 90:24, 91:4
**Attorney** [1] - 1:13
**attorney-client** [2] - 72:11, 72:14
**attorneys** [10] - 10:20, 39:11, 39:12, 42:2, 43:13, 50:2, 50:5, 72:6, 108:21, 109:1
**audit** [1] - 52:18
**August** [2] - 91:20, 91:22
**authority** [4] - 59:3, 111:4, 116:13
**automatically** [1] - 116:1
**availability** [1] - 118:23
**available** [5] - 42:19,

47:7, 104:19, 130:2, 131:1
**Avenue** [1] - 1:17, 1:20, 1:24
**average** [2] - 75:4, 75:7
**avoid** [3] - 19:15, 63:4, 105:21
**aware** [12] - 11:11, 16:20, 17:12, 18:12, 18:14, 22:16, 81:18, 83:22, 88:6, 94:7, 124:14, 130:2
**awareness** [5] - 47:9, 51:13, 51:14, 51:16, 88:1

**B**

**Bachelor** [1] - 90:18
**background** [1] - 90:17
**bad** [1] - 25:12
**balance** [2] - 47:4, 50:14
**ballpark** [1] - 99:3
**bargain** [1] - 15:11
**barred** [1] - 4:20
**based** [9] - 55:5, 55:15, 73:13, 80:3, 80:16, 86:1, 114:1, 117:25, 119:5
**basic** [2] - 58:6, 98:24
**basis** [4] - 19:9, 19:10, 39:23, 50:1
**became** [2] - 18:14, 94:8
**become** [8] - 18:12, 38:22, 43:25, 44:4, 48:16, 71:25, 98:20, 105:15
**becomes** [1] - 44:12
**becoming** [1] - 38:7
**BEFORE** [1] - 1:10
**began** [2] - 46:16, 50:10
**begin** [1] - 90:15
**Begin** [4] - 12:15, 19:6, 86:6, 100:15
**beginning** [2] - 53:20, 119:7
**behind** [1] - 111:4
**Belga** [1] - 24:13
**below** [5] - 25:14, 73:19, 79:12, 79:17, 90:14
**bench** [8] - 12:15, 15:13, 19:6, 19:23, 86:6, 87:3, 100:15,

101:22
**benefit** [7] - 47:9, 65:17, 68:14, 68:15, 113:14, 114:8, 125:24
**benefits** [3] - 69:15, 74:10, 115:4
**best** [8] - 7:6, 7:7, 60:16, 62:1, 62:2, 69:7, 82:1, 106:25
**Beth** [1] - 131:16
**better** [4] - 23:5, 29:8, 52:22, 53:11
**between** [16] - 4:9, 4:10, 31:25, 50:14, 65:4, 68:7, 72:11, 73:23, 76:5, 81:19, 108:4, 114:18, 115:3, 115:21, 117:1, 124:11
**Beyler** [7] - 6:24, 7:1, 9:10, 9:11, 10:4, 22:11, 36:1
**beyond** [8] - 70:11, 74:13, 74:15, 86:3, 86:17, 113:12, 114:6, 114:21
**bidder** [1] - 66:18
**bidders** [1] - 66:5
**big** [2] - 84:12
**Bill** [2] - 35:18, 84:25
**billet** [2] - 43:15, 43:24
**billets** [2] - 43:12, 95:12
**bind** [1] - 58:23
**binding** [1] - 127:18
**bios** [2] - 26:8, 34:24
**bit** [14] - 23:9, 33:10, 42:25, 45:3, 49:25, 57:24, 59:18, 64:24, 67:15, 86:20, 90:16, 91:6, 114:5, 116:25
**black** [1] - 124:22
**blind** [1] - 47:17
**block** [1] - 48:23
**body** [1] - 96:19
**bonds** [1] - 67:20
**book** [4] - 118:13, 118:14, 120:25, 130:1
**bottle** [2] - 115:11, 115:15
**bottom** [9] - 13:9, 23:9, 25:3, 25:15, 27:9, 28:22, 29:4, 103:5, 114:24
**box** [4] - 102:21, 102:25, 103:15, 103:8
**Bradley** [2] - 89:16, 89:25
**BRADLEY** [2] - 2:7, 89:18

**branch** [5] - 37:7, 49:12, 52:3, 52:7, 94:4
**break** [2] - 56:11, 56:15
**bribe** [1] - 117:22
**bribery** [18] - 123:3, 123:10, 123:18, 124:18, 124:20, 124:25, 125:1, 125:3, 125:12, 125:24, 126:15, 127:10, 127:15, 127:21, 127:24, 128:5, 128:11, 128:19
**bridge** [1] - 126:25
**brief** [8] - 30:22, 99:20, 99:25, 101:8, 120:1, 125:17, 128:14, 130:14
**briefing** [2] - 51:5, 129:20
**briefings** [1] - 42:17
**briefly** [5] - 3:3, 29:1, 66:1, 121:13, 129:13
**bring** [17] - 5:8, 5:21, 5:23, 10:17, 13:2, 17:24, 21:15, 21:17, 23:7, 24:21, 29:22, 31:21, 34:6, 45:4, 49:8, 82:22, 109:21
**bringing** [1] - 86:16
**brings** [2] - 52:3, 66:16
**British** [1] - 112:17
**broader** [2] - 59:18, 76:2
**broadly** [1] - 52:2
**bucket** [1] - 127:1
**budget** [1] - 43:24
**building** [2] - 18:2, 130:21
**bullet** [23] - 53:3, 53:19, 54:9, 54:13, 59:5, 59:7, 62:23, 63:25, 64:1, 64:18, 65:9, 65:22, 66:1, 66:10, 66:15, 67:8, 68:2, 68:17, 78:17, 80:1, 80:13, 104:5, 104:15
**BURKE** [1] - 1:6
**Burke** [56] - 7:7, 7:8, 10:7, 11:4, 12:5, 12:24, 12:25, 13:1, 13:6, 13:11, 13:16, 13:17, 14:3, 14:22, 15:1, 15:17, 15:25, 16:6, 22:3, 25:24, 27:10, 42:20, 42:23,

43:1, 43:4, 43:15, 43:25, 46:12, 46:13, 65:23, 71:3, 71:8, 72:15, 91:25, 92:18, 93:15, 94:1, 94:7, 96:6, 96:15, 97:10, 98:1, 98:3, 98:6, 98:10, 98:17, 98:21, 99:6, 99:21, 101:4, 103:18, 106:13, 107:14, 110:23, 126:2
**Burke's** [10] - 12:18, 22:3, 22:5, 86:9, 93:1, 93:10, 93:19, 93:23, 104:3, 125:23
**business** [10] - 29:16, 47:11, 51:19, 52:5, 55:10, 58:11, 62:17, 63:4, 74:8, 74:9
**BY** [66] - 1:9, 1:14, 1:16, 1:20, 2:2, 11:2, 11:17, 12:3, 15:15, 18:7, 18:22, 20:2, 20:25, 21:12, 21:19, 23:11, 24:2, 24:23, 25:7, 26:2, 26:10, 27:8, 28:8, 28:21, 29:5, 29:24, 30:13, 31:23, 32:25, 33:8, 33:25, 34:12, 35:17, 36:20, 44:6, 45:7, 45:20, 49:18, 54:8, 57:22, 59:6, 60:9, 63:12, 69:25, 77:20, 81:15, 83:5, 83:16, 87:12, 89:20, 92:14, 92:25, 93:18, 95:15, 95:24, 96:9, 96:17, 96:25, 99:13, 102:8, 102:23, 103:6, 103:13, 103:23, 104:25, 106:21

**C**

**Cafe** [1] - 24:13
**calendar** [1] - 53:22
**calibrate** [1] - 46:7
**CALLED** [1] - 2:2
**callout** [2] - 103:4, 103:12
**Cameron** [2] - 28:23, 29:2
**Canedo** [7] - 17:13, 17:14, 31:25, 32:3, 118:16, 118:18, 130:1
**cannot** [3] - 41:5, 62:20, 112:17
**capable** [1] - 126:19

**capacity** [2] - 63:1, 97:10
**captain** [3] - 38:21, 90:11, 90:15
**Captain** [14] - 23:13, 24:6, 24:11, 89:15, 92:15, 95:25, 99:14, 102:9, 102:24, 103:7, 108:1, 120:14, 131:7, 131:13
**captioned** [1] - 20:16
**capture** [1] - 128:17
**care** [1] - 108:21
**career** [6] - 42:14, 42:24, 48:11, 87:21, 91:2, 98:25
**case** [49] - 9:25, 15:16, 16:3, 16:13, 16:14, 16:16, 35:22, 36:4, 57:4, 77:8, 85:2, 86:20, 91:24, 104:1, 106:12, 107:10, 107:14, 108:10, 108:15, 108:25, 109:4, 109:25, 112:8, 116:15, 116:19, 119:10, 119:20, 123:22, 124:8, 124:14, 124:16, 124:20, 126:7, 126:13, 126:14, 126:15, 126:17, 127:3, 127:12, 127:18, 128:9, 128:10, 128:11, 128:20, 129:19, 129:20, 129:25, 130:17
**CASE** [1] - 1:5
**cases** [3] - 107:21, 119:5, 127:17
**categories** [2] - 63:21, 123:2
**category** [1] - 63:24
**Caudle** [12] - 26:15, 26:18, 26:20, 26:23, 27:1, 27:3, 27:13, 28:4, 28:10, 28:17, 29:16, 29:20
**caution** [1] - 62:8
**centered** [1] - 31:3
**certain** [7] - 39:8, 40:19, 41:19, 43:13, 50:13, 56:4, 79:13
**certainly** [8] - 57:4, 59:2, 72:6, 75:6, 84:8, 84:15, 86:16, 87:22
**CERTIFICATE** [1] - 132:12
**certification** [1] -

69:8
**Certified** [1] - 1:23
**certify** [2] - 42:12, 132:14
**cetera** [2] - 56:6, 65:19
**CFR** [4] - 58:6, 74:3, 74:5, 80:23
**Chaclan** [1] - 10:17
**chain** [4] - 12:8, 13:10, 82:7, 93:20
**chance** [5] - 53:3, 53:5, 53:7, 60:3, 66:8
**change** [2] - 73:20, 79:3
**changed** [2] - 74:3, 79:4
**changes** [6] - 50:6, 50:22, 51:4, 80:4, 81:25, 110:9
**charge** [4] - 41:19, 93:8, 109:14, 124:22
**charged** [1] - 112:9
**charges** [1] - 16:3
**charging** [1] - 56:24
**Charlie** [25] - 3:13, 7:20, 8:7, 8:11, 8:15, 8:25, 9:2, 12:5, 12:7, 12:18, 12:20, 12:23, 12:25, 13:6, 13:15, 14:3, 14:10, 14:21, 19:12, 20:3, 20:8, 23:1, 23:4, 34:1, 34:16
**Charlottesville** [1] - 42:10
**check** [4] - 46:7, 87:6, 129:4, 129:22
**checklist** [4] - 52:18, 52:19, 52:24, 53:14
**Chen** [1] - 29:2
**Chen's** [2] - 28:23, 29:1
**Chief** [1] - 43:20
**chief** [34] - 37:22, 39:17, 43:25, 44:1, 44:2, 44:4, 44:7, 44:8, 44:9, 44:12, 44:14, 44:18, 44:20, 44:23, 51:1, 51:2, 51:6, 51:8, 69:13, 69:18, 72:18, 74:11, 74:12, 74:17, 74:20, 81:5, 81:8, 85:2, 85:3, 86:10, 86:20, 94:13, 94:21
**chief's** [2] - 50:4, 51:3
**children** [1] - 103:2
**chose** [2] - 4:18, 119:21

**chosen** [1] - 86:13
**Christmas** [1] - 34:18
**circle** [1] - 121:11
**circuit** [1] - 127:19
**Circuit** [3] - 116:15, 126:13, 127:18
**circumstance** [1] - 130:17
**circumstances** [5] - 59:3, 77:6, 80:5, 118:2, 119:9
**circumstantial** [5] - 116:23, 117:3, 117:6, 117:25, 118:5
**citation** [1] - 124:1
**citations** [1] - 127:15
**cites** [1] - 128:6
**City** [3] - 33:20, 34:4, 34:14
**civilian** [5] - 37:21, 39:11, 42:2, 63:18, 63:21
**civilians** [1] - 47:19
**claim** [2] - 10:6, 49:2
**claims** [1] - 38:2
**clarification** [1] - 115:25
**clarifying** [1] - 130:14
**clear** [27] - 13:20, 13:24, 21:23, 27:22, 32:2, 34:21, 47:13, 48:9, 50:16, 51:20, 51:23, 52:6, 55:15, 65:23, 69:1, 69:10, 76:19, 76:21, 76:24, 77:15, 77:25, 78:5, 78:9, 78:11, 108:19, 127:3, 127:13
**clearly** [5] - 7:8, 64:12, 117:4, 118:6, 125:20
**client** [5] - 72:11, 72:14, 101:15, 101:17, 119:8
**close** [1] - 44:11
**closely** [1] - 38:13
**closing** [2] - 131:11, 132:3
**closings** [2] - 132:1, 132:5
**CNO** [17] - 35:18, 43:20, 44:1, 44:9, 44:10, 44:11, 44:12, 44:13, 44:16, 46:25, 47:1, 81:6, 84:15, 84:18, 95:7
**CNO's** [1] - 44:15
**co** [1] - 3:14

**co-conspirators** [1] - 3:14
**Code** [12] - 46:19, 54:21, 55:21, 55:22, 61:7, 61:13, 73:3, 81:4, 81:9, 82:12, 82:13, 82:15
**code** [9] - 39:2, 39:21, 41:10, 42:5, 49:5, 49:7, 49:8, 49:9, 51:11
**codes** [1] - 37:25
**cognizance** [1] - 38:1
**coined** [1] - 31:5
**colleagues** [3] - 121:14, 128:15, 129:13
**collected** [1] - 17:14
**collection** [1] - 54:3
**College** [1] - 90:21
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 132:14
**comfortable** [1] - 110:16
**coming** [4] - 16:5, 30:22, 109:17, 115:18
**command** [11] - 27:4, 41:13, 41:20, 43:5, 43:14, 43:23, 72:18, 82:7, 91:13, 93:8, 97:4
**Command** [1] - 13:11
**commander** [5] - 93:3, 94:8, 95:8, 97:15, 97:18
**Commander** [1] - 27:13
**commander's** [1] - 51:18
**commanders** [2] - 47:13, 91:5
**commanders'** [2] - 47:10, 74:8
**commanding** [3] - 44:19, 48:19, 48:20
**commencement** [1] - 64:20
**commissioned** [1] - 37:10
**commit** [1] - 124:25
**commitment** [1] - 59:4
**commitments** [2] - 58:23, 84:14
**committee** [1] - 3:25
**committing** [1] - 20:10

**common** [2] - 75:4, 75:7
**communicate** [1] - 48:4
**communicated** [1] - 130:16
**communication** [6] - 84:10, 105:7, 105:8, 105:9, 105:13, 121:19
**communications** [6] - 20:15, 20:16, 26:22, 60:11, 60:21, 84:8
**companies** [5] - 40:3, 61:2, 62:14, 62:17, 83:20
**company** [30] - 6:14, 16:1, 55:1, 56:4, 56:7, 58:25, 59:15, 59:20, 59:25, 60:3, 62:10, 62:21, 64:10, 64:12, 64:15, 65:5, 65:6, 65:12, 66:11, 66:22, 66:23, 66:25, 76:6, 76:17, 83:23, 105:18, 105:19, 106:2
**competent** [1] - 116:6
**competitive** [2] - 62:9, 62:20
**compiled** [1] - 47:6
**complainant** [2] - 119:1, 119:6
**complaint** [5] - 16:15, 16:18, 16:24, 17:1, 17:8
**complete** [5] - 40:10, 40:20, 53:23, 69:7, 107:13
**Complete** [1] - 68:2
**completed** [1] - 53:21
**Completeness** [1] - 68:18
**completes** [1] - 54:17
**compliance** [6] - 51:17, 51:20, 53:11, 53:17, 80:17, 97:17
**complied** [1] - 44:14
**complying** [2] - 53:4, 63:22
**conceal** [2] - 125:3, 126:2
**concealment** [1] - 125:25
**conceivable** [1] - 132:3
**concentration** [1] - 38:6
**concepts** [1] - 60:16

**concerning** [1] - 106:25

**concerns** [1] - 12:18

**concluded** [1] - 132:10

**conclusion** [1] - 23:25

**conduct** [53] - 3:19, 5:25, 38:4, 39:2, 39:9, 39:21, 41:10, 42:6, 42:11, 44:25, 45:3, 46:4, 46:14, 46:23, 47:10, 47:22, 48:6, 49:5, 49:7, 49:8, 49:9, 49:11, 49:14, 49:23, 51:12, 51:21, 51:25, 52:1, 52:9, 52:12, 52:15, 52:20, 53:16, 57:25, 58:1, 58:13, 58:18, 67:3, 70:14, 72:23, 72:25, 74:24, 83:19, 87:23, 95:1, 95:3, 95:6, 95:17, 95:19, 96:2, 97:21, 115:4, 118:1

**Conduct** [2] - 45:17, 49:20

**conducted** [4] - 98:15, 100:17, 100:21, 101:8

**confer** [3] - 121:13, 128:15, 129:13

**conference** [10] - 12:15, 15:13, 19:6, 19:23, 39:17, 56:24, 86:6, 87:3, 100:15, 101:22

**Conference** [1] - 132:16

**confident** [1] - 51:8

**confidential** [1] - 72:13

**conflict** [18] - 54:14, 54:15, 54:23, 55:1, 55:12, 55:13, 55:18, 55:23, 56:2, 56:7, 59:10, 60:1, 73:23, 80:12, 89:2, 89:7, 89:9, 102:16

**Conflicts** [1] - 62:23

**conflicts** [13] - 41:1, 55:6, 55:9, 60:5, 63:5, 68:6, 68:9, 68:19, 82:16, 102:12, 102:14, 102:18, 103:14

**conformance** [1] - 132:15

**confronted** [1] - 4:6

**confusing** [1] - 14:8

**Confusing** [1] - 25:16

**confusion** [1] - 78:13

**connotation** [1] - 49:9

**consider** [8] - 50:6, 50:8, 109:15, 111:3, 111:7, 117:3, 118:5, 130:11

**consideration** [1] - 116:24

**considerations** [2] - 118:22, 119:10

**considered** [7] - 75:1, 75:15, 77:4, 81:18, 112:18, 119:3, 121:3

**considering** [1] - 28:12

**considers** [1] - 127:24

**consistent** [3] - 9:24, 65:19, 120:18

**conspiracy** [11] - 123:10, 123:12, 124:19, 124:19, 124:22, 124:23, 124:25, 125:2, 125:6, 125:21, 126:7

**conspirators** [1] - 3:14

**constitute** [2] - 73:1, 77:25

**constitutes** [1] - 78:5

**Constitution** [1] - 1:24

**consult** [4] - 55:11, 69:3, 107:3, 107:4

**consultant** [1] - 88:19

**consultation** [1] - 40:10

**contacts** [1] - 66:5

**contained** [1] - 58:16

**contemplate** [2] - 75:18, 75:20

**content** [1] - 108:3

**contents** [3] - 56:15, 68:21, 106:24

**context** [10] - 50:15, 60:25, 61:25, 66:10, 66:16, 127:5, 127:21, 128:1, 128:10, 128:12

**continental** [1] - 80:9

**continue** [2] - 57:23, 95:14

**continued** [2] - 57:15, 108:2

**continues** [1] - 42:14

**continuing** [1] -

65:17

**continuously** [2] - 46:7, 107:1

**contract** [22] - 6:15, 12:24, 13:4, 13:17, 24:19, 35:13, 35:19, 35:23, 35:24, 36:3, 58:25, 59:25, 62:18, 62:19, 66:18, 66:22, 80:9, 80:24, 84:4, 84:22, 114:16, 115:21

**contracting** [2] - 61:2, 84:24

**contracts** [1] - 40:3

**control** [3] - 73:24, 74:1, 131:22

**convenes** [1] - 39:17

**conversation** [2] - 83:9, 129:18

**conversations** [5] - 13:10, 31:2, 81:19, 82:3, 82:5

**convince** [1] - 6:14

**copy** [3] - 17:8, 47:17, 100:7

**Corps** [5] - 38:8, 38:10, 38:12, 42:12

**corps** [1] - 43:10

**correct** [105] - 11:13, 12:8, 16:24, 17:2, 17:8, 17:15, 17:16, 17:21, 20:4, 20:5, 21:25, 22:10, 23:6, 23:19, 25:19, 26:13, 26:16, 26:21, 28:13, 28:14, 28:25, 29:18, 31:16, 31:20, 33:19, 35:3, 35:7, 35:10, 37:18, 41:6, 45:13, 55:17, 69:7, 70:8, 70:9, 70:12, 70:14, 70:21, 71:15, 71:16, 71:18, 71:21, 72:8, 72:10, 72:12, 72:13, 72:20, 73:9, 73:12, 73:14, 73:15, 73:17, 73:18, 73:21, 73:22, 73:25, 74:5, 74:9, 74:13, 74:14, 74:16, 74:22, 74:24, 75:8, 75:23, 75:24, 76:25, 77:1, 79:18, 81:12, 81:13, 81:16, 81:17, 81:20, 82:7, 82:14, 82:20, 83:20, 83:21, 84:1, 84:6, 84:7, 84:9, 84:11, 84:13, 84:16, 84:17, 84:20, 84:22, 85:7, 85:11, 85:17, 85:18, 85:20, 85:21,

93:22, 94:24, 95:9, 95:10, 95:13, 112:10, 116:10, 124:19, 128:6, 129:11

**corroboration** [2] - 120:23, 121:6

**corrupt** [8] - 115:5, 116:2, 116:5, 117:2, 117:5, 118:7, 127:22, 127:25

**corruption** [1] - 128:9

**Corruptly** [2] - 113:11, 113:20

**corruptly** [11] - 113:21, 114:2, 114:11, 116:3, 116:7, 126:23, 127:2, 127:6, 127:19, 128:1, 128:12

**Council** [1] - 90:3

**counsel** [22] - 9:3, 11:16, 15:19, 15:20, 15:22, 18:5, 32:21, 39:12, 40:11, 42:2, 42:4, 50:3, 81:5, 84:5, 91:3, 91:5, 92:12, 99:11, 127:9, 127:10, 128:16

**Counsel's** [1] - 39:8

**counseling** [1] - 72:2

**counselor** [30] - 41:11, 41:24, 42:14, 42:17, 54:18, 55:11, 55:20, 55:21, 64:20, 65:23, 65:24, 65:25, 67:8, 68:5, 71:25, 72:4, 72:9, 72:12, 79:24, 80:17, 81:20, 82:2, 97:7, 97:8, 97:13, 97:15, 98:11, 100:22, 107:13

**counselors** [7] - 41:12, 41:18, 41:22, 42:1, 42:12, 71:13, 71:17

**Count** [3] - 123:9, 124:21, 125:11

**counterparts** [1] - 50:4

**couple** [7] - 7:14, 61:6, 76:14, 108:20, 108:23, 108:25, 120:4

**course** [8] - 10:22, 17:22, 42:11, 71:23, 104:20, 109:3, 126:9, 131:21

**courses** [1] - 98:25

**COURT** [148] - 1:1, 3:7, 4:25, 5:19, 6:4, 6:16, 7:3, 7:13, 8:4,

8:16, 8:20, 9:7, 9:18, 10:12, 10:19, 12:14, 13:7, 14:23, 15:4, 15:8, 15:14, 18:6, 19:5, 19:9, 19:17, 19:20, 19:24, 20:24, 21:8, 24:1, 26:1, 32:23, 34:10, 36:10, 36:14, 44:2, 56:10, 56:17, 56:20, 57:1, 57:14, 69:23, 86:4, 86:22, 87:2, 87:4, 87:9, 89:11, 89:14, 92:22, 95:7, 95:11, 95:14, 96:23, 100:14, 100:16, 100:23, 101:6, 101:14, 101:21, 101:23, 102:5, 107:24, 109:6, 109:13, 109:15, 109:22, 109:24, 110:2, 110:5, 110:15, 110:23, 111:9, 111:13, 111:16, 111:25, 112:4, 112:8, 112:12, 112:19, 112:25, 113:3, 113:5, 113:8, 113:16, 114:2, 114:9, 114:20, 114:24, 115:1, 115:6, 115:12, 115:20, 115:23, 116:8, 116:11, 116:15, 116:20, 117:6, 117:10, 117:16, 117:18, 118:8, 118:11, 118:17, 119:13, 119:16, 119:25, 120:3, 120:10, 120:16, 120:22, 121:5, 121:11, 121:15, 121:22, 122:4, 122:7, 122:13, 122:19, 123:16, 123:19, 123:22, 123:25, 124:7, 124:17, 124:25, 125:11, 125:15, 126:5, 126:10, 126:22, 127:6, 128:4, 128:13, 128:22, 129:1, 129:15, 129:22, 130:8, 130:13, 130:21, 131:6, 131:12, 131:17, 132:2, 132:7, 132:20

**Court** [29] - 1:24, 3:1, 3:18, 5:24, 92:12, 99:11, 110:7, 110:11, 110:12, 110:21,

118:23, 122:23,
123:13, 123:22,
125:9, 125:13,
125:16, 125:19,
126:8, 126:14,
126:16, 127:23,
128:8, 129:17,
129:19, 130:15,
130:25, 132:13,
132:13
**court** [3] - 89:24,
121:1, 127:12
**Court's** [2] - 125:8,
127:2
**courtroom** [2] - 18:2,
21:1
**cover** [6] - 46:18,
54:4, 60:22, 99:1,
102:10, 105:1
**craft** [1] - 50:24
**created** [3] - 39:10,
49:24, 101:8
**credibility** [6] - 3:15,
4:2, 5:11, 6:19, 19:11
**crimes** [2] - 20:10,
114:11
**criminal** [6] - 11:6,
11:9, 61:7, 73:6,
73:16, 107:21
**CRM** [1] - 1:16
**CROSS** [2] - 11:1,
69:24
**Cross** [2] - 2:3, 2:6
**cross** [5] - 3:24,
4:16, 4:21, 10:21,
34:6
**CROSS-**
**EXAMINATION** [2] -
11:1, 69:24
   **Cross-Examination**
[2] - 2:3, 2:6
**cross-examination**
[3] - 3:24, 4:21, 10:21
**cross-examining** [1]
- 4:16
**crossed** [1] - 9:3
**crossover** [1] -
124:10
**CRR** [1] - 132:19
**culture** [1] - 31:6
**current** [2] - 27:19,
31:5, 31:14
**cut** [2] - 7:11, 10:6

# D

**daily** [1] - 52:5
**Daryl** [3] - 27:13,
30:21, 31:4
**date** [8] - 26:6,

29:25, 30:14, 45:21,
49:21, 86:9, 86:12
**Dated** [1] - 132:17
**DAY** [1] - 1:9
**days** [5] - 64:21,
108:20, 108:23,
108:25, 120:4
**DC** [7] - 1:11, 1:15,
1:17, 1:25, 126:12,
127:13, 127:18
**DCNO** [1] - 44:3
**deal** [4] - 10:20, 30:8,
37:25, 118:11
**dealing** [1] - 39:19,
60:11, 63:14
**deals** [1] - 49:9
**dealt** [3] - 32:13,
33:4, 43:24
**December** [1] - 36:1
**decide** [1] - 122:8
**decision** [5] - 46:8,
46:25, 56:6, 62:2,
69:13
**decision-making** [1]
- 46:8
**decisions** [3] -
43:24, 64:11, 68:13
**declarant** [15] - 3:10,
3:17, 3:20, 3:23, 3:24,
4:1, 5:10, 5:12, 5:17,
6:1, 6:6, 7:16, 10:15,
19:11, 19:14
**declarant's** [3] -
3:15, 3:18, 5:25
**declarants** [2] - 4:11,
4:20
**declined** [2] - 66:14,
125:10
**defendant** [49] -
7:18, 10:14, 14:10,
22:6, 22:18, 22:25,
23:12, 24:3, 25:3,
25:23, 26:3, 26:11,
26:25, 27:15, 28:2,
28:9, 28:15, 29:12,
29:19, 30:2, 30:17,
30:19, 31:25, 32:2,
33:13, 33:17, 34:13,
34:22, 35:5, 35:22,
36:3, 43:8, 46:11,
47:16, 48:9, 52:11,
52:14, 53:23, 69:19,
91:24, 100:25, 102:1,
113:13, 114:7,
120:23, 121:6, 124:3,
124:12, 128:6
**Defendant** [1] - 1:7
**DEFENDANT** [1] -
1:19
**defendant's** [13] -

22:22, 26:22, 35:10,
48:2, 111:13, 117:21,
117:24, 117:25,
121:7, 121:23,
122:11, 123:14,
129:10
**defense** [12] - 4:20,
9:3, 12:10, 18:5,
61:11, 61:12, 91:3,
100:12, 119:21,
121:2, 128:4, 130:10
**Defense** [12] - 4:24,
6:21, 6:23, 11:15,
12:11, 18:20, 37:1,
39:7, 60:14, 61:3,
88:1
**deferral** [1] - 106:5
**Defined** [2] - 113:11,
113:20
**defined** [2] - 114:2,
114:6
**definition** [5] - 75:17,
76:22, 123:3, 128:1,
128:12
**definitions** [1] -
75:13
**degree** [1] - 90:19
**DeLaPena** [5] - 17:7,
17:15, 18:1, 18:17,
18:18
**delay** [1] - 10:20
**deliberate** [2] -
130:19, 131:1
**deliberating** [3] -
57:5, 108:16, 122:2
**deliver** [1] - 122:23
**delivered** [1] - 100:8
**delve** [1] - 66:8
**demands** [1] -
113:22
**demonstrate** [2] -
101:4, 117:2
**demonstrates** [3] -
117:5, 118:7, 119:10
**demotion** [1] - 95:9
**Denese** [2] - 31:25,
32:3
**denied** [2] - 5:6,
123:14
**deny** [3] - 3:21, 4:14,
6:2
**denying** [1] - 5:16
**department** [2] -
37:22, 48:17
**Department** [4] -
37:1, 39:7, 61:2,
61:11
**departments** [1] -
61:10
**deprived** [1] - 4:15

**depth** [1] - 71:14,
128:9
**deputy** [2] - 38:17,
61:12
**derived** [2] - 73:20,
75:12
**describe** [3] - 40:15,
40:16, 64:5
**described** [4] - 3:11,
27:16, 27:18, 40:12
**describes** [1] - 72:8
**description** [2] - 9:9,
24:16, 67:1
**designated** [3] -
41:12, 41:21, 68:5
**designed** [2] - 87:23,
88:1
**desires** [3] - 70:18,
70:19, 119:8
**detail** [9] - 40:16,
45:3, 47:5, 47:6,
50:14, 57:24, 60:10,
68:20, 91:6
**detailed** [2] - 79:15,
90:2
**detailing** [2] - 63:13,
67:12
**details** [2] - 51:7,
67:13
**determined** [1] -
55:18
**dev** [1] - 31:9
**developed** [2] -
52:19, 118:25
**developing** [1] -
27:21
**dicta** [1] - 127:24
**differences** [1] - 4:8
**different** [15] - 14:16,
38:6, 46:18, 49:8,
56:1, 65:16, 80:8,
105:11, 113:4,
117:11, 119:18,
120:10, 127:14
**differently** [2] -
62:14, 83:20
**difficult** [1] - 50:13
**dig** [1] - 53:5
**diligence** [1] - 64:8
**Diplomate** [1] - 1:23
**direct** [7] - 30:5,
32:5, 56:14, 63:2,
108:2, 117:7, 131:14
**DIRECT** [2] - 36:19,
89:19
**Direct** [2] - 2:5, 2:8
**direction** [1] - 80:22
**directions** [1] - 40:13
**directly** [3] - 30:21,
32:13, 126:13

**disagree** [2] - 8:21,
101:14
**disagreements** [1] -
109:10
**disallowing** [1] -
4:12
**disclose** [5] - 24:6,
24:11, 24:15, 24:18,
80:20
**disclosed** [1] - 40:14
**Disclosure** [2] -
54:10, 68:3
**disclosure** [13] -
23:20, 23:23, 24:4,
39:5, 40:12, 40:18,
54:11, 54:16, 67:14,
68:21, 98:8, 107:1
**disclosures** [1] -
68:1
**discover** [1] - 18:1
**discovery** [1] - 115:9
**discuss** [7] - 40:2,
56:14, 66:12, 67:16,
106:7, 108:3, 109:4
**discussed** [8] - 10:1,
48:24, 64:24, 67:14,
70:6, 78:3, 88:3,
119:19
**discussing** [2] -
33:10, 33:16
**discussion** [7] -
6:23, 50:21, 51:7,
76:10, 105:16,
114:16, 114:17
**discussions** [3] -
23:17, 76:5, 105:16
**dismiss** [2] - 123:14,
125:10
**disqualification** [4] -
29:25, 55:12, 65:8,
65:20
**disqualified** [3] -
30:3, 30:17, 31:15
**disqualify** [4] - 64:2,
64:16, 65:9, 67:9
**dissected** [1] - 113:1
**disseminated** [1] -
51:10
**distinct** [3] - 124:10,
124:15, 127:25
**distinction** [1] -
115:21
**distinguish** [3] -
66:9, 115:3, 117:1
**district** [1] - 120:25
**District** [2] - 132:13
**DISTRICT** [3] - 1:1,
1:1, 1:10
**division** [1] - 115:21
**divisions** [1] - 37:24

**Docket** [1] - 111:23
**docket** [2] - 112:2, 117:14
**document** [36] - 46:15, 47:4, 47:24, 49:19, 50:1, 50:5, 50:21, 51:20, 52:4, 52:23, 55:22, 57:24, 58:5, 58:16, 59:14, 61:20, 61:24, 63:19, 67:3, 67:11, 69:20, 70:13, 70:15, 73:14, 73:23, 74:2, 75:10, 75:11, 78:4, 78:7, 78:11, 80:18, 82:16, 82:18, 88:5
**DoD** [10] - 39:8, 46:20, 61:8, 62:7, 62:18, 62:20, 62:25, 63:4, 104:20
**DOJ** [1] - 1:16
**DOJ-CRM** [1] - 1:16
**done** [5] - 29:8, 58:12, 84:25, 86:24, 114:14
**doubt** [4] - 8:13, 113:12, 114:6, 114:22
**down** [16] - 11:25, 16:4, 23:20, 35:16, 36:11, 53:5, 66:21, 73:19, 83:13, 89:12, 93:17, 96:24, 107:23, 111:12, 128:15, 129:5
**draft** [4] - 28:11, 70:16, 73:13, 81:23
**drafting** [1] - 70:17
**drawn** [4] - 58:5, 61:19, 63:8, 118:3
**drop** [2] - 103:4, 103:12
**DS** [1] - 107:6
**due** [1] - 127:9
**during** [4] - 22:4, 24:8, 66:23, 97:10
**duties** [11] - 56:3, 59:10, 59:22, 60:4, 60:5, 64:11, 64:16, 68:7, 102:19, 104:9, 104:20
**duty** [10] - 37:3, 37:5, 51:24, 60:2, 63:24, 64:8, 65:6, 77:24, 90:4, 90:8

**E**

**E-6** [1] - 25:16
**early** [2] - 29:9, 86:12
**easier** [1] - 86:18
**economy** [1] - 86:21

**edit** [1] - 111:19
**edited** [1] - 82:13
**edition** [1] - 46:4
**edits** [5] - 82:5, 111:1, 111:22, 111:24, 112:3
**educate** [1] - 88:4
**education** [1] - 90:17
**Edwards** [1] - 57:7
**effect** [17] - 4:2, 12:17, 12:19, 13:25, 14:5, 14:11, 14:18, 29:21, 30:5, 63:2, 77:2, 101:16, 101:25, 117:23, 120:5, 120:11, 124:5
**effectively** [1] - 58:12
**efficiently** [1] - 58:12
**effort** [1] - 81:3
**either** [4] - 30:22, 55:12, 71:5, 119:12
**electronic** [1] - 27:12
**elevated** [2] - 85:15, 85:16
**elsewhere** [2] - 9:10, 10:14
**email** [59] - 5:4, 6:9, 6:10, 6:13, 6:25, 7:20, 8:4, 9:14, 11:18, 11:21, 12:5, 12:6, 12:8, 13:15, 16:8, 18:23, 18:25, 22:2, 22:9, 22:14, 23:1, 23:4, 23:12, 23:15, 24:25, 25:1, 25:3, 26:6, 27:3, 27:6, 27:9, 28:2, 28:9, 28:15, 28:22, 29:12, 29:15, 30:14, 31:17, 31:18, 33:9, 33:13, 34:1, 36:1, 45:8, 45:14, 45:18, 45:22, 46:1, 46:11, 47:16, 48:2, 71:11, 96:10, 96:12, 96:19, 96:21, 112:16
**emails** [7] - 5:2, 7:17, 8:12, 8:19, 9:3, 16:6, 28:20
**emblem** [1] - 100:1
**emphasis** [2] - 115:10, 116:13
**emphasizes** [1] - 62:13
**employee** [9] - 30:4, 58:9, 59:21, 66:23, 75:5, 75:7, 94:1, 105:21, 106:7
**employees** [8] - 19:1, 58:7, 58:11,

58:22, 59:8, 97:21, 97:24, 104:17
**employer** [5] - 64:4, 105:18, 105:23, 106:8, 106:11
**employers** [1] - 103:3
**employment** [37] - 23:16, 39:22, 54:25, 59:8, 59:9, 59:13, 59:16, 59:19, 59:24, 63:15, 64:2, 64:10, 64:20, 66:5, 66:10, 66:14, 67:2, 76:8, 76:9, 76:10, 76:20, 77:9, 77:16, 82:19, 82:20, 83:10, 102:13, 105:1, 105:5, 105:9, 105:12, 105:15, 105:22, 106:8, 106:17
**Employment** [1] - 83:6
**encrypted** [2] - 32:5, 32:8
**End** [2] - 15:13, 19:23, 87:3, 101:22
**end** [6] - 7:25, 55:7, 76:15, 111:22, 116:9, 131:21
**endorse** [1] - 69:19
**ends** [1] - 108:22
**enforced** [1] - 73:2
**engage** [2] - 59:8, 60:18, 113:13, 114:7, 117:21
**engagement** [2] - 34:17, 35:6
**engaging** [2] - 60:17, 65:12
**engineer** [1] - 31:8
**enlisted** [1] - 47:19
**enrich** [1] - 125:24
**ensure** [6] - 60:20, 92:9, 107:2, 108:24, 117:4, 118:6
**ensures** [3] - 44:13, 44:14, 68:12
**entail** [1] - 73:21
**enter** [1] - 59:3
**entertain** [1] - 77:4
**entire** [5] - 7:6, 10:5, 14:1, 62:3, 93:8
**entirely** [1] - 13:24
**entirety** [1] - 112:21
**entities** [1] - 61:1
**entitled** [2] - 113:10, 132:15
**entity** [1] - 59:16
**entry** [2] - 112:2, 117:14

**environmental** [1] - 38:2
**equally** [2] - 95:12, 130:2
**equips** [1] - 61:23
**err** [1] - 50:13
**erroneous** [1] - 80:21
**especially** [1] - 127:12
**essential** [1] - 126:1
**essentially** [4] - 5:17, 67:1, 70:25, 127:6
**establish** [1] - 116:5
**estate** [2] - 67:20, 67:21
**estimate** [1] - 99:3
**estimation** [1] - 131:18
**et** [2] - 56:6, 65:19
**ethical** [13] - 57:25, 58:1, 58:13, 63:22, 72:23, 72:25, 74:23, 88:15, 95:19, 97:17, 97:21, 98:18, 98:20
**ethics** [86] - 11:5, 11:8, 11:12, 12:21, 14:17, 15:18, 39:2, 39:6, 39:19, 39:21, 41:10, 41:11, 41:18, 41:22, 41:24, 42:1, 42:4, 42:5, 42:12, 42:13, 42:17, 44:24, 45:2, 46:6, 46:18, 47:10, 47:13, 48:9, 48:13, 48:23, 49:1, 50:3, 52:18, 53:10, 53:21, 53:24, 54:18, 55:11, 55:20, 55:21, 58:8, 60:14, 61:9, 61:14, 64:19, 65:23, 65:24, 65:25, 67:7, 68:5, 70:8, 70:10, 71:13, 71:17, 71:25, 72:3, 72:9, 72:12, 74:20, 79:23, 80:17, 81:4, 81:20, 82:2, 87:15, 87:20, 88:9, 97:7, 97:8, 97:13, 97:15, 97:16, 98:4, 98:7, 98:10, 98:11, 98:24, 99:4, 100:8, 100:19, 100:20, 100:22, 102:9, 107:13
**Europe** [2] - 86:11, 91:11
**evaluating** [2] - 88:25, 89:4
**evaluation** [2] -

111:25, 120:18
**Evans** [1] - 128:20
**evening** [2] - 107:25, 108:1
**event** [3] - 55:13, 107:4, 107:5
**events** [1] - 29:9
**eventually** [1] - 44:4
**Eversman** [2] - 17:7, 131:16
**evidence** [42] - 3:15, 3:16, 3:18, 4:2, 4:12, 5:8, 5:14, 5:15, 5:20, 5:23, 6:5, 6:20, 9:19, 12:11, 12:22, 13:5, 15:9, 17:4, 17:23, 19:8, 19:14, 19:17, 22:18, 25:24, 26:25, 29:19, 36:3, 36:6, 82:23, 95:22, 96:22, 116:6, 116:23, 117:3, 117:4, 117:7, 117:25, 118:5, 118:6
**evolved** [1] - 27:18
**exact** [4] - 43:23, 52:20, 79:10, 82:21
**exactly** [1] - 58:5
**EXAMINATION** [6] - 11:1, 21:11, 36:19, 69:24, 87:11, 89:19
**examination** [3] - 3:24, 4:21, 10:21
**Examination** [6] - 2:3, 2:4, 2:5, 2:6, 2:6, 2:8
**examine** [1] - 3:23
**examining** [1] - 4:16
**example** [26] - 6:3, 24:6, 25:15, 29:2, 31:9, 39:16, 41:19, 46:8, 47:12, 48:12, 48:15, 53:4, 54:24, 55:5, 55:25, 72:22, 73:7, 74:2, 74:19, 75:15, 79:5, 80:7, 80:23, 83:25, 84:15, 85:15
**exceed** [1] - 48:5
**excellence** [1] - 31:6
**excellent** [1] - 126:25
**excepting** [1] - 131:21
**exception** [4] - 47:23, 101:2, 101:10, 122:22
**exceptional** [1] - 48:6
**Exchange** [4] - 116:24, 117:8,

117:14, 117:17

**exchange** [4] - 32:3,
113:24, 117:21,
127:19

**excuse** [3] - 39:14,
108:1, 109:2

**excused** [2] - 36:13,
89:13

**executive** [6] -
44:19, 48:19, 49:12,
52:3, 52:6, 94:4

**exercise** [1] - 62:8

**Exhibit** [48] - 4:24,
6:21, 6:23, 7:3, 8:4,
11:15, 12:11, 18:20,
21:16, 21:18, 23:8,
24:22, 27:5, 28:7,
28:19, 29:23, 30:11,
31:22, 33:6, 33:23,
45:5, 57:20, 77:18,
92:13, 92:15, 92:17,
92:20, 92:24, 93:14,
95:22, 95:25, 96:24,
99:12, 99:15, 99:19,
100:4, 100:7, 100:11,
101:4, 102:6, 102:7,
102:20, 103:21,
104:24, 106:19,
107:23, 111:23

**exhibit** [11] - 3:4, 3:5,
19:3, 21:21, 25:6,
49:16, 52:17, 54:7,
69:9, 88:3, 93:17

**EXHIBITS** [1] - 2:9

**exist** [3] - 4:9, 68:7,
68:10

**expand** [1] - 128:1

**expansion** [1] - 31:5

**expect** [3] - 44:17,
57:4, 131:17

**expectation** [2] -
48:5, 51:19

**expected** [4] - 51:22,
108:7, 119:19, 132:1

**expecting** [2] -
120:4, 122:14

**experience** [9] -
41:7, 48:25, 53:12,
58:13, 61:21, 71:2,
87:17, 127:11, 127:12

**experienced** [2] -
87:17, 87:19

**expert** [1] - 49:2

**explain** [10] - 3:20,
4:14, 6:2, 10:8, 37:19,
38:19, 74:20, 86:18,
90:12, 97:2

**explained** [1] -
118:23

**explains** [1] - 13:15

**explicit** [4] - 114:5,
117:9, 117:15, 117:22

**Explicit** [2] - 116:24,
117:17

**expose** [1] - 5:17

**extent** [3] - 60:19,
70:18, 70:19

**extrinsic** [1] - 6:20

# F

**F.2d** [1] - 118:23

**F.3d** [1] - 127:16

**F.4th** [1] - 127:17

**facilitate** [1] - 99:8

**facilities** [1] - 29:8

**facing** [1] - 88:15

**fact** [10] - 4:4, 10:4,
12:23, 33:20, 39:4,
60:19, 71:8, 86:7,
88:5, 108:7

**factor** [1] - 31:12

**factors** [1] - 31:12

**facts** [6] - 9:24, 9:25,
10:2, 10:14, 103:11,
107:1

**factual** [1] - 4:8

**fair** [8] - 30:9, 30:10,
30:17, 32:6, 33:18,
61:22, 70:24, 103:17

**fairness** [1] - 4:3,
84:4, 112:22

**faith** [2] - 80:16,
80:20

**faithful** [1] - 102:18

**fall** [5] - 60:3, 64:15,
80:18, 93:10, 123:2

**falls** [2] - 90:12,
123:15

**false** [3] - 7:24, 18:9,
18:13

**familiar** [15] - 16:11,
16:13, 20:8, 35:21,
40:8, 46:4, 48:25,
49:2, 49:4, 49:14,
65:1, 79:6, 80:7,
91:24, 98:20

**familiarity** [2] - 71:5,
84:3

**familiarize** [2] -
11:19, 88:4

**family** [3] - 22:1,
23:5, 63:3

**fancy** [1] - 128:19

**far** [3] - 16:16, 57:2,
71:2

**fashion** [2] - 42:2,
47:7

**Federal** [3] - 46:20,
61:14, 132:13

**FEDERAL** [1] -
132:20

**federal** [8] - 1:24,
40:19, 61:1, 75:4,
97:21, 97:24, 105:21,
106:7

**feedback** [11] -
25:12, 25:14, 25:15,
27:25, 28:23, 29:1,
29:3, 33:10, 33:17,
35:9, 35:12

**few** [9] - 38:4, 50:5,
67:16, 75:3, 83:17,
106:18, 109:9, 116:18

**Fi** [3] - 32:15, 32:19,
33:2

**field** [1] - 50:3

**FIFIELD** [107] - 1:16,
89:15, 89:20, 92:11,
92:14, 92:19, 92:25,
93:17, 93:18, 95:15,
95:21, 95:24, 96:7,
96:9, 96:16, 96:17,
96:22, 96:24, 96:25,
99:10, 99:13, 100:10,
100:17, 101:1, 102:4,
102:8, 102:20,
102:23, 103:4, 103:6,
103:12, 103:13,
103:21, 103:23,
104:23, 104:25,
106:20, 106:21,
107:23, 110:6,
110:18, 111:11,
111:15, 120:1, 120:8,
120:13, 120:20,
121:9, 121:13, 122:1,
122:6, 122:17,
122:21, 123:17,
123:21, 123:24,
124:1, 124:9, 124:19,
125:2, 125:13,
125:16, 125:19,
126:8, 126:11,
126:25, 127:9, 128:6,
128:14, 128:25,
129:2, 129:7, 129:17,
130:14, 131:2,
131:13, 131:20

**Fifield** [9] - 2:8,
102:3, 111:10,
119:25, 122:19,
123:19, 128:13,
130:6, 131:6

**fifth** [1] - 31:7

**figure** [1] - 75:8

**filed** [4] - 16:18,
54:11, 81:24, 122:25

**filer** [3] - 69:5, 89:1,
106:15

**filer's** [1] - 82:20

**Filer's** [1] - 83:6

**filers** [3] - 39:4,
67:17, 98:9

**files** [1] - 82:10

**filing** [1] - 16:20

**fill** [3] - 40:13, 43:12,
82:1

**filled** [1] - 89:5

**fills** [1] - 81:22

**final** [4] - 50:25,
54:22, 82:16, 109:8

**finalize** [1] - 50:24

**finally** [6] - 22:7,
22:25, 31:13, 38:4,
81:24, 116:23

**finances** [1] - 65:18

**financial** [19] - 30:5,
39:5, 40:12, 40:18,
40:25, 54:11, 54:16,
63:2, 64:3, 67:10,
67:13, 67:24, 68:7,
68:15, 68:21, 98:8,
103:2, 104:13, 126:4

**Financial** [1] - 54:9

**fine** [3] - 101:21,
109:22, 119:16

**finish** [1] - 131:21

**finishing** [1] - 131:18

**first** [33] - 11:4,
27:11, 30:19, 30:21,
30:23, 36:23, 38:17,
43:2, 43:6, 46:2,
53:19, 54:9, 58:20,
61:6, 62:5, 62:13,
64:1, 65:8, 67:8, 68:2,
76:22, 88:18, 89:23,
96:10, 96:12, 96:18,
102:14, 104:5,
110:11, 111:17,
111:19, 123:5, 123:6

**fitness** [1] - 31:5

**Flag** [1] - 53:20

**flag** [79] - 38:13,
38:19, 38:20, 38:23,
39:1, 39:3, 39:13,
39:16, 39:18, 39:20,
40:4, 40:9, 40:20,
41:2, 41:9, 41:13,
41:15, 41:16, 41:22,
41:24, 42:15, 42:16,
42:18, 43:4, 44:21,
46:22, 47:7, 47:17,
47:20, 47:22, 48:22,
50:23, 51:12, 51:16,
52:24, 53:2, 53:9,
53:21, 53:23, 54:17,
54:23, 54:24, 55:2,
55:8, 55:16, 55:18,
55:25, 56:3, 56:5,

61:21, 69:15, 70:7,
70:11, 71:10, 74:3,
74:15, 74:19, 80:13,
80:18, 82:11, 84:9,
87:18, 87:19, 87:22,
88:14, 90:14, 93:24,
94:1, 95:5, 95:18,
98:1, 98:3, 98:6,
102:11, 106:12,
107:13

**flat** [1] - 123:15

**fleet** [4] - 38:5, 38:6,
47:13, 95:8

**Fleet** [1] - 27:13

**Floor** [1] - 1:20

**focus** [5] - 37:13,
58:20, 63:23, 63:25,
102:14

**FOIA** [1] - 104:21

**folks** [4] - 57:11,
107:24, 109:4, 132:7

**follow** [8] - 16:21,
51:24, 52:9, 52:11,
52:14, 58:11, 60:21,
80:14

**followed** [3] - 36:6,
50:12, 131:14

**FOR** [3] - 1:1, 1:13,
1:19

**force** [8] - 48:7,
91:16, 92:4, 97:1,
97:2, 97:10, 107:7,
107:12

**forces** [1] - 65:16

**Forces** [2] - 27:13,
91:11

**foregoing** [1] -
132:14

**foreign** [2] - 112:15,
112:17

**foresee** [1] - 55:1

**forever** [3] - 7:12,
63:16, 109:16

**forgive** [1] - 108:22

**Form** [1] - 54:12

**form** [24] - 39:5,
40:7, 40:8, 40:11,
40:12, 40:17, 40:18,
54:16, 54:17, 55:4,
55:6, 55:16, 68:24,
69:2, 69:5, 81:16,
81:18, 81:22, 88:24,
88:25, 89:5, 89:10,
98:8, 113:4

**format** [1] - 132:15

**former** [2] - 35:15,
35:18

**forms** [5] - 41:2,
54:11, 67:15, 67:18,
69:6

**forth** [3] - 32:9, 75:23, 76:3
**forward** [4] - 5:8, 35:14, 110:21, 131:4
**forwarded** [1] - 28:23
**foundation** [3] - 12:12, 19:7, 96:20
**four** [14] - 26:3, 26:8, 26:11, 34:22, 34:24, 38:25, 44:9, 85:10, 85:12, 86:10, 93:4, 93:10, 93:19, 95:12
**four-star** [4] - 44:9, 86:10, 93:4, 95:12
**four-year** [1] - 85:10
**fourth** [1] - 27:14
**frameworks** [1] - 50:12
**fraud** [1] - 20:20
**free** [4] - 36:11, 89:12, 130:6, 130:20
**frequently** [3] - 48:21, 70:20, 81:22
**Friday** [2] - 57:6, 108:15
**friend** [1] - 66:25
**friendly** [1] - 47:6
**front** [3] - 19:18, 70:20, 70:25
**fruition** [1] - 9:1
**frustrated** [1] - 117:23
**frustration** [1] - 46:21
**full** [9] - 23:20, 23:23, 24:3, 24:4, 30:23, 64:8, 68:14, 97:5, 107:1
**fully** [2] - 58:6, 80:20
**furtherance** [2] - 123:12, 124:23
**future** [6] - 59:21, 65:18, 66:24, 106:7

**G**

**gain** [1] - 104:17
**gained** [1] - 54:25
**GARDNER** [2] - 2:3, 10:25
**Gardner** [22] - 7:19, 7:21, 8:11, 8:24, 9:4, 9:17, 10:22, 11:3, 11:18, 21:7, 21:13, 21:20, 23:23, 24:3, 24:24, 27:9, 27:22, 31:17, 31:24, 33:1, 33:9, 36:10
**Gardner's** [1] - 10:21

**General** [4] - 37:16, 39:8, 82:12, 100:1
**general** [28] - 4:12, 37:23, 37:25, 39:12, 40:11, 42:1, 44:21, 45:25, 50:3, 50:8, 50:25, 52:25, 54:21, 60:15, 60:16, 61:14, 61:15, 62:5, 67:19, 71:3, 81:6, 81:11, 84:5, 84:6, 84:19, 85:4, 85:16, 105:11
**general's** [2] - 43:10, 50:2
**generally** [17] - 38:8, 39:7, 44:15, 49:11, 51:15, 52:1, 55:7, 55:19, 55:20, 55:24, 66:13, 67:17, 73:5, 79:11, 118:15, 119:3, 123:1
**generals** [1] - 85:9
**gentlemen** [5] - 10:19, 56:12, 57:14, 101:23, 108:5
**Georgetown** [1] - 90:22
**gifts** [2] - 102:11, 115:4
**given** [9] - 18:9, 18:13, 44:13, 71:4, 110:7, 115:13, 119:9, 120:25
**gloss** [1] - 116:16
**Goal** [1] - 68:2
**goal** [3] - 34:18, 51:11, 68:1
**good-faith** [1] - 80:16
**govern** [3] - 80:16, 81:1, 97:20
**government** [58] - 4:18, 10:13, 12:22, 15:8, 19:14, 30:4, 36:14, 39:22, 40:20, 58:7, 58:10, 58:11, 58:24, 59:10, 62:12, 62:18, 62:19, 63:14, 64:8, 64:9, 66:22, 68:13, 68:15, 72:1, 72:3, 89:14, 89:15, 92:19, 100:10, 101:3, 102:12, 103:16, 105:1, 105:10, 110:11, 110:12, 110:15, 111:2, 111:5, 115:16, 117:24, 118:18, 118:25, 119:3, 119:19, 119:21, 120:9, 122:1,

122:23, 125:5, 125:20, 126:9, 126:19, 129:2, 129:20, 131:15, 131:22
**GOVERNMENT** [5] - 1:13, 2:2, 10:25, 36:18, 89:18
**Government** [23] - 21:16, 21:17, 23:7, 24:21, 27:5, 28:6, 29:22, 31:21, 33:5, 33:6, 33:23, 45:5, 57:20, 92:12, 92:15, 92:17, 92:20, 93:13, 94:5, 95:22, 99:11, 100:4, 100:7
**Government's** [5] - 82:22, 95:25, 99:14, 99:19, 104:24
**GOVERNMENT'S** [1] - 2:10
**government's** [5] - 5:14, 19:20, 120:20, 122:17, 129:12
**governor** [1] - 123:23
**GPS** [1] - 31:9
**grade** [4] - 38:20, 48:17, 85:22, 86:13
**graduated** [1] - 38:9
**gram** [1] - 61:14
**grant** [2] - 110:18, 129:10
**gray** [1] - 103:5
**great** [3] - 13:2, 15:6, 87:2
**greater** [3] - 66:4, 66:15, 78:18
**green** [1] - 102:21
**ground** [1] - 60:14
**grounds** [1] - 100:13
**group** [1] - 81:4
**Group** [1] - 1:19
**grouped** [1] - 63:20
**growth** [2] - 31:10, 31:11
**guess** [7] - 5:19, 9:19, 19:13, 76:21, 78:8, 123:11, 131:3
**guidance** [23] - 44:13, 46:4, 46:14, 46:24, 47:22, 48:3, 48:8, 49:21, 49:23, 50:12, 50:20, 51:9, 52:4, 52:21, 53:16, 58:16, 58:18, 60:20, 61:15, 61:24, 88:3, 88:11, 95:5
**Guidance** [2] -

45:17, 49:20

**H**

**H-a-n-n-i-n-k** [1] - 36:24
**halfway** [1] - 45:9
**hand** [1] - 102:22
**handle** [1] - 44:23
**HANNINK** [2] - 2:5, 36:18
**Hannink** [14] - 36:16, 36:23, 45:8, 56:14, 57:15, 57:23, 58:2, 59:1, 59:12, 60:10, 63:6, 69:10, 87:13, 89:11
**happy** [7] - 109:15, 110:23, 111:16, 115:20, 126:9, 129:20, 130:10
**harbor** [1] - 80:19
**head** [2] - 7:15, 48:17
**header** [1] - 23:10
**heading** [2] - 109:19, 117:16
**hear** [4] - 57:15, 110:24, 111:16, 122:16
**heard** [4] - 3:3, 10:7, 79:10, 102:1
**Hearings** [1] - 37:2
**hearsay** [12] - 3:11, 4:1, 4:9, 4:10, 12:13, 12:17, 14:18, 100:12, 100:16, 101:2, 101:9, 101:13
**heavily** [1] - 63:8
**held** [6] - 55:5, 55:10, 74:4, 91:2, 94:7
**help** [5] - 40:25, 47:8, 53:10, 68:4, 88:22
**helped** [1] - 108:9
**helpful** [3] - 17:3, 69:15, 126:6
**helps** [1] - 59:25
**hereby** [1] - 132:14
**hierarchy** [2] - 94:10, 94:16
**high** [7] - 25:21, 26:4, 26:11, 34:22, 58:3, 86:1, 102:15
**high-level** [1] - 58:3
**high-ranking** [4] - 25:21, 26:4, 26:11, 34:22
**higher** [1] - 52:3

**highest** [3] - 94:17, 94:18, 94:22
**highlight** [6] - 22:6, 29:6, 58:20, 62:4, 62:22, 116:1
**himself** [4] - 70:16, 74:12, 88:14, 126:3
**hire** [1] - 14:4
**hired** [3] - 12:19, 14:10, 14:12
**history** [1] - 46:15
**hold** [3] - 37:15, 109:16, 118:19
**home** [1] - 22:5
**honest** [1] - 20:14
**Honor** [50] - 3:3, 3:8, 7:5, 7:14, 7:15, 12:10, 12:12, 12:16, 13:20, 14:2, 14:13, 18:4, 19:3, 19:10, 19:19, 19:22, 20:1, 20:22, 21:4, 21:6, 21:10, 23:24, 25:23, 32:21, 34:5, 34:9, 36:8, 36:15, 56:19, 56:23, 57:18, 86:2, 86:7, 89:15, 100:12, 101:1, 102:4, 109:11, 110:6, 111:11, 112:23, 115:17, 120:1, 120:8, 120:21, 122:1, 124:9, 130:14, 131:2, 131:13
**HONORABLE** [1] - 1:10
**Hooker** [1] - 131:16
**hope** [1] - 108:22
**hoping** [1] - 59:21
**hosted** [1] - 26:5
**hostile** [1] - 119:7
**hour** [1] - 24:8
**hour-long** [1] - 24:8
**hours** [2] - 99:3, 99:5
**house** [2] - 22:22, 91:5
**HQ** [1] - 30:22
**humans** [1] - 65:15
**hundreds** [1] - 99:5
**hypothetical** [2] - 66:20, 77:11

**I**

**idea** [3] - 52:24, 78:25, 114:16
**identified** [2] - 55:9, 125:6
**identify** [4] - 29:8, 40:25, 68:6, 68:9
**IG** [5] - 16:14, 16:18, 16:23, 17:7, 17:10

**illegal** [3] - 115:4, 115:21, 124:24
**imagine** [2] - 11:22, 132:5
**iMessage** [1] - 33:2
**immediate** [1] - 41:14
**immediately** [2] - 66:13, 73:2
**impact** [2] - 35:13, 124:2
**impair** [1] - 59:22
**Impartiality** [1] - 62:5
**impartiality** [2] - 83:18, 103:11
**impartially** [1] - 62:7
**impeach** [3] - 4:13, 5:7, 8:1
**impeaching** [1] - 4:22
**impeachment** [1] - 4:3
**implements** [1] - 44:12
**implications** [1] - 107:17
**imply** [1] - 116:2
**import** [1] - 128:5
**importance** [2] - 71:5, 74:7
**important** [12] - 16:23, 17:2, 17:20, 17:23, 18:8, 43:16, 46:5, 53:1, 68:9, 107:12, 107:15, 123:6
**impose** [1] - 97:23
**impression** [4] - 5:18, 8:7, 8:8, 10:9
**improper** [1] - 104:18
**imputed** [1] - 63:3
**in-house** [1] - 91:5
**in-person** [2] - 51:7, 99:6
**inaccurate** [2] - 107:18, 107:19
**inadvertently** [1] - 60:23
**inappropriate** [2] - 60:6, 64:13
**inbox** [1] - 121:20
**incentives** [1] - 65:16
**inclined** [1] - 86:4
**include** [12] - 39:22, 40:23, 44:24, 45:1, 54:1, 54:12, 67:20, 81:6, 82:19, 95:19, 98:1, 104:11
**included** [6] - 20:16,

46:22, 58:17, 97:7, 103:17, 123:9
**includes** [1] - 40:20, 67:19
**including** [3] - 38:14, 59:9, 115:25
**inclusion** [1] - 111:20
**income** [1] - 40:22
**incomplete** [1] - 107:17
**inconsistency** [1] - 10:13
**inconsistent** [35] - 3:19, 4:12, 5:16, 5:20, 5:23, 5:25, 6:22, 7:1, 7:2, 7:25, 8:1, 8:5, 8:6, 8:9, 8:14, 8:17, 8:22, 8:23, 9:6, 9:9, 9:11, 9:14, 9:20, 9:21, 9:24, 10:2, 10:15, 13:18, 14:21, 14:23, 14:25, 15:4, 15:9, 19:17, 112:1
**incorporated** [2] - 50:7, 50:9
**indicated** [1] - 56:23
**indicates** [1] - 67:9
**indicating** [1] - 45:18
**indication** [1] - 71:9
**indications** [1] - 54:22
**indictment** [6] - 112:24, 124:5, 125:9, 125:13, 125:15, 125:22
**individual** [5] - 31:10, 68:16, 72:1, 72:7, 88:21
**indoctrination** [1] - 48:13
**indulgence** [1] - 120:1
**industry** [7] - 60:12, 60:17, 60:18, 60:25, 61:1, 84:9, 84:11
**infer** [1] - 103:17
**inference** [1] - 62:15
**inferences** [1] - 118:2
**influence** [5] - 46:8, 113:15, 114:15, 116:2, 116:7
**influenced** [2] - 113:24, 127:20
**inform** [2] - 106:15, 128:11
**informal** [2] - 49:25, 61:15
**information** [24] -

15:24, 18:9, 18:13, 19:16, 41:5, 54:1, 55:16, 61:19, 67:13, 67:17, 67:19, 67:23, 68:20, 68:23, 69:2, 89:1, 89:6, 89:8, 104:18, 104:19, 107:13, 107:15, 107:18, 130:15
**inherently** [2] - 127:21, 127:24
**initial** [9] - 16:16, 33:11, 36:24, 48:12, 71:17, 71:19, 81:23, 98:22, 98:23
**initiation** [1] - 16:16
**insert** [1] - 32:11
**inserted** [1] - 52:20
**inspector** [1] - 50:8
**instances** [2] - 5:14, 5:15
**instead** [3] - 12:24, 14:6, 79:21
**instinct** [1] - 119:16
**instruct** [2] - 108:3, 132:3
**instructing** [1] - 19:15
**instruction** [18] - 101:19, 112:5, 112:22, 115:7, 117:10, 117:18, 118:12, 118:13, 118:15, 119:23, 120:9, 120:25, 121:8, 121:24, 123:7, 124:21, 128:19, 130:9
**instructions** [16] - 19:1, 57:3, 109:8, 109:12, 110:8, 110:13, 110:16, 110:22, 115:25, 122:24, 122:25, 125:8, 125:14, 127:1, 129:9, 132:4
**integrity** [1] - 48:7
**intend** [1] - 130:5
**intended** [6] - 40:24, 47:4, 67:23, 75:4, 88:4, 113:14
**intent** [26] - 113:10, 113:13, 114:7, 114:9, 114:11, 114:12, 114:15, 115:5, 116:2, 116:5, 116:14, 116:16, 117:2, 117:5, 117:21, 117:24, 117:25, 118:7, 126:17, 126:23, 126:24, 127:3, 127:4,

127:7, 127:20
**intentionally** [1] - 60:23
**Interest** [1] - 62:22
**interest** [18] - 63:5, 67:10, 68:6, 68:10, 76:25, 89:2, 89:7, 89:9, 102:12, 102:14, 102:16, 102:17, 103:14, 104:9, 104:10, 104:13, 105:11, 126:3
**interested** [6] - 23:16, 76:15, 106:1, 106:3, 119:20, 126:8
**interesting** [3] - 76:12, 76:14, 77:3
**interests** [7] - 30:5, 63:3, 64:4, 68:8, 103:2, 104:11, 126:4
**interferes** [1] - 102:18
**interim** [1] - 74:3
**international** [2] - 38:1, 90:18
**interpretation** [1] - 78:12
**interruptions** [1] - 108:23
**interview** [1] - 16:9
**interviewed** [1] - 16:11
**interviews** [1] - 16:21
**intrinsic** [1] - 5:23
**introduce** [3] - 4:18, 4:23, 13:22
**introduced** [2] - 12:23, 13:19
**introducing** [3] - 5:10, 9:15, 13:23
**introduction** [1] - 27:2, 27:12
**investigating** [1] - 20:10
**investigation** [17] - 11:3, 11:5, 11:6, 11:8, 11:12, 12:21, 14:17, 15:16, 15:18, 15:24, 16:18, 17:21, 18:8, 18:23, 18:25, 20:3, 20:6
**investigative** [1] - 16:10
**Investigator** [1] - 17:7
**investigators** [2] - 18:9, 18:13
**investment** [1] - 46:6
**investments** [3] -

40:23, 55:5, 67:20
**investors** [7] - 6:13, 19:15, 20:13, 20:14, 20:17, 20:18, 20:21
**involved** [7] - 4:11, 51:1, 66:3, 66:15, 75:14, 78:17, 79:20
**involving** [1] - 103:9
**irrelevant** [2] - 14:13, 35:9
**Island** [1] - 90:22
**issue** [11] - 5:12, 10:20, 14:8, 44:22, 88:15, 94:25, 95:5, 118:9, 121:9, 126:13
**issued** [2] - 54:14, 55:15, 96:5
**issues** [10] - 18:14, 38:1, 56:2, 97:5, 97:6, 109:2, 124:10, 124:11, 124:15, 132:9
**Italy** [3] - 22:3, 22:5, 22:18
**item** [1] - 60:14
**items** [3] - 53:1, 53:13, 53:15
**itself** [7] - 25:4, 49:25, 55:16, 107:19, 123:13, 124:24, 125:1

---

**J**

**JAG** [24] - 37:17, 37:20, 38:4, 38:7, 38:8, 38:10, 38:12, 38:16, 38:17, 42:9, 42:11, 52:25, 55:21, 71:20, 71:22, 72:6, 74:9, 74:15, 74:21, 75:7, 81:4
**JAGs** [2] - 74:2, 74:13
**jail** [1] - 119:9
**job** [24] - 12:24, 12:25, 13:4, 13:6, 14:5, 14:7, 14:13, 14:15, 24:16, 56:1, 63:22, 63:24, 65:6, 65:17, 65:18, 66:12, 66:17, 66:24, 66:25, 75:21, 76:1, 77:23, 105:11, 114:16
**John** [1] - 36:23
**JOHN** [3] - 2:5, 36:18, 36:23
**john.hannink@ navy.mil** [1] - 45:12
**join** [2] - 48:13, 98:24
**joined** [1] - 38:10

**joint** [5] - 61:9, 110:8, 110:13, 122:24, 129:8
**jointly** [1] - 129:8
**JUDGE** [1] - 1:10
**Judge** [8] - 37:16, 82:11, 100:1, 112:22, 116:19, 118:19, 121:4, 121:18
**judge** [45] - 37:23, 37:25, 39:11, 40:11, 41:12, 41:20, 41:21, 41:23, 43:9, 43:10, 45:25, 47:11, 50:2, 50:24, 51:3, 52:25, 54:20, 60:15, 61:15, 81:6, 81:11, 84:6, 84:18, 85:4, 85:9, 85:16, 88:12, 88:18, 88:19, 91:4, 91:16, 91:17, 92:4, 97:1, 97:2, 97:10, 98:22, 98:23, 106:25, 107:2, 107:3, 107:5, 107:7, 108:7, 107:12
**judged** [1] - 118:22
**Judicial** [1] - 132:16
**judicial** [1] - 86:21
**Juliet** [4] - 6:24, 7:1, 10:4, 22:11
**July** [2] - 24:13, 24:16
**Jump** [27] - 11:12, 13:2, 13:12, 14:5, 15:2, 15:19, 15:25, 16:7, 19:2, 23:15, 24:12, 25:12, 26:5, 26:14, 27:1, 28:3, 28:12, 28:16, 29:17, 29:20, 30:6, 30:9, 33:11, 34:18, 35:23, 35:24, 36:4
**Jump's** [3] - 19:1, 33:20, 34:4
**June** [1] - 30:15
**junior** [2] - 48:14
**Jurors** [3] - 115:3, 117:3, 118:5
**Jury** [5] - 3:2, 10:18, 56:16, 57:13, 109:5
**jury** [27] - 5:8, 5:17, 10:17, 19:18, 45:6, 56:12, 57:3, 57:19, 58:21, 90:16, 92:23, 97:3, 109:8, 109:12, 110:8, 110:13, 110:22, 114:5, 122:24, 125:7, 125:14, 129:9, 129:19, 130:16,

130:17
**JURY** [1] - 1:9
**Justice** [1] - 73:3
**justice** [1] - 97:6

**K**

**KATHRYN** [1] - 1:16
**keeping** [1] - 107:2
**key** [8] - 58:4, 60:12, 61:4, 61:17, 61:23, 63:20, 80:12, 80:15
**Kim** [34] - 3:13, 5:1, 6:3, 6:7, 7:23, 8:11, 8:25, 9:2, 12:5, 12:7, 12:20, 12:25, 13:6, 13:15, 14:3, 14:10, 14:21, 19:12, 20:3, 20:8, 22:1, 22:17, 22:22, 23:1, 23:4, 24:7, 24:15, 24:18, 29:1, 33:13, 34:1, 34:13, 34:16, 35:5
**Kim's** [5] - 7:20, 8:7, 8:15, 12:18, 12:23
**kind** [19] - 33:10, 33:16, 39:1, 51:23, 58:23, 67:22, 67:23, 72:5, 76:12, 78:15, 88:13, 109:19, 110:25, 114:11, 114:15, 121:24, 131:17, 132:5
**kinds** [2] - 4:10, 102:9
**knowing** [2] - 117:23, 128:18
**knowingly** [2] - 58:22, 114:14
**knowledge** [5] - 46:16, 69:7, 94:25, 95:18, 103:10
**known** [3] - 38:22, 42:3, 91:13
**knows** [2] - 76:23, 84:16
**Kraus** [3] - 16:9, 16:15, 16:19

**L**

**LA** [1] - 34:17
**lack** [2] - 12:12, 96:20
**ladies** [5] - 10:19, 56:12, 57:14, 101:23, 108:5
**language** [6] - 63:8, 75:3, 77:14, 122:10, 122:15, 129:8

**large** [2] - 75:10, 75:11
**largely** [1] - 110:7
**last** [15] - 7:5, 8:4, 21:2, 31:2, 38:14, 42:24, 50:5, 60:14, 89:23, 89:24, 108:20, 109:9, 118:20, 123:4, 127:1
**latest** [1] - 46:3
**latitude** [1] - 34:11
**law** [34] - 38:1, 38:2, 38:3, 38:9, 54:21, 68:22, 73:10, 74:1, 90:19, 90:23, 97:7, 107:20, 107:21, 119:10, 123:3, 124:8, 124:14, 124:16, 124:22, 125:6, 126:7, 126:13, 127:3, 127:10, 127:12, 127:18, 127:24, 128:3, 128:20, 129:9, 129:11, 129:20, 129:25
**Law** [1] - 1:19
**law's** [1] - 117:23
**laws** [3] - 90:22, 97:20, 97:23
**lawyer** [5] - 41:16, 50:4, 51:3, 76:24, 97:4
**lawyers** [1] - 75:2
**lay** [2] - 19:7, 52:23
**lays** [2] - 12:25, 60:15
**lead** [3] - 46:9, 82:5, 107:19
**leader** [4] - 13:2, 15:6, 16:7, 37:22
**leaders** [5] - 46:3, 46:5, 48:18, 60:18
**leadership** [1] - 35:12
**Leadership** [7] - 25:21, 26:4, 26:12, 34:8, 34:23, 35:1, 35:9
**leading** [1] - 47:13
**leads** [1] - 50:21
**leaning** [1] - 35:14
**Learned** [1] - 106:23
**least** [5] - 46:16, 62:15, 70:24, 72:23, 113:23
**leave** [3] - 111:7, 115:20, 122:2
**leaves** [1] - 65:5
**leaving** [1] - 77:7, 122:4

**left** [5] - 5:18, 77:9, 86:14, 102:22, 131:5
**left-hand** [1] - 102:22
**legal** [15] - 37:20, 38:5, 39:9, 42:3, 43:13, 59:14, 61:21, 63:6, 75:13, 76:22, 91:3, 97:5, 107:16, 115:3, 115:21
**legally** [2] - 72:25, 126:21
**legislation** [1] - 38:3
**length** [1] - 50:14
**less** [3] - 48:14, 71:6, 95:12
**Lessons** [1] - 106:23
**lessons** [1] - 50:9
**letter** [7] - 14:8, 54:15, 55:8, 55:12, 56:3, 124:22
**letters** [2] - 54:14, 55:15
**level** [4] - 58:3, 58:9, 68:20, 102:15
**liabilities** [2] - 40:23, 67:21
**lie** [1] - 9:14
**life** [3] - 5:23, 63:18, 67:24
**likely** [2] - 78:24, 131:23
**limited** [1] - 114:10
**limiting** [1] - 130:9
**limits** [1] - 9:17
**line** [4] - 45:16, 47:17, 49:19, 49:20
**linkage** [1] - 114:18
**linked** [1] - 114:17
**list** [10] - 29:7, 41:21, 53:1, 55:10, 58:3, 58:17, 111:22, 123:9, 124:6, 125:8
**listed** [7] - 25:14, 45:21, 53:13, 58:4, 60:12, 91:8, 121:22
**listener** [8] - 12:17, 12:19, 13:24, 14:2, 14:11, 14:19, 101:16, 102:1
**listening** [1] - 14:3
**lists** [4] - 40:21, 40:22, 58:6
**litigation** [1] - 38:2
**LLP** [1] - 1:19
**locate** [1] - 126:12
**logical** [1] - 118:2
**look** [16] - 11:18, 20:13, 26:15, 55:4, 61:25, 78:14, 79:24, 81:23, 88:7, 105:25,

121:20, 122:7, 126:6, 129:24, 129:25
**looked** [3] - 33:9, 54:19, 61:9
**looking** [32] - 6:4, 7:3, 7:4, 13:7, 27:14, 28:9, 28:22, 29:1, 29:12, 45:21, 56:17, 59:19, 61:25, 63:17, 67:3, 76:1, 83:6, 110:2, 111:18, 112:4, 112:13, 112:19, 113:5, 113:16, 114:20, 116:8, 120:3, 125:13, 125:22, 126:11, 128:22, 131:4
**looks** [4] - 111:17, 120:24, 121:23, 122:8
**loop** [1] - 107:2
**love** [1] - 77:6
**lower** [1] - 102:21
**lunch** [1] - 130:24

**M**

**ma'am** [3] - 11:10, 11:14, 20:7
**Madison** [2] - 1:20, 90:20
**major** [1] - 41:13
**manner** [1] - 128:2
**March** [2] - 28:13, 29:15
**marked** [3] - 6:23, 92:12, 99:11
**Mary** [1] - 131:15
**Master** [1] - 90:20
**master** [1] - 90:22
**match** [1] - 75:18
**material** [4] - 25:17, 44:16, 88:25, 89:4
**materially** [1] - 89:9
**materials** [1] - 39:10
**math** [1] - 31:8
**matter** [13] - 13:21, 14:1, 14:20, 30:4, 45:18, 63:1, 70:23, 71:4, 100:24, 101:16, 103:9, 103:11, 132:15
**mattered** [1] - 20:16
**matters** [2] - 30:8, 42:4
**McDonald** [1] - 123:22
**McDonell** [1] - 123:21
**McDonnell** [12] - 112:11, 112:16, 123:20, 123:24, 124:2, 124:5, 124:8,

124:11, 126:7, 129:23
**McFADDEN** [1] -
1:10
**mean** [33] - 4:25,
5:11, 6:3, 7:24, 7:25,
8:23, 9:1, 36:1, 41:5,
44:2, 49:11, 53:14,
57:1, 59:12, 60:25,
62:11, 64:25, 65:7,
66:7, 68:23, 71:3,
74:15, 80:1, 88:14,
102:15, 104:7, 105:5,
114:9, 115:13,
119:13, 121:1, 124:9,
125:11
**meaning** [3] - 77:12,
104:8, 128:9
**meaningful** [2] -
68:19, 126:20
**meaningfully** [1] -
127:25
**means** [10] - 5:22,
50:19, 59:14, 62:12,
64:5, 64:23, 75:8,
76:24, 108:17, 118:25
**meant** [6] - 59:13,
60:20, 64:23, 77:15,
88:6, 88:20
**measure** [1] - 31:11
**mechanisms** [2] -
31:10, 46:24
**meet** [3] - 33:14,
33:20, 43:18
**meeting** [21] - 6:24,
6:25, 7:6, 7:8, 7:9,
7:10, 8:8, 8:9, 8:15,
10:1, 10:2, 10:3,
24:13, 33:19, 34:2,
34:3, 34:14, 66:21,
66:23, 66:24, 119:2
**Meghan** [7] - 3:13,
14:10, 19:12, 19:13,
20:4, 20:8, 28:23
**member** [2] - 18:15,
18:16
**members** [6] - 16:10,
51:24, 52:2, 72:7,
88:16, 88:22
**memo** [7] - 49:23,
51:5, 60:10, 63:13,
67:12, 69:11, 95:17
**memoranda** [2] -
61:12, 61:13
**memorandum** [5] -
54:2, 95:1, 95:4, 96:2,
96:5
**memorandums** [1] -
60:13
**Memorial** [1] -
108:17

**memorize** [3] - 49:3,
50:19, 87:24
**mens** [6] - 114:11,
114:12, 126:23,
127:13, 127:14, 128:5
**mention** [1] - 40:15
**mentioned** [11] -
39:23, 48:22, 51:18,
52:21, 61:4, 88:13,
97:8, 107:7, 121:9,
128:16, 128:18
**mentions** [1] - 65:22
**message** [4] - 33:1,
46:24, 47:12
**messages** [7] - 3:13,
17:13, 31:25, 32:3,
32:8, 32:15, 32:19
**messaging** [4] -
29:9, 32:2, 32:6, 32:8
**Messenger** [15] -
3:13, 14:10, 19:12,
19:13, 20:4, 20:8,
22:1, 22:17, 22:22,
24:7, 24:15, 24:19,
28:23, 33:14, 34:13
**Messenger's** [1] -
22:1
**met** [7] - 43:2, 43:6,
70:3, 72:15, 79:25,
92:9, 119:6
**methods** [1] - 86:19
**midafternoon** [1] -
56:11
**middle** [5] - 29:6,
36:23, 45:11, 48:17,
117:13
**middle-grade** [1] -
48:17
**might** [11] - 9:21,
12:19, 27:20, 56:3,
59:22, 71:6, 78:9,
78:12, 79:2, 88:7,
116:22
**Military** [1] - 73:3
**military** [14] - 15:22,
37:3, 37:5, 37:20,
38:3, 40:21, 43:11,
60:18, 61:10, 63:15,
90:4, 90:8, 97:6,
112:15
**million** [6] - 6:15,
34:17, 34:20, 35:6,
35:19, 84:22
**mind** [9] - 14:6, 16:5,
66:9, 121:7, 121:16,
121:23, 122:9,
122:11, 125:17
**minimum** [1] - 48:5
**minor** [1] - 112:3
**minutes** [4] - 56:13,

57:11, 122:21, 131:14
**mischaracterizatio
n** [2] - 18:5, 25:24
**misconduct** [1] -
44:22
**missing** [6] - 109:14,
118:9, 119:22, 120:8,
129:25, 130:3
**misstatement** [2] -
127:10, 129:11
**mistake** [1] - 80:16
**misunderstood** [1] -
128:25
**misuse** [2] - 102:11,
103:25
**mixed** [6] - 115:24,
116:1, 116:4, 116:14,
126:11, 126:16
**model** [1] - 31:9
**modifications** [2] -
110:14, 122:22
**modified** [3] - 80:23,
118:15, 123:8
**modify** [1] - 124:21
**modular** [1] - 31:3
**moment** [6] - 21:4,
83:14, 97:9, 120:17,
125:17, 129:13
**Monday** [1] - 1:10
**monetary** [1] - 43:17
**months** [3] - 27:24,
30:16, 116:18
**Moran** [2] - 35:18,
84:25
**morning** [1] - 131:10
**mortgages** [2] -
40:23, 67:21
**most** [7] - 37:23,
78:24, 85:9, 91:4,
93:12, 112:14, 132:4
**mostly** [1] - 131:9
**motion** [1] - 123:14
**motions** [1] - 112:23
**motive** [3] - 115:24,
126:12, 126:16
**motives** [3] - 116:1,
116:4, 116:14
**move** [5] - 19:24,
56:1, 92:19, 100:10,
108:9
**moving** [1] - 108:6
**MR** [75] - 56:21,
69:25, 77:18, 77:20,
81:14, 81:15, 82:22,
82:24, 83:1, 83:3,
83:5, 83:13, 83:16,
86:7, 86:24, 87:6,
87:8, 92:21, 96:20,
100:12, 101:7,
101:19, 109:11,

109:14, 109:20,
109:23, 110:1, 110:4,
110:25, 111:19,
112:2, 112:6, 112:10,
112:14, 112:21,
113:1, 113:4, 113:7,
113:9, 113:18, 114:4,
114:13, 114:23,
114:25, 115:2, 115:8,
115:13, 115:19,
115:22, 115:24,
116:10, 116:12,
116:18, 116:21,
117:8, 117:13,
117:17, 117:19,
118:9, 118:14,
118:19, 119:14,
119:24, 120:14,
120:21, 121:4,
121:18, 122:12,
128:24, 130:7,
130:12, 131:3, 131:9,
131:25, 132:6
**MS** [188] - 3:3, 3:8,
5:4, 5:24, 6:10, 6:18,
7:5, 7:14, 8:6, 8:19,
8:21, 9:11, 9:23, 11:2,
11:15, 11:17, 12:3,
12:10, 12:12, 12:16,
13:8, 13:20, 14:2,
14:7, 14:15, 14:25,
15:5, 15:15, 18:4,
18:7, 18:20, 18:22,
19:3, 19:7, 19:10,
19:19, 19:22, 20:1,
20:2, 20:22, 20:25,
21:4, 21:6, 21:10,
21:12, 21:15, 21:19,
23:7, 23:11, 23:24,
24:2, 24:21, 24:23,
25:6, 25:7, 25:23,
26:2, 26:10, 27:5,
27:8, 28:6, 28:8,
28:19, 28:21, 29:3,
29:5, 29:22, 29:24,
30:11, 30:13, 31:21,
31:23, 32:21, 32:25,
33:5, 33:8, 33:23,
33:25, 34:5, 34:8,
34:12, 35:16, 35:17,
36:8, 36:15, 36:20,
44:3, 44:6, 45:4, 45:7,
45:19, 45:20, 49:16,
49:18, 54:6, 54:8,
56:8, 56:19, 57:18,
57:22, 59:5, 59:6,
60:8, 60:9, 63:11,
63:12, 69:22, 82:23,
82:25, 86:2, 87:12,
89:15, 89:20, 92:11,
92:14, 92:19, 92:25,

93:17, 93:18, 95:15,
95:21, 95:24, 96:7,
96:9, 96:16, 96:17,
96:22, 96:24, 96:25,
99:10, 99:13, 100:10,
100:17, 101:1, 102:4,
102:8, 102:20,
102:23, 103:4, 103:6,
103:12, 103:13,
103:21, 103:23,
104:23, 104:25,
106:20, 106:21,
107:23, 110:6,
110:18, 111:11,
111:15, 115:17,
120:1, 120:8, 120:13,
120:20, 121:9,
121:13, 122:1, 122:6,
122:17, 122:21,
123:17, 123:21,
123:24, 124:1, 124:9,
124:19, 125:2,
125:13, 125:16,
125:19, 126:8,
126:11, 126:25,
127:9, 128:6, 128:14,
128:25, 129:2, 129:7,
129:17, 130:14,
131:2, 131:13, 131:20
**multifaceted** [1] -
125:5
**multiple** [1] - 41:15
**multipliers** [1] - 48:7
**must** [17] - 46:7,
62:7, 62:25, 63:4,
64:2, 65:9, 66:4,
68:20, 105:23, 106:8,
113:12, 114:6,
114:21, 117:4,
117:24, 118:6, 118:23

# N

**N1** [1] - 72:16
**nailed** [1] - 7:15
**name** [5] - 36:21,
36:23, 89:23, 89:24
**named** [1] - 42:20
**names** [2] - 26:3,
45:9
**Naples** [2] - 27:23,
92:9
**National** [1] - 90:3
**national** [3] - 90:20,
90:23, 97:6
**NAVAF** [7] - 91:13,
91:15, 92:2, 93:1,
94:8, 97:2, 97:11
**Naval** [5] - 43:21,
90:21, 91:11, 93:11,

112:17

**naval** [14] - 37:22, 39:17, 43:25, 44:1, 44:4, 44:7, 44:20, 69:18, 72:18, 81:8, 85:3, 86:10, 94:13, 94:21

**NAVEUR** [8] - 27:19, 91:13, 91:15, 92:2, 93:1, 94:8, 97:2, 97:11

**NAVEUR-NAVAF** [7] - 91:13, 91:15, 92:2, 93:1, 94:8, 97:2, 97:11

**Navy** [82] - 15:3, 15:18, 17:7, 17:10, 22:14, 22:19, 22:21, 23:16, 24:7, 24:12, 24:19, 26:4, 27:21, 28:11, 31:4, 31:5, 31:10, 31:19, 37:8, 37:15, 37:16, 37:21, 38:21, 40:3, 41:12, 42:11, 42:23, 43:4, 43:5, 43:14, 43:16, 43:17, 43:22, 44:9, 44:19, 46:22, 47:3, 47:18, 47:20, 48:13, 49:13, 50:3, 51:3, 51:20, 51:24, 52:2, 52:6, 53:12, 55:21, 58:25, 59:24, 60:1, 60:18, 61:13, 63:16, 66:21, 69:17, 71:22, 72:17, 81:8, 84:4, 87:23, 90:2, 90:6, 90:10, 90:13, 91:9, 93:21, 94:2, 94:4, 94:10, 94:16, 94:23, 95:6, 95:19, 98:24, 103:16, 125:4, 125:23

**Navy's** [10] - 39:2, 39:21, 41:10, 42:5, 44:24, 49:1, 49:5, 49:7, 87:14, 87:23

**necessarily** [8] - 9:1, 39:25, 54:4, 71:12, 81:23, 95:8, 109:16, 126:23

**necessary** [3] - 54:14, 64:22, 69:2

**necessity** [2] - 113:9, 114:18

**need** [14] - 5:7, 11:22, 19:16, 29:8, 50:19, 85:22, 109:1, 109:18, 110:3, 117:8, 117:22, 122:8, 122:15, 130:25

**Need** [2] - 116:24, 117:17

**needs** [4] - 40:13, 43:13, 117:14, 124:23

**negative** [6] - 27:25, 28:3, 28:16, 29:20, 33:10, 33:16

**negotiating** [13] - 59:9, 59:12, 59:13, 59:15, 64:2, 64:10, 71:19, 75:19, 75:20, 76:3, 105:15, 105:22, 106:17

**negotiation** [5] - 59:19, 64:23, 65:3, 65:4, 75:23

**negotiations** [2] - 64:20, 65:12

**never** [4] - 14:6, 49:3, 51:1, 66:8

**New** [6] - 1:17, 1:21, 33:20, 34:4, 34:14

**new** [5] - 23:5, 39:16, 39:18, 48:22, 54:25

**Newport** [1] - 90:21

**news** [2] - 108:6, 108:19

**Next** [30] - 11:12, 13:2, 13:12, 14:5, 15:2, 15:19, 15:25, 16:7, 19:1, 19:2, 23:15, 24:12, 25:12, 26:5, 26:14, 27:1, 28:3, 28:12, 28:16, 29:17, 29:20, 30:6, 30:9, 33:11, 33:20, 34:4, 34:18, 35:23, 35:24, 36:4

**next** [22] - 29:22, 33:5, 36:14, 36:15, 56:8, 56:18, 63:11, 68:17, 89:14, 108:23, 108:25, 113:8, 113:9, 115:1, 115:2, 115:23, 115:24, 120:4, 123:17, 126:10, 131:6, 131:15

**nice** [1] - 51:21

**night** [1] - 118:20

**NO** [1] - 1:5

**nobody** [1] - 10:7

**non** [2] - 14:18, 61:1

**non-federal** [1] - 61:1

**non-hearsay** [1] - 14:18

**none** [3] - 7:17, 57:10, 63:16

**nonofficial** [2] - 111:21, 123:6

**nonpublic** [2] - 104:18

**normal** [2] - 74:17, 79:14

**normally** [6] - 41:21, 44:22, 51:2, 63:18, 104:21, 109:20

**note** [3] - 31:2, 121:24, 128:14

**noted** [1] - 110:8

**notes** [1] - 129:4

**nothing** [4] - 8:3, 8:8, 9:5, 16:5

**notify** [2] - 64:19, 67:7

**November** [6] - 53:22, 98:19, 99:7, 99:21, 100:8, 103:19

**Number** [2] - 83:6, 111:23

**number** [19] - 37:24, 38:5, 38:14, 43:13, 44:8, 44:10, 46:22, 47:2, 58:20, 61:19, 78:18, 78:21, 79:10, 79:11, 79:12, 79:24, 80:4, 125:2, 125:21

**number-two** [3] - 44:8, 44:10, 47:2

**numbers** [1] - 117:11

**NW** [3] - 1:14, 1:17, 1:24

## O

**o'clock** [1] - 130:25

**O'NEILL** [38] - 1:20, 3:3, 3:8, 5:4, 5:24, 6:10, 6:18, 7:5, 9:11, 9:23, 11:2, 11:15, 11:17, 12:3, 12:10, 12:16, 13:8, 14:2, 14:15, 14:25, 15:5, 15:15, 18:7, 18:20, 18:22, 19:7, 19:10, 19:19, 19:22, 20:1, 20:2, 20:25, 21:4, 21:6, 23:24, 25:23, 32:21, 34:5

**O'Neill** [11] - 2:3, 9:8, 10:24, 19:25, 21:8, 21:20, 24:24, 26:17, 31:24, 35:15, 35:18

**O'Neill's** [1] - 25:2

**oath** [2] - 10:23, 57:16

**Oath** [1] - 36:17, 89:17

**object** [3] - 19:4, 34:5, 111:20

**objection** [21] - 12:12, 15:12, 15:14, 18:4, 19:3, 19:21, 19:24, 20:22, 23:24, 25:23, 32:21, 86:2, 92:21, 92:22, 96:20, 96:23, 101:18, 101:24, 102:5, 123:5, 123:17

**objections** [4] - 110:9, 123:1, 124:1, 129:10

**objective** [1] - 55:22

**objects** [1] - 100:12

**obligation** [2] - 63:6, 108:13

**obligations** [2] - 98:18, 106:14

**oblige** [1] - 126:9

**observed** [1] - 123:14

**obstruction** [5] - 127:14, 127:25, 128:5, 128:9, 128:10

**obtained** [1] - 104:19

**obviously** [6] - 43:10, 88:18, 110:3, 114:10, 118:15, 119:18

**occasion** [1] - 27:2

**occurred** [2] - 3:20, 6:1

**odds** [1] - 108:21

**OF** [3] - 1:1, 1:3, 1:9

**offense** [1] - 125:1

**offer** [10] - 12:11, 14:8, 66:17, 71:22, 76:12, 76:13, 76:18, 79:16, 79:22, 105:24

**offered** [7] - 10:7, 12:17, 12:24, 12:25, 66:23, 126:14, 129:8

**offering** [3] - 13:21, 56:25, 101:3

**offers** [1] - 66:12

**Office** [6] - 1:13, 37:1, 39:8, 50:2, 82:11, 99:25

**office** [13] - 37:25, 43:6, 43:9, 47:12, 51:3, 53:10, 54:20, 60:15, 61:15, 72:18, 84:5, 104:17

**Officer** [1] - 43:21

**officer** [83] - 30:4, 38:19, 38:20, 38:21, 38:23, 39:16, 41:24, 42:15, 42:16, 42:18, 43:4, 44:1, 44:8, 44:10, 44:19, 44:20,

44:21, 47:3, 47:7, 47:20, 50:23, 51:16, 52:25, 53:2, 53:10, 53:20, 53:21, 53:23, 54:17, 55:2, 55:8, 55:16, 55:18, 55:25, 56:5, 59:2, 60:22, 65:5, 66:11, 66:12, 66:21, 66:23, 66:24, 67:2, 67:5, 70:11, 74:15, 76:6, 76:13, 76:18, 76:20, 77:2, 77:7, 80:14, 80:18, 81:19, 81:22, 82:1, 82:11, 84:9, 87:22, 88:14, 88:16, 89:5, 93:23, 93:24, 94:1, 94:18, 94:22, 95:18, 102:11, 105:21, 106:7, 106:12, 107:14, 112:16, 112:17

**officer's** [5] - 48:20, 54:23, 54:24, 56:3, 67:24

**officers** [42] - 38:13, 39:1, 39:3, 39:13, 39:18, 39:20, 40:4, 40:9, 40:21, 41:2, 41:9, 41:13, 41:15, 41:16, 41:22, 46:22, 47:17, 47:22, 48:12, 48:14, 48:19, 48:22, 51:12, 61:22, 68:12, 69:16, 70:7, 71:10, 74:4, 74:19, 87:18, 87:19, 87:24, 90:13, 90:14, 93:11, 95:5, 98:1, 98:3, 98:6

**offices** [1] - 33:21, 34:4, 38:6

**OFFICIAL** [1] - 132:20

**Official** [2] - 1:24, 132:13

**official** [30] - 55:9, 59:10, 60:4, 60:5, 63:1, 64:3, 64:11, 64:16, 65:17, 67:9, 68:6, 68:7, 102:15, 102:19, 103:1, 104:8, 104:20, 106:10, 112:11, 112:18, 113:15, 113:21, 113:22, 113:24, 113:25, 116:3, 116:7, 117:22, 125:23, 127:21

**officials** [10] - 25:21, 26:4, 26:11, 34:22,

34:24, 53:13, 62:7, 62:20, 62:25, 63:4
**often** [7] - 39:19, 48:18, 58:7, 61:21, 81:18, 81:21, 82:4
**OG** [1] - 81:4
**OGE** [8] - 40:7, 40:16, 54:12, 67:18, 68:24, 69:2, 69:5, 88:24
**omit** [1] - 125:7
**once** [5] - 38:21, 52:24, 53:9, 65:3, 98:14
**one** [71] - 11:8, 11:9, 13:18, 14:25, 16:24, 17:4, 17:5, 18:12, 18:18, 19:13, 27:2, 29:6, 31:9, 34:16, 35:6, 38:24, 39:18, 39:25, 40:5, 40:10, 43:9, 44:16, 46:21, 46:23, 49:10, 51:4, 55:25, 57:9, 58:15, 62:21, 64:6, 66:2, 67:7, 71:19, 72:9, 73:7, 74:2, 74:10, 78:23, 78:25, 81:1, 81:23, 83:1, 83:14, 86:9, 88:6, 88:21, 89:3, 96:7, 105:9, 108:9, 109:11, 110:2, 110:19, 111:17, 112:12, 112:14, 112:15, 115:1, 115:2, 115:8, 115:19, 122:18, 123:2, 123:11, 125:3, 128:14, 129:3, 129:13, 130:10, 130:14
**one's** [2] - 104:11, 104:20
**ones** [1] - 112:10
**ongoing** [1] - 129:18
**online** [1] - 71:23
**open** [3] - 77:7, 77:9, 78:12
**opening** [1] - 126:1
**openly** [1] - 119:7
**operating** [1] - 131:23
**operations** [11] - 37:22, 39:17, 44:5, 44:7, 44:21, 69:18, 81:8, 86:10, 94:13, 94:21, 103:16
**opinion** [3] - 29:20, 107:16, 107:19
**opportunity** [8] -

3:20, 4:13, 4:15, 5:17, 6:1, 10:8, 10:11, 111:3
**oppose** [3] - 111:8, 111:13, 129:2
**opposed** [3] - 16:2, 16:3, 85:15
**Order** [1] - 3:1
**order** [9] - 35:23, 35:24, 35:25, 36:6, 62:1, 73:1, 73:2, 73:4, 77:15
**ordered** [2] - 35:19, 36:3
**organization** [2] - 62:8, 69:17
**oriented** [2] - 31:12, 46:20
**original** [2] - 119:1, 132:14
**originally** [1] - 16:17
**otherwise** [1] - 117:22
**ought** [1] - 50:9
**ourselves** [1] - 46:7
**outline** [2] - 27:3, 73:4
**outside** [5] - 5:15, 20:23, 34:6, 40:3, 59:8, 59:15, 80:10, 105:9, 108:22
**overall** [1] - 27:21
**overruled** [4] - 24:1, 26:1, 32:23, 34:10
**overruling** [2] - 101:18, 101:23
**overseas** [1] - 80:25
**overt** [10] - 111:21, 112:6, 112:9, 123:9, 123:12, 124:3, 124:6, 124:23, 125:7, 125:8
**own** [9] - 5:14, 13:22, 25:4, 41:16, 46:5, 51:17, 104:11, 114:11, 126:4
**owned** [3] - 40:22, 67:19, 67:21

# P

**p.m** [6] - 1:11, 3:1, 57:12, 132:10
**pacing** [1] - 131:22
**PAGE** [1] - 2:2
**page** [48] - 7:5, 13:7, 13:16, 23:8, 23:9, 25:6, 25:9, 27:6, 29:23, 45:10, 45:11, 45:19, 46:10, 48:1, 49:16, 52:17, 54:6,

56:8, 57:21, 60:8, 60:20, 62:3, 63:11, 63:23, 67:11, 69:9, 77:18, 81:14, 95:22, 96:7, 96:16, 102:21, 103:21, 104:23, 106:20, 109:8, 111:23, 112:2, 112:7, 113:16, 113:18, 113:20, 117:9, 117:11, 117:13, 132:15
**Pamela** [1] - 131:16
**papers** [1] - 70:20
**paragraph** [16] - 7:6, 25:8, 27:14, 30:23, 31:1, 31:7, 46:2, 48:2, 96:10, 112:20, 114:24, 116:9, 117:20, 123:11, 125:22
**paralegals** [1] - 43:13
**pardon** [3] - 49:6, 52:13, 79:19
**parents** [2] - 22:17, 22:23
**Parlatore** [22] - 1:19, 2:6, 56:20, 69:23, 87:5, 87:9, 87:13, 110:10, 111:18, 113:17, 118:8, 122:7, 122:20, 123:8, 123:11, 123:23, 124:21, 125:6, 126:14, 128:2, 129:24, 130:4
**PARLATORE** [76] - 1:20, 56:21, 69:25, 77:18, 77:20, 81:14, 81:15, 82:22, 82:24, 83:1, 83:3, 83:5, 83:13, 83:16, 86:7, 86:24, 87:6, 87:8, 92:21, 96:20, 100:12, 101:7, 101:19, 109:11, 109:14, 109:20, 109:23, 110:1, 110:4, 110:25, 111:19, 112:2, 112:6, 112:10, 112:14, 112:21, 113:1, 113:4, 113:7, 113:9, 113:18, 114:4, 114:13, 114:23, 114:25, 115:2, 115:8, 115:13, 115:19, 115:22, 115:24, 116:10, 116:12, 116:18, 116:21, 117:8,

117:13, 117:17, 117:19, 118:9, 118:14, 118:19, 119:14, 119:24, 120:14, 120:21, 121:4, 121:18, 122:12, 128:24, 130:7, 130:12, 131:3, 131:9, 131:25, 132:6
**Parlatore's** [4] - 110:14, 123:1, 123:5, 126:11
**part** [15] - 12:8, 27:20, 38:7, 38:12, 39:3, 40:6, 52:6, 60:10, 62:18, 63:13, 72:22, 94:4, 104:8, 111:21, 113:23
**participate** [3] - 16:21, 62:25, 103:9
**participating** [1] - 30:3
**particular** [10] - 30:4, 39:18, 42:24, 62:10, 63:1, 65:2, 78:2, 103:9, 105:19, 121:3
**particularly** [2] - 75:12, 118:17
**parties** [8] - 12:14, 19:5, 100:14, 103:10, 110:7, 121:1, 129:8, 130:2
**parties'** [1] - 118:21
**parts** [1] - 58:5
**party** [5] - 3:22, 3:23, 13:22, 13:23, 32:12
**past** [1] - 127:11
**path** [1] - 109:19
**Pause** [11] - 11:24, 12:2, 21:5, 83:2, 83:15, 87:7, 120:2, 121:17, 125:18, 129:6, 129:16
**pause** [1] - 56:10
**pay** [1] - 38:20
**peace** [1] - 109:17
**peculiar** [1] - 118:21
**penalized** [1] - 80:21
**pension** [1] - 85:25
**Pentagon** [1] - 43:7
**people** [23] - 4:19, 7:10, 26:14, 29:8, 31:12, 40:19, 43:11, 43:12, 48:4, 52:4, 54:19, 61:2, 62:19, 63:17, 64:9, 69:3, 71:14, 77:12, 81:7, 81:9, 82:8, 88:4, 104:8
**percent** [1] - 83:12

117:13, 117:17, 117:19, 118:9
**perfect** [2] - 30:24, 47:2
**perform** [1] - 68:19
**performance** [4] - 59:22, 102:18, 113:25, 127:20
**performed** [2] - 80:9, 80:25
**perhaps** [1] - 128:25
**period** [3] - 13:12, 14:16, 85:7
**periodic** [2] - 40:5, 42:13
**permission** [1] - 59:1
**person** [15] - 37:23, 41:17, 41:23, 48:12, 51:7, 65:5, 72:4, 84:2, 88:21, 98:15, 99:6, 103:10, 105:23, 106:8
**person's** [1] - 65:18
**personal** [7] - 22:9, 22:14, 31:18, 102:17, 103:1, 104:11, 126:4
**personally** [7] - 30:3, 33:4, 62:25, 66:3, 78:17, 98:10, 98:20
**personnel** [10] - 38:3, 43:5, 43:14, 43:17, 43:22, 43:24, 63:15, 72:17, 72:18, 85:3
**perspective** [1] - 122:17
**Ph.D** [1] - 31:8
**phase** [7] - 13:18, 14:25, 15:1, 15:2, 63:15
**phone** [1] - 17:14
**photograph** [2] - 92:18, 93:15
**phrase** [1] - 65:9
**phraseology** [1] - 128:20
**physical** [1] - 118:24
**pick** [2] - 57:25, 83:1
**picked** [1] - 39:24
**piggybacking** [1] - 51:23
**pilot** [4] - 15:1, 15:7, 27:19, 28:11
**place** [3] - 31:11, 43:14, 47:2
**places** [1] - 78:15
**plain** [1] - 66:9
**Plaintiff** [1] - 1:4
**plan** [5] - 29:16, 57:1, 57:3, 57:5, 108:15
**planning** [1] - 110:4
**plans** [3] - 33:14,

108:18, 115:16
**platform** [1] - 32:2
**pleased** [1] - 43:18
**pled** [1] - 125:21
**plenty** [1] - 72:6
**point** [38] - 5:13, 5:15, 8:2, 9:12, 14:7, 15:17, 15:20, 16:18, 19:18, 35:14, 46:21, 48:20, 53:19, 54:9, 54:13, 57:10, 59:5, 59:7, 61:17, 61:18, 62:23, 63:16, 63:17, 64:1, 64:18, 65:22, 66:2, 77:24, 78:2, 78:17, 79:22, 80:13, 81:19, 104:5, 104:15, 110:17, 126:19, 128:10
**pointing** [2] - 123:23, 125:11
**points** [3] - 15:10, 63:25, 104:16
**political** [1] - 90:19
**portion** [1] - 125:25
**portions** [2] - 6:11, 75:6
**portrait** [1] - 67:24
**position** [21] - 37:15, 37:20, 45:24, 58:10, 59:2, 59:21, 64:14, 85:17, 86:10, 91:15, 91:21, 94:7, 94:12, 94:17, 102:12, 104:1, 104:20, 105:17, 106:1, 125:23, 126:3
**Position** [1] - 103:25
**positionally** [1] - 94:17
**positions** [3] - 60:19, 91:1, 91:8
**positive** [1] - 13:3
**possible** [6] - 7:23, 8:12, 17:6, 80:4, 83:24, 131:20
**possibly** [2] - 25:1, 108:10
**post** [8] - 23:16, 39:22, 63:14, 102:12, 105:1, 123:19, 124:8, 126:7
**post-government** [4] - 39:22, 63:14, 102:12, 105:1
**potential** [19] - 13:1, 55:11, 56:2, 59:16, 59:20, 64:4, 66:5, 66:12, 68:6, 68:9, 68:15, 76:8, 77:14, 82:15, 88:10, 88:15,

106:16, 109:9, 110:19
**potentially** [7] - 8:14, 57:5, 65:17, 73:21, 78:14, 86:14, 103:15
**power** [2] - 118:18, 118:21
**PowerPoint** [9] - 99:8, 99:20, 100:8, 100:19, 100:21, 101:3, 101:9, 101:24, 103:18
**practical** [4] - 118:22, 118:24, 119:3, 119:10
**practice** [4] - 49:3, 69:14, 69:15, 125:8
**practices** [2] - 60:16, 106:25
**practicing** [1] - 90:24
**precise** [1] - 123:7
**predated** [2] - 11:8, 11:9
**predictable** [2] - 30:5, 63:2
**preferable** [1] - 62:7
**preparation** [1] - 100:22
**prepare** [2] - 99:7, 119:14
**prepared** [2] - 99:25, 110:19
**preparing** [1] - 72:22
**presence** [3] - 108:22, 116:1, 116:4
**present** [5] - 10:4, 10:18, 57:13, 59:23, 116:14
**pressures** [1] - 65:16
**prestigious** [1] - 95:12
**presumably** [1] - 108:16
**pretrial** [3] - 110:22, 119:2, 122:25
**pretty** [3] - 20:15, 109:7, 112:21
**previous** [1] - 92:9
**previously** [6] - 18:14, 37:5, 56:23, 67:14, 91:11, 95:21
**primary** [3] - 41:11, 116:2, 116:6
**principle** [2] - 59:1, 68:11
**principles** [11] - 57:25, 58:1, 58:4, 58:6, 58:11, 58:13, 58:17, 58:19, 64:6, 74:23, 75:9
**print** [1] - 50:17

**priorities** [1] - 44:15
**prisoner** [1] - 49:10
**private** [5] - 62:8, 68:7, 72:5, 104:10, 104:17
**privilege** [2] - 72:11, 72:14
**pro** [1] - 113:3, 114:7
**problem** [3] - 4:7, 5:5, 88:10
**problematic** [1] - 103:14
**procedures** [3] - 53:6, 60:22, 79:13
**Proceedings** [1] - 132:10
**process** [9] - 49:25, 51:2, 54:16, 55:7, 63:21, 79:15, 84:24, 119:2
**procurement** [4] - 66:4, 66:15, 78:18, 79:20
**produce** [3] - 118:22, 119:4, 119:11
**Produced** [1] - 1:25
**product** [1] - 15:3
**professionalism** [1] - 48:7
**professionally** [1] - 92:9
**program** [7] - 15:1, 15:7, 27:21, 28:11, 31:6, 31:14, 42:12
**programs** [1] - 27:20
**progress** [1] - 108:24
**promises** [1] - 58:23
**promising** [1] - 58:25
**promote** [2] - 26:14, 27:1
**promoting** [1] - 29:16
**promptly** [7] - 66:4, 66:6, 66:7, 66:17, 79:17, 80:1, 108:8
**proof** [5] - 115:5, 115:13, 117:5, 118:7, 122:9
**proper** [2] - 59:3, 59:22
**proposal** [2] - 35:10, 35:13
**propose** [4] - 34:17, 35:5, 113:11, 130:10
**proposed** [18] - 109:24, 110:8, 110:9, 110:13, 110:22,

111:1, 111:14, 111:19, 111:22, 111:24, 112:3, 112:22, 116:4, 118:12, 120:24, 122:24, 129:8
**proposing** [1] - 30:21
**prosecution** [3] - 13:5, 113:12, 114:21
**prosecutor** [1] - 91:3
**prospective** [4] - 103:3, 105:23, 106:8, 106:11
**protective** [2] - 69:16
**prove** [5] - 113:12, 114:6, 114:18, 114:21, 117:24, 117:25
**proven** [1] - 116:6
**provide** [9] - 39:13, 42:3, 46:15, 47:5, 63:19, 97:15, 107:1, 107:15, 129:21
**provided** [8] - 17:13, 26:3, 29:2, 39:16, 54:1, 55:16, 78:15, 110:16
**provider** [2] - 32:11, 32:12
**providing** [1] - 126:19
**provision** [3] - 38:5, 61:13, 80:19
**public** [20] - 39:4, 40:18, 64:7, 65:19, 65:20, 67:13, 68:11, 68:12, 68:21, 98:8, 102:15, 104:6, 104:9, 104:17, 104:19, 113:21, 113:24
**public's** [1] - 103:15
**publish** [2] - 45:5, 57:19
**published** [1] - 92:23
**pull** [12] - 11:15, 18:20, 27:5, 28:6, 28:19, 33:5, 33:6, 33:23, 57:19, 61:24, 88:11, 125:16
**purportedly** [1] - 5:2
**purporting** [1] - 58:23
**purpose** [7] - 6:9, 95:3, 95:16, 99:7, 101:3, 116:6, 125:21
**Purpose** [1] - 68:4
**purposefully** [1] - 89:6
**purposely** [1] - 89:1

**purposes** [2] - 3:17, 6:6
**put** [17] - 44:14, 50:23, 51:9, 59:20, 61:16, 70:20, 70:23, 70:25, 71:6, 71:7, 77:18, 88:3, 101:11, 111:3, 112:22, 113:19, 121:25
**putting** [1] - 50:11

### Q

**qualify** [1] - 76:9
**questions** [18] - 7:19, 21:21, 24:25, 25:2, 26:17, 26:19, 26:20, 34:9, 36:9, 41:10, 41:17, 42:19, 69:1, 69:22, 87:4, 87:8, 87:13, 106:18
**quick** [6] - 56:21, 88:24, 128:15, 129:4, 129:25, 130:24
**quickly** [3] - 108:7, 108:9, 132:5
**quid** [2] - 113:13, 114:7
**QUINN** [1] - 1:20
**quite** [7] - 61:21, 81:21, 82:4, 112:1, 128:16, 131:20, 131:23
**quo** [2] - 113:13, 114:7

### R

**raised** [1] - 80:24
**raises** [1] - 62:15
**ran** [1] - 46:22
**range** [1] - 97:5
**ranged** [1] - 102:11
**ranging** [1] - 97:5
**rank** [9] - 38:21, 85:23, 90:10, 90:12, 90:14, 93:10, 93:12, 93:19, 93:23
**ranking** [8] - 25:21, 26:4, 26:11, 34:22, 44:8, 48:14, 94:22, 95:7
**ranks** [4] - 38:24, 90:13, 90:15, 93:10
**rather** [5] - 100:24, 101:16, 101:25, 117:24, 124:17
**rational** [1] - 118:2
**RDR** [1] - 132:19
**RDR-CRR** [1] -

132:19
**re** [1] - 42:12
**re-certify** [1] - 42:12
**rea** [6] - 114:11, 114:12, 126:23, 127:13, 127:14, 128:5
**reach** [2] - 88:16, 88:22
**read** [36] - 3:9, 12:4, 30:25, 46:1, 46:2, 47:12, 47:17, 48:1, 53:3, 53:18, 53:19, 54:9, 58:9, 58:21, 59:7, 62:3, 62:6, 62:23, 64:1, 64:18, 65:2, 65:9, 66:2, 66:16, 68:2, 68:17, 70:14, 71:7, 96:18, 102:24, 103:7, 104:5, 104:15, 106:24, 116:18, 117:19
**reader** [3] - 50:16, 61:20, 61:24
**readily** [1] - 50:20
**readiness** [1] - 46:6
**reading** [4] - 12:6, 66:9, 71:10, 79:23
**ready** [7] - 10:21, 48:18, 50:18, 57:15, 61:20, 77:3, 131:11
**real** [2] - 67:20, 67:21
**realization** [1] - 64:9
**really** [11] - 31:12, 49:10, 71:9, 71:14, 75:11, 77:6, 84:2, 108:24, 111:7, 115:14, 120:15
**Realtime** [1] - 1:23
**Rear** [1] - 38:22
**reason** [6] - 8:13, 13:13, 14:18, 17:10, 17:12, 85:14
**reasonable** [4] - 103:10, 113:12, 114:6, 114:21
**reasons** [5] - 15:25, 47:1, 84:10, 123:15, 129:3
**REBECCA** [1] - 1:14
**rebuts** [2] - 12:22, 13:4
**receive** [12] - 39:1, 39:5, 39:20, 40:4, 42:8, 45:14, 70:7, 70:10, 70:15, 71:17, 79:16, 107:17
**received** [6] - 25:12, 47:15, 74:18, 87:20, 99:25, 113:14

**receives** [2] - 70:11, 113:22
**recently** [3] - 43:3, 91:4, 127:23
**Recessed** [1] - 57:12
**recipient** [1] - 96:21
**recitation** [1] - 50:11
**recognize** [9] - 12:4, 18:23, 25:1, 52:4, 92:15, 95:25, 99:17, 112:24, 113:1
**recollection** [8] - 8:15, 43:6, 43:15, 47:23, 58:17, 63:8, 72:17, 74:10
**recommend** [1] - 115:25
**recommendation** [1] - 56:6
**record** [5] - 33:3, 36:22, 100:17, 101:7, 132:15
**Record** [1] - 1:25
**records** [3] - 32:9, 32:14, 32:19
**recusal** [7] - 55:13, 56:3, 64:21, 65:7, 65:8, 65:10, 65:20
**recuse** [2] - 65:11, 106:10
**recused** [2] - 30:8, 56:5
**red** [4] - 118:13, 118:14, 120:24, 130:1
**Redirect** [2] - 2:4, 2:6
**redirect** [2] - 21:9, 87:10
**REDIRECT** [2] - 21:11, 87:11
**Reeves** [2] - 132:13, 132:19
**REEVES** [2] - 1:22, 132:19
**refer** [1] - 37:17
**reference** [7] - 50:18, 61:8, 63:20, 73:19, 79:2, 125:20, 127:10
**references** [15] - 58:4, 60:12, 61:4, 61:6, 61:17, 61:18, 61:20, 61:23, 73:8, 73:10, 73:13, 73:16, 78:23, 80:12, 80:15
**reflect** [1] - 128:3
**reflection** [1] - 40:25
**refresher** [1] - 42:13
**refreshers** [1] - 71:18
**refusal** [2] - 120:5,

120:11
**regarding** [4] - 66:5, 67:13, 95:18, 130:15
**regardless** [2] - 3:19, 5:25
**Registered** [1] - 1:23
**regret** [1] - 116:22
**regularly** [3] - 100:17, 100:21, 101:7
**regulation** [3] - 61:9, 73:24
**regulations** [8] - 38:3, 50:7, 73:17, 74:1, 80:15, 97:20, 97:23, 132:15
**Regulations** [2] - 46:20, 61:14
**reinforce** [1] - 48:4
**reject** [1] - 79:17
**rejected** [4] - 66:6, 66:7, 66:18, 80:1
**rejection** [7] - 77:5, 77:15, 78:1, 78:5, 105:24, 105:25, 106:6
**related** [5] - 56:4, 56:6, 97:16, 106:11, 112:15
**relates** [2] - 53:16, 58:10
**relation** [2] - 34:1, 34:13
**relations** [1] - 90:18
**relationship** [6] - 43:1, 43:8, 44:11, 72:13, 102:17, 118:25
**relationships** [1] - 63:4
**relatively** [2] - 112:3, 114:10
**releasable** [1] - 104:21
**relevance** [4] - 12:13, 18:4, 20:22, 86:2
**relevant** [8] - 15:10, 16:25, 17:1, 20:15, 41:5, 68:23, 103:11, 107:1
**relook** [1] - 53:7
**rely** [4] - 43:11, 68:13, 80:20, 115:16
**relying** [1] - 119:1
**remedy** [1] - 64:14
**remember** [5] - 21:20, 24:24, 26:18, 35:19, 43:2
**remind** [1] - 57:16
**reminded** [2] - 10:22, 57:7
**reminder** [2] - 46:5,

51:14
**remove** [3] - 120:7, 120:12, 121:4
**removed** [1] - 123:12
**removing** [1] - 121:6
**rental** [1] - 67:21
**report** [11] - 66:4, 66:19, 67:14, 67:18, 68:22, 69:2, 79:21, 80:2, 81:7, 81:9, 81:11
**reportable** [1] - 66:13
**reported** [2] - 22:18, 68:20
**Reporter** [4] - 1:23, 1:23, 1:24, 132:13
**reporter** [1] - 89:24
**REPORTER** [1] - 132:20
**reports** [3] - 50:8, 54:12, 68:4
**represent** [1] - 13:12
**represented** [2] - 15:19, 15:20
**representing** [2] - 72:1, 72:7
**request** [1] - 109:12, 121:21, 123:18, 124:3, 124:12, 125:7, 126:12, 126:15, 129:19, 130:18
**requesting** [2] - 127:8, 128:2
**requests** [2] - 128:7, 129:3
**require** [4] - 46:6, 60:19, 77:8, 79:14
**required** [20] - 39:12, 40:9, 41:2, 51:24, 52:9, 52:11, 52:14, 53:17, 54:11, 55:14, 65:21, 67:5, 68:4, 68:19, 68:21, 80:14, 98:3, 127:4, 127:13, 127:14
**requirement** [4] - 48:15, 56:4, 98:8, 106:15
**requires** [2] - 40:19, 64:19
**requiring** [2] - 4:6, 115:4
**requisite** [1] - 68:20
**research** [2] - 109:3, 118:20
**resides** [1] - 47:11
**resign** [1] - 86:12
**resolution** [1] -

88:12
**resolve** [3] - 55:23, 56:1, 56:7
**resource** [1] - 41:11
**resources** [4] - 41:9, 43:17, 69:3, 88:16
**respect** [9] - 27:22, 39:1, 39:21, 59:15, 64:11, 67:5, 88:1, 106:18, 127:9
**respectfully** [3] - 110:6, 124:9, 124:15
**respond** [2] - 9:8, 122:20, 130:5
**responding** [1] - 105:9
**response** [4] - 12:18, 23:1, 110:12, 126:20
**responsibilities** [1] - 59:11
**responsibility** [5] - 42:3, 48:14, 51:16, 55:2, 88:21
**responsible** [4] - 46:13, 69:10, 69:12, 81:2
**rest** [5] - 73:14, 115:18, 131:10, 131:24, 131:25
**rested** [1] - 109:21
**restrictions** [1] - 97:24
**result** [3] - 73:5, 83:10, 129:10
**resulting** [1] - 31:12
**results** [1] - 76:10
**resume** [1] - 10:21
**retain** [1] - 64:11
**retire** [9] - 37:11, 77:3, 85:10, 85:13, 85:14, 85:20, 85:23, 86:25
**retired** [1] - 86:15
**retirement** [5] - 37:14, 38:11, 76:14, 86:9, 86:12
**return** [2] - 108:2, 109:3
**reveal** [3] - 89:1, 89:6, 89:8
**review** [15] - 11:22, 17:4, 40:24, 48:3, 50:5, 52:18, 53:1, 53:14, 53:15, 54:18, 54:19, 54:22, 68:19, 70:17, 89:9
**reviewed** [2] - 82:8, 100:4
**reviewing** [3] - 17:5, 48:8, 72:23

**reviews** [2] - 28:3, 28:16
**revised** [2] - 48:3, 50:21
**revisited** [1] - 40:1
**rhetoric** [1] - 128:19
**Rhode** [1] - 90:21
**Richardson** [2] - 84:18, 84:21
**Ring** [1] - 127:16
**risk** [1] - 77:6
**Robert** [4] - 27:10, 42:20, 43:1, 91:25
**ROBERT** [1] - 1:6
**Robertson** [1] - 127:17
**role** [15] - 37:24, 38:12, 44:7, 44:18, 53:1, 72:3, 72:5, 72:7, 91:7, 91:19, 93:1, 97:1, 97:2, 97:13, 100:18
**room** [1] - 47:20
**ROSS** [76] - 1:14, 7:14, 8:6, 8:19, 8:21, 12:12, 13:20, 14:7, 18:4, 19:3, 20:22, 21:10, 21:12, 21:15, 21:19, 23:7, 23:11, 24:2, 24:21, 24:23, 25:6, 25:7, 26:2, 26:10, 27:5, 27:8, 28:6, 28:8, 28:19, 28:21, 29:3, 29:5, 29:22, 29:24, 30:11, 30:13, 31:21, 31:23, 32:25, 33:5, 33:8, 33:23, 33:25, 34:8, 34:12, 35:16, 35:17, 36:8, 36:15, 36:20, 44:3, 44:6, 45:4, 45:7, 45:19, 45:20, 49:16, 49:18, 54:6, 54:8, 56:8, 56:19, 57:18, 57:22, 59:5, 59:6, 60:8, 60:9, 63:11, 63:12, 69:22, 82:23, 82:25, 86:2, 87:12, 115:17
**Ross** [9] - 2:4, 2:5, 2:6, 7:13, 15:10, 21:9, 56:18, 57:17, 87:10
**rotate** [1] - 54:5
**rough** [1] - 131:18
**routinely** [3] - 40:1, 48:3, 48:5
**Royal** [2] - 28:11, 31:4
**rule** [8] - 3:5, 5:19, 47:5, 74:21, 79:24,

87:24, 88:5, 130:5
**Rule** [4] - 3:9, 3:12, 4:23, 9:20
**ruled** [1] - 112:23
**rules** [31] - 3:25, 4:12, 39:21, 39:22, 42:5, 44:24, 45:2, 46:18, 47:9, 48:9, 49:1, 50:11, 50:19, 51:14, 52:22, 52:23, 60:16, 62:5, 63:22, 77:8, 77:11, 84:16, 88:2, 88:6, 88:13, 95:19, 97:20, 97:23, 98:11, 98:21
**Rules** [1] - 4:4
**ruling** [1] - 10:16
**run** [1] - 53:11
**running** [2] - 27:19, 88:10
**rushed** [1] - 29:13

**S**

**safe** [1] - 80:19
**sailor** [1] - 31:5
**sailors** [1] - 46:9
**salary** [2] - 76:6, 76:12
**sanction** [1] - 73:6
**sat** [1] - 66:21
**saw** [3] - 13:1, 18:25, 100:25
**scale** [1] - 27:19
**scheduled** [1] - 33:19
**scheduling** [2] - 56:21, 130:15
**scheme** [3] - 125:3, 125:25, 126:2
**school** [6] - 38:9, 42:9, 48:17, 48:21, 71:20, 71:22
**schoolhouse** [1] - 98:23
**science** [1] - 90:19
**scope** [3] - 20:23, 86:2, 86:17
**scratch** [1] - 99:22
**screen** [2] - 77:21, 96:13
**screens** [1] - 93:13
**scroll** [3] - 11:25, 23:9, 26:7
**sealed** [2] - 57:8, 57:10
**searching** [2] - 63:23, 77:23
**seat** [1] - 109:6
**SEBASTIAN** [2] -

2:3, 10:25
**second** [11] - 25:8, 30:25, 48:2, 54:13, 62:16, 62:22, 64:18, 94:17, 94:18, 104:15, 118:19
**Secretary** [2] - 37:21, 60:14
**secretary** [4] - 61:11, 61:12, 61:13, 81:8
**Section** [1] - 83:6
**section** [15] - 60:11, 63:14, 67:12, 67:22, 73:19, 77:23, 78:2, 78:4, 78:11, 78:16, 82:19, 113:10, 113:19, 116:24, 117:14
**sections** [3] - 40:22, 73:7
**securities** [1] - 20:20
**Security** [1] - 90:3
**security** [3] - 90:20, 90:23, 97:6
**see** [37] - 4:4, 8:6, 17:4, 21:1, 22:13, 22:25, 23:10, 25:3, 25:8, 25:16, 28:22, 29:2, 29:6, 29:10, 29:21, 30:2, 30:22, 34:16, 36:6, 45:8, 45:11, 50:25, 57:2, 57:11, 58:3, 58:9, 58:15, 61:6, 65:22, 77:21, 83:8, 93:13, 96:13, 99:14, 102:1, 109:16, 124:1
**seeing** [1] - 16:8
**seek** [1] - 19:8
**seeking** [23] - 59:9, 59:17, 59:18, 59:24, 64:2, 64:10, 64:14, 64:10, 66:14, 66:22, 67:2, 75:25, 76:2, 76:9, 76:16, 76:20, 77:9, 77:16, 105:5, 105:12, 105:15, 105:21, 106:17
**seeks** [1] - 113:22
**selected** [3] - 38:22, 39:24, 43:4
**self** [3] - 13:22, 53:3, 99:2
**self-assess** [1] - 53:3
**self-serving** [1] - 13:22
**self-study** [1] - 99:2
**send** [7] - 9:14, 28:10, 34:1, 47:21,

55:21, 69:14, 118:12
**sending** [5] - 27:12, 46:13, 51:11, 69:11, 112:16
**sends** [2] - 69:18, 70:15
**senior** [9] - 37:20, 37:23, 46:3, 47:18, 48:16, 60:17, 60:18, 93:12, 97:4
**sense** [2] - 73:2, 88:7
**sent** [23] - 5:4, 6:13, 23:1, 23:12, 26:9, 26:11, 27:2, 28:11, 29:16, 31:15, 32:15, 32:17, 32:19, 33:2, 34:25, 36:1, 46:11, 46:12, 47:16, 47:25, 48:9, 51:5, 51:19
**sentence** [12] - 6:5, 27:11, 29:6, 30:19, 30:23, 62:13, 62:16, 96:18, 114:21, 115:3, 117:2, 118:4
**September** [1] - 26:8
**serve** [3] - 37:9, 72:6, 97:9
**served** [1] - 38:10
**service** [9] - 38:15, 47:19, 64:7, 65:19, 68:11, 72:7, 104:6, 125:23, 127:1
**services** [2] - 39:10, 40:21
**serving** [2] - 13:22, 41:24
**Session** [1] - 1:9
**sessions** [2] - 39:19, 58:18
**set** [2] - 88:5, 88:6
**several** [3] - 61:11, 95:11, 122:21
**shall** [3] - 55:11, 58:22, 59:8
**share** [4] - 28:2, 28:15, 29:20, 51:17
**ship** [1] - 44:19
**short** [10] - 7:11, 10:6, 37:17, 98:25, 111:2, 111:6, 117:19, 124:4, 124:13, 130:23
**shorter** [2] - 108:12, 108:14
**show** [5] - 5:2, 8:3, 32:12, 61:22, 101:14
**showing** [1] - 100:24
**shown** [1] - 69:14
**side** [4] - 51:14, 62:17, 102:22, 119:12
**sidebars** [1] - 57:8

**sign** [2] - 70:20, 70:25
**signature** [4] - 50:25, 51:1, 70:18, 71:7
**signed** [5] - 14:8, 34:18, 51:9, 71:8, 82:9
**significant** [1] - 112:15
**signs** [1] - 70:13
**similar** [6] - 6:13, 42:2, 54:1, 83:20, 83:22, 123:15
**similarly** [3] - 40:5, 42:1, 62:13
**simplified** [5] - 79:8, 79:14, 80:3, 80:8, 80:23
**simplifies** [1] - 115:19
**simply** [2] - 58:8, 117:2
**sit** [2] - 128:15, 129:4
**sitting** [1] - 21:1
**situated** [1] - 62:14
**situation** [9] - 62:1, 67:8, 67:25, 79:25, 88:7, 88:15, 88:20, 119:11, 119:18
**six** [2] - 38:14, 42:24
**Sixth** [2] - 116:15, 126:13
**SJAs** [1] - 107:5
**slide** [6] - 100:2, 103:5, 103:24, 105:3, 106:22, 106:24
**slightly** [2] - 113:4, 131:25
**slower** [1] - 108:21
**small** [2] - 15:7, 27:19
**small-scale** [1] - 27:19
**smile** [1] - 15:1
**smoother** [1] - 53:11
**Snyder** [1] - 127:23
**sole** [1] - 83:25
**solicited** [1] - 105:8
**solid** [1] - 53:6
**someone** [5] - 42:16, 65:10, 65:11, 119:21, 130:1
**sometimes** [6] - 52:21, 52:22, 73:6, 83:22, 91:13, 94:14
**somewhat** [1] - 113:2
**somewhere** [3] - 16:4, 75:17, 121:20
**SONJA** [2] - 1:22,

132:19

**Sonja** [2] - 132:13, 132:19

**soon** [3] - 108:10, 122:5, 122:6

**sorry** [6] - 10:19, 33:7, 44:3, 83:3, 105:7, 106:16

**sort** [6] - 41:9, 90:12, 105:12, 123:2, 125:25, 129:18

**sounds** [7] - 17:16, 35:21, 71:24, 86:22, 109:7, 111:9, 121:19

**source** [1] - 84:1

**sources** [1] - 61:19

**Space** [1] - 13:11

**speaking** [2] - 118:15, 123:1

**Special** [1] - 18:17

**special** [1] - 4:5

**specialized** [3] - 70:10, 74:12, 87:14

**specialty** [1] - 43:11

**specific** [22] - 16:20, 40:8, 41:18, 100:2, 101:5, 103:10, 113:10, 113:13, 114:7, 114:9, 114:10, 114:12, 116:13, 116:16, 121:21, 123:18, 126:17, 126:22, 126:24, 127:3, 127:4, 127:7

**specifically** [17] - 15:23, 16:5, 16:8, 16:17, 17:17, 19:13, 20:14, 26:19, 82:19, 86:13, 97:14, 99:1, 106:12, 112:12, 118:16, 121:1, 126:16

**specifies** [1] - 39:8

**spell** [3] - 36:21, 89:24, 127:7

**spelled** [1] - 68:22

**spent** [3] - 71:9, 86:9, 99:4

**spiel** [1] - 10:5

**sport** [2] - 88:9, 88:13

**spouse** [3] - 54:25, 55:25, 103:2

**staff** [29] - 35:23, 36:6, 41:16, 41:20, 41:25, 42:16, 47:8, 50:5, 50:12, 50:17, 51:6, 51:17, 52:25, 53:2, 53:9, 53:15, 88:18, 88:19, 91:4, 91:17, 97:16, 99:21,

104:3, 106:25, 107:2, 107:3, 107:5, 107:8

**staffs** [2] - 41:13, 41:14

**stage** [1] - 59:19

**stand** [3] - 25:4, 110:11, 130:19

**standard** [10] - 47:10, 47:21, 47:24, 48:6, 48:11, 51:24, 69:17, 100:22, 112:11, 112:16

**Standard** [1] - 45:17

**Standards** [1] - 49:20

**standards** [36] - 38:3, 39:9, 42:11, 44:25, 45:2, 46:4, 46:14, 46:23, 47:10, 47:21, 49:11, 49:14, 49:23, 51:12, 51:21, 52:1, 52:9, 52:11, 52:14, 52:20, 53:16, 58:18, 67:2, 70:14, 72:22, 72:25, 73:4, 74:4, 83:19, 87:23, 94:25, 95:3, 95:6, 95:17, 95:19, 96:2

**standing** [1] - 10:16

**star** [11] - 38:24, 38:25, 44:9, 85:17, 85:19, 86:10, 86:15, 93:4, 95:12

**stars** [2] - 93:10, 93:19

**start** [5] - 57:20, 58:7, 83:25, 86:19, 91:19

**started** [4] - 11:12, 16:13, 16:17, 40:15

**starting** [4] - 14:16, 27:16, 81:19, 112:6

**starts** [1] - 81:3

**state** [6] - 36:21, 89:23, 121:7, 121:23, 122:9, 122:11

**statement** [21] - 3:11, 3:19, 3:22, 3:24, 4:1, 4:12, 4:16, 5:25, 7:2, 8:5, 10:8, 13:23, 14:21, 14:24, 29:25, 58:8, 106:1, 112:1, 120:19, 129:9

**statements** [21] - 4:18, 4:22, 5:10, 5:20, 6:25, 7:20, 7:22, 8:1, 8:12, 8:17, 8:19, 8:25, 9:21, 12:23, 13:5, 13:22, 69:6, 101:12, 101:25, 120:23, 121:5

**STATES** [2] - 1:1, 1:3

**States** [14] - 1:13, 37:8, 61:7, 80:10, 90:2, 90:10, 91:9, 94:5, 127:16, 127:17, 128:8, 128:21, 132:13, 132:16

**statistical** [1] - 31:8

**status** [1] - 40:25

**statute** [7] - 40:19, 75:13, 79:6, 85:12, 125:12, 127:14, 127:15

**statutes** [1] - 46:19, 50:7, 60:13, 61:6, 63:9, 73:16, 80:15

**statutory** [1] - 125:19

**stay** [2] - 22:4, 130:18

**stayed** [1] - 22:21

**staying** [1] - 22:18

**stays** [1] - 63:16

**steady** [1] - 46:6

**stems** [2] - 39:3, 40:19

**stenographic** [1] - 132:14

**Stenographic** [1] - 1:25

**step** [2] - 36:10, 89:12

**steps** [2] - 26:14, 26:25

**still** [17] - 5:8, 6:14, 8:21, 10:23, 26:11, 56:17, 56:24, 57:16, 77:9, 91:21, 107:4, 109:17, 111:8, 111:13, 115:12, 119:22, 132:1

**STOCK** [2] - 54:12, 64:19

**stocks** [2] - 55:4, 67:20

**stop** [1] - 107:24

**strategic** [1] - 90:21

**stray** [1] - 60:23

**Street** [1] - 1:14

**strengthened** [1] - 116:25

**strike** [1] - 112:23

**strong** [3] - 16:7, 53:8, 53:11

**structured** [2] - 25:9, 33:18

**stuck** [6] - 6:17, 7:17, 7:21, 9:4, 9:15, 121:20

**studies** [1] - 90:21

**study** [1] - 99:2

**stuff** [3] - 8:22, 27:3, 71:14

**sub** [1] - 104:16

**sub-points** [1] - 104:16

**subject** [9] - 4:3, 45:16, 45:18, 49:19, 49:20, 65:16, 70:22, 71:4, 130:7

**subjects** [2] - 20:6, 46:19

**submit** [1] - 110:2, 124:15, 125:5

**submitted** [2] - 109:24, 111:1

**submitting** [1] - 69:5

**subpoena** [1] - 118:18

**substantially** [4] - 30:3, 63:1, 66:3, 78:17

**substantive** [2] - 68:4, 125:1

**succinct** [1] - 58:8

**sudden** [1] - 131:10

**suffice** [1] - 116:5

**sufficient** [1] - 47:5

**suggest** [3] - 8:8, 9:5, 118:4

**suggested** [4] - 25:20, 25:25, 34:22, 121:7

**suggesting** [1] - 115:2

**suggestion** [2] - 35:11, 113:19

**suggests** [2] - 120:25, 130:1

**Suite** [1] - 1:17

**sum** [1] - 129:7

**summarizes** [1] - 51:4

**summary** [1] - 91:1

**supervises** [2] - 37:24, 38:4

**supervisor** [4] - 54:18, 55:20, 68:5, 106:16

**supplement** [2] - 95:16, 95:18

**supplemental** [1] - 95:5

**supplied** [1] - 125:9

**support** [5] - 4:3, 38:5, 125:7, 126:14, 128:7

**supported** [1] - 3:16

**supporting** [3] - 3:10, 111:4, 116:12

**supports** [1] -

123:20

**supposed** [1] - 61:5

**Supreme** [3] - 123:22, 127:23, 130:25

**surrounding** [1] - 118:1

**suspected** [1] - 113:24

**sustain** [1] - 19:20

**sustained** [4] - 15:14, 18:6, 19:24, 20:24

**sustaining** [2] - 15:11, 96:23

**SWORN** [3] - 10:25, 36:18, 89:18

**synonymous** [1] - 126:24

## T

**tailored** [1] - 100:2

**talks** [2] - 4:5, 7:10

**taught** [2] - 48:10, 101:15

**team** [9] - 16:10, 18:15, 19:15, 31:11, 81:3, 88:9, 88:13, 88:16, 88:22

**technical** [1] - 65:2

**Technical** [1] - 68:17

**telecommunications** [1] - 32:11

**template** [1] - 99:25

**templates** [1] - 50:11

**ten** [1] - 130:23

**tendency** [1] - 79:3

**tenure** [1] - 87:22

**term** [7] - 65:2, 75:2, 75:15, 75:16, 79:13, 85:10, 116:16

**terms** [2] - 75:1, 118:24

**testified** [15] - 3:17, 4:4, 6:6, 6:7, 7:1, 8:11, 8:24, 9:10, 9:12, 21:2, 32:5, 47:1, 81:3, 93:20, 95:18

**testify** [3] - 8:2, 10:3, 101:11

**testifying** [4] - 5:1, 7:16, 18:5, 32:22

**testimony** [9] - 5:20, 9:22, 10:15, 56:15, 57:15, 89:12, 100:5, 108:2, 108:4

**text** [4] - 17:13, 31:24, 102:24, 103:7

**texts** [1] - 130:9

**THE** [156] - 1:1, 1:10, 1:13, 1:19, 2:2, 3:7, 4:25, 5:19, 6:4, 6:16, 7:3, 7:13, 8:4, 8:16, 8:20, 9:7, 9:18, 10:12, 10:19, 11:25, 12:14, 13:7, 14:23, 15:4, 15:8, 15:14, 18:6, 19:5, 19:9, 19:17, 19:20, 19:24, 20:24, 21:8, 24:1, 26:1, 26:7, 32:23, 34:10, 36:10, 36:12, 36:14, 44:2, 56:10, 56:17, 56:20, 57:1, 57:14, 69:23, 86:4, 86:22, 87:2, 87:4, 87:9, 89:11, 89:14, 92:22, 95:7, 95:10, 95:11, 95:13, 95:14, 96:23, 100:14, 100:16, 100:23, 101:6, 101:14, 101:21, 101:23, 102:5, 107:24, 109:6, 109:13, 109:15, 109:22, 109:24, 110:2, 110:5, 110:15, 110:23, 111:9, 111:13, 111:16, 111:25, 112:4, 112:8, 112:12, 112:19, 112:25, 113:3, 113:5, 113:8, 113:16, 114:2, 114:9, 114:20, 114:24, 115:1, 115:6, 115:12, 115:20, 115:23, 116:8, 116:11, 116:15, 116:20, 117:6, 117:10, 117:16, 117:18, 118:8, 118:11, 118:17, 119:13, 119:16, 119:25, 120:3, 120:10, 120:16, 120:22, 121:5, 121:11, 121:15, 121:22, 122:4, 122:7, 122:13, 122:19, 123:16, 123:19, 123:22, 123:25, 124:7, 124:17, 124:25, 125:11, 125:15, 126:5, 126:10, 126:22, 127:6, 128:4, 128:13, 128:22, 129:1, 129:15, 129:22, 130:8, 130:13, 130:21, 131:6, 131:12, 131:17,

132:2, 132:7
**themselves** [4] - 65:11, 67:9, 106:10, 125:24
**theory** [1] - 109:24
**they've** [3] - 5:10, 7:19, 13:19
**thinking** [3] - 8:10, 50:10, 130:22
**third** [4] - 32:12, 66:1, 78:16, 85:19
**third-party** [1] - 32:12
**three** [21] - 13:18, 15:2, 30:16, 38:17, 38:18, 38:24, 64:21, 71:22, 85:7, 85:10, 85:13, 85:14, 85:19, 85:22, 86:1, 86:8, 86:13, 86:15, 87:1, 123:2
**three-day** [1] - 71:22
**three-star** [1] - 86:15
**three-year** [1] - 85:7
**threshold** [4] - 79:9, 80:4, 80:8, 80:24
**throughout** [9] - 42:14, 49:12, 87:21, 91:2, 95:6, 98:24, 115:18, 119:2, 119:19
**thumbs** [1] - 84:22
**Thursday** [2] - 45:23, 108:11
**timeframe** [3] - 15:10, 46:17, 92:10
**timeline** [2] - 11:7, 34:21
**TIMOTHY** [1] - 1:20
**title** [8] - 38:23, 43:23, 61:7, 91:15, 100:1, 103:24, 105:3, 106:22
**Title** [1] - 63:9
**today** [6] - 21:1, 57:2, 89:12, 100:5, 122:3, 130:13
**together** [1] - 112:23
**toll** [4] - 32:9, 32:14, 32:19, 33:2
**tomorrow** [9] - 108:2, 109:3, 131:10, 131:11, 131:18, 131:21, 131:24, 132:4, 132:8
**took** [4] - 12:20, 26:14, 26:25, 72:22
**tool** [3] - 25:4, 88:6
**tools** [1] - 27:19
**top** [17] - 12:6, 22:6, 28:9, 28:20, 29:12,

36:1, 45:16, 58:4, 60:12, 61:4, 63:25, 64:1, 73:7, 80:12, 93:20, 95:7, 95:11
**top-ranking** [1] - 95:7
**topic** [5] - 39:8, 39:25, 40:5, 103:17, 103:18
**topics** [9] - 39:6, 39:24, 54:4, 54:5, 60:22, 98:11, 99:1, 101:5, 102:9
**total** [2] - 31:5, 131:22
**toto** [1] - 113:6
**touch** [2] - 39:9, 66:1
**touchstones** [1] - 63:20
**tour** [1] - 92:9
**tours** [1] - 38:14
**towards** [1] - 105:17
**tradition** [1] - 85:13
**train** [3] - 31:13, 98:10, 99:20
**trained** [6] - 42:5, 98:17, 98:21, 99:4, 101:4, 103:18
**trainers** [1] - 31:13
**Training** [1] - 53:19
**training** [59] - 27:23, 27:25, 28:3, 28:16, 35:6, 35:12, 39:1, 39:3, 39:5, 39:13, 39:16, 39:19, 39:20, 39:24, 40:2, 40:4, 40:6, 40:7, 40:8, 42:8, 42:13, 42:15, 48:15, 48:21, 48:23, 48:24, 48:25, 53:21, 53:24, 54:3, 58:8, 58:18, 70:8, 70:10, 71:17, 71:18, 71:19, 74:13, 74:17, 78:15, 87:14, 87:21, 98:4, 98:7, 98:9, 98:15, 98:22, 98:23, 98:24, 99:6, 99:8, 100:2, 100:8, 100:20, 102:10, 104:2, 104:4, 105:1
**transaction** [1] - 54:12
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:9
**transcript** [3] - 132:14, 132:14, 132:15
**transition** [1] - 63:18
**transparency** [1] -

66:19
**travel** [1] - 102:11
**treat** [2] - 62:13, 83:20
**treatment** [2] - 62:8, 62:15
**TREVOR** [2] - 1:10, 1:16
**trial** [3] - 110:9, 115:18, 119:4
**TRIAL** [2] - 1:9
**trickery** [1] - 59:14
**tried** [2] - 49:3, 77:24
**trip** [1] - 22:4
**troops** [1] - 29:9
**true** [10] - 5:5, 7:23, 8:10, 8:13, 20:21, 69:6, 75:9, 100:7, 110:18, 132:14
**truly** [1] - 61:1
**trust** [7] - 17:21, 17:23, 64:7, 65:20, 68:12, 103:16, 104:6
**truth** [9] - 13:21, 14:1, 14:9, 14:12, 14:20, 100:23, 101:15, 101:20, 101:24
**truthful** [2] - 5:3, 5:18
**truthfully** [1] - 41:3
**truthfulness** [1] - 88:25, 89:4
**try** [2] - 30:21, 132:4
**trying** [9] - 4:23, 4:25, 6:13, 13:25, 14:9, 14:14, 86:20, 113:19, 128:4
**turn** [1] - 82:2
**turned** [1] - 65:3
**turning** [1] - 97:1
**turnover** [2] - 53:9, 53:10
**turns** [2] - 54:24, 80:20
**two** [32] - 9:25, 13:18, 15:1, 23:4, 27:24, 28:20, 35:3, 38:24, 42:10, 44:8, 44:10, 47:2, 54:19, 55:24, 56:18, 58:20, 62:4, 62:13, 63:25, 67:7, 71:20, 76:22, 85:15, 86:11, 86:25, 98:25, 112:19, 114:17, 114:19, 123:5, 131:15, 132:9
**two-week-long** [1] - 42:10
**type** [6] - 42:8,

48:21, 67:17, 77:12, 91:17, 107:7
**typically** [2] - 82:17, 87:17

**U**

**U.S** [5] - 27:13, 31:4, 93:11, 94:2, 118:22
**U.S.C** [8] - 79:5, 103:3, 114:13, 125:12, 125:20, 127:5, 127:11, 128:12
**ultimately** [8] - 20:3, 20:20, 43:25, 71:8, 76:10, 82:10, 83:10, 101:10
**unauthorized** [3] - 58:22, 59:4, 84:14
**unclear** [2] - 25:16, 32:10
**uncommon** [1] - 60:17
**unconditional** [3] - 105:24, 105:25, 106:5
**uncover** [1] - 35:22
**under** [35] - 3:5, 3:14, 4:19, 6:18, 10:23, 11:5, 11:11, 14:17, 14:19, 14:20, 15:16, 15:17, 31:4, 38:1, 44:10, 44:20, 53:19, 54:9, 57:16, 61:12, 62:5, 67:2, 68:2, 73:3, 80:19, 104:21, 112:10, 112:16, 114:13, 123:3, 123:9, 124:21, 127:5, 131:23
**undergo** [3] - 98:3, 98:6, 98:9
**undergone** [1] - 87:20
**understandable** [1] - 47:6
**understood** [6] - 41:7, 53:12, 58:14, 74:24, 77:11, 131:2
**unequivocal** [4] - 76:19, 76:21, 76:24, 77:5
**unexpected** [1] - 120:15
**unfair** [2] - 62:15, 64:13
**unfortunately** [1] - 117:12
**Uniform** [1] - 73:3
**uniform** [2] - 37:23, 39:11

**uniformed** [4] - 63:17, 94:18, 94:22, 97:4
**UNITED** [2] - 1:1, 1:3
**United** [14] - 1:13, 37:8, 61:7, 80:10, 90:2, 90:10, 91:9, 94:5, 127:16, 128:8, 128:21, 132:13, 132:16
**University** [2] - 90:19, 90:22
**unlawful** [1] - 123:13
**unless** [6] - 4:13, 116:2, 116:5, 120:3, 120:14, 132:4
**unofficial** [1] - 112:24
**unrelated** [2] - 5:2, 6:9
**unsolicited** [2] - 105:6, 105:8
**untrue** [1] - 5:9
**untruthful** [5] - 5:16, 5:22, 6:10, 6:11, 6:22
**up** [42] - 7:25, 11:15, 16:21, 18:20, 21:15, 21:17, 23:7, 23:9, 24:21, 26:7, 27:5, 28:6, 28:19, 29:22, 31:21, 33:5, 33:6, 33:23, 34:6, 45:4, 50:25, 55:22, 56:17, 57:19, 57:25, 77:18, 78:23, 80:12, 82:7, 82:22, 84:22, 86:5, 94:11, 96:7, 109:18, 109:21, 110:11, 125:16, 129:7, 131:6, 131:18, 131:21
**update** [2] - 74:2, 108:6
**updated** [1] - 81:2
**useful** [1] - 50:18
**user** [1] - 47:6
**user-friendly** [1] - 47:6

**V**

**value** [3] - 113:23, 115:11, 127:20
**various** [5] - 4:10, 7:20, 38:24, 40:21, 60:13
**vary** [1] - 48:11
**VCNO** [11] - 47:21, 70:10, 70:13, 72:20, 74:8, 87:14, 94:14, 94:16, 94:20, 94:25,

95:8
**VCNOs** [1] - 87:17
**venues** [1] - 39:15
**veracity** [1] - 7:20
**verbal** [5] - 6:15, 24:18, 35:23, 35:24, 84:22
**verbally** [2] - 36:2, 84:13
**Verizon** [1] - 32:11
**version** [1] - 31:3
**versus** [5] - 117:7, 127:16, 127:17, 128:7, 128:21
**via** [1] - 32:17
**viable** [1] - 6:14
**vice** [26] - 44:2, 44:4, 44:7, 44:8, 44:9, 44:12, 44:14, 44:18, 44:20, 44:23, 50:4, 51:1, 51:2, 51:3, 51:6, 51:8, 69:13, 69:18, 74:11, 74:12, 74:17, 74:20, 81:5, 85:3, 86:10, 94:13
**view** [4] - 76:8, 105:17, 120:20, 129:12
**villa** [1] - 22:5
**violate** [1] - 59:1
**violated** [1] - 73:5
**violation** [3] - 15:18, 73:3, 73:20
**violations** [2] - 44:24, 107:20
**Virginia** [1] - 123:23
**virtue** [1] - 63:3
**visibility** [2] - 47:8, 51:13
**visit** [1] - 13:11
**vs** [1] - 1:5

**W**

**waiver** [1] - 85:23
**wants** [7] - 13:16, 14:22, 105:21, 106:7, 123:11, 129:1, 130:10
**War** [1] - 90:21
**war** [1] - 49:10
**ward** [1] - 47:20
**warning** [1] - 82:17
**Washington** [4] - 1:11, 1:15, 1:17, 1:25
**ways** [3] - 48:10, 55:24, 76:22
**wearing** [1] - 85:19
**Wednesday** [12] - 30:15, 108:11, 108:12, 108:14,

130:18, 130:19, 130:22, 131:19, 132:1, 132:5
**week** [7] - 34:16, 35:6, 42:10, 57:5, 98:25, 108:10
**weeks** [3] - 30:16, 35:3, 71:20
**welcome** [2] - 10:19, 57:14
**well-meaning** [1] - 77:12
**WhatsApp** [6] - 24:8, 32:4, 32:5, 32:13, 32:15, 33:1
**whole** [7] - 11:22, 12:4, 15:3, 46:1, 53:18, 78:8, 115:14
**Wi** [3] - 32:15, 32:19, 33:2
**Wi-Fi** [3] - 32:15, 32:19, 33:2
**wide** [1] - 43:16
**widely** [6] - 41:7, 53:12, 58:14, 74:24, 77:11, 119:18
**wife** [1] - 22:3
**WILMOT** [1] - 1:16
**wine** [2] - 115:11, 115:15
**winks** [2] - 117:23, 128:18
**Wisconsin** [1] - 90:20
**withdraw** [1] - 18:19
**withheld** [3] - 68:24, 89:1, 89:6
**withhold** [1] - 41:5
**WITNESS** [8] - 10:25, 11:25, 26:7, 36:12, 36:18, 89:18, 95:10, 95:13
**witness** [32] - 3:17, 3:23, 4:2, 4:7, 4:9, 4:13, 5:7, 5:13, 6:6, 11:16, 36:14, 36:15, 36:17, 86:17, 87:4, 89:14, 89:17, 92:12, 99:10, 101:10, 101:12, 102:2, 109:14, 118:9, 118:21, 119:1, 119:22, 120:5, 120:8, 120:11, 129:25, 130:3
**Witness** [2] - 36:13, 89:13
**WITNESSES** [1] - 2:2
**witnesses** [3] - 86:16, 131:5, 131:15
**wonder** [1] - 121:15

**wondering** [1] - 121:22
**word** [2] - 69:12, 71:7
**wording** [1] - 82:21
**words** [7] - 30:8, 45:17, 49:8, 66:11, 118:1, 126:16, 126:18
**works** [1] - 39:7, 50:4, 51:2
**wow** [1] - 53:4
**wrap** [1] - 56:17
**writ** [2] - 75:10, 75:11
**write** [3] - 27:15, 31:7, 55:22
**writing** [3] - 8:9, 106:16, 111:11
**written** [9] - 8:22, 16:4, 75:4, 80:13, 110:13, 110:22, 115:8, 119:15, 122:24
**wrote** [12] - 18:19, 23:4, 23:15, 24:3, 25:3, 25:9, 25:16, 27:9, 29:2, 29:7, 34:16, 66:24

**Y**

**year** [23] - 39:18, 39:25, 42:18, 47:22, 47:24, 50:1, 50:22, 51:4, 51:9, 52:20, 52:24, 53:9, 53:22, 54:5, 69:13, 85:7, 85:10, 86:9, 91:21, 98:9
**year's** [1] - 50:5
**years** [19] - 37:9, 37:10, 38:14, 38:17, 42:24, 50:22, 69:17, 76:14, 85:10, 85:12, 85:14, 85:19, 85:22, 86:1, 86:8, 86:11, 86:13, 90:9, 99:1
**York** [6] - 1:17, 1:21, 33:20, 34:4, 34:14
**Young** [1] - 118:23
**yourself** [5] - 11:19, 64:3, 64:16, 65:9, 99:4

**Z**

**zoom** [3] - 27:6, 28:19, 29:3