1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
2

3      - - - - - - - - - - - - - - - - )

4                                       *
       IN RE:
5                                       *    CASE NO. 2023-R-00151
       ROBERT BURKE
6                                       *

7      - - - - - - - - - - - - - - - - )

8

9                           Grand Jury 23-6

10                          United States District Courthouse
                            333 Constitution Avenue, NW
11                          Washington, DC 20001

12                          Tuesday, May 14, 2024

13

14            The testimony of DENESE CANEDO was taken in the

15     presence of a full quorum of the Grand Jury, commencing at

16     2:02 p.m., before:

17            KATHRYN FIFIELD
              Assistant United States Attorney
18
              TREVOR WILMOT
19            Assistant United States Attorney

20

21

22

23

24     Digitally reported by:

25     Timothy Atkinson, Grand Jury Court Reporter

DOJ-0002598012

1                        E X H I B I T S

2    Exhibit No.          Description              Marked

3       DC-001      List of contract terms          31

4       DC-002      Cell-phone extraction           24

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DOJ-0002598013

<u>P R O C E E D I N G S</u>

1

2   (Whereupon

3                          DENESE CANEDO

4   was called as a witness and, after first being duly sworn

5   by the Foreperson of the Grand Jury, was examined and

6   testified as follows:)

7                          EXAMINATION

8          BY MS. FIFIELD:

9      Q.   Good afternoon.

10     A.   -- I can't see people.  They can't see me, if it

11  matters.  I don't know if it matters, you know?

12         MS. FIFIELD:  You guys just -- you all look so

13  friendly.

14         FOREPERSON:  Just speak up so we can --

15         WITNESS:  Yes.

16         MS. FIFIELD:  Hear in the back.  If anyone can't

17  hear her at any point in time, please just let us know.

18         BY MS. FIFIELD:

19     Q.   All right.  Could you start by introducing

20  yourself to the grand jury and spell your first and last

21  name for the record?

22     A.   My name is Denese Canedo and that's spelled --

23  Denese, D-e-n-e-s-e.  Last name, Canedo, C-a-n-e-d-o.

24     Q.   Okay.  And can you tell the grand jury a little

25  bit about your educational background?

DOJ-0002598014

1        A.    Yes.  I attended public school for my grade years

2   and also undergraduate, and then I attended Columbia

3   University in New York City for graduate school.  I have a

4   master's degree in international security policy and

5   undergraduate degrees in Russian area studies and French.

6        Q.    What about your professional background?

7        A.    I am a federal civil servant, a GS-15, and I've

8   been with the federal government largely for about 27 years.

9   My primary specialty is foreign affairs, political military

10  affairs, specifically.  And I've also worked in

11  congressional relations and strategic communications.

12       Q.    Who have been your employers in the time that

13  you've been a federal government employee?

14       A.    Probably about half my career was with State

15  Department and I have additionally worked a large chunk of

16  my career for DOD or different Department of Defense

17  enterprises.  That includes the Department of the Army and

18  Department of the Navy.  And I've worked for a few other

19  federal agencies as well, and on the Hill.

20       Q.    Were you ever a uniformed member of the armed

21  services?

22       A.    Yes.

23       Q.    What branch?

24       A.    I enlisted in the Army National Guard.  And then

25  after I finished college, I got a direct commission in the

DOJ-0002598015

1    Navy Reserves.  And after a significant break in time, I

2    recently rejoined the Army Reserves as an officer.

3        Q.   So you were an officer in the Navy and now you're

4    an officer in the Army Reserves?

5        A.   Yes.

6        Q.   Okay.  Are you familiar with retired Navy Admiral

7    Robert Burke?

8        A.   Yes.

9        Q.   Were you in a romantic relationship with him?

10       A.   Yes.

11       Q.   When did that relationship begin?

12       A.   It began in May 2021.

13       Q.   And how did it begin?

14       A.   I had a job interview with Admiral Burke for a

15   position with his command.

16       Q.   And what command was that?

17       A.   He worked for Navy Forces Europe and Navy Forces

18   Africa, which was in Italy in Europe.

19       Q.   And what happened after the interview?  When did

20   you hear from him again?

21       A.   A few days after the interview, which was by

22   phone, he contacted me and left a voicemail.  I initially

23   didn't recognize that it was his name or voicemail.  It

24   would've been highly unusual for a four-star admiral to call

25   me.  So I didn't think of much of the voicemail.  It was a

DOJ-0002598016

1  bit garbled. And a few days after that, I got a different

2  voicemail, and it was from him. And it was clear -- says

3  this is Admiral Burke calling again. And then I was -- oh,

4  my gosh. And I contacted him back quickly and he said

5  initially that he was following up from the interview.

6      Q.   And what did he say in the first follow-up call

7  after the interview?

8      A.   He said that he and his executive director, who

9  was a senior executive servant -- that the two of them were

10 very impressed with me. He explained that I was not

11 selected for the position. I was one of the two final

12 candidates. And while I did a really great job, he

13 explained all the reasons that the man they selected was

14 more qualified for that particular position. However, he

15 said that he and his executive director agreed that I was

16 extremely impressive and talented and would be a great asset

17 for the command. And he asked if I was open to staying in

18 touch on future opportunities and that he had already asked

19 his executive director to keep me in mind and look for

20 opportunities.

21     Q.   And you mentioned that the relationship started in

22 May of 2021. Do you recall the date that you interviewed?

23     A.   I believe it was around April 30th. I'm not

24 exactly sure.

25     Q.   So you testified that he was impressed with you.

DOJ-0002598017

1    He wanted to keep in touch.  Did you continue to communicate

2    with him in the days after that?

3        A.   Yes.  When he called me and I contacted him back,

4    he explained that he was actually visiting the Virginia-D.C.

5    area and that he would like the opportunity to meet me if I

6    was open to that, while he was in the area.

7        Q.   And he was visiting because his command was in

8    Italy?

9        A.   Yes.  When I interviewed, I was living in the

10   National Capitol region, interviewing for a position in

11   Italy.  He was stationed in Italy, but he was visiting the

12   D.C. area on official Navy business.

13       Q.   Can you tell the grand jury a little bit about why

14   you were interested in that command over in Italy

15   specifically?

16       A.   Yes.  I'm a political military affairs specialist

17   and so that means that I look at foreign policy,

18   particularly as to use of the military and how the military

19   -- it's kind of like helping the military get along better

20   and more effectively with others and foreign partners and in

21   coalitions.  And so my daughter and I had lived in Italy

22   when she was much younger, when she was a toddler.  I'm a

23   mom of one, a single mom.  Sorry.

24       Q.   It's okay.

25       A.   Sorry.  And I explained to Admiral Burke -- I

DOJ-0002598018

1    explained during the interview that I was very eager to get

2    back to Italy where I had lived with my daughter because she

3    was older and I really wanted to spend more time in Europe

4    with her and have a better quality of life for the two of

5    us.  I'm so sorry.  This --

6         Q.   It's okay.  It's fair to say you had personal and

7    professional reasons for pursuing this job?

8         A.   Yes.

9         Q.   And in the communications that you had with Burke

10   following your interview, at some point did he start to make

11   overtures of a more personal nature towards you?

12        A.   Very quickly, yes.

13        Q.   Can you tell the grand jury about that?

14        A.   Yes.  So initially, he was saying he wanted me on

15   his staff.  Could we keep in touch?  I was very flattered.

16   I said absolutely, of course.  And then he asked if he could

17   meet me while he was in the area to get to know me better.

18   And I said I was open to that.  He had some logistical

19   constraints though.  He was actually taking leave for his

20   only son's wedding in Richmond.  And so we had some

21   logistics to work through.  But it turned personal very

22   quickly because he complimented me a lot.

23             He said he was very impressed and raved about my

24   intelligence and knowledge and experience and other things.

25   And as part of this wanting to get to know me, he said I

DOJ-0002598019

1    should really come to Italy.  And I thought that was very

2    odd.  And he said that he and his wife like to entertain --

3    they like to have company -- and he would very much welcome

4    me coming over.  And I thought that was really weird, and I

5    declined.  But we agreed to stay in touch and possibly meet

6    while he was in the Virginia area.  And then he asked, you

7    know, can I call you back?  And he did.  And then it just

8    got increasingly more personal.  And really right away, like

9    in the probably third phone call we had, he just confessed

10   that he was completely enamored with me -- that he was so

11   impressed during the interview and that while he wanted me

12   to work for him -- that he really wanted to get to know me

13   personally because he basically thought -- it sounds so

14   foolish now, but he basically thought that we were, like,

15   soulmates, and that he thought I was extraordinary and

16   wanted to get to know me personally as well.

17        Q.   How did those overtures make you feel?

18        A.    I was very confused at first and I was

19   overwhelmed.  I was a bit dazzled by his rank and his

20   knowledge and his influence.  He had a tremendous reputation

21   that I was very impressed by.  He was known in my

22   professional circles as being someone very impressive and

23   knowledgeable and powerful.  And I was a single mom and we

24   were coming out of COVID.  I had been rather isolated.  I

25   wasn't dating anyone.  And I also was uncomfortable because

DOJ-0002598020

1    he had mentioned he was married.  And I said whoa, I am not

2    interested in being a third party in anyone's marriage.  I'm

3    not going to have any of that.  It is not fair to me and it

4    is not fair to your spouse.  And he then disclosed that he

5    and his wife basically were friends -- that they had been

6    separated for a number of years -- that they had not been

7    intimate in at least four years.  Again, he's just

8    volunteering this.  He said that they were separated pending

9    divorce, and they will still collegial and they were working

10   things out amicably.  And he also told me that he was so

11   taken with me after the interview that he told his spouse

12   that he had met someone and that he really felt he had to

13   get to know that woman and that he was just very upfront

14   with her -- that it was something he felt so strongly about

15   he had to look into.

16              So he assured me that -- I mean, we had not even

17   physically met at this time, but he assured me that he was

18   going to move forward as quickly as possible in finalizing

19   the divorce.  And he explained that simply because of the

20   nature of both of their lives -- they're both very busy

21   professionals.  She was a dean of a college.  I mean, she's

22   also quite accomplished.  Just because of their busy lives,

23   they had been so busy that they hadn't really followed

24   through with the divorce.  They had a few things to work

25   out, like who was going to keep the house?  Were they going

DOJ-0002598021

1    to sell the house?  Split it?  One take it, one or another?

2    So he made it seem like there were just a few hanging chads.

3           May I also say about the interview -- it really

4    was not a typical job interview.  May I?

5         Q.    Yeah.

6         A.    And I know it may seem really weird to think that

7    he would be enamored with me after an interview, but the way

8    I approach job interviews is -- so I am a single mom and I'm

9    also at a fairly senior level.  And a lot of people --

10   sorry, this is so much -- to me.  I hadn't expected it to be

11   this tough.  A lot of people in my field and who work for

12   the federal government, particularly for DOD, they sacrifice

13   a lot.  And they don't always have that work balance.  And I

14   feel it's important for my employers to know that being a

15   mom is very important to me, and it's something I'm

16   committed to.  And if they hire me -- and I told them

17   straight up in the interview -- I said you can't ask this

18   because you're not allowed to, but I want you to know who

19   you're going to get and what you're going to get if you hire

20   me.  And I want you to know my motivation for wanting this

21   job.  Yes, it's an amazing job.  But I also have an amazing

22   daughter and we love living in Europe.

23          We've loved living in Italy.  She spoke Italian as

24   a child and went to Montessori, and we would love to come

25   back.  And I would love to see Europe with her.  And I also

DOJ-0002598022

1    explained that because I'm a single mom, what that means is

2    I'm going to work very hard for them.  But I'm going to take

3    my leave.  And there's going to be days when I have to the

4    dentist.  And I just -- I think it's very important -- so

5    I'm kind of like open kimono when I interview because I want

6    people to know exactly what they're getting.

7         Q.    Okay.

8         A.    So I volunteered a lot personally that an employer

9    wouldn't necessarily ask in an interview.

10        Q.    And did you ultimately make the decision to go

11   meet him in Richmond?

12        A.    I did.

13        Q.    And why did you make that decision?

14        A.    I had a lot of trust and confidence in his

15   judgement because of his position and his authority and his

16   rank.  He not only was a four-star admiral in the Navy.  He

17   had been the number one chief of personnel for the Navy.

18   It's called chief of personnel.  He had been the number two

19   overall officer in the Navy called the Vice CNO, the Vice

20   Chief of Naval Operations.  And also his career, he's a

21   submariner.  And submariners at that level, as officers,

22   deal throughout their careers with nuclear weapons.  And

23   because of my position at that time at the Pentagon, I knew

24   that he had about a third of the Earth's surface, plus the

25   Russia threat, all in his region.  He was responsible for

DOJ-0002598023

1    all of military naval operations in Europe and in Africa.

2    And again that includes, like, the Arctic.  It's an immense,

3    huge swatch of the world.  But not just the region -- but

4    over 30,000 personnel and nuclear weapons.  And I mean, in

5    the Navy, people who work with those weapons have a lot of

6    responsibility.

7         So because of the positions he had had and because

8    of his field and influence, I thought he was a person of

9    integrity and a person that I could believe in.  And

10   basically, like, in our third phone call, he's professing

11   his love for me.  And I said you don't even know me.  And he

12   said at my level and in my career, I make snap judgements

13   about people all the time.  I size people up.  I know them.

14   I know myself and I know that you're an amazing person and

15   that I've never felt this way in my life.  He told me even

16   before we met I've been in love in my life three times.

17   This is the third time.  I married the other two.  And so I

18   agreed to meet him.  I'm sorry.

19        Q.   It's okay.

20        A.   I'm sorry.  This is humbling.  Because obviously,

21   I didn't have the best judgement of character.

22        Q.   Did you spend the night together in Richmond?

23        A.   Yes.

24        Q.   And what happened while on that night and the next

25   day?

DOJ-0002598024

1          A.    So he took a leave from his family and his son and

2     his spouse and their wedding party to come meet me and spend

3     the night with me.  He told me that his family knew that he

4     had another engagement that night and that -- he basically,

5     as soon as we met and through the night and into the next

6     morning, continued to profess his love.  And he said that he

7     was more convinced than ever that we had to have a full

8     partnership in every way -- that he wanted us to live our

9     lives together.  And he basically swept me off my feet and

10    we were intimate that night.  We had sexual relations.  And

11    he said that he wanted to unify our lives from that moment

12    forward.  And because he's a four-star and every moment of

13    his schedule was packed, he basically did a data dump and

14    synching with my schedule and basically briefed me on where

15    he was going to be for the next two months.

16          So I had his full schedule.  He gave me a full

17    range of his contact information.  He told me redundancy --

18    if he didn't hear from me, I should be concerned.  Here's

19    who to call if I couldn't reach him.  I mean, it was like a

20    full disclosure, you know?  He assured me that he was moving

21    forward with the divorce as quickly as possible.  He thought

22    it would just be some tidying up he had to do and that he

23    was being transparent with his spouse and that he was going

24    to tell his spouse right away that he had to move forward

25    with their divorce immediately because he was in love with

DOJ-0002598025

1      someone else.

2           Q.   So after you parted ways the next day in Richmond,

3      thereafter did you perceive yourself to be in a committed

4      relationship?

5           A.   Yes.

6           Q.   A monogamous relationship?

7           A.   Yes.  He made very clear that he had not been

8      sexually intimate with his wife, his spouse, for more than

9      four years.

10          Q.   Okay.

11          A.   And he also expressed that he had not been

12     intimate with anyone else in a number of years, which was

13     credible based on the level of his responsibilities and

14     workload.  At that level, sometimes people sleep just four

15     hours a night.  It's tremendous responsibility.

16          Q.   And he went back to Italy after that weekend?

17          A.   He told me he went back to Italy --

18          Q.   Okay.

19          A.   -- he lied all the time.

20          Q.   It was your understanding that he went back to

21     Italy?

22          A.   Yes.

23          Q.   And thereafter were you in communication with him?

24          A.   Yes.

25          Q.   What were the nature of your communications?

DOJ-0002598026

1       A.   We were in near constant communication.  So when

2   he wasn't at work -- when we both weren't at work or asleep,

3   we were in constant communication.  We communicated multiple

4   times every day by text, by video chat, by phone, and by

5   email -- less so by email -- text messages as well.  I mean,

6   it was close, constant communication about everything from,

7   you know, which replacement air conditioner, about the roof,

8   I mean mundane things about house maintenance versus

9   interests or new songs we heard, about our love, about

10   romance, about work, about everything, about our families.

11       Q.   And you mentioned that when you met with him in

12   Richmond, he was very open with you.  Did that openness

13   continue as you were physically separated?

14       A.   Yes.  He continued to be extremely open.  And

15   because -- well, within a few weeks, he made clear that --

16   you know, not just that he wanted a lifetime with me but

17   that he wanted to marry me.  And he proposed multiple times

18   by phone and by video.  And it was a bit silly but a bit

19   romantic.  It was very romantic.  And I agreed, but I told

20   him I didn't believe in the diamond trade and I didn't

21   really want -- he wanted to buy me a ring and I said I don't

22   believe in the diamond trade.

23           So I put him off multiple times on getting me a

24   ring.  And I also told him he needed to focus on tidying up

25   the divorce so that we can move forward.  But in the

DOJ-0002598027

1  meantime, we were fully aligning our lives.  He was my

2  fiancé.  We were engaged.  We were aligned.  Again, we were

3  discussing every aspect of our lives from the mundane to the

4  romantic to the work.  And we were planning to go into

5  business together in addition to being married.  We were

6  planning to merge our finances and buy real estate together.

7  So I mean --

8      Q.   You were talking about details?

9      A.   Lots of details.

10     Q.   Did you also assist him in preparing divorce

11 paperwork?

12     A.   I did.

13     Q.   And now you talked about how your relationship was

14 mostly long-distance after --

15     A.   Yes.

16     Q.   -- you met in Richmond.  But you did meet a couple

17 of other times in person in the spring and summer of 2021;

18 is that right?

19     A.   Yes.

20     Q.   Did you meet in France in May?

21     A.   Yes.  I believe it was June.

22     Q.   And then you met again in D.C. in July?

23     A.   Yes.

24     Q.   Did Burke stay with you when he was in the D.C.

25 area in July?

DOJ-0002598028

1        A.   Yes.  He partially stayed with me and I partially

2   stayed with him.  He was in town on business and so he had a

3   hotel room.  So he told me that he was in town on business

4   but coming early and taking several days of leave to spend

5   extra time with me.  So he initially arrived.  We spent some

6   personal time together.  And then the work week started and

7   we both were on duty part of the work week.  And then when

8   his duty started, he moved into his hotel and moved me into

9   his hotel with him.  And we were kind of back and forth

10  between my place and his place.

11       Q.   So the purpose of -- in addition to spending time

12  with you, Burke had some Navy events that he had to attend

13  while he was in the D.C. area?

14       A.   Yes.

15       Q.   Are you familiar with a company called Next Jump?

16       A.   Yes.

17       Q.   How and when did you first become aware of Next

18  Jump?

19       A.   So when Bob was in town in July for business and

20  for the leave, he -- you know, we're syncing our schedules

21  for the week and figuring out when we can be together and

22  when we had to work separately and when we could meet.  And

23  during this syncing of our schedules for the week, he

24  mentioned that there was this company called Next Jump and

25  he said -- it was kind of a brief superficial conversation,

DOJ-0002598029

1   but he mentioned that there's this company.  They're really

2   cool.  They're really successful -- and that he's worked

3   with them before in his Navy capacity and that some of the

4   officials were in town that week, the same week he was in

5   D.C., and that they had invited him to lunch.  And he said I

6   should come along.

7       Q.   Did he mention an interest in working for them?

8       A.   Yes.

9       Q.   Had he talked to you about other opportunities

10  that he was interested in after concluding his military

11  service?

12      A.   Yes.

13      Q.   Can you tell the grand jury a little bit about

14  that, high level?

15      A.   Yes.  So he asked my advice on what he should do

16  and I advised him to go into nonprofit because I'm not about

17  the money.  And I urged him to do something -- you know, to

18  use his knowledge and power and influence to try to maybe

19  work on something to prevent climate change or something to

20  really make a difference, a nonprofit or something.  And he

21  wasn't so interested in that and said he was more interested

22  in making money.  And there were two jobs in particular that

23  he expressed interest in, and he kind of said he had two

24  soft offers already.  And his two primary interests were --

25  after a time working for the government of Australia, he

DOJ-0002598030

1    said that he was friends with the head of Australian Navy --

2    that they had worked together before.  They loved him.  He

3    loved them -- and that the senior Australian Navy official

4    had basically said whenever you're retired, whenever you're

5    ready to come to work for us, you've got a job.  Come to

6    work for us.

7           There was another very senior Navy official, I

8    think a former Secretary of the Navy.

9           (Knock on door.)

10          FOREPERSON:  It's probably the returns.

11          WITNESS:  Do I --

12          MS. FIFIELD:  Just hang on a second.

13          FOREPERSON:  Just hang on a second, please.

14          (Asides.)

15          FOREPERSON:  Sorry, it's the other --

16          MR. WILMOT:  That's all right.  Do we still have a

17   quorum?

18          FOREPERSON:  We still have a quorum.

19          GRAND JUROR:  Yes.

20          MS. FIFIELD:  Okay.

21          BY MS. FIFIELD:

22      Q.  Go ahead.

23      A.  So essentially he expressed interest in two

24   particular jobs.  And one was with the government of

25   Australia and it was a verbal offer from someone that he was

DOJ-0002598031

1    very collegial and close with.  And it wasn't just an

2    official relationship with him.  Like, they had basically --

3    they were like drinking buddies too.  So I mean, it was like

4    a tight relationship.  And Bob and I both knew that that

5    job, if it panned out, was worth a lot of money.  Like,

6    probably over $1 million a year in money.  But as he

7    explained it, he could not leave U.S. military retired

8    service and go immediately to work for a foreign government.

9    He would have to have permission -- I think it's from either

10   -- there's like a cooling-off period of maybe a few years,

11   and/or you have to get permission, I believe, through

12   Congress to go right over.  So we knew that it was a very

13   lucrative opportunity because there had been a former senior

14   naval official who had gone to work for the government of

15   Australia working on their counter-China issue.

16          So as Bob said, what the Australian Navy and

17   government wanted from him was his knowledge of submarines,

18   submarine warfare, and his counter-China and basically his

19   general management skills.  But it's kind of --

20   Q.   It's okay.

21   A.   Australia and the U.S. in recent years have

22   expanded their cooperation on submarine technology, very

23   sensitive submarine technologies.  He knew about -- so he

24   knew about these deals before I did and before the public

25   did.

DOJ-0002598032

1        Q.    Fair to say that you perceived his interest in

2    going to work for the Australian Government as serious?

3        A.    Yes.  He expressed that that was his preferred

4    job, initially.

5        Q.    And can I ask -- before this lunch meeting in July

6    in D.C. with Next Jump, were you aware of them having made

7    him any offer of employment?

8        A.    Yes.  Before lunch, he mentioned that they -- he

9    just kind of casually mentioned that this company Next Jump

10   was really great.  He had worked with them before.  They

11   were interested in him coming to work for them after he

12   retired.  And he was also interested in them.  So Next Jump

13   was one of the two enterprises that he expressed specific

14   interest in.  He really wanted government of Australia.

15   That was very lucrative.  There would be a lot of leave, a

16   lot of perks and everything, but there's this cooling-off

17   period.  So what he expressed was he was really interested

18   in working for Next Jump while he was waiting for that

19   ability to go to work for Australia.

20       Q.    Okay.

21       A.    What I was trying to get about the other naval

22   official is that it was like a matter of public record that

23   this other senior naval official had gone to work for the

24   government of Australia and was making over $1 million.

25   Because it had to be published.  So --

DOJ-0002598033

1    Q.    Understood.

2    A.    -- it was a very credible opportunity.

3    Q.    So the individuals who invited Burke to lunch from

4    Next Jump, were those individuals Charlie Kim and Meghan

5    Messenger?

6    A.    Yes.

7    Q.    Were those folks the co-CEOs of Next Jump?

8    A.    Yes.

9    Q.    Had you met them before this lunch?

10   A.    No.

11   Q.    Had you heard of them before this lunch?

12   A.    No.

13   Q.    And it was really only that you learned about Next

14   Jump immediately preceding this lunch --

15   A.    Yes.

16   Q.    -- in the context of the invitation?

17   A.    Yes.

18   Q.    Okay.  Did you end up attending that lunch

19   meeting?

20   A.    Yes.

21   Q.    Where was the lunch meeting?

22   A.    La Belga Café in the Capitol Hill region in D.C.

23   It's off -- great restaurant.

24   Q.    Did you pick that restaurant?

25   A.    I did.  I love it.

DOJ-0002598034

1          MS. FIFIELD:  All right.  I'm going to -- do we

2    need to do anything to get the Elmo broadcasting?

3          FOREPERSON:  On the bottom side, there are three

4    or four -- or whatever -- underneath the table.

5          MS. FIFIELD:  Oh, okay.  All right.  So I am

6    putting on the screen the first page of what has been marked

7    as Grand Jury Exhibit DC-002.

8          (Grand Jury Exhibit DC-002 marked for

9    identification.)

10         BY MS. FIFIELD:

11    Q.   Ms. Canedo, do you recognize DC-002, what it is

12    generally?

13    A.   Which is that?  There's a bunch of markings on

14    that.

15         MS. FIFIELD:  Yeah.  I'm showing the first page to

16    the witness.

17         BY MS. FIFIELD:

18    Q.   Do you recognize this as an extraction of your

19    cell-phone messages?

20    A.   Yes.

21    Q.   That's it.  I can take first page back.  I'm

22    putting on the Elmo --

23         GRAND JUROR:  Can you zoom it out so we can --

24         MS. FIFIELD:  Yeah.  I'm putting on the Elmo a

25    page that's marked 2622 in the bottom-right corner of Grand

DOJ-0002598035

1     Jury Exhibit DC-002.  That's a mouthful.  And can the

2     members of the grand jury read this message right here?

3              GRAND JUROR:  Yeah --

4              MS. FIFIELD:  It's okay?

5              FOREPERSON:  Yeah.

6              MR. WILMOT:  Just read it in.

7              MS. FIFIELD:  Okay.

8              BY MS. FIFIELD:

9        Q.   I'm going to read in the message.  It's from

10    Denese Canedo.  That's you?

11       A.   Yes.

12       Q.   And you said -- I'm so sorry.  I have the wrong

13    thing.  I'm getting ahead of myself.  So you made the

14    reservation at Belga Café?

15       A.   Yes.

16       Q.   This is Page 2725 of Grand Jury Exhibit DC-002.

17    This message is from whom?

18       A.   That's from Bob Burke.

19       Q.   Okay.

20       A.   To me.

21       Q.   And when you say Bob, you're referring to Admiral

22    Burke?

23       A.   When I say Bob, I mean Admiral Burke.

24       Q.   Okay.  And he said 1:30 is perfect, but they want

25    to have a more intimate conversation.  Meghan already

1  talking about a job.  And when he says Meghan, is that

2  Meghan Messenger?

3       A.   Yes.  One of those CEOs.

4       Q.   And did you pick Belga Café in part because it

5  would facilitate having that more intimate conversation?

6       A.   Yes.

7       Q.   And you had been there before?

8       A.   I had.  It's very cozy.  It's just very cozy, low-

9  traffic, quiet, elegant.

10       Q.   When you all met up at the Belga Café, what was

11  Burke wearing?

12       A.   He was wearing his Navy white uniform, which is

13  white slacks, white shirt, a chest-full of medals, his white

14  cover, which is like a hat with his admiral rank.  It was

15  very impressive.

16       Q.   Would he have been recognizable as a naval or

17  military officer?

18       A.   By anyone.

19       Q.   What were Kim and Messenger wearing?

20       A.   They were wearing more casual clothes, maybe like

21  khakis and a dress equivalent.  So I wouldn't even say

22  business casual.  It was more casual than business casual.

23       Q.   And when Burke pitched this meeting to you, did

24  you perceive it to be a business meeting?

25       A.   No.  In fact, he didn't really pitch it as a

DOJ-0002598037

1    meeting to me.  He pitched it as a lunch.  He said that

2    these executives had invited him to lunch and he would like

3    me to come along.

4        Q.    So you thought it was more of a casual social

5    networking kind of thing?

6        A.    Yes.

7        Q.    Had you met -- I think you already answered this,

8    but had you met Kim and Messenger prior to this meeting?

9        A.    I had not.

10       Q.    How did Burke introduce you to Kim and Messenger?

11       A.    So the four of us were inside the restaurant and

12   there was really no one else around.  It was 1:30, so the

13   lunch crowd had gone.  And so it was very intimate.  And he

14   introduced me as -- well, he introduced -- kind of cited my

15   professional credentials and said that I had been a

16   tremendous advisor and asset to him in his current capacity

17   and that I was a trusted confidante and friend to him --

18   that I was his muse.  And he made clear to them that

19   wherever he went in the future, I would go with him -- that

20   we were partners now and partners in the future.

21       Q.    As the conversation got underway at the lunch,

22   what was the nature of the conversation?

23       A.    So he introduced me and then he introduced me to

24   Next Jump.  So he kind of praised them.  And then Charlie

25   and Meghan, the two CEOs -- they just really kind of jumped

DOJ-0002598038

1    in and having learned that I'm a package deal with him were

2    really selling me on the company and selling both of us on

3    the company.  They were talking about the benefits and perks

4    of working there, how wonderful it was being in New York

5    City, how Bob would be able to work from anywhere he wanted

6    to -- that he wouldn't have to go to New York if he didn't

7    want to.  He could work in New York or D.C. or Florida or

8    wherever he wanted to be based.  They were willing to work

9    with him and to work with us.

10        Q.    So was it your impression that they were very

11   serious about having him come to work for them after his

12   retirement?

13        A.    Absolutely.  And in fact, they were giving both of

14   us the hard sell.  And Meghan in particular -- so Meghan is

15   the female CEO.  Charlie is the male CEO.  Meghan was

16   sitting across from me and she started to relate to me not

17   just as a CEO but like woman to woman and was saying that

18   employees of their companies and their spouses and partners

19   had all kinds of perks -- that not only would Bob benefit

20   from all these things, but I would as well.  And she talked

21   about all the amenities.  They said they have an in-house

22   chef.  They have nutrition classes.  They have in-house

23   yoga.  They have a manicurist, salon -- I mean, it was like,

24   you know, amazing.

25        Q.    So they're really trying to sell the two of you on

DOJ-0002598039

1   Next Jump?

2        A.   Yes.  And also they appealed to me from an ethical

3   perspective.  They were talking about all the good that

4   their company does.  Charlie, he said that his dad was a

5   preacher, I think.  So his dad was a preacher and while they

6   started Next Jump for modest capital reasons, they had grown

7   into something much more where they really wanted to help

8   people and companies kind of become the best versions of

9   themselves.  And so they kind of pitched it in an -- so yes,

10  they're talking about the perks, but they're also talking

11  about their altruistic mission.  And they had even said that

12  they had volunteered some services to the U.S. Government.

13       Q.   Okay.  At some point, did Charlie Kim mention a

14  contract for Next Jump to perform services for the U.S.

15  Navy?

16       A.   Yes.

17       Q.   Can you tell the grand jury about that?

18       A.   Yes.  So again, they were talking generally about

19  the company and about the perks and the benefits and how

20  they wanted Bob and welcomed both of us.  And then Charlie

21  just pulled out a napkin and started -- like a cocktail

22  napkin, dinner napkin, a paper napkin at the table, and just

23  started laying out terms.  And so it went from the general

24  conversation to okay, it's like this.  And he plops down the

25  napkin and he says okay.  So from the contract, you would --

DOJ-0002598040

1    let me back up a little bit.  He had asked Bob how soon he

2    could retire.  When are you eligible to retire?  And Bob had

3    said at the very earliest, the next spring, which was about

4    eight months away at that time.

5         So after knowing Bob's timeframe for retirement,

6    that's when he pulled out the napkin.  And he says okay.  So

7    the contract would be in place for at least six months

8    before you would start.  And at the top of the napkin, he

9    literally writes contract.  And then he does an arrow to

10   show the span of time, and -- arrow down, and it literally

11   has six months beside it.  And then at the bottom, he wrote

12   down some really big money figures and then made clear that

13   they wanted the contract to be in place for at least six

14   months before Bob went to work for them so that Bob could

15   talk about the positive impact of the contract and how his

16   Navy command enterprise had benefitted from the contract and

17   the services associated with that.

18        Q.   And for the record, you're using air quotes when

19   you say the contract.  And that's how Charlie Kim referred

20   to it -- was the contract?

21        A.   Yes.

22        Q.   What did that lead you to conclude about this

23   discussion?

24        A.   So to me, what I could tell at that time was that

25   it was some contract with Bob's current command at that time

DOJ-0002598041

1    that they were offering.  But I did not know much more than

2    that at the time, other than it was a contract pitched to

3    the Navy, specifically his command -- that they wanted while

4    he was still in command.  But what was also clear to me --

5    when Charlie is just saying the contract, it was clear to me

6    that the three of them knew something about the contract

7    that I didn't.  Like, Bob didn't say what contract, you

8    know?  It's like Charlie's just talking about this contract

9    and this timeline like they've had a lot of conversations.

10   And it was clear that they had a common understanding of

11   what the contract meant and that this was no surprise -- or

12   nothing new to them.

13        Q.   And when you talked about big money numbers, was

14   that in your understanding compensation for Burke, the big

15   money numbers at the bottom of the diagram?

16        A.   Yes.  At the bottom -- so it would start with a

17   contract.  At least six months would pass.  And at the end

18   is a lot of money for Bob.  And the money for Bob was his

19   compensation package for his employment that he would have

20   at the end of the six months.

21             MS. FIFIELD:  Okay.  I'm showing what has been

22   marked as Grand Jury Exhibit DC-001.

23             (Grand Jury Exhibit DC-001 marked for

24   identification.)

25             BY MS. FIFIELD:

DOJ-0002598042

1      Q.   Do you recognize this?

2      A.   I do.

3      Q.   What is this?

4      A.   This is a depiction that I sketched out when I met

5  with investigators -- when investigators asked to meet with

6  me about this lunch event.  I sketched it out.  And so what

7  I recall specifically, again, was the top, contract, the

8  arrow, the six months, all that.  I could not really

9  remember the figures that were at the bottom and I kind of

10 underlined them.  And I was explaining to the investigator I

11 don't really remember the figures.  I just remember they

12 were really big figures.

13     Q.   Eye-popping numbers?

14     A.   Yeah.  And also I've got two figures there because

15 during the lunch conversation, Next Jump made clear that --

16 so they talked in terms of base salary, benefits, equity in

17 the company, and so it was clear that what they were talking

18 about was likely to add up to at least $1 million.

19     Q.   So just to be clear so the grand jury is clear,

20 you drew this?

21     A.   I did.

22     Q.   This is a recreation of Charlie's napkin from your

23 memory?

24     A.   Yes.

25     Q.   And you drew this when you met with investigators

1    roughly in August of 2022?

2        A.    Yeah.  Roughly a year after the lunch event.

3        Q.    So just to sum up, what did you understand Charlie

4    Kim to be proposing in that moment?

5        A.    I understood Charlie to be proposing that Bob come

6    to work for them but that the contract should be in place

7    for at least six months beforehand.  And what I understood

8    was what they really wanted Bob to do in the job was to say

9    how awesome the contract was and to say how awesome they

10   were.

11       Q.    In the job, you mean once he comes to work for

12   Next Jump that he would be able to make that testimonial?

13       A.    Yes.  In fact, Bob at the lunch kind of asked

14   them, you know, what would my job be?  And they answered to

15   the effect of whatever you want, you know?  We just want you

16   to be able to talk about how awesome we were because you saw

17   us perform and the change in your command and what we can

18   do, the difference we can make.  We want you to be able to

19   speak to that personally.

20       Q.    As part of that, was it important that a contract

21   be in place six months prior to Burke's retirement?

22       A.    It wasn't six months prior to his retirement.

23   They just wanted the contract in place for at least six

24   months before he retired.  It didn't have to be the six

25   months immediately preceding.  It's just that it appeared

DOJ-0002598044

1    that they thought six months was a significant enough amount

2    of time for him to give a credible endorsement -- was my

3    understanding.

4         Q.    Did you understand the job and the contract to be

5    linked in some way?

6         A.    Yes.

7         Q.    Is it fair to say you understood the napkin to be

8    proposing a package deal?

9         A.    Yes.   It wasn't the entire package, but it was the

10   gist of the package.

11        Q.    Okay.

12        A.    With three important elements: the contract, at

13   least six months, and big-money payoff at the end.

14        Q.    What was your reaction to all of this?

15        A.    So I was in love with Bob.   I knew he had great

16   earning potential.   I mean, everyone likes a secure life.   I

17   would've preferred if we have a more modest life with

18   nonprofits.   And we kind of had different makeups.   But you

19   know, I was supportive of his ambitions.   It felt important

20   to him to have a bigger salary.   And so I liked the sound of

21   Next Jump.   I love New York City.   I went to grad school in

22   New York City.

23        Q.    Do I mind if I ask you to -- let's back up a

24   little.

25        A.    Sure.

DOJ-0002598045

1          Q.   I just -- when you see Charlie Kim drawing out

2     this arrangement on a napkin, what was your immediate

3     reaction?

4          A.   I was appalled.  So it went from here's this

5     awesome company and this great location with these great

6     benefits.  And then all of a sudden, this company and these

7     nice people were proposing something that was very

8     inappropriate.  And so Charlie literally brings out the

9     napkin and is speaking about the contract, draws this

10    timeline, and I'm like, whoa.  What am I hearing?  And as it

11    kind of sinks in, I'm like, this is not okay.  And I have to

12    stop this.  And I said hey, tell me more about your company

13    structure, you know?  So I stopped the conversation.  He

14    literally got about that far -- that level of detail there -

15    - and they did mention a little bit more about the equity

16    stake, et cetera.  And then I stopped it.  I mean, they were

17    mainly pitching to Bob, but I stopped it.  In my

18    professional capacity, I know enough that that was

19    inappropriate -- what they were proposing.

20         Q.   For those members of the grand jury who are not

21    familiar with federal government service, can you

22    contextualize the strength of your reaction, why you

23    immediately thought this was wrong and inappropriate?

24         A.   Yes.  It appeared to me they were basically

25    seeking a quid pro quo -- that they were conditioning his

DOJ-0002598046

1   employment or at least that hefty remuneration at the end to

2   having their contract in place while he was still in the

3   Navy.  So the Navy would've been paying for their services,

4   and then Bob would be having a big payoff at the end.  And

5   what they were proposing was inappropriate.

6        Q.   What was Burke's reaction to all of this as

7   Charlie's drawing the napkin?

8        A.   He's like nodding and leaning in and he seems like

9   he's kind of digging it.  And when I see this, you know, I'm

10  almost like in shock.  You know, I'm like, whoa.  Am I

11  hearing this right?  This is not okay.  And I kind of

12  paused, hoping that Bob would put an end to it, hoping that

13  Bob would say hey, you know, I appreciate that.  But you

14  know, we can't talk about the contract.  Let's put that

15  aside.  He didn't.  Bob was just rolling with it.  And so I

16  jumped in and it's because I'm an ethical person -- because

17  I loved him.  I wanted to protect him.  And I guess kind of

18  in my mind, I thought Bob has worked with them before.  They

19  have a personal, convivial relationship.  Maybe he's just

20  being nice and hearing them out.  And while -- I thought

21  maybe he was just being courteous or something.  But I

22  jumped in because I felt an obligation and a duty to -- I

23  was, after all, a government employee at the time even

24  though I was on leave that afternoon and at lunch on what I

25  thought was a social lunch.

DOJ-0002598047

1          Q.    Were you successful at redirecting that

2    conversation?

3          A.    Yes.

4          Q.    Was there any --

5          A.    For the moment, at least.  For the lunchtime.

6          Q.    Was there any mention of the contract for the

7    remainder of the lunch?

8          A.    Definitely not.

9          Q.    Okay.  What happened when you all parted ways?  Or

10   how did the lunch conclude?

11         A.    So the four of us finished lunch, and then we all

12   piled in my car.  And I drove the four of us back to where

13   their car was.  They had attended a Navy function before we

14   had lunch.  And I drove them back to the car and the three

15   of them got out of my car.  The windows were rolled up.  And

16   then they had an intense conversation outside my car, out of

17   my earshot, for about 5 or 10 minutes.

18         Q.    Can you tell the grand jury why you perceived

19   their conversation to be intense?

20         A.    Yes.  So actually, I'm a trained

21   counterintelligence special agent.  That was one of my first

22   jobs in the military.  My entire career until recently was

23   12 years in military intelligence.  I'm a trained observer.

24   My field was human intelligence, so I'm trained to read body

25   language, tells, signals, demeanor.  And so I could tell by

DOJ-0002598048

1    their body language and the intenseness of their expression

2    that it wasn't just, you know, backslapping, trading jokes

3    or something like that.  They were having an intense

4    conversation.

5        Q.   I did have two more questions about the contract

6    discussion at the lunch before we move on.  The first

7    question is -- and you did mention this, but I just want to

8    make clear -- did Charlie and/or Meghan Messenger discuss an

9    equity stake as part of this whole deal?

10       A.   They did, yes.

11       Q.   And you mentioned earlier that Charlie Kim or

12   Meghan Messenger -- I'm not sure who you attributed the

13   statement to -- they were talking about the good that their

14   company does and that they had done this work for the

15   government at no cost.

16       A.   Yes.  Some work, at least, for no cost.

17       Q.   Did Charlie Kim mention anything about Next Jump's

18   motivation for obtaining a contract with the U.S. Navy?

19       A.    They did.  They expressed a motivation for wanting

20   that contract and also for hiring Bob.  They expressed that

21   -- so they had mainly been, like, corporate.  I don't know.

22   I don't know that much about business.  But they expressed

23   that they wanted to expand into the federal arena -- that

24   they wanted to expand specifically into the DOD, Department

25   of Defense, arena -- that they wanted to grow their company

DOJ-0002598049

1  in the direction of having for-profit business with the

2  federal government, specifically DOD.  And they saw Bob as a

3  great asset to have to go in that direction.  And actually,

4  it was raised in that conversation that Bob would not be

5  able to probably work on defense-related stuff when he

6  initially came to them, again because of these cooling-off

7  periods that flag officers had.  And they're like, that's

8  okay.  You can do whatever you want, basically.  Once you

9  work for us -- it's like they didn't even care what he did.

10  I mean, like --

11       Q.   Did Charlie Kim mention wanting to derive a profit

12  from a relationship with the Navy?

13       A.   Yes.

14       Q.   All right.  Going back to you dropping them off.

15  They're having this intense conversation.  What happened

16  when Burke got back in the car?

17       A.   When Burke got back in the car, he was furious

18  with me.  It was really one of the first fights we had in

19  our relationship and it was a terrible fight, a verbal

20  fight.  He got back in and he immediately chided me and he

21  said I can't believe how rude and aggressive you were with

22  them.  And I said, what do you mean?  And I said you're

23  kidding, right?  I said what they said was incredibly

24  inappropriate.  And I said you should've jumped in and shut

25  that conversation down.  That was not okay.  And then we

DOJ-0002598050

1    switched to fighting about something else because they had

2    asked about his wife and where she wanted to go.  And so

3    then I fussed at him and I said why the hell didn't you tell

4    them that you're separated and getting divorced?  And so

5    that was -- yeah.

6         Q.   Did you have additional conversations about the

7    lunch meeting and the contract with Burke --

8         A.   We did.

9         Q.   -- after that?

10        A.   Multiple conversations, yes.

11        Q.   Did he give you some additional details about the

12   contract that weren't discussed at the lunch meeting?

13        A.   Yes.  Not many details were discussed at the lunch

14   meeting.  It was just they wanted it and they kind of

15   expected it and the timeline that I've expressed.  So no

16   details about the contract.  So again, when he got back in

17   the car, we were at odds.  He was angry about one thing.  I

18   was angry about another.  And we had words.  And I just

19   drove him wherever he had to go for his next business,

20   stopped and dropped him off.  And then later, we discussed

21   it.  And I said, what is that contract?  What the hell are

22   they talking about?  And then he explained to me the details

23   of the contract.

24             Among other things, we had other conversations

25   too.  I also -- because again, they seemed to have a shared

DOJ-0002598051

1    understanding about a contract, about -- I mean, just a

2    shared understanding.  And then so I asked Bob several

3    questions.  For example, I said hey, when they said a 10-

4    percent equity stake that they offered you as part of your

5    package -- 10-percent equity -- are they talking about

6    equity in the entire company?  Or --

7        Q.    And we're going to get to that --

8        A.    Okay.

9        Q.    -- in a second.  But did Burke tell you what kind

10   of services Next Jump was going to provide to the Navy?

11       A.    Yes.

12       Q.    What kind of services?

13       A.    He told me that it was like a training package, a

14   leadership training to try to help people be more effective

15   in what they do and also kind of happier in what they do,

16   like, to derive more satisfaction, and kind of the

17   connection between job satisfaction, efficiency, and -- you

18   know, kind of like that.  It was a bit vague.  But it's like

19   leadership training where you kind of maximize your

20   potential, I guess.

21       Q.    All right.

22       A.    And that they had pitched that as a training

23   package for his current command.

24       Q.    Shortly after that, did Burke get on a plane to

25   return to Italy?

DOJ-0002598052

1       A.   Yes.

2       Q.   Did you exchange messages with him via WhatsApp

3   about the lunch meeting and the contract --

4       A.   Yes.

5       Q.   -- after you parted ways?

6       A.   Yes.

7            MS. FIFIELD:  So I'm again putting up a page from

8   Grand Jury Exhibit DC-002, the extracted messages from

9   Canedo's phone.

10           BY MS. FIFIELD:

11      Q.   This is Page 2653.  Ms. Canedo, are you able to

12  read that top message there?

13      A.   Yes.

14      Q.   Could you read it to the grand jury, please?

15      A.   So Bob wrote I asked him to write out a job

16  description, but I've essentially agreed to work for them.

17      Q.   And you recall that that was a message that he

18  sent to you?

19      A.   Yes.

20           MR. WILMOT:  Who's the him?

21           BY MS. FIFIELD:

22      Q.   And by him, you mean --

23      A.   Bob Burke.

24      Q.   Bob Burke.

25      A.   Well, Bob Burke was saying I agreed to him, him

DOJ-0002598053

1   meaning, I think, Charlie Kim, the executive in the context.

2         Q.   So when he's saying I've essentially agreed to

3   work with them, he's referring to --

4         A.   Next Jump.

5         Q.   -- Next Jump, Kim, and Messenger?

6         A.   Yes.

7         Q.   I'm showing you another page from Grand Jury

8   Exhibit DC-002.  This is Page 2651.  Ms. Canedo, can you

9   read this message here?  Are you able to?

10        A.   Yes.

11        Q.   Okay.  Who sent this message?

12        A.   I sent it to Bob.

13        Q.   And what does it say?

14        A.   And I said to him, meaning what they talked about

15  at the Next Jump lunch in July, was it 10-percent equity in

16  the entire biz -- business -- or just whatever project or

17  projects you would work on?  And I said it was hard to hear

18  with 500k base salary ringing in my ears lol.

19        Q.   Was that referring to the remuneration that Kim

20  had proposed as part of this arrangement?

21        A.   Yes.  They were throwing out such big figures I

22  was just, like, kind of in awe.  I don't have business

23  lunches or social meetings where people are throwing out

24  figures like that.

25        Q.   And do you recall whether Burke responded to your

DOJ-0002598054

1   question about 10-percent equity?

2        A.   I do.  And he did.

3        Q.   This is Page 2649 of Grand Jury Exhibit DC-002.

4   Are you able to read this message here, Ms. Canedo?

5        A.   Yes.

6        Q.   Can --

7        A.   Bob Burke responded to me, 10 percent in the total

8   company.  I would be a junior co-owner, third behind Meghan,

9   Meghan being the co-CEO.  So there are two CEOs and he would

10  be number three in the company.  I had also looked at the

11  company.  And so by his response -- so I knew just from a

12  public search and I'm like, who the hell is Next Jump?  And

13  so I just do a search on them and I quickly find out at

14  they're a multi-billion-dollar company.  They had billions

15  of dollars in revenue and capital.  And they were very

16  successful, growing, and thriving.  And so 10 percent in the

17  entire business was millions of dollars.

18       Q.   I'm showing Page 2622, Grand Jury Exhibit DC-002.

19  Ms. Canedo, are you able to read this message here?

20       A.   Yes.

21       Q.   Who sent it?

22       A.   I sent it to Bob.

23       Q.   And before I have you read it, can you explain

24  what NAVEUR is?

25       A.   Yes.  NAVEUR is a shorthand for the command that

DOJ-0002598055

1    Bob was leading at the time.  It's Navy Command Europe/Navy

2    Command Africa.  It's actually combined.  So even though I

3    say NAVEUR, I really mean, like, the whole thing.

4         Q.   Okay.

5         A.   It's just shorthand for his command -- former

6    command.

7         Q.   Can you read the message to the grand jury?

8         A.   Yes.  To what extent do you think/believe the job

9    for you is tied or not to the contract trial with NAVEUR?

10   That made me nervous.

11        Q.   Do you recall whether Burke responded to your

12   question?

13        A.   I do.  And he did.

14        Q.   This message that I'm pointing to here -- and this

15   is Page 2621 of Grand Jury Exhibit DC-002.  Is this message

16   that I'm pointing to here -- is that Burke's response?

17        A.   Yes.

18        Q.   Can you read it to the grand jury, please?

19        A.   Yes.  He responded technically, zero.  But he

20   desires that I be able to have a personal testimonial, he

21   being Charlie Kim.

22        Q.   Okay.

23        A.   The CEO.

24        Q.   How did you interpret his response of technically,

25   zero?

1      A.   The way I interpreted it was it's probably not

2  written down anywhere, but essentially it's an understanding

3  that it's an expectation.  And also to have a personal

4  testimonial, it jived exactly with what Charlie expressed

5  verbally during the lunch timeframe -- was that what they

6  really wanted Bob for was to give his personal testimonial

7  about the difference that the contract made.

8      Q.   And when you say it's an expectation, do you mean

9  what you referred to in the prior message, which is a

10  linkage between the job and the contract?

11     A.   Yes.

12     Q.   You mentioned earlier that Burke was also

13  considering an opportunity to go work for the government of

14  Australia.

15     A.   Yes.

16     Q.   Bring your attention to this message here.  This

17  is Page 2593 of Grand Jury Exhibit DC-002.  Can you see this

18  message here?

19     A.   Yes.

20     Q.   Who sent it?

21     A.   I wrote Bob that message.

22     Q.   And what does the message say?

23     A.   And I said do you lean one way or the other?

24  Aussies or NJ?  NJ being Next Jump, Aussies being the job

25  with the Australian government.

DOJ-0002598057

1          Q.   Did he respond?

2          A.   Yes.

3          Q.   Is this his response higher up on the page here?

4          A.   Yes.

5          Q.   So Burke wrote what in this message on the same

6     page?

7          A.   Bob Burke responded to me Next Jump for three

8     reasons.  There is now a real offer.  It gets us out of the

9     DOD rut.  And it's different work than I've done before.

10    You know I'm depending upon you to run our LLC and be my EA,

11    executive assistant.

12         Q.   By DOD, he means Department of Defense?

13         A.   Yes.  We both worked for the Department of Defense

14    at that time.

15         Q.   And when he's referring to an LLC, is that a

16    reference to the business plans that you had made together?

17         A.   Yes.

18         Q.   So that meeting -- that lunch was in -- pardon me,

19    July of 2021, correct?

20         A.   Yes.

21         Q.   Did your relationship with Burke proceed much as

22    it had before after the lunch meeting?

23         A.   Well, we did have that fight and there was a

24    little bit of awkwardness.  And so it wasn't honeymoon in

25    paradise anymore.  It was a little more real.  And we're

DOJ-0002598058

1    also dealing with more real stuff.  Like, he's sharing his

2    financial documents with me and things.  And you know, now

3    we're both pretty excited about New York City and Next Jump.

4    And he's leaning there.  So me, I'm very detail-oriented and

5    I'm a planner.  And so we're looking at Zillow.  We're

6    looking at listings in New York.  We're thinking about

7    buying real estate.  And so we're really in the -- kind of

8    planning and syncing our futures, you know, merging our

9    households, merging our assets and things, and so planning

10   in that regard.

11       Q.   And did you learn anything of particular -- you

12   mentioned earlier that you were assisting him in preparing

13   documents for his divorce.

14       A.   Yes.

15       Q.   Did you learn anything of particular significance

16   around August/September 2021 in the course of your review of

17   his documents?

18       A.   Yes.  So in planning our future together and

19   learning what we had to invest in property, he basically

20   disclosed a lot of his assets to me and a lot of his wealth

21   and a lot of his obligations.  And he gave me, for example,

22   copies of his pay stubs, his withholdings, his tax returns -

23   - maybe not his tax returns -- his life insurance policies

24   and who the beneficiaries -- he gave me his first divorce

25   settlement because he had certain obligations that he would

DOJ-0002598059

1    have to carry forward to his first wife.  And then he was

2    assessing how much life insurance and things to give to his

3    second wife in the divorce.

4        Q.   What did you learn in the course of reviewing

5    paperwork associated with his previous divorces?

6        A.   I learned that he had been lying to me in various

7    regards and very seriously.

8        Q.   Can you explain that just at a high level?

9        A.   Yes.  So when we first met in Richmond and he

10   professed his love and we spent the first night together,

11   Bob told me that he had never been unfaithful to anyone.  He

12   told me that both his former wife and current wife had

13   cheated on him and let him down but that he was a man of

14   integrity, never had cheated, never would cheat, and again

15   that his current wife -- you know, they were separated.  She

16   knew that he was moving forward with his life.  And in that

17   early stage in Richmond and we were having those early

18   conversations, I said well, why did you want a divorce?  Why

19   did you all decide to divorce?  Why did you grow apart?

20   What happened?  What went wrong in your marriage?  And the

21   way he described it was I didn't really know her that well.

22   We dated two years and it really wasn't enough.  And in

23   hindsight, his words were basically fuck buddies.  And so

24   what I discovered when I was reviewing his first divorce

25   settlement -- I discovered that he had had roughly a two-

DOJ-0002598060

1  year relationship with his second wife, but it overlapped

2  with the last two years of his marriage.  And that was

3  evidence based upon -- because he was divorcing the second

4  wife and we were drawing up the papers and one of the key

5  data points you have to put on a divorce thing is the day

6  you married.

7         So I'm looking at his first divorce settlement and

8  his new draft divorce paper with the new one having the date

9  of their marriage.  And what I realized was there was only

10  two weeks separation between his -- so he filed for divorce

11  and because he had minor children, he had to wait at least a

12  year in Virginia, so from the date of filing to separation -

13  - so his final divorce decree, his next marriage was roughly

14  two weeks -- a little less than three weeks from that.  So

15  clearly, he had dated the second wife.  And additionally, it

16  was very disturbing to me that -- so not only had he lied

17  about extramarital but also it was very much more disturbing

18  because his second wife worked for him during that period.

19  She also was a uniformed officer and that was very

20  unethical.  Now I'm not saying that she worked for him the

21  entire two-year period, but a hefty chunk of that.  And he

22  had also told me that he had written job references for her

23  once she wasn't working for him and she traveled to D.C. --

24  that he gave references for her.  It was very unethical.

25         Q.   Did you confront him about not having been

DOJ-0002598061

1    truthful to you?

2        A.    Yes.

3        Q.    What happened?

4        A.    I told him that he had lied and he basically said

5    yep, I did it.  I lied.  I did.  And I said why did you do

6    that?  And he said because I know you're ethical and I know

7    if I told you the truth that I had cheated -- that you

8    wouldn't have had anything to do with me.  And I wanted you

9    and I wanted to have you, and so I lied.

10       Q.    Did this erode the trust that you had in Burke?

11       A.    Oh, yeah.  Oh, yeah.

12       Q.    And in the aftermath of this confrontation, what

13   were the dynamics like between the two of you?

14       A.    So after that, our relationship was very strained.

15   I didn't totally kick him to the curb, but basically my

16   position was you've lied to me and I don't know if I can

17   trust anything you've told me.  I don't know if I can trust

18   anything you say going forward, you know?  Yes, I'm in love

19   with you and I'm completely invested.  And at that point,

20   even my minor daughter knew that we were engaged.  I mean,

21   my daughter was vested.  She wanted a new dad, you know?

22       Q.    Yeah.  So you're having these strained relations.

23       A.    Yes.

24       Q.    Was there a subsequent event that caused further

25   cleavage in the relationship?

DOJ-0002598062

1     A.   Yes.  So we're having more communications,

2     challenges, and also he had a very intense work period -- a

3     period of exercises where it was more difficult for him to

4     challenge -- more difficult to communicate for logistic

5     reasons.  And so he had said he would call me.  And early

6     on, he had always said I'm going to be in touch.  If you

7     don't hear from me, something is wrong.  You know, I'll have

8     my aide contact you if I'm in -- I mean, like, constant

9     communication.  And so he had said he would contact me, and

10    he didn't.  And we were also trying to work through things.

11         Honestly, I was pretty stressed out.  And I

12    couldn't reach him and I thought he's in a classified area.

13    He can't get to his regular phone.  He can't get to his

14    regular email.  So I emailed him at his official work

15    address and I told him -- basically, it was like two lines.

16    And I was like, Bob, what are you doing?  You said you would

17    call.  I waited up all night.  I cried.  My daughter saw me

18    crying myself to sleep last night.  You know, contact me.

19    And so it was very brief and sent to his work account.

20    Q.   Brief but personal?

21    A.   Brief but personal and somewhat intimate.

22    Q.   Yeah.  What was his reaction to you sending that

23    email?

24    A.   He was furious.  He cussed me.  He called me

25    names.  I think he said that I was a fucking idiot.  He

DOJ-0002598063

1    accused me of trying to ruin his career.  He threatened me.

2    He said something to the effect of if you take me down, I'm

3    taking you down with me.

4        Q.   Okay.

5        A.   And that also revealed a different lie he had

6    made.  Because he had expressed early in our relationship

7    that because he was separated with his wife and his senior

8    leadership knew he was separated with his wife -- that

9    really, it was allowed within Navy policy for us to date but

10   that as a courtesy to his wife and to his command that we

11   simply needed to be discrete until they could finish the

12   divorce.  And so his angry reaction also revealed to me that

13   he had also misled me in that regard.

14       Q.   So I think you've answered this, but just to be

15   clear, he was angry with you because you had emailed his

16   official address?

17       A.   Yes.

18       Q.   And what specifically was he concerned about in

19   you having done that?

20       A.   He said you fucking idiot.  Like, 20 people read

21   my email.  And he's like, you fucking know that.  And I

22   said, who do you mean?  He's like, my JAG reads that, my

23   executive, my aide.  I mean, there's like at least -- all

24   kinds of people that get copied on all of my communications.

25   And I said how am I supposed to know that?  And I said I've

DOJ-0002598064

1   never dated an admiral before.  And so I didn't know that.

2   And I also didn't know that our relationship was wrong,

3   really.

4        Q.   And so when he was angry about you not having been

5   sufficiently discrete, that's when you realized maybe it

6   isn't as cool for us to be together as I thought?

7        A.   Yes.

8        Q.   Okay.

9        A.   Cool with the Navy.

10       Q.   Cool with the Navy.  So you weren't able to meet

11  in person again between July -- and the next time you met in

12  person was November of 2021?  Is that right?

13       A.   Yes.

14       Q.   And was that in New York City?

15       A.   Yes.

16       Q.   And were you able --

17       A.   New York, yes.

18       Q.   I'm sorry about that.  And there was also a visit

19  to Newport, Rhode Island --

20       A.   Yes.  So --

21       Q.   -- in that same time period?

22       A.   Yes.  New York and Newport.

23       Q.   Okay.  Were you able to repair some of the

24  relationship upon your reuniting in person?

25       A.   Yes.

DOJ-0002598065

1     Q.    What was the purpose for Burke coming stateside in

2     November 2021?  Or purposes, I should say.

3     A.    The very senior Navy leadership get together

4     roughly quarterly and they sync about the global strategic

5     situation and other things.  So he was in town to -- or he

6     was in the U.S. for that sync with the senior Navy

7     leadership.  And he told me that he also had another meeting

8     with Next Jump.

9     Q.    And part of the purpose of the visit was for you

10    to be able to get together again, right?

11    A.    Yes.  He also said he wanted to see me while he

12    was in the U.S.

13    Q.    And did he take leave to do that?

14    A.    He told me he took leave.

15    Q.    And you met in New York City?

16    A.    Yes.

17    Q.    And that was ostensibly for the personal portion

18    of his trip?

19    A.    Personal and business.  He told me -- so we both

20    liked New York, clearly.  And he proposed that we meet in

21    New York both because we like it there and he had some

22    personal time but also because he needed to meet with Next

23    Jump again.

24    Q.    Did you expect to be included in the visit to Next

25    Jump?

DOJ-0002598066

1      A.   Yes.

2      Q.   Were you?

3      A.   No.

4      Q.   What did he tell you about why you weren't

5  included?

6      A.   So when he arrived in the evening to New York City

7  and had a meeting with Next Jump the next day, I thought we

8  would all go together like before.  But what he told me was

9  that his meeting with Next Jump the following day was

10  official Navy business -- that it was about the contract

11  that they were proposing with his command.  And I said well,

12  do you think it's also a recruiting thing?  Do you think

13  they're also going to talk about you working for them?  And

14  he said oh, they may.  But you know, this meeting is about

15  the contract.  So you can't come because it's about the

16  contract.

17      Q.   Did anything about that explanation strike you as

18  odd?

19      A.   A lot.

20      Q.   Can you elaborate?

21      A.   Yeah.  So it struck me as odd for several reasons.

22  So first of all, I didn't really find it plausible that he

23  would be meeting with Next Jump and not talking about his

24  job offer.  That just didn't seem very plausible.  And also

25  it was very odd because he had asked me to book a hotel in

DOJ-0002598067

1    New York that was near Next Jump because he would be meeting

2    with them.  And so when he arrived at our hotel that I had

3    booked at his request and when he said oh, this is a Navy

4    meeting, I said oh, well, do we need to change the hotel to

5    your name so that you can claim it on your travel voucher,

6    which is customary for a U.S. official traveling on official

7    business.  And he said oh, no.  We don't want to do that.

8    And I just thought that was really weird.

9        Q.   Did he in fact meet with Next Jump?

10       A.   He did.

11       Q.   Approximately how long did that meeting last?

12       A.   I believe from roughly around -- well, I think he

13   departed the room around 9 a.m.  So he met with them

14   sometime between like 9 a.m. to like 3, 3:30 in the

15   afternoon.

16       Q.   Did that exceed your expectations in terms of the

17   length of the meeting?

18       A.   Oh, yeah.

19       Q.   Why did you expect it to be shorter than that?

20       A.   He had expressed that the purpose of meeting with

21   Next Jump was specifically about the contract.  He's a

22   freaking four-star admiral, you know?  He's not going to

23   chit-chat all day about one particular contract when he has

24   so much to worry about in his command.  So if it was about a

25   contract, you know, you would think it would take an hour or

DOJ-0002598068

1  two tops.  Also, he had expressed an intention to spend the

2  afternoon with me.  And he had denied that they were going

3  to talk about the job offer.

4       Q.   What was his demeanor when he returned to the

5  hotel after the meeting had concluded?

6       A.   When he returned to the hotel, he was on cloud

7  nine.  It was like he was high on life.  He was exuberant.

8  I mean, he was like a kid in a candy store.  He's just

9  raving about Next Jump and he's almost, like, jumping up and

10  down, so excited.  I've never seen him so excited.  He was

11  just exuberant.  And he was raving about Next Jump and he

12  explained what had happened that day when he was there.

13      Q.   What did he tell you about what had happened that

14  day?

15      A.   He told me he got there and that they talked about

16  the contract, but then quickly it transitioned to a full-on

17  recruiting effort.  And he explained -- and he's just

18  volunteering all this.  He's just, like, so excited.  He

19  wants to tell me all about it.  And what he says is that

20  they gave the full-court press and that they wined and dined

21  him -- that they put on this magnificent lunch.

22          They gave him the full tour of the company, showed

23  him all around, introduced him to everyone -- and he told me

24  clearly, they had it planned because it wasn't just him that

25  was there in recruiting.  But they were recruiting two

DOJ-0002598069

1   specific people, him, plus one other person.  And he

2   described that person as a leading national sports figure.

3   And he explained that the reason they were recruiting them

4   simultaneously -- him because Next Jump wanted to go into

5   federal in DOD -- but the other guy because Next Jump also

6   wanted to move and expand for profit into the sports and

7   entertainment sector.

8        Q.   Did he mention anything about the offer of an

9   equity stake in the company?

10       A.   Yes.  He also mentioned -- if I recall, I believe

11  he mentioned that they had increased the equity stake, I

12  believe, to like 20, 25 percent.  So it was like a shocking

13  amount of money.

14       Q.   Did he come back with anything in his possession?

15       A.   Yes, he did.  He came back with all kinds of --

16  what do you call them when you go to the Oscars?  Swag bags.

17  He came back with swag bags, and they were like overflowing

18  with gifts.  He had a special vintage bottle of wine that

19  Meghan and Charlie had -- had vintage when they established

20  the company or 10 years prior.  So this special vintage of

21  red wine bottled in the U.S.  And then some other gifts,

22  knick-knacks and things like that.

23       Q.   Did he say anything about the contract?

24       A.   Yes.  He didn't talk about the contract.  I asked

25  about the contract and I said so what about this contract?

DOJ-0002598070

1    And he said to me they are asking for a ridiculous amount of

2    money.  It was either the word ridiculous or very similar.

3    They're asking a ridiculous -- you know, like, astounding

4    amount of money for this contract.  And I'm not going to do

5    that and I'm not going to tell my staff to do that, you

6    know?  I mean, it's just like that's not happening.

7         Q.   He said no way they were going to get a contract?

8         A.   Yeah.  He said that that was ridiculous and he

9    wasn't going to support that.

10        Q.   And you had previously expressed -- to put it

11   lightly -- misgivings about this contract job arrangement,

12   correct?

13        A.   Yeah.  More than misgivings.  I told him that I

14   felt that what Next Jump was proposing was unethical and

15   inappropriate.  And yeah, he needed to have no part of that.

16   And so he reassured me -- in July, he had told me oh, you

17   know, I'm just considering the contract.  And then in

18   November, he told me, like, why he wasn't going to go agree.

19   He said because it was a ridiculous amount of money.

20        Q.   And were you reassured when he told you that?

21        A.   Yep.  I believed him.

22        Q.   At some point also in the fall of 2021 did you

23   give Burke an ultimatum regarding his marriage?

24        A.   Yes, I did.  I gave him an ultimatum while we were

25   in New York and while we were in Newport.  And then

DOJ-0002598071

1    subsequently, I reinforced.  And I said hey, I've been very

2    patient, but I need to know you're for real.  And if you and

3    your wife aren't going to be able to get to this point where

4    you do this amicable joint settlement where you work out all

5    the details and you just file it with the court, which is

6    possible in Florida where they were filing -- I said you

7    need to file unilaterally.  And I said I don't care if I

8    have to wait one year, two years, however long it takes for

9    your divorce to be settled.  I need to know that you're for

10   real and committed and moving forward.  And if you can't do

11   it the amicable way -- it has to be the hard, long way -- I

12   will support you the entire way.  But I need to see you're

13   for real.

14        Q.   Did he agree to that?

15        A.   He did.  And in Newport he also bought me a

16   diamond ring.  I caved and allowed him to buy me an

17   engagement ring in November.

18        Q.   At some point, did he change tact?

19        A.   Yes, he did.

20        Q.   Can you tell the grand jury about that?

21        A.   Yes.  So after we met in New York and Rhode

22   Island, he went back to Italy.  He was supposed to be

23   meeting with a notary to sign the divorce filings to be

24   filed so they would be finished with that.  And around late

25   November, he told me that that had fallen apart, that his

DOJ-0002598072

1  wife had a meltdown when they went in for the signing --

2  that she just had a meltdown.  He couldn't press it with

3  her.  She was fragile.  And then in December, we were

4  planning to spend Christmas and I think New Year's together.

5  We were going to meet in Budapest, Hungary.  We had already

6  met in Europe once.  We were going to meet in Europe again,

7  both on leave.  And about a week before we were supposed to

8  meet, I get an email out of the blue from him, very brief, a

9  few lines.  And he says I'm sorry.  I need to try to work

10 things out with my spouse.

11      Q.   And what were the nature of your communications --

12 you and Burke -- in the aftermath of that?

13      A.   They were very limited after that.  It was clear

14 that he was not fully committed to a monogamous relationship

15 with me.  It wasn't clear to me -- so he definitely didn't

16 say I'm done with you or ciao ciao or bye bye, get lost.  He

17 really left me in limbo and our relationship in limbo.  He

18 told me he felt he needed to try to work it out with his

19 wife -- that he felt a duty to do that.  So I had to kind of

20 respect that.  I wanted to give him space to try to figure

21 things out, but I'm hanging in there and I'm waiting kind of

22 for the verdict, you know?  Is he in his marriage or is he

23 out?  And so I tried to respect his space.

24           We had some limited communications.  Some of them

25 were professional-related.  I got offered a job in Italy.  I

DOJ-0002598073

1    let him know, like hey, I got offered a job with your

2    command and another command.  Should we talk about this?

3    And you know, we sent limited professional communications.

4    Yeah.

5        Q.    So was there ever a formal breakup?

6        A.    There was a formal breakup and it came in April.

7        Q.    And did you ultimately take a job in Italy?

8        A.    I did.

9        Q.    Was it with his command?

10        A.    No.

11        Q.    Why was that?

12        A.    I reached out to him and I said I got these two

13    offers.  I'm guessing maybe you don't know about the one

14    with your command, but can we please talk about this?

15    Because I can't take the job unless I know we can both be

16    comfortable with that.  And I think maybe he didn't reply,

17    which made me very uncomfortable working -- accepting a job

18    with his command.  So I went with the other command.  Both

19    of them were in Naples, Italy.  The other one was actually,

20    probably a less attractive job.  But I took the other one

21    because I wasn't comfortable working with him.

22        Q.    Just at a very high level, what happened in April

23    2022?

24        A.    In April 2022, I got a call out of the blue from

25    Barbara Burke and --

1          Q.    That's Burke's spouse at the time?

2          A.    Yes.  I got a call out of the blue from Barbara

3    Burke and she said that she was calling on behalf of Bob and

4    they wanted to let me know that someone had made some

5    allegations about me and Bob having an inappropriate

6    relationship.  And she basically pressured me to destroy

7    evidence of our relationship.

8          Q.    Did she tell you anything about what had happened

9    to evidence of your relationship on Burke's end?

10         A.    She did.

11         Q.    What did she say?

12         A.    So for context, if I may, Barbara Burke is a

13   former military intelligence officer, went to the rank of

14   Colonel in military intelligence and had a career in

15   military intelligence.  And so I knew that, but also she

16   stressed it during our conversation.  And she expressed to

17   me that people might be poking around.  And so she said that

18   she had -- she said that Bob had shared everything with her,

19   everything.  And Bob and I had a lot of intimate stuff.

20              We had intimate photos, videos, audio recordings,

21   like the works of people that are super intimate and in

22   love.  And she made clear to me, which is very painful, that

23   he had shared everything with her and also that she had

24   destroyed everything -- that no one looking through any of

25   his stuff, professional or personal, would find anything.

DOJ-0002598075

1    And she made clear that she had, like, gone into all the

2    caches and the cloud and she asked me to do the same thing.

3    And she says and if you don't know how, I'll fly to D.C. and

4    I'll take care of your equipment and basically your scrub.

5         Q.   Did you learn at some point in 2022 that Next Jump

6    had obtained a contract with Burke's command?

7         A.   I did.

8         Q.   Can you tell the grand jury about that?

9         A.   Yes.  So remember I had two job offers in Italy,

10   one with Bob's command and one with the other command in

11   Italy.  I took the job with the other command in Italy.  But

12   before I fully made my decision -- the other one was more

13   management-oriented and I expressed to the other hiring

14   manager hey, you know, I'm comparing these two jobs and I

15   would like to know more about management development

16   opportunities if I come to work for you.  And he says oh,

17   well, our sister organization here, NAVEUR-NAVAF -- they

18   just hired this company, Next Jump, to provide a leadership

19   training package.  And because we're their sister

20   organization and co-located, we also get to benefit from

21   that.  So if you come to work for us, you can have the

22   benefit of Next Jump.  But then he also expressed that I

23   shouldn't put too much stock in it because he didn't really

24   think much of them -- that they were very five and dime and

25   not -- he was somewhat familiar with them relative to other

DOJ-0002598076

1    executive training packages.  And he's like, so you've got

2    that Next Jump option, but you've also got the Army's

3    executive development program, which is really very good and

4    very well-known in the industry.  So he told me the gamut of

5    management leadership development opportunities I would

6    have.  And he also offered to mentor me as well.

7        Q.   What was your reaction to hearing that Next Jump

8    had obtained a contract with Burke's command?

9        A.   So that was around the month of February.  So I

10   had last spoken with Bob about Next Jump in probably

11   November in New York.  Flash forward, this is February.  He

12   had told me back in November that contract is never going to

13   happen.  It's too exorbitant.  It's ridiculous.  Flash

14   forward to February -- that was one of the first shoes that

15   dropped.  Because I realized his command had concluded a

16   contract with Next Jump of the same nature that had been

17   described the previous July and fall.

18       Q.   For training and development services?

19       A.   Yes.

20       Q.   And did you learn at some point that Burke had

21   accepted a job with Next Jump?

22       A.   I did.

23       Q.   And after learning those two things, did you -- I

24   think you said this already but just to be clear, did that

25   make you reflect differently on what he had told you about

DOJ-0002598077

1    the contract?

2        A.    Yes.  It was clear that he had managed me.  It was

3    clear that he misled me about his intentions with Next Jump

4    and the contract.

5            MS. FIFIELD:  Anything else?

6            BY MS. FIFIELD:

7        Q.    Okay.  So we're going to take an opportunity to

8    get some questions from the grand jury.  But before we do

9    that, I just want to give you some final admonishments and

10   opportunity to tell us anything else.  So is there anything

11   that I have not asked you that you believe this grand jury

12   should know to fairly evaluate this case?

13       A.    Just that I'm very humbled by the mistake in

14   character judgement I made with Bob.  I'm embarrassed and

15   humbled.  And that's why I cried at the beginning of this.

16   It was a heartbreaking experience for me and very difficult

17   for me and my daughter.  And so I'm sorry that I was

18   emotional during this.

19       Q.    Do you have any complaints about the way that

20   you've been treated by anyone associated with the criminal

21   investigative team, meaning myself, Mr. Wilmot, AUSA

22   Rothstein, or any of the investigative agents that we've

23   been working with?

24       A.    No complaints.

25       Q.    Has anyone, including Bob Burke, Charlie Kim,

DOJ-0002598078

1    Meghan Messenger, or anyone else pressured you or influenced

2    you to say anything other than the absolute truth with

3    respect to your grand jury testimony?

4         A.   No.

5         Q.   Is there anything else that you would like to add

6    or explain about your testimony?

7         A.   No.

8         Q.   If you decide later after you leave the grand jury

9    that you've made a mistake in your testimony or that your

10   testimony requires clarification, can I ask that you will

11   notify Special Agent Sebastian Gardner right away?

12        A.   Yes.

13        Q.   Okay.  We just want to make sure that your

14   testimony is completely accurate.  And if I do not hear from

15   you that you have contacted Agent Gardner for that purpose,

16   I'm going to assume that you remain satisfied with your

17   testimony.  Is that fair?

18        A.   Yes.

19             MS. FIFIELD:  At this point, I'm going to ask Ms.

20   Canedo to step out for a bit.  And we will talk about your

21   questions.

22             (Whereupon, at 3:32 p.m., the witness was excused

23   and was subsequently recalled at 3:36 p.m.)

24             BY MS. FIFIELD:

25        Q.   Just a handful of questions.  You don't have to go

DOJ-0002598079

1    into the details, but based on your understanding, what

2    precipitated Barbara Burke reaching out to you in April of

3    2022?

4         A.   She said that someone had filed an inquiry or

5    complaint or FOIA request requesting information about Bob's

6    travels and alleging that we had an inappropriate

7    relationship.  And she said that Bob's communications were

8    tracked and monitored and that he had asked her to reach out

9    to me.  And also --

10        Q.   She told you that he asked her to reach out to

11   you?

12        A.   Yes.

13        Q.   Okay.

14        A.   But she also said that -- well, some of the

15   allegations also pertained to my daughter.  So when Bob and

16   I were planning our future, we had planned to maybe live in

17   Australia and -- or to New York.  And my daughter knew that

18   we were engaged and considering different opportunities, my

19   daughter had talked with people.  And so the letter that was

20   submitted alleging an inappropriate relationship between me

21   and Bob also had implications for my daughter.  And it

22   alleged that maybe I was going to kidnap her away to

23   Australia.  And it was a bit of an odd letter, but it had

24   raised some concerns among -- well, I think it was NCIS.

25   And so because Bob's communications were limited and because

DOJ-0002598080

1    Bob was concerned about me and also she was concerned about

2    me, they both agreed that it would be best for her to reach

3    out.  And also Bob didn't reach out because he felt really

4    bad because he realized he had been kind of an ass to me.

5        Q.   And so was it your understanding -- and again,

6    correct me if I'm wrong, was it your understanding that

7    Barbara Burke was suggesting that you delete information to

8    cover up evidence of your relationship?

9        A.   Barbara Burke was not suggesting it.  Barbara

10   Burke requested it.  In fact, she urged and requested

11   repeatedly.  I told her I haven't done anything wrong.  I

12   don't have anything to hide.  And I said this experience was

13   real for me and my memories are precious.  And she called me

14   a fool.  And also, I said I don't have anything on my

15   government equipment.  I didn't carry on my relationship

16   with my government equipment.  Nobody is going to get my

17   private stuff and my private phone because I didn't do

18   anything wrong.  And she said you are such a fool.  They can

19   get anything they want and you need to destroy everything.

20   It's not going to look good for you either, you know, that

21   you were played -- and she didn't say you were played like a

22   fool, but basically she did.  And she just said that if I

23   cared about Bob, I would destroy everything.  And also, you

24   know, it wouldn't look good for me that I had that

25   relationship.

DOJ-0002598081

1           So I mean, not only did she request it, she

2    offered her services to cleanse and purge.  I didn't agree

3    to that.

4           Q.    So did you in fact acquiesce to her request?

5           A.    Hell no.  I did not.  I'm not about that kind of

6    thing.  I own my decisions.  I own my actions.  Some of my -

7    - I mean, clearly, I had bad judgement in trusting Bob Burke

8    and letting him into my life.  But I own my actions.  And I

9    refused.

10          Q.    You refused to delete evidence?

11          A.    I refused.  And then Bob called me and Bob asked

12   me to destroy evidence.

13          Q.    And to be clear, you did not?

14          A.    I did not.

15          MS. FIFIELD:  Okay.

16          GRAND JUROR:  I have --

17          MS. FIFIELD:  Can we wait until we get through the

18   first list?

19          GRAND JUROR:  Sure.

20          MS. FIFIELD:  Thanks.  I appreciate that.

21          WITNESS:  And I believe -- actually, I think they

22   both called me.  So Bob would call me at least once, maybe

23   twice.  Bob calls me at least once or twice.  And I think

24   they called me once.  And all of these efforts were aimed at

25   getting me to destroy evidence.

DOJ-0002598082

```
1              BY MS. FIFIELD:
2         Q.   Okay.  So switching gears a little bit, what was
3    your impression of Next Jump?  Basically, what did you think
4    of Next Jump based on the information that you had received
5    from Burke and information that you had received from other
6    sources?
7         A.   So they sounded interesting.  They definitely
8    sounded successful.  They definitely were profitable.  I do
9    my research.  So I looked at everything that was publicly
10   published about them.  I researched them and they were
11   clearly thriving and growing.  They did interesting work.  I
12   mean, I thought it was interesting.  Most of it was profit-
13   oriented.  And they also had some progressive ideas, you
14   know?  I mean, like, the yoga, the nutrition, nutrition
15   programs for the employees.  So they had a progressive labor
16   approach.
17              So originally, I thought they were interesting,
18   exciting, innovative, successful, and all that sounded
19   really great.  I didn't like what Charlie was suggesting
20   about the contract at our lunch.  But I kind of thought
21   maybe they're not that experienced in federal contracting.
22   Maybe he doesn't quite realize that what he's proposing is
23   illegal or wrong.  And as long as we move on and turn a
24   corner and move away from that, everything is okay.  So I
25   thought that as long as Bob didn't do those two things in
```

DOJ-0002598083

1   that order that they wanted, I thought Next Jump might be a

2   good place to work.  And yeah.

3       Q.   How did Burke -- at any time did Burke give to you

4   negative or skeptical information about Next Jump?

5       A.   Negative or skeptical?

6       Q.   He was a fan of Next Jump?

7       A.   He was a huge fan.  I don't think he ever said

8   anything down about them.  Everything about them he loved.

9       Q.   Okay.

10      A.   He loved and he also encouraged me to love them.

11  And he just kind of brushed away the contract thing.

12      Q.   Did he talk in any great detail with you about the

13  work that they had performed for the Navy before?

14      A.   Some of it -- a little detail.  Well, really what

15  he had described was that he had hired them before -- he had

16  hired Next Jump before.  I think it was to do, like, a pilot

17  program or something like that.  And what he had expressed

18  was that in years past in his prior position -- that he had

19  tried to launch a Navy-wide program with them -- that

20  there's this pilot and he wanted to expand it or do this

21  Navy-wide thing.  But for some reason or another, it didn't

22  work out.

23      Q.   Do you recall who paid for the lunch at Belga Café

24  in July?

25      A.   I don't.

DOJ-0002598084

1      Q.   Did you pay for it?

2      A.   I did not.

3      Q.   Do you have any specific recollection of Burke

4  paying?

5      A.   So what I recollect is that Burke said that they

6  invited him and that I was welcome to join.  So because they

7  invited, I would guess that they paid.  But I honestly don't

8  remember who paid at the end.  But it wasn't me.

9      Q.   And in terms of what was paid for, did you share

10  food?

11      A.   We did.  Some of the things we ordered

12  individually and some of the things were shared.

13      Q.   What about drinks?

14      A.   Even drinks were shared, yep.  So I know that Bob

15  and I both had alcoholic drinks.  I was on leave for the

16  afternoon and I was not at business.  I was spending time

17  with the man I was in love with, I thought, having a good

18  lunch that was going to be sociable.  And so I had, I think,

19  one drink.  But I recall what I had.  I had an Aperol

20  spritz, which is something very popular in Italy.  We're

21  talking about Italy.  Meghan had never tried it.  And it was

22  cozy enough that I was like Meghan, try it.  Sure.  You

23  know, try my drink.  And she tried it and it was just nice.

24  Oh, and tapas.  And also some entrees.  So the appetizers

25  were, like, shared and --

DOJ-0002598085

1          Q.    Do you recall what other beverages other folks had

2    or what was ordered?

3          A.    I recall that Bob had several drinks.  He

4    typically drinks, like, a vodka and something -- a vodka and

5    tonic, vodka and whatever.  It's always got vodka.  And I

6    think he had a couple, maybe three.  I don't recall if

7    Meghan and Charlie did.  I don't think they did.  I do

8    recall that they were driving from New York and they said

9    they had driven from New York for this meeting and they were

10   driving back that afternoon.  So I know at least one of them

11   did not have drinks.

12         Q.    You talked about this earlier and you testified --

13   and correct me if this is not a fair characterization of

14   your testimony -- you testified that your near-immediate

15   reaction to what Charlie was writing out on this napkin at

16   the restaurant was that it was wrong and inappropriate.

17         A.    Yeah.

18         Q.    Is that fair?

19         A.    That's fair.

20         Q.    Can you explain to the grand jury in the context

21   of your training and your experience why you immediately and

22   strongly had that reaction?

23         A.    So I don't have specific training in contracting,

24   but I have worked at high enough levels of government that I

25   know that there's a lot of scrutiny on contracts and that

DOJ-0002598086

1    all government officials are sworn to be ethical and have

2    integrity in the way they approach things.  We're not

3    allowed to accept gifts.  There's very strict rules for

4    accepting gifts.  And if there is, like, you have to either

5    have approval in advance or claim it and then reimburse the

6    cost.  I mean, like, even for buying lunch for someone or

7    accepting lunch from someone, there's rules for that, if

8    it's over, like, $30, $50 or something.  So it's highly

9    regulated -- what you can accept from private parties or

10   from corporates or other governments.

11          So Bob was a Navy official.  I was a Department of

12   Navy civilian official, different enterprises.  I was on

13   leave.  He was on duty on business.  It was a duty day for

14   him.  He was not on leave that afternoon.  He went back to

15   work after that meeting.  He had other meetings.  So he had

16   a business morning, the lunch with the drinks with Next

17   Jump, and then back to work on official Navy business.  It

18   was a duty day for him.

19          Q.   In his whites?

20          A.   In his whites.  So how did I know it was wrong?

21   You know, I just had this kind of gut instinct that it

22   wasn't right.

23          Q.   Let me ask you this -- in your training and

24   experience as a federal employee and based on ethics

25   trainings that you've had to take yourself, is it

FREE STATE REPORTING, INC.

DOJ-0002598087

1    appropriate for a federal government employee to negotiate

2    employment while simultaneously working on a matter in the

3    course of your employment that would affect --

4        A.    No.

5        Q.    -- the financial interests --

6        A.    So I know enough about contracting and ethics to

7    know that that's not okay -- that you can't tie government

8    business to personal gain.

9            MS. FIFIELD:  All right.  Can I ask you to step

10   out one more time just to make sure there are no follow-up

11   -- or get any follow-ups from you?

12           WITNESS:  Sure.

13           (Whereupon, the witness was excused at 3:51 p.m.

14   on May 14, 2024.)

15

16

17

18

19

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

DOJ-0002598088

1                    *C E R T I F I C A T E*

2

3          I, KYLE JENKINS, certify that this is an accurate

4    transcript of the notes and digital audio recording by

5    TIMOTHY ATKINSON, Court Reporter, of the testimony taken

6

7                              And

8

9    the proceedings held in the case of In Re: Robert Burke

10   before the Grand Jury

11

12                            Held in

13

14   United States District Court of the District of Columbia on

15   May 14, 2024.

16

17

18   June 24, 2024                    _____
     Date                            Kyle Jenkins
19                                    Transcriber

20

21                                   _____
                                     Timothy Atkinson
22                                   Official Reporter

23

24

25

                    FREE STATE REPORTING, INC.
                 Court Reporting  Transcription
                    D.C. Area 301-261-1902
                    Balt. & Annap. 410-974-0947

DOJ-0002598089