**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 24–265 (2) (TNM)** |
| **v.** | : | |
| | : | |
| **YONGCHUL "CHARLIE" KIM, and** | : | |
| **MEGHAN MESSENGER,** | : | |
| | : | |
| **Defendants.** | : | |

**UNITED STATES' MOTION**
**TO ADMIT OUT-OF-COURT CO-CONSPIRATOR STATEMENTS**

The United States of America respectfully moves *in limine* to admit at the trial of Defendants Yongchul "Charlie" Kim and Meghan Messenger (1) statements made by party opponents Kim and Messenger against themselves pursuant to Federal Rule of Evidence 801(d)(2)(A); (2) statements by co-conspirators Kim and Messenger against each other pursuant to Federal Rule of Evidence 801(d)(2)(E); and (3) statements by co-conspirator Robert Burke pursuant to Rule 801(d)(2)(E), without limitation to other non-hearsay purposes for which the statements may be admitted.

The Indictment charges that, from September 2020 through October 2022, Burke, a U.S. Navy Admiral stationed in Europe, conspired with Kim and Messenger, co-CEOs of Company A to commit bribery, specifically, to accept and receive future employment in exchange for a government contract. (*See* ECF No. 1, ¶¶ 20-21, 23-24, 51). As explained below, certain statements by Kim, Messenger, and Burke, made during the conspiracy period to each other and to others, are admissible as statements by co-conspirators in furtherance of the bribery conspiracy.

## I.    SUMMARY OF THE EVIDENCE

In or about August 2018, Company A, run by Messenger and Kim, was subcontracted with the Navy to provide workforce training to a small component of personnel under Burke's command when Burke was stationed in the United States.  *See* ECF No. 1 at ¶ 11.  Under this "pilot program," Company A could potentially obtain as much as $10 million; however, the Navy terminated the pilot program around November 2019.  *See id.* at ¶ 12.  Company A received far less than the money allotted for in the pilot program, and a mere fraction of the contract they had hoped to obtain.  *See*, *e.g.*, DOJ-NXJ-000022 (April 2021 Kim email, noting the "non-success from the beta" and stating, "the initial $100MM commitment from the Navy, in hindsight should have been closed [in] July 2018.").

Kim and Messenger attempted to salvage their business from the Navy by going to Burke directly to pitch their proposal for continued defense contracting.  Burke had transitioned to another position in the Navy, however, and Kim and Messenger received an instruction from a Navy officer to have no further contact with Burke.

By June 2020, Kim contacted Person 1, the Navy Admiral then in charge of the command Burke had previously held when he authorized the pilot program.  But, he reached a dead end. Kim acknowledged, "[w]e've been told to not contact/communicate with Admiral Burke," and he asked where Company A stood with the Navy.  Person 1 replied that he could not answer the question, and he referred Kim to contact the Navy Contracting Office for information.

Meanwhile, Company A was experiencing the effects on its bottom line from the COVID-19 pandemic.  Messenger wrote to an investor in July 2020, for example, that "we are experiencing a 50% drop in weekly revenues."  This decline necessarily related to Company A's e-commerce

business, *see* ECF No. 1 at ¶ 18, because its other business, workforce training, had reported no revenue since the pilot program ended in late 2019. *Id*. at ¶¶ 17-18.

Driven by their desperation, Kim and Messenger initiated prohibited communications with Burke, who, at that time, was head of the Navy's European and African command. *Id*. at ¶¶ 27-30. Between September 2020 and February 2021, Kim and Messenger tried – repeatedly and unsuccessfully – to secure a meeting with Burke to promote Company A. Eventually, Burke acceded. A remote meeting occurred on April 8, 2021, with participants from the Navy, such as Person 2, remembering it as an unremarkable marketing pitch.

But another, secretive, remote meeting occurred on April 20, 2021, between Burke, Kim, and Messenger, during which they devised a plan: They would offer a contract to Burke in exchange for a government contract. Within hours of this meeting, Kim wrote to certain Company A personnel that it was the "the highest stakes meeting to date and the tiniest wrong move would/could lose all trust-come across slimy." Kim wrote that Messenger said she "felt slimy" during the call because Burke "*wants to work for us but we're asking for a deal first*," whereas Kim had been "nervous but calm." (Emphasis added.)

About two weeks later, Burke reported to Kim and Messenger that Person 2 was "working options and angles hard for funding our project[.]" Kim and Messenger reported to an investor that Burke would work to get a $50 million contract to Company A through Burke's command, and added that Burke wanted to work at Company A. The message did not reveal that the contract and job were a bargained-for exchange that, as Messenger would later describe it, amounted to "no contract no job."

On May 10, 2021, Kim, with Messenger copied, emailed Burke proposing a $20 million contract, even though no contracting personnel under Burke's command had considered a potential

procurement.  Messenger explained in an email to certain Company A personnel that the quote was lowered because, at $50 million, it would "look like we are taking advantage of Burke."

On July 13, 2021, Kim emailed Burke's personal address only and, copying Messenger, arranged for a lunch meeting in Washington, DC for July 23, 2021.  That day, Burke invited Person 3, a personal companion, and invited her to attend the lunch.  Prior to the lunch, Burke sent a text message to Person 3 stating that Kim and Messenger "want to have a more intimate conversation" and "Meghan already talking about job."  According to Person 3, during the lunch, Kim talked about a contract between Company A and the Navy and the resulting job for Burke at Company A.

All three of the conspirators memorialized their lunch meeting.  Kim emailed senior Company A personnel and reported, "Burke. Crazy day. Five hours. He would have stayed all night if we stayed. In short [a contract] starting with his command almost ASAP."  In the same email, Kim said that they had also discussed Burke coming to work at Company A after his retirement and including "salary equity etc."  Kim reported that Burke was "very excited" and "wanted to resign next week," but Kim "[t]old him to hold off and first launch this part 1."

Also, that evening, Messenger emailed members of her family, stating that Burke would give Company A a government contract and subsequently work for Company A:

> [T]he longest day of my life in DC . . . getting small few million-dollar deal with burke for navy europe deal to prove the result to then get bigger deal and offered Burke full time offer wants to be [with Company A] starting next July.  Surreal. A 4stsr [sic] working for us when he retires . . . longest day but worth it.

The next day, July 24, Burke texted Person 3 that "Charlie  sent me a note . . . . I asked him to write out a job description – but I've essentially agreed to work for them . . . ."  Burke also described employment at Company A as a "real offer" that would get him "out of the DoD rut."  When Person 3 asked about the stock part of the offer because "[i]t was hard to hear with '500k

base salary' ringing in my ears," Burke replied, "10% in total co … junior coowner behind Meghan . . ." On August 26, 2021, about a month after the lunch meeting, Burke sent the Secretary of the Navy a memo formalizing his intention to retire from the Navy in May 2022.

Throughout the summer of 2021, emails show that Company A was still developing the application it intended to provide to the Navy as part of the deal with Burke. In late August, Company A sent the product to Burke to "test drive." Meanwhile, Messenger emailed Company A personnel that the latest proposal to Burke was reduced to a $1 million contract. Messenger explained, "We don't want Bob [Burke] to get off the hook…the $ amount is less significant at this stage [ . . . .] IN our POV [point of view] the contract size is less important than the things it triggers (including being able to say we're in partnership with the navy)[.]"

The results of the Navy's "test drive" of Company A's software were not good. On September 22, 2021, Burke emailed Kim and Messenger that Company A's application "in and of itself does not stand on its own" and that the "app-based approach" "just does not seem to be sustainable or scalable for us [the Navy]." Burke concluded, "I just can't do this as structured."

Internally, Kim, copying Messenger, forwarded Burke's email to Company A personnel. A Company A employee replied and called the feedback "very embarrassing." Externally, Kim invited Burke to Company A's now-lavish New York City headquarters. Burke agreed.

On November 16, 2021, Burke visited Company A. Burke told Person 3, who traveled to New York with him, that he was meeting Kim and Messenger. This time Person 3 was not invited. According to Person 3, Burke said after the meeting that Kim and Messenger increased the equity stake they would give Burke in Company A.

From Kim's and Messenger's perspective, the meeting was a great success. Kim explained in a contemporaneous email to Company A personnel that the company was about to be "full force

back into business with the Navy." Kim also described a detailed plan to work around the significant flaws in Company A's app, which included bringing some of Burke's officers over for an in-person training in New York City, culminating in the contract to be "signed before Xmas." Executing the plan would require the assistance of much of Company A's "Partners team:"

> Meghan and I met for a little over 4 hours today with Admiral Burke. In short, we're about to go full force back into business with the Navy. We have 4 of his senior most people coming in 2 weeks . . . Within one week [of that visit] . . . he is going to propose back a ~$1MM engagement with [Company A] with goal of having it signed before Xmas. We will likely launch in the new year, the work will be in Naples, Italy and Rota, Spain. We will likely engage our entire Partners team to help with the coaching and training of the pilot Sailor population.

Two days later, Messenger replied to Kim only via email reflecting her ongoing belief that the conspiracy was driving toward its intended results: "Weird to think Burke gonna be on our team likely next summer eh[.]"

As the conspirators planned, in early December 2021 four of Burke's officers attended NextJump's in person training. If Kim felt concern about the need to impress Burke's officers with the quality of the training, he did not appear to express it to anyone. To the contrary, in a November email to a NextJump partner, Kim seemed to consider the government contract a foregone conclusion:

> Within one week of academy [training] these 4 leaders are going to be tasked with how and what they need our help with. Contract signed before Xmas and then we're off to the races, ideally tangible success by March. Present April/ may for all navy deal to 640k sailors and 5000 commands globally. Then Burke ideally leaves navy joins [NextJump] somewhere between July-oct next year in nyc.

By December 2021, Company A personnel were contacting Burke's staff to arrange their travel—even though a contract had not been signed. As Person 2 put it, in response to the travel assistance request, "Comptroller is researching possible vehicles, but we don't even have proposals . . . I'm not sure how to stop this direct communication between he [Burke] and them [Company A]." Nevertheless, in mid-December Burke ordered Person 2 to get a contract to Company A to

provide training to Burke's command, and Person 2 instructed Burke's staff to implement it.  One training officer under Burke's command later remarked, in response to Company A's training proposal, "I'm sorry, but I really don't like the pricing. They are screwing us."

On December 22, 2021, Company B, which held the prime contract with the U.S. Government concerning certain training programs, signed the subcontract for NextJump to provide the training to Burke's command.  On December 23, describing the speed with which the contract was signed, a NextJump employee cheered, "That is what happens when a 4* admiral is calling the shots."  The training was given in January 2022; however, it was poorly received  and this feedback was shared with Burke in or around February 2022.

Despite the negative feedback, Burke introduced Kim and Messenger to other Naval officers and promoted Company A in an effort to help it secure additional government contracts. In making these introductions, Burke praised Company A's product—exactly as the conspirators agreed to do when they met the prior summer in Washington, DC.  For example, Burke wrote to Person 4, a high-ranking Admiral responsible for training sailors throughout the Navy, promoting Company A and how it could be a good fit for the U.S. Navy.  Burke also promoted Company A to a high-ranking foreign official from a Foreign Military.

Burke retired from the Navy in the summer of 2022.  He began working at Company A in October 2022, but only remained in the job for a few months before resigning.  The relationship between Burke, on the one hand, and Kim and Messenger, on the other, was a marriage of convenience that did not last.  In October 2022, Messenger wrote to Kim remembering an argument with Burke, in which she had an "outburst" and said, "no contract no job."  Additionally, on January 17, 2023, the same day Burke emailed Kim and Messenger to tender his resignation,

Messenger emailed Kim her "negative predictions." Messenger's "negative predictions" included that Burke would tell everyone she and Kim "baited him into a contract for a job offer."

## II.    LEGAL STANDARDS

Federal Rule of Evidence 801(d)(2)(A) provides that a statement is not hearsay if it is offered against an opposing party and "was made by the party in an individual or representative capacity[.]"

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is offered against an opposing party and "was made by th[at] party's co-conspirator during and in furtherance of the conspiracy." The admission of co-conspirator statements under Rule 801(d)(2)(E) does not violate the Confrontation Clause. *Giles v. California*, 554 U.S. 353, 374 n.6 (2008).

There is a two-part test for the admission of a statement under this Rule: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). In determining whether the first prong of the test is satisfied, the Court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and it "must find that the government has offered 'independent evidence' apart from the statements themselves that a conspiracy exists and that the Defendant and the declarant were involved in the conspiracy." *United States v. Bailey*, 19-CR-156 (CKK), 2022 U.S. Dist. LEXIS 171874, at *6 (D.D.C. Sept. 22, 2022). Even so, "the content of the statement itself can also be considered in determining whether such independent evidence exists." *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996) (citations omitted); *see also* Fed. R. Evid 801(d)(2) ("The statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under [subsection] (E)."). Independent

evidence "can take any number of forms, including contemporaneous acts suggestive of the charged conspiracy and/or corroborative of the contents of the purported co-conspirator statements." *Id*. To admit a statement under this rule, the Court "must find by a preponderance of the evidence that the person making the statement was a co-conspirator and that the statement was made during and in furtherance of the conspiracy." *Gatling*, 96 F.3d at 1520 (citing *Bourjaily*, 483 U.S. 175-76).

Procedurally, the Court "can preliminarily admit hearsay statements of co-conspirators, subject to connection through proof of conspiracy." *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006) (citation omitted). It is well-established in this Circuit that the government need not prove the preliminary facts of an alleged conspiracy prior to disclosing the co-conspirators' statements at trial. *See United States v. Carson*, 455 F.3d 336, 365 n.26 (D.C. Cir. 2006). Indeed, a pretrial hearing is unnecessary and disfavored. *See United States v. Lorenzana-Cordon,* 1:03-cr-CKK, 2016 WL 11664060, *1 (D.D.C. Jan. 21, 2016) ("In fact, it is common practice for courts in the D.C. Circuit to admit co-conspirator statements conditionally, subject to connection through proof of conspiracy—*i.e.,* contingent upon the government's subsequent introduction at trial of sufficient evidence to persuade the Court that the requirements of Rule 801(d)(2)(E) have been met.") (internal citations and quotation marks omitted); *see also United States v. Jackson*, 627 F.2d 1198, 1218 (D.C. Cir. 1980) (finding that district courts are "vested with considerable discretion to admit particular items of evidence 'subject to connection'").

While admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not particularly restrictive. It is satisfied if the statement is "in some way . . . designed to promote or facilitate achievement of the goals of the on-going conspiracy, as by, for example, providing reassurance to a coconspirator, seeking to induce a

coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy." *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993); *accord United States v. Maldonado-Rivera*, 922 F.2d 934, 958–59 (2d Cir. 1990).  Nor do the statements have to necessarily relate to ongoing events or future conduct.  "[S]tatements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy." *United States v. Thai*, 29 F.3d 785, 813–14 (2d Cir. 1994); *accord United States v. Heinemann*, 801 F.2d 86, 95–96 (2d Cir. 1986); *see also United States v. Lozano-Reyes*, 101 F.3d 686, 1996 U.S. App. LEXIS 14182 at *5 (2d Cir. June 12, 1996) (unpublished opinion) (affirming trial court's admission of co-conspirator statement whose purpose was "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits.").  "Rule 801(d)(2)(E) does not require that the statement be made to a co-conspirator," *United States v. Edmond*, 52 F.3d 1080, 1111 (D.C. Cir. 1995), and statements aimed at "communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals" further the conspiracy and are admissible under Rule 801(d)(2)(E), *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).  While "mere narratives of past successes and failures" or "casual comments to people outside or inside the conspiracy" are not admissible, a statement that "can reasonably be interpreted as encouraging a co-conspirator *or other person* to advance the conspiracy, or as enhancing a co-conspirator *or other person's* usefulness to the conspiracy" is admissible under Rule 801(d)(2)(E).  *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir.) (emphasis added).  This may include statements deployed to keep key personnel "current on the status of the business" as, for example, "statements regarding profits [may] serve[] as motivation for her continued participation." *Id.*

## III.    ARGUMENT

### A.  A Conspiracy Existed Between the Defendants.

The first prong of the *Bourjaily* test for admitting a co-conspirator statement under Federal Rule of Evidence 801(d)(2)(E) is whether a conspiracy existed that included the defendant, in this case Kim and Messenger.  *See* 483 U.S. at 175.  The existence of this conspiracy is established by sufficient independent evidence in addition to the co-conspirator statements.  *See Bailey*, 2022 U.S. Dist. LEXIS 171874, at *6; *Gatling*, 96 F.3d at 1520; Fed. R. Evid 801(d)(2).[1]

As an initial matter, the evidence shows that Kim and Messenger formed a conspiracy in or about September 2020, by initiating what they knew was prohibited communications with Burke, because of evidence of Company A's dire financial condition caused by (1) the lack of any revenue for their leadership training business, and (2) the COVID-19 economic disruptions to their e-commerce business. Burke joined the conspiracy on or about April 20, 2021, during a remote meeting he had with Kim and Messenger.  Kim wrote to Company A personnel that Burke "wants to work for us but we're asking for a deal first."  Evidence that Burke joined the conspiracy in late April is borne out by his communication to Kim and Messenger on May 7, 2021, that he had directed Person 2, a staff member, to "work[ ] options and angles hard for funding our project." The conspiracy continued through the July 23, 2021, meeting in Washington, D.C., through the November 16, 2021, visit to Company A's headquarters, and through Burke's order to Person 2 to

---

[1] Indeed, and not to be understated, the Court already ruled in the Burke trial that "[t]he Government is permitted to introduce co-conspirator statements [by Kim and Messenger against Burke] under Federal Rule of Evidence 801(d)(2)(E) *because it has proved the existence of a conspiracy by a preponderance of the evidence.*"  (ECF No. 150 at 1 (citing *Bourjaily*) (emphasis added)); *see also* Transcript at 108:1-4 (I find that the Government has presented a sufficient body of evidence beyond the statements themselves to show by a preponderance of the evidence that a conspiracy existed between the three Co-Defendants."); *id.* at 109:22-24 ("In sum, I find that the Government has proven the existence of a conspiracy between the three Co-Defendants by a preponderance of the evidence.").

provide a contract for Company A in December 2021. The conspiracy continued in the spring of 2022, when Burke promoted Company A to other officials in the U.S. Navy and a Foreign Military and introduced those contacts to Kim and Messenger. For example, Burke wrote an email to Kim and Messenger – even after he had officially recused himself from Company A business – in which he advised his co-defendants how to appeal to Person 4, an Admiral in charge of the Navy's budget for pipeline schools. Burke continued in the conspiracy while misleading Navy personnel by failing to honestly disclose the extent of his job discussions with Kim and Messenger, and the actions he took, despite this conflict, to award government business to Company A. In fact, Burke participated in the conspiracy through October 2022, when he accepted the promised employment at Company A.

> B. *Kim and Messenger's Statements During and in Furtherance of the Conspiracy Are Admissible.*

For the reasons already stated by the Court in admitting Kim and Messenger's statements against Burke, the statements are equally admissible against Kim and Messenger. Specifically, Kim and Messenger's statements to each other, to their employees, and to their investors from September 2020 through October 2022 furthered the conspiracy and are admissible under Rule 801(d)(2)(E). *See Bourjaily*, 483 U.S. at 175. As to communications between Kim, Messenger, and Company A personnel related to the Navy contract deal with Burke, the Court has previously held that it was "convinced by the Government's argument that Mr. Kim and Ms. Messenger communicated these statements to their employees in order to motivate them to perform the tasks necessary for Defendants Kim and Messenger to uphold their end of the bargain." Transcript of Pretrial Conference at 114:12-16, United States v. Burke, 1:24-cr-00265 TMN (Apr. 10, 2025) (hereinafter "Transcript"). As to communications between Kim, Messenger, and Burke, the Court previously held those statements were also admissible as statements "that keep a co-conspirator

updated on the status of the business, motivate a co-conspirator's continued participation or provide background information on key conspiracy members[.]" *Id.* at 115:15-19 (citation and quotation marks omitted). Third, communications between Kim, Messenger, and Company A investors referencing the Navy contract deal with Burke are admissible because "[m]ost of th[o]se statements to investors are likely admissible because Defendants Kim and Messenger needed their investors' buy-in so they would continue to financially and otherwise support the company." *Id.* at 116:14-17. [2]

### C. Burke's Statements During and in Furtherance of the Conspiracy Are Admissible Against Kim and Messenger.

The second prong of *Bourjaily* is also satisfied with respect to multiple categories of statements made by Burke during the course of and in furtherance of the bribe conspiracy. *See* 483 U.S. at 175. Those categories of statements and examples of statements falling within each category are described below.

i.    <u>Statements by Burke to Kim and Messenger</u>

For the same reasons that Kim's and Messenger's statements to each other and to Burke are admissible against each other as statements by a coconspirator, *see supra*, Burke's statements made in furtherance of his conspiracy are equally admissible against them. Specifically, Burke's messages to Kim and Messenger apprised them of key developments with the Navy side of the bribe scheme, and served to prepare his co-defendants for the steps that were being taken by him – and needed to be taken by them – to obtain the contracts.

Examples of such statements include:

---

[2] Of course, these statements are also admissible as statements by a party opponent under Rule 801(d)(2)(A).

- A May 6, 2021, email from Burke to Kim and Messenger stating "Juliet working options and angles hard for funding our project[.]"

- A September 22, 2021, email from Burke to Kim and Messenger stating that Company A's application "in and of itself does not stand on its own" and that the "app-based approach" "just does not seem to be sustainable or scalable for us [the Navy]." Burke concluded, "I just can't do this as structured[,]" but then offered advice for the type of pilot project that would fit the Navy, and stating "[i]f you could re-structure something along these lines, I will take it to my fiscal/legal team for an assessment."

- Emails from Burke to Kim and Messenger in December 2021 and January 2022 pertaining to steps taken to finalize the contract, to include Burke's apprising Kim and Messenger of certain roadblocks in the contracting process that Kim helped Burke resolve.

- Burke's May 2022 email to Kim and Messenger attaching his official recusal memorandum. In the text of the email, Burke wrote "I have all my ducks in a row now with Navy to have discussions with you on employment."

- A June 2022 email Burke wrote to Kim and Messenger describing his recent discussions with Person 4, a senior Navy Admiral, and advising Kim and Messenger about how to influence and appeal to Person 4 when they spoke to him. Importantly, this email was written after Burke had formally recused himself from working on behalf of Next Jump, a fact that was known to Kim and Messenger because Burke previously had forwarded them his recusal memo.

ii.  <u>Statements by Burke to Other Military Personnel Regarding a Contract with Company A and Promoting Company A</u>

The second category of statements that the government will seek to introduce includes Burke's statements to other Navy personnel ordering a contract be put in place with Company A, and his statements to other United States and foreign military personal promoting Company A's business.  In exchange for a job with Company A (Phase 3), Burke's role in the conspiracy was twofold:  first, he was to ensure that that Navy awarded an initial contract to Company A for its workforce training business (Phase 1), and second, before retiring from the Navy, and beyond, he was expected to continue promoting Company A to other military personnel in an effort to secure additional, larger contracts (Phase 2).  Consequently, Burke's statements that fill within this category go to the heart of the conspiracy and are admissible.  Moreover, it is completely immaterial that the officials to whom Burke was communicating were unaware of the conspiracy.  What matters is that Burke made those statements with the goal of having the officials aid the conspiracy by awarding work to Company A.  *See* Transcript at 117:3-12.

Examples of such statements include:

- A September 15, 2021, email from Burke to Person 2 stating that "Charlie is pinging me incessantly. Wants to visit 'and get this moving" and directing Person 2 to give Burke access to Company A's training materials and cost paperwork "to craft a thorough response."

- A December 16, 2021, email from Burke to Person 2 in which he ordered her to arrange a contract between the Navy and Company A, and explaining "[w]ould like to get this in place to support kick off events in Early Jan if possible."

- March 14 and 28, 2022, emails from Burke to Person 4, Commander US Fleet Forces, who was responsible for training sailors throughout the Navy, introducing him to Kim and Messenger, and promoting Company A and how it could be a good fit for the Navy.

- A May 25, 2022, email from Burke to a high-ranking foreign official from a Foreign Military promoting Company A because Burke knew "your team is considering something similar."

    iii.  <u>Statements by Burke to Other Navy Personnel Discussing His Retirement and Future Employment</u>

The third category of statements that the government will seek to introduce includes Burke's statements to Navy personnel, including his Navy Ethics Counselor ("NEC"), in which he failed to disclose his job discussions with Kim and Messenger, and misrepresenting his lack of a role in awarding government business to Company A.

It is well-settled that efforts to conceal an ongoing conspiracy serve to further that conspiracy, and that statements by a coconspirator in an effort to conceal or prevent discovery of the conspiracy are admissible under Federal Rule of Evidence 801(d)(2)(E). *See, e.g.*, *United States v. Mayfield*, 909 F.3d 956, 962 (8th Cir. 2018); *United States v. Weaver*, 507 F.3d 178, 186 (3d Cir. 2007) ("[S]tatements made for the purpose of concealing a conspiracy can further the conspiracy regardless of whether the addressee is a co-conspirator."); *United States v. Payne*, 437 F.3d 540, 546 (6th Cir. 2006) ("Statements designed to conceal an ongoing conspiracy are made in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E)."); *United States v. Broussard*, 80 F.3d 1025, 1039 (5th Cir. 1996) ("Given that concealment is often a necessary part of a conspiracy, statements made to aid the concealment are made in furtherance of the conspiracy."); *United States v. Blakey*, 960 F.2d 996, 998 (11th Cir. 1992) ("Statements which serve a necessary

part of a conspiracy by concealing it or impeding an investigation are admissible as statements made during and in furtherance of the conspiracy.").

Here, a goal of the conspiracy was not only for Burke to obtain a Navy contract for Company A, but for him to continue leveraging his position at the Navy to promote Company A's services in an ongoing effort to secure additional contracts. *See* ECF No. 1 at para. 26. Had Burke revealed in the truth about his job discussions, the Navy would have recused him from any involvement in awarding a contract to Company A. *See id.* As such, it was critical to the success of the conspiracy that Burke failed to report and misled the Navy about the nature of and his involvement in the conspiracy.

Examples of such statements include:

- An August 26, 2021, memo from Burke to the Secretary of the Navy requesting voluntary retirement and stating that he was aware of the directive governing pre- and post-retirement standards of conduct and employment activities—and thereby falsely implying that he was following those standards.

- A March 28, 2022, email from Burke to the NEC asking for a legal opinion letter on seeking post-retirement employment, and claiming "I have had no conversations, have no intent to aim for a specific company, and most likely will not actively seek employment until after 1 July."

- Burke's March 28, 2022, Post-Government Employment Advice Opinion Request, in which he falsely stated he was not yet seeking employment with anyone in particular, had taken no actions concerning his future employment, to include being interviewed or accepting a position, and had had no official involvement with or duties related to prospective employers.

- A May 6, 2022, email from Burke to the NEC stating that "Company A has approached me asking if I would be interested in having post-Navy employment discussions – I let them know I could not, had some prerequisites to meet and would get back with them if/when I met those prerequisites." Burke also wrote "[f]ull disclosure" before explaining that he had worked with Company A in 2017 on one contract, and had "hired them for the pilot program here[,]" adding that the "contract decision was through the ED[.]"

- A July 18, 2022, email from Burke to himself, attaching a Public Financial Disclosure Form in which he wrote that he had "tentatively accepted a job offer from Company A for post-retirement employment[,]" but with no mention of his prior job discussions with Kim and Messenger.

    iv.  <u>Statements by Burke to Person 3</u>

The fourth and final category of statements that the government will seek to introduce includes Burke's statements to Person 3 – in particular his statements in connection with the July 2021 meeting in Washington, D.C. and the November 2021 meeting in New York City – regarding his discussions with Kim and Messenger about a contract for and his future employment with Company A.

These statements furthered the conspiracy and were not "mere narratives" or "casual comments to people inside or outside the conspiracy." *See Tarantino*, 846 F.2d at 1412. Indeed, Burke's statements furthered the criminal conspiracy because their purpose was to falsely placate and assure Person 3 that the conduct about which she was aware was proper. In other words, Burke's statements to Person 3 – a trusted confidant with whom he planned to spend his post-Navy life – kept Person 3 necessarily informed while ensuring she was "on side" and would not scupper

his arrangement with Kim and Messenger. *See, e.g., Weaver*, 507 F.3d at 186 ("statements made for the purpose of concealing a conspiracy can further the conspiracy [for purposes of Rule 801(d)(2)(E)] regardless of whether the addressee is a co-conspirator.").

Finally, these statements are also admissible because they are reflective of Burke's – a co-conspirator's – state of mind, and that state of mind may color the co-conspirator's intention behind making the statement. *See United States v. Quinn*, 403 F. Supp. 2d 57, 66-67 (D.D.C. 2005) ("Circumstantial evidence plays a substantial role in conspiracy trials because of its relevance in establishing conspiracies and the genuine inability to obtain direct evidence of the conspiratorial agreement."); *United States v. Edmond*, 52 F.3d 1080, 1111 (D.C. Cir. 1995) ("The declarant's intent is the relevant inquiry" under Rule 801(d)(2)(E)). The intention behind the statement also shows why Rule 801(d)(2)(E) "does not require that the statement be made to a co-conspirator." *Edmond*, 52 F.3d at 1111 (D.C. Cir. 1995).

Examples of such statements include[3]:

- A July 23, 2021, text message from Burke to Person 3 regarding the upcoming July 23, 2021, lunch with Kim and Messenger in Washington, DC, stating that Kim and Messenger "want to have a more intimate conversation" and "Meghan already talking about job."

---

[3] Portions of the text chain between Burke and Person 3 in which Person 3 asks questions of Burke about the Company A agreement, which then prompt his statements in response, are also admissible because (1) Person 3's messages were questions, which are not hearsay because they make no assertion and have no truth value, (2) are merely offered to provide context for Burke's responses, and (3) "statements introduced to show their effect on the listener are not offered to prove the truth of the matter asserted and therefore are not hearsay." *United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022); *see also Hamilton v. Nat'l R.R. Passenger Corp.*, No. 1:19-CV-01986 (TNM), 2020 WL 6781234, at *3 n.4 (D.D.C. Nov. 18, 2020) ("The Court finds that this statement is not hearsay because it is not being introduced here for its truth, but to show its effect on the listener.").

- Two July 24, 2021, text messages from Burke to Person 3 stating that "Charlie sent me a note" and "I asked him to write out a job description – but I've essentially agreed to work for [Company A] . . . ."

- A subsequent July 24, 2021, text message from Burke to Person 3 in response to her asking about the stock part of the Company A offer because "[i]t was hard to hear with '500k base salary' ringing in my ears[,]" to which Burke replied, "10% in total co … junior coowner behind Meghan [Messenger] . . . ."

- A subsequent July 24, 2021, text message from Burke to Person 3 in response to her asking "To what extent u think /believe the job for you is tied (or not?) to the contract/ trial w naveur?  That made me nervous[,]" to which Burke replied, "technically - zero.  But he desires that I be able to have a personal testimonial."

- A subsequent July 24, 2021, text message from Burke to Person 3 explaining that he was "lean[ing]" toward working for Company A, "for three reasons - there is now a real offer, it gets us out of the DoD rut, and it is different work than I've done before."  Burke also explained to Person 3 that he was "depending on you to run our LLC and be my EA."

- Statements Burke made to Person 3 following the November 2021 meeting with Kim and Messenger at Next Jump's offices in New York City.

## IV.  CONCLUSION

For the reasons stated herein and any that may be stated in a hearing on pretrial motions, the government respectfully requests that the Court admit certain statements by Kim and Messenger, both against themselves as statements by a party opponent and against each other as

statements by a coconspirator, and certain statements by Burke as statements by a coconspirator, pursuant to Federal Rules of Evidence 801(d)(2)(A) and 801(d)(2)(E).

Respectfully submitted,

JEANINE FERRIS PIRRO                     EDWARD SULLIVAN
UNITED STATES ATTORNEY                    Acting Chief, Public Integrity Section
N.Y. Bar No. 1387455                      U.S. Department of Justice

By      /s/                                       /s/
Rebecca G. Ross                          Trevor Wilmot
Brian P. Kelly                           Kathryn E. Fifield
Assistant United States Attorney         Trial Attorneys
601 D Street N.W.                        1301 New York Ave. NW
Washington, DC 20530                     Washington, D.C. 20530
Office: (202) 252-4490                   Office: (202) 514-1412