# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 24–265 (2)(3) (TNM) |
| | : | |
| YONGCHUL "CHARLIE" KIM, and | : | |
| MEGHAN MESSENGER, | : | UNDER SEAL |
| | : | |
| Defendants. | : | |

### UNITED STATES' OMNIBUS MOTION IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION *IN LIMINE*

The Omnibus Motion *in Limine* (the "Motion") filed by Defendants Charlie "Yongchul" Kim ("Kim") and Meghan Messenger ("Messenger"), ECF No. 176, relies on faulty legal premises, including overly expansive readings of the Federal Rules of Evidence. It should be denied.

## I.    Background

In May 2024, a federal grand jury in the District of Columbia returned a five-count Indictment against Kim and Messenger, and their co-defendant, retired four-star Navy Admiral Robert P. Burke ("Burke"). *See* ECF No. 1. The indictment charges Kim and Messenger each with one count of conspiracy to commit bribery, in violation of 18 U.S.C. § 371, and one count of bribery, in violation of 18 U.S.C. § 201(b)(1). The charges relate to a scheme perpetuated by all three defendants to commit bribery; specifically, for Kim and Messenger to offer, and for Burke to accept, a job at Company A, in exchange for Burke's securing a government contract for Company A.[1]

---

[1] As the Court is aware of the facts and evidence relevant to this trial, the government does not repeat them here but incorporates by reference those facts and evidence as detailed in previous briefing. *See e.g.*, ECF No. 148 at 4-20, ECF No. 155 at 2-11.

Kim's and Messenger's trial begins on August 18, 2025. On May 30, 2025, Kim and Messenger filed the Motion, seeking several pretrial rulings. Specifically, they ask this Court to preclude: 1) certain summary testimony from the government's summary witnesses; 2) evidence of Company A's negative work environment and negative opinions about Kim and Messenger; 3) evidence of negative reviews about Company A and its products; 4) conversations between Burke and Person 3 about Company A, Kim, and Messenger; 5) evidence that Person 3's possessed a government security clearance. *See generally* Motion Kim and Messenger further seek an expansive cross-examination should DCIS Agent Cordell "Trey" DeLaPena ("SA DeLaPena") testify at trial. *Id.* For the reasons discussed below, the Motion is meritless and should be denied.

## II.    The Court Should Not Preclude Evidence from the Government's Summary Witnesses.

Kim and Messenger argue that the government should be precluded from eliciting certain testimony from its summary witnesses. They point to ten examples from the case agent's testimony at Burke's trial that fit into three general categories of testimony: 1) the background of the government's investigation; 2) individuals and entities associated with the investigation; and 3) evidence collected, or not collected, during the government's investigation.

The Court should deny, or at a minimum defer ruling on, this part of the Motion because it seeks sweeping relief while being devoid of legal support.

### a.  Applicable Case Law

It is well-established that the government may call "non-expert summary witnesses," such as a case agent, "[to] help the jury organize and evaluate evidence." *United States v. Cooper*, 949 F.3d 744, 750 (D.C. Cir. 2020) (*citing United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983)). This includes evidence that is "complex and fragmentally revealed in the testimony of multitude of witnesses throughout the trial." *Lemire*, 720 F.2d at 1348. There are, however, limits

to the government's use of summary evidence in certain circumstances. To stay within those limits, the government must first lay a foundation for any summary evidence and the summary witness cannot "draw controversial inferences or pronounce[] judgment." *United States v. Mitchell*, 816 F.3d 865, 876-77 (D.C. Cir. 2016). In certain circumstances, if the court finds it appropriate, it "can issue a limiting instruction regarding its use[.]" *Id.* at 877. Importantly, "cross-examination can expose inaccuracies or unfair characterizations." *Id.*

Nothing precludes a summary witness, like a case agent, from testifying about facts about which he has personal knowledge. *See* Fed. R. Evid. 602 (a "[w]itness may not testify unless personal knowledge is shown."); *see also Lemire*, 720 F.2d at 1347 (finding that summary witness testimony was permissible because summary witness testified from his personal knowledge of the evidence); *see also United States v. Buchanan*, Crim. No. 24-256 (CKK), 2025 WL 1100033, at *6 (D.D.C. April 14, 2025) (noting that a court may allow a witness to testify about facts relevant to a case within his personal knowledge); *United States v. Nicholson*, 961 F.3d 328, 335 (5th Cir. 2020) (describing a witness as both a fact witness and a summary witness). As such, the government may call a law enforcement witness who is familiar with the government's pre-indictment investigation to provide relevant background information. *See United States v. Moore*, 651 F.3d 30, 60 (D.C. Cir. 2011) (law enforcement witnesses may "provide relevant background information as to the investigation's duration and scope or the methods of surveillance, based on personal knowledge"); *see also United States v. Kilpatrick*, 798 F.3d 365, 381-82 (6th Cir. 2015) (finding that testimony about how an agent became involved in a case, what the investigation was about, who the suspects were, and other background information is admissible because it is "designed to set the stage for the introduction of evidence"); *United States v. Flores-De-Jesus*, 569 F.3d 8, 19 (1st Cir. 2009) ("There may be value in having a case agent describe the course of his

investigation in order to set the stage for the testimony to come about the nature of the conspiracy and the defendants involved."); *United States v. Goosby*, 523 F.3d 632, 638 (6th Cir. 2008) (law enforcement officer's testimony is permissible if it is limited to "constructing the sequence of events in the investigation," and if its purpose is to "provide background information and to explain how and why the agents even came to be involved with th[e] particular defendant") (quotation marks and citation omitted)).

### b. Argument

In seeking to preclude summary witness testimony, Kim and Messenger first argue that the evidence obtained during the government's investigation was "neither voluminous nor admissible." Motion at 3.[2] Not so. The government's investigation involved relevant conduct that spanned multiple years, multiple subjects, and several different potential schemes. To fully investigate the alleged criminal conduct, case agents reviewed evidence obtained from myriad sources, such as 2703(d) orders, voluntary productions from different government departments and witnesses, search warrants, and dozens of witness interviews and grand jury subpoenas. *See generally* 05/07/2025 PM Trial Tr. at 98:13-106:3. In this context, the Court should permit the government latitude to explain to the jury the various steps taken to gather the evidence that will be presented at trial. Indeed, the absence of this background testimony would create the false impression – which would work to unfairly benefit of Kim and Messenger – that the government's investigation was inch-deep or too rushed for the jury to rely upon.

Kim and Messenger further argue that the government's summary witness testimony violates Federal Rule of Evidence 802 because it is based on hearsay or otherwise inadmissible

---

[2] Pin citations to the Omnibus Motion refer to pagination in the document itself, not to the pagination generated by ECF.

evidence. Motion at 4. This argument rings hollow, as Kim and Messenger fail to point to the purportedly inadmissible documents or hearsay statements .

Kim and Messenger's more specific arguments that 1) evidence about the background of the government's investigation; 2) individuals and entities associated with the investigation; and 3) evidence collected, or not collected, during the government's investigation also fail for the reasons discussed in turn below.

### i. Testimony about the Background of the Government's Investigation is Relevant and Admissible.

Kim and Messenger assert that evidence about the background of the government's investigation is "conclusory," goes to the "ultimate[ ]issue," and should be precluded. *Id.* at 4. More specifically, Kim and Messenger seek to preclude 1) "evidence about why the government investigation focused on a certain date range"; and 2) "the fact that search warrant affidavits were reviewed and approved by an 'independent court,' which determined that there was probable cause to find evidence of a crime and fruits of a crime." *Id.* at 4-5. Kim and Messenger's characterization of this evidence is misleading, and their premises are faulty.

First, limited testimony about the government's investigation, to include the methods used to conduct that investigation that a layperson may not understand (*e.g.*, what a search warrant is), are admissible as background to help the jury understand the evidence and contextualize the sources of the government's evidence. *See* Fed. R. Evid. 702 (evidence is admissible if it helps the jury "to understand the evidence or to determine a fact in issue"); *see also supra* at 3-4 (citing legal precedent that maintains that background testimony about an investigation is admissible). Referencing that the government lawfully obtained evidence pursuant to court order or search warrant does not bootstrap into the record anything improper, nor does it impermissibly suggest any prior decision-maker or court determined any of the ultimate issues the jury will be asked to

consider.  A magistrate's duty to find probable cause to issue a warrant during an ongoing investigation is meaningfully distinct from the jury's duty to find guilt beyond a reasonable doubt (or not) after hearing all of the evidence presented in a trial.

Second, Kim and Messenger's argument that background evidence about the investigation goes to an "ultimate[ ]issue" is conclusory because nothing about it suggests whether the defendants committed any element of, or had the requisite mental state to commit, the charged offenses. *See United States v. Boyd*, 55 F.3d 667, 668-69 (D.C. Cir. 1995) (finding testimony violated the Federal Rules of Evidence where testimony went to the defendant's mental state, an element of the offense). Instead where, as here, the case agent does not offer "conclusions or impermissibly argue the government's case," background evidence, including the scope and methods used during that investigation, is admissible. *See Kilpatrick*, 798 F.3d at 382. The is also nothing prejudicial (much less unduly prejudicial) about providing such context for the jury. In sum, the case agent's testimony at trial will not include conclusions or impermissibly argue the government's case.

### ii.  Testimony about Individuals and Entities Associated with the Investigation is Relevant and Admissible.

Kim and Messenger also argue that evidence about individuals and entities associated with the government's investigation should be precluded, including "summaries" about: 1) Company A, Kim and Messenger, and their roles in the contracting process; 2) Admiral Burke and his role in contracting with Company A; 3) Person 3, her relationship with Burke, and her connection to events relevant to the investigation; and 4) senders and recipients of emails sent and received during the investigation,. Motion at 5, 8, 11-12.

Kim and Messenger's attempt to preclude evidence about individuals and entities related to the government's investigation lacks legal support and should be rejected. To the contrary, the

evidence in question does not summarize anything; rather, it is testimony based on personal knowledge and is, therefore, admissible. *See supra* at 3-4 (citing to legal precedent admitting testimony about facts based on personal knowledge). When, as here, a summary witness spent years investigating a case, including reviewing government databases, business records, locating and reviewing public records, and surveilling relevant individuals, that witness has personal knowledge about various individuals and entities related to that investigation, such as their job titles and roles. *See United States v. Nnanyerungo*, 39 F.3d 1205, 1208-09 (D.C. Cir. 1994) (rejecting claim that witness did not have personal knowledge because testimony of witness' qualifications and position, and the fact that testimony was uncontradicted, gave jury sufficient basis to credit testimony). To take but one example, testimony that states a fact about a writing or recording is admissible. *See United States v. Sliker*, 751 F.2d 477, 483 (2d Cir. 1984) (testimony of witness that bank deposits are insured by the FDIC is permissible).

### iii. Testimony About Evidence Collected or Not Collected During the Government's Investigation Is Relevant and Admissible.

Kim and Messenger argue that testimony about evidence collected or not collected during the government's investigation should be precluded, including testimony about: 1) contracts Company A had with the Navy; 2) training, legal, and paperwork requirements; 3) emails obtained during the investigation; and 4) evidence of what the government did not find during its investigation. Motion at 8, 10, 12-13.

Rule 1006 is "an exception to the best evidence rule" that allows a witness, such as a case agent, to provide summary evidence. *See United States v. Weaver*, 281 F.3d 228, 232 (D.C. Cir. 2002). "[T]he point of Rule 1006 is to avoid introducing all the documents." *United States v. Faulkenberry*, 614 F.3d 573, 588-89 (6th Cir. 2010) (*quoting United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008)).

As noted above, this was a complex investigation with a voluminous amount of record evidence gathered. Thus, testimony relating to Company A's contracts, training, legal, and paperwork requirements, and email obtained during the investigation, is all based on evidence the government intends to admit at trial or that would otherwise be admissible. For example, summary testimony about Company A's contract is rooted in business records obtained from the prime contractor and other contracting documents the government anticipates admitting through the witnesses. Summary testimony about Burke's, Kim's, and Messenger's training, legal, and paperwork requirements is similarly rooted in evidence the government anticipates admitting through its summary witnesses, and other witnesses, and the summary witnesses' own personal knowledge of those requirements. So, too, will the government also admit the emails obtained during the government's investigation.

To the extent that Kim and Messenger disagree with a witness's testimony, they can cross-examine the witness about his testimony, including the reliability of summary testimony. *See Kilpatrick*, 798 F.3d at 383 (noting that although only 151 out of about 370,000 subpoenaed text messages were shown to the jury, the defendants had access to all the evidence summarized by the witness and defendants were able to challenge the witness' summary through cross-examination).

Finally, contrary to established precedent, Kim and Messenger assert that a summary witness may not testify about evidence not found during the government's investigation. "A witness who has examined the records may testify that no record 'of a specific tenor is there contained.'" *Id.* at 382-83 (*quoting United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979); *see also* McCormick on Evidence § 234 (2013) ("Witnesses may also testify that an event did not occur because relevant records contain no mention of it."). Summary witness testimony about

evidence collected during the government's investigation, and evidence that was not found during the government's investigation, is admissible and the defense motion must be denied.

### III.  Evidence Relating to the Poor Quality of and Negative Reaction to Company A's Services Is Relevant to the Existence of a Bribe and Not Unduly Prejudicial.

#### a.  The Evidence Kim and Messenger Seek to Exclude is Highly Relevant.

Kim and Messenger next argue that "evidence that [Company A's] services were not well received [by the Navy] or that the services were of poor quality" should be excluded are irrelevant . Motion at 16. While the government agrees that this case does not "revolve around … the quality of services provided," *id.,* this statement elides the function of Rule 401, which is to admit, subject to any other Rule, evidence that "has *any tendency* to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence[,]" Fed. R. Evid. 401 (emphasis added), and the threshold for finding evidence to be relevant under Rule 401 is low, *see, e.g.*, *United States v. Moore*, 590 F. Supp. 3d 277, 283 (D.D.C. 2022) (noting Rule 401's "liberal relevance standard," and explaining that "[t]he degree of probative value required for evidence to be admissible under Rule 401 is 'very low'" (quoting *United States v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998))); *United States v. Slatten*, 310 F. Supp. 3d 141, 145 (D.D.C. 2018) ("[E]vidence need not be dispositive of an element of the crime to be relevant, it must merely cross the low threshold prescribed by Rule 401."); *cf. United States v. Earle*, 375 F.3d 1159, 1162 (D.C. Cir. 2004) ("The district court's decision to admit evidence as relevant is subject to review only for abuse of discretion." (citation omitted)).

Kim and Messenger maintain that the government cannot surmount this low bar because "any relevance that the quality of [Company A's] services might have to Burke's state of mind, knowledge, or motive is beside the point for [Kim and Messenger's] trial[,]" and that "[t]he issue here is [Kim and Messenger's] intent, not what motivated Burke." Motion at 16. This argument

lacks force because it ignores that they are also charged with conspiring with Burke "to use Burke's official position as a Navy Admiral to benefit and enrich themselves through bribery." ECF No. 1 at ¶ 21.

As their co-conspirator, Burke's knowledge and state of mind is inextricably intertwined with the charges against Kim and Messenger. *See United States v. McPartland*, 81 F.4th 101, 115 (2d Cir. 2023) ("Evidence of a co-conspirator's state of mind may be relevant to explain how a criminal enterprise developed, to help the jury understand the basis for the coconspirators' relationship of mutual trust, or to complete the story of the crime on trial." (quotation marks and citations omitted)); *United States v. Sans*, 731 F.2d 1521, 1532 (11th Cir. 1984) (overruling defendant's objection that certain evidence admitted at trial was irrelevant because, *inter alia*, the evidence "was relevant to the issue of [the codefendant's] criminal intent regarding the conspiracy[, and s]ince [the codefendant] was an alleged coconspirator, his state of mind was relevant"). Evidence that Burke was aware that other Navy personnel considered the services to be substandard, overpriced, and ill-matched to the needs of the Navy yet nonetheless ordered his subordinates to award a training contract to Company A, and that he knew the January 2022 training was poorly received, yet continued to promote the same training to other senior Nany officers anyway, shows that Burke had entered into and carried out a criminal conspiracy with Kim and Messenger.   To take but one example: the government intends to prove that Burke told Kim and Messenger during the conspiracy that Company A's product did not stand on its own and could not be used by the Navy – and that Kim and Messenger consequently worked with Burke to ram the contract through Burke's command. In other words, proof that Company A's product was so ill-fitted for the Navy shows that the contract at issue was obtained because of a bribe, and not because the training was considered by the Navy to be potentially useful.

It follows that Kim and Messenger's knowledge that their training program was poorly matched to the Navy is directly relevant to Kim's and Messenger's own state of mind in pursuing a *quid pro quo* with Burke. Indeed, if Kim and Messenger believed Company A's training program stood on its own then presumably there would have been no need—or certainly less incentive—for Kim and Messenger to bribe Burke for that contract and to promote and influence Company A to other military personnel.

Kim and Messenger's knowledge that their pilot program failed, and their knowledge that the product they offered in later had not improved is inextricably part of what motivated them to bribe Burke and is therefore intertwined with the events of this conspiracy. For example, in July 2019 a Company A employee emailed Kim and Messenger, among others, sharing "'rumors and hearsay' that some in [the] Navy are not satisfied with [Company A's] Task 1 performance … ." As another example, in an April 2021 email to Messenger and others, Kim wrote, referring to the prior pilot program, that the "beta didn't quite work" and was "non-success[ful[,]" and "[a]fter seeing the [Company A] office, the next day we got word from Burke that he did not get the support from the CNO." And in September 2021, Burke emailed Kim and Messenger some "unfiltered Sailor feedback" from Navy personnel who had used Company A's product. The feedback that Burke shared with Kim and Messenger was extremely negative. Based on that feedback and his own review of Company A's product, Burke bluntly informed Kim and Messenger that "the tool in and of itself does not stand on its own[,]" and "your current app-based approach … just does not seem to be sustainable or scalable for us." As shown at Burke's trial, this email caused Kim and Messenger to lure Burke to Company A's headquarters in New York City in November 2021, a meeting that resulted in a recommitment to the bribe scheme.

Based on the voluminous evidence that Company A's training was a known dud, Kim and Messenger's argument that these shortcomings is irrelevant to their state of mind in their dealings with Burke is toothless.

### b. The Evidence that Kim and Messenger Seek to Exclude Is Not Unduly Prejudicial, Misleading, or Confusing.

Kim and Messenger also argue that, even if evidence concerning the quality of Company A's services is relevant, it should nonetheless be excluded under Rule 403. Motion at 17. They are mistaken.

Of course, the mere fact that the evidence may be harmful to the defense is not a basis for its exclusion. It is axiomatic that "all evidence offered by the prosecution in a criminal case is intended to be prejudicial." *United States v. Williams*, 271 F.R.D. 1, 2 (D.D.C. 2010). Consequently, courts must assess "whether the prejudice is 'unfair,'" and "whether the danger of 'unfair prejudice' *substantially* outweighs the probative value of the evidence." *Id.* (emphasis in original); *see also United States v. Loza*, 764 F. Supp. 2d 55, 58 (D.D.C. 2011) ("Under Rule 403, the test is 'unfair prejudice,' not prejudice or harm to the defense."). Moreover, Rule 403 imposes a "high barrier to justify the exclusion of relevant evidence." *United States v. Lieu*, 963 F.3d 122, 128 (D.C. Cir. 2020). A "trial judge's application of Rule 403 [is reviewed] for abuse of discretion … [and] appellate courts must be extremely wary of second-guessing the legitimate balancing of interests undertaken by the trial judge." *United States v. Ring*, 706 F.3d 460, 471–72 (D.C. Cir. 2013) (quotations and citations omitted). And, even in close cases, which this is not, Rule 403 "tilts … toward the admission of evidence[.]" *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984).

Based on that high barrier to exclusion, Kim and Messenger's arguments hold no weight. Kim and Messenger do not satisfy their burden of showing that the evidence is of such an

inflammatory nature that it should be excluded. Indeed, courts in this Circuit have routinely admitted evidence that is significantly more prejudicial than the evidence about which Kim and Messenger complain here. *See, e.g.*, *United States v. Miller*, 799 F.3d 1097, 1106 (D.C. Cir. 2015) (permitting evidence where witnesses "wept on the stand" and testified that they "had been left homeless with a sick baby" after the defendant lied to them about a mortgage, because the evidence was probative of the defendant's fraudulent intent in carrying out the charged travel and wire fraud scheme); *United States v. Brockenborrugh*, 575 F.3d 726, 736–37 (D.C. Cir. 2009) (permitting evidence of the defendant's sexual relationship with a real estate agent because it was relevant to whether the defendant knowingly participated in the charged fraud scheme); *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) (permitting evidence that defendant placed a gun in a woman's vagina and threatened her when she tried to withdraw from a fraud scheme, because the evidence was offered to show the defendant's intent and controlling role in the scheme).

Even so, Kim and Messenger argue that "[t]he jury might improperly conclude that if [Company A's] services were inadequate, [Kim and Messenger] must have resorted to bribery—a form of propensity reasoning that Rule 403 explicitly guards against." Motion at 18. But calling evidence about the poor quality and fit of their business's services and products is neither "prior acts" or "propensity" evidence. [3] First, Company A's performance and the Navy's negative opinion of its services does not involve other crimes, wrongs, or acts. *See United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000); *cf. United States v. Badru*, 97 F.3d 1471, 1475 (D.C. Cir.

---

[3] Kim and Messenger cite to *Old Chief v. United States*, 519 U.S. 172 (1997), for the proposition that evidence of prior bad acts may cause a jury to "generaliz[e] a defendant's earlier bad act into bad character and tak[e] that as raising the odds that he did the later bad act now charged." ECF No. 176 at 17. But that case concerned the admission of evidence that the defendant had previously been convicted of assault causing serious bodily injury. That is hardly the type of evidence at issue here.

1996) ("In cases where the incident offered is part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an 'other' crime. The evidence is offered as direct evidence of the fact in issue." (citation omitted)).

Second, claiming that Company A's poor product is "a form of propensity reasoning" is a transparent effort to shoehorn non-character evidence into a Rule 404 analysis that the Court should decline to accept. There is nothing here that involves Kim and Messenger's character at all, much less an effort to show improper propensity. And even if criminal propensity were somehow at issue here, "Rule 404(b) is a rule of inclusion rather than exclusion[,]" and "is quite permissive, prohibiting the admission of other crimes evidence in but one circumstance—for the purpose of proving that a person's actions conformed to his character." *Bowie*, 232 F.3d at 929-30 (citations and quotations omitted). Rule 404(b) prohibits the introduction of evidence only when its *sole* purpose is to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence is allowed for any other purpose unrelated to the defendant's character or propensity to commit crime, such as proving, without limitation, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* 404(b)(2). Here, as discussed above, the evidence concerning Company A's services is offered for a purpose unrelated to Kim and Messenger's character or propensity to commit crime—namely, it is offered to show their state of mind, knowledge, motive, and intent in entering into a *quid pro quo* with Burke. This is entirely permissible.

And even in the context of Rule 404(b) evidence – which this evidence is not –the D.C. Circuit has held that "the danger of unfair prejudice [is] minimal" where, as here, the other acts evidence adds "no emotional or other pejorative emphasis not already introduced" by the evidence

of the charged crimes themselves. *United States v. Straker*, 800 F.3d 570, 591 (D.C. Cir. 2015); *United States v. Bell*, 795 F.3d 88, 99-100 (D.C. Cir. 2015) (upholding admission of other crimes evidence where the contested evidence "did not involve conduct any more sensational or disturbing than the other conduct attributed to the [defendant]" (internal alterations and quotation marks omitted)); *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 185 (D.D.C. 2015) (allowing admission of evidence where it involved conduct "that is no more serious than that charged in the indictment").

Kim and Messenger also seek to exclude the evidence on grounds that "[e]valuating the quality of training services" offered by Company A would "confuse the issues with the jury" and "potentially involv[e] complex expert testimony and extensive documents, leading to undue delay and waste of time." Motion at 17. But whether or not Company A's products were objectively "good," or may in fact have benefitted the Navy if given the chance, is not at issue here. What is at issue is the impact on Kim's, Messenger's, and Burke's actions of their knowledge that Navy personnel did not believe Company A was a good fit and were hesitant to award a contract. Eliciting those historical facts at trial does not "require specialized expertise," Motion at 17, just as eliciting them during Burke's trial raised no concerns of confusion or delay. To the contrary, excluding that evidence would cause juror confusion, by depriving the jury of evidence "to complete the story of the crime on trial." *McPartland*, 81 F.4th at 115.

### c. Evidence of Positive Reactions to Company A's Services Is Irrelevant Except in Limited Circumstances.

Kim and Messenger ask that, if the Court denies their motion to exclude evidence that Company A's services were widely understood to be useless to the Navy, then "fundamental fairness requires that [they] be permitted to present evidence of positive reception." Motion at 18. The government agrees that eliciting testimony from witnesses on this topic during cross-

examination is appropriate.    However, Kim and Messenger should not be permitted to present in the abstract affirmative evidence about the virtues of Company A's services through "complex expert testimony and extensive documents … specialized expertise, comparisons to industry standards, and assessments of user experiences." Motion at 17. As the government has explained before, *see* ECF No. 155 at 20-22, ECF No. 177 at 9-16, it would not be a defense to the charges in this case if the contract to Company A benefitted the Navy, the Navy would have awarded the contract even without the bribe, or Kim and Messenger had acted in good faith. What Kim and Messenger seek to do here raises precisely the issues of which they complain in the Motion.

Alternatively, if the Court is inclined to permit Kim and Messenger to introduce evidence of positive reception by the Navy to Company A's services, then such evidence should be admitted only to the extent it rebuts the government's evidence that Kim and Messenger's struggles to deliver a workable product to the Navy contributed to their state of mind in entering a *quid pro quo* with Burke. That is, the relevance is not whether in the abstract the trainings were or were not a good fit for the Navy. Rather, positive reviews (like the negative feedback the government presented before) have relevance only in what they show about Messenger and Kim's—and Burke's—understanding of how the Company A trainings were received (poorly), thus providing a motive to offer the job-for-a-contract bribe here.

## IV.    Certain Evidence Relating to Company A's Workplace and Kim and Messenger is Relevant and Not Unduly Prejudicial.

Kim and Messenger seek to exclude evidence "that [Company A] had a negative workplace atmosphere, as well as negative opinions of [Kim and Messenger]." Motion at 15. They cite as examples statements by former Company A employees and Navy personnel that "[Company A] 'was a toxic work environment [and] cult like,'" that "[Company A] was 'pretty slimy,'" and that Kim was "'a jerk.'" *Id.* at 15. Kim and Messenger's argument is moot insofar as the government

16

does not intend to introduce that or similar evidence to impugn their character or to cast Company A as a negative work environment, subject to the defendants opening the door at trial.

## V.    Conversations between Person 3 and Burke about Company A and Kim and Messenger are Relevant and Not Prejudicial.

Kim and Messenger seek to exclude certain statements made by Burke and Person 3 following the defendants' July 23, 2021, lunch meeting in Washington, D.C.   Specifically, Kim and Messenger seek to exclude anticipated testimony of Person 3 that Burke was "was furious with" Person 3 because she attempted to shut down the defendants' discussion of their bribery agreement during the lunch meeting, as well as Person 3's statement that the conversation was "inappropriate" and that Burke should have "shut that conversation down."   Motion at 20.   Kim and Messenger summarily assert that these statements constitute inadmissible hearsay and "would mislead the jury if elicited."   *Id.*

Should the government or either of the defendants call Person 3 as a witness, the identified statements would be admissible.   These statements are relevant because they go to the existence of the conspiracy, Burke's knowledge of and participation in the conspiracy, and—specifically— the concealment aspect of the conspiracy, and none of the statements identified in Kim's and Messenger's motion would be offered as hearsay statements.   Both Burke and Person 3 are declarants within the set of identified statements.   Burke's statement that he was "furious" with Person 3 and that he "chided" her for attempting to shut down the discussion about the bribery proposal are not hearsay because they are co-conspirator statements made during and in furtherance of the conspiracy.   Fed. R. Evid. 801(d)(2)(E).   Person 3 would testify that she attempted to thwart the illicit discussion of the bribery arrangement after Burke did not.   Burke's expression of anger after the fact is probative of his furthering the conspiracy by discouraging interference by Person 3 and his efforts to maintain his relationship with Kim and Messenger, his

co-conspirators, and preserve their agreement to engage in a *quid pro quo*.[4]   Moreover, the strength of Burke's negative reaction and his need to "chide" Person 3 is probative of his corrupt state of mind and his knowledge of the wrongfulness of his conversation with Kim and Messenger at the Belga Café.   As discussed above, Burke's knowledge of the conspiracy and state of mind is inextricably intertwined with the charges against Kim and Messenger.   *See supra* at 10 (citing *McPartland*, 81 F.4th at 115; *Sans*, 731 F.2d at 1532).

Person 3's statements, as identified in Kim's and Messenger's motion, are not hearsay because none of them are factual assertions that would be offered for their truth.   *See* Fed. R. Evid. 802(a), (c) (defining "Statement" and "Hearsay").   Person 3 may testify as to her own observations from the meeting because that is her first-hand knowledge.   Fed. R. Evid. 602. Further, her belief that the conversation about the bribery proposal was "inappropriate" is admissible as lay-opinion testimony because that observation is "rationally based on [her] perception," it would be "helpful" for the jury in "clearly understanding [Person 3]'s testimony or [] determining a fact in issue," and is "not based on scientific, technical, or other specialized knowledge."   Fed. R. Evid. 701.   Person 3's observations about the meeting based on what she saw first-hand and her own knowledge of government ethics rules as well as Burke's obligations are "well founded on [her] personal knowledge and susceptible to specific cross examination." *Hall v. C.I.A.*, 538 F. Supp. 2d 64, 69 (D.D.C. 2008) (quoting *Teen-Ed, Inc. v. Kimball Intern. Inc.*, 620 F.2d 399, 403 (3d Cir.1980)).   These observations are admissible as first-hand knowledge under Rule 602 and lay-opinion testimony under Rule 701.

---

[4]      Aside from any statements that may be offered, Person 3's first-hand observation that, while sitting in front of Kim and Messenger, Burke did nothing to shut down their bribery proposal is probative of all three coconspirators' furthering the conspiracy.   This testimony would be admissible as first-hand testimony under Rule 602.

Person 3 may also testify that she communicated her concerns to Burke and that Burke should have "shut that conversation down" as she tried to do.   These statements by Person 3 to Burke would not be offered for their truth—that is, they would not be offered to show that the conversation was, in fact, inappropriate.   Rather, the statements would be offered to show that Burke, based on his knowledge and experience (of which Person 3 was aware), himself understood and believed that that the discussion was illicit and that he should not have participated in it.   This in turn goes to Burke's corrupt state of mind, his efforts to conceal the bribery conspiracy from the Navy, and his intent to continue to participate in and further the conspiracy in spite of his knowledge of its wrongfulness.

Kim and Messenger make no effort to explain why the identified statements are "mislead[ing]" and it is not clear why this would be the case.   Thus, they have not identified any basis under Rule 403 that these statements should be excluded and it does not appear that such a basis exists.   This Court should not exclude these statements under Rule 403.

## VI.    Person 3's Security Clearance

Kim and Messenger argue that evidence of Person 3's federal government security clearance should be precluded because Person 3 never disclosed that a state trial court in Virginia found she was not credible during a trial related to her divorce and child custody proceedings. *See* Motion at 20-22. To be clear, as even Kim and Messenger recognize, Person 3 was under no obligation to specifically disclose such a finding as the clearance applications did not ask any question of the sort. *Id.* at 21. In fact, the clearance application asked about any divorces, and Person 3 disclosed the Virginia case.

Nevertheless, the government does not intend to introduce evidence of Person 3's security clearance during its case-in-chief.   Should Kim and Messenger open the door to this issue, however, the government reserves the right argue the admissibility of this subject in re-direct or

rebuttal. *See United States v. Loza*, 764 F. Supp. 2d 55, 58-59 (D.D.C. Feb. 3, 2011) ("As a general rule, inadmiss[i]ble extrinsic evidence can become admissible on redirect examination as rebuttal evidence, when defense counsel has opened the door to such evidence.") (internal brackets, quotations, and citation omitted); *see also United States v. Knight,* 185 F. Supp. 2d 65, 69 (D.D.C.2002) (in drug case, holding that 404(b) evidence would be excluded pursuant to Rule 403 with the exception that "[i]f the defense argues or suggests at trial that [the defendant] did not intend to sell the drugs or that he did not possess the gun in connection with the drugs or know that he possessed it ... he will 'open the door' to receipt of the evidence"); *United States v. Finch*, 16.F3d 228, 233 (11th Cir. 1994) (asserting that cross-examination of a witness may open the door to "rebut something that had been elicited").

**VII.    This Court Should Limit Cross-Examination of SA DeLaPena.**

A defendant's right to conduct cross-examination is not unfettered.   Although the Sixth Amendment's Confrontation Clause guarantees criminal defendants an "opportunity" to cross-examine witnesses against them, it does not guarantee cross-examination "that is effective in whatever way, and to whatever extent, the defense might wish."   *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted).   The Court has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."   *Id.*; *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); Fed. R. Evid. 611 ("The court should exercise reasonable control … so as to … avoid wasting time; and [ ] protect witnesses from harassment or undue embarrassment.").    No Sixth

Amendment violation has occurred "so long as defense counsel is able to elicit enough information to allow a discriminating appraisal of the witness's motives and bias." *United States v. Hall*, 613 F.3d 249, 255 (D.C. Cir. 2010) (internal citations and quotation marks omitted); *see also id.* ("This Sixth Amendment right … does not require a trial court to permit unlimited cross-examination by defense counsel, but rather requires the court to give a defendant a realistic opportunity to ferret out a potential source of bias.") (internal quotation marks omitted)).

Kim's and Messenger's request to cross-examine SA DeLaPena as to allegations of purported misconduct is baseless and should be denied. First, and most importantly, Kim and Messenger mischaracterize the relevant factual record. There is no credible evidence that SA DeLaPena committed any misconduct in connection with either of the cited matters—*United States v. Rafaraci*, 1:21-cr-00610 (D.D.C.) (hereinafter, "*Rafaraci* Dkt.") and *United States v. Newland*, 3:17-cr-00623 (S.D. Cal.) (hereinafter, "*Newland* Dkt."). In *Rafaraci*, SA DeLaPena signed an affidavit in support of a criminal complaint that was later determined to contain inaccurate information. Once it became clear that the affidavit contained inaccurate information, the government and the defense in that case jointly proposed redactions to the affidavit to excise the inaccurate information, which the court accepted, and the affidavit supporting the criminal complaint was refiled as redacted. *Rafaraci* Dkt., ECF Nos. 35, 36, and 03/24/2022 minute order. The defendant subsequently pleaded guilty. *Id.*, ECF No. 44-46 and 04/22/2022 minute order. Contemporaneous to these events, SA DeLaPena testified as a government witness in *Newland*. Following the *Newland* trial, the defense filed a motion to compel discovery, asserting that the government failed to disclose that SA DeLaPena "provided false information in his sworn affidavit" in support of the *Rafaraci* complaint. *Newland* Dkt., ECF No. 1005 at 1. Separately, the *Newland* defendants jointly moved, post-trial, to dismiss the indictment based, in part, on their

allegation that SA DeLaPena "bribed witnesses" to get them to testify.  *Id.*, ECF No. 873.   In granting the defendants' post-trial motion to compel discovery—and apparently relying solely on the parties' representations in their filings rather than independent evidence—the *Newland* court commented that "it is clear that, at a minimum, Agent DeLaPena made misrepresentations" in the *Rafaraci* affidavit.  *Id.*, ECF No. 1020.   The *Newland* court denied the defendants' post-trial motion to dismiss the indictment and did not address whether SA DeLaPena had sought to improperly pay witnesses.  *Id.*, ECF No. 1009.

Neither the *Newland* court, nor the *Rafaraci* court, nor any other court, has ever found that SA DeLaPena intentionally misrepresented facts, attempted to deceive a court, bribed witnesses, or lied under oath.   There is no credible evidence that he did.   After the litigation in *Rafaraci* and *Newland*, the Department of Defense, Office of Inspector General, Office of Professional Responsibility (DoD-OIG-OPR) investigated allegations of misconduct on the part of SA DeLaPena.   DoD-OIG-OPR found "no misconduct by SA DeLaPena" in connection with the *Rafaraci/Newland* matters and closed the investigation without further action.[5]   Exhibit A at 7.

Accordingly, none of SA DeLaPena's conduct in connection with the *Rafaraci* or *Newland* cases is probative of his character for truthfulness in this case.   Specific instances of a witness's conduct are permissible subjects of cross-examination only if probative of truthfulness or untruthfulness and subject to the discretion of the Court.   Fed. R. Evid. 608(b); *United States v. O'Neal*, 844 F.3d 271, 276 (D.C. Cir. 2016) ("[Q]uestioning about such incidents [under Rule 608(b)] must be 'probative.' As with all evidentiary determinations, even if the district court finds that the questioning would be probative, it must then apply the 'overriding' balancing test of

---

[5] The OPR report has been disclosed to the defendants and will be filed under seal under separate cover for the Court's inspection.   It is cited herein as "Exhibit A."

Rule 403." (Internal citations omitted)).    Kim and Messenger ostensibly seek to cross-examine SA DeLaPena as to two instances of alleged misconduct: (1) the fact that the *Rafaraci* affidavit contained incorrect information, and (2) the *Newland* defendants' allegation that SA DeLaPena bribed witnesses.    As to the first instance, the facts show that, while SA DeLaPena's *Rafaraci* affidavit contained incorrect information, SA DeLaPena did not knowingly supply incorrect information in that affidavit, nor did SA DeLaPena have any intent to deceive the court in supplying incorrect information.    Exhibit A at 7.    Moreover, the errors in the *Rafaraci* affidavit were rectified—the incorrect information was excised from the affidavit and the defendant subsequently pleaded guilty.    DoD-OIG-OPR concluded that, "[b]ecause the facts do not show that SA DeLaPena knowingly provided any incorrect information in the *Rafaraci* affidavit, the facts also do not show that he lacked candor."    *Id.* at 7.    Thus, the fact of incorrect information contained in an affidavit signed by SA DeLaPena is not probative of SA DeLaPena's character for truthfulness.    And, to the extent that Kim and Messenger nevertheless argue that the presence of incorrect information in the affidavit is itself probative of SA DeLaPena's character for truthfulness, any probative value is vastly outweighed by the risk of unfair prejudice, jury confusion, waste of time, etc.    *See* Fed. R. Evid. 403; *O'Neal*, 844 F.3d at 276.    The facts surrounding the presence of incorrect information in the *Rafaraci* affidavit are clear, but complex. The risk that Kim and Messenger would effectively mislead the jury by merely suggesting that SA DeLaPena falsified an affidavit or lied under oath (neither of which is accurate) is high.    They should not be permitted to wade into a line of cross-examination that is nearly certain to inappropriately generate an inference that SA DeLaPena is not a truthful witness.

Kim and Messenger should not be allowed to cross-examine SA DeLaPena about the allegation that SA DeLaPena bribed or attempted to bribe witnesses at all.    There is absolutely no

evidence supporting that allegation.    The facts show that SA DeLaPena appropriately coordinated with supervisors to furnish compensation to foreign witnesses for lost wages and childcare expenses, and that such payments were never actually furnished.    Exhibit A at 7.    DoD-OIG-OPR did not find this witness bribery allegation credible in the least.    *Id*.    The only "evidence" of this allegation is the *Newland* defendants' bald assertion that SA DeLaPena's efforts to compensate witnesses pursuant to his agency's policies constituted bribery.    This Court should not permit Kim or Messenger to cross-examine SA DeLaPena about an allegation found to be without foundation.    In addition to being false, the allegation (if it were credible at all) is not probative of SA DeLaPena's character for truthfulness, nor is it relevant for any other purpose in this case.

For the reasons described above, Kim and Messenger should be precluded from cross-examining SA DeLaPena on Kim and Messenger's unfounded assertions of misconduct related to the *Rafaraci* and *Newland* cases.    However, to the extent that this Court finds instances of SA DeLaPena's prior conduct are permissible cross-examination fodder, Kim and Messenger should be absolutely prohibited from introducing extrinsic evidence in connection with the *Rafaraci* or *Newland* cases.    Rule 608(b) unambiguously prohibits the admission of extrinsic evidence to prove a witness's character for untruthfulness or rebut a witness's denials.    *United States v. Whitmore*, 359 F.3d 609, 618 (D.C. Cir. 2004).    The purpose of Rule 608(b)'s prohibition on extrinsic evidence is "to avoid minitrials on wholly collateral matters which tend to distract and confuse the jury."    *United States v. Saada*, 212 F.3d 210, 222 (3d Cir. 2000) (internal quotation marks omitted); *accord Whitmore*, 359 F.3d at 618 ("[T]he purpose of [Rule 608(b)] is to prohibit things from getting too far afield – to prevent the proverbial trial within a trial.").

Kim and Messenger suggest that they should be able to introduce extrinsic evidence, including "judicial findings and government filing[s]" because these documents are "are evidence of SA De La Pena's bias." Motion at 23. While extrinsic evidence is admissible to show bias, *see United States v. Smith*, 232 F.3d 236, 242-43 (D.C. Cir. 2000), none of the documents that Kim and Messenger reference contain evidence of purported bias on SA DeLaPena's part. As discussed above, there is no evidence that SA DeLaPena was dishonest or that he had any intent to deceive in connection with either the *Rafaraci* or *Newland* matters, and Kim and Messenger cannot credibly show otherwise. Accordingly, it is not proper for the defendants to foster an inference that SA DeLaPena is biased or motivated to manipulate evidence, make false statements, or commit any other kind of misconduct in service of achieving criminal convictions, because the facts show that he did not commit any such misconduct in connection with the *Rafaraci* or *Newland* matters. Finally, out-of-court statements by judges or litigants in other districts constitute inadmissible hearsay, and neither Kim nor Messenger has identified any exception to the rule against hearsay that would permit them to introduce such statements for their truth.

In sum, Kim and Messenger seek to cross-examine SA DeLaPena as to unproven and misleading allegations. They should not be permitted to do so under Rule 608(b), Rule 403, and this Court's general supervisory authority to limit cross-examination. Kim and Messenger further seek to introduce misleading extrinsic evidence to improperly generate an inference that SA DeLaPena lied, is lying, or has otherwise compromised this investigation or another. They should similarly be prohibited from doing so under Rule 608(b), the rules against hearsay, and Rule 403.

## VIII.    Conclusion

For the reasons stated herein, and any that may be stated at a hearing on these pretrial motions, the government respectfully requests that the Court deny Kim's and Messenger's motions *in limine*.

Respectfully submitted,

| | |
|---|---|
| JEANINE FERRIS PERRO<br>UNITED STATES ATTORNEY | EDWARD P. SULLIVAN<br>Acting Chief, Public Integrity Section<br>U.S. Department of Justice |

By    ___/s/_____        ___/s/_____

| | |
|---|---|
| Rebecca G. Ross<br>Brian P. Kelly<br>Joshua Rothstein<br>Assistant United States Attorneys<br>601 D Street N.W.<br>Washington, DC 20530<br>Office: (202) 252-4490 | Kathryn E. Fifield<br>Trial Attorney<br>1301 New York Ave. NW, Suite 1000<br>Washington, D.C. 20530<br>Office: (202) 514-1412 |