## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **24-cr-265 (TNM)** |
| **ROBERT P. BURKE,** | |
| **Defendant.** | |

### UNITED STATES' SENTENCING MEMORANDUM

The Defendant, Robert Burke, was one of the most powerful and trusted men in the United States Navy and, by extension, the United States Government. Driven by greed and the desire to free himself from "the DOD rut," Burke chose to exploit the power and trust conferred on him by accepting a bribe. Influenced by Charlie Kim and Meghan Messenger's promise to make him a millionaire in return for the abuse of his office, Burke ordered his staff to give a contract to Next Jump and he promoted Next Jump's product – which he knew to be a poor fit for the Navy– to senior Navy commanders. As agreed, Burke then received a half-a-million-dollar salary and a mountain of stock options that were projected to be worth many millions of dollars.  As the former Vice Chief of Naval Operations (VCNO), Burke knew the rules precluded him from influencing the contract, much less ordering it, while he was negotiating employment at Next Jump. And so, rather than report his interactions with Kim and Messenger, he concealed them through half-truths and lies. In effect, once he agreed to the bribe, Burke was working to advance Next Jump's – and his own – interests, not that of the Navy he was sworn to serve.  Burke's conduct was as blatant and egregious as it was damaging to the public's trust in its leaders and corrosive to the integrity of the procurement system. His offense demands accountability. His crime calls out for punishment.

As argued below, the Pre-Sentence Investigation Report ("PSR") correctly calculates the Guidelines range except that the loss amount enhancement under U.S.S.G. § 2B1.1 should be +14 rather than +12. *See* PSR, para 57. Thus, the Court should find that Burke's total adjusted offense level is 32 (not 30) and his Criminal History Category is I. The Court should sentence Burke to a Guidelines sentence of 121 months' imprisonment, to be followed by three years' of supervised release, and order a $400 special assessment. The Court should also impose forfeiture in the amount of $86,748.08, corresponding to his income while employed at Next Jump, and $322,850 in restitution, corresponding to the funds paid by the Navy in connection with Burke's criminal conduct, and a $150,000 fine (near the midpoint of the applicable Guidelines range).

## I.    FACTS RELEVANT TO SENTENCING

During trial, the Government presented the testimony of seven witnesses and admitted over 100 exhibits into evidence. This evidence proved that Burke entered into an illegal bribery agreement with his co-Defendants, Kim and Messenger, exchanged a contract for a job, and then lied to cover it up. Specifically, the evidence established the following sequence of events:

### A.    The Defendants' Bribery Scheme

#### 1.  *Next Jump Seeks Government Contracts*

In or about August 2018, Next Jump was subcontracted with the Navy to provide workforce training to the Office of the Chief of Naval Personnel ("OPNAV N-1"), which was then under Burke's command. Under the contract, Next Jump had the potential to obtain as much as $10 million from a pilot program, and Kim believed the pilot program could ripen to a $100 million contract. But the pilot program was poorly received, and the Navy terminated it after roughly a year. Government Exhibit ("GOVEX") 5. In the end, Next Jump received a mere fraction of the revenue they had hoped to obtain. Kim later noted the pilot's "non-success," stating, "the initial

$100MM commitment from the Navy, in hindsight should have been closed [in] July 2018."
GOVEX 20.

By November 2019, Kim and Messenger tried to re-establish business with the Navy and
went to Burke directly to pitch their proposal. At that time, Burke told Kim and Messenger that
the Navy was cracking down on officers having contracting discussions with vendors like them.
And anyway, Burke had transitioned to another position in the Navy. Thus, Kim and Messenger
were instructed by Burke's staff to have no further contact with him. GOVEX 58. Kim, copying
Messenger, confirmed that they understood the no contact message, telling Burke that they would
"stand by until we hear from you." *Id.*

The COVID-19 pandemic soon followed, and Next Jump came under financial strain from
the resulting economic disruptions. Specifically, Next Jump's e-commerce business line
("Business-1") suffered, and its other business line, workforce and leadership development
training ("Business-2"), had reported zero revenue since the Navy pilot program ended in late
2019. GOVEX 46. The precipitous loss of revenue for Business-1 and the lack of other prospects
for Business-2 formed a clear motive for Kim and Messenger to enter into the corrupt agreement
with Burke – they needed the money, needed to prove Business-2 had value, and were getting
nowhere by following the Navy's well-established contracting procedures. What is more, as one
Next Jump investor noted in a message to Kim and Navy, Next Jump had put "all their eggs" in
the basket that was a Navy contract.

By early April 2021, Burke, then Commander of U.S. Naval Forces Europe and Africa,
wrote to a colleague that he was "out of gas" and looking to retire from the Navy at his earliest
convenience. GOVEX 153.

### 2. April 2021 Prohibited Contact with Burke

Kim and Messenger were desperate, so of course they reneged on their pledge to "stand by

until we hear from" Burke. Between September 2020 and February 2021, they tried repeatedly to secure a meeting with Burke to promote Next Jump, a transparent effort to re-establish business with the Navy. *See, e.g.*, 05/05/2025 AM Trial Tr. at 77:9-79:5. Eventually, Burke met with Kim, Messenger, and senior members of Burke's staff on April 8, 2021. GOVEX 19.  Burke's civilian Executive Director, Juliet Beyler (referred to in the Indictment as "Person 2"), attended the meeting and described it as an unremarkable marketing pitch. Beyler testified that Next Jump was not promoting anything different than their prior failed pilot program at OPNAV N-1 years before. 05/07/2025 AM Trial Tr. at 37:14-24. Nevertheless, Burke agreed to another meeting with Kim and Messenger via WhatsApp on April 21. GOVEX 21. Notably, this time only the Defendants participated. GOVEX 22.

Three key pieces of evidence prove that the seeds of the bribery scheme were sown on the WhatsApp call. First, Messenger's handwritten notes for the call show that they planned to tell Burke that she and Kim would "like to make you a millionaire" by offering him "pure cash" and "equity" in Next Jump. Ex. F (Messenger's Notes). Second, within hours of this meeting, Kim wrote an email in which he described the call to senior Next Jump leadership as "the highest stakes meeting to date and the tiniest wrong move would/could lose all trust-come across slimy." GOVEX 22. Kim added that, during a short break in the meeting, Messenger said she "felt slimy he wants to work for us but we're asking for a deal first." *Id*. Third, about two weeks later, Burke emailed Kim and Messenger stating that Beyler was "working options and angles hard for funding our project[.]" GOVEX 23.

On May 11, 2021, Kim, with Messenger copied, proposed to Burke a $20 million contract – to provide basically the same programming that had failed two years earlier. GOVEX 28.

### 3 . *The Quid Pro Quo*

On July 13, 2021, the Defendants exchanged emails to arrange a lunch meeting in

Washington, D.C., on July 23, 2021, where they finalized their corrupt arrangement. GOVEX 32. Before he took the meeting, Burke knew that Kim and Messenger wanted to talk about Navy business for Next Jump, as well as about a future job for Burke. GOVEX 42B at 7. In other words, the red flags were plain to see and yet Burke took the meeting anyway.

And further reflecting Burke's knowledge that the meeting was going to be improper, he concealed it from the Navy. First, Burke arranged the meeting using his personal email account and without copying any Navy personnel. Second, Burke's official itinerary for the afternoon of July 23 stated "Executive Time" (meaning personal time) rather than disclosing a meeting with vendors to discuss business with the Navy. GOVEX 37. Third, Burke invited an individual identified in the Indictment as "Person 3," Burke's girlfriend at the time, to attend the lunch, and told her the meeting was about a job. GOVEX 42A at 1-7. As he wrote in a text beforehand, Kim and Messenger "want to have a more intimate conversation" and "Meghan [Messenger] already talking about [a] job." *Id* at 7. Fourth, in texts to Person 3, Burke stated that he deliberately excluded his staff from attending the meeting. *Id.* at 7-9.

As Burke expected, in the meeting Messenger and Kim offered to hire Burke with a $500,000 salary and stock options in exchange for the government contract they so desperately sought. *See* GOVEX 42B 4-5, 9.

The Defendants memorialized the lunch meeting, providing compelling real time evidence of the *quid pro quo*. Kim emailed senior Next Jump personnel and reported, "Burke. Crazy day. Five hours. He would have stayed all night if we stayed. In short [a contract] starting with his command almost ASAP." GOVEX 39. In the same email, Kim said that they had also discussed Burke coming to work at Next Jump after his retirement, including "salary equity etc." *Id.* Kim reported that Burke was "very excited" and "wanted to resign next week," but Kim "***[t]old him to***

**hold off and first launch this part 1**," referencing the stage of the agreement in which Burke would direct his staff to provide a contract to Next Jump. *Id.* (emphasis added). Messenger wrote a similar email to her family members that evening. *See* Ex. G. The next day, July 24, 2021, Burke texted Person 3 that "[Kim] sent me a note  . . . . I asked him to write out a job description – but I've essentially agreed to work for them . . . ." GOVEX 42 at 4.

Why did Burke enter into this illicit agreement? In describing his own motivation to corruptly agree with Kim and Messenger, Burke indicated that employment at Next Jump was a "real offer" that would get him "out of the DoD rut." *Id*. at 18. And, of course, there was the money: Person 3 asked how big an equity stake Kim and Messenger offered Burke, because "[i]t was hard to hear with '500k base salary' ringing in my ears." *Id.* at 4. Burke replied, "10% [ownership] in total co[mpany] … junior coowner behind [Messenger]. . . " *Id*. at 5. Showing that Burke considered the future equity stake to be a value driver, Burke explained that Kim "wants all his team to own some of the company – so he can pay lower salary and incentive performance through ownership." *Id.* at 6.

Person 3 asked to what extent the job at Next Jump was "tied" to his providing a Navy contract; Burke answered, "technically - zero. But he desires that I be able to have a personal testimonial." *Id.* at 9. In other words, Burke's employment was contingent on providing a contract to Next Jump so that Burke could attest to Next Jump's product. Underscoring Burke's agreement to work for Next Jump, on August 26, 2021, about a month after the lunch meeting, Burke sent the Secretary of the Navy a memo announcing his intention to retire from the Navy in May 2022. GOVEX 50.

The Defendants developed a three-phased approach to their efforts to unlawfully obtain Navy contracts for Next Jump. In Phase One, Burke would take official action to deliver an initial

contract for Next Jump to train a portion of his command, Navy Europe and Africa, to "produce demonstratable metrics of success[.]" GOVEX 46 at 2. In Phase Two, Burke, armed with the results of the initial contract, would influence other senior Navy officials to obtain a second, Navy-wide (and thus more valuable) contract for Next Jump. *Id.* at 2. And in Phase Three, Burke would retire from the Navy and join Next Jump as a Senior Partner. *Id.*

Throughout the summer of 2021, emails show that Next Jump was still developing the tech application that it intended to present to the sailors under Burke's command for Phase One of the illegal bribery agreement. In this context, Messenger emailed select Next Jump personnel indicating that she and Kim decided to reduce their $20 million proposal down to a $1 million contract. GOVEX 53. Messenger explained, "We don't want Bob [Burke] to get off the hook…the $ amount is less significant at this stage [. . . .] IN our POV [*i.e.*, point of view] the contract size is less important than the things it triggers (including being able to say we're in partnership with the navy)[.]" *Id.* This statement was entirely consistent with Messenger's earlier view that the point of the first contract was to "make data showing results" that would lead to the increased contract (*i.e.*, the $100 million, all-Navy deal) for which Kim and Messenger were hunting.

But when Next Jump's product was ready and made informally available to some Navy personnel to "test drive," the results were so bad that on September 22, 2021, Burke emailed Kim and Messenger that Next Jump's application "in and of itself does not stand on its own" and that the "app-based approach" "just does not seem to be sustainable or scalable for us [*i.e.*, the Navy]." GOVEX 56 at 1. Burke stated that, "I just can't do this as structured." *Id.* at 2. Tellingly, however, Burke did not close the door to Kim and Messenger; instead, he instructed them how to modify their proposal so that he could ram it through his administration and, in that respect, he offered "to talk this week or next if helpful." *Id.* Kim then invited Burke to Next Jump's lavish New York

City headquarters, and Burke quickly agreed to visit them. *Id*. at 1. It is plain in the context of the evidence that the Defendants purpose in meeting was to discuss how best to salvage their corrupt agreement.

>    4. *Phase One: Burke Performed a Corrupt Official Act on Next Jump's Behalf to Direct a Contract to Next Jump*

To complete Phase One of their illegal bribery agreement, in mid-December 2021, Burke used his official position to order his subordinates to ensure Next Jump had a contract with the Navy to provide a training program in Naples, Italy, and Rota, Spain, the following month – an order that Navy contracting officials felt was inappropriate and, under normal circumstances, impossible. GOVEX 78, *see also* 05/07/2025 PM Trial Tr. at 39:22-40:4, 59:1-4, 60:4-9, 05/13/25 PM Trial Tr. at 28:12-20. The evidence presented at trial also indicated that Burke's subordinates thought that contracting with Next Jump was neither necessary nor a good use of the command's limited training budget. *See, e.g.*, 05/07/2025 PM Trial Tr. at 55:18-25, 73:20-22, 05/13/25 PM Trial Tr. at 29:3-10, 30:13-31:3.

Preceding Burke's official action to direct a contract to Next Jump, the Defendants continued to meet to discuss their corrupt bribery agreement and finalize its execution. On November 16, 2021, Burke visited Next Jump's headquarters in New York City. GOVEX 65. Immediately after the meeting, Kim emailed select Next Jump personnel that the company was about to be "full force back into business with the Navy." GOVEX 66. Kim also described a detailed plan that would work around (but not fix) the significant flaws in Next Jump's app – the plan was to send four officers under Burke's command to attend an in-person training at Next Jump and report back to Burke and his senior staff about the program's utility. *Id.* This plan was conceived in deception because the Defendants pre-determined that the contract would be "signed

before Xmas" no matter the officers' review of the training. *Id.* The Defendants had come up with

a plan to accomplish the goals of their corrupt agreement.

      Executing the plan would require the assistance of Next Jump's "Partners" team, whom

Kim emailed to "informate" as to what transpired in their meeting with Burke:

> [Messenger] and I met for a little over 4 hours today with [Burke]. In short, we're
> about to go full force back into business with the Navy. We have 4 of his senior
> most people coming in 2 weeks . . . Within one week [of that visit] . . . he is going
> to propose back a ~$1MM engagement with [Next Jump] with goal of having it
> signed before Xmas. We will likely launch in the new year, the work will be in
> Naples, Italy and Rota, Spain. We will likely engage our entire Partners team to
> help with the coaching and training of the pilot Sailor population.

*Id.* And Kim clearly believed, based on that meeting, that their three-phased plan with Burke was

moving forward, as he later wrote to an associate:

> Contract signed before Xmas and then we're off to the races, ideally tangible
> success by March. Present April/ may for all navy deal to 640k sailors and 5000
> commands globally. Then [Burke] ideally leaves navy joins [Next Jump]
> somewhere between July-oct next year in nyc.

GOVEX 67 at1.

      Two days later, Messenger emailed Kim alone and expressed her ongoing belief that the

conspiracy was driving toward its intended results: "Weird to think Bob [Burke] gonna be on our

team likely next summer eh[.]" GOVEX 68.

      In mid-December 2021, Next Jump personnel were contacting Burke's staff to arrange

their travel – even though a contract had not been signed. When Beyler learned about this, she

wrote, "Why are they coming? We have no contact with them," and then clarified, "I mean contract

not contact. Comptroller is researching possible vehicles, but we don't even have proposals . . . I'm

not sure how to stop this direct communication between [Burke] and [Next Jump]." GOVEX 74.

Indeed, Beyler testified at trial that she told Burke repeatedly not to communicate directly with

Kim and Messenger relating to contract actions, advice that Burke clearly rejected. 05/07/25 AM

Trial Tr. at 10-17. Nevertheless, on or about December 17, 2021, Burke took official action to fulfill his end of the illegal bribery agreement and ordered Beyler to provide a contract for Next Jump to train to his command. GOVEX 78 at 1. In turn, Beyler instructed Burke's staff to follow Burke's order, including Burke's directive that the contract be "in place by 10 Jan." *Id*. at 1. Burke's staff had approximately 10 working days to get the contract in place, whereas, in the ordinary course, constructing and implementing federal government contracts takes months. As to Next Jump's "pricing proposal" for their proposed training, one training specialist under Burke's command remarked, "I'm sorry, but I really don't like the pricing. They are screwing us." GOVEX 169. Indeed, Burke's order was for the Next Jump contract to be valued at approximately $350,000, which required Burke's staff to zero out the command's entire training budget. O5/05/2025 Trial Tr. at 83:13-24.

The Navy ordered the contract for Next Jump to train Navy personnel in Naples, Italy, and Rota, Spain, in January 2022. The training provided by Next Jump was widely disparaged. In fact, a post-training survey was compiled showing the mostly negative reviews. GOVEX 95; *see also* 05/07/2025 PM Trial Tr. at 69:25-70:2 (Witness Amanda Kraus describing the training as the "worst" she had ever seen). Evidence that Burke was made aware of this negative feedback was not disputed by the defense at trial.

### 5. *Phase Two: Burke Promotes Next Jump to Other High-Ranking Officials*

Even though Burke knew that Next Jump's training received mostly negative feedback, Burke worked to complete Phase Two of the illegal bribery agreement by promoting Next Jump to other high-ranking officials with the hope that Next Jump would receive a larger contract in the future. *See* GOVEX 47 at 2. For example, Burke wrote to the Admiral responsible for training sailors throughout the Navy and promoted Next Jump, asserting that Next Jump should provide Navy-wide training. GOVEXS 99, 101. Burke also promoted Next Jump to a high-ranking Admiral

in the British Royal Navy. GOVEX 123. Of course, in using his official position to advocate for Next Jump within the Navy, Burke was advancing his own financial interests because he had already agreed to join Next Jump later that year with a large equity stake. In other words, Burke's future ownership of part of Next Jump was incentivizing his performance even before Burke retired from the Navy.

### 6.  *Phase Three: Kim and Messenger Offer Burke a Job at Next Jump*

Burke fulfilled Phases One and Two of the illegal bribery agreement by taking official action to direct a contract to Next Jump and by promoting Next Jump to other high-ranking officials. It was time for Kim and Messenger to complete Phase Three and hire him. But first, Kim and Messenger visited Burke and his wife in Naples and stayed at their home. *See* GOVEX 107. Following that visit, Burke expressed to Kim and Messenger, "So glad you guys made the trip. Was good to finally be able to talk." GOVEX 109. A few weeks later, Burke received his Next Jump offer letter, which mirrored the terms discussed at the lunch in July 2023 when the Defendants cemented the *quid pro quo*. GOVEX 126. Kim and Messenger offered Burke a position at Next Jump with a $500,000 base salary and 100,000 stock options. *Id.*

### B.    **Burke's Concealment and Conflict of Interest**

At trial, the Government presented evidence showing that Burke's prior command positions within the Navy made him an authority on the Navy's ethical Standards of Conduct. For example, in 2020, Burke was the second-highest uniformed officer in the Navy, and he issued the ethical guidance for the entire organization. 05/12/2025 PM Trial Tr. at 44:7-45:1, 46:13-47:14. In addition, Burke obtained annual ethics trainings. *See generally* GOVEX 9; *see also* 05/12/2025 PM Trial Tr. at 53:18-25.  Relevant here, the ethics rules required Burke to disclose that Next Jump offered him a job in July 2021. *See, e.g.*, GOVEX 9 at 35-36; GOVEX 111; 05/12/2025 PM Trial Tr. at 59:7-60-25. If Burke had disclosed that he was seeking employment from Next Jump (in that

he did not unambiguously reject their job offer), he knew the Navy would have forced his recusal from any decision-making role with respect to Next Jump and a potential Navy contract. 05/12/2025 PM Trial Tr. at 65:7-21; *see also* GOVEX 9 at 35-36.

To fulfill his end of corrupt agreement with Kim and Messenger – and to receive the "real offer" of a lucrative pay package from Next Jump that would get him out of the "DoD rut" – Burke had to direct a contract to Next Jump and promote Next Jump to other high-ranking officials. *See* GOVEX 47.  To do so, therefore, Burke could not allow himself to be recused or conflicted out of handling matters concerning Next Jump. Accordingly, at no point from July 2021 to May 2022, did Burke report to the Navy that Kim and Messenger had offered him a job at Next Jump, or that he had discussed with them the possibility of working for Next Jump as early as April 2021. 05/13/25 AM Trial Tr. at 34:1-35:24. On the contrary, Burke actively concealed the job offer while performing certain tasks necessary for him to retire and obtain post-government employment. For example, on August 26, 2021, Burke sent the Secretary of the Navy a memo requesting voluntarily retirement in May 2022, affirming that he was aware of the directive governing pre- and post-retirement standards of conduct and employment activities – and thereby falsely implying that he was following those standards. GOVEX 50. Despite knowing he had engaged in job negotiations with Kim and Messenger, Burke implied that he would continue to follow that directive. *See id.* But, of course, Burke continued to actively ignore it.

Burke's ethics counselor, Captain Bradley Appleman, advised Burke that prior to seeking post-government employment it would be wise to request a post-government employment opinion. *See generally* GOVEX 111. Seeking a post-government opinion is consistent with typical practice when a high-ranking Navy official is retiring from the Navy and considering post-government employment options. The opinion is intended to ensure that retiring officials do not run afoul of

the Navy's code of conduct and the law. On March 28, 2022, Burke emailed Captain Appleman to request a generic post-government employment opinion. *Id*. at 7. In his March 28, 2022, email to Captain Appleman, however, Burke falsely stated that he "had no conversations, have no intent to aim for a specific company, and most likely will not actively seek employment until after 1 July." *Id*. Then, on May 6, 2022, Burke again emailed Captain Appleman and falsely implied that Next Jump had just approached him to ask if he "would be interested in having post-navy employment discussions." *Id*. at 3. Burke falsely reported to Captain Appleman that he rejected Next Jump's entreaty out-of-hand. *Id*. A few days later, Burke subsequently signed a memorandum disqualifying himself from participating in any matters with Next Jump, effectively snowing the Navy into believing that Burke's conduct was above board and in line with government ethics rules, with which Burke was intimately familiar, as discussed above. GOVEX 113. By that time, it had been almost ten months since Burke "essentially agreed to work for" Kim and Messenger following their D.C. lunch meeting. GOVEX 42B at 4. It had been over five months since Burke ordered Person 2 to provide the contract to Next Jump.  And Burke had already used his position to promote Next Jump to other high-ranking officials.

In one of his final deceptive acts, in July 2022, Burke withheld material information – his employment agreement – from his mandatory public financial disclosure report (OGE-278e). GOVEX 134. Burke joined Next Jump in October 2022.

### C.    Relevant Conduct to the Guidelines Calculation - Obstruction

Although this evidence was not presented at trial, the Court is well aware of Burke's additional obstructive conduct. *See* ECF No. 68 (United States' Notice of Intent to Use Evidence under Fed. R. Evid. 404(B); *see also* 04/10/2025 Pretrial Conf. Tr. at 118:11-123:15. During this investigation, the Government obtained a recorded telephone call from the Defendant's ex-girlfriend, Person 3. This recording, from April 15, 2022, indicates that Burke attempted to coerce

Person 3 to destroy evidence of his criminal misconduct. Notably, the call occurred contemporaneous with Burke's efforts to deceive the Navy into believing he had not engaged in job-for-contract talks with Next Jump in 2021. In the conversation, Burke told Person 3 that he learned from an NCIS agent that her ex-husband sent NCIS a letter accusing Burke and Person 3 of having an illicit relationship. *See* 4/15/2022 Recorded Call Tr. at 14:4-10. Burke recounted the agent's description of the letter, to include that it contained "an unusual number of specifics in here that would allow [NCIS] to investigate if it were within [its] jurisdiction." *Id.* at 16:1-2. Burke said that the NCIS agent told the ex-husband that other organizations would be better suited to investigate the allegations. *Id.* at 11.

Burke told Person 3 that when another investigating organization obtained the letter, "they're gonna go look at it really hard," *Id.* at 16: 5-6, and "you and I will be toast[,]" *Id.* at 7-16. Burke further explained, "They will investigate. They will look at all sorts of things. They will look at dots that intersect . . . and they will draw a conclusion." *Id.* at 24:25-25:4. Burke knew this to be the case because, as a senior Navy Admiral, Burke had "watched every one of these cases for the last seven years as somebody in a position to render decisions on them." *Id.* at 25: 8-10.

Against this backdrop, Burke said that he had deleted records, and he encouraged Person 3 to do the same: "I've destroyed everything, you know . . . I would hope you would do the same . . . Everything, I destroyed. And you have to go looking hard because shit gets kept in a lot of places." *Id.* at 9:23- 10:3. Burke said that if the Navy came for "my private stuff[,] [t]hey're not gonna find anything, it's all gone. I sanitized heavily. I would ask you to do the same just in case . . . I've just seen it done too many times." *Id.* at 52:17-23. Burke stated that another person helped delete his records too - the person "cleaned all of my files." *Id.* at 41: 13-14. Burke also told Person

3 to conceal her records, stating, "move it somewhere and fucking hide it, like on a thumb drive that nobody can find." *Id.* at 43:25-44:1.

When Person 3 doubted whether she and Burke would be forced to provide records during an investigation, Burke responded that her job was at stake if the records came to light: "I see activity that precludes future government employment . . . I've seen that in the past." *Id* at 26:1. Burke also suggested that they coordinate a story to tell future investigators and he threatened Person 3 if she did not accede to his demands. *See id.* at 10:7-8 ("I could make a different story, but it's got to be really clean"), 25:12 ("Here's my statement: I'm not going by myself.").

Notably, although Burke contended in pre-trial litigation that his obstructive conduct concerned concealing an extramarital affair and not the bribe scheme, Burke said on the recording that he reviewed all their messages and deleted everything. Taking Burke at his word, he surely would have noticed the texts he exchanged with Person 3 from the summer of 2021 concerning his agreement to work for Next Jump five months before he ordered Beyler to deliver them a Navy contract. Further, the obstructive conduct shows that when Burke concealed information from Captain Appleman and others, which was occurring at roughly the same time as the recording, he did so with the intent to mislead the Navy and cover up his misconduct.

Furthermore, the evidence indicates that Burke told his co-conspirators to delete evidence as well. *See* Ex. H (Kim's June 23, 2022, notes). Kim took notes on a June 23, 2023, call with Burke, in which they discussed the investigation into Burke's abuse of power. *Id.* On that call, Kim's notes indicate that Burke told him to delete their WhatsApp communications. *Id.* While testifying in his own trial, Kim confirmed that this conversation took place, Burke instructed him to delete his WhatsApp messages, and that he did so. *See* 8/29/2025 Trial Tr. at 80:24-82:14.

## II.    SENTENCING GUIDELINES

Burke now faces sentencing on four counts:  18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 201(b)(2) (accepting a bribe); 18 U.S.C. § 208(a) (acts affecting a personal financial interest); and 18 U.S.C. § 1001(a)(1) (scheme to conceal material facts).

As noted by the final PSR, *see* ¶¶ 122-28, 130-37, 143-49, Burke faces the following statutory penalties:

| | | |
|---|---|---|
| Counts 1, 4, and 5 (§§ 371, 208, 1001) | Class D felonies | <ul><li>Five-year maximum term of imprisonment</li><li>Term of supervised release not to exceed three years</li><li>Not less than one nor more than five years' probation</li><li>$250,000 maximum fine</li><li>Mandatory $100 special assessment per count</li></ul> |
| Count 3  (§ 201) | Class C felony | <ul><li>Fifteen-year maximum term of imprisonment</li><li>Term of supervised release not to exceed three years</li><li>Not less than one nor more than five years' probation</li><li>$250,000 maximum fine</li><li>Mandatory $100 special assessment</li></ul> |

The Government agrees with the Sentencing Guidelines range calculated in the PSR, except that the enhancement for loss amount under § 2B1.1 should be +14 and not +12, as argued below. *See* PSR, para. 57. Thus, the Government submits that the total adjusted offense level is 32 (not 30).

| SENTENCING GUIDELINES CALCULATIONS<br>Group 1 (Bribery) (18 U.S.C. § 201(b)(2)) | |
|---|---|
| Base Offense Level (U.S.S.G. §2C1.1(a)(1)) | 14 |
| Loss Amount Between $550,000 and $1,500,000 (U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(E)) | +14 |
| Offense Involved a High-Level Decision-Maker (U.S.S.G. § 2C1.1(b)(3)) | +4 |
| Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| Chapter 4 Adjustment for Certain Zero-Point Offenders | -2 |
| **TOTAL ADJUSTED OFFENSE LEVEL** | **32** |

### A. The Appropriate Loss Amount is $1,000,000 and the +14 Level Enhancement Pursuant to U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(E) is Appropriate

Pursuant to U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(E), the loss amount is calculated by the greater amount of either 1) the benefit received or to be received in return for the payment; 2) the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense.

Here, the greatest amount is the value of the contract that the Defendants agreed Burke secure from the Navy. The evidence proves that Burke promised Kim and Messenger that he would direct the Navy to enter a $1,000,000 contract with the Navy. For example, on July 23, 2021, the same day Burke, Kim, and Messenger met secretly at the Belga Café, Kim emailed his company's closest confidants and described the contract Burke promised: "But smaller single digit million deal in this years [sic] budget." GOVEX 33. In an email to Next Jump employees approximately two weeks after the Belga Café meeting, Messenger wrote: "BLUF – we need to research subcontractor options ASAP. It will be single digit millions." Ex. B (August 5, 2021, email from Messenger, subject line: Navy Contracting). Kim, Messenger, and Burke finalized their agreement

that Next Jump's contract with the Navy would be one million dollars after they met again, secretly, in New York City on November 16, 2021, at Next Jump's headquarters. About a week after that meeting, Kim and Messenger explained to their staff at an all hands meeting that "Burke flew in from Naples last week to meet and promised small $1M engagement[.]" Ex. C at 4 (11.22.2021 All Hands Meeting Notes). As a former employee at Next Jump explained, she was the person who took notes during this meeting, and the promise of the $1,000,000 contract was not a hypothetical but was the "plan." *See* 08/26/25 Trial Tr. at 63:17-64:7.

Burke's ultimate inability to deliver on his promise of a $1,000,000 Navy contract for Next Jump does not compel using a lower loss amount. *United States v. Feldman*, 338 F.3d 212, 223 (3d Cir. 2003) ("[L]oss under the Sentencing Guidelines is determined by calculating the greater of actual or intended loss, and intended loss includes loss that was impossible."). What matters for sentencing purposes under U.S.S.G. § 2C1.1(b)(2) and § 2B1.1(b)(1)(E) is the amount the Defendants <u>intended to be received</u>, regardless of whether anything resulted. *See, e.g., United States v. Blagojevich*, 794 F.3d 729, 742-43 (7th Cir. 2015) (finding the loss amount was $1.5 million because that was the figure discussed on recording even though "nothing came of these overtures"); *United States v. Ellis*, 951 F.2d 580, 585 (4th Cir. 1991) (affirming the district court's calculation of the benefit to be received as including the value of a promised payment even though the promisor "later reneged on th[e] commitment"); *see also* U.S.S.G. § 2C1.1 background (emphasizing that the "object" of the bribe is what determines its estimated value).

Thus, when the Court can reasonably determine the benefit received (or to be received) in return for a bribe, and that amount is greater than the bribe or any loss to the government, § 2C1.1(b)(2)(A) requires an enhancement corresponding to the amount of that benefit. *Compare United States v. Hang*, 75 F.3d 1275, 1284 (8th Cir.1996) (affirming the loss calculation

determined where the court calculated the loss based on the benefit received by defendant's victims in return for the payments) *with Ellis*, 951 F.2d at 585–86 (refusing to enhance sentence according to "potentially limitless" and difficult-to-ascertain profits that race track company gained as a result of improperly-induced legislation). Here, based on the evidence, the Court can reasonably determine that Burke, Kim, and Messenger agreed and <u>intended</u> that Burke's "Phase One" official act would be to award a contract from Navy Europe and Africa valued at one million dollars. Kim and Messenger's contemporaneous communications leave no doubt as to what they understood Burke agreed to deliver. And Burke's intent is laid bare by the fact that he zeroed out his command's training budget for Next Jump, thus giving the company every penny that was within his power to give. As a result, the +14 level enhancement applies.[1]

### B. Burke was a High-Level Decision-Maker and a +4 Level Enhancement Pursuant to U.S.S.G. § 2C1.1(b)(3)) Applies

Pursuant to 2C1.1(b)(3), a +4 level adjustment applies because Burke was a public official holding a "high-level decision-making or sensitive position." At the time of his criminal offenses, Burke was a four-star Navy Admiral and the Commander of Naval Forces in Europe and Africa. This meant that Burke oversaw 12,000 to 17,000 Navy employees. *See* 05/06/25 PM Trial Tr. at 71:11-14. Burke did not report to a higher chain of command at Navy Europe and Africa and had final authority to make decisions on behalf of the Navy Europe and Africa, including how to spend its budget and the contracts it would enter. *Id.* at 73:14-25. By the nature of his high-ranking position, Burke had substantial influence over the decision-making process and a +4 level adjustment is warranted pursuant to 2C1.1(b)(3). *See United States v. Johnson*, 605 F.3d 82, 83-

---

[1] Alternatively, if the Court does not find that the intended benefit was a one-million-dollar contract, then a +12 level enhancement applies, as Kim and Messenger's bribe, which Burke accepted, was a job with a $500,000 salary (plus stock options). *See* GOVEX 42B at 4, GOVEX 126.

84 (D.C. Cir. 2010) (upholding +4 level adjustment pursuant to 2C1.1(b)(3) because defendant was a law enforcement officer who had the power to make decisions on behalf of the government).

### C. Burke Obstructed Justice and a +2 Level Enhancement Pursuant to U.S.S.G. § 3C1.1 is Warranted

Pursuant to U.S.S.G § 3C1.1, a +2 level adjustment applies because Burke "willfully obstructed or impeded, or attempted to obstruct or impede . . . the investigation" that resulted in his conviction. As described above, Burke called Person 3 and attempted to threaten and coerce her into deleting evidence relating to their relationship, which he knew would have included evidence of their lunch with Kim and Messenger at the Belga Café and the subsequent text conversations about their bribery agreement discussed at that lunch. Also in the call, Burke attempted to convince Person 3 to concoct a false story to tell investigators, stating that he could "make a different" story provided it was "clean." This conduct is exactly the type of conduct contemplated by U.S.S.G § 3C1.1. *See* U.S.S.G. § 3C1.1 cmt. 4(D) (listing, under "Examples of Covered Conduct," "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation . . . or attempting to do so"). Burke's effort to obstruct was certainly willful. First, when Burke's requests were rebuffed by Person 3, he resorted to threats by telling Person 3 that he was "not going by myself." Second, the recording occurred in April 2022, while Burke was disguising from Captain Appleman (and the Navy) the true nature of his communications and involvement with Kim and Messenger around future employment and the contract he had ordered.

Although Person 3 did not yield to Burke's entreaties and threats, Burke's actions need not have a substantial effect on the investigation, prosecution, or sentencing, as a +2 level enhancement pursuant to § 3C1.1 applies as long as Burke's actions had "the potential to weaken the government's case, prolong the pendency of the charges, and encumber the court's docket with an

unnecessary trial." *United States v. Maccado*, 225 F.3d 766, 772 (D.C. Cir. 2000); *see also United States v. Mafanya*, 24 F.3d 412, 415 (2d Cir. 1994) (holding that defendant obstructed justice by using a false identity before a magistrate judge even when his true identity was discovered before the hearing). Burke's call to Person 3, in which he asked her to "delete everything" obviously had the potential to "weaken the government's case" and "prolong the pendency of the charges" because had Person 3 listened to Burke, the Government would have lost key evidence of Burke's corrupt agreement with Kim and Messenger, such as the text messages detailing the Defendants' discussion of the bribery agreement at the Belga Café.

Additionally, as described above, Burke instructed his co-conspirators to delete their WhatsApp messages. Even though Kim claims he only deleted two WhatsApp messages because of Burke's instruction to delete evidence, that claim defies all logic, as the entirety of their communications during the key dates of the alleged conspiracy could not be recovered from Kim's phone, *see* 09/02/2025 AM Trial Tr. at 127:2-132:18, clearly undermining the integrity of the Government's investigation. For these reasons, a +2 level adjustment pursuant to USSG § 3C1.1 is applicable here.

### III.     THE APPROPRIATE SENTENCE

Once the Court calculates the Defendant's advisory Guidelines range applicable to the federal counts of conviction, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). To make this determination, the Court may consider all factual evidence relevant to the conduct of conviction that is proven by a preponderance of the evidence, including evidence not presented to the jury, without regard to the rules of admissibility at trial, subject to basic principles of reliability. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing

determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

The factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); and the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B).

The PSR calculates Burke's criminal history as category I.  PSR ¶ 69.  Burke is eligible for a Chapter Four Adjustment for certain zero-point offenders, reducing his adjusted offense level by two points. *Id.* at ¶ 65. Assuming the Court sustains the Government's objection and finds that the correct loss amount is $1,000,000 (resulting in a +14 enhancement under U.S.S.G. § 2B1.1) Burke's Guidelines imprisonment range is 121 to 151 months.  The Government submits that a sentence of 121-months imprisonment is appropriate and not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). The United States also submits that the imposition of 60 months of supervised release, a $150,000 fine, restitution of $322,850.00 to the Navy, an order of forfeiture for the $86,748.08 in salary Burke was paid by Next Jump, and a $400 special assessment, and a $150,000 fine (near the midpoint of the applicable Guidelines range) is appropriate.

## A.  The Nature and Circumstances of Burke's Offenses Support a Significant Term of Imprisonment

Judged by the number of stars on his shoulders and the high-level commands he held, Burke held a position of the highest trust within the United States military, and by extension the United States Government. Driven by greed and the desire to free himself of the perception of a "DOD rut," he exploited the Government's trust and the unquestioning loyalty of his staff.

It is no exaggeration to say that the weight of the world was on Burke's subordinates in December 2021. As Ms. Beyler testified, it was clear to the Navy that Russia was going to invade Ukraine. Seeming to brush aside the weighty responsibilities connected to that crisis – and depriving his staff of the short holiday reprieve during the crisis - Burke ordered his staff to slap together a contract for Next Jump's training services at unprecedented speed and at a bloated price. *See* 05/05/2025 AM Trial Tr. at 67:24-68:8;  05/07/2025 PM Trial Tr. at 45:10-18;  05/13/2025 PM Trial Tr. at 37:12-20. Burke did that not because he believed that the training would help his sailors, but because he was influenced by Kim and Messenger's repeated pitches to make him a millionaire if he delivered them Navy business first. The truth is, Burke knew this training was a waste of time and money, and not suitable for his command, let alone the entire Navy.  *See* GOVEX 52. His people told him as much time and time again. And even Burke came to realize that Next Jump's product did nothing for the Navy because, months before he sprang the contract order on his staff, Burke told Kim and Messenger that their product would not work for his command and that he could not "do this as structured." *Id.* at 2. Yet, when Kim responded to this email with an invitation to meet with him and Messenger at Next Jump's opulent headquarters, Burke immediately accepted. *Id.* at 1. And it was at that meeting, in November 2021, that the co-conspirators reaffirmed their "deal," having cooked up a plan to legitimize Next Jump's training services. GOVEX 66. It is plain to see now, in the context of all the evidence, that Burke willfully participated in this scheme – and helped salvage it when his staff tried to scuttle the contract he had to deliver. It all amounts to a stunning abuse of power because, as Burke well knew, the only thing he needed to do to wield the machinery of the Navy toward the goal he shared with Kim and Messenger was to give a single order.

And all the while he intentionally hid what he was doing from the Navy. Burke lied about this bribe scheme multiple times, including in sworn statements. He lied to Captain Appleman, his ethics counselor, when in March 2022 he told Captain Appleman that he's had "no conversations, have no intent to aim for a specific company, and most likely will not actively seek employment until after 1 July," when, in fact, Burke had been seeking a job with Next Jump for nearly a year. GOVEX 111. Burke lied when he told other senior leaders in the spring of 2022 about how much good Next Jump was doing for his command when, in fact, Burke's command had already cut ties with Next Jump GOVEXS 99, 101, 123. Burke lied to law enforcement officers about the scheme for nearly an hour before he was confronted with evidence of his crimes. GOVEX 150. Then, he finally admitted the wrongfulness of his conduct. *Id.* Burke's concealment of his dealings with Kim and Messenger only underscores that wrongfulness and that Burke knew exactly what he was doing, but felt the rules and the laws should not apply to him.

### B.    Burke's History and Characteristics Do Not Mitigate the Gravity of His Conduct

Burke's background does not support a lesser punishment. On the contrary, Burke's status as a four-star Navy Admiral and his purposeful neglect of the responsibility and integrity that rank mandates requires the opposite. Importantly, it was only because of Burke's many years of service that he was able to commit the offenses of which he now stands convicted. Burke used the power and respect afforded to his rank to bind the Navy into a useless, wasteful, and expensive engagement with Next Jump, undermining the integrity of the procurement process. That Burke worked in a position of public service and public trust does not weigh in favor of leniency but rather was plainly an abuse of his position and supports a term of 121-months imprisonment. This unavoidable fact is laid bare by Burke's own statement to the Navy when he was VCNO. In connection with issuing the Navy's Standards of Conduct, Burke told the entire organization that

they had to own their ethics, and that a single poor decision could destroy a lifetime of service. Burke became the very person he exhorted his subordinates not to become.

### C.    The Need for the Burke's Sentence to Reflect the Seriousness of the Offense and Promote the Rule of Law Supports a Term of Imprisonment

Burke's sentence must also reflect the seriousness of the offense to promote rule of law, to provide just punishment, and to provide adequate deterrence. Senior military leaders are given an enormous amount of responsibility and trust. Burke's crimes did significant damage to the credibility of the Navy and of senior U.S. military leadership. As the evidence presented at trial made clear, Burke abused his position as a four-star Admiral and, by his own admission, concealed his criminal conduct from those who "needed to know." This type of behavior cannot be explained away and must be taken seriously. Burke's abuse of power corrupted processes that are designed to fairly, transparently, and efficiently steward the American treasury. Conduct like this erodes trust in government and in the U.S. military. And it also unjustly rewards corrupt enterprise at the expense of those who play by the rules. It is impossible to know how widespread and longstanding the effects of this crime will be on the procurement process going forward. One way the Court can restore trust in the integrity of the system is by a strong sentence here. A sentence of 121-months imprisonment sends the messages that no one, including high-ranking military officers, is above the law.

### D.    The Need for Just Punishment and Adequate Deterrence Supports a Term of Imprisonment

A sentence of 121-months imprisonment will also provide deterrence. Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). The requested sentence will serve both here.

As to specific deterrence, although Burke – after an hour of lying and concealing – admitted his criminal conduct to NCIS investigators during his October 3, 2023, voluntary interview, he did not, ultimately, take responsibility for his actions and has never expressed any remorse. Although Burke is admittedly unlikely to engage in future criminal conduct, the jury's verdict demands a serious sentence.

The recommended sentence will deter other senior government officials from abusing their position of trust and obstructing justice. Burke's actions – secretly dealing with prospective government contractors, extracting the promise of a job with a lucrative compensation package, improperly using his position to influence other senior military leaders, and lying and covering up his crimes (and encouraging others to do the same) – erodes the faith the public has, not only in high-ranking military leaders, but senior government officials more broadly. The conduct here thus requires a sentence that will send a message that this type of abuse of power will have serious consequences.

## IV.    FOREFEITURE

The Government also requests the Court impose a forfeiture money judgment in the amount of $86,748.08, which represents the proceeds Burke received from the job at Next Jump (*i.e.*, his take-home salary). *See* Ex. A (Proposed Order of Criminal Forfeiture). "Criminal forfeiture is not an independent substantive offense, nor is it even an element of an offense. It is instead 'an aspect of punishment imposed following conviction of a substantive criminal offense.'" *United States v. Day*, 416 F. Supp. 2d 79, 84 (D.D.C. 2006) (quoting *Libretti v. United States*, 516 U.S. 29, 39 (U.S. 1995)), *aff'd in part on other grounds and rev'd in part on other grounds*, 524 F.3d 1361 (D.C. Cir. 2008). Criminal forfeiture may take the form of: (1) an *in personam* money judgment against the defendant; (2) forfeiture of specific assets; and (3) forfeiture of "substitute assets" if the directly forfeitable assets are unavailable. *United States v. Zorrilla-Echevarria*, 671 F.3d 1, 5-

6 (1st Cir. 2011) (citation omitted). Since Burke has seemingly dissipated all the proceeds he received from the bribery scheme, the Government requests that the Court impose a forfeiture money judgment against Burke and to allow for forfeiture of any substitute assets to pay the money judgment if Burke has any assets. *See* Ex. A.

Federal Rule of Criminal Procedure 32.2 governs criminal forfeitures. As required by Rule 32.2(a) of the Federal Rules of Criminal Procedure, the Government provided notice to Burke in the Indictment that it intended to seek a forfeiture money judgment against her as part of "any sentence in accordance with the applicable statute." Fed. R. Crim. P. 32.2(a). Specifically, the Indictment included a forfeiture allegation that provided notice to Burke that upon conviction of any of the offenses alleged in Counts One through Three, the Government would seek criminal forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p). *See* ECF No. 1 at 12-13. The forfeiture allegation also stated that, "[t]he United States will also seek a forfeiture money judgment equal to value of any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses." *Id*. The forfeiture allegation did not request forfeiture of specific property. *Id*.; *see also generally Christie v. United States*, 2014 WL 2158432, at *10 (S.D.N.Y. May 23, 2014) (holding that the government "has the discretion to choose whether to pursue a money judgment rather than forfeiture of specific property"). Because the Government is asking for a forfeiture money judgment in this case, "the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A).

Here, Burke obtained at least $86,748.08 in proceeds as the result of his bribery scheme with Kim and Messenger. As the Government proved at trial, Burke exchanged a Navy contract for a job at Next Jump. Burke worked at Next Jump from October 1, 2022, to January 31, 2023, and was paid "semi-monthly." *See* Ex. D (Burke's Next Jump Profile). A review of Burke's

personal bank account held at the Navy Credit Federal Union ("NCFU"), indicates that he received direct deposits of his salary semi-monthly:

| Date | Amount |
|---|---|
| 10/14/2022 | $10,843.51 |
| 10/28/2022 | $10,843.51 |
| 11/14/2022 | $10,843.51 |
| 11/29/2022 | $10,843.51 |
| 12/14/2022 | $10,843.50 |
| 12/29/2022 | $10,843.52 |
| | Total: $65,061.06 |

*See* Ex. E (Burke's Bank Records for October, November, and December 2022).

Although the Government does not have Burke's bank records for his last month of employment, January, the evidence proves his average gross salary was $21,687.02. As such, considering Burke's salary in January 2023, Burke received a total of $86,748.08 in salary during his time at Next Jump. Therefore, the Government requests that the Court impose a forfeiture money judgment in that amount since the proceeds are no longer available for seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and 21 U.S.C. § 853(p).

## V.    FINE

Under 18 U.S.C. § 201, the maximum fine is greater of $250,000 or three times the monetary equivalent of the thing of value. Here, Probation found that the thing of value is the value of the $322,850 contract that Burke directed to Next Jump.  Thus, the maximum fine under the statute is $968,500. The Government disagrees. The Government maintains that the thing of value

was the $500,000 salary that Kim and Messenger offered, and Burke accepted. Thus, the maximum fine under the statute should be $1,500,000.

At Offense Level 32, Burke's Guidelines fine range is $35,000 to $350,000. (At the PSR-calculated Offense level 30, the range is $30,000 to $300,000.) *See* U.S.S.G. § 5E1.2. The government requests a fine near the midpoint of that range, $150,000, as a punishment and deterrent that (like the jail time requested) is appropriate but not greater than necessary to serve the goals of sentencing under § 3553(a).

## VI.    RESTITUTION

The crime of bribery is an "offense[s] against property under" Title 18, and thus falls under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. As a result, the Court must order that "the defendant make restitution to the victim of the offense[s]." 18 U.S.C. § 3663A(a)(1). Specifically, the Government requests Defendant be ordered to pay restitution in the amount of $322,850.00 to the Navy. GOVEX 91 at 3; 05/07/2025 PM Trial Tr. at 65:23-25; s*ee also* 18 U.S.C. § 3663A (requiring courts to order restitution in the full amount of victim's loss). This amount represents the loss to the government caused by Burke's corrupt contract for a job exchange.

## VII.    SPECIAL ASSESSMENT

A $400 special assessment must be imposed. *See* 18 U.S.C. § 3013(a)(2)(A).

## VIII.    CONCLUSION

Burke's criminal conduct and the harm he has caused must be taken seriously. Our government cannot function properly when trusted leaders commit crimes that erode the public trust. The Government asks the Court to impose a sentence of 121-months imprisonment.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: /s/ *Rebecca G. Ross*
    Rebecca G. Ross
    Assistant United States Attorney
    601 D Street N.W.
    Washington, DC 20530
    Office: (202) 252-4490

EDWARD P. SULLIVAN
ACTING CHIEF, PUBLIC INTEGRITY SECTION

By: /s/ *Trevor Wilmot*
    Trevor Wilmot
    Trial Attorney, Public Integrity Section
    U.S. Department of Justice
    1301 New York Ave. NW, 10th Floor
    Washington, D.C. 20530

**CERTIFICATE OF SERVICE**

Rebecca G. Ross, attorney for the United States, hereby certifies that a true and correct copy of this memorandum has been electronically filed and accordingly served upon attorney for the defendant.

<div style="margin-left:40%">

*/s/ Rebecca G. Ross*
Rebecca G. Ross

</div>