```
UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
---------------------------------------------------x
THE UNITED STATES OF AMERICA,
                                              Case No.: 1:24-CR-00265-TNM
       -against-

ROBERT P. BURKE,                              DEFENDANT'S SENTENCING
              Defendant.                      MEMORANDUM
---------------------------------------------------x
```

Defendant, Admiral Robert P. Burke (United States Navy, Retired), through his undersigned counsel, respectfully submits this memorandum in aid of sentencing. After a trial by jury, Admiral Burke was convicted of conspiracy, bribery, acts affecting a personal financial interest, and concealment of material facts. He now stands before this Court at the end of a forty-year career of decorated and distinguished service to the United States, a career that has been irrevocably destroyed by this conviction.

While the defense respects the institution of the jury, we respectfully contest its findings and intend to pursue all available post-trial remedies, including a direct appeal. The purpose of this memorandum, however, is not to relitigate the trial but to provide the Court with a full and accurate picture of the man to be sentenced and to assist the Court in its solemn duty under 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary."

This memorandum will first outline the governing legal standard for sentencing. It will then address the significant legal and factual errors in the advisory Guidelines calculation set forth in the Presentence Investigation Report ("PSR"), which result in a dramatically overstated sentencing range. Finally, it will conduct a thorough analysis of the § 3553(a) factors, including several letters,[1] which overwhelmingly demonstrate that a sentence far below even a properly

---

[1] A copy of these letters are annexed hereto at Exhibit "A."

calculated advisory range is warranted. When Admiral Burke's lifetime of extraordinary public service, his nonexistent criminal history, his serious health conditions directly caused by his service to our nation, the severe collateral consequences he faces, and the powerful character evidence submitted on his behalf are fully considered, it becomes clear that a non-custodial sentence is sufficient to satisfy the statutory purposes of sentencing.

## I. LEGAL STANDARD FOR SENTENCING

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the U.S. Sentencing Guidelines are advisory, not mandatory. The D.C. Circuit has established a two-step process for district courts at sentencing. First, the court must correctly calculate the applicable advisory Guidelines range, which serves as the "starting point and initial benchmark." *U.S. v. Tann*, 532 F.3d 868 (D.C. Cir. 2008). Second, the court must consider the full range of statutory factors enumerated in 18 U.S.C. § 3553(a) to determine whether to impose a sentence within, above, or below the advisory range. *See U.S. v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008).

A district court has broad discretion to impose a non-Guidelines sentence, or "variance," based on an individualized assessment of the § 3553(a) factors. *See United States v. Murray*, 897 F.3d 298 (D.C. Cir. 2018). The court may not presume that a Guidelines sentence is reasonable. *U.S. v. Anderson*, 632 F.3d 1264 (D.C. Cir. 2011). In imposing a sentence outside the advisory range, the court must provide a reasoned, individualized explanation grounded in the statutory factors. *See United States v. Parks*, 995 F.3d 241 (D.C. Cir. 2021). This framework ensures that the ultimate sentence is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

## II. THE OFFENSE CONDUCT IN CONTEXT

The government's theory at trial, which the jury ultimately accepted, was that Admiral Burke entered into an agreement for future employment with the company Next Jump and, in exchange, used his official position to steer a training contract to the company. The defense maintains that this narrative is a fundamental mischaracterization of Admiral Burke's motives and actions and intends to challenge the sufficiency of the evidence on appeal. His interest in Next Jump's training program stemmed from a genuine belief in its potential to benefit the Navy, the very same reason he later agreed to join the company. The compensation offered by Next Jump—a $500,000 salary and stock options—was substantially below what a retired four-star admiral could command in the private sector and was less than other competing offers he had received. He was not motivated by greed, but by a belief in the mission and product of the company.

Admiral Burke's dealings with NextJump were not the actions of a man predisposed to corruption, but a tragic deviation from his well-established character at a time of immense professional and personal stress at the twilight of a demanding forty-year career. Indeed, as the letter from Mr. Scott Sloan makes clear, Admiral Burke had previously gone to great lengths to erect a wall between his personal relationships and his official duties, specifically to avoid even the appearance of impropriety with a government contractor. (Ex. A, Character Letters at 10). This history underscores the aberrant nature of the instant offense. While the jury has rendered its verdict, the context of this conduct is essential for the Court to fashion a just sentence.

## III. THE PSR ADVISORY GUIDELINES CALCULATION IS ERRONEOUS

The PSR calculates a Total Offense Level of 30 and a Criminal History Category of I, yielding an advisory Guidelines range of 97 to 121 months' imprisonment. (PSR ¶ 126). This calculation, however, is predicated on two significant legal errors: the improper application of a

3

two-level enhancement for obstruction of justice and a twelve-level enhancement based on the gross value of the contract rather than its net benefit. When corrected, the advisory Guidelines range is 51 to 63 months, and even that corrected range overstates the seriousness of the offense in light of the factors under 18 U.S.C. § 3553(a).

**A. The Obstruction of Justice Enhancement is Legally and Factually Inapplicable.**

The PSR incorrectly applies a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, based on a mischaracterization of an April 15, 2022, recorded conversation between Admiral Burke and Ms. Denese Canedo. (PSR ¶¶ 49, 61). The PSR's conclusion that Admiral Burke "attempted to coerce Denese Canedo to destroy evidence of his criminal misconduct" (PSR ¶ 49) is a bridge too far, unsupported by the facts and contrary to the controlling legal standard in this Circuit.

The enhancement for obstruction requires that the defendant "*willfully* obstructed or impeded…the administration of justice *during the investigation, prosecution, or sentencing of the instant offense*." U.S.S.G. § 3C1.1 (emphasis added). The D.C. Circuit has established a demanding, two-part test for this enhancement: the government must prove both (1) that the defendant possessed the "actual subjective intent" to obstruct justice, and (2) that the obstructive act had a "direct nexus" to the offense of conviction. *See U.S. v. Barry*, 938 F.2d 1327, 1332 (D.C. Cir. 1991); *U.S. v. Reeves*, 586 F.3d 20, 22 (D.C. Cir. 2009). The government can meet neither prong here.

First, Admiral Burke lacked the specific intent to obstruct justice in this case. The enhancement applies only where the defendant "consciously act[s] with the purpose of obstructing justice." *U.S. v. Henry*, 557 F.3d 642, 646 (D.C. Cir. 2009). The April 15, 2022 conversation was not about the Next Jump contract or bribery; it was exclusively about the potential public

4

disclosure of a private, extramarital affair. (Dkt. 85). At the time of the call, Admiral Burke was not aware of any criminal investigation into his relationship with Next Jump. His sole intent, however misguided, was to prevent profound personal and professional embarrassment for both himself and Ms. Canedo. A desire to conceal a personal relationship is not tantamount to an intent to obstruct a criminal investigation he did not know existed.

Second, the requisite nexus between the conversation and the "instant offense" is absent. The D.C. Circuit requires that the conduct be "calculated to obstruct the administration of justice *with respect to the offense of conviction.*" *Barry*, 938 F.2d at 1332 (emphasis in original). The conversation at issue never mentions Next Jump, Mr. Kim, Ms. Messenger, or the Navy contract. It is entirely divorced from the subject matter of the bribery conviction. It is obvious that Admiral Burke did not know he was being recorded but there is still no mention of Next Jump, Mr. Kim, Ms. Messenger, or any Navy Contract. The government's attempt to bootstrap a conversation about a personal affair into evidence of obstruction in a bribery case is precisely the kind of impermissible propensity argument that Rule 404(b) is designed to prevent—arguing that a desire to conceal one thing makes it more likely one would conceal another. Because the conversation was not aimed at impeding an investigation into bribery, the nexus is missing and the enhancement cannot apply. This two-level enhancement must be removed.

**B. The "Benefit Received" Must Be Calculated as Net Profit, Not Gross Contract Value.**

The PSR errs in applying a 12-level enhancement under U.S.S.G. § 2C1.1(b)(2) based on a benefit value of "approximately $355,000." (PSR ¶ 57). The commentary to this guideline is explicit: "The value of 'the benefit received or to be received' means the *net value* of such benefit." § 2C1.1 cmt. n. 2 (emphasis added). The gross value of the contract is not the correct metric. In *United States v. Ring*, the U.S. District Court for the District of Columbia held that where a bribe

is paid for a government contract, the "value of the benefit" is the profit made on the contract, not its gross value. 811 F. Supp. 2d 359, 379 (D.D.C. 2011).

The evidence shows that while Next Jump received approximately $269,000 in revenue, it incurred $160,110 in direct costs to perform the training services for the Navy.[2] Therefore, the net benefit to Next Jump was **$108,890**. This net value falls within the $95,000 to $150,000 bracket of the § 2B1.1 loss table, which corresponds to an **8-level increase**, not a 12-level increase.

### C. The Correctly Calculated Guideline Range is 51 to 63 Months.

Based on these necessary corrections, the properly calculated Total Offense Level is **24**. The calculation is as follows: Base Offense Level of 14 (USSG §2C1.1(a)(1)); plus 8 levels for the net benefit of $108,890 (§2B1.1(b)(1)(E)); plus 4 levels for his role as a high-level public official (§2C1.1(b)(3)); minus 2 levels as a Zero-Point Offender (§4C1.1). This results in a Total Offense Level of 24. With a Criminal History Category of I, the corrected advisory Guidelines range is **51 to 63 months**.

## IV. A SENTENCE OF PROBATION IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, UNDER 18 U.S.C. § 3553(a)

The central command of federal sentencing is that the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Here, an individualized assessment demonstrates that a non-custodial sentence is appropriate and just. Indeed, the Probation Office itself has identified factors that could justify a sentence below the advisory range, noting that "the Court may find that Admiral Burke's lengthy military service and service-related contributions to this country prior to the instant offense may

---

[2] A copy of NextJump's spreadsheet is annexed hereto at Exhibit "B."

warrant a downward departure." (PSR ¶ 152). Further, the Probation Office identified "Admiral Burke's age, significant medical issues, and his lengthy and distinguished military and public service prior to the instant offense" as factors that "would warrant a variance from the applicable guideline range." (PSR ¶ 154).

**A. The History and Characteristics of the Defendant Demand a Non-Custodial Sentence (§ 3553(a)(1))**

While the nature of the offense is serious, it must be weighed against the extraordinary history and characteristics of the defendant. This is not a case of a career criminal. It is the case of a single, tragic, and aberrant chapter at the very end of a life defined by honor, courage, and commitment.

Robert Burke's story is one of relentless dedication. Born Robert Peter Buccini, his father changed the family name to Burke to shield his sons from the anti-Italian discrimination he faced in their new home of Kalamazoo, Michigan. (PSR ¶ 77). From a young age, he was driven; he became an Eagle Scout, a competitive violinist, and by age 14, had a work permit to be a custodian so he could afford parts to rebuild motorcycle engines. (PSR ¶ 78). He enlisted in the Navy to pay for his engineering degree at Western Michigan University, graduating *magna cum laude*. (PSR ¶¶ 80, 101).

His forty-year naval career was forged in the most demanding environments imaginable. After completing the grueling Naval Nuclear Power School, his first assignment was a 38-month tour on a nuclear submarine, a cycle of 105 days at sea—completely cut off from family—followed by a brief rest and two months of intense training before deploying again. (PSR ¶ 82). During his first shore tour, he used his limited off-duty time to earn a Master's Degree in Electrical Engineering with a 4.0 GPA. (PSR ¶¶ 82, 101). In total, he spent over seventeen years at sea,

7

submerged in submarines, in the harshest of operational environments, including eight strategic deterrent patrols on ballistic missile submarines, often submerged for months at a time. (PSR ¶ 82).

He rose to command at every level, earning the military's highest honors, including the Defense Distinguished Service Medal and the Legion of Merit (six awards). (PSR ¶ 107). His peers recognized his exceptional leadership with the Vice Admiral James Bond Stockdale Award, an honor given to only one leader per coast annually. (PSR ¶ 106). He was not a peacetime admiral; he led through crisis. As Chief of Naval Personnel, he shouldered the immense burden of command after two tragic ship collisions in 2017, leading reforms with "empathy and moral clarity." (Ex. A, Moran Letter at 2). As Vice Chief of Naval Operations, he led the investigation into the politically charged COVID-19 outbreak on the USS THEODORE ROOSEVELT, with the clear guidance to his team to "do what is right for the Navy." (Ex. A, Brown Letter at 2). And as Commander of U.S. Naval Forces Europe, he was in Romania on the night Russia invaded Ukraine. When his security detail urged an immediate evacuation, he refused, stating, "I am here with one of our most dedicated allies and I am not going anywhere," a powerful act of solidarity at a moment of extreme tension. (Ex. A, Salata Letter at 3).

This lifetime of service has taken a profound physical and mental toll. Admiral Burke is a 63-year-old man with a **100% disability rating** from the Department of Veterans Affairs for a host of serious, service-connected medical conditions, including "Atherosclerotic heart disease," "Degenerative arthritis of the cervical spine with spinal stenosis," and "Generalized Anxiety Disorder" stemming from decades of high-stress service and chronic sleep deprivation. (PSR ¶¶ 91-92). A lengthy term of imprisonment would pose a grave risk to his health, and the Bureau of Prisons is unlikely to be able to provide the specialized care he requires.  He also suffers from an

additional asymptomatic but potentially life-threatening chronic medical condition which requires close medical monitoring by specialists and daily medication to control.

**B. The Need for the Sentence to Achieve the Statutory Goals (§ 3553(a)(2))**

The statutory goals of sentencing do not require a lengthy period of incarceration. **Specific deterrence** is not a relevant concern. The consequences Admiral Burke has already faced are catastrophic and permanent. He has been publicly disgraced, stripped of his reputation, and has lost the career that defined his entire adult life. He is no longer employable in any role of responsibility, and he will never again hold a position of public trust.

Furthermore, Admiral Burke faces severe **collateral consequences** unique to his former position that constitute a separate and devastating form of punishment. Pursuant to 10 U.S.C. § 1370, the Secretary of the Navy has the authority to determine that he did not serve satisfactorily at the rank of Admiral, which would result in his being retired at a lower grade and a substantial reduction in his pension. If this Court imposes a sentence of confinement, 10 U.S.C. § 1161 authorizes the Secretary of the Navy to "drop [him] from the rolls," an action that would terminate his retired status and all associated pay and benefits entirely. Additionally, any sentence of confinement greater than 59 days will result in suspension of his VA disability benefits. These administrative penalties are not speculative; they are a direct and foreseeable consequence of this conviction. Moreover, these consequences will also negatively affect Admiral Burke's ex-wife, the mother of his children, who receives 31% of his retired pay.

With respect to **general deterrence**, the public humiliation of a four-star Admiral being convicted of a felony sends a powerful message. The notion that only a multi-year prison sentence can deter such conduct is unsupported. Finally, Admiral Burke poses no danger to the public. The goals of incapacitation and rehabilitation are therefore inapplicable.

**C. The Kinds of Sentences Available and the Need to Avoid Unwarranted Disparities (§ 3553(a)(3), (6))**

A sentence of probation is available and is the most appropriate sentence here. The Judiciary Sentencing Information (JSIN) data cited in the PSR is instructive.

The bribery and fraud Guidelines have been widely criticized for their mechanical, loss-driven framework that produces "irrational" results and fails to account for the whole person as required by § 3553(a). *See, e.g., United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012). This is precisely such a case, where the Guidelines fail to capture the immense mitigating weight of a lifetime of selfless service. A significant variance is not only justified but necessary to achieve a just result.

**V. LETTERS IN SUPPORT OF ADMIRAL BURKE**

Submitted in support of Admiral Burke are letters from a remarkable cross-section of individuals who have known him over his lifetime: fellow four-star admirals, the former Master Chief Petty Officer of the Navy, subordinates whom he mentored, and his family. A consistent theme emerges: the man convicted in this case is not the man they have known for decades.

1. **Admiral (retired) William Moran**, who served as the Vice Chief of Naval Operations, writes: "To say I was shocked when I learned of Admiral Burke's legal troubles would be an understatement. The charges felt entirely out of step with the man I knew—his values, his character, and the way he conducted himself professionally and personally… I only wish to offer an honest account of my experience with Admiral Burke—a man entrusted with great responsibility, who served with distinction, who led during crisis, and who always seemed guided by a deep sense of duty." (Ex. A, Character Letters at 2).

2. **Master Chief Petty Officer of the Navy (retired) Russell Smith**, the Navy's highest-ranking enlisted sailor, attests: "I cannot reconcile who Bob Burke is with what put him in front of this legal process, and with a knowledge of him that is far deeper than a typical work relationship, can unequivocally say that it is an aberrance - a complete departure from who he truly is at the core." (Ex. A, Character Letters at 4).

3. **Mr. Scott Sloan**, a former subordinate, provides powerful evidence of Admiral Burke's commitment to avoiding impropriety: "I offered to help him to break through the bureaucratic logjam on the contractor side… I will never forget his response. He appreciated my offer, but he wanted to keep our personal relationship separate from any entanglement on the professional side. He did not want any perception of impropriety to arise… That is character and integrity in a nutshell." (Ex. A, Character Letters at 10).

4. **Captain Jason Salata,** an officer who worked for Admiral Burke, details instances where Admiral Burke's leadership *directly* impacted world events thereby keeping Americans and our allies safe, he concludes his letter declaring his unwavering support and that he witnessed first hand Admiral Burke as a "polished diplomat, an artful negotiator and a lethal combat leader" along with his "capacity for kindness, generosity and deeply honest self-reflection."

5. **Dr. Barbara Burke**, his wife of sixteen years and a retired Army intelligence officer, provides a deeply personal perspective on the immense pressures that defined their life together: "For forty years, he has been on call 24/7/365… The cumulative effect of this relentless operational tempo, the constant stress, and the chronic sleep deprivation is a burden that few can comprehend… This offense, this terrible lapse in judgment, occurred at the absolute nadir of his life, at a time when the immense weight of his career, his

declining health, and our own marital struggles converged. It was an aberration, a tragic deviation from a lifetime of otherwise honorable service." (Ex. A, Character Letters at 14).

## VI. SENTENCING RECOMMENDATION

For all the reasons set forth in this memorandum, and based on a thorough consideration of the factors under 18 U.S.C. § 3553(a), we respectfully request that the Court impose a sentence of time served, or in the alternative, a non-custodial sentence of probation. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes of federal sentencing.

A non-custodial sentence is fully warranted by Admiral Burke's lifetime of extraordinary and decorated public service, his complete lack of any prior criminal history, his advanced age and significant, service-connected medical conditions, and the devastating and permanent personal, professional, and financial consequences he has already suffered. It is one thing to serve your country through the military, it is another to serve during wartime and for over forty years, his sacrifice deserves to be considered.

Should the Court determine that a period of incarceration is required, we urge the Court to impose a sentence of home confinement in lieu of imprisonment. This would allow his continued medical care at his own expense rather than transferring that burden to the government, as well as enabling him to continue productive home employment to service any additional financial burdens imposed by fines and/or restitution. Such a sentence would justly reflect the powerful mitigating circumstances of Admiral Burke's case.

## VII. CONCLUSION

Admiral Robert Burke's life has been one of unparalleled service and sacrifice for his country. The conduct for which he was convicted represents a tragic and inexplicable deviation

from an otherwise exemplary life. His fall from the highest echelons of military leadership to a convicted felon is a punishment of immense and enduring severity.

A sentence should punish, but it must also be just and no greater than necessary. Considering the totality of the circumstances—his lifetime of extraordinary service, his nonexistent criminal history, his serious medical conditions, the severe collateral consequences he faces, and the deeply flawed nature of the Guidelines calculation—a sentence of imprisonment is not necessary to achieve the statutory goals of sentencing. We respectfully ask the Court to impose a sentence that recognizes the entirety of Admiral Burke's life and allows this 63-year-old veteran, in failing health, to live out his remaining years with his family.

Respectfully submitted,

Timothy Parlatore, Esq.
Antoinette O'Neill, Esq.
PARLATORE LAW GROUP, LLP
*Attorneys for Robert P. Burke*
260 Madison Ave., 17th Floor
New York, New York 10016

cc: All Parties via ECF