UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * )
UNITED STATES OF AMERICA,        )        Criminal Action
                                 )        No. 24-00265
            Plaintiff,           )
                                 )
   vs.                           )
                                 )
YONGCHUL "CHARLIE" KIM and       )        Washington, D.C.
MEGHAN MESSENGER,                )        August 27, 2025
                                 )        10:03 a.m.
            Defendants.          )        **MORNING SESSION**
                                 )
* * * * * * * * * * * * * * * )

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE TREVOR N. McFADDEN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:      REBECCA G. ROSS, ESQ.
                         BRIAN P. KELLY, ESQ.
                         JOSHUA S. ROTHSTEIN, ESQ.
                         SARAH C. SANTIAGO, ESQ.
                         UNITED STATES ATTORNEY'S OFFICE
                           FOR THE DISTRICT OF COLUMBIA
                         601 D Street, Northwest
                         Washington, D.C. 20530

FOR THE DEFENDANT        WILLIAM S. BURCK, ESQ.
            KIM:         AVI PERRY, ESQ.
                         BRETT RAFFISH, ESQ.
                         CHRISTOPHER J. CLORE, ESQ.
                         JOHN F. SCANLON, ESQ.
                         QUINN, EMANUEL, URQUHART & SULLIVAN,
                           LLP
                         1300 I Street, Northwest
                         Suite 900
                         Washington, D.C. 20005

FOR THE DEFENDANT        REED BRODSKY, ESQ.
        MESSENGER:       SIMONE RIVERA, ESQ.
                         GIBSON, DUNN & CRUTCHER, LLP
                         200 Park Avenue
                         New York, New York 10166

REPORTED BY:            LISA EDWARDS, RDR, CRR
                        Official Court Reporter
                        United States District Court for the
                          District of Columbia
                        333 Constitution Avenue, Northwest
                        Room 6706
                        Washington, D.C. 20001
                        (202) 354-3269

<u>I N D E X</u>

<u>WITNESS</u>:                                                    <u>PAGE</u>

Brian Kelly
     Direct Examination                                        7
     Cross-Examination                                        36
     Redirect Examination                                     48

Douglas Wood
     Direct Examination                                       54
     Cross-Examination                                        71

Greg Kunkel
     Direct Examination                                       82

THE COURT:  Good morning.

MR. PERRY:  Good morning, your Honor.

MR. KELLY:  Good morning, your Honor.

THE COURTROOM DEPUTY:  This is Criminal Case 24-265, *United States of America versus Yongchul "Charlie" Kim and Meghan Messenger*.

Counsel, please come forward to identify yourselves for the record, starting with the Government.

MR. KELLY:  Good morning, your Honor.  Brian Kelly for the United States.  I'm joined by AUSAs Rebecca Ross, Josh Rothstein, Sarah Santiago and paralegal Stephanie Creel.

THE COURT:  Good morning, folks.

MR. KELLY:  Good morning.

MS. ROSS:  Good morning.

MR. BURCK:  Good morning, your Honor.  Bill Burck, Avi Perry, Brett Raffish, Fritz Scanlon and Christopher Clore for the Defendant, Mr. Kim, who's present in the court.

THE COURT:  Good morning, gentlemen.

Good morning, Mr. Kim.

MR. PERRY:  Good morning, your Honor.

MR. BRODSKY:  And good morning, your Honor.  Reed Brodsky and Simone Rivera with Ms. Messenger, who's here today.

THE COURT:  Good morning, folks.

Good morning, Ms. Messenger.

Are we ready with your first witness, Mr. Burck?

MR. BURCK:  Yes, your Honor.

THE COURT:  Great.

MR. BURCK:  Your Honor, just one procedural issue that we wanted to get the Court's guidance on.  I've conferred with the Government.

We understand the Court's rule that we cannot discuss anything -- we can't talk to the witness while they're on direct or cross.  The only question we have is, if our clients testify, we understand that they do have a Sixth Amendment right, at least on direct, if it's an overnight or a weekend, to be able to continue to talk to them, because we are their counsel --

THE COURT:  Yes.

MR. BURCK:  -- and they're criminal Defendants.  And the Government seems to agree with that.

On cross, we wouldn't be able to talk to them unless we notified the Court and the Government that we thought that we needed to talk to them about some issue that was arising in there.  And we would, of course, notify everyone and explain what we think we need to talk to them about, not -- without getting into the privilege, but just saying we really feel like we have to -- have an obligation

to talk to the client on cross.

But our understanding is that, with respect to the Defendants, if they are on direct, if it's overnight or over the weekend, we would still be able to communicate with them normally.

THE COURT:  That's my understanding, too.

MR. BURCK:  Thank you, your Honor.

THE COURT:  Thanks.

You can bring in the jury.

Do you have your -- do you have your first witness ready?

MR. CLORE:  Yes.  Our first witness is here.  I can go grab him right now, your Honor.

THE COURT:  Thanks.

MR. CLORE:  Your Honor, do you want me at the podium?

THE COURT:  Sure.

I take it you all have worked out with Mr. Brodsky who the witnesses are and some sort of order?

MR. CLORE:  Yes.

THE COURT:  Great.  Is Mr. Kim -- is he putting on his defense first, then, I guess, and then Ms. Messenger would?  Is that the plan?

We can deal with it later.  The jury is coming.

THE COURTROOM DEPUTY:  Jury panel.

(Whereupon, the jury entered the courtroom at 10:06 a.m. and the following proceedings were had:)

THE COURT:  Good morning, ladies and gentlemen. Welcome back.  You all may be seated.  I hope you enjoyed a little bit later morning this morning and avoided some of the traffic.

We're ready to begin the Defendants' case in chief.

Mr. Clore, does Mr. Kim have a witness?

MR. CLORE:  Yes, your Honor.  The defense calls General Brian Kelly.

THE COURT:  Sir, if you could stand for a moment to be sworn.

THE COURTROOM DEPUTY:  Please raise your right hand.

BRIAN KELLY, DEFENSE WITNESS, SWORN.

THE COURTROOM DEPUTY:  Thank you.

MR. CLORE:  May I proceed, your Honor?

THE COURT:  You may.

MR. CLORE:  Thank you.

DIRECT EXAMINATION

BY MR. CLORE:

Q.  Good morning, General Kelly.

A.  Good morning.

Q.  To begin, would you please state and spell your full

Kelly - DIRECT - By Mr. Clore

name.

A.   My name is Brian, B-R-I-A-N, middle name Thomas, T-H-O-M-A-S, last name Kelly, K-E-L-L-Y.

Q.   And, General Kelly, do you understand that you're testifying under oath today?

A.   I do.

Q.   And is there any reason why you wouldn't be able to testify truthfully today?

A.   There is not.

Q.   Where are you from, General Kelly?

A.   I group up in Newark, New Jersey.

Q.   And where did you go to undergrad?

A.   I left Newark, New Jersey, went to Piscataway, New Jersey, and left from Piscataway to go to the University of Notre Dame out in South Bend, Indiana.

Q.   When did you graduate and what was your major?

A.   I graduated in 1988 with a bachelor of science in aerospace engineering.

Q.   After graduating, were you commissioned to the Air Force?

A.   Yeah.  I went to Notre Dame on a reserve officer training corps, ROTC, scholarship and, as a result of my graduation, I was commissioned into the Air Force with a four-year commitment to pay back.

Q.   And what year was that?  What year did you join the Air

Kelly - DIRECT - By Mr. Clore

Force?

A.   So I graduated in May of '88.  But at the time, there was a delayed entry into the Air Force.  And I had started my Air Force career in January of 1989.

Q.   Approximately how long were you with the Air Force?

A.   I retired in -- 1 June of 2022, so 33 years and six months.

Q.   What was your rank when you left the Air Force?

A.   At the time that I retired, I was a lieutenant general, three-star general, in the United States Air Force.

Q.   And what were your responsibilities in that role?

A.   My last role in the Air Force, I was the deputy chief of staff for manpower, personnel and services.  So I was basically the head human capital officer for the United States Air Force.  And I had responsibility for about 720,000 Air Force members in terms of policy for everything from recruiting, development, training, transition, retirement of that workforce, as well as advocacy for the budgets that were associated with the pays and bonuses, et cetera, for the human capital enterprise, for building that human capital enterprise for the United States Air Force.

Q.   And that was as a three-star general.  Correct?

A.   That was as a three-star general.  Yes.

Q.   So focusing on 2017, at that point, were you a

three-star general?

A.   No.   In 2017, I was a new two-star general.   And I was the commander of the Air Force personnel center, which was the execution arm, if you will, the operational arm of the United States Air Force human capital enterprise, so the folks who carried out the day-to-day human capital operations for the Air Force.

Q.   Got you.   So how, if at all, did your responsibilities as a two-star differ from your responsibilities as a three-star?

A.   Well, the two-star position I was in, responsible for execution, actually reported to that three-star position that I was later promoted to.   And the two-star position's responsibilities, as I said, were more along execution of the mission.   The three-star's responsibilities were to set policy, oversee policy, advocate for budgets and set the direction for the human capital enterprise for the Air Force.

Q.   And so you mentioned the Air Force personnel center. Right?   Is it okay if I refer to that as the AFPC?

A.   Sure.

Q.   Okay.   You sort of gave an overview of what the AFPC was.   What was your role at the AFPC?   Did you have a specific title?

A.    I was the commander of the Air Force personnel center,

so I had oversight of the entire operation for military and civilian execution of human resource policy, everything from hiring to promotion, policy, to retention, to execution of what we would call permanent change-of-station moves as people move from one base duty location to another base duty location.  The Air Force personnel center oversaw those assignments and the processing, cutting of orders, execution of that, and then management of the budgets that were associated with all those enterprises.

Q.  Now, again, focusing on 2017, were there any sort of specific issues that you and the AFPC were dealing with at that time?

A.  Yeah.  I think it wasn't just the AFPC.  I think it was the Air Force at large, and I would probably say DOD at a wider spread.

But, you know, as we talked to more and more senior leaders, we were all sort of struggling with the change in warfare and what was going on.  There was a discussion about the nature of warfare was changing.  We were in the information age.  Information needed to be processed faster.  Decisions needed to be made quicker. There was a variety of challenges that we were trying to do.

And because I was on the human capital side of the enterprise -- others were working on, you know, new planes, new missiles, new technology.  My role was to work on the

human capital side of that and try to maximize the human capital side of the enterprise in carrying out our mission.

Q.   Can you explain a little bit more about what you mean about maximizing the human capital at the Air Force?

A.   Yeah.  I think we, you know, often talked about -- like I said, you know, we had the best equipment in the world, but the real force -- the difference for us was the people. And so we wanted to make sure that each individual airman could maximize their talent and their capabilities and that we brought to the enterprise from a human capital perspective the ability for that human capital to make decisions quickly, make accurate decisions, communicate quickly to keep up with what we thought was an overwhelming amount of information that was available in the information age.

Every level of airman in our enterprise, going to the highest levels, was, you know, probably inundated and overcome with amounts of information that they received on a daily basis and had to process.

Q.   Is it accurate to say that around that time there were specific training needs for Air Force personnel?

A.   Specific what, please?

Q.   Training needs.

A.   I think we were always looking -- there was a lot of existing training already.  We were, again, always looking

Kelly - DIRECT - By Mr. Clore

for ways to make things better.  You know, and in this area of the human capital enterprise for which I was, you know, heavily involved in leadership positions, we were always looking for ways to improve the training that we would do for the individual airman and the, you know, human capital enterprise.

THE COURT:  Mr. Clore, could I ask a quick question?

MR. CLORE:  Sure.

THE COURT:  The jurors have heard a lot about the CNP, the chief of naval personnel.  Is that -- was your job kind of the equivalent in the Air Force?

THE WITNESS:  When I was at the three-star position, it was the Air Force equivalent to the CNP.

THE COURT:  Okay.  Thank you.

MR. CLORE:  Thank you, Judge.

BY MR. CLORE:

Q.  Now, focusing on -- keeping our focus on 2017, was there a time that you learned about a company called Next Jump?

A.  Yeah.  I arrived in that job in the Air Force personnel center, which was down in San Antonio, Texas, at Joint Base Randolph in San Antonio, and I arrived down there in about June of 2017.

And somewhere in the fall, maybe September, some other officers who were at the base made me aware of an

Kelly - DIRECT - By Mr. Clore

opportunity and a company that they had been made aware of called Next Jump.

And they made me aware of an opportunity to attend what was called a leadership training academy that Next Jump was putting on that had to do with, again, training individuals and training leadership development for individuals.

Q.   So before we get there, if you recall, what, if anything, did you learn about Next Jump from the individuals who first told you about it?

A.   Yeah.  The way that they presented the information to me -- so again, I was the senior commander, so I think they were giving me the information in a way that I could digest it.

They gave me some background information and then gave me a book that sort of had a -- details of Next Jump. And one of the details for Next Jump was a designation by the Harvard Business Review that they were designated as a deliberately developmental organization.

And as I read and understood about what that meant to be, it was designating the company as their day-to-day processes, the day-to-day culture, the day-to-day work that they did was constantly around not just business outcomes, but developing their people to maximize their business outcomes.

Kelly - DIRECT - By Mr. Clore

Q.   Is that what specifically interested you in Next Jump?

A.   Absolutely.  As a human capital person, our interest was, you know, how could we translate that to maximize our airmen's capabilities to maximizes our output?

Q.   So after learning about Next Jump, it sounds like -- well, did you actually attend a leadership academy?

A.   Yeah.  So it was made available to several of us. Several of us from the Air Force personnel center went to New York City to the location for Next Jump.  I kind of remember it was around, you know, late October, Halloween-time.  I think there was a Halloween parade going on in New York, so I remember that.

And we attended the couple-day leadership academy up in New York City.

Q.   If -- if you wouldn't mind, would you explain for the jury what takes place at a leadership academy?

A.   Yeah.  So this was a couple-day event for which the Next Jump staff, in a *pro bono* manner, so it was free for us to attend -- we just had to, you know, find our way, from a travel perspective, up to New York.

We went through various exercises that talked about communication and communication from an individual perspective.  What are the barriers or things that worked to either inhibit or, you know, advance communication from an individual perspective, from a group perspective?

Interactive communication.  What were those things that were discussed that led to good decisionmaking?  We were certainly interested in that from a decisionmaking standpoint.

And they explained the theories and the discussions about, you know, how they had developed these practices, where they had been, people they'd been exposed to.  Next Jump had been, you know, exposed to lots of different companies, Fortune 500 companies and different enterprises.  And they brought some of that knowledge and their understanding and the lessons they had learned and the abilities that they had built.  They discussed that during the leadership academy.

There was also some parts of it that were related to nutrition, physical fitness, different things that all contributed to an individual's ability to think clearly, communicate well and make good decisions.

Q.  And what, if anything, did you value, given your position at the AFPC, about the training you received at the leadership academy?

A.  Yeah.  I think -- you know, lots of folks brought different kinds of thoughts to us.  A lot of times things were related to systems.  People would bring IT systems to either help track different things or think about something, or they would bring process changes or suggest

Kelly - DIRECT - By Mr. Clore

reorganizational changes.

What was, I think, different and unique from the discussion with Next Jump, it was about the individual, and then the impact to the organization, not only from an individual capability, but from a culture standpoint. Right?  Like, how do you change the culture?  How do you change the approach that people take to communication?  How do you change the approach they take to decisionmaking?

Q.  Now, at the time you attended this training, did you think that Next Jump's services were applicable to the Air Force?

A.  I did.

Q.  How so?

A.  Again, I thought we, as an Air Force, were trying to find ways -- and we were struggling with how do we, you know, increase our capabilities in -- in light of the sort of information age, environment, the requirement to make decisions faster?

And, you know, there was lots of other things that the Air Force was working on in regard to new technologies, you know.  You know, we were building new aircraft, new communications systems, new satellites, et cetera.

But from my lane and my responsibilities, we always felt like the best way to increase the capabilities were to increase the human weapons system, the individual

Kelly - DIRECT - By Mr. Clore

airmen.

And so this approach was different than other things we had seen because it looked at culture, because it looked at ways to adjust those.  And so we had interest.

Q.  You mentioned things like increasing capabilities, and I want to dig into that a little bit more.

Were there any specific Air Force objectives that you thought would be addressed by the leadership academy -- by the training you received at Next Jump?

A.  Yeah.  I think we, as an Air Force -- particularly as a senior leader in the Air Force -- wanted to make more accurate and faster decisions.  We thought the battlefield required, you know, clearer decisionmaking and faster decisionmaking.  We thought there was some opportunity to try and unlock some of that through the Next Jump training that was available.

Q.  Were you the only Air Force employee present, General Kelly?

A.  No.  There were several others.  I brought, I think, two other folks with me from the Air Force personnel center, subordinates.  And then -- I didn't know it, but when I arrived, there was others from the U.S. Air Force chaplain's office.  So the deputy chaplain of the United States Air Force was there with an assistant.  And then there was members of a fighter wing in the United States Air Force

Kelly - DIRECT - By Mr. Clore

that is down near Phoenix, Arizona, Luke Air Force Base, and several their leaders were there at the session as well.

Q.  Were employees from other organizations present as well?

A.  There were some Navy personnel who were there.  And then there were some employees and people from other businesses and organizations I don't recall, obviously.  The uniformed ones were, you know, more relevant to me.

Q.  If you recall, do you remember having discussions with other individuals who were present at the leadership academy about the training you all had received?

A.  Yeah.  I think -- you know, certainly the deputy chaplain happened to be a one-star general at the time.  I was a two-star general at the time.  He and I had conversations.

There was another senior colonel there that was there at the time from the fighter wing that we talked about at Arizona.

And so we all talked about, you know, Hey, this is different than -- we had all gone through lots of leadership training.  Right?  The Air Force isn't short on trying to provide that to you.  And this was unique in a different way.  And so we were discussing the unique ways and differences that we saw from that compared to the kind of training we had been exposed to before that.

Q.  Now, after the leadership academy, did you stay in

contact with Mr. Kim and Ms. Messenger afterwards?

A.   I did.   Several ways.   So they were very good about -- I think they even said, if you are willing to, you know, stay in contact with us --

MR. KELLY:   Objection --

THE WITNESS:   -- and contribute, not just --

MR. KELLY:   -- hearsay, your Honor.

THE COURT:   Overruled.

You may answer, sir.

THE WITNESS:   Thank you, your Honor.

You know, they sort of set up a community of practice.   And if you were willing to participate, periodically they would send out emails and -- you know, on the latest things they had learned.   They had visited different places.   Maybe they refined a concept or refined an idea that was there.

Sometimes I had opportunity to reply back. Sometimes I was busy and didn't reply back.   But that went on for months on end.

And then I had an opportunity to invite them back down to my headquarters at the Air Force personnel center in Texas.   And I did that in the spring of 2018 after visiting in October.   And they came down and visited our headquarters for a day and a half or so and did some training with more of our people, did some exercises.

We got a chance to tour them around and show them the things that we did, the way that we kind of ran some things at the Air Force personnel center.  And they were able then to give me some feedback and thoughts about what they observed and maybe some things for us to look at or try.

BY MR. CLORE:

Q.  Would you give the jury sort of an idea of the training that Mr. Kim and Ms. Messenger provided during their visit to the AFPC?

A.  Yeah.  You know, one of the specific exercises that we ran through was a way to try to sort of improve feedback and understanding of communication between two individuals and also raise the sort of standards.  It was called the OBO, sort of observe and be observed.  Somebody would give a briefing about a subject.  Then somebody else would give that individual feedback about how that briefing went.  And then somebody else would give feedback to the feedback-giver.  Right?  So there was a three-way sort of participation.

And it had the opportunity to sort of raise, you know, everybody's acumen, everybody's understanding. Feedback -- helpful feedback is not a good skill that everybody has.  I think people struggle with giving, you know, developmental feedback in a positive way in the Air

Kelly - DIRECT - By Mr. Clore

Force, I sense in military culture in general. It's not something we've always been great about. Direct candor and direct understanding sometimes weren't the best. And so that exercise was pretty powerful in showing us better ways to do that.

Q. I don't think you mentioned this. Approximately when was this visit?

A. It was sometime in the spring of 2018. I don't exactly remember. I'm going to say somewhere in the, you know, February, March, April timeframe.

Q. And if you recall, what were your thoughts on the training services provided during that visit?

A. Yeah. I thought -- again, I thought it was really helpful. You know, not everybody from my team -- not everybody loved it because I think the candor in some cases wasn't for everybody. And you had to sort of break through that.

I think the higher up you were in the leadership chain and responsibility chain, the more you saw the benefits and the less you were worried about the candor and the, you know, frank discussions that were happening as part of the opportunities there.

And then, you know, we were interested in the feedback they gave us, too. Right? They gave us feedback on how we operated and what we did at the Air Force

Kelly - DIRECT - By Mr. Clore

personnel center.  And I found that helpful for me as I worked my day-to-day responsibilities.

Q.  What, if any, was sort of your main takeaway from that training?

A.  Our main takeaway from the training?

Q.  Yes.

A.  It was that we could apply some of the, you know, things that were there as an opportunity to help us, either at the senior decisionmaking level in the Air Force or, you know, if it was scaleable into other opportunities across the Air Force to, you know, improve the way that we, as a culture, communicated and made decisions and, hopefully, you know, improved the way that we were able to process information in a faster basis and a more accurate basis.

Q.  Now, you mentioned very briefly that it appeared that the feedback within the Air Force differed based on rank. Is that accurate?

A.  Yeah.  I think -- you know, again, there was a lot of candor involved in some of the discussions.  It was one of the key tenets of the training that was there.  I think, as you go up in rank, as you're higher in rank, you're sort of self-actualized.  You're not, you know, trying to climb the pyramid, if you will.  And so I think there was more openness to that discussion.

I think, when you're at the bottom of the pyramid,

there was a lot of openness to it as well.

I think there was a frozen middle portion of the organization that you had to try to get through, and the frozen middle, I think, were more adverse and more concerned about having a more frank approach to training in that way.

Q.  Now, you've discussed a visit to a leadership academy in 2017, followup communications with Mr. Kim and Ms. Messenger afterwards, and a visit in or around the spring of 2018.  Is that right?

A.  That's correct.

Q.  Do you recall if the Air Force was charged for any of those services?

A.  We were not.

Q.  So I think -- you were eventually promoted to three-star general.  Right?

A.  That's correct.

Q.  Around when was that?

A.  I was promoted and took my three-star position at the last couple days of August, first couple days of September in 2018.

Q.  And did you also become deputy chief of staff at the Air Force at that time?

A.  Yes.  The three-star promotion was commensurate with taking that position.

Q.  And I believe earlier, Judge McFadden asked you if you

were familiar with Admiral Robert Burke from the Navy.

A.   When I took that --

THE COURT:   I asked about the position, CNP.

MR. CLORE:   My apologies.

BY MR. CLORE:

Q.   He asked you about the position CNP at the Navy?

A.   Yeah.   When I took the position in the Air Force, the --
what we called the A1, my counterparts in the other services
were the Army G1 and the Navy's chief of naval personnel, or
CNP.   The Marine Corps had a similar position.   So standard
practice is you know your counterparts and you work a lot of
things with your counterparts.

Q.   Were you familiar with Admiral Robert Burke?

A.   Admiral Burke was the CNP at the time when I took my
position in 2018.

Q.   And again, how would you describe your role now as DCS
and Admiral Burke's role as CNP?

A.   Identical except for different missions, different
cultures.   Right?   Air Force mission and culture is
different than Navy mission and culture.   But otherwise, the
responsibilities and duties are the same.

Q.   Now, as the deputy chief of staff -- and I think you
touched on this a little bit -- but were you involved in Air
Force contracting decisions?

A.   I was not.

Kelly - DIRECT - By Mr. Clore

Q.  Now, did you speak with Mr. Kim and Ms. Messenger after becoming deputy chief of staff?

A.  I did, in two ways.  One, you know, we continued to have periodic email exchanges where, again, the community of practice where they would share best practices.

And then, on a couple of occasions, they were in the Pentagon, and they asked to visit me in the Pentagon, and they were able to do that.  I think they were also visiting the Navy, but while they were there, they had a chance to visit me and they came to my office I think at least on two occasions.

Q.  Now, even though you didn't have a specific role in contracting discussions, was it common for general contractors to speak to you directly to pitch their services?

A.  Yeah.  I think senior uniformed members and senior members of the Department of Defense, your -- it was common practice and pretty constant that contractors come and pitch you capabilities and services periodically.

In the HR space, I was pitched a lot of things about IT, information technology, training, those kinds of things.  And so it wasn't unusual for the Next Jump folks to come see me.

Q.  And did you think there was anything improper about those discussions?

Kelly - DIRECT - By Mr. Clore

A.  I did not.

Q.  Now, you reconnected with Mr. Kim and Ms. Messenger after becoming deputy chief of staff.  Did you recall -- did Mr. Kim and Ms. Messenger want to pursue a contract with the Air Force?

A.  Yeah.  One of the things that they were, you know, evolving and doing was, you know, working on sort of taking the work that they had done at the leadership academy and other work that they had done and trying to translate it into a way that would work for the Department of Defense, trying to translate it into ways that would scale at larger portions.

And so they were in the process of developing those and they were showing me what they were now able to do and what they were able to offer.

And at some point in time that eventually culminated in them having a formal plan with, Here's what we can provide and this is the kind of prices and things that it would cost.

Q.  And did you want work with Next Jump at that time?

A.  We wanted to work with Next Jump at that time, but I thought, for us at the Air Force and what we had available, the resources that we had available, the prices that Next Jump was putting on the training were too high for the Air Force.

Kelly - DIRECT - By Mr. Clore

Q.   Well, let's unpack that a little bit.  Why did you want to work with Next Jump?

A.   I think -- as I stated before, the capabilities and what they were providing were a little unique.  It was a different approach to leadership training.  It had potential to solve or help us solve some of the challenges that we felt that we had in human capital and trying to maximize the capabilities among our human capital enterprise.  And so it was unique.

We didn't have others that were taking that approach that could help us not only change the human capital, but change the culture of the Air Force in a positive way.  And so we were interested.

Q.   So this was about a year after you first attended the leadership academy.  At this point, did you still believe that there were specific Air Force objectives that could be addressed by Next Jump's service?

A.   Yes.

Q.   And how?  What objectives?

A.   Yeah.  These objectives of maximizing each individual airman's capability to increase the overall capabilities of the Air Force.  You know, we were again working our way into understanding new war-fighting concepts about working in an information age, processing information.  There was a concept called joint all-domain command and control, JADC2.

And this concept fused information from lots of different domains in lots of different ways.  And it required the ultimate decision-makers to be able to process, communicate correctly and do things.

And so as we were thinking through all those things, there was a role for us to play on the human capital side to make sure that each individual airman had the ability to do those things at a higher level.

Q.  Now, is it accurate that the Air Force didn't end up working with Next Jump because of funding?

A.  Yeah.  You know, the contracting offer that was provided to us from Next Jump at scale was too large and was too pricey for us.  We were probably, you know, unfortunately -- although we had requirements, we were probably in the hundreds of thousands to millions range.  And the scale and discussion that they were having was in the tens of millions to hundreds of millions range.

Q.  Would you have moved forward with Next Jump if the Air Force had the funds available?

A.  We probably would have, or if we could have gotten it down to a smaller scale that we could have paid for it a lower price, probably.

Q.  So, General Kelly, you retired from the Navy in 2022.  Correct?

A.  No, because I was in the Air Force.

Q.  Sorry.

THE COURT:  What an insult.

BY MR. CLORE

Q.  I apologize.  I apologize.  The Air Force.

A.  I retired officially on 1 June 2022.

Q.  And what are you doing currently?

A.  I am now the president and chief executive officer, the CEO, of a nonprofit known as the Military Officers Association of America, MOAA, M-O-A-A.

Q.  And what is the MOAA?

A.  So MOAA has been around for 96 years now.  And MOAA's nonprofit mission is to preserve and protect the earned benefits of those who are serving in uniform, those who have served in uniform, their families, their survivors, to make sure that everything from pay, medical benefits, care, quality of life for those folks is commensurate with the services that they provide and that the nation tells them they're going to take care of them.

So our role is to make sure the nation keeps its promises to those who serve in uniform.

Q.  And what are your responsibilities as MOAA's president?

A.  So I'm the president and CEO.  I report to a board of directors.  And I'm responsible for everything in the organization, from revenue, advocacy missions, results in those places, taking care of -- we have a membership

organization -- we have 350,000 members nationwide that we serve and provide a number of different values and services to them.

And in addition, we run two nonprofit 501(c)(3) charities as part of that mission. One of those charities takes care of scholarships for military children. And another one takes care of -- to protect and prevent veterans who get themselves into crisis.

Q. Did you remain in contact with Mr. Kim and Ms. Messenger after you retired from the Air Force?

MR. KELLY: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: I did. I didn't initially, but I made -- I remade contact. I had an opportunity in my role at -- as my new job to go to New York City. And when I went to New York City -- I have an investment contractor who does our portfolio at MOAA, Goldman Sachs, and when I was visiting Goldman Sachs, I had an opportunity to reconnect with Mr. Kim and Ms. Messenger.

I had discovered that they moved locations since the last time I had been there with them, and so I had an opportunity to come and visit their new location and reestablish contact with them.

BY MR. CLORE:

Q. Did you ever work with Next Jump at MOAA -- while at

MOAA?

A.   I did.

MR. KELLY:  Objection.  Relevance.

THE COURT:  Parties, approach.

(Whereupon, the following bench conference was held:)

MR. CLORE:  I think if the Government's position is going to be that Next Jump's services were so poor that they had to have bribed the Navy in order to get a contract, I think this is relevant because what it establishes is that, over time, Next Jump has continually made improvements in the services they provide.

And we've also heard testimony that that is actually consistent with what happened previously with the Navy, that they were given information from Admiral Burke as to certain changes that were needed to be made to their services and they made those changes.

And they were also able to secure a contract with Next Jump.

THE COURT:  So what's he going to talk about?

MR. CLORE:  Essentially what he'll say is that Next Jump -- basically, Next Jump provided services to his employees at MOAA, training services, essentially similar leadership training services that Next Jump had previously provided to the Air Force.

Kelly - DIRECT - By Mr. Clore

And I think the overarching point is simply that the services are valid.  They were valid early on.  They remained valid.  They remained useful.

And this is just a point -- this is just a very short line of questioning that makes that fairly simple point.

MR. KELLY:  Your Honor, by this point in time, the general was retired from the military.  MOAA is not a branch of the United States military.  This isn't providing training to a military service.

And in fact, the Defendants' *Touhy* letter asking for the general to testify specifically said his relevance was to testify to the Air Force's interest in Next Jump prior to his retirement.

I don't see how them providing training services to a private company that is not a branch of the military is relevant to the appropriateness or value of Next Jump's services to the Navy, to the Air Force, to anything else that's relevant to this case.

THE COURT:  But, I mean, isn't it Mr. Clore's point that you all have been suggesting that this was kind of inferior service?  And shouldn't they be able to rebut that?

MR. KELLY:  I think we were very careful.  Ms. Beyler has testified multiple times during her testimony

that she believed, and others believed, Next Jump had good ideas that could be appropriate to a private company, but that it was not scaleable or useable for an active branch of the military.  MOAA is not an active branch of the military.  It is a private entity.

It's just -- this is -- plus, I mean, this is years after the conspiracy period.  But I think that's even aside.  This is -- MOAA is not akin to a branch of the military.  We have been saying that their services, their product, was not scaleable to the Navy.

To the extent that they wanted to get out testimony that the general thought that it was appropriate for the Air Force, which is somewhat akin to the Navy, that's fine.  But this is MOAA.  This is --

THE COURT:  All right.  I think that's points you can make in cross-examination.

I'm overruling the objection.

We are going to move --

MR. CLORE:  It's very quick.  I'm at the very end.

THE COURT:  Okay.

MR. CLORE:  Thank you.

(Whereupon, the following proceedings were had in open court:)

THE COURT:  The objection is overruled.

Kelly - DIRECT - By Mr. Clore

BY MR. CLORE:

Q.  I believe the last question was, did you work with Next Jump while at MOAA, General Kelly?

A.  I did not work for Next Jump at any time.

Q.  I'm sorry.  Did Next Jump provide services to MOAA?

A.  Yes.  When I made the reconnection to Next Jump in 2023 -- right? -- I had probably had the last interaction with Next Jump in the 2020-2021 timeframe or so, and I started at MOAA in January of '23.  And it would have been the spring of '23 when I made this trip to New York.

I discovered, as part of our conversation, that they had evolved the training that was available.  They had created a way to modularize it, if you will, to smaller chunks and smaller places and -- in what I would call more affordable chunks.

And in my new role at MOAA, I had 84 employees and I was interested in the same kind of things I was interested -- for different reasons than I was interested in the Air Force, as, how do I maximize my employees' capability and how do I help my employees to perform at higher levels and help me solve the challenges that we had at MOAA?

And we had some challenges at MOAA, you know, like every organization does.  Even nonprofits have challenges that they have to go through for solving.  And so I thought

Kelly - DIRECT - By Mr. Clore

that there was an opportunity to employ the Next Jump services to help me do that with my workforce at MOAA.

Q.  And were you pleased with the services you received at MOAA?

A.  I was.

MR. CLORE:  Could I have a moment, your Honor?

THE COURT:  Yes.

BY MR. CLORE:

Q.  Last question, General Kelly.

Were the services that Next Jump provided to MOAA free or were they paid?

A.  They were paid.

MR. CLORE:  Nothing further, your Honor.

THE COURT:  All right.  Mr. Brodsky, are you seeking to examine this witness?

MR. BRODSKY:  No, your Honor.

THE COURT:  Okay.  Mr. Kelly, cross-examination.

You two aren't related, right?

MR. KELLY:  No, we are not, your Honor.

CROSS-EXAMINATION

BY MR. KELLY:

Q.  I was actually going to say, good morning, sir.

A.  Good morning.

Q.  And thank you for your service.

A.  Thanks.

Kelly - CROSS - By Mr. Kelly

Q.  We've never met before, have we?

A.  We have not.

Q.  So my name is also Brian Kelly.  And in fact, we spell it the same way.

A.  The proper way.

Q.  Different middle names.  Yes, the right way.  But different middle names.  And no relation.  Is that right?

A.  That's correct.

Q.  Sir, I just want to go back, I think, to the time that you were familiar with Next Jump and the Defendants during your time at the Air Force.

And correct me if any of this is wrong.  Did you say you first became aware of Next Jump sometime in 2017?

A.  That's correct.  In the fall of 2017.

Q.  And I think shortly after that, you said, is when you attended a leadership academy at Next Jump's offices in New York.  Is that right?

A.  That's right.  I think it was late October 2017.

Q.  Okay.  And then at some point after that, Next Jump -- and I assume including the Defendants -- they came out to your command, you said, in about spring of 2018 and did some free training for some of your personnel.  Is that right?

A.  Yeah.  We extended an invite in the spring of 2018.  Both Mr. Kim and Ms. Messenger came to the Air Force personnel center, did some training, and also did a tour and

discussion of how we operated at the Air Force personnel center.

Q. And you said a few things about, at least in your opinion, Next Jump's services were applicable to the Air Force and there was some interest by the Air Force to working with Next Jump and that you personally thought it would be good to work with Next Jump. Is that all fair?

A. That's all fair.

Q. Just to be clear, though, during your time at the Air Force, there never was a contract between the Air Force and Next Jump to provide services?

A. No contract between the Air Force and Next Jump that I'm aware of.

Q. Okay. And so you never personally ordered your command to give Next Jump a contract?

A. I never worked -- I didn't stay at my command much longer from there. As we discussed earlier, I was promoted and moved up to the higher position.

When I was in the higher position, we discussed a potential to get Next Jump on contract with myself and some senior officers above my level. And the ultimate decision was that the price was too high and we couldn't do it.

Q. So I just wanted to talk about that a little bit.

So -- I mean, you said that you thought it would be applicable to the Air Force. But a problem with what

Kelly - CROSS - By Mr. Kelly

Next Jump was proposing is that it was too expensive.  Is that right?

A.   At least from an Air Force perspective.  What we had, resources available, it was too expensive at the time.

Q.   And I think you even said that the Defendants were pitching something in the realm of tens of millions.  I think you even said hundreds of millions of dollars?

A.   I think anywhere from tens of millions up to hundreds of millions.  They had a variety of scales that you could choose from, but none of them were small enough for us, for the resources we had available, to be applicable.

Q.   And not having those resources available, was that like a one-off, just that year you had a shortfall of funds?  Or was something like hundreds of millions of dollars for training services just nowhere near the realm of possibility?

A.   No.  I would say it depends on what year you were in, but it also depended where you were in the enterprise.  You know, you're in the United States Air Force.  Your mission is to fly, fight and win.  And if you are in the human capital part of that enterprise, money is harder to come by than -- you know, if you're buying an F-35, hundreds of F-35s, there is more money than there is sometimes for training individuals and things like that.

          So there might be some years and times when we had

more money available, but certainly at that time, when I was able to and talking to my seniors, we didn't have the money available.

Q.   But at the end of the day, I mean, a $100 million contract was just outside the realm of reality at that time. Right?

A.   At that specific point in time for us, based on what we had available.

Q.   And I know you did the leadership academy in New York. Correct?

A.   I did.

Q.   And that was an in-person training in Next Jump's offices?

A.   It was.

Q.   And then the training that they came out to your command, where was that?

A.   We did it in our -- one of main conference rooms at the Air Force personnel center.  We brought some of our employees in and rotated who was in.  We had briefings.  We had the training sessions that we talked about earlier, and we did it there.

       And then we took them on a tour through various parts of the enterprise at the center.

Q.   And you may have said this on direct, and I apologize, but the center, is that located in the Northern

Kelly - CROSS - By Mr. Kelly

Virginia/D.C. area or is that somewhere else?

A.   It's in San Antonio, Texas.

Q.   In the United States?

A.   In the United States.

Q.   And that was also a live, in-person training with Next Jump personnel.  Correct?

A.   That is correct.

Q.   Are you ware that around the 2018 to 2019 period, when they came out to do that training and you were introduced to Next Jump, that sort of their product that they were pitching was largely technology-based?

A.   We knew that, you know, they had started as a technology company and a lot of things were spun off and that they were using technology to help the leadership training people -- purpose.  They exposed us to an app they used for feedback, an app that they used to help communicate, do scoring, a variety of things that the app was utilized for and other things that they were doing.

So we were aware that there was an IT component to the training.

Q.   And so the feedback app was part of that, you know, tens or hundreds or millions of dollars of training contract they were proposing?

A.   That's right.

Q.   Back during that time period, in 2018-2019, do you know

Kelly - CROSS - By Mr. Kelly

if Next Jump was authorized or approved to have their feedback app installed on official military or government devices?

A.  I'm not aware.  I mean, we never did it -- you know, we never did it in the Air Force.  I don't know if they were authorized in other places or anything.  I wasn't aware.

Q.  Were Air Force personnel allowed to bring their personal devices into, you know, active combat zones, classified meetings, things like that?

A.  Certainly the exclusionary places for Air Force personnel would have been classified zones and classified places where you couldn't bring your phone.  For instance, my office in the Pentagon was designated as a secure compartmented facility, and so my phone stayed in the hallway in a locker.  I never brought my phone into my office.

Q.  And so if Next Jump's product at that point in time, 2018-2019, would have needed to be installed on a personal device to be useable, would that have been a problem?

A.  No.  I think, you know, there's plenty of opportunities and plenty of places -- I would say the vast majority of places -- for which you would do training, particularly personnel training, would be outside of those compartmented facilities.  You wouldn't -- certainly you wouldn't do the training in those facilities, in those places.  But you

Kelly - CROSS - By Mr. Kelly

certainly have plenty of opportunity and plenty of places to do them without being restricted by having personal devices or personal phones.

Q.  Sir, moving on, are you aware this case has to do with the leadership training services contract that Naval Forces Europe and Africa awarded to Next Jump around December 2021 to January 2022?

A.  I'm aware that the case is about that, but I'm not aware of the contract or the details of the contract.

Q.  You were with the Air Force during your career.  Is that right?

A.  That's correct.

Q.  You never worked for the Navy?

A.  I did not work for the Navy, no.

Q.  That contract that NAVEUR-NAVAF awarded to Next Jump in 2021-2022, you didn't have anything to do with that, did you?

A.  I did not.

Q.  And you don't today, or then, have any firsthand knowledge whatsoever about that contract.  Correct?

A.  I do not.

Q.  You don't have any idea about how that contract came to be awarded to Next Jump?

A.  I don't.  It would have been a Navy-specific action.

Q.  And you said that you interfaced with Robert -- Admiral

Burke when he was the CNP for the Navy and you were the equivalent of that in the Air Force.  Is that right?

A.  Yeah.  I mean, again, each of the services' counterparts tended to have a requirement to work together.  We would testify together.  You're called to go to, for instance, the Senate and the House Armed Services Committees on a yearly basis, call all of the chiefs of personnel from the four services, and so you testify jointly.  So I think Admiral Burke sat next to me on two occasions as we testified in front of Congress.  And we would have joint preparation prior to that, so we would exchange, you know, what's going on in the Air Force personnel enterprise, what's going on in the Navy personnel enterprise.

Q.  By the time late 2021 into 2022, are you aware that Admiral Burke was no longer the CNP at the Navy?

A.  While he was the CNP, I was aware that he was promoted to be the vice chief of naval operations.  So he moved up from being a three-star to four-star.  So a new CNP came in at the time, Admiral John Nowell.  But I certainly saw Admiral Burke move up to the position, and then I saw that he was subsequently reassigned from vice chief of naval operations to Naples, Italy, to the NAVEUR-NAV Africa position.

Q.  And during the time that he was the commander of NAVEUR-NAVAF, were you in direct contact with Admiral Burke

Kelly - CROSS - By Mr. Kelly

at all during that period?

A.  I was not.

Q.  So are you aware that Admiral Burke went to work for Next Jump at some point in 2022?

A.  I found --

MR. CLORE:  Objection --

THE WITNESS:  I'm aware now.  I found that out --

MR. CLORE:  Objection, your Honor.

THE COURT:  Overruled.

BY MR. KELLY:

Q.  Were you aware of that back in 2022 when he went to work for Next Jump?

A.  I wasn't aware of that until later in, like, 2023.

Q.  So going back to what you knew in 2021 to 2022, you don't have any firsthand knowledge about how it is that Admiral Burke went to work at Next Jump.  Is that right?

A.  I do not know, no.

Q.  And you don't know anything about any job discussions that may have happened between Mr. Kim, Ms. Messenger and Admiral Burke back in 2021?

A.  I don't.

Q.  So you would have no knowledge about whether or not the Defendants and Admiral Burke had been engaged in job discussions for him to work at Next Jump in 2021?

A.  I don't have any knowledge of that.

Q.   And you wouldn't have any knowledge about whether or not the Defendants had offered the admiral a bribe in exchange for offering -- in exchange for ordering a contract at NAVEUR-NAVAF, would you?

MR. CLORE:  Objection, your Honor.

THE COURT:  Overruled.

THE WITNESS:  I don't have any information about that.

BY MR. KELLY:

Q.   Before, you said that it's normal for companies to pitch sort of senior personnel in the Air Force.  Is that right?

A.   I think -- not just the Air Force.  I think companies, contractors come into the Department of Defense and talk about their capabilities and their ideas and how they can help on a pretty frequent basis.

Q.   The Air Force is a pretty big organization.  Right?

A.   Pretty large.

Q.   The Air Force has people whose job it is to award contracts on behalf of the Air Force?

A.   They have people whose specific role is to execute the contracts and, you know, the legalities and stuff of the contracts.  Each individual portfolio, from a requirements standpoint, is involved in that process.

So, for instance, for me, I would be involved in defining the requirements for HR services, requirements for

Kelly - CROSS - By Mr. Kelly

IT services, anything from a requirements perspective.

Then the contracting folks would be responsible for actually negotiating, executing, setting up contracts.

Q.  And typically, in your experience, contractors work with those contracting personnel to stand up new contracts for the Air Force.  Is that right?

A.  They had to do that.  That was required.

Q.  It was required?

A.  To -- yeah.  I mean, I don't think you can stand up a contract with the Air Force without working through the contract personnel.

Q.  And, General, you said that it's normal to be pitched on products.  If you were personally involved -- or if any senior Air Force officer were involved in job discussions, like active job discussions, with a contractor or a potential contractor, would they be allowed to be involved in helping award that contractor a contract with the Air Force?

A.  The awarding part -- so they would typically not be what we would call the designated acquisition official, the official who makes the final decision.  But they certainly might be asked for opinions or discussions or be asked to evaluate a proposal for its merits and those kind of things. But they wouldn't be the person who is actually making the final decision.

Kelly - CROSS - By Mr. Kelly

Q.  They wouldn't be able to order their command to give that contractor a contract if they were involved in active job discussions with them, would they?

A.  That would not be the normal process for how it would work.

MR. KELLY:  The Court's indulgence.

No further questions.

THE COURT:  Any redirect, Mr. Clore?

REDIRECT EXAMINATION

BY MR. CLORE:

Q.  General Kelly, do you remember being asked about Air Force ethics rules and obligations?

A.  Asked by the Air Force?

Q.  Asked by Mr. Kelly.

A.  Yes.

Q.  During your conversations with Mr. Kim and Ms. Messenger, whose job would it have been to advise a civilian contractor like them about Air Force rules and regulations in terms of contracting?

MR. KELLY:  Objection, your Honor.  Beyond the scope of cross-examination.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat the question again, please?

Kelly - REDIRECT - By Mr. Clore

BY MR. CLORE:

Q.   Whose job would it have been to advise someone like Mr. Kim and Ms. Messenger about naval rules and regulations?

A.   Again, just for me, I was involved with Air Force rules, not naval rules, but --

Q.   Apologies.

A.   -- for me, certainly, the senior official would be responsible.  You know, we got lots of ethics briefings and lots of ethics training.  We would be the first line of defense.  But certainly, when you get into the formal discussion of the contract, the contracting officers would do that.

But certainly in any discussion where, as a senior officer, you felt the ethical boundaries were being crossed or something, you would raise that issue.

Q.   I want to talk a little bit about Mr. Kim and Ms. Messenger.

Mr. Kelly, over the course of your contact with them, leadership training, communications, the training that was provided to MOAA, did you get a general impression of who they were?

MR. KELLY:  Objection, your Honor.  Beyond the scope of cross-examination.  He wasn't asked any of those questions during direct.  I had no opportunity to cross him.

MR. CLORE:  May we --

Kelly - REDIRECT - By Mr. Clore

THE COURT:  Sustained.

BY MR. CLORE:

Q.  In your experience, General Kelly, did Mr. Kim or Ms. Messenger ever cross any ethical lines?

MR. KELLY:  Objection, your Honor.  Beyond the scope of direct and cross-examination.

MR. CLORE:  Your Honor, may we approach?

THE COURT:  All right.

(Whereupon, the following bench conference was held:)

MR. CLORE:  Your Honor, they were specifically asked on cross-examination a hypothetical about bribery and whether or not the Defendants were actually offered any bribes to Admiral Burke.

So the reason I'm asking this question is because I believe, through that line of questioning, the prosecution has opened the door to questions about whether or not General Kelly perceived them to be ethical people and whether or not, over the course of his experience, he ever witnessed --

THE COURT:  Understood.

Why isn't that --

MR. KELLY:  Your Honor, we filed a motion *in limine* on this, and you already ruled at the pretrial conference that you would allow limited evidence as to the

Kelly - REDIRECT - By Mr. Clore

Defendants' reputation for honesty.

I mean, if he's asking for -- specific questions, did they offer -- did they ever offer you a bribe, that's not general reputation.  Just because they didn't bribe someone in one particular circumstance is not probative of whether or not they bribed someone in another.  You can't bring in character evidence through specific acts of good faith.

And -- and morality is not a pertinent character trait to this charge.

THE COURT:  All right.  So I think "ethical lines" is probably a little broad and problematic.

Do you have kind of a narrower response to his question?

MR. CLORE:  Yes.  Look, I think -- I mean, we can -- I mean, we can ask him whether -- rather than just, did he ever have any experiences with them crossing ethical lines -- I mean, I think it would be appropriate to, at the very least, ask him about his specific experience, for example, if he were actually offered a bribe in connection with his conversations with [indiscernible].

THE COURT REPORTER:  I'm sorry.  I'm struggling to hear you, sir.

MR. CLORE:  So -- actually, may I have one moment?

THE COURT:  Sure.

Kelly - REDIRECT - By Mr. Clore

(Mr. Clore confers with co-counsel privately.)

MR. CLORE:  Your Honor, I think the way to do this and the way to do it more specifically is to -- excuse me -- is to specifically ask General Kelly if, during his contracting discussions with Mr. Kim and Ms. Messenger, they ever offered him a bribe.

THE COURT:  I'm --

MR. KELLY:  Your Honor, I actually think that's more problematic.  There's case law that says specifically that just because you didn't act corruptly in relation to one official act is -- it's not character evidence.  It's propensity evidence that, because they didn't attempt to bribe one general, they couldn't have attempted to bribe another.

I mean, you can't -- you can't use specific acts to prove up a general character trait.  I mean, that's --

THE COURT:  I don't think that's what he's doing. I think he's responding to your cross-examination.

I'm overruling the objection -- well, as to that question.  You can ask that question.

MR. CLORE:  Okay.

(Whereupon, the following proceedings were had in open court:)

THE COURT:  Can you rephrase your question, Mr. Clore?

Kelly - REDIRECT - By Mr. Clore

MR. CLORE:  Certainly.

BY MR. CLORE:

Q.  General Kelly, do you recall being asked a hypothetical question about whether or not a bribe had been offered?

A.  From the --

Q.  From Mr. Kelly.

A.  Yes.

Q.  Did Mr. Kim or Ms. Messenger ever offer you a bride when you were dealing with them?

A.  No.

MR. CLORE:  May I have a moment, your Honor?

Nothing further, your Honor.  Thank you.

THE COURT:  General Kelly, thank you for your testimony here today.  You may step down and you're free to go.

THE WITNESS:  Thank you, your Honor.

(Witness excused.)

THE COURT:  Mr. Clore, you may call your next witness.

(Thereupon, Douglas Wood entered the courtroom and the following proceedings were had:)

THE COURT:  Good morning, sir.  If you could just remain standing there for just a moment.

THE WITNESS:  Yes, sir.

THE COURTROOM DEPUTY:  Please raise your right

Kelly - REDIRECT - By Mr. Clore

hand.

DOUGLAS WOOD, DEFENSE WITNESS, SWORN.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Mr. Raffish, who are you calling?

MR. RAFFISH:  Mr. Doug Wood.

THE COURT:  Sir, you may have a seat.

THE WITNESS:  Thank you.

THE COURT:  And you may proceed, Mr. Raffish.

MR. RAFFISH:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. RAFFISH:

Q.  Mr. Wood, you know this, but this is my first time speaking before the jury.  My name is Brett Raffish, and I represent Mr. Kim.

Thank you for your time this morning, Mr. Wood.

A.  My pleasure.

Q.  I want to start from the very beginning.  Can you state your name for the record.

A.  Certainly.  Douglas Wood, W-O-O-D.

Q.  Do you understand that you're testifying under oath today?

A.  I do.

Q.  Okay.  Can you tell us a little bit about where you're from?

A.  Sure.  I'm from Hampton, New Hampshire.  My family has

been there for 250 years.

Q.   You've lived there all your life?

A.   I have, so far.

Q.   Where did you go to college?

A.   I went to Hawthorne College in Antrim, A-N-T-R-I-M, New Hampshire.

Q.   What did you major in, Mr. Wood?

A.   In aeronautics.

Q.   Got it.

And after you graduated, what did you do?

A.   Immediately following graduation, I was a cargo pilot for a small company.  And then I was hired by American Airlines in 1985.

Q.   How long have you been at American?

A.   40 years.

Q.   What's your role in American?

A.   Currently a captain on the Boeing 777.

Q.   What routes do you fly?

A.   What's called the ultra long-haul.  So I fly Sydney, Asia, a lot of Europe, India.  Long flying.

Q.   Where is home base for you?

A.   Dallas-Fort Worth, Texas.

Q.   Got it.  So you fly to Dallas and then ultra long-haul?

A.   Correct.  I fly as a passenger down to Dallas and then begin my work there.

Q.  Got it.  And how big are these aircraft that you fly?

MS. SANTIAGO:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  The Boeing 777 weighs 777,000 pounds, carries 302 people, and is capable of flying over 18 hours.

BY MR. RAFFISH:

Q.  Wow.  How many people are in the cockpit, usually?

A.  Either three or four.  The flight -- the airplane is certified just for two, but because of the routes that we fly, when we go over eight hours, we must have three; over 12, we have to have four.  Sometimes, if it's over 18, we have to have two captains and two first officers.

Q.  And so when you're in the cockpit with, you know, let's say two or three other folks, how senior are you in relation to those folks?

A.  I'm generally the most senior.

Q.  And within American, the organization, how senior are you?

A.  Very.  I'm No. 31 out of 16,000.

Q.  So I want to talk about your work history at American.

A.  Sure.

Q.  In the last ten years, are there any other roles that you've had aside from being a pilot?

A.  Yes.  In the last ten years, I held the position of

chair of professional standards.

Q.  And what's that?

A.  So that is -- it's a program that has existed for many, many years.  But this particular program I built.  It was something that I had in my head when I was a chief pilot many years ago.

And this was a program that was born out of necessity when American Airlines was going to merge with four other airlines.  And it was a cultural integration program based on safety and, of course, the human element.

And it turned into something much more than that, which went from a part-time job to a complete full-time job.

Q.  Got it.  So I want to talk a little bit more about that.

A.  Sure.

Q.  Just to set the timeframe, when did American develop this program?

A.  Well, I developed the program.  And it was in 2014 it began.

Q.  Got it.  And why was American -- you mentioned -- I think you mentioned a little bit about this.

A.  Sure.

Q.  Why was American looking to develop -- and forgive me if I'm pronouncing it incorrectly -- but the office of professional standards?

A.  Sure.  So over the past 20 years, airlines have

Wood - DIRECT - By Mr. Raffish

consolidated into three major airlines.  We have American, Delta, United.  United is a blend of Continental and United. Delta is a blend of Northwest Airlines and Delta.  And American is now a blend of USAir, Reno, TWA, America West and American Airlines.

And each airline has a specific culture that they hire to.  Their training is based on that.  Their safety management system is based on that.

And when American, the last airline to consolidate, went to the FAA and said that they were just going to put the pilots together, the FAA said they couldn't do that because of the failures of their experience.

So American needed a program to integrate these cultures.  And I was chosen, appointed, to build this, to set it up, to train to it and deploy it.

Q.  Got it.  And why did American come to you?

A.  I don't know how to say no.

No, I had worked as a chief pilot for many years, and -- in the Boston domicile, where we had 770 pilots.  And I was able to do -- to resolve conflicts.  Having worked inside the management system for many years, I recognized that there was no program designed for the human element. It was either retain, send back to the line, or fire after an infraction.

And so there was no reparative opportunity there.

And I had for many years advocated that we come up with a program where we could retrain pilots who erred.

Q.  How long -- so you were the head of this office of professional standards.

A.  Yes.

Q.  And how long were you in that role?

A.  From 2014 until 2022.

Q.  And how many folks did you oversee in that role?

A.  So I had a direct report -- six direct reports, who were the -- what we called our national team.  We developed policy, procedures, protocols, trainings, deployment.  And then I had a team out in the field to support the 16,000 pilots of anywhere between 72 people and 132 people.

Q.  Got it.  And what were the folks in the field and your direct reports, what were they doing?

A.  So the people in the field were handling challenges when pilots found themselves in a position of conflict with another human.  And you think on a daily basis, any given pilot will come in contact with four -- three, four, five, six, 12, 13 or 17 flight attendants, plus aide agents, mechanics.

And so there's a lot of opportunity for conflict. Remember, pilots are, by nature, driven, Type A, very aggressive people.  And those interactions don't always go well.

Wood - DIRECT - By Mr. Raffish

Also, in our work, my team would field calls from other pilots who were worried about their flying partners. And that -- you know, the underlying causes of those concerns were -- they're various, but we developed opportunities to support them and get them back flying.

Q.  Got it.  So you were identifying problems in the field?

A.  Correct.

Q.  And what -- how were you addressing -- sorry.  Let me ask a preliminary question.

Was your office addressing those concerns?

A.  Yes.  So we worked -- it was a rather unique opportunity.  In the past, professional standards was a completely union group.  The function of professional standards still remains, but the administration of professional standards was -- was a joint opportunity.  And there's a lot of reasons why that happened.  And if you want to know, I can tell you that.

But -- so the chair is -- works directly for the union president, but is responsible, both jointly as an appointed position to the vice president of flight for American Airlines and the president of the -- the president of the union, and is funded by -- in whole by the corporation.

Q.  If you had to give a bottom-line takeaway, you know, "This is what the office of professional standards does and

Wood - DIRECT - By Mr. Raffish

what they're trying to accomplish," what would it be?

A.  It would be supporting the human element within our pilots because, while they are -- they're just human, like everybody else, the responsibilities borne by pilots are rather weighty and they tend -- pilots tend to -- they tend to resolve their problems sometimes in very unhealthy ways, which can result in behavioral challenges that we had to identify and figure out the underlying cause.  Making the skies safer is number one.

Q.  I want to switch gears just a little bit.

In the course of your work, did you hear about a company called Next Jump?

A.  Yes, I did.

Q.  And how did you hear about Next Jump?

A.  One of our pilots I had flown with coming back from Milan into New York.  And she had mentioned that she had gone to a training at Next Jump and that the philosophy of the Next Jump corporation felt a lot like the philosophy of professional standards that I had been sharing with her on the trip over to Milan and back.

And when she described that to me, she offered that she would -- because she had attended a training at Next Jump, she offered that we would present me, my work, to them.  And so that's really how the very first opportunity began.

Wood - DIRECT - By Mr. Raffish

Q.  She was a copilot?

A.  She was.  She was one of my copilots.

Q.  Do you remember her name?

A.  I do.  Linda Wackerman.

Q.  And who is Linda Wackerman?

A.  Who is Linda Wackerman?  Well, we had crossed paths in college, back in 1982, 1983.  And I didn't remember that.

MS. SANTIAGO:  Objection.  Relevance.

THE COURT:  Parties, approach.

(Whereupon, the following bench conference was held:)

THE COURT:  Where are we going?

MR. RAFFISH:  I'm just trying to -- just trying to get the fact that she was a Navy admiral.  This is being offered for the effect on the listener.  He ultimately heard this information and sought out Next Jump's training.

MR. ROTHSTEIN:  We believe that all these interactions occurred well after the conspiracy and that any knowledge that he has is irrelevant.  I think it's after -- after the last overt act of this conspiracy.  So we actually believe he doesn't have any relevant testimony that he can provide to have the jury.

THE COURT:  Okay.  Well, it's a little late to be suggesting that we strike the witness.

So where are we going?

Wood – DIRECT – By Mr. Raffish

MR. RAFFISH:  We're going -- he ultimately attended Next Jump's leadership and practice courses during the pandemic, so I believe during the conspiracy period.

THE COURT:  Okay.  And this is to show...?

MR. RAFFISH:  To show that, you know, Next Jump's services were valuable and that they were useful.

THE COURT:  Okay.

MR. RAFFISH:  To rebut testimony, you know, that we've all previously heard.  And this is what Mr. Clore said just moments ago.

THE COURT:  Yes.  Okay.  So I'm overruling the objection.  Let's --

MR. RAFFISH:  I'll keep it moving.  Thank you, your Honor.

THE COURT:  Thanks.

(Whereupon, the following proceedings were had in open court:)

THE COURT:  The objection is overruled.

You may continue, sir.

BY MR. RAFFISH:

Q.  Was Ms. Wackerman a Navy admiral?

A.  Yes, she was.

Q.  Okay.  So can you tell us, you know, from this initial conversation with Ms. Wackerman, what did you do next?

A.  Well, having spent now 16 hours with Linda in the flight

Wood - DIRECT - By Mr. Raffish

desk, I recognized her leadership abilities and asked her to come on board to my small team, the leadership team, which she declined, politely, because she was still active in the Naval Reserves as a rear admiral.

And I begged her to consider coming to professional standards after she retired, which she did. And that's when I was able to really understand the depth of Ms. Wackerman's leadership opportunities.

Q.   Got it.  Did you ultimately seek out Next Jump's training?

A.   No, I didn't.  Actually, Linda was the one who recommended it to me in the 2018-2019 timeframe.  And I did not have a moment of free time.  It was either -- I just -- I worked a lot, so I didn't have time to attend.  I wish I did.

But at the time, I couldn't believe that I could gain anything from them.  I just -- it was ignorance rather than -- I didn't push them away.  I just didn't have the time.  I couldn't value taking my time away from American Airlines and giving it to another entity.

Q.   So let's fast-forward a little bit.

A.   Sure.

Q.   Are you familiar with Leadership in Practice?

A.   I am.

Q.   What is Leadership in Practice?

Wood - DIRECT - By Mr. Raffish

A.   Leadership in Practice is a weekly webinar where Charlie and Ms. Messenger provide training about steward leadership or, as we call it at American, servant leadership.  And it involves so many elements of the human condition and how to make world leaders better leaders -- actually, all leaders --

THE COURT REPORTER:  I'm sorry.  World or war?

THE WITNESS:  World leaders.

BY MR. RAFFISH:

Q.   And have you attended Leadership in Practice courses?

A.   I have.

Q.   When was the first course you attended?

A.   It would have been during COVID when I was at home.  And so I want to say April of 2020.

Q.   And what led you to take that course?

A.   First, I had the free time, which was something I had never had in the previous years.  And really it was out of curiosity, to see what this was all about.  And I had no intention of doing anything but sit for that first hour course.

Q.   And what did you think about the training?

A.   I was blown away.  I was so impressed with what I heard that I then attended every week, and then regretted my decision of not attending the leadership training down in -- at Next Jump headquarters.

Wood - DIRECT - By Mr. Raffish

Q. And what -- you know, just that first course, for example, what was covered, generally?

A. It's simply leadership and different aspects of how to truly empower those people in -- who work for you. But we did -- it's done at the granular level, at -- really at how to address the fragile human element in the leadership process. It's so difficult to describe because it's leadership on a beyond-Ph.D. level.

Q. Was it -- in your role at American, were you familiar with, you know, different kinds of leadership training methodologies?

A. Yes. We developed a lot at American.

Q. And how did the training you received in that first Leadership in Practice course compare to some of the other methodologies you were familiar with?

A. Theirs was more a global reach to a human who was wired differently than high-conflict individuals, the left-brain pilots. It encompassed more humans in the world than normal humans. And I don't mean that disparagingly. But pilots are, if you've ever sat with one, they're rather boring because they're solely focused on the task at hand.

        And the Leadership in Practice opened my eyes to the opportunity that we had been -- we hadn't been addressing all of the elements of the fragile human condition in our training. So to say that I -- I know I'm

repeating myself, but I was -- I saw such huge value in what Next Jump was sharing just in this one snippet that I was compelled to continue to attend.

Q.   Was it unique?

A.   Unique?  It's, yes, very unique.

Q.   So I want to go back to that first course you attended. What medium was this course offered?  You mentioned it was during COVID.  Right?

A.   It was.  So it was on Zoom.

Q.   Okay.  Could you see other attendees?

A.   So one of the requirements -- I wouldn't say requirements, but one of the requests from Mr. Kim and Ms. Messenger was that everyone have their camera on, to place their name and the company -- the corporation they worked for in the box so that all of us could interact and see the reactions of all of us.  It made it -- it made it real.  During COVID, as you remember, there was no real human contact.  And this felt real.

Q.   And what companies did you see?

A.   Oh, my goodness.

MS. SANTIAGO:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. RAFFISH:

Q.   How many of these courses did you attend?

A.   A lot.  I don't remember the exact number, because I

Wood - DIRECT - By Mr. Raffish

attended until I went back to Dallas to -- when they opened our headquarters to work after COVID.  So it would have been July.  More than a dozen, 15.

Q.  Okay.  Looking back, you know, at your attendance, were there any other lessons you learned that you thought were particularly powerful?

A.  Integrity was probably one of the most fundamental elements of these trainings that a leader, in order to be successful, must be able to look in the mirror and recognize a human of deep integrity in order to lead.

Q.  So we've talked about Leadership in Practice.  You've mentioned attending several of these courses.  Did you have any further interaction with Next Jump?

A.  I did.

Q.  And what was that?

A.  I was invited on numerous occasions to attend a one-day leadership course at their Next Jump headquarters.

Q.  Did you ultimately attend the --

A.  Oh, I did.  After, you know, thinking about my decisions in 2018-2019, I did.  I jumped at the first opportunity.

Q.  Got it.  And approximately when was that?

A.  I want to say it was March of '23.

Q.  Okay.  And what was that course like?

A.  So it was similar.  The focus was simply about steward leadership, about leaders giving themselves to their

Wood - DIRECT - By Mr. Raffish

corporation and to their people in order to empower those in their charge to be the best that they can be so that each of those employees could enrich their own lives, enrich the lives of others and, of course, make the corporation a better place.

Q.  How many other folks attended this leadership course?

A.  I happened to go with Linda Wackerman, and then there were five others, so there were seven in total.  There was one person who didn't come.

Q.  Okay.  And where were these folks from?

A.  So two were from the Navy.  One was from Carlisle Corporation.  And two were from -- they were contractors for the Air Force.

Q.  Okay.  And generally speaking, what was your impression of the training?

A.  It was exceptional.  I can give you an example, but it was exceptional.

Q.  Are you familiar with First Thursday?

A.  Yes.

Q.  What is First Thursday?

A.  First Thursday is a day where some of the most prominent people in the world come to Next Jump for a themed evening of fellowship, camaraderie and sharing of ideas and ideals. It's at their Next Jump headquarters in New York City.

Q.  Does it cost anything to attend?

A.  No.

Q.  Does any of the training that we've covered so far cost anything?

A.  No.

Q.  Okay.  And who else -- turning back to First Thursdays, who else have you met or seen at these events?

A.  Oh, my goodness.

Q.  Just generally speaking.

MS. SANTIAGO:  Objection.

THE COURT:  Sustained.

BY MR. RAFFISH:

Q.  Have you ever asked Mr. Kim or Ms. Messenger why they offered these services for free?

MS. SANTIAGO:  Objection.

THE COURT:  Sustained.

BY MR. RAFFISH:

Q.  Speaking about Mr. Wood, has Next Jump's services that you've personally observed had an impact on --

MS. SANTIAGO:  Objection.

BY MR. RAFFISH:

Q.  -- a personal impact?

MS. SANTIAGO:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes.  A deep impact on my ability to be an asset to my corporation.

Wood - DIRECT - By Mr. Raffish

BY MR. RAFFISH:

Q.  How, if any, has it affected your professional life?

MS. SANTIAGO:  Objection.

THE COURT:  Overruled.

THE WITNESS:  It has made me a better human.

BY MR. RAFFISH:

Q.  Have you observed or seen any downstream effects from the trainings that you've observed and that you've subsequently brought back?

A.  I have.  I've been able to share those elements of the Next Jump trainings with the team -- even though I'm not on it anymore, with the team at American Airlines; and most, if not all of them, have been -- have been employed, because they're so simple, but they are things that we just -- as a leader, we just don't think to do because of the simplicity of all of it.

MR. RAFFISH:  No further questions, your Honor. Thank you.

THE COURT:  Thank you.

All right.  Cross-examination, Ms. Santiago.

MS. SANTIAGO:  Thank you.

CROSS-EXAMINATION

BY MS. SANTIAGO:

Q.  Good morning.

A.  Good morning.

Wood - CROSS - By Ms. Santiago

Q.  How are you?

A.  I'm well.  Thank you.

Q.  Do you know Robert Burke?

A.  I don't.  I know his name, but I don't know the person.

Q.  And have you ever been with the U.S. military?

A.  No, I have not.

Q.  Have you ever been involved in negotiating a contract with the U.S. military?

A.  I have not.

Q.  Have you ever had any connection with any negotiations of contracts between Next Jump and the U.S. military?

A.  I have not.

Q.  Do you know who Juliet Beyler is?

A.  No, I do not.

Q.  And you met Charlie Kim for the first time in 2023.  Is that correct?  At a Leadership in Practice training?

A.  In person, correct.

Q.  And prior to that, you had just watched his videos online?

A.  That's correct.

            MS. SANTIAGO:  No further questions.

            THE COURT:  Any redirect, Mr. Raffish?

            MR. RAFFISH:  No redirect, your Honor.  Thank you.

            THE COURT:  Captain Wood, thank you for your testimony here today.  You may step down.  You're free to

Wood - CROSS - By Ms. Santiago

go.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  All right, folks.  Let's take our morning break.  Let me ask you to be back in 15 minutes.

(Whereupon, the jury exited the courtroom at 11:25 a.m. and the following proceedings were had:)

THE COURT:  All right.  So, Mr. Burck, I've allowed this testimony on how great Next Jump is, largely because I think, even though I frankly don't think it's an element or terribly relevant, I think the Government put on evidence suggesting that it was childish or irrelevant or somehow defective.  And so I think it's been appropriate for you to be able to address that to a certain extent.

MR. BURCK:  Yes.

THE COURT:  But I think we're running to the end of that.

MR. BURCK:  Your Honor, we have very little of that left.  The -- really, any.

We have -- the witnesses we have coming up are really people who directly worked with the Defendants at Next Jump.  We have a former admiral who is the IG at the Navy, who's going to be talking to them -- to the jury about his interactions with the Defendants and his own views on Admiral Burke.

And then that's really -- and then the question will be whether or not the Defendants testify.

THE COURT: Okay.

MR. PERRY: There may be a few other witnesses, but they're either people who work at Next Jump or at the Navy, like Jim Raimondo or some other Next Jump employees.

THE COURT: Okay. I want to be clear: I feel like we're exhausting this.

MR. BURCK: Yes, your Honor. We thought -- because the Government basically put in evidence that Next Jump was useless, we thought that at least some evidence contrary --

THE COURT: I agree. That's why I've allowed it.

MR. BURCK: Thank you.

MR. BRODSKY: Your Honor, just a procedural question. I just wasn't sure, sitting there. If I had a few questions, would I just proceed to do a little mini-direct of the witness?

THE COURT: Yes. I'm sorry. Did --

MR. BRODSKY: It's okay. I didn't -- it's okay.

THE COURT: I know I had asked you the first time, but yes. My -- I think you're certainly entitled to -- if you'd like to -- we can call Captain Wood back, if you'd like to direct him. But I think it would be appropriate for you to direct any of Mr. Kim's witnesses that you wanted to

immediately after their direct.

MR. BRODSKY:  And it would be a direct.  Correct?

THE COURT:  That would be -- unless --

MR. BRODSKY:  As opposed to --

THE COURT:  -- you can show that they are somehow hostile.

MR. BRODSKY:  No.  They're not hostile.

THE COURT:  Okay.  But please remind me if there's anybody you want to direct.

MR. BRODSKY:  Thank you, your Honor.

THE COURT:  Thanks.

Anything else we need to discuss?

MR. BURCK:  Your Honor, sorry.  Two other things. We are still obviously thinking about -- or I should say our clients are thinking about whether or not they're going to testify.

THE COURT:  Sure.

MR. BURCK:  We expect that, with our witnesses, we'll go through the end of today.  It's a possibility, because the Government is not asking a lot of cross, and they've told us they probably are not.  Obviously -- that's other than Mr. Kunkel.  I think they will have cross for him.

If we come to, like, 4:00, 4:30, Mr. Kim is still thinking about whether or not he wants to testify.  We would

ask the Court's indulgence to break early so he has the evening to decide.  We will inform the Court and the Government by, say, 7:00 p.m. if he was going to testify.  But that's the only -- we don't think we're going to be in that position, but it may be something like, you know, 4:00, 4:30, potentially, that we're done with our witnesses.  And then the next witness could be Mr. Kim.

THE COURT:  All right.  I'll take that under advisement.  Let's see where we are.

MR. BURCK:  Your Honor, one last point.

THE COURT:  Yes.

MR. BURCK:  We may end up calling Denese Canedo.  And in that circumstance, we would ask the Court's permission to treat her as a hostile witness as to aspects of her testimony.

THE COURT:  All right.  So my general sense on that is you'd have to -- that would have to be demonstrated.

MR. BURCK:  Yes, your Honor.

THE COURT:  It does not -- certainly it's conceivable to me you'd be able to demonstrate that.  But I would not allow you to start off crossing her.

MR. BURCK:  Absolutely.  My plan, your Honor -- I'd be crossing her.  I would start with direct.  My expectation is at some point, if we call her, that she would start being clear that she's not friendly.

So that's why --

THE COURT:  And then you can approach at that point.

MR. BURCK:  Thank you, your Honor.

THE COURT:  Yes.  All right.

And then, Mr. Burck, you all were thinking about any other proposed jury instructions?

MR. BURCK:  Mr. Brodsky has some input.

MR. BRODSKY:  Yes, your Honor.  If we can get them to you by tonight.  Is that okay?

THE COURT:  Tonight?

MR. BRODSKY:  Yes.

THE COURT:  Okay.  Let's -- and I think you all had suggested a missing evidence instruction.  Given where things are, it sounds like we're going to be discussing this very soon.

MR. BURCK:  Yes, your Honor.

THE COURT:  So definitely today.  If there are any -- anything else, then we need to come to ground on where there are disagreements.

MR. ROTHSTEIN:  Yes, your Honor.  We could provide a missing evidence instruction.  But I think a lot of it will depend on whether or not Mr. Kim testifies and what Mr. Kunkel's involvement was in preserving documents for this case.

THE COURT:  Okay.  Well, I think I'd suggest, if you have something you think you might be requesting, you should provide that today.

MR. ROTHSTEIN:  Will do.

THE COURT:  Thanks, folks.  See you in ten minutes.

MR. SCANLON:  Your Honor?

THE COURT:  Yes.

MR. SCANLON:  We may have -- excuse me.  Depending on a conversation that me and Mr. Rothstein are going to have now, we may have one thing briefly to discuss before Mr. Kunkel comes out.

THE COURT:  All right.

MR. SCANLON:  Thank you, your Honor.

THE COURTROOM DEPUTY:  All rise.  This honorable Court stands in recess.

(Thereupon a recess was taken, after which the following proceedings were had:)

THE COURT:  All right.  Mr. Scanlon?

MR. SCANLON:  We were able to work out our differences, your Honor.

THE COURT:  Look at this.  The case is settling?

MR. SCANLON:  We're ready to go as soon as they dismiss it, your Honor.

THE COURT:  All right.

MR. BRODSKY:  Your Honor, I just wanted to let you know, in terms of witnesses, there is a witness landing tonight at Dulles, 3:45 p.m.  So she would not be able to make it here.  It's Shana Echevarria.  She would be a character witness for Meghan.  And we would put her on first thing tomorrow morning.  That's different of a kind than, I think, the two witnesses this morning.  She knows Meghan from -- through Next Jump, but that would be -- she knows Meghan Messenger through Next Jump.  But that would be the nature of it.

THE COURT:  Okay.  Are you asking me something?

MR. BRODSKY:  I just wanted to let you know, because I think you said no more witnesses like the two this morning.  I just wanted to let you know this is -- I view --

THE COURT:  A character witness.

MR. BRODSKY:  Thank you.

(Thereupon, Greg Kunkel entered the courtroom and the following proceedings were had:)

THE COURT:  Can the attorneys approach.

(Whereupon, the following bench conference was held:)

THE COURT:  So Ms. Chaclan informs me that one of the jurors -- I'm trying to figure out who it's likely to be -- who I guess works in the airlines has flown with Captain Wood.

MR. BURCK:  Oh, I know which one it is.

THE COURT:  He doesn't believe that would affect his views at all, but he wanted to let us know.

Does anybody believe we need to voir-dire him?  I guess it's probably Juror No. 12.  Does anybody believe we need to voir-dire him?

MR. BURCK:  I mean, the only thing I could think of -- he's already said that he would not be affected.  I mean, it might -- it might be beneficial to just ask him: You don't have a negative or positive view of him from those interactions?  That might be useful.

THE COURT:  All right.

MS. ROSS:  I agree with that, your Honor.

THE COURT:  Michelle, can we bring him in?

THE COURTROOM DEPUTY:  Yes.

THE COURT:  Maybe, Mr. Kelly, you can step back.

MR. KELLY:  I'll just go sit.  I don't think you need all of us for this.

THE COURT:  Agreed.

MR. BURCK:  Do you want me to stay up here?

THE COURT:  Yes.

(Thereupon, Juror No. 12 entered the courtroom and the following bench conference proceedings were had:)

THE COURT:  Good morning, sir.

JUROR NO. 12:  Good morning.

THE COURT:  This is Juror No. 12.

And you brought to Ms. Chaclan's attention the fact that, I guess, you've flown with Captain Wood in your professional --

JUROR NO. 12:  Correct.

THE COURT:  -- position.  Thanks for raising that.

And I believe you also told her you wouldn't have any positive or negative views --

JUROR NO. 12:  No.

THE COURT:  -- of him that would shape your view of his testimony at all?

JUROR NO. 12:  Correct.  I couldn't tell you when or where.  In the past eight years.  I definitely -- I recognized him when he walked in the room.

THE COURT:  Great.  Thank you.  I appreciate it. You may have a seat.

We'll bring in the jury.

(Whereupon, the following proceedings were had in open court:)

THE COURTROOM DEPUTY:  Jury panel.

(Whereupon, the jury entered the courtroom at 11:48 a.m. and the following proceedings were had:)

THE COURT:  Welcome back, ladies and gentlemen. You all may have a seat.

Mr. Scanlon, the defense may call its next

witness.

MR. SCANLON:  Mr. Kim calls Greg Kunkel, your Honor.

THE COURT:  Mr. Kunkel, could you stand for just a moment to be sworn.

THE COURTROOM DEPUTY:  Please raise your right hand.

GREG KUNKEL, DEFENSE WITNESS, SWORN.

THE COURTROOM DEPUTY:  Thank you.  You may have a seat.

THE COURT:  Mr. Scanlon.

DIRECT EXAMINATION

BY MR. SCANLON:

Q.  Good morning, Mr. Kunkel.

A.  Good morning.

Q.  Do you mind stating your name and spelling it for the jury.

A.  Sure.  My name is Greg Kunkel.  G-R-E-G K-U-N-K-E-L.

Q.  And where are you from, Mr. Kunkel?

A.  I'm from Phoenix, Arizona.

Q.  And did you go to high school?

A.  I did.  I went to Phillips Exeter, a boarding school in New Hampshire.

Q.  And when you were at Phillips Exeter, did you meet someone named Charlie Kim?

A.  I did.  I went to Exeter as a freshman, and Charlie came as a sophomore.  We were the same year, and lived in the same dorm.

Q.  And how well did you get to know Mr. Kim over the course of that time?

A.  We became really close friends.

Q.  And did you go to college, Mr. Kunkel?

A.  I did.

Q.  Where did you go?

A.  I went to Wesleyan University in Connecticut.

Q.  And what year did you graduate?

A.  1995.

Q.  Now, during that time period when you were at Wesleyan, did you stay in touch with Mr. Kim?

A.  I did.

Q.  Could you just -- how closely?

A.  He went to Tufts University, so I didn't see him all that often.  But he visited my family on spring break and -- yeah.  In some ways, he's like a second son to my parents.

Q.  Now, what, if any, jobs did you have after you graduated from Wesleyan in 1995?

A.  I graduated and moved to Boston and worked for a division of Standard & Poor's.  I was an economist.

Q.  And how long were you an economist at Standard & Poor's?

A.  About two and a half years.

Kunkel - DIRECT - By Mr. Scanlon

Q.  And during that time period, were you in touch with Mr. Kim?

A.  I was.

Q.  How closely?

A.  Pretty closely.  So he had gotten a job at Morgan Stanley in New York, so I didn't see him all that often. But he moved back to Boston to start what became Next Jump full-time in our apartment.  So we lived together when he moved back to Boston.  He moved back to Boston, I want to say, mid-1997, is my recollection.

Q.  And what did you do, if anything, after you were an economist at Standard & Poor's?

A.  I joined Charlie and a couple other individuals to -- at what became Next Jump.

Q.  And what was it called at that time period?

A.  I think it was called CWE, LLC.

Q.  And this was around 1997?

A.  At this point -- I think I joined May of 1998.

Q.  What drew you to working there at CWE?

A.  Yeah -- a couple of things.  One, in high school, you know, Charlie would joke of one day kind of starting a company and maybe we'd do a company together.  And, you know, my -- I come from a background -- my dad is an accountant, so that was not even in my wheelhouse.  Charlie was more of an entrepreneur.  So I thought that would be

awesome.  I didn't think too much of it.

But I realized I didn't want to be an economist. The next level was either go the Ph.D. route.  I didn't want to do it.  So that was, I think, initially what drew me, was Charlie's enthusiasm, that conversation.

So that was kind of the initial part.  And then that first summer, we had -- you know, I think Charlie was funding it just through his credit cards at that point, so we weren't taking salary, and we had interns maybe paying $8 an hour.  I forget exactly, but...

And I remember Charlie -- it was kind of after a session, and one of the interns really wanted to work on their presentation skills ahead of -- kind of going back, he was a rising senior.  And Charlie had taught this whole course for presentation.  I just -- he didn't have to.  And I just remember kind of thinking, you know, it wasn't the money; there was care and, you know, wanting to develop.

And that ended up, I think, being an ethos I think we've had at Next Jump.  It made me think about what I want to do kind of longer term.  That's just a memory that sticks with me.

Q.  So when you joined CWE, which ultimately became Next Jump, what did you understand the business did?

A.  So Charlie had started kind of a college -- for lack of a better word -- coupon book back when he was at Tufts.  And

Kunkel - DIRECT - By Mr. Scanlon

it had kind of a phone directory for students.  It had, you know, the local wing place or restaurants or different, you know, dry cleaning, things like that.  It would have an ad in the book, would have a coupon that you could at the time cut out and bring in and get 20 percent off, you know, a free appetizer, et cetera.

So that's what he did in college.  He came back to kind of start it full-time.  And he was starting to expand -- at that point, we went to multiple colleges.  It started to expand throughout the U.S.  And his idea was to bring this to -- a similar concept to corporations as a corporate benefit.

Q.  So how did the company make money?

A.  At the time, it was purely advertising.  So that -- this is an example.  That local wing store, you know, chicken wing store would pay, you know, advertising to be in the -- in the book.

Q.  And I think you said you joined in 1998.  Can you explain what you observed over the growth of this company over the next couple of years?

A.  So for the first year, you know, we were scrapping through it and building it.  We had both a print guidebook. We -- it was right around the time where websites were really kind of starting.  We built a website.

Charlie then started to fundraise; and we raised

Kunkel - DIRECT - By Mr. Scanlon

money and we started to grow quite quickly.  So we hired a bunch of employees.  It was right at the beginning of kind of the dot-com kind of era.  And so that was -- it was a transition into that in the first couple of weeks.

Q.  And do you know how much money was able to be raised for this company, I guess, over time?

A.  I don't recall exactly, but I want to say in the neighborhood of $40 to $50 million.

Q.  And do you recall about when the first fundraise was?

A.  My recollection is somewhere in 1999.  It was a small amount from a close family member.

Q.  Okay.  And as the business grew, how did it change over time?

A.  So, you know, we had our print guidebooks.  So at the time, Charlie then expanded into New York and opened up an office in New York.  I ran our Boston office and kind of the traditional college business.

And at the time, I believe Morgan Stanley was one of the first clients in the guidebook.  And they had an internal employee discount program, kind of a website.  And they asked us if we could do that.

And so we built and started to manage the employee discount program.  And that ultimately took roots into what became Corporate Perks; it is now Perks At Work, which is our now, you know, main business line.

Q.  Now, this business -- I'm going to call it Perks At Work.  You understand what I'm referring to?

A.  I do.

Q.  How did that business make money?

A.  So there are a couple of different ways.  But the primary way that we make money is for merchants -- I can maybe give an example.  But merchants would sell, say, laptop computers, cars or hotel rooms at a discount, and we'd take a percentage of the sale -- we call it a commission -- you know, from those sales that -- employees that have access to the employee discount program.  So that's the main part of our revenue.

We do have some revenue that comes from my HR clients that are offering the program, if they want, like a white glove service and a higher tier service.

Q.  And if you could just -- just as an example, you said the laptop.

A.  Yes.

Q.  Explain how that -- what your service would be if an employee wants to get a laptop from Perks At Work.

A.  Yes.  So I'll use an example of -- take Lenovo.  You know, they sell ThinkPads, popular laptops.  Say it's a $1200 laptop.  They may sell it to an employee for $1,000, so the employee gets a $200 discount, for argument's sake.  We get a 5 percent commission.  So of that $1,000, we would

Kunkel - DIRECT - By Mr. Scanlon

make revenue of $50.

And so -- and then we would take that revenue and we'd invest some back in what we call wild points, which is a reward currency. So some of that revenue we would give additional value back to the users.

Q. And who would actually pay the commission?

A. In that example I used, Lenovo would pay us the $50 of commission times however many they sold.

Q. And did you stay at Next Jump from when you joined in 1997 or 1998 up until today?

A. So at the end of the dot-com piece, we went down from roughly 200 employees all the way down eventually to four and built the company up. I left and went to get my MBA, my business degree, at Duke. That was in the fall of 2002. I came back in 2004 and have been at Next Jump ever since.

Q. You just mentioned that the company went from several -- many employees down to four. What happened?

A. You know, in short, we raised a lot of money. We spent a lot of money. We learned a lot of lessons. And we were making money on our guidebooks and losing -- weren't making enough money. And at the time, you know, I think the prevailing thinking in the environment was: Don't worry about profits; just worry about revenue.

And then the market crashed, and so I think many companies gave up. And we didn't.

Kunkel - DIRECT - By Mr. Scanlon

Q.  So you rejoined in 2004.  How was the company doing then?

A.  I think when I joined maybe there were 13 employees, give or take.  So we were working our way -- we were profitable, working our way back up.

Q.  Is there any particular reason why you went back to a company with 13 employees after you graduated from Duke with -- from business school?

A.  Yeah.  I thought about it a lot.  It was -- I had other opportunities.  I had classmates that were going to Wall Street, going to consulting.  And I think, ultimately, it only sharpened that, you know, I wanted to work in a company where certainly the people I knew would invest back in me as a person.  It was a close group, and I felt we could build something special.

Q.  So over the course of the next ten years, so about -- when you came back from business school, you said 2004, to the 2015-'16 time period, could you just briefly describe how the business went during that period?

A.  So kind of at the company level or at the -- for me personally?

Q.  Why don't we take it company first and then --

A.  Okay.

Q.  You know what?  Let's change it around.

So very quickly, what role did you have at the

Kunkel - DIRECT - By Mr. Scanlon

company during that time period?

A.   So I came in in kind of a business development role.   I had a variety of different projects.   But I opened up our U.K. operations.   So we were having clients who were asking us, you know, we have this employee benefit here.   We have U.K. operations -- or we'd have a U.K. office.   And so we expanded into the U.K.   We eventually opened up a consumer rewards business with clients like a MasterCard.

And we opened up a membership-based rewards program, like AAA and AARP.   And I was, you know, heavily involved in those programs.

Q.   At some point, did Next Jump develop another business line in addition to Perks At Work?

A.   Eventually, we opened up what we internally called Business 2, our leadership business.

Q.   Can you explain what that is?

A.   So just a little on the origins of it:   I want to say somewhere around 2010, 2012, in there, we would have leaders from other companies that would come and we were -- we would give them culture tours and just -- we were very open.   It was kind of our giving-back initiative.   We were just very open about, you know, practices that we ran, how we did recruiting, how we coached and brought kind of coaching into the work, how we were transparent.

And that became -- you know, many leaders came

through it.  They would ask us, Can we come and observe?  I forget the exact timing, but we started a leadership academy, which -- I think initially it was a one-day and it grew -- where people could come.  It was just our mission in giving back.  And we, I think, were quite unique in exposing our practices and, you know, teaching of, you know, how we felt, of putting kind of the human and developing kind of the person, you know, within the business.

And so out of that, we had significant interest of being able to do more.  And so that eventually became something that we decided to commercialize.

Q.  Okay.  What is the leadership academy?

A.  It's taken a few different forms.  But typically, it's a one- to three-day kind of event where -- a series of exercises.

An example:  We have a what's working/what's not exercise in which, say, teams may get together and say:  Okay.  Here's things that are working on our team; here's things that are not working on our team.

And it was a very deliberate ritual.  You couldn't argue.  It was just -- there was a whole list and you would vote for it.  So it's an example of an exercise.  But it was around helping individuals improve self-awareness, rituals that they could take back and, you know, bring back to be a more effective individual, a leader, as well as a team.

Kunkel - DIRECT - By Mr. Scanlon

Q.   And did Next Jump charge for people to come during this early time period of the leadership training?

A.   We did not.

Q.   Now, I think you mentioned at some point there was a push to commercialize this.  Can you explain what happened there?

A.   Yes.  So my understanding was that -- I think -- I want to say right around 2015, there was a book called *An Everyone Culture*, which was released by a group of professors at Harvard, around this concept called a deliberately developmental organization.

And they had searched all these types of companies that put kind of adult development into the -- into the culture and the fabric of an organization.  And they had -- after looking at hundreds of different organizations, maybe even more, they selected Next Jump as one of the three.  And that put us on the map, I think, in terms of just interest of what we were doing, you know:  How do you build a more deliberate kind of learning organization?

And so that was -- accelerated the interest.  And I think we had, you know, shareholder investor feedback of, you know, this is taking a lot of energy from senior people, you know.  You know, is the -- and we started to have hard questions of, is this *pro bono* initiative detracting from our Perks At Work business?  That would be more on the

defense side.

I think -- but also, there was a signal that we had so many clients or so many organizations and leaders coming that this is a big problem that companies were facing, and could this be an opportunity for us to commercialize?

Q.   Okay.  This Harvard book, you said they selected one of three.  Can you explain that?

A.   So my understanding was they had initially written -- Robert Kegan is one of the experts in adult development. And he had -- my understanding -- has kind of disproved this theory that had existed for a long time that adults stop growing, mentally, emotionally, development-wise when you do physically, so somewhere in -- 18 to 21.  He disproved that.

And one thing he noticed is that your adult development depends a lot on your environment.  And most of us work -- are at work kind of our longest hours.  So he became very curious and started researching what organizations actually are deliberate with this type of development, and would that lead to more successful companies, et cetera?

And so they had written a Harvard business article.  They had two companies, a company called Bridgewater, which is a financial services company, a company called Decurion, which is based in California, and

Kunkel - DIRECT - By Mr. Scanlon

then they chose Next Jump as their third.

Q.   Okay.  So what, if anything, did you do to try to commercialize this business?

A.   At the time, you know, Charlie and Meghan decided that they would like to go deep with one organization and to really be invested.  And so we had -- to that end, they led an initiative that I think was interviewing and getting to know several big organizations.  I think one of the first pilots -- or the first commercial pilot we had was with a financial company called Fidelity.  So I was involved from -- kind of the operations of that.  But that was the first kind of pilot that we had.

Q.   And when did that pilot occur?

A.   My recollection is 2017.  It may have gone a bit into 2018.  But somewhere in that timeframe.

Q.   And was this *pro bono* or was this paying?

A.   They paid us -- my recollection is 500,000.

Q.   And what did you do for them?

A.   So it was in their Fidelity financial center.  So if you go to kind of a financial center, just as kind of a consumer, and meet with a financial advisor -- they had these centers all throughout the country.  And we worked -- one of their, you know, challenges was they were trying to have a more open culture.  They were having -- they really struggled with, you know, female financial advisors,

attracting them.

They wanted a more kind of transparent culture, a more -- also a more coaching culture. So they were very attracted, the person that ran the financial centers, in this concept, and could this help?

So that was part of what I did. So I would go around and travel to different financial centers, working with some of these rituals with their senior leaders at those offices.

Q. How did it go?

A. It went well. It went well. So -- I think we learned a lot in terms of, you know, context in terms of how to explain it, how to get started. You know, there were some that were very receptive to it.

And we found actually the -- kind of the leaders that were in some ways the ones that had the reputation of being the most kind of difficult to work with, or the most top-down, struggled with it, I think were quite threatened by a possibility of being more transparent.

Q. And was there additional followup with Fidelity after this initial $500,000 job?

A. There was not.

Q. Okay. What, if any, other customers did Next Jump have for the leadership training program?

A. So the next -- I think the choice that Charlie and

Kunkel - DIRECT - By Mr. Scanlon

Meghan chose for the initial project was -- at kind of this scale was the U.S. Navy.

Q. And how were -- how did Next Jump originally get in touch with the Navy?

A. I think it's a longer story, but the -- my understanding was that Obama had set up a task force of different military branches. I think an -- Admiral Peg Klein was put in charge of it.

And they were -- my understanding was they were tasked with -- there was a series of sexual discriminations, cheating scandals, kind of cultural challenges within the military.

And they were tasked with combining -- they had representatives from each of the branches, and they had met an individual, Simon Sinek, who's -- he's a TED Talk speaker, kind of The Power of Why. He had worked -- and he knew Charlie and Meghan. When they were having this session -- again, I wasn't there, but my understanding was that he recommended Charlie and Meghan or Next Jump to -- for that task force to meet. And so I think that was one of the initial -- several came eventually to a leadership academy.

And that, I believe, led to an introduction to an Admiral Shelanski, who was the head of the IG. And he was very interested in -- you know, he's responsible for kind of

Kunkel - DIRECT - By Mr. Scanlon

compliance and culture, and it's certainly on -- my understanding, it was on his mind of, you know, Navy crashes and other cultural issues.  And I think he was a big advocate of -- that this type of work could be super helpful to the Navy.

Q.  And did discussions begin about potentially Next Jump doing work for the Navy?

A.  It did.

Q.  And how did that go?

A.  There were a couple of conversations.  One was their -- I think they called it kind of a PET project, performance evaluation training.  I may have it slightly wrong.  But it was -- they were kind of separate from us, but thinking about a project of -- in their performance eval to bring in more of a 360.  They wanted to kind of experiment -- a more 360.  So you would also get feedback from peers and subordinates, et cetera.  And we had given them some just feedback and things that we were seeing from other leaders and others in the space.

And then there was a conversation around -- a pilot within some of the work that we were doing and the tools we had to help them incorporate some of that into becoming more of a learning organization.  So there were two discussions kind of parallel.

Q.  I want to talk about the first discussion you addressed

Kunkel - DIRECT - By Mr. Scanlon

first, the one about the PET project.

A.   Sure.

Q.   Was Next Jump hired to do that?

A.   Ultimately, yes.

Q.   Okay.

MR. SCANLON:   Could we please bring up what's already been admitted into evidence as Defense Exhibit 11.

BY MR. SCANLON:

Q.   Do you recognize this document, Mr. Kunkel?   And we can scroll to Page 2, if --

A.   If you don't mind scrolling.

Q.   Sure.

A.   I do recognize this.

Q.   What is it?

A.   These are -- this is a contract for that evaluation tool that we built for them.

Q.   And what did this evaluation tool do?

A.   It enabled U.S. sailors or employees within the Navy to give more peer-to-peer feedback and kind of open-ended feedback on a variety of different topics, or subordinates. So this was their concept.

We built the -- kind of an app that enabled them to do this.

Q.   And I see here the name of a company, PowerTrain, Incorporated.   Do you see that?

Kunkel - DIRECT - By Mr. Scanlon

A.   I do.

Q.   What is PowerTrain?

A.   So my understanding is they were a contractor in their -- kind of a government contractor that worked -- had Navy contracts in place within kind of personnel and -- my words, but kind of the HR kind of people matter.  And they came to us and proposed the vehicle to be able to do kind of the app for them and the work for them.  They recommended we be a subcontractor through PowerTrain.

Q.   Who is "they" in this conversation?

A.   I don't remember exactly, but -- it was the Navy, but I'm not sure exactly who it was in the Navy.

Q.   And was this something that would be ongoing or was this sort of a one-off product that was provided?

A.   In terms of this PET project?

Q.   The PET project.

A.   It was a one-time project.

Q.   And how --

A.   That was my understanding.

Q.   How much was this contract for?

A.   1.97 million.

Q.   And did Next Jump complete the contract?

A.   We did.

Q.   Now I want to turn to the second project you mentioned, the leadership training.

Kunkel - DIRECT - By Mr. Scanlon

Who, if anyone, at the Navy did you have discussions with about the leadership training product?

A.    I mean, several.  But I think the many decisionmaker, influencer -- initially, Charlie and Meghan had gotten, I believe, introduced through Admiral Shelanski to an Admiral Burke, who was at the time the CNP, the chief of naval personnel, or what I would call in my term kind of the head of HR.  And so there was -- he was the initial kind of advocate for that program.

Q.    And did you meet Admiral Burke?

A.    I have, yes.  I did.

Q.    Did he come to Next Jump's headquarters?

A.    He did.  He came where -- I forget the exact date -- that -- I was not present.  I think I videoconferenced in and then later, I believe, joined when the CNO came to Next Jump.  And I was at that meeting.

Q.    And what's a CNO?

A.    The head of the Navy, or the chief naval officer.

Q.    You said that folks would come to your offices a lot to learn about this leadership training?

A.    Uh-huh.

Q.    Was this --

THE COURT REPORTER:  Is that yes?

THE WITNESS:  Yes.  Sorry.

Kunkel - DIRECT - By Mr. Scanlon

BY MR. SCANLON:

Q.  Was this visit consistent with those?  More significant?  Less significant?

A.  It was -- it was hugely significant.  So -- yeah, it was a memorable day.

Q.  And what, if anything, business-wise, came out of this meeting?

A.  Yeah.  My understanding was, you know, subsequently for that he gave kind of a green light for his support in a pilot.  And I think shortly thereafter we started to engage in the feedback pilot or the leadership pilot.

Q.  Okay.

MR. SCANLON:  I'd like to bring up what has previously been entered into evidence as Defense Exhibit 16.  If we can publish it to the jury, please.

BY MR. SCANLON:

Q.  Do you recognize what this is, Mr. Kunkel?

A.  I do.

Q.  What is it?

A.  Do you mind scrolling down?

Q.  The second page.  Sure.

A.  Yep.  This is the -- this is the leadership pilot that we did.

Q.  Okay.  And I see this --

MR. SCANLON:  If you flip back to Page 1.

Kunkel - DIRECT - By Mr. Scanlon

BY MR. SCANLON:

Q.   This is again with PowerTrain?

A.   It is.

Q.   And whose idea was it to use PowerTrain as the contractual mechanism?

A.   That was their recommendation, is my understanding.  I didn't work directly on this one, but my understanding was that that was the Navy recommendation.

Q.   Okay.

MR. SCANLON:  Turning to Page 2, if you could highlight what's next to 0001.

BY MR. SCANLON:

Q.   What is 10X app?

A.   So 10X is a -- both a ritual and a mobile app that we had.  In essence, it was a feedback training kind of tool and a coaching tool of -- which could be used or would often be used.  In a ritual where, say, I might give a presentation, everybody in the audience could give feedback anonymously to me as the presenter.  And there would be a series of coaches that would then give public feedback about my presentation or my project.

And the individuals in the crowd that were giving the feedback had the psychological safety.  It was anonymous, but then they could compare, how was my feedback-giving and coaching to that individual to, say, to

Kunkel - DIRECT - By Mr. Scanlon

me, just like the senior coaches?  And so that was a ritual to help train feedback-giving.

Q.  Okay.

MR. SCANLON:  We can drop the call-out.

BY MR. SCANLON:

Q.  And next to 0002, what is feedback app, 58,000 total users?

A.  The feedback app was the mobile app that enabled, in short, anonymous feedback.  You could set it up for different meetings.  You could have groups of people for this.  And you would have a leader board and you could see in the app your own feedback.  So that was -- that was the feedback app.

And they had, you know, purchased licenses for that feedback app for up to 58,000 users.

Q.  Okay:

MR. SCANLON:  You can drop the call-out, please.

BY MR. SCANLON:

Q.  And at the bottom, do you see that there's a figure of $4,869,565?

A.  I do.

Q.  Was this contract performed?

A.  It was.

Q.  And did you understand that this 4-point-whatever million dollars was the whole of what Next Jump would be

Kunkel - DIRECT - By Mr. Scanlon

doing for the Navy?

A.  No.  It was initially agreed on that it would be a $10 million contract.  And so I think -- my recollection -- for budget purposes, they needed to split it in two.  And this was the first half.

Q.  And do you recall -- I just want to -- you see the date of this is September 21st of 2018.  So we can anchor ourselves in time -- like, the leadership academy sort of kick-off around the same time as this?

A.  It very well could have been.  We had -- I think at that time we were running a leadership academy at least once a quarter, if not once every month.

Q.  Okay.

MR. SCANLON:  You can take this down, sir.

THE COURT:  Why don't we stop here for lunch.

MR. SCANLON:  Sure.

THE COURT:  Ladies and gentlemen, I'll ask you to be back at 1:30.

Mr. Kunkel, I'll direct you not to discuss the contents of your testimony with anyone over the lunch break.

Thanks, folks.

MR. KELLY:  Thank you, your Honor.

(Whereupon, the jury exited the courtroom at 12:25 p.m. and the following proceedings were had:)

THE COURTROOM DEPUTY:  This honorable court stands

Kunkel - DIRECT - By Mr. Scanlon

in recess.

(Thereupon, a luncheon recess was taken, after which the following proceedings were had:)

(Morning proceedings concluded.)

**<u>CERTIFICATE</u>**


I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.



Dated this 27th day of August, 2025.


<u>/s/ Lisa Edwards, RDR, CRR</u>
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

**$**

$1,000 [2] - 88:23, 88:25
$10 [1] - 105:3
$100 [1] - 40:4
$1200 [1] - 88:23
$200 [1] - 88:24
$4,869,565 [1] - 104:20
$40 [1] - 87:8
$50 [3] - 87:8, 89:1, 89:7
$500,000 [1] - 96:21

**'**

'23 [3] - 35:9, 35:10, 68:22
'88 [1] - 9:2

**/**

/s [1] - 107:12

**0**

0001 [1] - 103:11
0002 [1] - 104:6

**1**

1 [3] - 9:6, 30:5, 102:25
1.97 [1] - 100:21
10166 [1] - 1:25
10:03 [1] - 1:7
10:06 [1] - 7:2
10X [2] - 103:13, 103:14
11 [1] - 99:7
11:25 [1] - 73:6
11:48 [1] - 81:22
12 [9] - 56:12, 59:20, 80:5, 80:22, 80:25, 81:1, 81:5, 81:9, 81:12
12:25 [1] - 105:23
13 [3] - 59:20, 90:3, 90:7
1300 [1] - 1:21
132 [1] - 59:13
15 [2] - 68:3, 73:5
16 [2] - 63:25, 102:14
16,000 [2] - 56:20, 59:12

17 [1] - 59:20
18 [3] - 56:5, 56:12, 94:14
1982 [1] - 62:7
1983 [1] - 62:7
1985 [1] - 55:13
1988 [1] - 8:17
1989 [1] - 9:4
1995 [2] - 83:12, 83:21
1997 [2] - 84:17, 89:10
1998 [3] - 84:18, 86:18, 89:10
1999 [1] - 87:10
1:30 [1] - 105:18

**2**

2 [3] - 91:15, 99:10, 103:10
20 [2] - 57:25, 86:5
200 [2] - 1:25, 89:12
20001 [2] - 2:4, 107:14
20005 [1] - 1:22
2002 [1] - 89:14
2004 [3] - 89:15, 90:1, 90:17
2010 [1] - 91:18
2012 [1] - 91:18
2014 [2] - 57:17, 59:7
2015 [1] - 93:8
2015-'16 [1] - 90:18
2017 [10] - 9:25, 10:2, 11:10, 13:18, 13:23, 24:7, 37:13, 37:14, 37:18, 95:14
2018 [10] - 20:22, 22:8, 24:8, 24:20, 25:15, 37:21, 37:23, 41:8, 95:15, 105:7
2018-2019 [4] - 41:25, 42:18, 64:12, 68:20
2019 [1] - 41:8
202 [2] - 2:4, 107:15
2020 [1] - 65:14
2020-2021 [1] - 35:8
2021 [5] - 43:6, 44:14, 45:14, 45:20, 45:24
2021-2022 [1] - 43:16
2022 [9] - 9:6, 29:23, 30:5, 43:7, 44:14, 45:4, 45:11, 45:14, 59:7
2023 [3] - 35:7, 45:13, 72:15

2025 [2] - 1:6, 107:10
20530 [1] - 1:17
21 [1] - 94:14
21st [1] - 105:7
24-00265 [1] - 1:3
24-265 [1] - 4:5
250 [1] - 55:1
27 [1] - 1:6
27th [1] - 107:10

**3**

302 [1] - 56:5
31 [1] - 56:20
33 [1] - 9:6
333 [2] - 2:3, 107:14
350,000 [1] - 31:1
354-3269 [2] - 2:4, 107:15
36 [1] - 3:5
360 [2] - 98:15, 98:16
3:45 [1] - 79:3

**4**

4-point-whatever [1] - 104:24
40 [1] - 55:15
48 [1] - 3:6
4:00 [2] - 75:24, 76:5
4:30 [2] - 75:24, 76:6

**5**

5 [1] - 88:25
500 [1] - 16:9
500,000 [1] - 95:17
501(c)(3 [1] - 31:4
54 [1] - 3:7
58,000 [2] - 104:6, 104:15

**6**

601 [1] - 1:16
6706 [1] - 2:3

**7**

7 [1] - 3:5
71 [1] - 3:8
72 [1] - 59:13
720,000 [1] - 9:16
770 [1] - 58:19
777 [2] - 55:17, 56:4
777,000 [1] - 56:4

7:00 [1] - 76:3

**8**

8 [1] - 85:9
82 [1] - 3:9
84 [1] - 35:16

**9**

900 [1] - 1:22
96 [1] - 30:11

**A**

a.m [4] - 1:7, 7:2, 73:7, 81:22
A1 [1] - 25:8
AAA [1] - 91:10
AARP [1] - 91:10
abilities [2] - 16:12, 64:1
ability [5] - 12:11, 16:16, 29:8, 70:24, 107:7
able [25] - 5:14, 5:19, 6:4, 8:7, 21:4, 23:13, 26:8, 27:14, 27:15, 29:3, 32:18, 33:22, 40:2, 48:1, 58:20, 64:7, 68:9, 71:10, 73:14, 76:20, 78:20, 79:3, 87:5, 92:10, 100:7
absolutely [2] - 15:2, 76:22
academy [19] - 14:4, 15:6, 15:13, 15:16, 16:13, 16:20, 18:8, 19:9, 19:25, 24:6, 27:8, 28:15, 37:16, 40:9, 92:3, 92:12, 97:22, 105:8, 105:11
accelerated [1] - 93:20
access [1] - 88:11
accomplish [1] - 61:1
accountant [1] - 84:24
accurate [7] - 12:12, 12:20, 18:12, 23:14, 23:17, 29:9, 107:4
acquisition [1] - 47:20
act [3] - 52:10, 52:11, 62:20
action [1] - 43:24

Action [1] - 1:3
active [6] - 34:3, 34:4, 42:8, 47:15, 48:2, 64:3
acts [2] - 51:7, 52:15
actualized [1] - 23:22
acumen [1] - 21:22
ad [1] - 86:3
addition [2] - 31:4, 91:13
additional [2] - 89:5, 96:20
address [2] - 66:6, 73:14
addressed [3] - 18:8, 28:17, 98:25
addressing [3] - 60:8, 60:10, 66:24
adjust [1] - 18:4
administration [1] - 60:14
Admiral [22] - 25:1, 25:13, 25:14, 25:17, 32:15, 43:25, 44:8, 44:15, 44:19, 44:20, 44:25, 45:3, 45:16, 45:20, 45:23, 50:14, 73:25, 97:7, 97:24, 101:5, 101:10
admiral [5] - 46:2, 62:14, 63:21, 64:4, 73:22
admitted [1] - 99:7
adult [3] - 93:13, 94:10, 94:15
adults [1] - 94:12
advance [1] - 15:24
adverse [1] - 24:4
advertising [2] - 86:14, 86:16
advise [2] - 48:17, 49:2
advisement [1] - 76:9
advisor [1] - 95:21
advisors [1] - 95:25
advocacy [2] - 9:18, 30:24
advocate [3] - 10:16, 98:4, 101:9
advocated [1] - 59:1
aeronautics [1] - 55:8
aerospace [1] - 8:18
affect [1] - 80:2
affected [2] - 71:2, 80:8
affordable [1] - 35:15

**AFPC** [7] - 10:20, 10:22, 10:23, 11:11, 11:13, 16:19, 21:10
**Africa** [2] - 43:6, 44:22
**afterwards** [2] - 20:1, 24:8
**age** [4] - 11:20, 12:15, 17:17, 28:24
**agents** [1] - 59:20
**aggressive** [1] - 59:24
**ago** [2] - 57:6, 63:10
**agree** [3] - 5:18, 74:13, 80:13
**agreed** [2] - 80:19, 105:2
**ahead** [1] - 85:13
**aide** [1] - 59:20
**Air** [99] - 8:19, 8:23, 8:25, 9:3, 9:4, 9:5, 9:8, 9:10, 9:12, 9:15, 9:16, 9:21, 10:3, 10:5, 10:7, 10:17, 10:19, 10:25, 11:6, 11:14, 12:4, 12:21, 13:12, 13:14, 13:20, 15:8, 17:10, 17:14, 17:20, 18:7, 18:10, 18:11, 18:17, 18:20, 18:22, 18:23, 18:25, 19:1, 19:20, 20:21, 21:3, 21:25, 22:25, 23:9, 23:10, 23:16, 24:11, 24:21, 25:7, 25:19, 25:23, 27:5, 27:22, 27:24, 28:12, 28:16, 28:22, 29:9, 29:18, 29:25, 30:4, 31:10, 32:25, 33:13, 33:18, 34:13, 35:19, 37:11, 37:24, 38:1, 38:4, 38:5, 38:9, 38:10, 38:12, 38:25, 39:3, 39:19, 40:18, 42:5, 42:7, 42:10, 43:10, 44:2, 44:12, 46:11, 46:12, 46:16, 46:18, 46:19, 47:6, 47:10, 47:14, 47:17, 48:11, 48:13, 48:18, 49:4, 69:13
**aircraft** [2] - 17:21, 56:1
**airline** [2] - 58:6, 58:9
**Airlines** [7] - 55:13, 57:8, 58:3, 58:5, 60:21, 64:20, 71:12
**airlines** [4] - 57:9,

57:25, 58:1, 79:24
**airman** [4] - 12:8, 12:16, 13:5, 29:7
**airman's** [1] - 28:21
**airmen** [1] - 18:1
**airmen's** [1] - 15:4
**airplane** [1] - 56:9
**akin** [2] - 34:8, 34:13
**all-domain** [1] - 28:25
**allow** [2] - 50:25, 76:21
**allowed** [4] - 42:7, 47:16, 73:9, 74:13
**Amendment** [1] - 5:13
**AMERICA** [1] - 1:3
**America** [3] - 4:5, 30:9, 58:4
**American** [21] - 55:12, 55:14, 55:16, 56:18, 56:21, 57:8, 57:15, 57:19, 57:22, 58:1, 58:4, 58:5, 58:9, 58:13, 58:16, 60:21, 64:19, 65:3, 66:9, 66:12, 71:12
**amount** [2] - 12:14, 87:11
**amounts** [1] - 12:18
**anchor** [1] - 105:7
**anonymous** [2] - 103:24, 104:9
**anonymously** [1] - 103:19
**answer** [1] - 20:9
**Antonio** [3] - 13:21, 13:22, 41:2
**Antrim** [1] - 55:5
**ANTRIM** [1] - 55:5
**apartment** [1] - 84:8
**apologies** [2] - 25:4, 49:6
**apologize** [3] - 30:4, 40:24
**app** [15] - 41:15, 41:16, 41:17, 41:21, 42:2, 99:22, 100:8, 103:13, 103:14, 104:6, 104:8, 104:12, 104:13, 104:15
**aPPEARANCES** [1] - 1:12
**appeared** [1] - 23:15
**appetizer** [1] - 86:6
**applicable** [4] - 17:10, 38:4, 38:25, 39:11
**apply** [1] - 23:7
**appointed** [2] -

58:14, 60:20
**appreciate** [1] - 81:15
**approach** [11] - 17:7, 17:8, 18:2, 24:5, 28:5, 28:11, 32:4, 50:7, 62:9, 77:2, 79:19
**appropriate** [5] - 34:2, 34:12, 51:18, 73:13, 74:24
**appropriateness** [1] - 33:17
**approved** [1] - 42:1
**April** [2] - 22:10, 65:14
**area** [2] - 13:1, 41:1
**argue** [1] - 92:21
**argument's** [1] - 88:24
**arising** [1] - 5:22
**Arizona** [3] - 19:1, 19:17, 82:20
**arm** [2] - 10:4
**Armed** [1] - 44:6
**Army** [1] - 25:9
**arrived** [3] - 13:20, 13:22, 18:22
**article** [1] - 94:23
**Asia** [1] - 55:20
**aside** [2] - 34:8, 56:24
**aspects** [2] - 66:3, 76:14
**asset** [1] - 70:25
**assignments** [1] - 11:7
**assistant** [1] - 18:24
**associated** [2] - 9:19, 11:9
**Association** [1] - 30:9
**assume** [1] - 37:20
**attempt** [1] - 52:12
**attempted** [1] - 52:13
**attend** [9] - 14:3, 15:6, 15:19, 64:14, 67:3, 67:24, 68:16, 68:18, 69:25
**attendance** [1] - 68:4
**attendants** [1] - 59:20
**attended** [12] - 15:13, 17:9, 28:14, 37:16, 61:22, 63:2, 65:10, 65:12, 65:23, 67:6, 68:1, 69:6
**attendees** [1] - 67:10
**attending** [2] - 65:24, 68:12
**attention** [1] - 81:2

**ATTORNEY'S** [1] - 1:15
**attorneys** [1] - 79:19
**attracted** [1] - 96:4
**attracting** [1] - 96:1
**audience** [1] - 103:18
**August** [3] - 1:6, 24:19, 107:10
**AUSAs** [1] - 4:10
**authorized** [2] - 42:1, 42:6
**available** [13] - 12:14, 15:7, 18:16, 27:22, 27:23, 29:19, 35:12, 39:4, 39:11, 39:12, 40:1, 40:3, 40:8
**Avenue** [3] - 1:25, 2:3, 107:14
**AVI** [1] - 1:18
**Avi** [1] - 4:17
**avoided** [1] - 7:5
**award** [2] - 46:18, 47:17
**awarded** [3] - 43:6, 43:15, 43:23
**awarding** [1] - 47:19
**aware** [17] - 13:25, 14:1, 14:3, 37:13, 38:13, 41:19, 42:4, 42:6, 43:4, 43:8, 44:14, 44:16, 45:3, 45:7, 45:11, 45:13
**awareness** [1] - 92:23
**awesome** [1] - 85:1

**B**

**bachelor** [1] - 8:17
**background** [2] - 14:15, 84:23
**barriers** [1] - 15:23
**base** [4] - 11:5, 13:25, 55:21
**Base** [2] - 13:21, 19:1
**based** [8] - 23:16, 40:7, 41:11, 57:10, 58:7, 58:8, 91:9, 94:25
**basis** [6] - 12:19, 23:14, 44:7, 46:15, 59:18
**battlefield** [1] - 18:12
**became** [9] - 37:13, 83:6, 84:7, 84:14, 85:22, 87:24, 91:25,

92:10, 94:18
**become** [1] - 24:21
**becoming** [3] - 26:2, 27:3, 98:23
**BEFORE** [1] - 1:10
**began** [2] - 57:18, 61:25
**begged** [1] - 64:5
**begin** [4] - 7:7, 7:25, 55:25, 98:6
**beginning** [2] - 54:17, 87:2
**behalf** [1] - 46:19
**behavioral** [1] - 61:7
**bench** [5] - 32:5, 50:9, 62:10, 79:20, 80:23
**Bend** [1] - 8:15
**beneficial** [1] - 80:9
**benefit** [2] - 86:12, 91:5
**benefits** [3] - 22:20, 30:13, 30:15
**best** [6] - 12:6, 17:24, 22:3, 26:5, 69:2, 107:7
**better** [6] - 13:1, 22:4, 65:5, 69:5, 71:5, 85:25
**between** [6] - 21:13, 38:10, 38:12, 45:19, 59:13, 72:11
**Beyler** [2] - 33:25, 72:13
**beyond** [4] - 48:20, 49:22, 50:5, 66:8
**beyond-Ph.D** [1] - 66:8
**big** [5] - 46:16, 56:1, 94:4, 95:8, 98:3
**Bill** [1] - 4:16
**bit** [13] - 7:5, 12:3, 18:6, 25:23, 28:1, 38:23, 49:16, 54:23, 57:13, 57:20, 61:10, 64:21, 95:14
**blend** [3] - 58:2, 58:3, 58:4
**blown** [1] - 65:22
**board** [3] - 30:22, 64:2, 104:11
**boarding** [1] - 82:22
**Boeing** [2] - 55:17, 56:4
**bono** [3] - 15:18, 93:24, 95:16
**bonuses** [1] - 9:19
**book** [6] - 14:16, 85:25, 86:4, 86:17, 93:8, 94:7

**boring** [1] - 66:20
**born** [1] - 57:7
**borne** [1] - 61:4
**Boston** [6] - 58:19, 83:22, 84:7, 84:9, 87:16
**bottom** [3] - 23:25, 60:24, 104:19
**bottom-line** [1] - 60:24
**boundaries** [1] - 49:14
**box** [1] - 67:15
**brain** [1] - 66:17
**branch** [5] - 33:8, 33:16, 34:3, 34:4, 34:8
**branches** [2] - 97:7, 97:14
**break** [5] - 22:16, 73:5, 76:1, 83:18, 105:20
**BRETT** [1] - 1:19
**Brett** [2] - 4:17, 54:13
**Brian** [5] - 3:4, 4:9, 7:11, 8:2, 37:3
**BRIAN** [3] - 1:14, 7:16, 8:2
**bribe** [8] - 46:2, 51:3, 51:4, 51:20, 52:6, 52:13, 53:4
**bribed** [2] - 32:9, 51:6
**bribery** [1] - 50:12
**bribes** [1] - 50:14
**bride** [1] - 53:8
**Bridgewater** [1] - 94:24
**briefing** [2] - 21:16, 21:17
**briefings** [2] - 40:19, 49:8
**briefly** [3] - 23:15, 78:11, 90:18
**bring** [14] - 6:9, 16:23, 16:25, 42:7, 42:12, 51:7, 80:14, 81:17, 86:5, 86:11, 92:24, 98:14, 99:6, 102:13
**broad** [1] - 51:12
**Brodsky** [4] - 4:24, 6:18, 36:14, 77:8
**BRODSKY** [14] - 1:23, 4:23, 36:16, 74:15, 74:20, 75:2, 75:4, 75:7, 75:10, 77:9, 77:12, 79:1, 79:12, 79:16

**brought** [9] - 12:10, 16:10, 16:21, 18:19, 40:18, 42:15, 71:9, 81:2, 91:23
**budget** [1] - 105:4
**budgets** [3] - 9:19, 10:16, 11:8
**build** [3] - 58:14, 90:14, 93:18
**building** [3] - 9:20, 17:21, 86:22
**built** [7] - 16:12, 57:4, 86:24, 87:22, 89:13, 99:16, 99:22
**bunch** [1] - 87:2
**Burck** [4] - 4:16, 5:3, 73:8, 77:6
**BURCK** [22] - 1:18, 4:16, 5:4, 5:6, 5:17, 6:7, 73:15, 73:18, 74:9, 74:14, 75:13, 75:18, 76:10, 76:12, 76:18, 76:22, 77:4, 77:8, 77:17, 80:1, 80:7, 80:20
**Burke** [18] - 25:1, 25:13, 25:14, 32:15, 44:1, 44:9, 44:15, 44:20, 44:25, 45:3, 45:16, 45:20, 45:23, 50:14, 72:3, 73:25, 101:6, 101:10
**Burke's** [1] - 25:17
**Business** [2] - 14:18, 91:15
**business** [21] - 14:23, 14:24, 85:23, 87:12, 87:17, 87:25, 88:1, 88:4, 89:14, 90:8, 90:17, 90:19, 91:2, 91:8, 91:12, 91:15, 92:8, 93:25, 94:22, 95:3, 102:6
**business-wise** [1] - 102:6
**businesses** [1] - 19:5
**busy** [1] - 20:18
**but..** [1] - 85:10
**buying** [1] - 39:22
**BY** [35] - 2:1, 7:22, 13:17, 21:7, 25:5, 30:3, 31:24, 35:1, 36:8, 36:21, 45:10, 46:9, 48:10, 49:1, 50:2, 53:2, 54:11, 56:7, 63:20, 65:9, 67:23, 70:11, 70:16, 70:20, 71:1, 71:6, 71:23, 82:13, 99:8,

102:1, 102:16, 103:1, 103:12, 104:5, 104:18

**C**

**California** [1] - 94:25
**call-out** [2] - 104:4, 104:17
**camaraderie** [1] - 69:23
**camera** [1] - 67:13
**candor** [4] - 22:2, 22:15, 22:20, 23:19
**Canedo** [1] - 76:12
**cannot** [1] - 5:9
**capabilities** [10] - 12:9, 15:4, 17:16, 17:24, 18:5, 26:19, 28:3, 28:8, 28:21, 46:14
**capability** [3] - 17:5, 28:21, 35:20
**capable** [1] - 56:5
**capital** [20] - 9:14, 9:20, 9:21, 10:5, 10:6, 10:17, 11:23, 12:1, 12:2, 12:4, 12:10, 12:11, 13:2, 13:5, 15:2, 28:7, 28:8, 28:12, 29:6, 39:21
**Captain** [4] - 72:24, 74:23, 79:25, 81:3
**captain** [1] - 55:17
**captains** [1] - 56:13
**cards** [1] - 85:8
**care** [6] - 30:15, 30:18, 30:25, 31:6, 31:7, 85:17
**career** [2] - 9:4, 43:10
**careful** [1] - 33:24
**cargo** [1] - 55:11
**Carlisle** [1] - 69:11
**carried** [1] - 10:6
**carries** [1] - 56:5
**carrying** [1] - 12:2
**cars** [1] - 88:8
**Case** [1] - 4:4
**case** [7] - 7:7, 33:19, 43:4, 43:8, 52:9, 77:25, 78:22
**cases** [1] - 22:15
**causes** [1] - 60:3
**center** [17] - 10:3, 10:19, 10:25, 11:6, 13:21, 15:8, 18:20, 20:21, 21:3, 23:1, 37:25, 38:2, 40:18, 40:23, 40:25, 95:19,

95:20
**centers** [3] - 95:22, 96:4, 96:7
**CEO** [2] - 30:8, 30:22
**certain** [2] - 32:16, 73:14
**certainly** [17] - 16:3, 19:11, 40:1, 42:10, 42:24, 43:1, 44:19, 47:21, 49:7, 49:10, 49:13, 53:1, 54:19, 74:22, 76:19, 90:13, 98:1
**CERTIFICATE** [1] - 107:1
**certified** [1] - 56:10
**certify** [1] - 107:4
**cetera** [5] - 9:20, 17:22, 86:6, 94:21, 98:17
**Chaclan** [1] - 79:22
**Chaclan's** [1] - 81:2
**chain** [2] - 22:19
**chair** [2] - 57:1, 60:18
**challenges** [9] - 11:22, 28:6, 35:21, 35:23, 35:24, 59:16, 61:7, 95:23, 97:11
**chance** [2] - 21:1, 26:10
**change** [9] - 11:4, 11:18, 17:6, 17:7, 17:8, 28:11, 28:12, 87:12, 90:24
**change-of-station** [1] - 11:4
**changes** [4] - 16:25, 17:1, 32:16, 32:17
**changing** [1] - 11:19
**chaplain** [2] - 18:23, 19:12
**chaplain's** [1] - 18:22
**character** [6] - 51:7, 51:9, 52:11, 52:16, 79:5, 79:15
**charge** [4] - 51:10, 69:2, 93:1, 97:7
**charged** [1] - 24:11
**charities** [2] - 31:5
**CHARLIE** [1] - 1:6
**Charlie** [19] - 4:5, 65:1, 72:15, 82:25, 83:1, 84:13, 84:21, 84:24, 85:7, 85:11, 85:14, 85:24, 86:25, 87:15, 95:4, 96:25, 97:17, 97:19, 101:4
**Charlie's** [1] - 85:5

**cheating** [1] - 97:11
**chicken** [1] - 86:15
**chief** [15] - 7:8, 9:12, 13:11, 24:21, 25:9, 25:22, 26:2, 27:3, 30:7, 44:17, 44:21, 57:5, 58:18, 101:6, 101:18
**chiefs** [1] - 44:7
**childish** [1] - 73:12
**children** [1] - 31:6
**choice** [1] - 96:25
**choose** [1] - 39:10
**chose** [2] - 95:1, 97:1
**chosen** [1] - 58:14
**Christopher** [1] - 4:17
**CHRISTOPHER** [1] - 1:19
**chunks** [2] - 35:14, 35:15
**circumstance** [2] - 51:5, 76:13
**City** [5] - 15:9, 15:14, 31:15, 31:16, 69:24
**civilian** [2] - 11:2, 48:18
**classified** [3] - 42:8, 42:11
**classmates** [1] - 90:10
**cleaning** [1] - 86:3
**clear** [3] - 38:9, 74:7, 76:25
**clearer** [1] - 18:13
**clearly** [1] - 16:16
**client** [1] - 6:1
**clients** [7] - 5:12, 75:15, 87:19, 88:14, 91:4, 91:8, 94:3
**climb** [1] - 23:22
**Clore** [8] - 4:18, 7:9, 13:7, 48:8, 52:1, 52:25, 53:18, 63:9
**CLORE** [40] - 1:19, 6:12, 6:15, 6:20, 7:10, 7:18, 7:20, 7:22, 13:9, 13:16, 13:17, 21:7, 25:4, 25:5, 30:3, 31:24, 32:7, 32:21, 34:19, 34:21, 35:1, 36:6, 36:8, 36:13, 45:6, 45:8, 46:5, 48:10, 49:1, 49:25, 50:2, 50:7, 50:11, 51:15, 51:24, 52:2, 52:21, 53:1, 53:2, 53:11
**Clore's** [1] - 33:20

**close** [3] - 83:6, 87:11, 90:14
**closely** [3] - 83:16, 84:4, 84:5
**CNO** [2] - 101:15, 101:17
**CNP** [12] - 13:11, 13:14, 25:3, 25:6, 25:10, 25:14, 25:17, 44:1, 44:15, 44:16, 44:18, 101:6
**co** [1] - 52:1
**co-counsel** [1] - 52:1
**coached** [1] - 91:23
**coaches** [2] - 103:20, 104:1
**coaching** [4] - 91:23, 96:3, 103:16, 103:25
**cockpit** [2] - 56:8, 56:14
**college** [6] - 55:4, 62:7, 83:7, 85:24, 86:7, 87:17
**College** [1] - 55:5
**colleges** [1] - 86:9
**colonel** [1] - 19:15
**Columbia** [2] - 2:2, 107:13
**COLUMBIA** [2] - 1:1, 1:16
**com** [2] - 87:3, 89:11
**combat** [1] - 42:8
**combining** [1] - 97:13
**coming** [5] - 6:24, 61:15, 64:5, 73:20, 94:4
**command** [6] - 28:25, 37:21, 38:14, 38:16, 40:16, 48:1
**commander** [4] - 10:3, 10:25, 14:12, 44:24
**commensurate** [2] - 24:23, 30:16
**commercial** [1] - 95:9
**commercialize** [4] - 92:11, 93:5, 94:6, 95:3
**commission** [4] - 88:10, 88:25, 89:6, 89:8
**commissioned** [2] - 8:19, 8:23
**commitment** [1] - 8:24
**Committees** [1] - 44:6
**common** [2] - 26:13,

26:17
**communicate** [5] - 6:4, 12:12, 16:17, 29:3, 41:16
**communicated** [1] - 23:12
**communication** [6] - 15:22, 15:24, 16:1, 17:7, 21:13
**communications** [3] - 17:22, 24:7, 49:19
**community** [2] - 20:11, 26:4
**companies** [11] - 16:9, 46:10, 46:12, 67:19, 89:25, 91:19, 93:12, 94:4, 94:21, 94:23
**company** [27] - 13:19, 14:1, 14:21, 33:16, 34:2, 41:13, 55:12, 61:12, 67:14, 84:22, 86:13, 86:19, 87:6, 89:13, 89:16, 90:1, 90:7, 90:12, 90:20, 90:22, 91:1, 94:23, 94:24, 94:25, 95:10, 99:24
**compare** [2] - 66:14, 103:24
**compared** [1] - 19:23
**compartmented** [2] - 42:14, 42:23
**compelled** [1] - 67:3
**complete** [3] - 57:12, 100:22, 107:6
**completely** [1] - 60:13
**compliance** [1] - 98:1
**component** [1] - 41:19
**computers** [1] - 88:8
**conceivable** [1] - 76:20
**concept** [7] - 20:15, 28:25, 29:1, 86:11, 93:10, 96:5, 99:21
**concepts** [1] - 28:23
**concerned** [1] - 24:4
**concerns** [2] - 60:4, 60:10
**concluded** [1] - 106:4
**condition** [2] - 65:4, 66:25
**conference** [7] - 32:5, 40:17, 50:9, 50:25, 62:10, 79:20, 80:23

**conferred** [1] - 5:8
**confers** [1] - 52:1
**conflict** [3] - 59:17, 59:22, 66:17
**conflicts** [1] - 58:20
**Congress** [1] - 44:10
**Connecticut** [1] - 83:10
**connection** [2] - 51:20, 72:10
**consider** [1] - 64:5
**consistent** [2] - 32:14, 102:2
**consolidate** [1] - 58:10
**consolidated** [1] - 58:1
**conspiracy** [4] - 34:7, 62:18, 62:20, 63:3
**constant** [1] - 26:18
**constantly** [1] - 14:23
**constitutes** [1] - 107:4
**Constitution** [2] - 2:3, 107:14
**consulting** [1] - 90:11
**consumer** [2] - 91:7, 95:21
**contact** [9] - 20:1, 20:4, 31:9, 31:14, 31:23, 44:25, 49:18, 59:19, 67:18
**contents** [1] - 105:20
**context** [1] - 96:12
**Continental** [1] - 58:2
**continually** [1] - 32:11
**continue** [3] - 5:14, 63:19, 67:3
**continued** [1] - 26:3
**contract** [27] - 27:4, 32:9, 32:18, 38:10, 38:12, 38:15, 38:20, 40:5, 41:22, 43:5, 43:9, 43:15, 43:20, 43:22, 46:3, 47:10, 47:11, 47:17, 48:2, 49:11, 72:7, 99:15, 100:20, 100:22, 104:22, 105:3
**contracting** [8] - 25:24, 26:13, 29:11, 47:2, 47:5, 48:19, 49:11, 52:5
**contractor** [8] - 31:16, 47:15, 47:16,

47:17, 48:2, 48:18, 100:3, 100:4
**contractors** [5] - 26:14, 26:18, 46:13, 47:4, 69:12
**contracts** [7] - 46:19, 46:21, 46:22, 47:3, 47:5, 72:11, 100:5
**contractual** [1] - 103:5
**contrary** [1] - 74:12
**contribute** [1] - 20:6
**contributed** [1] - 16:16
**control** [1] - 28:25
**conversation** [6] - 35:11, 63:24, 78:10, 85:5, 98:20, 100:10
**conversations** [4] - 19:14, 48:16, 51:21, 98:10
**copilot** [1] - 62:1
**copilots** [1] - 62:2
**corporate** [1] - 86:12
**Corporate** [1] - 87:24
**Corporation** [1] - 69:12
**corporation** [6] - 60:23, 61:18, 67:14, 69:1, 69:4, 70:25
**corporations** [1] - 86:11
**corps** [1] - 8:22
**Corps** [1] - 25:10
**correct** [20] - 9:23, 24:10, 24:16, 29:24, 37:8, 37:12, 37:14, 40:10, 41:6, 41:7, 43:12, 43:20, 55:24, 60:7, 72:16, 72:17, 72:20, 75:2, 81:5, 81:12
**correctly** [1] - 29:4
**corruptly** [1] - 52:10
**cost** [3] - 27:19, 69:25, 70:2
**Counsel** [1] - 4:7
**counsel** [2] - 5:15, 52:1
**counterparts** [4] - 25:8, 25:11, 25:12, 44:3
**country** [1] - 95:22
**couple** [11] - 15:13, 15:17, 24:19, 26:6, 84:13, 84:20, 86:20, 87:4, 88:5, 98:10
**couple-day** [2] - 15:13, 15:17
**coupon** [2] - 85:25,

86:4
**course** [19] - 5:22, 49:18, 50:19, 57:10, 61:11, 65:12, 65:15, 65:20, 66:1, 66:14, 67:6, 67:7, 68:17, 68:23, 69:4, 69:6, 83:4, 85:15, 90:16
**courses** [4] - 63:2, 65:10, 67:24, 68:12
**Court** [7] - 2:1, 2:2, 5:20, 76:2, 78:16, 107:12, 107:13
**court** [6] - 4:19, 34:23, 52:23, 63:17, 81:19, 105:25
**COURT** [118] - 1:1, 4:1, 4:13, 4:20, 5:1, 5:5, 5:16, 6:6, 6:8, 6:14, 6:17, 6:21, 7:3, 7:12, 7:19, 13:7, 13:10, 13:15, 20:8, 25:3, 30:2, 31:12, 32:4, 32:20, 33:20, 34:15, 34:20, 34:24, 36:7, 36:14, 36:17, 45:9, 46:6, 48:8, 48:22, 50:1, 50:8, 50:21, 51:11, 51:22, 51:25, 52:7, 52:17, 52:24, 53:13, 53:18, 53:22, 54:4, 54:6, 54:8, 56:3, 62:9, 62:12, 62:23, 63:4, 63:7, 63:11, 63:15, 63:18, 65:7, 67:22, 70:10, 70:15, 70:23, 71:4, 71:19, 72:22, 72:24, 73:4, 73:8, 73:16, 74:3, 74:7, 74:13, 74:19, 74:21, 75:3, 75:5, 75:8, 75:11, 75:17, 76:8, 76:11, 76:16, 76:19, 77:2, 77:5, 77:11, 77:13, 77:18, 78:1, 78:5, 78:8, 78:13, 78:19, 78:22, 78:25, 79:11, 79:15, 79:19, 79:22, 80:2, 80:12, 80:14, 80:16, 80:19, 80:21, 80:24, 81:1, 81:6, 81:10, 81:15, 81:23, 82:4, 82:11, 101:23, 105:15, 105:17
**Court's** [5] - 5:7, 5:9, 48:6, 76:1, 76:13
**courtroom** [7] - 7:1, 53:20, 73:6, 79:17,

80:22, 81:21, 105:23
**COURTROOM** [12] -
4:4, 6:25, 7:14, 7:17,
53:25, 54:3, 78:15,
80:15, 81:20, 82:6,
82:9, 105:25
**covered** [2] - 66:2,
70:2
**COVID** [4] - 65:13,
67:8, 67:17, 68:2
**crashed** [1] - 89:24
**crashes** [1] - 98:2
**created** [1] - 35:13
**credit** [1] - 85:8
**Creel** [1] - 4:12
**criminal** [1] - 5:17
**Criminal** [2] - 1:3,
4:4
**crisis** [1] - 31:8
**CROSS** [2] - 36:20,
71:22
**cross** [15] - 5:11,
5:19, 6:1, 34:16,
36:17, 48:21, 49:23,
49:24, 50:4, 50:6,
50:12, 52:18, 71:20,
75:20, 75:22
**Cross** [2] - 3:5, 3:8
**cross-examination**
[8] - 34:16, 36:17,
48:21, 49:23, 50:6,
50:12, 52:18, 71:20
**Cross-Examination**
[2] - 3:5, 3:8
**CROSS-**
**EXAMINATION** [2] -
36:20, 71:22
**crossed** [2] - 49:14,
62:6
**crossing** [3] - 51:17,
76:21, 76:23
**crowd** [1] - 103:22
**CRR** [3] - 2:1, 107:3,
107:12
**CRUTCHER** [1] -
1:24
**culminated** [1] -
27:17
**cultural** [3] - 57:9,
97:11, 98:3
**culture** [16] - 14:22,
17:5, 17:6, 18:3, 22:1,
23:11, 25:19, 25:20,
28:12, 58:6, 91:20,
93:14, 95:24, 96:2,
96:3, 98:1
**Culture** [1] - 93:9
**cultures** [2] - 25:19,
58:14
**curiosity** [1] - 65:18

**curious** [1] - 94:18
**currency** [1] - 89:4
**customers** [1] -
96:23
**cut** [1] - 86:5
**cutting** [1] - 11:7
**CWE** [3] - 84:16,
84:19, 85:22

## D

**D.C** [5] - 1:6, 1:17,
1:22, 2:4, 107:14
**dad** [1] - 84:23
**daily** [2] - 12:19,
59:18
**Dallas** [4] - 55:22,
55:23, 55:24, 68:1
**Dallas-Fort** [1] -
55:22
**Dame** [2] - 8:15, 8:21
**date** [2] - 101:13,
105:6
**Dated** [1] - 107:10
**day-to-day** [5] - 10:6,
14:21, 14:22, 23:2
**days** [2] - 24:19
**DCS** [1] - 25:16
**deal** [1] - 6:24
**dealing** [2] - 11:11,
53:9
**December** [1] - 43:6
**decide** [1] - 76:2
**decided** [2] - 92:11,
95:4
**decision** [5] - 29:3,
38:21, 47:21, 47:25,
65:24
**decision-makers** [1]
- 29:3
**decisionmaker** [1] -
101:3
**decisionmaking** [6] -
16:2, 16:3, 17:8,
18:13, 18:14, 23:9
**decisions** [9] -
11:21, 12:12, 16:17,
17:18, 18:12, 23:12,
25:24, 68:19
**declined** [1] - 64:3
**Decurion** [1] - 94:25
**deep** [3] - 68:10,
70:24, 95:5
**defective** [1] - 73:13
**DEFENDANT** [2] -
1:18, 1:23
**Defendant** [1] - 4:18
**Defendants** [12] -
1:7, 5:17, 6:3, 37:10,

37:20, 39:5, 45:23,
46:2, 50:13, 73:21,
73:24, 74:2
**Defendants'** [3] -
7:7, 33:11, 51:1
**DEFENSE** [3] - 7:16,
54:2, 82:8
**defense** [5] - 6:22,
7:10, 49:10, 81:25,
94:1
**Defense** [5] - 26:17,
27:10, 46:13, 99:7,
102:14
**defining** [1] - 46:25
**definitely** [2] - 77:18,
81:13
**degree** [1] - 89:14
**delayed** [1] - 9:3
**deliberate** [3] -
92:20, 93:19, 94:19
**deliberately** [2] -
14:19, 93:11
**Delta** [3] - 58:2, 58:3
**demonstrate** [1] -
76:20
**demonstrated** [1] -
76:17
**Denese** [1] - 76:12
**Department** [3] -
26:17, 27:10, 46:13
**depended** [1] - 39:18
**deploy** [1] - 58:15
**deployment** [1] -
59:11
**depth** [1] - 64:7
**deputy** [7] - 9:12,
18:23, 19:11, 24:21,
25:22, 26:2, 27:3
**DEPUTY** [12] - 4:4,
6:25, 7:14, 7:17,
53:25, 54:3, 78:15,
80:15, 81:20, 82:6,
82:9, 105:25
**describe** [3] - 25:16,
66:7, 90:18
**described** [1] - 61:21
**designated** [3] -
14:18, 42:13, 47:20
**designating** [1] -
14:21
**designation** [1] -
14:17
**designed** [1] - 58:22
**desk** [1] - 64:1
**details** [3] - 14:16,
14:17, 43:9
**detracting** [1] -
93:24
**develop** [4] - 57:15,
57:22, 85:17, 91:12

**developed** [5] - 16:6,
57:17, 59:10, 60:4,
66:12
**developing** [3] -
14:24, 27:13, 92:7
**development** [8] -
9:17, 14:6, 91:2,
93:13, 94:10, 94:13,
94:16, 94:20
**development-wise**
[1] - 94:13
**developmental** [3] -
14:19, 21:25, 93:11
**device** [1] - 42:19
**devices** [3] - 42:3,
42:8, 43:2
**differ** [1] - 10:9
**differed** [1] - 23:16
**difference** [1] - 12:7
**differences** [2] -
19:23, 78:21
**different** [32] - 16:9,
16:15, 16:22, 16:24,
17:2, 18:2, 19:19,
19:21, 20:15, 25:18,
25:20, 28:5, 29:1,
29:2, 31:2, 35:18,
37:6, 37:7, 66:3,
66:10, 79:6, 86:2,
88:5, 91:3, 92:13,
93:15, 96:7, 97:6,
99:20, 104:10
**differently** [1] -
66:17
**difficult** [2] - 66:7,
96:17
**dig** [1] - 18:6
**digest** [1] - 14:13
**dire** [2] - 80:4, 80:6
**Direct** [3] - 3:5, 3:7,
3:9
**direct** [20] - 5:11,
5:13, 6:3, 22:2, 22:3,
40:24, 44:25, 49:24,
50:6, 59:9, 59:15,
74:18, 74:24, 74:25,
75:1, 75:2, 75:9,
76:23, 105:19
**DIRECT** [3] - 7:21,
54:10, 82:12
**direction** [1] - 10:17
**directly** [4] - 26:14,
60:18, 73:21, 103:7
**directors** [1] - 30:23
**directory** [1] - 86:1
**disagreements** [1] -
77:20
**discount** [5] - 87:20,
87:23, 88:8, 88:11,
88:24

**discovered** [2] -
31:20, 35:11
**discriminations** [1] -
97:10
**discuss** [4] - 5:10,
75:12, 78:11, 105:19
**discussed** [5] - 16:2,
16:12, 24:6, 38:17,
38:19
**discussing** [2] -
19:22, 77:15
**discussion** [8] -
11:19, 17:3, 23:24,
29:16, 38:1, 49:11,
49:13, 98:25
**discussions** [16] -
16:6, 19:8, 22:21,
23:19, 26:13, 26:25,
45:18, 45:24, 47:14,
47:15, 47:22, 48:3,
52:5, 98:6, 98:24,
101:2
**dismiss** [1] - 78:24
**disparagingly** [1] -
66:19
**disproved** [2] -
94:11, 94:14
**district** [1] - 107:13
**DISTRICT** [4] - 1:1,
1:1, 1:11, 1:16
**District** [3] - 2:2, 2:2,
107:13
**division** [1] - 83:23
**document** [1] - 99:9
**documents** [1] -
77:24
**DOD** [1] - 11:14
**dollars** [4] - 39:7,
39:14, 41:22, 104:25
**domain** [1] - 28:25
**domains** [1] - 29:2
**domicile** [1] - 58:19
**done** [4] - 27:8, 27:9,
66:5, 76:6
**door** [1] - 50:17
**dorm** [1] - 83:3
**dot** [2] - 87:3, 89:11
**dot-com** [2] - 87:3,
89:11
**Doug** [1] - 54:5
**Douglas** [3] - 3:7,
53:20, 54:19
**DOUGLAS** [1] - 54:2
**down** [16] - 13:21,
13:22, 19:1, 20:21,
20:23, 29:21, 53:14,
55:24, 65:24, 72:25,
89:11, 89:12, 89:17,
96:18, 102:20, 105:14
**downstream** [1] -

71:7
  **dozen** [1] - 68:3
  **drew** [2] - 84:19, 85:4
  **driven** [1] - 59:23
  **drop** [2] - 104:4, 104:17
  **dry** [1] - 86:3
  **Duke** [2] - 89:14, 90:7
  **Dulles** [1] - 79:3
  **DUNN** [1] - 1:24
  **during** [23] - 16:12, 21:9, 22:12, 33:25, 37:10, 38:9, 41:25, 43:10, 44:24, 45:1, 48:16, 49:24, 52:4, 63:2, 63:3, 65:13, 67:8, 67:17, 83:13, 84:1, 90:19, 91:1, 93:1
  **duties** [1] - 25:21
  **duty** [2] - 11:5

**E**

  **early** [3] - 33:2, 76:1, 93:2
  **earned** [1] - 30:12
  **Echevarria** [1] - 79:4
  **economist** [4] - 83:23, 83:24, 84:12, 85:2
  **Edwards** [1] - 107:12
  **EDWARDS** [2] - 2:1, 107:3
  **effect** [1] - 62:15
  **effective** [1] - 92:25
  **effects** [1] - 71:7
  **eight** [2] - 56:11, 81:13
  **either** [8] - 15:24, 16:24, 23:8, 56:9, 58:23, 64:13, 74:5, 85:3
  **element** [5] - 57:10, 58:22, 61:2, 66:6, 73:11
  **elements** [4] - 65:4, 66:24, 68:8, 71:10
  **email** [1] - 26:4
  **emails** [1] - 20:13
  **EMANUEL** [1] - 1:20
  **emotionally** [1] - 94:13
  **employ** [1] - 36:1
  **employed** [1] - 71:13
  **employee** [8] - 18:17, 87:20, 87:22,

88:11, 88:20, 88:23, 88:24, 91:5
  **employees** [15] - 19:3, 19:5, 32:23, 35:16, 35:20, 40:19, 69:3, 74:6, 87:2, 88:11, 89:12, 89:17, 90:3, 90:7, 99:18
  **employees'** [1] - 35:19
  **empower** [2] - 66:4, 69:1
  **enabled** [3] - 99:18, 99:22, 104:8
  **encompassed** [1] - 66:18
  **end** [9] - 20:19, 29:9, 34:19, 40:4, 73:16, 75:19, 76:12, 89:11, 95:6
  **ended** [2] - 85:18, 99:19
  **energy** [1] - 93:22
  **engage** [1] - 102:10
  **engaged** [1] - 45:23
  **engineering** [1] - 8:18
  **enjoyed** [1] - 7:4
  **enrich** [2] - 69:3
  **entered** [6] - 7:1, 53:20, 79:17, 80:22, 81:21, 102:14
  **enterprise** [16] - 9:20, 9:21, 10:5, 10:17, 11:24, 12:2, 12:10, 12:16, 13:2, 13:6, 28:8, 39:18, 39:21, 40:23, 44:12, 44:13
  **enterprises** [2] - 11:9, 16:10
  **enthusiasm** [1] - 85:5
  **entire** [1] - 11:1
  **entitled** [1] - 74:22
  **entity** [2] - 34:5, 64:20
  **entrepreneur** [1] - 84:25
  **entry** [1] - 9:3
  **environment** [3] - 17:17, 89:22, 94:16
  **equipment** [1] - 12:6
  **equivalent** [3] - 13:12, 13:14, 44:2
  **era** [1] - 87:3
  **erred** [1] - 59:2
  **ESQ** [11] - 1:13, 1:14, 1:14, 1:15, 1:18, 1:18, 1:19, 1:19, 1:20, 1:23,

1:24
  **essence** [1] - 103:15
  **essentially** [2] - 32:21, 32:23
  **establishes** [1] - 32:10
  **et** [5] - 9:20, 17:22, 86:6, 94:21, 98:17
  **ethical** [5] - 49:14, 50:4, 50:18, 51:11, 51:17
  **ethics** [3] - 48:12, 49:8, 49:9
  **ethos** [1] - 85:18
  **Europe** [2] - 43:6, 55:20
  **eval** [1] - 98:14
  **evaluate** [1] - 47:23
  **evaluation** [3] - 98:12, 99:15, 99:17
  **evening** [2] - 69:22, 76:2
  **event** [2] - 15:17, 92:14
  **events** [1] - 70:6
  **eventually** [7] - 24:14, 27:16, 89:12, 91:7, 91:14, 92:10, 97:21
  **evidence** [11] - 50:25, 51:7, 52:11, 52:12, 73:12, 74:10, 74:11, 77:14, 77:22, 99:7, 102:14
  **evolved** [1] - 35:12
  **evolving** [1] - 27:7
  **exact** [3] - 67:25, 92:2, 101:13
  **exactly** [5] - 22:8, 85:10, 87:7, 100:11, 100:12
  **EXAMINATION** [6] - 7:21, 36:20, 48:9, 54:10, 71:22, 82:12
  **examination** [8] - 34:16, 36:17, 48:21, 49:23, 50:6, 50:12, 52:18, 71:20
  **Examination** [6] - 3:5, 3:5, 3:6, 3:7, 3:8, 3:9
  **examine** [1] - 36:15
  **example** [10] - 51:20, 66:2, 69:16, 86:15, 88:7, 88:16, 88:21, 89:7, 92:16, 92:22
  **except** [1] - 25:18
  **exceptional** [2] - 69:16, 69:17
  **exchange** [3] -

44:11, 46:2, 46:3
  **exchanges** [1] - 26:4
  **exclusionary** [1] - 42:10
  **excuse** [2] - 52:3, 78:9
  **excused** [2] - 53:17, 73:3
  **execute** [1] - 46:20
  **executing** [1] - 47:3
  **execution** [6] - 10:4, 10:12, 10:14, 11:2, 11:3, 11:7
  **executive** [1] - 30:7
  **exercise** [3] - 22:4, 92:17, 92:22
  **exercises** [4] - 15:21, 20:25, 21:11, 92:15
  **Exeter** [3] - 82:22, 82:24, 83:1
  **exhausting** [1] - 74:8
  **Exhibit** [2] - 99:7, 102:14
  **existed** [2] - 57:3, 94:12
  **existing** [1] - 12:25
  **exited** [2] - 73:6, 105:23
  **expand** [2] - 86:9, 86:10
  **expanded** [2] - 87:15, 91:7
  **expect** [1] - 75:18
  **expectation** [1] - 76:24
  **expensive** [2] - 39:1, 39:4
  **experience** [5] - 47:4, 50:3, 50:19, 51:19, 58:12
  **experiences** [1] - 51:17
  **experiment** [1] - 98:15
  **experts** [1] - 94:10
  **explain** [9] - 5:23, 12:3, 15:15, 86:19, 88:19, 91:16, 93:5, 94:8, 96:13
  **explained** [1] - 16:5
  **exposed** [4] - 16:7, 16:8, 19:24, 41:15
  **exposing** [1] - 92:5
  **extended** [1] - 37:23
  **extent** [2] - 34:11, 73:14
  **eyes** [1] - 66:22

**F**

  **F-35** [1] - 39:22
  **F-35s** [1] - 39:23
  **FAA** [2] - 58:10, 58:11
  **fabric** [1] - 93:14
  **facilities** [2] - 42:24, 42:25
  **facility** [1] - 42:14
  **facing** [1] - 94:5
  **fact** [4] - 33:11, 37:3, 62:14, 81:3
  **failures** [1] - 58:12
  **fair** [2] - 38:7, 38:8
  **fairly** [1] - 33:5
  **faith** [1] - 51:8
  **fall** [3] - 13:24, 37:14, 89:14
  **familiar** [7] - 25:1, 25:13, 37:10, 64:23, 66:9, 66:15, 69:18
  **families** [1] - 30:14
  **family** [3] - 54:25, 83:18, 87:11
  **far** [2] - 55:3, 70:2
  **fast** [1] - 64:21
  **fast-forward** [1] - 64:21
  **faster** [5] - 11:21, 17:18, 18:12, 18:13, 23:14
  **February** [1] - 22:10
  **feedback** [32] - 21:4, 21:12, 21:17, 21:18, 21:19, 21:23, 21:25, 22:24, 23:16, 41:15, 41:21, 42:2, 93:21, 98:16, 98:18, 99:19, 99:20, 102:11, 103:15, 103:18, 103:20, 103:23, 103:25, 104:2, 104:6, 104:8, 104:9, 104:12, 104:13, 104:15
  **feedback-giver** [1] - 21:19
  **feedback-giving** [2] - 103:25, 104:2
  **fellowship** [1] - 69:23
  **felt** [7] - 17:24, 28:7, 49:14, 61:18, 67:18, 90:14, 92:7
  **female** [1] - 95:25
  **few** [4] - 38:3, 74:4, 74:17, 92:13
  **Fidelity** [3] - 95:10, 95:19, 96:20

**field** [5] - 59:12, 59:14, 59:16, 60:1, 60:6
**fight** [1] - 39:20
**fighter** [2] - 18:25, 19:16
**fighting** [1] - 28:23
**figure** [3] - 61:8, 79:23, 104:19
**filed** [1] - 50:23
**final** [2] - 47:21, 47:25
**financial** [8] - 94:24, 95:10, 95:19, 95:20, 95:21, 95:25, 96:4, 96:7
**fine** [1] - 34:14
**fire** [1] - 58:23
**First** [4] - 69:18, 69:20, 69:21, 70:5
**first** [34] - 5:3, 6:10, 6:12, 6:22, 14:10, 24:19, 28:14, 37:13, 49:9, 54:12, 56:13, 61:24, 65:12, 65:16, 65:19, 66:1, 66:13, 67:6, 68:20, 72:15, 74:21, 79:5, 85:7, 86:21, 87:4, 87:9, 87:19, 90:22, 95:8, 95:9, 95:12, 98:25, 99:1, 105:5
**firsthand** [2] - 43:19, 45:15
**fitness** [1] - 16:15
**five** [2] - 59:19, 69:8
**flight** [4] - 56:9, 59:20, 60:20, 63:25
**flip** [1] - 102:25
**flown** [3] - 61:15, 79:24, 81:3
**fly** [7] - 39:20, 55:18, 55:19, 55:23, 55:24, 56:1, 56:11
**flying** [4] - 55:20, 56:5, 60:2, 60:5
**focus** [2] - 13:18, 68:24
**focused** [1] - 66:21
**focusing** [3] - 9:25, 11:10, 13:18
**folks** [18] - 4:13, 5:1, 10:6, 16:21, 18:20, 26:22, 30:16, 47:2, 56:15, 56:16, 59:8, 59:14, 69:6, 69:10, 73:4, 78:5, 101:19, 105:21
**following** [18] - 7:2, 32:5, 34:22, 50:9,

52:22, 53:21, 55:11, 62:10, 63:16, 73:7, 78:18, 79:18, 79:20, 80:23, 81:18, 81:22, 105:24, 106:3
**followup** [2] - 24:7, 96:20
**FOR** [5] - 1:1, 1:13, 1:16, 1:18, 1:23
**Force** [98] - 8:20, 8:23, 9:1, 9:3, 9:4, 9:5, 9:8, 9:10, 9:12, 9:15, 9:16, 9:22, 10:3, 10:5, 10:7, 10:18, 10:19, 10:25, 11:6, 11:14, 12:4, 12:21, 13:12, 13:14, 13:20, 15:8, 17:11, 17:14, 17:20, 18:7, 18:10, 18:11, 18:17, 18:20, 18:22, 18:24, 18:25, 19:1, 19:20, 20:21, 21:3, 22:1, 22:25, 23:9, 23:11, 23:16, 24:11, 24:22, 25:7, 25:19, 25:24, 27:5, 27:22, 27:25, 28:12, 28:16, 28:22, 29:9, 29:19, 29:25, 30:4, 31:10, 32:25, 33:18, 34:13, 35:19, 37:11, 37:24, 38:1, 38:5, 38:10, 38:12, 38:25, 39:3, 39:19, 40:18, 42:5, 42:7, 42:10, 43:10, 44:2, 44:12, 46:11, 46:12, 46:16, 46:18, 46:19, 47:6, 47:10, 47:14, 47:18, 48:12, 48:13, 48:18, 49:4, 69:13
**force** [3] - 12:7, 97:6, 97:20
**Force's** [1] - 33:13
**Forces** [1] - 43:5
**foregoing** [1] - 107:4
**forget** [3] - 85:10, 92:2, 101:13
**forgive** [1] - 57:22
**formal** [2] - 27:17, 49:10
**former** [1] - 73:22
**forms** [1] - 92:13
**Fort** [1] - 55:22
**Fortune** [1] - 16:9
**forward** [3] - 4:7, 29:18, 64:21
**four** [10] - 8:24, 44:7, 44:18, 56:9, 56:12, 57:9, 59:19, 89:12,

89:17
**four-star** [1] - 44:18
**four-year** [1] - 8:24
**fragile** [2] - 66:6, 66:24
**frank** [2] - 22:21, 24:5
**frankly** [1] - 73:10
**free** [9] - 15:18, 36:11, 37:22, 53:14, 64:13, 65:16, 70:13, 72:25, 86:6
**frequent** [1] - 46:15
**freshman** [1] - 83:1
**friendly** [1] - 76:25
**friends** [1] - 83:6
**Fritz** [1] - 4:17
**front** [1] - 44:10
**frozen** [2] - 24:2, 24:4
**full** [5] - 7:25, 57:12, 84:8, 86:8, 107:5
**full-time** [3] - 57:12, 84:8, 86:8
**function** [1] - 60:13
**fundamental** [1] - 68:7
**funded** [1] - 60:22
**funding** [2] - 29:10, 85:8
**fundraise** [2] - 86:25, 87:9
**funds** [2] - 29:19, 39:13
**fused** [1] - 29:1

## G

**G1** [1] - 25:9
**gain** [1] - 64:17
**gears** [1] - 61:10
**General** [15] - 7:11, 7:23, 8:4, 8:10, 18:17, 29:23, 35:3, 36:9, 47:12, 48:11, 50:3, 50:18, 52:4, 53:3, 53:13
**general** [19] - 9:9, 9:10, 9:23, 9:24, 10:1, 10:2, 19:12, 19:13, 22:1, 24:15, 26:13, 33:8, 33:12, 34:12, 49:20, 51:4, 52:13, 52:16, 76:16
**generally** [4] - 56:17, 66:2, 69:14, 70:8
**gentlemen** [4] - 4:20, 7:3, 81:23, 105:17
**GIBSON** [1] - 1:24

**given** [5] - 16:18, 32:15, 59:18, 77:14, 98:17
**giver** [1] - 21:19
**giving-back** [1] - 91:21
**global** [1] - 66:16
**glove** [1] - 88:15
**Goldman** [2] - 31:17, 31:18
**goodness** [2] - 67:20, 70:7
**GOVERNMENT** [1] - 1:13
**Government** [8] - 4:8, 5:8, 5:18, 5:20, 73:11, 74:10, 75:20, 76:3
**government** [2] - 42:2, 100:4
**Government's** [1] - 32:7
**grab** [1] - 6:13
**graduate** [2] - 8:16, 83:11
**graduated** [6] - 8:17, 9:2, 55:10, 83:20, 83:22, 90:7
**graduating** [1] - 8:19
**graduation** [2] - 8:23, 55:11
**granular** [1] - 66:5
**great** [5] - 5:5, 6:21, 22:2, 73:9, 81:15
**green** [1] - 102:9
**Greg** [4] - 3:9, 79:17, 82:2, 82:18
**GREG** [2] - 82:8, 82:18
**grew** [2] - 87:12, 92:4
**ground** [1] - 77:19
**group** [5] - 8:11, 15:25, 60:13, 90:14, 93:9
**groups** [1] - 104:10
**grow** [1] - 87:1
**growing** [1] - 94:13
**growth** [1] - 86:19
**guess** [5] - 6:22, 79:24, 80:5, 81:3, 87:6
**guidance** [1] - 5:7
**guidebook** [2] - 86:22, 87:19
**guidebooks** [2] - 87:14, 89:20

## H

**half** [3] - 20:24, 83:25, 105:5
**Halloween** [2] - 15:11
**Halloween-time** [1] - 15:11
**hallway** [1] - 42:15
**Hampshire** [3] - 54:25, 55:6, 82:23
**Hampton** [1] - 54:25
**hand** [4] - 7:15, 54:1, 66:21, 82:7
**handling** [1] - 59:16
**hard** [1] - 93:23
**harder** [1] - 39:21
**Harvard** [4] - 14:18, 93:10, 94:7, 94:22
**haul** [2] - 55:19, 55:23
**Hawthorne** [1] - 55:5
**head** [6] - 9:14, 57:5, 59:3, 97:24, 101:7, 101:18
**headquarters** [7] - 20:21, 20:23, 65:25, 68:2, 68:17, 69:24, 101:12
**hear** [3] - 51:23, 61:11, 61:14
**heard** [5] - 13:10, 32:13, 62:15, 63:9, 65:22
**hearsay** [1] - 20:7
**heavily** [2] - 13:3, 91:10
**held** [5] - 32:6, 50:10, 56:25, 62:11, 79:21
**help** [13] - 16:24, 23:8, 28:6, 28:11, 35:20, 35:21, 36:2, 41:14, 41:16, 46:15, 96:5, 98:22, 104:2
**helpful** [4] - 21:23, 22:14, 23:1, 98:4
**helping** [2] - 47:17, 92:23
**hereby** [1] - 107:3
**high** [5] - 27:24, 38:22, 66:17, 82:21, 84:20
**high-conflict** [1] - 66:17
**higher** [7] - 22:18, 23:21, 29:8, 35:21, 38:18, 38:19, 88:15
**highest** [1] - 12:17

**highlight** [1] - 103:11
**hire** [1] - 58:7
**hired** [3] - 55:12, 87:1, 99:3
**hiring** [1] - 11:3
**history** [1] - 56:21
**home** [2] - 55:21, 65:13
**honesty** [1] - 51:1
**Honor** [57] - 4:2, 4:3, 4:9, 4:16, 4:22, 4:23, 5:4, 5:6, 6:7, 6:13, 6:15, 7:10, 7:18, 20:7, 20:10, 33:7, 36:6, 36:13, 36:16, 36:19, 45:8, 46:5, 48:20, 49:22, 50:5, 50:7, 50:11, 50:23, 52:2, 52:8, 53:11, 53:12, 53:16, 54:9, 63:14, 71:17, 72:23, 73:18, 74:9, 74:15, 75:10, 75:13, 76:10, 76:18, 76:22, 77:4, 77:9, 77:17, 77:21, 78:7, 78:14, 78:21, 78:24, 79:1, 80:13, 82:3, 105:22
**honorable** [2] - 78:15, 105:25
**HONORABLE** [1] - 1:10
**hope** [1] - 7:4
**hopefully** [1] - 23:12
**hostile** [3] - 75:6, 75:7, 76:14
**hotel** [1] - 88:8
**hour** [2] - 65:19, 85:10
**hours** [4] - 56:6, 56:11, 63:25, 94:17
**House** [1] - 44:6
**HR** [5] - 26:20, 46:25, 88:13, 100:6, 101:8
**huge** [1] - 67:1
**hugely** [1] - 102:4
**human** [35] - 9:14, 9:20, 9:21, 10:5, 10:6, 10:17, 11:2, 11:23, 12:1, 12:4, 12:10, 12:11, 13:2, 13:5, 15:2, 17:25, 28:7, 28:8, 28:11, 29:6, 39:20, 57:10, 58:22, 59:18, 61:2, 61:3, 65:4, 66:6, 66:16, 66:24, 67:18, 68:10, 71:5, 92:7
**humans** [2] - 66:18, 66:19

**hundreds** [8] - 29:15, 29:17, 39:7, 39:8, 39:14, 39:22, 41:22, 93:15
**hypothetical** [2] - 50:12, 53:3

## I

**idea** [5] - 20:16, 21:8, 43:22, 86:10, 103:4
**ideals** [1] - 69:23
**ideas** [3] - 34:2, 46:14, 69:23
**identical** [1] - 25:18
**identify** [2] - 4:7, 61:8
**identifying** [1] - 60:6
**IG** [2] - 73:22, 97:24
**ignorance** [1] - 64:17
**immediately** [2] - 55:11, 75:1
**impact** [4] - 17:4, 70:18, 70:21, 70:24
**impressed** [1] - 65:22
**impression** [2] - 49:20, 69:14
**improper** [1] - 26:24
**improve** [4] - 13:4, 21:12, 23:11, 92:23
**improved** [1] - 23:13
**improvements** [1] - 32:11
**in-person** [2] - 40:12, 41:5
**including** [1] - 37:20
**incorporate** [1] - 98:22
**Incorporated** [1] - 99:25
**incorrectly** [1] - 57:23
**increase** [4] - 17:16, 17:24, 17:25, 28:21
**increasing** [1] - 18:5
**India** [1] - 55:20
**Indiana** [1] - 8:15
**indiscernible]** [1] - 51:21
**individual** [14] - 12:8, 13:5, 15:22, 15:25, 17:3, 17:5, 17:25, 21:17, 28:20, 29:7, 46:22, 92:25, 97:15, 103:25
**individual's** [1] - 16:16
**individuals** [10] -

14:6, 14:7, 14:9, 19:9, 21:13, 39:24, 66:17, 84:13, 92:23, 103:22
**indulgence** [2] - 48:6, 76:1
**inferior** [1] - 33:22
**influencer** [1] - 101:4
**inform** [1] - 76:2
**information** [17] - 11:20, 12:14, 12:18, 14:11, 14:13, 14:15, 17:17, 23:13, 26:21, 28:24, 29:1, 32:15, 46:7, 62:16
**informs** [1] - 79:22
**infraction** [1] - 58:24
**inhibit** [1] - 15:24
**initial** [6] - 63:23, 85:6, 96:21, 97:1, 97:21, 101:8
**initiative** [3] - 91:21, 93:24, 95:7
**input** [1] - 77:8
**inside** [1] - 58:21
**installed** [2] - 42:2, 42:18
**instance** [3] - 42:12, 44:5, 46:24
**instruction** [2] - 77:14, 77:22
**instructions** [1] - 77:7
**insult** [1] - 30:2
**integrate** [1] - 58:13
**integration** [1] - 57:9
**integrity** [2] - 68:7, 68:10
**intention** [1] - 65:19
**interact** [1] - 67:15
**interaction** [2] - 35:7, 68:13
**interactions** [4] - 59:24, 62:18, 73:24, 80:11
**interactive** [1] - 16:1
**interest** [7] - 15:2, 18:4, 33:13, 38:5, 92:9, 93:17, 93:20
**interested** [8] - 15:1, 16:3, 22:23, 28:13, 35:17, 35:18, 97:25
**interfaced** [1] - 43:25
**internal** [1] - 87:20
**internally** [1] - 91:14
**interns** [2] - 85:9, 85:12
**interviewing** [1] - 95:7
**introduced** [2] - 41:9, 101:5

**introduction** [1] - 97:23
**inundated** [1] - 12:17
**invest** [2] - 89:3, 90:13
**invested** [1] - 95:6
**investment** [1] - 31:16
**investor** [1] - 93:21
**invite** [2] - 20:20, 37:23
**invited** [1] - 68:16
**involved** [13] - 13:3, 23:19, 25:23, 46:23, 46:24, 47:13, 47:14, 47:16, 48:2, 49:4, 72:7, 91:11, 95:10
**involvement** [1] - 77:24
**involves** [1] - 65:4
**irrelevant** [2] - 62:19, 73:12
**issue** [3] - 5:6, 5:21, 49:15
**issues** [2] - 11:11, 98:3
**IT** [4] - 16:23, 26:21, 41:19, 47:1
**Italy** [1] - 44:22

## J

**JADC2** [1] - 28:25
**January** [3] - 9:4, 35:9, 43:7
**Jersey** [3] - 8:11, 8:13, 8:14
**Jim** [1] - 74:6
**job** [15] - 13:11, 13:20, 31:15, 45:18, 45:23, 46:18, 47:14, 47:15, 48:3, 48:17, 49:2, 57:12, 84:5, 96:21
**jobs** [1] - 83:20
**JOHN** [1] - 1:20
**John** [1] - 44:19
**join** [1] - 8:25
**joined** [8] - 4:10, 84:13, 84:18, 85:22, 86:18, 89:9, 90:3, 101:15
**Joint** [1] - 13:21
**joint** [3] - 28:25, 44:10, 60:15
**jointly** [2] - 44:8, 60:19
**joke** [1] - 84:21
**Josh** [1] - 4:11

**JOSHUA** [1] - 1:14
**Judge** [2] - 13:16, 24:25
**JUDGE** [1] - 1:11
**Juliet** [1] - 72:13
**July** [1] - 68:3
**Jump** [95] - 13:19, 14:2, 14:4, 14:9, 14:16, 14:17, 15:1, 15:5, 15:9, 15:18, 16:8, 17:3, 18:9, 18:15, 26:22, 27:20, 27:21, 27:24, 28:2, 29:10, 29:12, 29:18, 31:25, 32:11, 32:19, 32:22, 32:24, 33:13, 34:1, 35:3, 35:4, 35:5, 35:6, 35:8, 36:1, 36:10, 37:10, 37:13, 37:19, 38:6, 38:7, 38:11, 38:12, 38:15, 38:20, 39:1, 41:6, 41:10, 42:1, 43:6, 43:15, 43:23, 45:4, 45:12, 45:16, 45:24, 61:12, 61:14, 61:17, 61:18, 61:23, 65:25, 67:2, 68:13, 68:17, 69:22, 69:24, 71:11, 72:11, 73:9, 73:22, 74:5, 74:6, 74:11, 79:8, 79:9, 84:7, 84:14, 85:19, 85:23, 89:9, 89:15, 91:12, 93:1, 93:16, 95:1, 96:23, 97:3, 97:19, 98:6, 99:3, 100:22, 101:16, 104:25
**Jump's** [14] - 17:10, 28:17, 32:8, 33:17, 37:16, 38:4, 40:12, 42:17, 62:16, 63:2, 63:5, 64:9, 70:17, 101:12
**jumped** [1] - 68:20
**June** [3] - 9:6, 13:23, 30:5
**Juror** [3] - 80:5, 80:22, 81:1
**JUROR** [4] - 80:25, 81:5, 81:9, 81:12
**jurors** [2] - 13:10, 79:23
**JURY** [1] - 1:10
**jury** [17] - 6:9, 6:24, 6:25, 7:1, 15:16, 21:8, 54:13, 62:22, 73:6, 73:23, 77:7, 81:17, 81:20, 81:21, 82:17, 102:15, 105:23

**K**

**K-E-L-L-Y** [1] - 8:3
**K-U-N-K-E-L** [1] - 82:18
**keep** [2] - 12:13, 63:13
**keeping** [1] - 13:18
**keeps** [1] - 30:19
**Kegan** [1] - 94:10
**Kelly** [23] - 3:4, 4:9, 7:11, 7:23, 8:3, 8:4, 8:10, 18:18, 29:23, 35:3, 36:9, 36:17, 37:3, 48:11, 48:14, 49:18, 50:3, 50:18, 52:4, 53:3, 53:6, 53:13, 80:16
**KELLY** [23] - 1:14, 4:3, 4:9, 4:14, 7:16, 20:5, 20:7, 31:11, 32:3, 33:7, 33:24, 36:19, 36:21, 45:10, 46:9, 48:6, 48:20, 49:22, 50:5, 50:23, 52:8, 80:17, 105:22
**key** [1] - 23:20
**kick** [1] - 105:9
**kick-off** [1] - 105:9
**Kim** [33] - 4:6, 4:18, 4:21, 6:21, 7:9, 20:1, 21:9, 24:7, 26:1, 27:2, 27:4, 31:9, 31:19, 37:24, 45:19, 48:16, 49:3, 49:16, 50:3, 52:5, 53:8, 54:14, 67:12, 70:12, 72:15, 75:24, 76:7, 77:23, 82:2, 82:25, 83:4, 83:14, 84:2
**KIM** [2] - 1:6, 1:18
**Kim's** [1] - 74:25
**kind** [61] - 13:12, 15:9, 19:23, 21:2, 27:18, 33:21, 35:17, 47:23, 51:13, 79:6, 84:21, 85:6, 85:11, 85:13, 85:16, 85:20, 85:24, 86:1, 86:8, 86:24, 87:2, 87:3, 87:16, 87:20, 90:20, 91:2, 91:21, 91:23, 92:7, 92:14, 93:13, 93:19, 94:11, 94:17, 95:11, 95:12, 95:20, 96:2, 96:15, 96:17, 97:1, 97:11, 97:16, 97:25, 98:11, 98:13, 98:15, 98:24, 99:19,

99:22, 100:4, 100:5, 100:6, 100:7, 101:7, 101:8, 102:9, 103:15
**kinds** [3] - 16:22, 26:21, 66:10
**Klein** [1] - 97:7
**knowledge** [7] - 16:10, 43:20, 45:15, 45:22, 45:25, 46:1, 62:19
**known** [1] - 30:8
**knows** [2] - 79:7, 79:8
**Kunkel** [13] - 3:9, 75:22, 78:12, 79:17, 82:2, 82:4, 82:14, 82:18, 82:19, 83:7, 99:9, 102:17, 105:19
**KUNKEL** [1] - 82:8
**Kunkel's** [1] - 77:24

**L**

**lack** [1] - 85:24
**ladies** [3] - 7:3, 81:23, 105:17
**landing** [1] - 79:2
**lane** [1] - 17:23
**laptop** [4] - 88:8, 88:17, 88:20, 88:23
**laptops** [1] - 88:22
**large** [3] - 11:14, 29:12, 46:17
**largely** [2] - 41:11, 73:9
**larger** [1] - 27:11
**last** [12] - 8:3, 9:12, 24:19, 31:21, 35:2, 35:7, 36:9, 56:23, 56:25, 58:9, 62:20, 76:10
**late** [4] - 15:10, 37:18, 44:14, 62:23
**latest** [1] - 20:14
**law** [1] - 52:9
**lead** [2] - 68:10, 94:20
**leader** [5] - 18:11, 68:8, 71:15, 92:25, 104:11
**leaders** [13] - 11:17, 19:2, 65:5, 65:6, 65:8, 68:25, 91:18, 91:25, 94:3, 96:8, 96:15, 98:18
**leadership** [50] - 13:3, 14:4, 14:6, 15:6, 15:13, 15:16, 16:13, 16:20, 18:8, 19:9,

19:19, 19:25, 22:18, 24:6, 27:8, 28:5, 28:15, 32:24, 37:16, 40:9, 41:14, 43:5, 49:19, 63:2, 64:1, 64:2, 64:8, 65:2, 65:3, 65:24, 66:3, 66:6, 66:8, 66:10, 68:17, 68:25, 69:6, 91:15, 92:2, 92:12, 93:2, 96:24, 97:21, 100:25, 101:2, 101:20, 102:11, 102:22, 105:8, 105:11
**Leadership** [8] - 64:23, 64:25, 65:1, 65:10, 66:14, 66:22, 68:11, 72:16
**learn** [2] - 14:9, 101:20
**learned** [6] - 13:19, 16:11, 20:14, 68:5, 89:19, 96:11
**learning** [3] - 15:5, 93:19, 98:23
**least** [7] - 5:13, 26:11, 38:3, 39:3, 51:19, 74:11, 105:11
**led** [4] - 16:2, 65:15, 95:6, 97:23
**left** [6] - 8:13, 8:14, 9:8, 66:17, 73:19, 89:13
**left-brain** [1] - 66:17
**legalities** [1] - 46:21
**Lenovo** [2] - 88:21, 89:7
**less** [2] - 22:20, 102:3
**lessons** [3] - 16:11, 68:5, 89:19
**letter** [1] - 33:11
**level** [8] - 12:16, 23:9, 29:8, 38:21, 66:5, 66:8, 85:3, 90:20
**levels** [2] - 12:17, 35:21
**licenses** [1] - 104:14
**lieutenant** [1] - 9:9
**life** [3] - 30:16, 55:2, 71:2
**light** [2] - 17:16, 102:9
**likely** [1] - 79:23
**limine** [1] - 50:24
**limited** [1] - 50:25
**Linda** [6] - 62:4, 62:5, 62:6, 63:25, 64:11, 69:7

**line** [7] - 33:5, 49:9, 50:16, 58:23, 60:24, 87:25, 91:13
**lines** [3] - 50:4, 51:11, 51:18
**Lisa** [1] - 107:12
**LISA** [2] - 2:1, 107:3
**list** [1] - 92:21
**listener** [1] - 62:15
**live** [1] - 41:5
**lived** [3] - 55:2, 83:2, 84:8
**lives** [2] - 69:3, 69:4
**LLC** [1] - 84:16
**LLP** [2] - 1:21, 1:24
**local** [2] - 86:2, 86:15
**located** [1] - 40:25
**location** [4] - 11:5, 11:6, 15:9, 31:22
**locations** [1] - 31:20
**locker** [1] - 42:15
**long-haul** [2] - 55:19, 55:23
**longest** [1] - 94:17
**look** [4] - 21:5, 51:15, 68:9, 78:22
**looked** [2] - 18:3, 18:4
**looking** [6] - 12:24, 12:25, 13:4, 57:22, 68:4, 93:15
**losing** [1] - 89:20
**loved** [1] - 22:15
**lower** [1] - 29:22
**Luke** [1] - 19:1
**lunch** [2] - 105:15, 105:20
**luncheon** [1] - 106:2

**M**

**M-O-A-A** [1] - 30:9
**main** [5] - 23:3, 23:5, 40:17, 87:25, 88:12
**major** [3] - 8:16, 55:7, 58:1
**majority** [1] - 42:21
**makers** [1] - 29:3
**manage** [1] - 87:22
**management** [3] - 11:8, 58:8, 58:21
**manner** [1] - 15:18
**manpower** [1] - 9:13
**map** [1] - 93:17
**March** [2] - 22:10, 68:22
**Marine** [1] - 25:10
**market** [1] - 89:24
**MasterCard** [1] -

91:8
**matter** [1] - 100:6
**maximize** [6] - 12:1, 12:9, 14:24, 15:3, 28:7, 35:19
**maximizes** [1] - 15:4
**maximizing** [2] - 12:4, 28:20
**MBA** [1] - 89:13
**McFadden** [2] - 1:10, 24:25
**mean** [18] - 12:3, 33:20, 34:6, 38:24, 40:4, 42:4, 44:3, 47:9, 51:2, 51:15, 51:16, 51:18, 52:15, 52:16, 66:19, 80:7, 80:9, 101:3
**meant** [1] - 14:20
**mechanics** [1] - 59:21
**mechanism** [1] - 103:5
**medical** [1] - 30:15
**medium** [1] - 67:7
**meet** [4] - 82:24, 95:21, 97:20, 101:10
**meeting** [2] - 101:16, 102:7
**meetings** [2] - 42:9, 104:10
**MEGHAN** [1] - 1:6
**Meghan** [9] - 4:6, 79:5, 79:7, 79:9, 95:4, 97:1, 97:17, 97:19, 101:4
**member** [1] - 87:11
**members** [5] - 9:16, 18:25, 26:16, 26:17, 31:1
**membership** [2] - 30:25, 91:9
**membership-based** [1] - 91:9
**memorable** [1] - 102:5
**memory** [1] - 85:20
**mentally** [1] - 94:13
**mentioned** [12] - 10:19, 18:5, 22:6, 23:15, 57:19, 57:20, 61:16, 67:7, 68:12, 89:16, 93:4, 100:24
**merchants** [2] - 88:6, 88:7
**merge** [1] - 57:8
**merits** [1] - 47:23
**MESSENGER** [2] - 1:6, 1:24
**Messenger** [24] - 4:6,

4:24, 5:2, 6:22, 20:1, 21:9, 24:7, 26:1, 27:2, 27:4, 31:9, 31:19, 37:24, 45:19, 48:17, 49:3, 49:17, 50:4, 52:5, 53:8, 65:2, 67:13, 70:12, 79:9

**met** [4] - 37:1, 70:6, 72:15, 97:14

**methodologies** [2] - 66:11, 66:15

**Michelle** [1] - 80:14

**mid-1997** [1] - 84:10

**middle** [5] - 8:2, 24:2, 24:4, 37:6, 37:7

**might** [7] - 39:25, 47:22, 78:2, 80:9, 80:11, 103:17

**Milan** [2] - 61:16, 61:20

**Military** [1] - 30:8

**military** [16] - 11:1, 22:1, 31:6, 33:8, 33:9, 33:10, 33:16, 34:4, 34:9, 42:2, 72:5, 72:8, 72:11, 97:6, 97:12

**million** [5] - 40:4, 87:8, 100:21, 104:25, 105:3

**millions** [9] - 29:15, 29:16, 29:17, 39:6, 39:7, 39:8, 39:9, 39:14, 41:22

**mind** [5] - 15:15, 82:16, 98:2, 99:11, 102:20

**mini** [1] - 74:18

**mini-direct** [1] - 74:18

**minutes** [2] - 73:5, 78:6

**mirror** [1] - 68:9

**missiles** [1] - 11:25

**missing** [2] - 77:14, 77:22

**mission** [8] - 10:15, 12:2, 25:19, 25:20, 30:12, 31:5, 39:19, 92:4

**missions** [2] - 25:18, 30:24

**MOAA** [21] - 30:9, 30:10, 30:11, 31:17, 31:25, 32:1, 32:23, 33:8, 34:4, 34:8, 34:14, 35:3, 35:5, 35:9, 35:16, 35:22, 35:23, 36:2, 36:4, 36:10, 49:20

**MOAA's** [2] - 30:11,

30:21

**mobile** [2] - 103:14, 104:8

**modularize** [1] - 35:13

**moment** [7] - 7:12, 36:6, 51:24, 53:11, 53:23, 64:13, 82:5

**moments** [1] - 63:10

**money** [14] - 39:21, 39:23, 40:1, 40:2, 85:17, 86:13, 87:1, 87:5, 88:4, 88:6, 89:18, 89:19, 89:20, 89:21

**month** [1] - 105:12

**months** [2] - 9:7, 20:19

**morality** [1] - 51:9

**Morgan** [2] - 84:5, 87:18

**Morning** [1] - 106:4

**morning** [33] - 4:1, 4:2, 4:3, 4:9, 4:13, 4:14, 4:15, 4:16, 4:20, 4:21, 4:22, 4:23, 5:1, 5:2, 7:3, 7:5, 7:23, 7:24, 36:22, 36:23, 53:22, 54:15, 71:24, 71:25, 73:5, 79:6, 79:7, 79:14, 80:24, 80:25, 82:14, 82:15

**MORNING** [1] - 1:7

**most** [7] - 56:17, 68:7, 69:21, 71:12, 94:16, 96:17

**motion** [1] - 50:23

**move** [3] - 11:5, 34:18, 44:20

**moved** [8] - 29:18, 31:20, 38:18, 44:17, 83:22, 84:7, 84:9

**moves** [1] - 11:4

**moving** [2] - 43:4, 63:13

**MR** [141] - 4:2, 4:3, 4:9, 4:14, 4:16, 4:22, 4:23, 5:4, 5:6, 5:17, 6:7, 6:12, 6:15, 6:20, 7:10, 7:18, 7:20, 7:22, 13:9, 13:16, 13:17, 20:5, 20:7, 21:7, 25:4, 25:5, 30:3, 31:11, 31:24, 32:3, 32:7, 32:21, 33:7, 33:24, 34:19, 34:21, 35:1, 36:6, 36:8, 36:13, 36:16, 36:19, 36:21, 45:6, 45:8, 45:10, 46:5, 46:9, 48:6,

48:10, 48:20, 49:1, 49:22, 49:25, 50:2, 50:5, 50:7, 50:11, 50:23, 51:15, 51:24, 52:2, 52:8, 52:21, 53:1, 53:2, 53:11, 54:5, 54:9, 54:11, 56:7, 62:13, 62:17, 63:1, 63:5, 63:8, 63:13, 63:20, 65:9, 67:23, 70:11, 70:16, 70:20, 71:1, 71:6, 71:17, 72:23, 73:15, 73:18, 74:4, 74:9, 74:14, 74:15, 74:20, 75:2, 75:4, 75:7, 75:10, 75:13, 75:18, 76:10, 76:12, 76:18, 76:22, 77:4, 77:8, 77:9, 77:12, 77:17, 77:21, 78:4, 78:7, 78:9, 78:14, 78:20, 78:23, 79:1, 79:12, 79:16, 80:1, 80:7, 80:17, 80:20, 82:2, 82:13, 99:6, 99:8, 102:1, 102:13, 102:16, 102:25, 103:1, 103:10, 103:12, 104:4, 104:5, 104:17, 104:18, 105:14, 105:16, 105:22

**MS** [13] - 4:15, 56:2, 62:8, 67:21, 70:9, 70:14, 70:19, 70:22, 71:3, 71:21, 71:23, 72:21, 80:13

**multiple** [2] - 33:25, 86:9

**must** [2] - 56:11, 68:9

## N

**name** [13] - 8:1, 8:2, 8:3, 37:3, 54:13, 54:18, 62:3, 67:14, 72:4, 82:16, 82:18, 99:24

**named** [1] - 82:25

**names** [2] - 37:6, 37:7

**Naples** [1] - 44:22

**narrower** [1] - 51:13

**nation** [2] - 30:17, 30:19

**national** [1] - 59:10

**nationwide** [1] - 31:1

**nature** [3] - 11:19,

59:23, 79:10

**NAV** [1] - 44:22

**NAVAF** [3] - 43:15, 44:25, 46:4

**naval** [8] - 13:11, 25:9, 44:17, 44:21, 49:3, 49:5, 101:6, 101:18

**Naval** [2] - 43:5, 64:4

**NAVEUR** [4] - 43:15, 44:22, 44:25, 46:4

**NAVEUR-NAV** [1] - 44:22

**NAVEUR-NAVAF** [3] - 43:15, 44:25, 46:4

**Navy** [35] - 19:4, 25:1, 25:6, 25:20, 26:9, 29:23, 32:9, 32:15, 33:18, 34:10, 34:13, 43:13, 43:14, 43:24, 44:1, 44:13, 44:15, 62:14, 63:21, 69:11, 73:23, 74:6, 97:2, 97:4, 98:2, 98:5, 98:7, 99:18, 100:5, 100:11, 100:12, 101:1, 101:18, 103:8, 105:1

**Navy's** [1] - 25:9

**Navy-specific** [1] - 43:24

**near** [2] - 19:1, 39:15

**necessity** [1] - 57:8

**need** [6] - 5:23, 75:12, 77:19, 80:4, 80:6, 80:18

**needed** [7] - 5:21, 11:20, 11:21, 32:16, 42:18, 58:13, 105:4

**needs** [2] - 12:21, 12:23

**negative** [2] - 80:10, 81:8

**negotiating** [2] - 47:3, 72:7

**negotiations** [1] - 72:10

**neighborhood** [1] - 87:8

**never** [9] - 37:1, 38:10, 38:14, 38:16, 42:4, 42:5, 42:15, 43:13, 65:17

**New** [22] - 1:25, 8:11, 8:13, 8:14, 15:9, 15:12, 15:14, 15:20, 31:15, 31:16, 35:10, 37:17, 40:9, 54:25, 55:5, 61:16, 69:24, 82:23, 84:6, 87:15,

87:16

**new** [14] - 10:2, 11:24, 11:25, 17:20, 17:21, 17:22, 28:23, 31:15, 31:22, 35:16, 44:18, 47:5

**Newark** [2] - 8:11, 8:13

**Next** [109] - 13:19, 14:2, 14:4, 14:9, 14:16, 14:17, 15:1, 15:5, 15:9, 15:17, 16:8, 17:3, 17:10, 18:9, 18:15, 26:22, 27:20, 27:21, 27:23, 28:2, 28:17, 29:10, 29:12, 29:18, 31:25, 32:8, 32:11, 32:19, 32:22, 32:24, 33:13, 33:17, 34:1, 35:2, 35:4, 35:5, 35:6, 35:8, 36:1, 36:10, 37:10, 37:13, 37:16, 37:19, 38:4, 38:6, 38:7, 38:11, 38:12, 38:15, 38:20, 39:1, 40:12, 41:5, 41:10, 42:1, 42:17, 43:6, 43:15, 43:23, 45:4, 45:12, 45:16, 45:24, 61:12, 61:14, 61:17, 61:18, 61:23, 62:16, 63:2, 63:5, 64:9, 65:25, 67:2, 68:13, 68:17, 69:22, 69:24, 70:17, 71:11, 72:11, 73:9, 73:22, 74:5, 74:6, 74:10, 79:8, 79:9, 84:7, 84:14, 85:19, 85:22, 89:9, 89:15, 91:12, 93:1, 93:16, 95:1, 96:23, 97:3, 97:19, 98:6, 99:3, 100:22, 101:12, 101:15, 104:25

**next** [11] - 44:9, 53:18, 63:24, 76:7, 81:25, 85:3, 86:20, 90:16, 96:25, 103:11, 104:6

**NO** [4] - 80:25, 81:5, 81:9, 81:12

**none** [1] - 39:10

**nonprofit** [3] - 30:8, 30:12, 31:4

**nonprofits** [1] - 35:24

**normal** [4] - 46:10, 47:12, 48:4, 66:18

**normally** [1] - 6:5

**Northern** [1] - 40:25
**Northwest** [5] - 1:16, 1:21, 2:3, 58:3, 107:14
**notes** [1] - 107:5
**nothing** [2] - 36:13, 53:12
**noticed** [1] - 94:15
**notified** [1] - 5:20
**notify** [1] - 5:22
**Notre** [2] - 8:15, 8:21
**Nowell** [1] - 44:19
**nowhere** [1] - 39:15
**number** [3] - 31:2, 61:9, 67:25
**numerous** [1] - 68:16
**nutrition** [1] - 16:15

### O

**oath** [2] - 8:5, 54:20
**Obama** [1] - 97:6
**objection** [22] - 20:5, 31:11, 32:3, 34:17, 34:24, 45:6, 45:8, 46:5, 48:20, 49:22, 50:5, 52:19, 56:2, 62:8, 63:12, 63:18, 67:21, 70:9, 70:14, 70:19, 70:22, 71:3
**objectives** [4] - 18:7, 28:16, 28:19, 28:20
**obligation** [1] - 5:25
**obligations** [1] - 48:12
**OBO** [1] - 21:14
**observe** [2] - 21:15, 92:1
**observed** [6] - 21:5, 21:15, 70:18, 71:7, 71:8, 86:19
**obviously** [3] - 19:6, 75:14, 75:21
**occasions** [4] - 26:6, 26:11, 44:9, 68:16
**occur** [1] - 95:13
**occurred** [1] - 62:18
**October** [3] - 15:10, 20:23, 37:18
**OF** [4] - 1:1, 1:3, 1:10, 1:16
**offer** [5] - 27:15, 29:11, 51:3, 53:8
**offered** [10] - 46:2, 50:13, 51:20, 52:6, 53:4, 61:21, 61:23, 62:15, 67:7, 70:13
**offering** [2] - 46:3,

88:14
**OFFICE** [1] - 1:15
**office** [11] - 18:23, 26:10, 42:13, 42:16, 57:23, 59:3, 60:10, 60:25, 87:16, 91:6
**officer** [6] - 8:21, 9:14, 30:7, 47:14, 49:14, 101:18
**officers** [4] - 13:25, 38:21, 49:11, 56:13
**Officers** [1] - 30:8
**offices** [4] - 37:16, 40:13, 96:9, 101:19
**official** [6] - 42:2, 47:20, 47:21, 49:7, 52:11, 107:12
**Official** [1] - 2:1
**officially** [1] - 30:5
**often** [4] - 12:5, 83:18, 84:6, 103:16
**once** [2] - 105:11, 105:12
**one** [51] - 5:6, 11:5, 14:17, 19:12, 21:11, 23:19, 26:3, 27:6, 31:5, 31:7, 39:13, 40:17, 51:5, 51:24, 52:11, 52:13, 61:9, 61:15, 62:2, 64:11, 66:20, 67:2, 67:11, 67:12, 68:7, 68:16, 69:9, 69:11, 76:10, 78:11, 79:22, 80:1, 84:20, 84:21, 85:12, 87:18, 92:3, 92:14, 93:16, 94:7, 94:10, 94:15, 95:5, 95:8, 95:23, 97:20, 98:10, 99:1, 100:14, 100:17, 103:7
**one-day** [2] - 68:16, 92:3
**one-off** [2] - 39:13, 100:14
**one-star** [1] - 19:12
**one-time** [1] - 100:17
**ones** [2] - 19:7, 96:16
**ongoing** [1] - 100:13
**online** [1] - 72:19
**open** [8] - 34:23, 52:23, 63:17, 81:19, 91:20, 91:22, 95:24, 99:19
**open-ended** [1] - 99:19
**opened** [8] - 50:17, 66:22, 68:1, 87:15, 91:3, 91:7, 91:9,

91:14
**openness** [2] - 23:24, 24:1
**operated** [2] - 22:25, 38:1
**operation** [1] - 11:1
**operational** [1] - 10:4
**operations** [6] - 10:7, 44:17, 44:22, 91:4, 91:6, 95:11
**opinion** [1] - 38:4
**opinions** [1] - 47:22
**opportunities** [6] - 22:22, 23:10, 42:20, 60:5, 64:8, 90:10
**opportunity** [21] - 14:1, 14:3, 18:14, 20:17, 20:20, 21:21, 23:8, 31:14, 31:18, 31:22, 36:1, 43:1, 49:24, 58:25, 59:22, 60:12, 60:15, 61:24, 66:23, 68:20, 94:5
**opposed** [1] - 75:4
**order** [6] - 6:19, 32:9, 48:1, 68:8, 68:10, 69:1
**ordered** [1] - 38:14
**ordering** [1] - 46:3
**orders** [1] - 11:7
**organization** [13] - 14:19, 17:4, 24:3, 30:24, 31:1, 35:24, 46:16, 56:18, 93:11, 93:14, 93:19, 95:5, 98:23
**organizations** [6] - 19:3, 19:6, 93:15, 94:3, 94:19, 95:8
**originally** [1] - 97:3
**origins** [1] - 91:17
**otherwise** [1] - 25:20
**ourselves** [1] - 105:8
**outcomes** [2] - 14:23, 14:25
**output** [1] - 15:4
**outside** [2] - 40:5, 42:23
**overall** [1] - 28:21
**overarching** [1] - 33:1
**overcome** [1] - 12:18
**overnight** [2] - 5:14, 6:3
**overruled** [10] - 20:8, 31:12, 34:24, 45:9, 46:6, 48:22, 56:3, 63:18, 70:23, 71:4
**overruling** [3] -

34:17, 52:19, 63:11
**oversaw** [1] - 11:6
**oversee** [2] - 10:16, 59:8
**oversight** [1] - 11:1
**overt** [1] - 62:20
**overview** [1] - 10:22
**overwhelming** [1] - 12:13
**own** [3] - 69:3, 73:24, 104:12

### P

**p.m** [3] - 76:3, 79:3, 105:24
**PAGE** [1] - 3:3
**Page** [3] - 99:10, 102:25, 103:10
**page** [1] - 102:21
**paid** [4] - 29:21, 36:11, 36:12, 95:17
**pandemic** [1] - 63:3
**panel** [2] - 6:25, 81:20
**parade** [1] - 15:11
**paralegal** [1] - 4:11
**parallel** [1] - 98:24
**parents** [1] - 83:19
**Park** [1] - 1:25
**part** [10] - 22:21, 31:5, 35:11, 39:21, 41:21, 47:19, 57:12, 85:6, 88:12, 96:6
**part-time** [1] - 57:12
**participate** [1] - 20:12
**participation** [1] - 21:20
**particular** [3] - 51:5, 57:4, 90:6
**particularly** [3] - 18:10, 42:22, 68:6
**parties** [2] - 32:4, 62:9
**partners** [1] - 60:2
**parts** [2] - 16:14, 40:23
**passenger** [1] - 55:24
**past** [3] - 57:25, 60:12, 81:13
**paths** [1] - 62:6
**pay** [5] - 8:24, 30:15, 86:16, 89:6, 89:7
**paying** [2] - 85:9, 95:16
**pays** [1] - 9:19
**peer** [2] - 99:19

**peer-to-peer** [1] - 99:19
**peers** [1] - 98:16
**Peg** [1] - 97:7
**Pentagon** [3] - 26:7, 42:13
**people** [30] - 11:5, 12:7, 14:24, 16:7, 16:23, 17:7, 19:5, 20:25, 21:24, 41:14, 46:18, 46:20, 50:18, 56:5, 56:8, 59:13, 59:16, 59:24, 66:4, 69:1, 69:22, 73:21, 74:5, 90:13, 92:4, 93:1, 93:22, 100:6, 104:10
**perceived** [1] - 50:18
**percent** [2] - 86:5, 88:25
**percentage** [1] - 88:9
**perform** [1] - 35:20
**performance** [2] - 98:11, 98:14
**performed** [1] - 104:22
**period** [12] - 34:7, 41:8, 41:25, 45:1, 63:3, 83:13, 84:1, 84:15, 90:18, 90:19, 91:1, 93:2
**periodic** [1] - 26:4
**periodically** [2] - 20:13, 26:19
**Perks** [6] - 87:24, 88:1, 88:20, 91:13, 93:25
**permanent** [1] - 11:4
**permission** [1] - 76:14
**Perry** [1] - 4:17
**PERRY** [4] - 1:18, 4:2, 4:22, 74:4
**person** [10] - 15:2, 40:12, 41:5, 47:24, 69:9, 72:4, 72:17, 90:14, 92:8, 96:4
**personal** [5] - 42:7, 42:18, 43:2, 43:3, 70:21
**personally** [5] - 38:6, 38:14, 47:13, 70:18, 90:21
**personnel** [31] - 9:13, 10:3, 10:19, 10:25, 11:6, 12:21, 13:11, 13:20, 15:8, 18:20, 19:4, 20:21, 21:3, 23:1, 25:9, 37:22, 37:25, 38:1,

40:18, 41:6, 42:7, 42:11, 42:23, 44:7, 44:12, 44:13, 46:11, 47:5, 47:11, 100:5, 101:7

**perspective** [7] - 12:11, 15:20, 15:23, 15:25, 39:3, 47:1

**pertinent** [1] - 51:9

**PET** [4] - 98:11, 99:1, 100:15, 100:16

**Ph.D** [2] - 66:8, 85:3

**Phillips** [2] - 82:22, 82:24

**philosophy** [2] - 61:17, 61:18

**Phoenix** [2] - 19:1, 82:20

**phone** [4] - 42:12, 42:14, 42:15, 86:1

**phones** [1] - 43:3

**physical** [1] - 16:15

**physically** [1] - 94:14

**piece** [1] - 89:11

**pilot** [13] - 55:11, 56:24, 57:5, 58:18, 59:19, 95:9, 95:12, 95:13, 98:21, 102:10, 102:11, 102:22

**pilots** [14] - 58:11, 58:19, 59:2, 59:13, 59:17, 59:23, 60:2, 61:3, 61:4, 61:5, 61:15, 66:18, 66:19, 95:9

**Piscataway** [2] - 8:13, 8:14

**pitch** [3] - 26:14, 26:18, 46:10

**pitched** [2] - 26:20, 47:12

**pitching** [2] - 39:6, 41:11

**place** [5] - 15:16, 67:14, 69:5, 86:2, 100:5

**places** [10] - 20:15, 30:25, 35:14, 42:6, 42:10, 42:12, 42:21, 42:22, 42:25, 43:1

**Plaintiff** [1] - 1:4

**plan** [3] - 6:23, 27:17, 76:22

**planes** [1] - 11:24

**play** [1] - 29:6

**pleased** [1] - 36:3

**pleasure** [1] - 54:16

**plenty** [4] - 42:20, 42:21, 43:1

**plus** [2] - 34:6, 59:20

**podium** [1] - 6:16

**point** [20] - 9:25, 27:16, 28:15, 33:1, 33:4, 33:6, 33:7, 33:21, 37:19, 40:7, 42:17, 45:4, 76:10, 76:24, 77:3, 84:18, 85:8, 86:9, 91:12, 93:4

**points** [2] - 34:15, 89:3

**policy** [6] - 9:16, 10:16, 11:2, 11:3, 59:11

**politely** [1] - 64:3

**poor** [1] - 32:8

**Poor's** [3] - 83:23, 83:24, 84:12

**popular** [1] - 88:22

**portfolio** [2] - 31:17, 46:22

**portion** [1] - 24:2

**portions** [1] - 27:12

**position** [21] - 10:11, 10:12, 13:14, 16:19, 24:18, 24:24, 25:3, 25:6, 25:7, 25:10, 25:15, 32:7, 38:18, 38:19, 44:20, 44:23, 56:25, 59:17, 60:20, 76:5, 81:6

**position's** [1] - 10:13

**positions** [1] - 13:3

**positive** [4] - 21:25, 28:13, 80:10, 81:8

**possibility** [3] - 39:16, 75:19, 96:19

**potential** [3] - 28:5, 38:20, 47:16

**potentially** [2] - 76:6, 98:6

**pounds** [1] - 56:5

**Power** [1] - 97:16

**powerful** [2] - 22:4, 68:6

**PowerTrain** [5] - 99:24, 100:2, 100:9, 103:2, 103:4

**Practice** [8] - 64:23, 64:25, 65:1, 65:10, 66:14, 66:22, 68:11, 72:16

**practice** [5] - 20:12, 25:11, 26:5, 26:18, 63:2

**practices** [4] - 16:7, 26:5, 91:22, 92:6

**preliminary** [1] - 60:9

**preparation** [1] -

44:10

**present** [6] - 4:18, 18:17, 19:3, 19:9, 61:23, 101:14

**presentation** [4] - 85:13, 85:15, 103:18, 103:21

**presented** [1] - 14:11

**presenter** [1] - 103:19

**preserve** [1] - 30:12

**preserving** [1] - 77:24

**president** [7] - 30:7, 30:21, 30:22, 60:19, 60:20, 60:21

**pretrial** [1] - 50:24

**pretty** [6] - 22:4, 26:18, 46:15, 46:16, 46:17, 84:5

**prevailing** [1] - 89:22

**prevent** [1] - 31:7

**previous** [1] - 65:17

**previously** [4] - 32:14, 32:24, 63:9, 102:14

**price** [2] - 29:22, 38:22

**prices** [2] - 27:18, 27:23

**pricey** [1] - 29:13

**primary** [1] - 88:6

**print** [2] - 86:22, 87:14

**private** [3] - 33:16, 34:2, 34:5

**privately** [1] - 52:1

**privilege** [1] - 5:24

**pro** [3] - 15:18, 93:24, 95:16

**probative** [1] - 51:5

**problem** [3] - 38:25, 42:19, 94:4

**problematic** [2] - 51:12, 52:9

**problems** [2] - 60:6, 61:6

**procedural** [2] - 5:6, 74:15

**procedures** [1] - 59:11

**proceed** [3] - 7:18, 54:8, 74:17

**proceedings** [15] - 7:2, 34:22, 52:22, 53:21, 63:16, 73:7, 78:18, 79:18, 80:23, 81:18, 81:22, 105:24, 106:3, 106:4, 107:6

**process** [8] - 12:19,

16:25, 23:13, 27:13, 29:3, 46:23, 48:4, 66:7

**processed** [1] - 11:21

**processes** [1] - 14:22

**processing** [2] - 11:7, 28:24

**produced** [1] - 107:6

**product** [5] - 34:10, 41:10, 42:17, 100:14, 101:2

**products** [1] - 47:13

**professional** [11] - 57:1, 57:24, 59:4, 60:12, 60:13, 60:15, 60:25, 61:19, 64:6, 71:2, 81:4

**professors** [1] - 93:10

**profitable** [1] - 90:5

**profits** [1] - 89:23

**program** [16] - 57:3, 57:4, 57:7, 57:10, 57:16, 57:17, 58:13, 58:22, 59:2, 87:20, 87:23, 88:11, 88:14, 91:10, 96:24, 101:9

**programs** [1] - 91:11

**project** [9] - 97:1, 98:11, 98:14, 99:1, 100:15, 100:16, 100:17, 100:24, 103:21

**projects** [1] - 91:3

**prominent** [1] - 69:21

**promises** [1] - 30:20

**promoted** [5] - 10:13, 24:14, 24:18, 38:17, 44:16

**promotion** [2] - 11:3, 24:23

**pronouncing** [1] - 57:23

**propensity** [1] - 52:12

**proper** [1] - 37:5

**proposal** [1] - 47:23

**proposed** [2] - 77:7, 100:7

**proposing** [2] - 39:1, 41:23

**prosecution** [1] - 50:16

**protect** [2] - 30:12, 31:7

**protocols** [1] - 59:11

**prove** [1] - 52:16

**provide** [11] - 19:21, 27:18, 30:17, 31:2, 32:12, 35:5, 38:11, 62:22, 65:2, 77:21, 78:3

**provided** [8] - 21:9, 22:12, 29:11, 32:22, 32:25, 36:10, 49:20, 100:14

**providing** [3] - 28:4, 33:9, 33:15

**psychological** [1] - 103:23

**public** [1] - 103:20

**publish** [1] - 102:15

**purchased** [1] - 104:14

**purely** [1] - 86:14

**purpose** [1] - 41:15

**purposes** [1] - 105:4

**pursue** [1] - 27:4

**push** [2] - 64:18, 93:5

**put** [7] - 58:11, 73:11, 74:10, 79:5, 93:13, 93:17, 97:7

**putting** [4] - 6:21, 14:5, 27:24, 92:7

**pyramid** [2] - 23:23, 23:25

## Q

**quality** [1] - 30:16

**quarter** [1] - 105:12

**questioning** [2] - 33:5, 50:16

**questions** [8] - 48:7, 49:24, 50:17, 51:2, 71:17, 72:21, 74:17, 93:24

**quick** [2] - 13:7, 34:19

**quicker** [1] - 11:21

**quickly** [4] - 12:12, 12:13, 87:1, 90:25

**QUINN** [1] - 1:20

**quite** [3] - 87:1, 92:5, 96:18

## R

**Raffish** [5] - 4:17, 54:4, 54:8, 54:13, 72:22

**RAFFISH** [20] - 1:19, 54:5, 54:9, 54:11, 56:7, 62:13, 63:1, 63:5, 63:8, 63:13,

63:20, 65:9, 67:23, 70:11, 70:16, 70:20, 71:1, 71:6, 71:17, 72:23
**Raimondo** [1] - 74:6
**raise** [6] - 7:14, 21:14, 21:21, 49:15, 53:25, 82:6
**raised** [3] - 86:25, 87:5, 89:18
**raising** [1] - 81:6
**ran** [5] - 21:2, 21:12, 87:16, 91:22, 96:4
**Randolph** [1] - 13:22
**range** [2] - 29:15, 29:17
**rank** [4] - 9:8, 23:16, 23:21
**rather** [5] - 51:16, 60:11, 61:5, 64:17, 66:20
**RDR** [3] - 2:1, 107:3, 107:12
**reach** [1] - 66:16
**reactions** [1] - 67:16
**read** [1] - 14:20
**ready** [4] - 5:3, 6:11, 7:7, 78:23
**real** [4] - 12:7, 67:17, 67:18
**reality** [1] - 40:5
**realized** [1] - 85:2
**really** [14] - 5:25, 22:13, 61:24, 64:7, 65:17, 66:5, 73:19, 73:21, 74:1, 83:6, 85:12, 86:24, 95:6, 95:24
**realm** [3] - 39:6, 39:15, 40:5
**rear** [1] - 64:4
**reason** [3] - 8:7, 50:15, 90:6
**reasons** [2] - 35:18, 60:16
**reassigned** [1] - 44:21
**Rebecca** [1] - 4:10
**REBECCA** [1] - 1:13
**rebut** [2] - 33:22, 63:8
**received** [6] - 12:18, 16:19, 18:9, 19:10, 36:3, 66:13
**receptive** [1] - 96:14
**recess** [4] - 78:16, 78:17, 106:1, 106:2
**recognize** [4] - 68:9, 99:9, 99:13, 102:17
**recognized** [3] -

58:21, 64:1, 81:14
**recollection** [5] - 84:10, 87:10, 95:14, 95:17, 105:3
**recommendation** [2] - 103:6, 103:8
**recommended** [3] - 64:12, 97:19, 100:8
**reconnect** [1] - 31:18
**reconnected** [1] - 27:2
**reconnection** [1] - 35:6
**record** [2] - 4:8, 54:18
**recruiting** [2] - 9:17, 91:23
**redirect** [3] - 48:8, 72:22, 72:23
**Redirect** [1] - 3:6
**REDIRECT** [1] - 48:9
**Reed** [1] - 4:23
**REED** [1] - 1:23
**reestablish** [1] - 31:23
**refer** [1] - 10:20
**referring** [1] - 88:2
**refined** [2] - 20:15
**regard** [1] - 17:20
**regretted** [1] - 65:23
**regulations** [2] - 48:19, 49:3
**rejoined** [1] - 90:1
**related** [3] - 16:14, 16:23, 36:18
**relation** [3] - 37:7, 52:10, 56:15
**released** [1] - 93:9
**relevance** [6] - 31:11, 32:3, 33:12, 56:2, 62:8, 67:21
**relevant** [6] - 19:7, 32:10, 33:17, 33:19, 62:21, 73:11
**remade** [1] - 31:14
**remain** [2] - 31:9, 53:23
**remained** [2] - 33:3
**remains** [1] - 60:14
**remember** [13] - 15:10, 15:12, 19:8, 22:9, 48:11, 59:23, 62:3, 62:7, 67:17, 67:25, 85:11, 85:16, 100:11
**remind** [1] - 75:8
**Reno** [1] - 58:4
**reorganizational** [1] - 17:1
**reparative** [1] - 58:25

**repeat** [1] - 48:23
**repeating** [1] - 67:1
**rephrase** [1] - 52:24
**reply** [2] - 20:17, 20:18
**report** [2] - 30:22, 59:9
**reported** [1] - 10:12
**REPORTED** [1] - 2:1
**REPORTER** [3] - 51:22, 65:7, 101:23
**Reporter** [2] - 2:1, 107:12
**reports** [2] - 59:9, 59:15
**represent** [1] - 54:14
**representatives** [1] - 97:14
**reputation** [3] - 51:1, 51:4, 96:16
**requesting** [1] - 78:2
**requests** [1] - 67:12
**required** [4] - 18:13, 29:2, 47:7, 47:8
**requirement** [2] - 17:17, 44:4
**requirements** [7] - 29:14, 46:22, 46:25, 47:1, 67:11, 67:12
**researching** [1] - 94:18
**reserve** [1] - 8:21
**Reserves** [1] - 64:4
**resolve** [2] - 58:20, 61:6
**resource** [1] - 11:2
**resources** [4] - 27:23, 39:4, 39:11, 39:12
**respect** [1] - 6:2
**responding** [1] - 52:18
**response** [1] - 51:13
**responsibilities** [10] - 9:11, 10:8, 10:9, 10:14, 10:15, 17:23, 23:2, 25:21, 30:21, 61:4
**responsibility** [2] - 9:15, 22:19
**responsible** [6] - 10:11, 30:23, 47:2, 49:8, 60:19, 97:25
**restaurants** [1] - 86:2
**restricted** [1] - 43:2
**result** [2] - 8:22, 61:7
**results** [1] - 30:24
**retain** [1] - 58:23
**retention** [1] - 11:3

**retired** [7] - 9:6, 9:9, 29:23, 30:5, 31:10, 33:8, 64:6
**retirement** [2] - 9:18, 33:14
**retrain** [1] - 59:2
**revenue** [7] - 30:24, 88:12, 88:13, 89:1, 89:2, 89:4, 89:23
**Review** [1] - 14:18
**reward** [1] - 89:4
**rewards** [2] - 91:8, 91:9
**rise** [1] - 78:15
**rising** [1] - 85:14
**ritual** [4] - 92:20, 103:14, 103:17, 104:1
**rituals** [2] - 92:23, 96:8
**Rivera** [1] - 4:24
**RIVERA** [1] - 1:24
**Robert** [5] - 25:1, 25:13, 43:25, 72:3, 94:10
**role** [18] - 9:11, 9:12, 10:23, 11:25, 25:16, 25:17, 26:12, 29:6, 30:19, 31:14, 35:16, 46:20, 55:16, 59:6, 59:8, 66:9, 90:25, 91:2
**roles** [1] - 56:23
**Room** [1] - 2:3
**room** [1] - 81:14
**rooms** [2] - 40:17, 88:8
**roots** [1] - 87:23
**ROSS** [3] - 1:13, 4:15, 80:13
**Ross** [1] - 4:10
**rotated** [1] - 40:19
**ROTC** [1] - 8:22
**ROTHSTEIN** [4] - 1:14, 62:17, 77:21, 78:4
**Rothstein** [2] - 4:11, 78:10
**roughly** [1] - 89:12
**route** [1] - 85:3
**routes** [2] - 55:18, 56:10
**rule** [1] - 5:9
**ruled** [1] - 50:24
**rules** [5] - 48:12, 48:18, 49:3, 49:4, 49:5
**run** [1] - 31:4
**ruled** [1] - 50:24
**running** [2] - 73:16, 105:11

## S

**Sachs** [2] - 31:17, 31:18
**safer** [1] - 61:9
**safety** [3] - 57:10, 58:7, 103:23
**sailors** [1] - 99:18
**sake** [1] - 88:24
**salary** [1] - 85:9
**sale** [1] - 88:9
**sales** [1] - 88:10
**San** [3] - 13:21, 13:22, 41:2
**Santiago** [2] - 4:11, 71:20
**SANTIAGO** [12] - 1:15, 56:2, 62:8, 67:21, 70:9, 70:14, 70:19, 70:22, 71:3, 71:21, 71:23, 72:21
**Sarah** [1] - 4:11
**SARAH** [1] - 1:15
**sat** [2] - 44:9, 66:20
**satellites** [1] - 17:22
**saw** [5] - 19:23, 22:19, 44:19, 44:20, 67:1
**scale** [5] - 27:11, 29:12, 29:15, 29:21, 97:2
**scaleable** [3] - 23:10, 34:3, 34:10
**scales** [1] - 39:9
**scandals** [1] - 97:11
**SCANLON** [23] - 1:20, 78:7, 78:9, 78:14, 78:20, 78:23, 82:2, 82:13, 99:6, 99:8, 102:1, 102:13, 102:16, 102:25, 103:1, 103:10, 103:12, 104:4, 104:5, 104:17, 104:18, 105:14, 105:16
**Scanlon** [4] - 4:17, 78:19, 81:25, 82:11
**scholarship** [1] - 8:22
**scholarships** [1] - 31:6
**school** [5] - 82:21, 82:22, 84:20, 90:8, 90:17
**science** [1] - 8:17
**scope** [3] - 48:21, 49:23, 50:6
**scoring** [1] - 41:16
**scrapping** [1] - 86:21

**scroll** [1] - 99:10
**scrolling** [2] - 99:11, 102:20
**searched** [1] - 93:12
**seat** [4] - 54:6, 81:16, 81:24, 82:10
**seated** [1] - 7:4
**second** [3] - 83:19, 100:24, 102:21
**secure** [2] - 32:18, 42:13
**see** [16] - 26:23, 33:15, 65:18, 67:10, 67:16, 67:19, 76:9, 78:5, 83:17, 84:6, 99:24, 99:25, 102:24, 104:11, 104:19, 105:6
**seeing** [1] - 98:18
**seek** [1] - 64:9
**seeking** [1] - 36:15
**selected** [2] - 93:16, 94:7
**self** [2] - 23:22, 92:23
**self-actualized** [1] - 23:22
**self-awareness** [1] - 92:23
**sell** [3] - 88:7, 88:22, 88:23
**Senate** [1] - 44:6
**send** [2] - 20:13, 58:23
**senior** [19] - 11:17, 14:12, 18:11, 19:15, 23:9, 26:16, 38:21, 46:11, 47:14, 49:7, 49:13, 56:15, 56:17, 56:18, 85:14, 93:22, 96:8, 104:1
**seniors** [1] - 40:2
**sense** [2] - 22:1, 76:16
**separate** [1] - 98:13
**September** [3] - 13:24, 24:19, 105:7
**series** [3] - 92:14, 97:10, 103:20
**servant** [1] - 65:3
**serve** [2] - 30:20, 31:2
**served** [1] - 30:14
**service** [7] - 28:17, 33:10, 33:22, 36:24, 88:15, 88:19
**services** [34] - 9:13, 17:10, 22:12, 24:12, 25:8, 26:15, 26:19, 30:17, 31:2, 32:8, 32:12, 32:17, 32:22, 32:23, 32:24, 33:2,

33:15, 33:18, 34:9, 35:5, 36:2, 36:3, 36:10, 38:4, 38:11, 39:15, 43:5, 44:8, 46:25, 47:1, 63:6, 70:13, 70:17, 94:24
**Services** [1] - 44:6
**services'** [1] - 44:3
**serving** [1] - 30:13
**SESSION** [1] - 1:7
**session** [3] - 19:2, 85:12, 97:18
**sessions** [1] - 40:20
**set** [7] - 10:15, 10:16, 20:11, 57:15, 58:15, 97:6, 104:9
**setting** [1] - 47:3
**settling** [1] - 78:22
**seven** [1] - 69:8
**several** [10] - 15:7, 15:8, 18:19, 19:2, 20:2, 68:12, 89:16, 95:8, 97:21, 101:3
**sexual** [1] - 97:10
**Shana** [1] - 79:4
**shape** [1] - 81:10
**share** [2] - 26:5, 71:10
**shareholder** [1] - 93:21
**sharing** [3] - 61:19, 67:2, 69:23
**sharpened** [1] - 90:12
**Shelanski** [2] - 97:24, 101:5
**short** [4] - 19:20, 33:5, 89:18, 104:9
**shortfall** [1] - 39:13
**shortly** [2] - 37:15, 102:10
**show** [3] - 21:1, 63:5, 75:5
**show..** [1] - 63:4
**showing** [2] - 22:4, 27:14
**side** [5] - 11:23, 12:1, 12:2, 29:7, 94:1
**signal** [1] - 94:2
**significant** [4] - 92:9, 102:2, 102:3, 102:4
**similar** [4] - 25:10, 32:23, 68:24, 86:11
**Simon** [1] - 97:15
**Simone** [1] - 4:24
**SIMONE** [1] - 1:24
**simple** [2] - 33:5, 71:14
**simplicity** [1] - 71:15
**simply** [3] - 33:1,

66:3, 68:24
**Sinek** [1] - 97:15
**sit** [2] - 65:19, 80:17
**sitting** [1] - 74:16
**six** [3] - 9:6, 59:9, 59:20
**Sixth** [1] - 5:13
**skies** [1] - 61:9
**skill** [1] - 21:23
**skills** [1] - 85:13
**slightly** [1] - 98:12
**small** [4] - 39:10, 55:12, 64:2, 87:10
**smaller** [3] - 29:21, 35:13, 35:14
**snippet** [1] - 67:2
**sold** [1] - 89:8
**solely** [1] - 66:21
**solve** [3] - 28:6, 35:21
**solving** [1] - 35:25
**someone** [4] - 49:2, 51:5, 51:6, 82:25
**sometime** [2] - 22:8, 37:13
**sometimes** [6] - 20:17, 20:18, 22:3, 39:23, 56:12, 61:6
**somewhat** [1] - 34:13
**somewhere** [7] - 13:24, 22:9, 41:1, 87:10, 91:18, 94:14, 95:15
**son** [1] - 83:19
**soon** [2] - 77:16, 78:23
**sophomore** [1] - 83:2
**sorry** [8] - 30:1, 35:5, 51:22, 60:8, 65:7, 74:19, 75:13, 101:24
**sort** [21] - 6:19, 10:22, 11:10, 11:17, 14:16, 17:16, 20:11, 21:8, 21:12, 21:14, 21:15, 21:19, 21:21, 22:16, 23:3, 23:21, 27:7, 41:10, 46:11, 100:14, 105:8
**sought** [1] - 62:16
**sounds** [2] - 15:5, 77:15
**South** [1] - 8:15
**space** [2] - 26:20, 98:19
**speaker** [1] - 97:16
**speaking** [4] - 54:13, 69:14, 70:8, 70:17
**special** [1] - 90:15

**specific** [16] - 10:24, 11:11, 12:21, 12:22, 18:7, 21:11, 26:12, 28:16, 40:7, 43:24, 46:20, 51:2, 51:7, 51:19, 52:15, 58:6
**specifically** [6] - 15:1, 33:12, 50:11, 52:3, 52:4, 52:9
**spell** [2] - 7:25, 37:3
**spelling** [1] - 82:16
**spent** [2] - 63:25, 89:18
**split** [1] - 105:4
**spread** [1] - 11:15
**spring** [7] - 20:22, 22:8, 24:8, 35:10, 37:21, 37:23, 83:18
**spun** [1] - 41:13
**staff** [6] - 9:13, 15:18, 24:21, 25:22, 26:2, 27:3
**stand** [4] - 7:12, 47:5, 47:9, 82:4
**Standard** [3] - 83:23, 83:24, 84:12
**standard** [1] - 25:10
**standards** [10] - 21:14, 57:1, 57:24, 59:4, 60:12, 60:14, 60:15, 60:25, 61:19, 64:6
**standing** [1] - 53:23
**standpoint** [3] - 16:4, 17:5, 46:23
**stands** [2] - 78:16, 105:25
**Stanley** [2] - 84:6, 87:18
**star** [18] - 9:10, 9:23, 9:24, 10:1, 10:2, 10:9, 10:10, 10:11, 10:12, 10:13, 13:13, 19:12, 19:13, 24:14, 24:18, 24:23, 44:18
**star's** [1] - 10:15
**start** [6] - 54:17, 76:21, 76:23, 76:25, 84:7, 86:8
**started** [13] - 9:3, 35:9, 41:12, 85:24, 86:10, 86:25, 87:1, 87:22, 92:2, 93:23, 94:18, 96:13, 102:10
**starting** [4] - 4:8, 84:21, 86:8, 86:24
**state** [2] - 7:25, 54:17
**STATES** [4] - 1:1, 1:3, 1:11, 1:15

**States** [14] - 2:2, 4:5, 4:10, 9:10, 9:15, 9:21, 10:5, 18:23, 18:25, 33:9, 39:19, 41:3, 41:4, 107:13
**stating** [1] - 82:16
**station** [1] - 11:4
**stay** [6] - 19:25, 20:3, 38:16, 80:20, 83:14, 89:9
**stayed** [1] - 42:14
**stenographic** [1] - 107:5
**step** [3] - 53:14, 72:25, 80:16
**Stephanie** [1] - 4:11
**steward** [2] - 65:2, 68:24
**sticks** [1] - 85:20
**still** [6] - 6:4, 28:15, 60:14, 64:3, 75:14, 75:24
**stop** [2] - 94:12, 105:15
**store** [2] - 86:15, 86:16
**story** [1] - 97:5
**Street** [3] - 1:16, 1:21, 90:11
**strike** [1] - 62:24
**struggle** [1] - 21:24
**struggled** [2] - 95:25, 96:18
**struggling** [3] - 11:17, 17:15, 51:22
**students** [1] - 86:1
**stuff** [1] - 46:21
**subcontractor** [1] - 100:9
**subject** [1] - 21:16
**subordinates** [3] - 18:21, 98:17, 99:20
**subsequently** [3] - 44:21, 71:9, 102:8
**successful** [2] - 68:9, 94:20
**suggest** [2] - 16:25, 78:1
**suggested** [1] - 77:14
**suggesting** [3] - 33:21, 62:24, 73:12
**Suite** [1] - 1:22
**SULLIVAN** [1] - 1:20
**summer** [1] - 85:7
**super** [1] - 98:4
**support** [3] - 59:12, 60:5, 102:9
**supporting** [1] - 61:2
**survivors** [1] - 30:14

sustained [4] - 50:1, 67:22, 70:10, 70:15
switch [1] - 61:10
sworn [2] - 7:13, 82:5
SWORN [3] - 7:16, 54:2, 82:8
Sydney [1] - 55:19
system [3] - 17:25, 58:8, 58:21
systems [3] - 16:23, 17:22

## T

takeaway [3] - 23:3, 23:5, 60:24
talent [1] - 12:9
task [3] - 66:21, 97:6, 97:20
tasked [2] - 97:10, 97:13
taught [1] - 85:14
teaching [1] - 92:6
team [11] - 22:14, 59:10, 59:12, 60:1, 64:2, 71:11, 71:12, 92:18, 92:19, 92:25
teams [1] - 92:17
technologies [1] - 17:20
technology [5] - 11:25, 26:21, 41:11, 41:12, 41:14
technology-based [1] - 41:11
TED [1] - 97:15
ten [4] - 56:23, 56:25, 78:5, 90:16
tend [3] - 61:5
tended [1] - 44:4
tenets [1] - 23:20
tens [4] - 29:16, 39:6, 39:8, 41:21
term [2] - 85:20, 101:7
terms [7] - 9:16, 48:19, 79:2, 93:17, 96:12, 100:15
terribly [1] - 73:11
testified [2] - 33:25, 44:9
testifies [1] - 77:23
testify [10] - 5:12, 8:8, 33:12, 33:13, 44:5, 44:8, 74:2, 75:16, 75:25, 76:3
testifying [2] - 8:5, 54:20

testimony [11] - 32:13, 33:25, 34:12, 53:14, 62:21, 63:8, 72:25, 73:9, 76:15, 81:11, 105:20
Texas [4] - 13:21, 20:22, 41:2, 55:22
THE [151] - 1:1, 1:10, 1:13, 1:16, 1:18, 1:23, 4:1, 4:4, 4:13, 4:20, 5:1, 5:5, 5:16, 6:6, 6:8, 6:14, 6:17, 6:21, 6:25, 7:3, 7:12, 7:14, 7:17, 7:19, 13:7, 13:10, 13:13, 13:15, 20:6, 20:8, 20:10, 25:3, 30:2, 31:12, 31:13, 32:4, 32:20, 33:20, 34:15, 34:20, 34:24, 36:7, 36:14, 36:17, 45:7, 45:9, 46:6, 46:7, 48:8, 48:22, 48:23, 50:1, 50:8, 50:21, 51:11, 51:22, 51:25, 52:7, 52:17, 52:24, 53:13, 53:16, 53:18, 53:22, 53:24, 53:25, 54:3, 54:4, 54:6, 54:7, 54:8, 56:3, 56:4, 62:9, 62:12, 62:23, 63:4, 63:7, 63:11, 63:15, 63:18, 65:7, 65:8, 67:22, 70:10, 70:15, 70:23, 70:24, 71:4, 71:5, 71:19, 72:22, 72:24, 73:2, 73:4, 73:8, 73:16, 74:3, 74:7, 74:13, 74:19, 74:21, 75:3, 75:5, 75:8, 75:11, 75:17, 76:8, 76:11, 76:16, 76:19, 77:2, 77:5, 77:11, 77:13, 77:18, 78:1, 78:5, 78:8, 78:13, 78:15, 78:19, 78:22, 78:25, 79:11, 79:15, 79:19, 79:22, 80:2, 80:12, 80:14, 80:15, 80:16, 80:19, 80:21, 80:24, 81:1, 81:6, 81:10, 81:15, 81:20, 81:23, 82:4, 82:6, 82:9, 82:11, 101:23, 101:24, 105:15, 105:17, 105:25
theirs [1] - 66:16
themed [1] - 69:22
themselves [3] -

31:8, 59:17, 68:25
theories [1] - 16:5
theory [1] - 94:12
thereafter [1] - 102:10
Thereupon [5] - 53:20, 78:17, 79:17, 80:22, 106:2
they've [1] - 75:21
thinking [9] - 29:5, 68:19, 75:14, 75:15, 75:25, 77:6, 85:16, 89:22, 98:13
ThinkPads [1] - 88:22
third [1] - 95:1
Thomas [1] - 8:2
THOMAS [1] - 8:3
thoughts [3] - 16:22, 21:4, 22:11
thousands [1] - 29:15
threatened [1] - 96:18
three [21] - 9:10, 9:23, 9:24, 10:1, 10:10, 10:12, 10:15, 13:13, 21:19, 24:14, 24:18, 24:23, 44:18, 56:9, 56:11, 56:15, 58:1, 59:19, 92:14, 93:16, 94:8
three-day [1] - 92:14
three-star [11] - 9:10, 9:23, 9:24, 10:1, 10:10, 10:12, 13:13, 24:14, 24:18, 24:23, 44:18
three-star's [1] - 10:15
three-way [1] - 21:19
throughout [2] - 86:10, 95:22
Thursday [3] - 69:18, 69:20, 69:21
Thursdays [1] - 70:5
tier [1] - 88:15
timeframe [5] - 22:10, 35:8, 57:15, 64:12, 95:15
timing [1] - 92:2
title [1] - 10:24
today [11] - 4:25, 8:5, 8:8, 43:19, 53:14, 54:21, 72:25, 75:19, 77:18, 78:3, 89:10
together [6] - 44:4, 44:5, 58:11, 84:8, 84:22, 92:17
tomorrow [1] - 79:6

tonight [3] - 77:10, 77:11, 79:3
took [6] - 24:18, 25:2, 25:7, 25:14, 40:22, 87:23
tool [4] - 99:15, 99:17, 103:15, 103:16
tools [1] - 98:22
top [1] - 96:18
top-down [1] - 96:18
topics [1] - 99:20
total [2] - 69:8, 104:6
touch [3] - 83:14, 84:1, 97:4
touched [1] - 25:23
Touhy [1] - 33:11
tour [3] - 21:1, 37:25, 40:22
tours [1] - 91:20
track [1] - 16:24
traditional [1] - 87:17
traffic [1] - 7:6
train [2] - 58:15, 104:2
training [71] - 8:22, 9:17, 12:21, 12:23, 12:25, 13:4, 14:4, 14:5, 14:6, 16:19, 17:9, 18:9, 18:15, 19:10, 19:20, 19:24, 20:24, 21:8, 22:12, 23:4, 23:5, 23:20, 24:5, 26:21, 27:24, 28:5, 32:23, 32:24, 33:10, 33:15, 35:12, 37:22, 37:25, 39:15, 39:24, 40:12, 40:15, 40:20, 41:5, 41:9, 41:14, 41:20, 41:22, 42:22, 42:23, 42:25, 43:5, 49:9, 49:19, 58:7, 61:17, 61:22, 62:16, 64:10, 65:2, 65:21, 65:24, 66:10, 66:13, 66:25, 69:15, 70:2, 72:16, 93:2, 96:24, 98:12, 100:25, 101:2, 101:20, 103:15
trainings [4] - 59:11, 68:8, 71:8, 71:11
trait [2] - 51:10, 52:16
transcript [2] - 107:5, 107:6
TRANSCRIPT [1] - 1:10
transition [2] - 9:17, 87:4
translate [3] - 15:3,

27:9, 27:11
transparent [3] - 91:24, 96:2, 96:19
travel [2] - 15:20, 96:7
treat [1] - 76:14
TREVOR [1] - 1:10
TRIAL [1] - 1:10
trip [2] - 35:10, 61:20
true [2] - 107:4, 107:5
truly [1] - 66:4
truthfully [1] - 8:8
try [6] - 12:1, 18:15, 21:6, 21:12, 24:3, 95:2
trying [12] - 11:22, 17:14, 19:20, 23:22, 27:9, 27:11, 28:7, 61:1, 62:13, 79:23, 95:23
Tufts [2] - 83:17, 85:25
turn [1] - 100:24
turned [1] - 57:11
turning [2] - 70:5, 103:10
TWA [1] - 58:4
two [25] - 10:2, 10:9, 10:11, 10:13, 18:19, 19:13, 21:13, 26:3, 26:11, 31:4, 36:18, 44:9, 56:10, 56:13, 56:15, 69:11, 69:12, 75:13, 79:7, 79:13, 83:25, 94:23, 98:23, 105:4
two-star [5] - 10:2, 10:9, 10:11, 10:13, 19:13
Type [1] - 59:23
type [2] - 94:19, 98:4
types [1] - 93:12
typically [3] - 47:4, 47:19, 92:13

## U

U.K [4] - 91:4, 91:6, 91:7
U.S [7] - 18:22, 72:5, 72:8, 72:11, 86:10, 97:2, 99:18
ultimate [2] - 29:3, 38:21
ultimately [8] - 62:15, 63:1, 64:9, 68:18, 85:22, 87:23, 90:11, 99:4

**ultra** [2] - 55:19, 55:23
**under** [3] - 8:5, 54:20, 76:8
**undergrad** [1] - 8:12
**underlying** [2] - 60:3, 61:8
**understood** [2] - 14:20, 50:21
**unfortunately** [1] - 29:13
**unhealthy** [1] - 61:6
**uniform** [3] - 30:13, 30:14, 30:20
**uniformed** [2] - 19:6, 26:16
**union** [3] - 60:13, 60:19, 60:22
**unique** [10] - 17:2, 19:21, 19:22, 28:4, 28:9, 60:11, 67:4, 67:5, 92:5
**united** [2] - 2:2, 58:2
**UNITED** [4] - 1:1, 1:3, 1:11, 1:15
**United** [15] - 4:5, 4:10, 9:10, 9:14, 9:21, 10:5, 18:23, 18:25, 33:9, 39:19, 41:3, 41:4, 58:2, 107:13
**University** [3] - 8:14, 83:10, 83:17
**unless** [2] - 5:20, 75:3
**unlock** [1] - 18:15
**unpack** [1] - 28:1
**unusual** [1] - 26:22
**up** [36] - 8:11, 12:13, 15:14, 15:20, 20:11, 22:18, 23:21, 29:9, 38:18, 39:8, 44:17, 44:20, 47:3, 47:5, 47:9, 52:16, 58:15, 59:1, 73:20, 76:12, 80:20, 85:18, 87:15, 89:10, 89:13, 89:25, 90:5, 91:3, 91:7, 91:9, 91:14, 97:6, 99:6, 102:13, 104:9, 104:15
**URQUHART** [1] - 1:20
**USAir** [1] - 58:4
**useable** [2] - 34:3, 42:19
**useful** [3] - 33:3, 63:6, 80:11
**useless** [1] - 74:11
**users** [3] - 89:5, 104:7, 104:15
**utilized** [1] - 41:17

## V

**valid** [3] - 33:2, 33:3
**valuable** [1] - 63:6
**value** [5] - 16:18, 33:17, 64:19, 67:1, 89:5
**values** [1] - 31:2
**variety** [5] - 11:22, 39:9, 41:17, 91:3, 99:20
**various** [3] - 15:21, 40:22, 60:4
**vast** [1] - 42:21
**vehicle** [1] - 100:7
**versus** [1] - 4:5
**veterans** [1] - 31:7
**vice** [3] - 44:17, 44:21, 60:20
**videoconferenced** [1] - 101:14
**videos** [1] - 72:18
**view** [3] - 79:14, 80:10, 81:10
**views** [3] - 73:24, 80:3, 81:8
**Virginia/D.C** [1] - 41:1
**visit** [9] - 21:9, 22:7, 22:12, 24:6, 24:8, 26:7, 26:10, 31:22, 102:2
**visited** [3] - 20:14, 20:23, 83:18
**visiting** [3] - 20:22, 26:9, 31:18
**voir** [2] - 80:4, 80:6
**voir-dire** [2] - 80:4, 80:6
**vote** [1] - 92:22
**vs** [1] - 1:5

## W

**W-O-O-D** [1] - 54:19
**Wackerman** [6] - 62:4, 62:5, 62:6, 63:21, 63:24, 69:7
**Wackerman's** [1] - 64:8
**walked** [1] - 81:14
**Wall** [1] - 90:10
**wants** [2] - 75:25, 88:20
**war** [2] - 28:23, 65:7
**war-fighting** [1] - 28:23
**ware** [1] - 41:8

**warfare** [2] - 11:18, 11:19
**Washington** [5] - 1:6, 1:17, 1:22, 2:4, 107:14
**watched** [1] - 72:18
**ways** [14] - 13:1, 13:4, 17:15, 18:4, 19:22, 20:2, 22:4, 26:3, 27:11, 29:2, 61:6, 83:19, 88:5, 96:16
**weapons** [1] - 17:25
**webinar** [1] - 65:1
**website** [2] - 86:24, 87:20
**websites** [1] - 86:23
**week** [1] - 65:23
**weekend** [2] - 5:14, 6:4
**weekly** [1] - 65:1
**weeks** [1] - 87:4
**weighs** [1] - 56:4
**weighty** [1] - 61:5
**welcome** [2] - 7:4, 81:23
**Wesleyan** [3] - 83:10, 83:13, 83:21
**West** [1] - 58:4
**whatsoever** [1] - 43:20
**wheelhouse** [1] - 84:24
**white** [1] - 88:15
**whole** [4] - 60:22, 85:14, 92:21, 104:25
**wider** [1] - 11:15
**wild** [1] - 89:3
**WILLIAM** [1] - 1:18
**willing** [2] - 20:3, 20:12
**win** [1] - 39:20
**wing** [5] - 18:25, 19:16, 86:2, 86:15, 86:16
**wired** [1] - 66:16
**wise** [2] - 94:13, 102:6
**wish** [1] - 64:14
**WITNESS** [20] - 3:3, 7:16, 13:13, 20:6, 20:10, 31:13, 45:7, 46:7, 48:23, 53:16, 53:24, 54:2, 54:7, 56:4, 65:8, 70:24, 71:5, 73:2, 82:8, 101:24
**witness** [17] - 5:3, 5:10, 6:11, 6:12, 7:9, 36:15, 53:17, 53:19,

62:24, 73:3, 74:18, 76:7, 76:14, 79:2, 79:5, 79:15, 82:1
**witnessed** [1] - 50:20
**witnesses** [9] - 6:19, 73:20, 74:4, 74:25, 75:18, 76:6, 79:2, 79:7, 79:13
**Wood** [12] - 3:7, 53:20, 54:5, 54:12, 54:15, 54:19, 55:7, 70:17, 72:24, 74:23, 79:25, 81:3
**WOOD** [1] - 54:2
**word** [1] - 85:25
**words** [1] - 100:6
**workforce** [2] - 9:18, 36:2
**working/what's** [1] - 92:16
**works** [2] - 60:18, 79:24
**world** [6] - 12:6, 65:5, 65:7, 65:8, 66:18, 69:22
**worried** [2] - 22:20, 60:2
**worry** [2] - 89:22, 89:23
**Worth** [1] - 55:22
**wow** [1] - 56:8
**written** [2] - 94:9, 94:22

## Y

**year** [9] - 8:24, 8:25, 28:14, 39:13, 39:17, 83:2, 83:11, 86:21
**yearly** [1] - 44:6
**years** [19] - 9:6, 30:11, 34:7, 39:25, 55:1, 55:15, 56:23, 56:25, 57:4, 57:6, 57:25, 58:18, 58:21, 59:1, 65:17, 81:13, 83:25, 86:20, 90:16
**Yongchul** [1] - 4:5
**YONGCHUL** [1] - 1:6
**York** [16] - 1:25, 15:9, 15:12, 15:14, 15:20, 31:15, 31:16, 35:10, 37:17, 40:9, 61:16, 69:24, 84:6, 87:15, 87:16
**yourselves** [1] - 4:8

## Z

**zones** [2] - 42:8, 42:11
**Zoom** [1] - 67:9