**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 1:24-cr-00265 (2)(3) (TNM)** |
| | **:** | |
| **YONGCHUL "CHARLIE" KIM and** | **:** | |
| **MEGHAN MESSENGER,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

**UNITED STATES' REPLY TO DEFENDANTS' OPPOSITION TO
*MOTION IN LIMINE* TO ADMIT CERTAIN EVIDENCE**

1. *Evidence Concerning Next Jump's Products and the January 2022 Contract*

The parties have already extensively litigated the extent to which the Court should allow the government to admit evidence concerning the quality, fit, and reception by the Navy to Next Jump's products and services, and concerning the amount of time it took the Navy to implement Next Jump's January 2022 contract with Admiral Robert Burke's command. *See* ECF Nos. 176, 201, 214, 365, 370, 376, 379. The government will not belabor all those arguments again here. We will, however, reiterate that the fundamental premise on which Defendants' position is based— that evidence concerning the Navy's view of Next Jump's products and services is not relevant to Defendants' state of mind because they were somehow unaware of those views—is false. The government's evidence unequivocally demonstrates that Defendants *were* aware of those issues.

To take a few examples, on July 23, 2019, Defendants were informed by a Next Jump employee that there were "'rumors and hearsay' [] that some in the Navy are not satisfied with our Task 1 Performance[.]" GOVEX 6. On April 13, 2021, Kim wrote to Messenger and others, referring to the prior pilot program, that the "beta didn't quite work" and was "non-success[ful.]" GOVEX 34. On August 12, 2021, Juliet Beyler wrote to Burke that she had "talked with Meghan and Charlie and explained that we have decided not to proceed[,]" and that she told them she was

"not comfortable obligating significant funds on something that we might find no value in." GOVEX 179. She also listed several "talking points" which included, among other things, that Next Jump's product / program was "not effective, scalable or sustainable for us." *Id.* On September 22, 2021, Burke sent some highly negative "unfiltered Sailor feedback" to Defendants and informed them that "the tool in and of itself does not stand on its own[,]" that "your current app-based approach … just does not seem to be sustainable or scalable for us[,]" and that Burke "just can't do this as structured." GOXEX 68.

Moreover, while the fit and quality of Next Jump's products and services is by no means the focus of the government's case, it is nonetheless inextricably intertwined with critical portions thereof. For example, to put into context the charged conduct the government must admit evidence and testimony concerning Next Jump's original one-year pilot program with the Navy, including that the contract was not extended at the conclusion of the pilot period, which in turn caused Defendants to continue communicating with Burke and others in an effort to obtain another contract. But how could the government possibly explain *why* the pilot was not extended unless we are allowed to introduce at least limited evidence that the Navy concluded that Next Jump was not scalable or a good fit for the Navy's needs? Or that Defendants, *see, e.g.*, 8/19/2025 AM Trial Tr. at 37:14-38:6 (Beyler testifying that she personally informed Defendants at the conclusion of the pilot program about some of the difficulties the Navy encountered in implementing Next Jump's product), and Burke, *see id.* at 33:22-34:1, 36:23-37:1, 38:19-21, were also aware of that fact? The simple answer is that it is not possible. Consequently, precluding the evidence would leave the jury with an incomplete record of events that are inextricably intertwined to the charged conduct.

As another example, the government must present evidence that Burke's most trusted advisor, Beyler, counseled him not to contract with Next Jump but that he did so anyway—presumably, as the government is entitled to argue, because he and Defendants had entered into a corrupt agreement. Yet, were the Court to adopt Defendants' position, the government would be precluded from explaining to the jury *why* Beyler advised Burke not to contract with Next Jump in 2021. Nor would the government be able to present evidence, as it did at the first trial, that Burke proceeded to order the Next Jump contract even though he was advised that the Navy already had a different similar product in place that was a better fit. *See, e.g.*, 8/19/2025 PM Trial Tr. at 9:16-10:1, 11:12-13:5.

To take another example, Defendants repeatedly argue that any feedback to their January 2022 training is irrelevant because it occurred after Burke had already approved the contract. But the government's case, including as alleged in the indictment, is that the corrupt agreement involved *multiple* "phases," and that one of those phases was for Burke to continue advocating within the Navy and elsewhere on Next Jump's behalf *after* securing the contract with his command in order to help Defendants secure larger, more lucrative contracts. The government's evidence unequivocally demonstrates that Burke was aware of the negative feedback following the January 2022 training, but that he nonetheless attempted to fulfill his end of the corrupt bargain he struck with Defendants by advocating on their behalf anyway. But if the government were precluded from introducing even limited evidence that the January 2022 training was a failure, then the jury would be deprived of compelling evidence showing that the only possible reason Burke continued advocating for Next Jump after receiving that feedback was because he had been bribed. Indeed, without introducing evidence that the January 2022 training was a failure, how would the government even explain to the jury how or why Next Jump never got its coveted "all-

Navy" deal or "all DoD" deal?  Again, the jury would be left with a gaping hole in understanding the government's case.  As just one example of why the evidence is necessary—in GOVEX 106 Beyler and her team discussed providing the training feedback package to Burke, with Beyler writing there would be "no expansion to the contract[,] [t]hat's the final answer, [and] I will bottom line that hard no if you need me to."  In response, Amanda Kraus wrote that she had already informed Next Jump that "the command was not committing additional funds at this time." *Id.*  In short, were the Court to adopt Defendants' position and prohibit the introduction of this evidence, the government is at a loss as to how we could possibly present a complete and coherent case to the jury.  Moreover, it would deprive the jury of its ability to act as a rational arbiter of the facts presented to it, which in this case would undoubtedly allow a rational juror to conclude that Defendants were aware of the negative feedback at the Navy, or at the very least that their product was not a good fit, and that this knowledge at least in part led them to bribe Burke by exchanging a job for a contract.

Finally, as to the speed with which the January 2022 contract was implemented, testimony from several of the government's witnesses clearly established that the Next Jump contract was, in their extensive experience, an exception to the rule, and that it was only implemented that quickly because Burke personally ordered them to get it done.  *See, e.g.*, 8/19/2025 PM Trial Tr. at 70:10-19.  The government's witnesses also testified that, in their extensive experience, it was highly unusual for a senior officer such as Burke to be personally and directly involved in the contracting process at all, much less to order his subordinates to enter into a particular contract with a specific vendor.  *See, e.g.*, 8/21/2025 AM Trial Tr. at 100:14-23; 8/26/2025 PM Trial Tr. at 82:18 – 83:7.  Even Defendants recognized Burke's unique ability to accelerate the process—on December 16, 2021, someone noted to Defendants that Kim had previously observed that "things

with the military can be slow/take time," and asked Defendants whether the contract was "something that may get hung up/delayed[.]" GOVEX 94. Kim responded: "Not when you have [a] 4-star. Can turn around in hours and days. This should be done almost immediately." *Id*. The fact that the January 2022 contract was implemented over a condensed timeframe, because Burke himself gave the order, and that Defendants knew that Burke held such power, is undoubtedly relevant to proving why Defendants were willing to bribe Burke in exchange for that contract in the first place.

2. *Admitting Kim's Prior Testimony*

Defendants complain that the government's motion *in limine* seeking to admit certain portions of Kim's testimony from the previous trial is premature because the government has "not identif[ied] the specific prior statements it seeks to admit[.]" ECF No. 376 at 4. The purpose of the government's motion on this point was to put the Court and Defendants on notice that, unsurprisingly, the government was considering admitting certain of Kim's prior statements in its case-in-chief. The government is not prepared at this time to identify every possible specific statement that it may seek to admit. Indeed, those decisions will likely continue to change and evolve even as the evidence comes in during the trial. That said, in the interests of transparency and resolving potential evidentiary issues in advance of trial, the government *may* seek to admit the following statements, or portions thereof. This list is by no means intended to be exhaustive:

- Statements regarding WhatsApp and text messages: 8/29/2025 AM Trial Tr. at 86:8-11; 9/2/2025 AM Trial Tr. at 129:14 – 132:18; 9/2/2025 PM Trial Tr. at 87:1-17.

- Statements regarding Next Jump compliance and/or ethics policies and trainings: 8/29/2025 AM Trial Tr. at 123:15 – 128:8; 8/29/2025 PM Trial Tr. at 145:8 – 170:21.

- Statements regarding Belga Café and/or Person 3: 8/28/2025 PM Trial Tr. at 129:23 – 137:19, 147:7 – 148:1; 8/29/2025 AM Trial Tr. at 10:7 – 13:8, 15:23 – 16:6; 9/2/2025 PM Trial Tr. at 43:14 – 47:20.

Despite claiming that the government's motion *in limine* is premature, Defendant's nonetheless appear to argue, or at the very least imply, that *no* statements by Kim from the previous trial could be admissible under *Bruton*. But none of the statements identified above, nor likely *any* of Kim's prior statements, rise nearly to the level of the types of incriminating or prejudicial statements that implicate *Bruton*. It is well-settled that *Bruton* applies narrowly, and only where a codefendant's statements are facially incriminating and expressly implicate another defendant:

> But *Bruton,* particularly as it was subsequently interpreted in *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), applies only to a codefendant's statement that "expressly implicat[es]" the defendant. *Bruton,* 391 U.S. at 124 n. 1, 88 S.Ct. at 1621 n. 1. Such evidence is thought to be so incriminating that it constitutes an exception to the general proposition that a judge's limiting instruction will prevent any improper use of the statement by the jury. *Id.* at 135-36, 88 S.Ct. at 1627-28. As *Richardson* made clear, the *Bruton* exception is a narrow one; it applies only to "facially incriminating" confessions that by definition " 'powerfully incriminat[e]' " the defendant and that can be distinguished from statements that become incriminatory only when linked with other evidence introduced at trial. *Richardson,* 481 U.S. at 207-08, 107 S.Ct. at 1707-08 (quoting *Bruton,* 391 U.S. at 135, 88 S.Ct. at 1627).

*United States v. Washington*, 952 F.2d 1402, 1404-05 (D.C. Cir. 1991).

To that end, none of the cases cited in Defendants' opposition avail them. *United States v. Straker*, 800 F.3d 570 (D.C. Cir. 2015), concerned the admission of confessions by co-conspirators. *Washington*, 952 F.2d 1402 (D.C. Cir. 1991), involved the introduction of a non-testifying codefendant's statement that he had participated in drug transaction only at the insistence of an "individual," or "others." *Gray v. Maryland*, 523 U.S. 185 (1998), involved the admission of a (redacted) confession of a codefendant that named the defendant as a perpetrator. *Serio v. United States*, 401 F.2d 989 (D.C. Cir. 1968), involved the admission of a confession by a codefendant which implicated another defendant. And *Samia v. United States*, 599 U.S. 635 (2023), similarly involved the admission of a codefendant's confession that directly incriminated another defendant.

6

The government is unaware of any statement by Kim during the first trial that directly incriminates himself, much less Messenger.  The cases cited by Defendants are inapposite, and the government should be permitted to admit certain prior sworn statements made by Kim during the upcoming trial.  An appropriate limiting instruction by the Court would suffice insofar as none of Kim's statements from the first trial constitute the types of facially incriminating statements by a codefendant at issue in *Bruton* and its progeny.  And, to the extent that any statements by Kim even remotely implicate or incriminate Messenger, then appropriate redactions may also be applied.[1]

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By _____/s/_____
Brian P. Kelly
Rebecca G. Ross
Assistant United States Attorney
601 D Street N.W.
Washington, DC 20530
Office: (202) 252-4490

---

[1] In terms of the mechanics of introducing Kim's prior sworn statements during the government's case-in-chief, we would anticipate marking the specific statements to be introduced, with any appropriate redactions, providing those portions of the trial transcripts to the government's summary agent witness, and having the summary witness read verbatim from those transcripts.